**U.S. Department of Labor**         Wage and Hour Division
                                     Washington, DC 20210



FLSA2019-6

April 29, 2019

Dear **Name***:

This letter responds to your request for an opinion on whether service providers working for a virtual marketplace company (VMC) are employees or independent contractors under the Fair Labor Standards Act (FLSA).  This opinion is based exclusively on the facts you have presented.  You represent that you do not seek this opinion for any party that the Wage and Hour Division (WHD) is currently investigating or for use in any litigation that commenced prior to your request.

**BACKGROUND**

You write on behalf of your client,[1] a virtual marketplace company that operates in the so-called "on-demand" or "sharing" economy.  Generally, a VMC is an online and/or smartphone-based referral service that connects service providers to end-market consumers to provide a wide variety of services, such as transportation, delivery, shopping, moving, cleaning, plumbing, painting, and household services.  VMCs help consumers to obtain these services with greater efficiency—days, weeks, or months faster than they would outside the virtual marketplace.  VMCs accomplish this through a software platform called an analytic hierarchy process—a technological structure for organizing data that uses objective criteria to match consumers to service providers.

Regarding your client specifically, before your client allows service providers to use your platform, it requires them to provide certain basic information:  the service provider's name, contact information, and social security number.  Service providers must also self-certify their experience and qualifications, complete a background check through an accredited third party, and complete an identity check through a different vendor.  Your client also requires them to acknowledge and accept a terms of use agreement and a service agreement, which states that your client provides only a platform for connecting providers with customers and disclaims any employment relationship between your client and the service providers.  Additionally, these agreements state that only the service providers, and not your client, will provide services to consumers in the virtual marketplace.  The agreements also classify the service providers as independent contractors.

Your client does not interview service providers or require them to undergo training.  Once the service providers begin to use its virtual platform, it provides them with information on how the virtual marketplace works, such as tips on best practices through an online resource center, and feedback from existing users (both consumers and service providers) on the level of service that

---

[1] WHD draws the following background information from the representations that you make in your letter.

consumers generally expect.  Your client does its entire onboarding process online and does not require service providers to review any of these materials.  Your client also allows service providers to immediately begin providing work to customers once their account is activated and does not require them to report to a physical office.

Your client's platform consolidates information from a consumer's service request (such as the kind of service needed, location, and date and time) and provides that information to service providers through its virtual platform.  The platform also allows its service providers to communicate with consumers—including through mobile app messaging or masked telephone calls—to exchange details about the requested service, including adjustments to the scope, price, or time.  Your client allows service providers to arrange for repeat business with a consumer, including future jobs outside the virtual marketplace.

Customers using your client's platform pay service providers on a per job basis.  Your client sets default prices based on the region and scope of the service provider's work and uses default price tiers that correspond to the number and type of services being offered.  It also allows its service providers to request (presumably from the customer) to charge different prices based on other factors, including their work experience outside of the virtual marketplace.  Finally, your client issues its service providers Form 1099s reflecting their earnings through your client's platform.

Your client's service agreement allows service providers the right to, among other things: accept, reject, or ignore any service opportunity on the virtual platform; determine whether to accept any service opportunities at all; select service opportunities by time and place; determine the tools, equipment, and materials needed to deliver their services; and hire assistants or personnel.  Your client's agreement provides that it will not inspect a service provider's work for quality or rate the service provider's performance.  Your client does, however, let consumers rate its service providers' performance.  Your client's service agreement also allows service providers to provide their services to consumers through other means, including competing VMC platforms.

Your client does not require a service provider to accept or complete a minimum number of service opportunities.  Your client designates a service provider as "inactive" if they have not taken a job for a certain period of time, but inactive service providers can reactivate their account with a telephone call or email.  Your client also gives service providers the right to "multi-app"—that is, to simultaneously acquire work on a competitor VMC platform in order to determine the most desirable or profitable service opportunity available at any given time.  Your client's service providers often make use of this ability to "multi-app."

Your client's service providers design their own schedules and determine exactly when, where, and how much to work in the virtual marketplace.  Few of them spend full-time hours providing services through your client's platform.  Service providers may consider a variety of factors when determining whether to accept work—such as, for example, fee amount, expected time, dynamic pricing in effect, location, availability of parking, traffic, and access to additional consecutive service opportunities—in order to maximize their profit or fit their work into their individual schedules.  Moreover, service providers may choose between more difficult jobs that are more lucrative, and jobs with less revenue potential, according to their personal needs and profit motives.  However, if a service provider cancels an accepted service opportunity without

sufficient notice, your client will charge a cancellation fee on behalf of the consumer. Your client collects these fees to maintain the integrity of its platform.

Your client does not impose requirements on how its service providers must perform their work, such as what transportation route to take, the order in which to clean an apartment, or the make, model, type, brand, source, or amount of their working materials. Your client is not present when the service provider works and does not monitor, supervise, or control the particulars of that work. Moreover, your client requires service providers to purchase, at their expense, all of their own supplies and equipment. Your client does not reimburse them for operating expenses, such as transportation costs, vehicles, professional certifications, or licensing.

Your client will seek to terminate its relationship only if a service provider who commits a material breach, such as: inappropriate behavior toward a consumer or the VMC; fraud; repeated canceling or rescheduling of service opportunities on short notice; or receiving an aggregate consumer rating below a certain minimum threshold. Your client will initiate this termination process only in these instances to maintain the integrity of its virtual marketplace.

**GENERAL LEGAL PRINCIPLES**

The FLSA applies to those workers whom the FLSA defines as "employees." *See* 29 U.S.C. §§ 206, 207. An "employee" is any individual whom an employer suffers, permits, or otherwise employs to work. *See* 29 U.S.C. §§ 203(e)(1), (g). This definition is very broad, but it was "obviously not intended to stamp all persons as employees." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947). For example, independent contractors are not "employees." *See, e.g.*, *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947) (recognizing that workers may be independent contractors when their work does not "in its essence … follow[] the usual path of an employee").

Over its history, WHD has consistently applied an interpretation of "employee" that adheres to the text of the FLSA and judicial precedent interpreting it:

> An employee, as distinguished from a person who is engaged in business for himself or herself, is one who, as a matter of economic reality, follows the usual path of an employee and is dependent upon the business to which he or she renders service. The employer-employee relationship under the FLSA is tested by economic reality rather than technical concepts. It is not determined by common law standards relating to master and servant.

WHD Opinion Letter, 2002 WL 32406602, at *2 (quotation marks omitted).[2]

---

[2] *See, e.g.*, WHD Opinion Letter, 2000 WL 34444342, at *3 (Dec. 7, 2000); WHD Opinion Letter, 2000 WL 34444352, at *1 (Jul. 5, 2000); WHD Opinion Letter, 1999 WL 1788137, at *1 (Jul. 12, 1999); WHD Opinion Letter, 1995 WL 1032489, at *1 (June 5, 1995); WHD Opinion Letter, 1995 WL 1032469, at *1 (Mar. 2, 1995); WHD Opinion Letter, 1986 WL 740454, at *1 (June 23, 1986); WHD Opinion Letter, 1986 WL 1171083, at *1 (Jan. 14, 1986); WHD Opinion Letter WH-476, 1978 WL 51437, at *2 (Oct. 19, 1978); WHD Opinion Letter WH-361, 1975 WL 40984, at *1 (Oct. 1, 1975).

As reflected by this longstanding interpretation, the touchstone of employee versus independent contractor status has long been "economic dependence." *See, e.g., Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 379–80 (5th Cir. 2019); *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 138–40 (2d Cir. 2017); *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806–07 (6th Cir. 2015). The Supreme Court has instructed that a worker's "dependence" should be assessed "in light of the purposes of the Act." *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947). Thus, for example, as "broad" as the definitions of "employ" and "employee" are, "they cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction." *Portland Terminal*, 330 U.S. at 152; *see also, e.g., Tony & Susan Alamo Found. v. Sec. of Labor*, 471 U.S. 290, 295 (1985) ("While the statutory definition is exceedingly broad, … it does have its limits." (citation omitted)); *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013) ("These 'broad definitions' do not, however, bring 'independent contractors' within the FLSA's ambit.").

Whether a worker is economically dependent on a potential employer is a fact-specific inquiry that is individualized to each worker. *See Barrantine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981). The inability of the worker to work on his or her own terms often suggests dependence. *See, e.g., Saleem*, 854 F.3d at 148; *Scantland*, 721 F.3d at 1312 (citing *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1311–12 (5th Cir. 1976)); *see also Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1542 (7th Cir. 1987) ("The usual argument that workers are 'dependent' on employers … is that they are immobile.") (Easterbrook, J., concurring). Accordingly, independent contractors are often characterized by their ability to, for example, regularly negotiate working conditions or simultaneously work for another business. *See Parrish*, 917 F.3d at 387 (holding that work "on a 'project-by-project basis' … counsels heavily in favor of [independent contractor] status" (citation omitted)); *Saleem*, 854 F.3d at 141–43 (holding that the ability to simultaneously "draw income through work for others," such as by working for a competitor, indicates "considerable independence"). When determining economic dependence, WHD considers six factors derived from Supreme Court precedent:

(1) The nature and degree of the potential employer's control;

(2) The permanency of the worker's relationship with the potential employer;

(3) The amount of the worker's investment in facilities, equipment, or helpers;

(4) The amount of skill, initiative, judgment, or foresight required for the worker's services;

(5) The worker's opportunities for profit or loss; and

(6) The extent of integration of the worker's services into the potential employer's business.[3]

*See Rutherford*, 331 U.S. at 730; *United States v. Silk*, 331 U.S. 704, 716 (1947) (Social Security Act case).

---

[3] Encompassed within these factors is the worker's degree of independent organization and operation.

Other factors may also be relevant, and the appropriate weight to give to each factor depends on the facts. *See Silk*, 331 U.S. at 716.  Additionally, "the determination of [employee status] does not depend on such isolated factors but rather upon the circumstances of the whole activity." *Rutherford*, 331 U.S. at 730.  Therefore, WHD does not determine employee status by simply counting factors, but by weighing these factors in order to answer the ultimate inquiry of whether the worker is "engaged in business for himself or herself," or "is dependent upon the business to which he or she renders service." WHD Opinion Letter, 2002 WL 32406602, at *2.

***Control***.  The first factor is the nature and degree of the potential employer's control.  A business may have control where it, for example, requires a worker to work exclusively for the business; disavow working for or interacting with competitors during the working relationship; work against the interests of a competitor; work inflexible shifts, achieve large quotas, or work long hours, so that it is impracticable to work elsewhere; or otherwise face restrictions on or sanctions for external economic conduct, among others.  *See, e.g.*, *Saleem*, 854 F.3d at 141–42 (collecting cases finding that a business "relinquishes control" over a worker and thereby makes the worker "less economically dependent" when it allows the worker "to work for its competitors" or "draw income through work for others"); *Pilgrim Equip.*, 527 F.2d at 1312 (noting control that causes a worker to have "no viable economic status that can be traded to other … companies," such that the worker cannot operate as "a separate economic entity"); WHD Opinion Letter, 2000 WL 34444342, at *4 (Dec. 7, 2000) (finding "significant control" where the workers were "not permitted to work for other businesses while … in the company's service"); *cf.* WHD Opinion Letter, 2002 WL 32406602, at *3 (noting that employees generally work for only one employer, sometimes using an "exclusive employment agreement").

***Permanency of relation***.  The second factor is the permanency of the worker's relationship with the potential employer.  Permanence arises where a business, for example, requires a worker to agree to a fixed term of work; disavow working for or interacting with competitors after the working relationship ends; or otherwise face restrictions on or sanctions for leaving the job in order to pursue external economic opportunities, among others.  *See Saleem*, 854 F.3d at 142 (citing *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 784 (11th Cir. 2006)) (observing that permanency of relation restricts external opportunities).  Additionally, the existence of a long-term working relationship may indirectly indicate permanence.  *See, e.g.*, *Scantland*, 721 F.3d at 1319 (finding permanency where the workers "could not work for other companies, were required to work long hours, and could not turn down work orders," such that their relationship "was not only of long duration, but … was also exclusive"); *Donovan v. Brandel*, 736 F.2d 1114, 1117 (6th Cir. 1984) (finding no permanency where the length of the working relationship "was a product of a mutually satisfactory arrangement").

***Investment in facilities, equipment, or helpers***.  The third factor is the amount of the worker's investment in facilities, equipment, or helpers.  If a business makes these investments and provides them to a worker, that worker may come to rely on the business to supply those investments in order to perform his or her services.  *See Keller*, 781 F.3d at 810 ("[T]he capital investment factor is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered or that the worker is simply using implements of the [company] to accomplish the task." (alteration in original) (quotation marks omitted)).  That reliance could make it more difficult for the worker to pursue other economic opportunities, thereby increasing the worker's economic dependence.  *See Saleem*, 854 F.3d at

5

144–46 (noting, conversely, that greater investments enable workers to more easily pursue external opportunities, thereby increasing their independence); *Scantland*, 721 F.3d at 1318 (noting that worker investments are analogous to the "independence any employee has who has gained experience and the ability to market [themselves] to competing employers").

***Skill, initiative, judgment, and foresight required*.**  The fourth factor is the amount of skill, initiative, judgment, and foresight required for the worker's services.  In *Rutherford*, for example, while the business profited from the alleged independent contractors' work, the business's profits were not because of the workers' "initiative, judgment[,] or foresight," as would be expected from a "typical independent contractor." *Rutherford*, 331 U.S. at 730. Instead, the profits resulted from work that was simply "more like piecework." *Id.*; *see also Saleem*, 854 F.3d at 143-44 (concluding that drivers, "[b]y toggling back and forth between different car companies and personal clients, and by deciding how best to obtain business from … clients," increased their personal profits "through the[ir] initiative, judgment[,] or foresight," indicating their "considerable independence" (internal quotation marks omitted)).  This factor may also look to, for example, whether the worker has the "skills necessary to locate and manage discrete work projects [that are] characteristic of independent contractors," as opposed to skills "of the task-specific, specialized kind that form a piece of a larger enterprise." *Wilson v. Guardian Angel Nursing, Inc.*, 2008 WL 2944661, at *13 (M.D. Tenn. 2008).  How the worker acquired his skill is also relevant.  Among other things, if "the company provides all workers with the skills necessary to perform the job," that suggests employee status.  *Keller*, 781 F.3d at 809; *see Scantland*, 721 F.3d at 1318; *see also, e.g.*, *Hughes v. Family Life Care Inc.*, 117 F. Supp. 3d 1365, 1372 (N.D. Fla. 2015) ("The relevant inquiry [for the skill factor] is whether [the worker] is dependent upon [the company] to equip her with the skills necessary to perform her job.").

***Opportunity for profit and loss*.**  The fifth factor is the worker's opportunities for profit or loss. These opportunities typically exist where the worker receives additional compensation based, not on greater efficiency, but on the exercise of initiative, judgment, or foresight (*e.g.*, commission); has flexibility to renegotiate compensation throughout the working relationship; or has capital expenditure at risk in the job.  *See, e.g.*, *Scantland*, 721 F.3d at 1316–17 (examining whether a worker's ability to earn more is due to "being more technically proficient," which indicates employee status, or instead to "managerial skill," which indicates independent contractor status); WHD Opinion Letter, 2002 WL 32406602, at *2–3 (noting, that "courts focus on who, the alleged employer or employee, controls the major determinants of profit or loss and who exercises the managerial skills on which profit or loss depend"); WHD Opinion Letter, 2000 WL 34444342, at *5 (discussing how placing capital expenditure at risk indicates independent contractor status).  Opportunities for profit or loss can indicate independent contractor status even if the worker is not "*solely* in control of [his or her] profits or losses." *Chao v. Mid-Atl. Installation Servs., Inc.*, 16 Fed. App'x 104, 107 (4th Cir. 2001) (emphasis in original).

***Integrality*.**  The sixth factor is the extent of the integration of the worker's services into the potential employer's business.  For example, a worker's services are integrated into a business if they form the "primary purpose" of that business.  *Werner v. Bell Family Med. Ctr., Inc.*, 529 F. App'x 541, 545 (6th Cir. 2013) (observing that an ultrasound technician was not integrated into a medical center's business because ultrasounds were not "[t]he heart of [its] business").

6

In short, while the FLSA has a very broad scope of coverage, it is not so broad that all workers are caught within its reach—far from it.  *See Walling*, 330 U.S. at 152; *cf. Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (noting "the flawed premise that the FLSA pursues its remedial purpose at all costs" (quotation marks omitted)).  Recognizing this limitation on coverage protects the freedom of workers to operate as independent contractors and remain outside the FLSA's scope.

**OPINION**

Based on the facts you provide in your letter, it appears that the service providers who use your client's virtual marketplace are independent contractors.

Your client provides a referral service.  As such, it does not receive services from service providers, but empowers service providers to provide services to end-market consumers.  The service providers are not working for your client's virtual marketplace; they are working for consumers through the virtual marketplace.  They do not work directly for your client to the consumer's benefit; they work directly for the consumer to your client's benefit.  It is therefore inherently difficult to conceptualize the service providers' "working relationship" with your client, because as a matter of economic reality, they are working for the consumer, not your client. Indeed, they are similar to certain healthcare providers who use a homecare registry to obtain clients—workers whom WHD has previously stated can be classified as independent contractors under appropriate circumstances.  *See* WHD Field Assistance Bulletin 2018-4, at *1 (July 13, 2018) [hereinafter "FAB 2018-4"] (discussing, through the application of numerous factors, how "a [homecare] registry that simply facilitates matches between clients and caregivers … is not an employer").  Thus, it appears that your client's service providers "do not fit any 'traditional employment paradigm covered by the Act.'"  WHD Opinion Letter FLSA2018-29, 2018 WL 6839426, at *2 (Dec. 21, 2018) (quoting *Harker v. State Use Indus.*, 990 F.2d 131, 133 (4th Cir. 1993)).

Upon consideration of "the circumstances of the whole activity," *Rutherford*, 331 U.S. at 730, WHD does not see any indication that the service providers are economically dependent on your client within the meaning of the FLSA.  A discussion of the following factors demonstrates why.

***Control.***  Your client does not appear to exert control over its service providers.  Rather, your client gives the service providers significant flexibility, including the ability to pursue external economic opportunities.

First, your client does not impose any duties, such as strict shifts, large quotas, or long hours.  Instead, your client gives them flexibility to choose if, when, where, how, and for whom they will work, and they regularly use this flexibility to their own profit and personal advantage.  The service providers therefore have complete autonomy to choose the hours of work that are most beneficial to them.  Indeed, your client does not even require them to perform a minimum amount of work. This freedom enables them to pursue any and all external opportunities at their leisure.  Moreover, they are able to work full-time in your client's virtual marketplace, but most of them choose not to do so, which may indicate that they are pursuing other jobs outside your client's platform.

7

Your client provides its service providers the right to work simultaneously for competitors, and they routinely do so in order to maximize their profit. In fact, they will "multi-app"—that is, simultaneously run your client's virtual platform alongside the platform of a competitor to compare virtual opportunities in real time and pick the best opportunity on a job-by-job basis. *See Parrish*, 917 F.3d at 387 (holding that work "on a 'project-by-project basis' … counsels heavily in favor of [independent contractor] status" (citation omitted)). By providing them the right to "multi-app," your client has relinquished control over their external opportunities. *See Saleem*, 854 F.3d at 141–42. Your client even allows service providers to cancel jobs in order to pursue external opportunities on a competitor's platform. Your client also requires service providers to pay a cancellation fee only if they cancel a job without providing the consumer adequate notice.[4]

Moreover, your client does not inspect a service provider's work for quality or rate a service provider's performance. Indeed, your client does not impose requirements on how its service providers must perform their work, is not present when the service provider works, and does not monitor, supervise, or control the particulars of that work. Your client's lack of control weighs in favor of the service providers being in business for themselves. The service providers have complete autonomy to choose the hours of work that are most beneficial to them, may simultaneously work for competitors of your client without repercussions, and are subject to minimal, if any, supervision by your client. Accordingly, this factor weighs heavily in favor of independent contractor status.

***Permanency of relation.*** Your client does not appear to have a permanent working relationship with its service providers that would be indicative of an employer-employee relationship. In fact, the service providers appear to maintain a high degree of freedom to exit the working relationship. Most importantly, your client does not restrict them from interacting with competitors, either during the relationship itself (since service providers may work on multiple platforms simultaneously) or after the relationship ends.

Your letter does not indicate how long service providers typically remain "active" on your client's virtual marketplace. However, even assuming, in light of your client's promise that it will terminate a relationship with a service provider only for cause, that service providers maintain a lengthy working relationship with your client, they do so only "on a 'project-by-

---

[4] Your client does reserve the right to remove a service provider from its virtual marketplace if that person frequently cancels jobs without adequate notice. However, this or other neutral requirements that your client imposes—such as background and identity checks before gaining access to the platform—are less relevant given the general lack of control that your client exercises over when, where, how, and for whom the service providers work. *See, e.g.*, *Thornton v. Charter Commc'ns, LLC*, 2014 WL 4794320, at *11 (E.D. Mo. 2014) ("Quality control and compliance-monitoring that stem from the nature of the business—that is, from the nature of the goods or services being delivered—are qualitatively different from control that stems from the nature of the relationship between the employees and the putative employer." (quotation marks omitted)); FAB 2018-4, at *2 (noting that a homecare registry may "confirm caregiver credentials, conduct background checks, contact professional references, and engage in other quality-control measures," without establishing an employment relationship).

8

project basis'" *Parrish*, 917 F.3d at 387.  This factor weighs strongly in favor of independent contractor status.

***Investment in facilities, equipment, or helpers*.**  Your client does not invest in facilities, equipment, or helpers on behalf of its service providers.  Instead, your client requires its service providers to purchase all necessary resources for their work, and your client does not reimburse those purchases.

Your client primarily invests in its virtual referral platform, but those investments do not, alone, establish an employment relationship with the service providers who use that platform because they are not investments in the work the service providers perform.  *See* FAB 2018-4, at *8 (stating that a homecare registry's investments in "office space, payroll software, timekeeping systems, and other products to operate its business" do not, without more, establish an employment relationship with a caregiver on its registry, but that "investments in the tools necessary for the caregiver to perform his or her services may indicate" economic dependence).  To be sure, the service providers rely on your client's software to quickly obtain jobs, but that reliance only marginally decreases their relative independence, because they can use similar software on competitor platforms.  Overall, this factor weighs in favor of independent contractor status.

***Skill, initiative, judgment, or foresight required*.**  Your letter does not specifically identify what types of services are offered on your client's virtual marketplace.  However, regardless of the specific services they perform, your client's service providers, like the drivers in *Saleem*, choose between different service opportunities and competing virtual platforms and exercise managerial discretion in order to maximize their profits, thereby showing "considerable independence" from your client.  *See Saleem*, 854 F.3d at 143–44.  Additionally, your client's service providers do not undergo mandatory training.  The fact that they do not appear to rely on your client to provide them with training also increases their economic independence.  *See Scantland*, 721 F.3d at 1318 (skills obtained through an employer's training are less indicative of independent contractor status).  The exercise of managerial discretion and the lack of training weighs in favor of independent contractor status.

***Opportunity for profit and loss*.**  Your client's service providers do not "receive [a] predetermined amount" of compensation for their work, but instead "control[] the major determinants of profit or loss."  WHD Opinion Letter, 2002 WL 32406602, at *2–3.  Your client sets default prices, but it allows service providers to choose different types of jobs with different prices, take as many jobs as they see fit, and negotiate the price of their jobs.  They can further control their profit or loss by "toggling back and forth between different" competing VMC platforms.  *See Saleem*, 854 F.3d at 144.  Additionally, because your client charges a fee for cancelled services, the service providers risk losing money if they do not complete a job they have accepted.  These opportunities for profit or loss give them a substantial amount of control over their level of compensation, and therefore independence from your client.  Moreover, service providers' flexibility to work for different platforms, choose how to perform the job, choose different jobs with different prices, negotiate the prices of their jobs, and choose whether or not cancelling a job is worthwhile indicates that their opportunity for profit or loss is driven by their own managerial skill, not simply their productivity.  This factor therefore weighs in favor of

9

independent contractor status, even though your client—by setting default prices—retains some control over their profits and losses. *Mid-Atl. Installation Servs.*, 16 F. App'x at 107.

***Integrality.***  Your client's service providers are not integrated into your client's referral business. First, the service providers who use your client's virtual platform do not develop, maintain, or otherwise operate that platform; rather, they use that platform to acquire service opportunities. Your client offers a finished product to its service providers; its business operations effectively terminate at the point of connecting service providers to consumers and do not extend to the service provider's actual provision of services.  In other words, the service providers are not an integral part of your client's referral service; they are consumers of that service from your client and negotiate with your client over the terms and conditions of using that service.  Accordingly, they are not operationally integrated into your client's business.

Relatedly, the business's "primary purpose" is not to provide services to end-market consumers, but to provide a referral system that connects service providers with consumers.  *Werner*, 529 F. App'x at 545.  This lack of integration weighs in favor of independent contractor status. *See Saleem*, 854 F.3d at 142.

**CONCLUSION**

Under the facts described in your letter, we conclude that your client's service providers are independent contractors, not employees of your client.  The facts in your letter demonstrate economic independence, rather than economic dependence, in the working relationship between your client and its service providers.  The FLSA therefore recognizes your client's status as independent contractors.

We trust that this letter is responsive to your inquiry.

Sincerely,

Keith E. Sonderling
Acting Administrator

**\*Note: The actual name(s) was removed to protect privacy in accordance with 5 U.S.C. § 552(b)(7).**

10

Notice of Proposed Rule: Employee or Independent Contractor Classification Under the Fair Labor Standards Act, RIN 1235-AA43 | U.S. Department of Labor

Case 1:22-cv-22671-CMA   Document 83-1   Entered on FLSD Docket 06/26/2023   Page 11 of 20



An official website of the United States government.
Here's how you know



**Wage and Hour Division**

WHD    Wages and the Fair Labor Standards Act    Misclassification of Employees as Independent Contractors
Notice of Proposed Rule: Employee or Independent Contractor Classification Under the Fair Labor Standards Act, RIN 1235-AA43

# Notice of Proposed Rule: Employee or Independent Contractor Classification Under the Fair Labor Standards Act, RIN 1235-AA43

On October 13, 2022, the U.S. Department of Labor published a Notice of Proposed Rulemaking (NPRM) to revise the Department's guidance on how to determine who is an employee or independent contractor under the Fair Labor Standards Act (FLSA). The NPRM proposed to rescind a prior rule, Independent Contractor Status Under the Fair Labor Standards Act (2021 IC Rule), that was published on January 7, 2021 and replace it with an analysis for determining employee or independent contractor status that is more consistent with the FLSA as interpreted by longstanding judicial precedent. The Department believes that its proposed rule would reduce the risk that employees are misclassified as independent contractors, while providing added certainty for businesses that engage (or wish to engage) with individuals who are in business for themselves.

The comment period closed on December 13, 2022. The Department is currently reviewing all timely submitted comments. The full text of the NPRM can be found at Federalregister.gov.

## Additional Information

- Proposed Rule: Employee or Independent Contractor Classification under the Fair Labor Standards Act
- Extension of Comment Period: Employee or Independent Contractor Classification

Notice of Proposed Rule: Employee or Independent Contractor Classification Under the Fair Labor Standards Act, RIN 1235-AA43 | U.S. Department of Labor

Case 1:22-cv-22671-CMA   Document 83-1   Entered on FLSD Docket 06/26/2023   Page 12 of 20

- Topics

- Worker Rights

- For Employers

- Resources

- Interpretive Guidance

- State Laws

- News

### Wage and Hour Division

An agency within the U.S. Department of Labor

Notice of Proposed Rule: Employee or Independent Contractor Classification Under the Fair Labor Standards Act, RIN 1235-AA43 | U.S. Department of Labor

Case 1:22-cv-22671-CMA   Document 83-1   Entered on FLSD Docket 06/26/2023   Page 13 of 20

200 Constitution Ave NW
Washington, DC 20210

1-866-4-US-WAGE

1-866-487-9243

www.dol.gov

## FEDERAL GOVERNMENT PLUS-SQUARE

White House

Benefits.gov

Coronavirus Resources

Disaster Recovery Assistance

DisasterAssistance.gov

USA.gov

Notification of EEO Violations

No Fear Act Data

U.S. Office of Special Counsel

## LABOR DEPARTMENT PLUS-SQUARE

About DOL

Guidance Search

Español

Office of Inspector General

Subscribe to the DOL Newsletter

Read the DOL Newsletter

Emergency Accountability Status Link

A to Z Index

## WHD PORTALS PLUS-SQUARE

YouthRules!

Notice of Proposed Rule: Employee or Independent Contractor Classification Under the Fair Labor Standards Act, RIN 1235-AA43 | U.S. Department of Labor

Case 1:22-cv-22671-CMA   Document 83-1   Entered on FLSD Docket 06/26/2023   Page 14 of 20

Wage Determinations

Connect With DOL

facebook  twitter  instagram  youtube  linkedin

f

Site Map   |   Important Website Notices   |   Privacy & Security Statement


An official website of the United States government.
Here's how you know



# Wage and Hour Division

**WHD** | **WHD Fact Sheets** | Fact Sheet 13: Employment Relationship Under the Fair Labor Standards Act (FLSA)

**Print Fact Sheet**

WAGE AND HOUR DIVISION
UNITED STATES DEPARTMENT OF LABOR

# Fact Sheet 13: Employment Relationship Under the Fair Labor Standards Act (FLSA)

**Revised March 2022**

On March 14, 2022 a district court in the Eastern District of Texas vacated the Department's Delay Rule, Independent Contractor Status Under the Fair Labor Standards Act (FLSA): Delay of Effective Date, 86 FR 12535 (Mar. 4, 2021), and the Withdrawal Rule, Independent Contractor Status Under the Fair Labor Standards Act (FLSA): Withdrawal, 86 FR 24303 (May 6, 2021).  The district court further stated that the Independent Contractor Rule, Independent Contractor Status Under the Fair Labor Standards Act, 86 FR 1168 (Jan. 7, 2021), became effective as of March 8, 2021, the rule's original effective date, and remains in effect.

This fact sheet provides general information concerning the meaning of

apply to any person engaged in work which may otherwise be subject to the Act. In the application of the FLSA an employee, as distinguished from a person who is engaged in a business of his or her own, is one who, as a matter of economic reality, follows the usual path of an employee and is dependent on the business which he or she serves. The employer-employee relationship under the FLSA is tested by "economic reality" rather than "technical concepts." It is not determined by the common law standards relating to master and servant.

The U.S. Supreme Court has on a number of occasions indicated that there is no single rule or test for determining whether an individual is an independent contractor or an employee for purposes of the FLSA. The Court has held that it is the total activity or situation which controls. Among the factors which the Court has considered significant are:

1. The extent to which the services rendered are an integral part of the principal's business.
2. The permanency of the relationship.
3. The amount of the alleged contractor's investment in facilities and equipment.
4. The nature and degree of control by the principal.
5. The alleged contractor's opportunities for profit and loss.
6. The amount of initiative, judgment, or foresight in open market competition with others required for the success of the claimed independent contractor.
7. The degree of independent business organization and operation.

There are certain factors which are immaterial in determining whether there is an employment relationship. Such facts as the place where work is performed, the absence of a formal employment agreement, or whether an alleged independent contractor is licensed by State/local government are not considered to have a bearing on determinations as to whether there is an employment relationship.

required that the employee be paid at least the Federal minimum wage of $5.85 per hour effective July 24, 2007; $6.55 per hour effective July 24, 2008; and $7.25 per hour effective July 24, 2009, and in most cases overtime at time and one-half his/her regular rate of pay for all hours worked in excess of 40 per week. The Act also has youth employment provisions which regulate the employment of minors under the age of eighteen, as well as recordkeeping requirements.

## Typical Problems

(1) One of the most common problems is in the construction industry where contractors hire so-called independent contractors, who in reality should be considered employees because they do not meet the tests for independence, as stated above. (2) Franchise arrangements can pose problems in this area as well. Depending on the level of control the franchisor has over the franchisee, employees of the latter may be considered to be employed by the franchisor. (3) A situation involving a person volunteering his or her services for another may also result in an employment relationship. For example, a person who is an employee cannot "volunteer" his/her services to the employer to perform the same type service performed as an employee. Of course, individuals may volunteer or donate their services to religious, public service, and non-profit organizations, without contemplation of pay, and not be considered employees of such organization. (4) Trainees or students may also be employees, depending on the circumstances of their activities for the employer. (5) People who perform work at their own home are often improperly considered as independent contractors. The Act covers such homeworkers as employees and they are entitled to all benefits of the law.

**1-866-4USWAGE (1-866-487-9243).**

This publication is for general information and is not to be considered in the same light as official statements of position contained in the regulations.

The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

**Topics**

**Worker Rights**

**For Employers**

**Resources**

**Interpretive Guidance**

State Laws

News



**Wage and Hour Division**

An agency within the U.S. Department of Labor

200 Constitution Ave NW
Washington, DC 20210

1-866-4-US-WAGE

1-866-487-9243

www.dol.gov

**FEDERAL GOVERNMENT** PLUS-SQUARE

White House

Benefits.gov

Coronavirus Resources

Disaster Recovery Assistance

DisasterAssistance.gov

USA.gov

Notification of EEO Violations

No Fear Act Data

U.S. Office of Special Counsel

**LABOR DEPARTMENT** PLUS-SQUARE

About DOL

Guidance Search

Español

Office of Inspector General

Subscribe to the DOL Newsletter

Read the DOL Newsletter

Emergency Accountability Status Link

A to Z Index

**WHD PORTALS** PLUS-SQUARE

YouthRules!

Wage Determinations

Connect With DOL

facebook twitter instagram youtube linkedin

f

Site Map | Important Website Notices | Privacy & Security Statement