```
1                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
2                        MIAMI DIVISION
                  CASE NO. 22-cv-22671-CMA
3


4   DELIO BATISTA, CARLOS LOPEZ,    Miami, Florida
    MARIANA LOPEZ and RAFAELA
5   VALIENTE,                       July 10, 2023

6          Plaintiffs,             9:16 a.m. to 5:23 p.m.

7       vs.                        Courtroom 13-3

8   AVANT ASSURANCE, INC.,          (Pages 1 to 214)
    REINIER CORTES and ANDREA
9   GONZALEZ QUINTERO,

10         Defendants.

11  _____

12              JURY TRIAL EXCERPT - DAY 1
         BEFORE THE HONORABLE CECILIA M. ALTONAGA,
13           CHIEF UNITED STATES DISTRICT JUDGE

    APPEARANCES:
14
    FOR THE PLAINTIFFS:    TOUSSAINT CUMMINGS, ESQ.
15                         BRIAN POLLOCK, ESQ.
                           FairLaw Firm
16                         135 San Lorenzo Avenue Suite 770
                           Coral Gables, FL 33146-1878
17                         (305) 230-4884
                           Toussaint@fairlawattorney.com
18                         Brian@fairlawattorney.com

19  FOR THE DEFENDANTS:    SANTIAGO CUETO, ESQ.
                           Santiago A. Cueto
20                         2100 Ponce De Leon Boulevard Suite 1250
                           Coral Gables, FL 33134-5267
21                         (305) 777-0377
                           Sc@cuetolawgroup.com
22
                           DANIEL TROPP, ESQ.
23                         Law Offices of Daniel E. Tripp, Esquire
                           5750 Collins Avenue Apartment 4A
24                         Miami Beach, FL 33140-2316
                           (305) 814-2035
25                         Dantropp@bellsouth.net
```

1    APPEARANCES CONTINUED:

2    REPORTED BY:          STEPHANIE A. McCARN, RPR
                           Official Court Reporter
3                          400 North Miami Avenue
                           Thirteenth Floor
4                          Miami, Florida 33128
                           (305) 523-5518
5                          Stephanie_McCarn@flsd.uscourts.gov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **I N D E X**

2                   **WITNESSES**

3

   **WITNESSES FOR THE PLAINTIFFS:**               **Page**

4

   **Reinier Cortes**

5      Direct Examination by Mr. Pollock          **31**

     Direct Examination (Cont'd.) by Mr. Pollock     **84**

6    **Jennifer Manjarres**

     Direct Examination by Mr. Pollock         **145**

7      Cross-Examination by Mr. Tropp           **157**

     Redirect Examination by Mr. Pollock       **163**

8

9

10    **WITNESSES FOR THE DEFENDANTS:**              **Page**

                                            **--**

11

12                    **EXHIBITS**

13

14    **EXHIBITS IN EVIDENCE**          **IDENTIFIED**    **ADMITTED**

15    **Plaintiffs' Exhibit No. 1**          **115**        **--**

   **Plaintiffs' Exhibit No. 6**           **78**        **--**

16    **Plaintiffs' Exhibit No. 8**           **89**        **--**

   **Plaintiffs' Exhibit No. 12**          **118**        **--**

17    **Plaintiffs' Exhibit No. 13**          **132**        **--**

18

19

                  **MISCELLANEOUS**

20

                                         **Page**

21    **Proceedings........................................**    **4**

   **Court's Preliminary Jury Instructions............**    **5**

22    **Opening Statement on Behalf of the Plaintiffs.....**   **11**

   **Opening Statement on Behalf of the Defendants.....**   **22**

23    **Court Reporter's Certificate.....................**   **190**

24

25

1          (The proceedings excerpt was held at 9:16 a.m.)

2          THE COURT:  Good morning.

3          ALL PARTIES:  Good morning.

4          THE COURT:  Please state your appearances.

5          MR. CUMMINGS:  Toussaint Cummings on behalf of the

6   Plaintiff.

7          MR. POLLOCK:  Good morning, Your Honor.  Brian Pollock

8   for the Plaintiffs, who are at our table.  Would you like us to

9   introduce them?

10         THE COURT:  Yes, please.

11         MR. POLLOCK:  All right.  To the left of Mr. Cummings

12  is Mr. Batista.  He's putting on his sweater.  To his left is

13  Ms. Lopez; to her left is Ms. Valiente and to her left on the

14  end is Mr. Lopez.

15         THE COURT:  Okay.  Thank you.

16         MR. POLLOCK:  Thank you, Your Honor.

17         THE COURT:  Thank you.

18         MR. TROPP:  Good morning, Judge.  I'm going to make

19  sure I speak into the microphone today.

20         THE COURT:  Good morning.

21         MR. TROPP:  Daniel Tropp on behalf of the Defendants.

22         MR. CUETO:  Santiago Cueto on behalf of the

23  Defendants.

24         MR. CORTES:  Good morning.  Reinier Cortes.

25         MS. GONZALEZ QUINTERO:  Good morning.  Andrea

```
 1   Gonzalez.

 2            THE COURT:  Very good.  Good morning.

 3            Please be seated.

 4            We're ready for the jury.  Any issues before we bring

 5   the jurors inside?

 6            MR. POLLOCK:  There's an issue with the demonstratives

 7   that the Defendants want to use in their opening.  I don't know

 8   if you want to address it before or after the jury comes in.

 9            THE COURT:  After we pick the jury.

10            MR. POLLOCK:  No problem.

11       (Pause in proceedings.)

12            THE COURTROOM DEPUTY:  Are you ready, Judge?

13            THE COURT:  I am.  Thank you.

14              COURT'S PRELIMINARY JURY INSTRUCTIONS

15            THE COURT:  Thank you.  Please be seated.

16            Members of the jury, now that you have been sworn, I

17   need to explain some basic principles about a civil trial and

18   your duty as jurors.  These are preliminary instructions.  I

19   will give you more detailed instructions at the end of the

20   trial.

21            It is your duty to listen to the evidence, decide what

22   happened and apply the law to the facts.  It is my job to

23   provide you with the law that you must apply, and you must

24   follow the law even if you disagree with it.

25            You must decide the case on only the evidence
```

1   presented in the courtroom.  Evidence comes in many forms.  It
2   can be testimony about what someone saw, heard or smelled.  It
3   can be an exhibit or a photograph.  It can be someone's
4   opinion.  Some evidence may prove a fact indirectly.

5        Let's say a witness saw wet grass outside and people
6   walking into the courthouse carrying wet umbrellas.  This may
7   be indirect evidence that it rained, even though the witness
8   did not personally see it rain.  Indirect evidence like this is
9   also called circumstantial evidence.  It's simply a chain of
10  circumstances that likely proves a fact.

11       As far as the law is concerned, it makes no difference
12  whether evidence is direct or indirect.  You may choose to
13  believe or disbelieve either kind.  Your job is to give each
14  piece of evidence whatever weight you think it deserves.

15       Now, during the trial, you will hear certain things
16  that are not evidence and you must not consider them.  First,
17  the lawyers' statements and arguments are not evidence.  In
18  their opening statements and closing arguments, the lawyers
19  will discuss the case.  Their remarks may help you follow each
20  side's arguments and presentation of evidence, but the remarks
21  themselves are not evidence and should not play a role in your
22  deliberations.

23       Second, the lawyers' questions and objections are not
24  evidence.  Only the witnesses' answers are evidence.  Do not
25  decide that something is true just because a lawyer's question

Case 1:22-cv-22671-CMA  Document 123-1  Entered on FLSD Docket 09/21/2023  Page 7 of
214
Court's Preliminary Jury Instructions
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA
7

1   suggests that it is.  For example, a lawyer may ask a witness,

2   You saw Mr. Jones hit his sister, didn't you?  Well, that

3   question is not evidence of what the witness saw or what

4   Mr. Jones did unless the witness agrees with it in the

5   witness's answer.

6           There are rules of evidence that control what the

7   Court can receive into evidence.  When a lawyer asks a witness

8   a question or presents an exhibit, the opposing lawyer may

9   object if he thinks the rules of evidence do not permit it.  If

10  I overrule the objection, then the witness may answer the

11  question or the Court may receive the exhibit.

12          If I sustain the objection, then the witness cannot

13  answer the question and the Court cannot receive the exhibit.

14  When I sustain an objection to a question, you must ignore the

15  question and not guess at what the answer might have been.

16          Sometimes I may disallow evidence -- this is also

17  called striking evidence -- and order you to disregard or

18  ignore it.  That means that you must not consider the evidence

19  when you are deciding the case.

20          I may allow some evidence for only a limited purpose.

21  When I instruct you that I have admitted an item of evidence

22  for a limited purpose, you must consider it for only that

23  purpose and no other.

24          As I mentioned earlier, to reach a verdict, you may

25  have to decide which testimony to believe and which testimony

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 8 of 214

Court's Preliminary Jury Instructions
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

8

 1    not to believe.  You may believe everything a witness says,

 2    part of it or none of it.

 3           When considering a witness's testimony, you may take

 4    into account the witness's opportunity and ability to see, hear

 5    or know the things the witness is testifying about, the

 6    witness's memory, the witness's manner while testifying, any

 7    interest the witness has in the outcome of the case, any bias

 8    or prejudice that the witness may have, any other evidence that

 9    contradicts the witness's testimony, the reasonableness of the

10    witness's testimony in light of all the evidence and any other

11    factors affecting believability.

12           At the end of the trial, I will give you additional

13    guidelines for determining a witness's credibility.

14           As I mentioned earlier, the Plaintiff has the burden

15    of proving their case by what the law calls a preponderance of

16    the evidence.  That means that the Plaintiff must prove that in

17    light of all the evidence what they claim is more likely true

18    than not.

19           So if you could put the evidence favoring the

20    Plaintiffs and the evidence favoring the Defendants on opposite

21    sides of balancing scales, Plaintiffs need to make the scales

22    tip to their side.  If the Plaintiffs fail to meet this burden,

23    you must find in favor of the Defendants.

24           To decide whether any fact has been proved by a

25    preponderance of the evidence, you may, unless I instruct you

1    otherwise, consider the testimony of all witnesses, regardless

2    of who called them, and all exhibits the Court allowed,

3    regardless of who produced them.

4            After considering all the evidence, if you decide a

5    claim or fact is more likely true than not, then the claim or

6    fact has been proved by a preponderance of the evidence.

7            While serving on the jury, you may not talk with

8    anyone about anything related to the case.  You may tell people

9    that you are a juror and give them information about when you

10   must be in court, but you must not discuss anything about the

11   case itself with anyone.

12           You should not talk about the case with each other

13   until you begin your deliberations.  You want to make sure that

14   you have heard everything -- all the evidence, the lawyers'

15   closing arguments and my instructions on the law -- before you

16   begin deliberating.  You should keep an open mind until the end

17   of the trial.  Premature discussions may lead to a premature

18   decision.

19           In this age of technology, I want to emphasize that in

20   addition to not talking face-to-face with anyone about the

21   case, you must not communicate with anyone about the case by

22   any other means.  This includes e-mails, text messages and the

23   Internet, including social networking websites such as Facebook

24   and Twitter.  You also should not Google or search online or

25   offline for any information about the case, the parties or the

1    law.

2          The law forbids jurors to talk with anyone else about

3    the case and prevents anyone to talk to jurors about it.  It is

4    very important that you understand why these rules exist and

5    why they are so important.

6          You must base your decision only on the testimony and

7    other evidence presented in the courtroom.  It is not fair to

8    the parties if you base your decision in any way on information

9    you acquire outside the courtroom.  For example, the law often

10   uses words and phrases in special ways, so it is important that

11   any definitions you hear come only from me and not from any

12   other source.

13         Only you jurors can decide a verdict in this case.

14   The law sees only you as fair and only you have promised to be

15   fair.  No one else is so qualified.

16         So let's walk through the trial.  First, each side may

17   make an opening statement, but they don't have to.  Remember,

18   an opening statement is not evidence, and it is not supposed to

19   be argumentative.  It is just an outline of what that party

20   intends to prove.

21         Next, the Plaintiffs will present their witnesses and

22   ask them questions.  After the Plaintiffs ask questions, the --

23   question the witnesses, the Defendants may ask the witnesses

24   questions.  This is called cross-examining the witnesses.  Then

25   the Defendants present their witnesses and the Plaintiffs may

Opening Statement on Behalf of the Plaintiffs          11
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    cross-examine them.  You should base your decision on all of

2    the evidence, no matter which parties presented it.

3              After all the evidence is in, the parties' lawyers

4    present their closing arguments to summarize and interpret the

5    evidence for you and I give you instructions on the law.

6    Finally, you will go to the jury room to deliberate.

7              We'll hear opening statements at this time.  Each side

8    has 20 minutes to present.  We'll hear from Plaintiffs first.

9              OPENING STATEMENT ON BEHALF OF THE PLAINTIFFS

10             MR. POLLOCK:  May it please the Court.

11             Ladies and gentlemen, thank you for your time and

12   attention in performing what is actually a great public service

13   in serving on a federal jury.  Not many people actually are

14   able to do this, and this is one of the great foundations of

15   our society here in the U.S.  It is -- one of the foundations

16   of our justice system is that we can come to court and have a

17   judge decide legal issues and you decide the facts.

18             And so I introduce myself, Toussaint, Delio, Mariana,

19   Rafaela and Carlos.  I'll try to keep the same order, if that

20   makes a difference.  But we're here because we filed a -- they

21   filed a civil lawsuit because they claim that they're owed

22   wages.  And what are they owed?

23             So the first thing is that they should've been paid

24   overtime wages and classified as employees instead of the

25   Defendants paying them as independent contractors, and so --

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 12 of
214
12
Opening Statement on Behalf of the Plaintiffs
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    didn't pay them overtime, so they didn't care how many hours

2    they worked.

3            The next thing is that there was an agreement in place

4    where my clients would receive commissions based on the

5    insurance policies they put in place, how many members they

6    were able to sign up.  And they were entitled to bonuses and

7    submissions either under a period of a contract or that the

8    Defendants -- that Avant Assurance was unjustly enriched by the

9    work that my clients performed.

10            So what we're looking for and what we're asking you to

11   award at the end of this case are the wages that my clients

12   earned -- the overtime, the commissions and the bonus.  Nothing

13   more, but nothing less.

14            So my clients worked for Avant Assurance, which does

15   business under the fictitious name of the Obamacare Insurance

16   Center.  And we're here to decide Avant Assurance -- my clients

17   are suing its owners -- Mr. Gonzalez -- excuse me -- Mr. Cortes

18   and his wife, Ms. Gonzalez -- and you can decide whether they

19   are personally responsible for the overtime wages as employers

20   under the law, under the Fair Labor Standards Act.

21            And so the Defendants in this case, they sell health

22   insurance, and they focus on selling as many policies as they

23   can during the opening enrollment period that runs from

24   November 1st through the end of January.  For people who don't

25   get insurance through their employer, you go on the

Case 1:22-cv-22671-CMA  Document 123-1  Entered on FLSD Docket 09/21/2023  Page 13 of 214

Opening Statement on Behalf of the Plaintiffs
July 10, 2023                                    13
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    Marketplace, and these are -- this is a company that gets a
2    bunch of inbound leads, and they provide all the leads.
3            They provide the workspace, the workstation, the
4    computer, the software, the leads, everything, and all my
5    clients need to do -- just like the other insurance agent who
6    worked in Avant -- was walk in the door, sit down, log into the
7    computer and start taking calls.  They didn't make outbound
8    calls.  They took them.  And they only talk to the potential
9    insurance members or insureds that they got through the leads
10   that the Defendants would provide.
11           So they would log into the computer.  They had their
12   headset plugged into the computer via Softphone, so not a
13   physical phone at your desk.  And once you're logged in, you
14   start getting calls, kind of like a customer support center.
15   So you start getting calls and you sell the insurance and you
16   have people sign up.
17           And my clients were offering the insurance that Avant
18   Assurance authorized them to sell.  And these are some of the
19   companies that they were authorized to sale.  And once the lead
20   would decide on which insurance policy they wanted to sign up
21   for, my clients wouldn't do anything else.  They would just
22   transfer the call to the customer support team from Avant to go
23   ahead and handle -- and put in the rest of the information for
24   the transaction.  But nonetheless, they claim my clients were
25   independent contractors.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 14 of
214                                                                                    14
Opening Statement on Behalf of the Plaintiffs
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1          So when they hired my clients, they paid their entire

2     workforce as 1099.  Everybody was a 1099.  This is a business

3     that sells insurance through insurance agents, but they didn't

4     have any employees.  Everybody was a 1099.  And because of

5     that, you're going to hear they didn't pay payroll taxes

6     because it's a 1099.  They didn't pay Workers' Comp while my

7     clients were there, and they didn't pay overtime wages.

8          And so the first issue that you're going to be asked

9     to decide is whether my clients were really employees who

10    should've gotten a W-2, who should've gotten overtime.  And

11    that's the first issue.

12         What's the evidence going to show?  That my clients

13    were really employees.  They should've gotten overtime.  And

14    you're going to hear that the Defendants provided everything

15    that my clients needed to do the work.  Not only that, they

16    controlled their work.  They paid them by commissions and

17    bonuses.

18         My clients had no risk of losing money.  They didn't

19    have any money that they spent.  In fact, they couldn't go into

20    the office and be negative that day because they weren't

21    spending any money.  So as long as they walked in and sold,

22    they would make money.  Otherwise, they'd walk out and didn't

23    make any money.  They couldn't go in the negative.  They had no

24    risk of losing any money.

25         Avant provided, and its owners provided, everything --

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 15 of
214
Opening Statement on Behalf of the Plaintiffs
July 10, 2023                                           15
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

 1    computers, offices, phones, software.  You're going to hear

 2    about the cool software that they had that you log into and it

 3    sends you leads and it tracks all the information.

 4           And my clients were working so much, during the open

 5    enrollment period especially.  You'll hear about Rafaela when

 6    she was working 9 in the morning until 9 at night.  Who else

 7    are you working for when you're working 12 hours a day?

 8           So the Defendants are going to tell you, We didn't

 9    control them.  They could come and go as they please.  But

10    we're going to have schedules that told my clients when to show

11    up, told them where to show up.  You know, Hey, We have the old

12    office in Kendall.  Now we want you to go to the new office in

13    Doral.

14           They controlled how the work would be done because

15    they had processes.  We're going to send you the lead.  You're

16    going to go ahead and try to get that member to sign up.  And

17    once you do, it's going to go to the processing center and

18    they're gonna handle the back end.  It's not my client's

19    decision.  It was theirs.

20           And then they controlled the work by determining who

21    you're going to sell to.  You're going to sell to the people

22    that -- the leads that come in.  Because as long as you're

23    logged in, you're going to keep getting leads.  And they're

24    going to tell you, Well, you could have not taken a lead.

25    Yeah, how long would that have lasted?  And you can answer that

Opening Statement on Behalf of the Plaintiffs
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1    question.

 2            They weren't paying my clients by some other

 3    production.  They were paying them by commission.  So there was

 4    a set commission that was going to be paid, along with a bonus,

 5    and there was a written bonus plan.  You're going to get a

 6    bonus if you sell -- up to 350 members, you're going to get a

 7    $5,000 bonus.  If you sell up to 599, you're going to get a

 8    $10,000 bonus.  And if you sold 600 or more members, you're

 9    going to get a $25,000 bonus.  And the bonuses are going to be

10    paid in April of 2022.

11            We talked about the fact that there's no risk because

12    my clients really didn't have a risk.  They would go in and

13    work every day.  And the Defendants provided everything -- the

14    office space, the desk, computers, the monitors, the software,

15    everything they needed to do.  All they needed to do was walk

16    in the door, be able to use a computer and speak.  That's it.

17            So they're not going have any evidence that shows that

18    my clients worked anywhere else during the hours that they were

19    sitting at Avant.

20            So the other thing is -- my clients' claim is

21    commissions and bonuses.  And so the commissions -- that's

22    tough to read -- that Avant failed to pay the commissions and

23    bonuses and that they -- and that they didn't do so because

24    they kept the money that should've gone to my clients.

25            So Avant verbally at first offered to pay its agents
```

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 17 of
214
Opening Statement on Behalf of the Plaintiffs                17
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    their commissions, and they were going to get a comission in

2    the 2020 to 2021 year because open enrollment starts in

3    November and ends in February.  So they were going to roll out

4    their new payment plans every year.

5           And you saw the written commission and bonus plan for

6    2021 and 2022.  My clients accepted that because they said,

7    Yes, this is what we're going to do.  We're going to make

8    money, we're going to work on commission like other employees

9    who do, and as much as insurance policies we can place for

10   members that you provide us, we're going make more money.

11          And so what the evidence is going to show is that

12   Avant owes my clients not only the overtime that they worked

13   but also for the commissions and bonuses.  And what you're

14   going to hear is that Mr. Cortes was -- he was the wizard

15   behind the curtain, that insurance companies would go ahead and

16   they would pay commissions -- they would pay the commissions to

17   his company and there would be a commission statement.

18          But what Mr. Cortes did was he put his name on every

19   insurance policy that was issued.  He could've left it so that

20   my clients' names -- Delio's name was on a policy that went to

21   one member, Carlos was on a policy that went to another member

22   and Rafaela on the other member and Mariana on the other

23   member, and then you get the commission statement and it's

24   easy.

25          You look at the commission statement.  Delio sold 65

Opening Statement on Behalf of the Plaintiffs
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   policies, 130 policies, and you pay him for those.  That's not

2   what he did.  You can ask why didn't he do that.  That would've

3   been so easy.  Instead, he put his name on all the policies.

4   So when the commission statement comes in, it's Mr. Cortes's

5   name for every commission from every insurer.

6          So what he does is he says, Well, you're going to have

7   to trust me.  Trust me that I'm going to do the right counting.

8   I'm going to put my name on every policy, but just trust me.

9   I'm going to go through the software and I'm going to determine

10  which insurance policies you placed and which Mariana placed

11  and which Rafaela placed, which Delio placed and which the

12  other insure -- other insurance agents placed.  Just trust me

13  on that.

14         I'm not going to show you the commission statements

15  from the insurance companies, and it's just going to be based

16  on the software.  I know there's going to be differences, but

17  you're going to have to trust me.  And you're going to decide

18  whether you want to trust Mr. Cortes.  And you are going to

19  hear from my clients about how many members they actually

20  signed up and how they know that.

21         Now, what you may hear from the Defendants is that

22  they're going to try to distract you, right.  I mean, it makes

23  sense.  Because -- and ask why they're going to try to distract

24  you and what this has to do at all with our case.  They're

25  going to talk about how before we filed the lawsuit, they sent

Case 1:22-cv-22671-CMA Document 123-1 Entered on FLSD Docket 09/21/2023 Page 19 of 214

Opening Statement on Behalf of the Plaintiffs
July 10, 2023                                                    19
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1  a letter to Mariana, to Carlos to complain that they were

2  stealing their customers after they left.  You're going to hear

3  that after we filed this lawsuit, they sued Rafaela and

4  Mariana.

5        What does that have to do with the money that my

6  clients earned while they were working there?  You're not going

7  to hear the Judge tell you, Oh, the law allows you to reduce

8  their pay.  This all happened after the fact, so why are you

9  going to bring it up?

10        What they can't explain is how or why anything that my

11  clients did after they left Avant has anything to do with this

12  case.  In fact, they didn't send a letter to Delio; they didn't

13  send a letter to Rafaela.  It doesn't matter.

14        So at the end of this case, you're going to hear the

15  evidence and I'll do some fancy -- not super fancy, but kind of

16  like this display because it's a case about wages and you've

17  got to stay interested.  And at the end of the case, after you

18  hear the witnesses testify and review the evidence, Judge

19  Altonaga is going to again instruct you on the law.

20        And we have jury instructions.  It's going to tell

21  you -- Your Honor's going to tell you what the law is, and it's

22  your obligation to follow the law and render a decision.

23        And you're going to hear that the law requires

24  companies like Avant to make and keep records of how many hours

25  their employees work and the amount they're paid.  And if you

Opening Statement on Behalf of the Plaintiffs
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    find it that my clients were employees and the Defendants

2    didn't keep adequate records for my clients, then my clients

3    are entitled to estimate the hours that they worked because

4    you're going to hear that there were no time records.  They

5    didn't care because they weren't paying overtime.  What did

6    they care?  My clients were making them money.

7            So you're going to hear that it's going to be your

8    responsibility to decide whether my clients are entitled to

9    overtime, and you're going to hear about the six factors.

10   You're going hear about how overtime is different than the

11   right to silence.  You can't waive or contract away your right

12   to overtime.  Overtime has to be paid.  It doesn't matter if

13   you sign a contract.  You have an agreement.  You can't get

14   around the law.  And overtime is the law for employees.

15           And so this isn't like a right to silence where you

16   can waive it or sign it away.  If you work overtime and you're

17   entitled to get paid it, it doesn't matter if you agree with

18   your employer it could be less.  You're not going to hear that.

19           You're going to hear, Oh, they wanted -- that your

20   clients were independent contractors, that they filed 1099s and

21   they filed as independent contractors.  The case is going to

22   show that the Defendants issued the 1099s and that based on the

23   documents that the Defendants issued, my clients filed their

24   taxes based on the documents.  And if they would've issued

25   W-2s -- like we believe the evidence is going to show they

Opening Statement on Behalf of the Plaintiffs
July 10, 2023                                                        21
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    should have -- my clients would have filed as employees.

2    Wouldn't have any problem with it.

3           And in making this decision whether my clients were

4    employees, you're going to hear about the economic realities

5    and how your focus should be on whether and how my clients

6    depended on the Defendants for their income, whether my clients

7    who walked in and out at the Avant office sat at their desk,

8    used their computers, logged into their software and serviced

9    their leads were in business for themselves because that's

10   really what you're going to hear the test is.

11          The Court is going to instruct you that you can

12   consider that the Defendants paid my clients by commission in

13   direct deposit and that -- how these factors play in deciding

14   whether my clients should've been classified as paid employees,

15   and if so, whether they worked and should've gotten paid

16   overtime.

17          And as far as the commissions and the bonuses, you can

18   ask yourselves, you know, what's the motivation for not paying

19   that money.  Where did that money really go?  Should it have

20   gone to my clients?

21          Should they have gotten the commissions that they are

22   going to tell you that they earned by signing up all of these

23   different insureds and passing them along to the customer

24   service center after which it went behind a curtain and they

25   don't know what happened, or are you going to believe the

Opening Statement on Behalf of the Defendants
July 10, 2023                                                22
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    Defendants?  Mr. Cortes, his name is on every insurance policy

2    that's written and performed the accounting behind the curtain.

3           So at the end of the case, there is going to be a

4    closing argument and then there is going to be a verdict form.

5    All we're going to ask for you to do is keep an open mind,

6    okay.  You haven't made your minds up.  Keep an open mind,

7    consider the evidence, but most importantly, use your common

8    sense in making and in forming your opinion throughout the

9    case.

10          Don't form it until the end of the case once you hear

11   all the evidence.  I am not afraid of any of it.  We want you

12   to hear it all.  We don't want the case to end early.  We don't

13   want you to make your minds up early.  We want you to hear

14   everything.  We want you to wait for the jury instructions and

15   then make up your minds.

16          Thank you for your attention.  Thank you for taking

17   time out of your lives for the next couple days, for listening

18   to us, for bearing with us and for the decision that you'll

19   ultimately render.

20          THE COURT:  Defense counsel.

21          OPENING STATEMENT ON BEHALF OF THE DEFENDANTS

22       (Pause in proceedings.)

23          MR. TROPP:  Ladies and gentlemen of the jury, truly,

24   it's an honor for me to be here today in this courtroom.  It's

25   really a big deal.  The whole jury system is -- let me turn my

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 23 of
214                                                                      23
Opening Statement on Behalf of Other Defendants
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

 1    mic on.  It's, you know, fundamental.  It's what makes -- keeps

 2    us to be free, you know, to have a jury decide these issues.

 3         And what I find most interesting is although I know

 4    the Judge is an expert in wage and hour law, as is

 5    Mr. Pollock -- but ultimately you decide.  You're going to be

 6    the decision-makers.  I find that to be very interesting.  And

 7    it's not like you can have a jury from outside of Miami.  It

 8    has to be a Miami jury because you know how Miami works.

 9    You're in that best situation.

10         You know the difference between a W-2 employee, an

11    employee who has to show up 9 to 5, half an hour for lunch like

12    a school teacher or a bus driver or -- you know the difference

13    between an independent contractor or a salary-based job.

14    You've been here most of your lives, most of you, and you know

15    how the system works.

16         And the last thing I want to do is distract you.  I'm

17    going to try to keep you from being distracted.  And one thing

18    about the truth, the truth always stays the same.  It doesn't

19    change.  You're going to see changes.  You're going to see

20    things that are going to -- that they're going to say that they

21    said that they're going to show that they're not going to show.

22    So truth is constant and truth, I believe, is simple.

23         And I want to -- the whole idea is I want to make this

24    simple for you.  This is not an FLSA wage and hour case.  It's

25    not.  So that's going to be -- one of the first questions in

Opening Statement on Behalf of the Defendants    24
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   your verdict form is:  Are they employees under the FLSA as

2   defined as the FLSA?

3          They were not.  They were independent contractors.

4   They were not employees.  This isn't a typical salary job.

5   This was a retail sales job.  There's licensed insurance sales

6   agents.  Their job was not to be an insurance agent.  Their

7   jobs were to be insurance sales.  And they basically -- part of

8   their licenses is not only the State of Florida but they have

9   to be licensed with the CMS.  In other words, like the

10  Obamacare enrollment.

11         And that's -- that's a -- that's a -- during open

12  enrollment and that's when they're claiming there was overtime

13  worked, during the open enrollment 13-week period.  Which what

14  I find mind-boggling is in that 13 weeks that they're claiming

15  there should have been overtime, Carlos, his, like, first three

16  months made $21,000, over $21,000, averaging about, like, 2300

17  a month.  That's not a minimum wage job.  This is not a minimum

18  wage case.  Making 25 -- almost 3,000 a week.

19         Delio made 6,000 in his second month, 1500 in his

20  first month and $21,000 his third month.  $30,000 in three

21  months during the open enrollment period.  Mariana made $27,000

22  in that opening enrollment period.  $27,000.  And Rafaela made

23  approximately like $42,000.  She averaged about $3,337 a week.

24  It's not a minimum wage -- it's not a wage and hour case.  It's

25  not an hourly case.  They got hired from the first day they

Opening Statement on Behalf of the Defendants
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

 1    came in.

 2          And Reinier and his wife started this company from

 3    ground up, brought these people in, taught them how to make

 4    money, told them, You can make a lot of money.  You've just got

 5    to sell.  And the more they sold, the more money they made.

 6    Every person that they sold to, they got a percentage.  More

 7    people they sell, they got a bonus.

 8          The whole idea was to incentivize them to make them

 9    want to make money.  The more money they made, the more money

10    the company makes.  That's how a retail establishment works.

11    It's not a wage and hour case.

12          And then they're saying -- they said that the

13    recordkeeping was not good.  First of all, under the law, an

14    employer does not have to keep any records for independent

15    contractors.  You're going to hear also testimony that they set

16    up their own LLCs.  They set up their own companies.  Which

17    they filed tax forms, tax records, tax returns saying that

18    they're self-employed, working for these other companies, their

19    own companies, not W-2s.  They wanted that.  They asked for

20    that.

21          And that's -- and that's how they knew -- they knew

22    from day one that's how this works.  You sell more; you get

23    paid more.  If you don't want to show up to work, you don't

24    have to show up to work.  If you don't want to work two hours,

25    you didn't have to work two hours.  They were allowed to work

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 26 of
214                                                                                          26
Opening Statement on Behalf of the Defendants
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

 1  from home if they wanted to when all they had to do was ask.

 2          And they're going to make a big deal about this

 3  calendar thing, this calendar done by the agents.  I don't know

 4  if they considered -- like, we think that's our best evidence,

 5  the calendar workweek that they put together, because it shows

 6  that they only had to work like 30 hours a week.  It says 9 to

 7  3.  They didn't work on Saturdays and Sundays.

 8          You're going to see in those calendars that Delio,

 9  like, would take three days off in the week or not come in at

10  all.  It's up to them.  That's how retail works.  If you don't

11  want to show up, you don't show up.  If you don't want to work,

12  you don't work.

13          But they wanted to work during open enrollment.

14  That's like a florist during Valentines.  That's their day of

15  making the most money.  That's their -- we shouldn't have paid

16  overtime for that 13-week enrollment period.  No.

17          If Avant was -- if they said, We're going to keep the

18  place open 24 hours, these Plaintiffs probably would've been

19  there 24 hours because that's their opportunity to make money.

20  And that's one of the essential parts of the independent

21  contractor factors that we're going to go through -- is their

22  opportunity for profit or loss.

23          What does that mean?  Some people are stuck in a

24  dead-end job and they have no opportunities to go up and down.

25  Some people have minimum wage jobs and they could be there for

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 27 of
214                                                                                27
Opening Statement on Behalf of the Defendants
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1  ten years and they're not going to go anywhere.  That makes

2  somebody an employee.  But they had the profit and loss

3  opportunity.  That's the biggest factor in why they're

4  independent contractors.  The time -- they decided when they

5  worked.  They decided how long they wanted to work.

6          Now, I wasn't even going to bring it up.  I wasn't

7  going to make a big deal about it.  But the fact is:  While

8  they worked for Avant, they were allowed to bring in their cell

9  phones.  They had access to all the recordkeeping equipment.

10 They could see what they were making, what was owed to them,

11 how many -- what was going on.  Never once -- not once while

12 they were working for Avant did they say, Hey, I'm owed a

13 dollar.  Hey, I'm owed overtime.  I'm owed a bonus.  I'm owed a

14 commission.  Not once the whole time.

15         And then, just so you know, although it may look like

16 that you've got a bunch of employees and they must have done

17 something wrong, all these people here, like, in unison --

18 you've got Carlos and Mariana who are brothers and sisters who

19 basically took pictures and, like, started their own companies

20 mirroring the same thing that they were doing.

21         MR. POLLOCK:  Objection, Your Honor.  This goes

22 outside the scope.

23         MR. TROPP:  He brought it up, Judge.

24         MR. POLLOCK:  It's also argumentative.

25         THE COURT:  It is argumentative.  Just focus on what

Opening Statement on Behalf of the Defendants
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

 1    the testimony and the evidence will show, please.

 2            MR. TROPP:  Okay.

 3            The evidence will show that this whole wage and hour

 4    thing came to fruition and mentioned for the first time -- the

 5    first time it ever came up was the day this lawsuit started and

 6    that before this lawsuit started, Avant sent a cease and desist

 7    letter -- a letter to Mariana and Carlos to stop taking

 8    their -- stop doing what they were doing with the infringement

 9    on the company, you know, the privileges and secrets and

10    what -- what they did.

11            And then in response to that, in response to the cease

12    and desist, basically, you know, on the grounds of this, on

13    this infringement of the company's rights and trade secrets and

14    all that stuff, basically taking -- basically recopying the

15    company, they responded in unison -- they said, Oh, it's a wage

16    and hour case.  It's a commission and bonus case.

17            It's very important that in this lawsuit there are

18    three counts.  The first count is under FLSA, wage and hour.

19    They say they were paid -- should've been paid overtime.

20    You're going to see that's really a small part of what they're

21    saying they're owed.  Count 2 and Count 3 are contracts based

22    on contract and unjust enrichment.  You can't recover on both.

23    They're basically saying, You didn't pay us what you agreed to

24    pay us.

25            We're going to show you that they got everything that

Opening Statement on Behalf of the Defendants
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    they were entitled to.  They made a lot of money.  And

2    instead -- you could ultimately -- when you look at the facts,

3    you can determine, Okay.  Was there anything owed?  Were there

4    commissions owed?  Were there bonuses owed?

5              We're going to show you that Mariana, she admitted she

6    got her bonus.  They got their commissions.  They got their

7    bonus.  This is a contract case.  It's not a wage and hour

8    case.  You're going to see that.

9              And at the end when we finish -- I am going to try to

10   get through this as fast as we can without distracting you and

11   ask you:  Were they employees under the FLSA, which is meant to

12   protect people?  It's meant to make sure that people get their

13   minimum wage, time and a half.  It's made to, like, not -- keep

14   employers from controlling workers and taking advantage of

15   them.  It's not meant to help --

16             MR. POLLOCK:  Objection, Your Honor.  This is all

17   argumentative.

18             THE COURT:  Sustained.

19             MR. TROPP:  At the end when you get the verdict form,

20   the first question is:  Are the employees under the wage and

21   hour act, FLSA?  You're going to check no.  No.

22             MR. POLLOCK:  Objection, Your Honor.  This is all

23   closing argument, what you're going to check.  It's not what

24   the evidence is going to show.

25             THE COURT:  Overruled.

Opening Statement on Behalf of the Defendants
July 10, 2023
30
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1          MR. TROPP:  And also, you'll see nothing was owed.

2     Everything was paid.  People here who were injured -- or most

3     injured or most hurt from this is Reinier and his wife, Andrea,

4     who tried to help these people.  That's what you're going to

5     see.  Thank you.

6          THE COURT:  Ladies and gentlemen, if you wish, you may

7     take notes to help you remember what the witnesses say.  If you

8     do take notes, please do not share them with anyone until you

9     go to the jury room to decide the case.  Do not let note-taking

10    distract you from carefully listening to and observing the

11    witnesses.

12          When you leave the courtroom, you should leave your

13    notes hidden from view in the jury room.  The court security

14    officer should be passing out notebooks and pens or pencils, as

15    I speak, shortly.

16          Whether or not you take notes, you should rely on your

17    own memory of the testimony.  Your notes are there only to help

18    your memory.  They are not entitled to greater weight than your

19    memory or impression about the testimony.

20          We'll be breaking for lunch at 12:30, so let's

21    continue, please.  First witness.

22          MR. POLLOCK:  The Plaintiffs call Reinier Cortes, the

23    Defendant.

24          THE COURT:  Mr. Cortes, please approach.

25          Raise your right hand.

1                    **(Time 11:21 a.m.)**

2                        **REINIER CORTES,**

3    a witness for the Plaintiffs, testified as follows:

4            **THE WITNESS:  I do.**

5            **THE COURT:  Please be seated.**

6                    **DIRECT EXAMINATION**

7    BY MR. POLLOCK:

8    Q.  Afternoon, Mr. Cortes.

9    A.  Hello.

10   Q.  What's your full name?

11   A.  Say again.

12   Q.  What is your full name?

13   A.  Reinier Cortes Flores.

14   Q.  And you're married to the other individually-named

15   Defendant in this case, Andrea Gonzalez Quintero; is that

16   right?

17   A.  Correct.

18   Q.  Now, Avant is your company, is it not?

19   A.  I'm sorry.  What was the question?

20   Q.  Avant is your company?

21   A.  Yes.  I'm the CEO.

22   Q.  You're also the president?

23   A.  Yes.

24   Q.  And your wife is the vice president; is that also true?

25   A.  Correct.

1    Q.  And she works with you in the business?

2    A.  Correct.

3    Q.  And she's always worked with you at Avant since it opened

4    in 2020; is that correct?

5    A.  Not since it was formed.

6    Q.  Okay.  Not since it was formed?

7    A.  Correct.

8    Q.  But she's worked with you since 2020 in the business,

9    right?

10   A.  I don't recall if it was since 2020 because she had a job

11   at the time, a full-time job.

12   Q.  Avant is a health insurance agency, right?

13   A.  It's a health insurance agency.

14   Q.  As a health insurance agency, it sells health insurance or

15   markets health insurance to people who don't get health

16   insurance from their employer, right?

17   A.  Can you repeat the question?  It was a long question.

18   Q.  Sure.  Your company markets health insurance to people who

19   don't get health insurance from their employers?

20   A.  Not only that they don't get insurance from their

21   employers; that they don't have health insurance regardless if

22   it's from their employers or not.

23   Q.  Okay.  And then as far as Avant's business, it has to be

24   licensed to sell insurance in the State of Florida; is that

25   true?

Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1    A.  Correct.

 2    Q.  And it also has to be licensed in other states in order to

 3    sell insurance in, let's say, Illinois or Texas, correct?

 4    A.  Correct.

 5    Q.  And you were the one who applied for the licenses that

 6    allowed Avant to sell the health insurance --

 7              THE COURT REPORTER:  I'm sorry.  The question a little

 8    slower, please.

 9    BY MR. POLLOCK:

10    Q.  You were the one who applied for the licenses that allow

11    Avant to sell health insurance in Florida, Illinois and Texas;

12    is that correct?

13    A.  Yes.

14    Q.  As far as hiring agents, you're the one who did that; is

15    that right?

16    A.  What's the question?

17    Q.  Hiring agents.  You're the one who hired the health

18    insurance agents at Avant?

19    A.  At the beginning, yes.

20    Q.  Okay.  At the beginning, meaning until --

21    A.  From when I formed the company.

22    Q.  From when you formed the company until at least -- what? --

23    July or August of 2022?

24    A.  I do not recall until what time I was personally involved.

25    Q.  I don't know if we got that answer.
```

Direct Examination - Redirect Colvia
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1   A.   So I do not recall until what time I was personally the one

 2   hiring agents directly.

 3   Q.   In 2020, you're the one who hired the agents, correct?

 4   A.   Correct.

 5   Q.   In 2021, you're the one who hired the agents, correct?

 6   A.   Correct.

 7   Q.   And, in fact, you're the one who hired each of my

 8   clients -- Delio, Carlos, Mariana and Rafaela, right?

 9   A.   Yes.

10   Q.   All right.  As far as recruiting other insurance agents for

11   the business, you were the one who would've posted any

12   advertisements to solicit people to come in and work for your

13   company, right?

14   A.   What's the question?

15   Q.   Sure.  You're the one who posted the advertisements to

16   recruit insurance agents for the business; is that correct?

17   A.   I believe in the beginning everything was word of mouth,

18   referrals, people that I've been knowing for years, and then I

19   may have posted something on Craigslist, probably.

20   Q.   As far as the pay structure at Avant, you're the one who

21   decided how agents would be paid; is that right?

22   A.   Could you please repeat the question?

23   Q.   Sure.  You're the one who decided how agents at Avant would

24   be paid?

25   A.   Not necessarily.
```

Case 1:22-cv-22671-CMA   Document 123-1   Entered on ELSD Docket 09/21/2023   Page 35 of
214
Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA
35

1  Q.  Well --

2  A.  It was a mutual agreement between the agents and the

3  company.

4  Q.  It was an agreement between the agents and yourself, right?

5  A.  And the company, correct.

6  Q.  What do you mean "and the company"?

7  A.  Say again.

8  Q.  You said it was also "and the company."  What company are

9  you referring to?

10  A.  Avant Assurance.

11  Q.  All right.  And did my clients agree with anybody else at

12  Avant other than you on how they would be paid?

13  A.  No.  Just with me.

14  Q.  Okay.  That's what I thought.  Okay.

15      Now, as far as the different insurances that Avant was

16  authorized to sell, that would include Oscar, Cigna,

17  UnitedHealthcare, Ambetter and others for about eight or ten

18  companies in total?

19  A.  Yes, around that.

20  Q.  And when you open up an insurance agency, can you just

21  start selling insurance for anybody, for any company, or is

22  there a process that you have to go through?

23  A.  Well, you would need to have a contract if you want to get

24  compensated for it.

25  Q.  So do you need to be appointed to these different insurance

Case 1:22-cv-22671-CMA  Document 123-1  Entered on ELSD Docket 09/21/2023  Page 36 of 214

Direct Examination / Redirect Cortes
July 10, 2023                                                     36
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1  companies in order to sell for them?

2  A.  What's the question?

3  Q.  Do you need to be appointed to the different insurance

4  companies to sell for them?

5  A.  So I don't know the legality of appointed.  I know that if

6  you want to get paid, you need to have a contract with the

7  insurance company.

8  Q.  Okay.  And so each of the insurance companies that we just

9  talked about for the eight or ten in total, were you the one

10 who applied to get the contracts with these different

11 companies?

12 A.  If I am the one that apply to the contract for the

13 companies, yes.

14 Q.  And as far as -- is there an appointment process for you to

15 be appointed to be able to sell insurance for these companies?

16 A.  What's the question?

17 Q.  An appointment process.

18 A.  I don't understand appointment, what you're referring by.

19 Q.  Okay.  Do you remember giving a deposition in this case?

20 A.  Say again.

21 Q.  Do you remember giving a deposition in this case?

22 A.  Yes.

23 Q.  And you gave the deposition by Zoom on April 11th of 2023

24 with my associate Mr. Cummings, who is the one that took your

25 deposition.  Do you remember going through that exercise?

Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.    Yes.

2    Q.    And do you remember being asked a series of questions in

3    that deposition?  Right?

4    A.    Yeah.

5    Q.    And do you remember being asked these questions and giving

6    the following response, Page 8 of your deposition:  Okay.

7    Understood.  All right.  And do you understand that the court

8    reporter just swore you in under oath to tell the truth?  Your

9    answer was correct.  And you said all right.

10         So we're not in a courtroom setting, obviously.  We're over

11   Zoom and I'm in my office and I'm assuming you are wherever you

12   are in your office.  But because you're sworn under oath to

13   tell the truth, even though we're not in a courtroom setting, I

14   want to remind you that you always have to tell the truth no

15   matter what the question is.  That's whether you don't remember

16   or you do remember, understood?  And you answered correct.

17         That was your answer back then, right?

18   A.    Yeah.  If that's what you have, that would be the answer.

19   Q.    Okay.  And then Mr. Cummings actually asked you about the

20   appointment process at Page 13.  Okay.  I may not remember all

21   the insurance companies, but how many insurance companies is

22   Avant appointed with?  And you said eight or ten.

23         And then the question was:  How does Avant Assurance become

24   appointed with an insurance company?  So what's the process?

25   So you have to send an inquiry to each of the companies and

Case 1:22-cv-22671-CMA   Document 123-1   Entered on ELSD Docket 09/21/2023   Page 38 of
214
Direct Examination - Redirect Cortes
38
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1  basically present a business plan.  And if they accept it, they

2  issue a contract.

   Was that your answer back then?

4  A.  Yes.  Basically, you submit a business plan and then they

5  will issue a contract if your business plan is favorable to

6  them.

7  Q.  Okay.  So the answer is correct, what you gave then?

8  A.  Yes.

9  Q.  And you understand the appointment process, what I'm

10 talking about?  Is that a yes or no?  You understand what the

11 process is?  Yes or no.

12 A.  Can I ask a question?

13 Q.  No.  You can't ask me a question.  But you can go ahead and

14 answer me yes or no whether you know what the appointment

15 process is that we were talking about.

16 A.  I don't understand the difference between appointment and

17 contract, if that's what you want to hear from me.

18 Q.  Now, Avant sold Obamacare insurance during the open

19 enrollment period; is that right?

20 A.  Right.

21 Q.  And the open enrollment period runs from November 1 to the

22 end of January of each year; is that right?

23 A.  Yes.  At the beginning, it could have been just November

24 and December, but the law changed and they made an extension

25 through January.

1    Q.  And the law changed as far as my clients are concerned when

2    they worked from the 2020 enrollment period, which went from

3    November 2020 to January of 2021, and then the '21 to '22

4    enrollment period.  That enrollment period was more than the

5    two months.  That was from November 1st to the end of January

6    for those couple years, right?

7    A.  What was the question?

8    Q.  The question was:  The open enrollment period that my

9    clients worked, right, we're talking about the time period from

10   November of 2020 through the end of January of 2022, right?

11   A.  What is the question?  I don't understand the question.

12   Q.  I'm asking if that's the open enrollment period that they

13   worked that we're talking about in this case.

14   A.  So they worked from November 1st through January 1st.  Is

15   that your question?

16   Q.  Yes.

17   A.  Okay.  Yeah.

18   Q.  Okay.  Because you mentioned that there were other

19   enrollment periods in the past that ended in December, but

20   we're not talking about those.

21   A.  2020 was one of those open enrollments.  That is what I am

22   referring about that.

23   Q.  And open enrollment's the time when people who don't have

24   health insurance from their employer get to choose their health

25   insurance plan for the next year?

Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1                    THE COURT REPORTER:  I'm sorry.  The question again.

2       BY MR. POLLOCK:

3       Q.  Open inrollment is the time when people who don't have

4       health insurance from their -- get to choose their health

5       insurance plan for the next year or try to renew their plan for

6       the next year, right?  That's what open enrollment is?

7            You gave a deposition without an interpreter, did you not?

8       A.  Yes.  I speak fluent English.

9       Q.  Okay.

10      A.  If I don't understand your question, I have to ask you.

11      Q.  Understood.  And I want you to continue to do that.

12      A.  Don't get mad at me for that.

13      Q.  Nobody's mad.

14           I'm just asking you if open enrollment is the time when

15      people who don't have insurance or looking to renew their

16      insurance other than as provided by their employer go ahead and

17      go on the Marketplace to find insurance.  Yes or no?

18                  MR. TROPP:  Objection, compound.

19                  THE WITNESS:  I don't understand the question.

20                  THE COURT:  Overruled.

21      BY MR. POLLOCK:

22      Q.  All right.  You don't understand the question?

23      A.  No.

24      Q.  Okay.  Do you know what the open enrollment period is?

25      A.  Yes.

Direct Examination - Redirect Cortes
July 10, 2023                                          41
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   Q.  Is the open enrollment period a time when people can go

2   ahead and select their health insurance plan when their

3   employer doesn't give them insurance?

4   A.  It's not necessarily when the employer doesn't give them

5   insurance.

6   Q.  Okay.

7   A.  If that's what you're asking.  I'm not sure.

8   Q.  Well, can you get a health insurance plan on the

9   Marketplace if you've already got insurance from your employer?

10  A.  There are certain qualifications that even though your

11  employer might offer insurance but you can still apply for the

12  ACA, which is the Obamacare.  That's why I wanted to make that

13  clear that it's not necessarily that it's not offered by the

14  employer.

15  Q.  Most of the people who go through the open enrollment

16  process don't have insurance from their employer; is that

17  right?

18  A.  I don't know that.

19  Q.  Well, most of the policies that you sold through your

20  company were not the people who already had insurance based on

21  the plans that they were getting, right?

22  A.  They didn't have insurance.

23  Q.  Okay.  And that was most of the people did not have

24  insurance already, right?

25  A.  Say again.

Direct Examination - Redirect Cortes
July 10, 2023
42
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1   Q.  Most of the people who got insurance from Avant did not
 2   already have insurance in place for their health?
 3   A.  Correct.  But the open enrollment also is a period where if
 4   you have insurance, that's your opportunity to switch plans as
 5   well.  So it could have been that they had insurance.
 6   Q.  Sure.  They could've had insurance and now it's the time
 7   when the amount of their insurance is going to change or the
 8   benefits for their health insurance is going to change.  And so
 9   that's when they go to your company and they call your company
10   and you offer them different plans, right?
11   A.  (No audible response.)
12   Q.  And so for a health insurance agency like yours at Avant,
13   it's a very busy time.  Would you agree?
14   A.  Yeah.
15   Q.  I mean, you think of a feeding frenzy.  This is -- for a
16   health insurance agency, this is the time where you can make
17   the most money in the shortest amount of time, right?
18   A.  Correct.
19   Q.  And when you started your company in 2020, that 2020 to
20   2021 open enrollment period was the first one that your company
21   had worked through, right?
22   A.  Correct.
23   Q.  So your company -- you also have a -- is doing business as
24   a fictitious name, the Obamacare Insurance Center; is that
25   right?
```

1   A.   Yes.

2   Q.   And that's the name that you registered with the State of

3   Florida?

4   A.   Correct.  That's the DBA.

5   Q.   And as far as an office, your company has an office, does

6   it not?

7   A.   Correct.

8   Q.   Its first office was in Kendall?

9   A.   In Kendall, yes.

10  Q.   And you had that office until, let's say, May, June of

11  2022?

12  A.   Until last year, yeah.

13  Q.   Until May or June of 2022 it was, right?

14  A.   May 2022, yeah.

15  Q.   And then you moved to the bigger office in Doral?

16  A.   Correct.

17  Q.   And when you moved to the bigger office in Doral, agents

18  had to have parking cards to go in and out of the parking

19  garage?

20  A.   Yes.  Like in most of the buildings, they have a parking

21  garage.  You need a key card to go in and out.

22  Q.   And so for anybody who wanted to work at Avant in 2020,

23  2021 and into 2022, that would be your decision, right?

24  A.   Correct.

25  Q.   Now, to work at Avant, an agent -- you said it would first

1    be word of mouth, right?

2    A.   Correct.

3    Q.   And so an agent -- let's say Rafaela.  Rafaela would come

4    and talk to you over the phone or meet with you in person?

5    A.   Yes.  She was referred to us through a friend, a mutual

6    friend that we both share, because she wasn't making enough

7    money with them as an independent agent and she would make more

8    money with us.  So she was referred to us by them.

9    Q.   And so you hired Rafaela.  She was the first one you hired,

10   right?

11   A.   She was what?

12   Q.   She was the first of my clients whom you hired?

13   A.   No.  I think it was Delio.

14   Q.   It was Delio first?

15   A.   Yes.

16   Q.   You talked to Delio about getting his license and then

17   Delio came and worked for you?

18   A.   Correct.  Yeah, he didn't have a job at the time.  He is

19   also married to my mom, so obviously I wanted to help him.

20   Q.   So was Delio one of the first agents that started working

21   for you?

22   A.   Say that again.

23   Q.   Was Delio one of the first agents who started working for

24   you?

25   A.   Delio, yes.

1   Q.  So in insurance, you don't get paid right away at the

2   company, right?

3   A.  What's the question?

4   Q.  Sure.  In the insurance business, you don't get paid the

5   day that you sign up a new member?

6   A.  Correct.

7   Q.  So you have expenses that you're paying until you get money

8   from the insurance company; is that correct?

9   A.  Correct.

10  Q.  So when you hire somebody who is going to be an insurance

11  agent, you can't just hire Delio without making sure that he's

12  first licensed to sell insurance; is that correct?

13  A.  That is correct.

14  Q.  And so Delio has to be a licensed insurance agent in each

15  state where he's supposed to sell insurance?

16  A.  Correct.

17  Q.  And so before somebody comes to work for you, you make sure

18  that they are a licensed health insurance agent; is that true?

19  A.  Correct.

20  Q.  And then because Delio has to be licensed, your

21  understanding is that when you hire Delio, Delio's going to do

22  the work, right?  He's going to be the one who's going to be

23  the agent?

24  A.  What's the question?

25  Q.  When you hired Delio as an insurance agent, what you're

Direct Examination of Reiner Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    expecting is for Delio to do the work, correct?

2    A.   I don't understand your question.

3    Q.   Sure.  Delio sitting on the left with the goatee and the

4    black zip-up -- right?  That's Delio?

5    A.   Yes.

6    Q.   Okay.  And when you hired Delio to work at Avant, what you

7    were looking for was for Delio to do the work at Avant; is that

8    right?

9    A.   To produce, yeah.  To solicit business.

10   Q.   He would be the one producing for you?

11   A.   Correct.

12   Q.   Okay.  So it's not like you expected Delio, when you hired

13   him, to go out and then have four other people who you don't

14   know do the work for him, right?  That's not what you

15   understood was going to go on?

16   A.   He wasn't prevented from bringing help.

17   Q.   He could bring help, but he couldn't have anybody else sell

18   for him because he was a licensed insurance agent whom you

19   hired, correct?

20   A.   Yes.

21   Q.   Okay.  And so you hired Delio.  Then you hired Rafaela?

22   A.   Probably in that order, yeah.

23   Q.   And then was it Carlos or Mariana who was next?

24   A.   Mariana and then Carlos.

25   Q.   And then you hired how many other agents working for you?

```
 1   A.   We had more.   There were another three, four agents at the
 2   same time.
 3   Q.   Okay.   So you had seven or eight agents at the same time?
 4   A.   Say again.
 5   Q.   You had about seven or eight agents working for you?
 6   A.   It could have been around that number.
 7   Q.   And to work for you, every insurance agent at Avant you
 8   classified and you paid as an independent contractor until
 9   when?   About November of 2022?
10   A.   What was the question?
11   Q.   Sure.   Every insurance agent that worked at Avant you
12   classified and paid as an independent contractor until November
13   of 2022; is that correct?
14   A.   No.   That's incorrect.
15   Q.   Okay.   So you had insurance agents who were employees
16   before then?
17   A.   Correct.
18   Q.   How many?
19   A.   I don't recall.   But we did have employees and independent
20   contractors, both, insurance agents.
21   Q.   But you didn't have any before we filed the lawsuit, did
22   you?
23   A.   Come again.
24   Q.   You didn't have any insurance agents who were employees
25   before we filed this lawsuit in August of 2022, did you?
```

Direct Examination of Reinier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.    Probably, yes.

2    Q.    Probably?

3    A.    Yes.

4    Q.    Well, you had no way of tracking the time that people

5    entered work and left work each day at Avant, did you?

6    A.    No.  Correct.

7    Q.    So even though you say you had employees, you weren't

8    keeping track of their time?

9    A.    They were salaried employees.

10   Q.    They were salaried employees.  So you had insurance agents

11   who were salaried?

12   A.    Yes.

13   Q.    And you didn't care how much they worked because they were

14   on salary, right?

15   A.    Not necessarily.

16   Q.    Well, which is it?  You didn't keep track of the time

17   because you didn't have them clock in and out.

18   A.    They had a schedule and they knew what time they had to be

19   at the office, the employees.

20   Q.    They knew when they had to be at the office, but, I mean,

21   for you, you didn't care because they were on salary, right?

22   A.    No.  I did care.  Don't put words in my mouth, please.

23   Q.    Okay.  You cared.

24        So you made sure -- so how many people were getting paid

25   overtime as independent contractors?  None, right?

Direct Examination of Reinier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.    What's your question?

2    Q.    Independent contractors didn't get overtime, did they?

3    A.    I wasn't tracking their time, so I wouldn't know if they

4    worked 40 hours, 30 hours or 20 hours.

5    Q.    And you didn't care how many hours the independent

6    contractors worked because you weren't paying them wages; you

7    were paying them as independent contractors?

8    A.    Commissions.

9    Q.    And as far as you understand it, because you paid them

10   commissions, you didn't have to pay them as employees?

11   A.    What's the question?

12   Q.    Because you paid them commissions, you didn't have to pay

13   them as employees?

14   A.    No.  That's not the reason.

15   Q.    Okay.

16   A.    You want to ask me a question?

17   Q.    Well, for my clients -- well, let me ask you this:  In

18   November of 2022, right, so a couple months after we filed this

19   lawsuit, you decided to pay all of your insurance agents as

20   employees, right?

21   A.    Correct.  Not all.  Let me clarify that.  We still have

22   independent contractors insurance agents at this time.

23   Q.    But the majority of your insurance agents are employees?

24   A.    Not necessarily.

25   Q.    Since November?

Direct Examination - Reinier Cortes
July 10, 2023                                                50
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.   Correct.

2         MR. TROPP:  Your Honor, I'd just like to object on

3    grounds of relevance.

4         THE COURT:  Overruled.

5    BY MR. POLLOCK:

6    Q.   And so let's talk about these insurance agents, what they

7    do and -- so for the insurance agents, do you agree that you

8    provided, and Avant provided, everything they need to do their

9    work?

10   A.   For the insurance agents?

11   Q.   Yes.

12   A.   During what time frame?

13   Q.   While my clients worked there.

14   A.   Say again.

15   Q.   While my clients worked there.

16   A.   We had computers and they had the use of that.

17   Q.   My question was:  Did you provide everything they needed to

18   do their work?

19   A.   I don't know if they had everything they needed to do their

20   work, but we had computers available for them.

21   Q.   Okay.  Well, you had an office?

22   A.   We had an office, yeah.

23   Q.   You had a desk?

24   A.   Correct.

25   Q.   You had computers?

Case 1:22-cv-22671-CMA   Document 123-1   Entered on ELSD Docket 09/21/2023   Page 51 of
214
51
Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1  A.   Correct.

2  Q.   You had computer monitors?

3  A.   Correct.  Some of them even brought their own laptops.

4  Q.   And if they didn't, you provided those computers?

5  A.   Say again.

6  Q.   If they didn't provide their own laptops, then you provided

7  your own -- you provided a computer for them?

8  A.   We had computers available, yes.

9  Q.   We talked about the monitors.

10      You provided computer software, did you not?

11 A.   Yes.  CRM.

12 Q.   I'll go through that in second.

13      Besides the CRM, you had an electronic signature program

14 Blueink?

15 A.   That was available and they were free to use it or not at

16 their discretion.

17 Q.   And you paid for these subscriptions for these softwares?

18 A.   I'm sorry?

19 Q.   You paid for the subscriptions for these softwares?

20 A.   Yes.

21 Q.   The office, the air conditioning, lights, water, all

22 provided by Avant, right?

23 A.   Yeah.  And coffee as well.

24 Q.   And the phone system, it went through the computer.  It was

25 a Softphone system.  But that was also something that Avant

Direct Examination of Reinier Cortes
July 10, 2023                                52
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    provided?

2    A.  It was available, yes.  It was there.

3    Q.  I mean, that's how calls came through when they were

4    sitting at the office -- was through the phone system that

5    Avant provided, correct?

6    A.  Yes.  When you got to work, you log into the work platform.

7    You get your calls from the work platform.  We had a similar

8    platform for insurance.

9    Q.  Okay.  Except Uber doesn't provide the cars, right?

10   A.  Say that again.

11           THE COURT REPORTER:  I'm sorry.  What was the question

12   again?

13   BY MR. POLLOCK:

14   Q.  Uber doesn't provide the cars, do they?

15   A.  I believe they have a program where you can lease a car or

16   buy a car from them.

17   Q.  You believe?

18   A.  I've been an Uber driver myself.

19   Q.  Okay.  And when you were an Uber --

20   A.  I don't know if it's changed or not.  And that's my belief

21   from my experience as an Uber driver.

22   Q.  And when you were an Uber driver, you provided your own

23   vehicle, didn't you?

24   A.  I didn't need to use one from Uber, so I provided my own

25   vehicle, yes.

Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    Q.   So what Uber provided only was the software, right?

2    A.   Say again.

3    Q.   They provided the software?

4    A.   The software, yes.

5    Q.   You did the marketing at Avant to bring in the leads?

6    A.   Correct.  They also did their own marketing and they also

7    brought their own referrals.  Not a whole lot, but they did

8    some of that too.

9    Q.   You provided all the leads, did you not?

10   A.   Not all the leads, like I said before.  They also provided

11   their own leads, their own personal clients.

12   Q.   You provided the insurance products that they were going to

13   sell because the company was contracted with the different

14   insurance companies, correct?  You provided parking at the

15   office?

16   A.   Parking was for any visitor, tenants or not.

17           THE COURT REPORTER:  I'm sorry.  Any visitor, what was

18   the word --

19           THE WITNESS:  Or tenants.

20   BY MR. POLLOCK:

21   Q.   But for my clients working and the other agents working at

22   Avant, they received parking, including the parking garage at

23   the office, right?

24   A.   Yeah.

25   Q.   And they got a parking card for that?

1    A.   Yes.

2    Q.   Some people, like Delio, brought their own headsets, but

3    some people would use the headsets that Avant provided; is that

4    not true?

5    A.   No.

6    Q.   Avant didn't provide headsets?

7    A.   We had headsets available, but not all of them were using

8    the headset.

9    Q.   And then there was also the processing center that you had;

10   is that right?

11   A.   Customer service team, yes.

12   Q.   And so you had a couple different teams at the front end

13   and the back end of every insurance transaction, did you not?

14   A.   Yes.

15   Q.   You have another company in Colombia, Avant Assurance SAS?

16   A.   That's true, yes.

17   Q.   And what Avant Assurance SAS does is they receive inbound

18   leads, so people call Avant SAS.  Do they also do outbound

19   calling?

20   A.   Say again.

21   Q.   Does Avant SAS in Colombia also call customers?

22   A.   Well, I'm not authorized to speak on behalf of that

23   company.

24   Q.   Why not?  Aren't you the president of that company?

25   A.   It's not relevant to this matter, to this case.

Direct Examination - Redirect Cortes
July 10, 2023                                          55
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1  Q.  If there is an objection, your lawyer will provide that to

2  you.

3      So you're the representante legal, I think you said --

4          MR. TROPP:  Your Honor, objection, relevance.  It's

5  outside the scope.

6          THE COURT:  Overruled.

7  BY MR. POLLOCK:

8  Q.  So we're the -- so for Avant Assurance SAS, that company,

9  does it make calls to people who want insurance or does it only

10 receive calls?

11 A.  It could be both.

12 Q.  Okay.  So what Avant Assurance SAS does is it tries to get

13 as many leads as possible; is that correct?

14 A.  They're a marketing company, yes.

15 Q.  They're a marketing company for insurance.  And then what

16 they do is they take those calls once they have somebody on the

17 line and they transfer those calls to your company here, Avant,

18 first in Kendall and then in Doral, right?

19 A.  It was over the phone regardless of the location.

20 Q.  Yeah, it was over the phone.

21     So what you would do is you would use Avant Assurance SAS

22 in Colombia to try to aggregate all these leads and then you

23 would provide all the customers or all the leads to the agents

24 who were at Avant here in Miami, right?

25 A.  Correct.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on ELSD Docket 09/21/2023   Page 56 of
214                                                                                    56
Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

 1           MR. POLLOCK:  Can I get the ELMO for a second, please?

 2           THE COURT REPORTER:  It's on the ELMO.

 3           MR. POLLOCK:  I'm sorry.  The HDMI.

 4    BY MR. POLLOCK:

 5    Q.  And so these are all the things that your company -- that

 6    we talked about that the company provided.

 7        And then you also talked about the CRM software, right?

 8    That's Radiusbob?  Yes?

 9    A.  Correct.

10    Q.  And so Radiusbob, we have it up on the screen.  It's just a

11    screenshot of it.

12        That's a piece of software that's available for anybody to

13    purchase or license; is that true?  Anybody can buy it?

14    A.  Yeah.  Anybody can purchase a license.

15    Q.  And so what then happens is as you purchase the license,

16    then that software, you have to customize it for your business,

17    don't you?

18    A.  Some of it.

19    Q.  So all the customization that was done for your business,

20    that was done by or for your company so that Radiusbob would

21    work with the insurance industry?

22    A.  Correct.

23    Q.  And then you have to input all the information for the

24    different insurance agents but also for the different insurance

25    companies and then all the different plans from each of the

1    insurance companies.  You can have all that information in the

2    software, right?

3    A.   Yes.

4    Q.   Besides all that, then you have to import all the data for

5    all the leads that would come through.  So every person's name

6    and personal information would also have to go into Radiusbob,

7    right?

8    A.   Correct.

9    Q.   And so in order to use Radiusbob, right, when you come in

10   to start working for Avant, somebody has to show you how to use

11   that software because this has been customized for your

12   company; isn't that right?

13   A.   No.  They have their own YouTube videos as well, like

14   tutorials.

15   Q.   And besides the tutorials, it would be either you or your

16   wife who would show my clients how to use the Radiusbob

17   software?

18   A.   Yes.  Simple training.

19   Q.   And then how to go ahead and answer a phone call

20   because phone calls didn't come to a hand phone.  There wasn't

21   one.  It would be a headset that you plugged into the computer.

22       So you would have to know how, when a call would come in,

23   to click to answer it on the computer, right?

24   A.   Correct.

25   Q.   So in order to work for you, isn't it true that all my

Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    clients needed to bring with them to do their work was their

2    voice, their computer skills and be able to type?

3    A.   Not necessarily.

4    Q.   In your deposition in which you swore to tell the truth,

5    the same truth as if you would be in the courtroom today,

6    Mr. Cummings asked you the following question and you gave the

7    following response:  What did the agents need to bring to work

8    with them every day to do their jobs?  This is at Page 142 of

9    your deposition.  And your answer was:  Their voice, pretty

10   much, and, you know, computer skills, right.  They needed to be

11   able to type.  That's it.

12       Was that the question and the answer that you gave in this

13   case in your deposition on April 11th under oath?

14   A.   In reference to the Plaintiffs in the case, yes.

15   Q.   Now, the office that you had in Kendall, how is that set

16   up?

17   A.   How?

18   Q.   How is it -- when you walk into the office, what was there?

19   A.   We had a desk, like nine, eight, ten.

20   Q.   It was just a big, open space with desks, or were there

21   private offices as well?

22   A.   I wouldn't call it a big, open space.  It was a small

23   office, yeah.  We had eight to ten desks in that space in an

24   open area.

25   Q.   In an open area.

Direct Examination - Redirect copies
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1       Did you have also have private offices in that space?

2   A.   There were three, yeah.

3   Q.   And you were in one of those private offices?

4   A.   Correct.

5   Q.   Your wife was in another one of the private offices?

6   A.   No.  She was outside some of the time.

7   Q.   She was outside.

8       Who was in the other private office?

9   A.   They were empty.

10  Q.   And then you had the eight or nine desks?

11  A.   Correct.

12  Q.   And as far as all the computers that were there, you had

13  eight or nine computers?  Or actually more because you had

14  yours too that --

15  A.   We had less at the time as well.  We didn't start with

16  eight or nine computers.  We started with something else.

17  Q.   You worked up to that?

18  A.   Say again.

19  Q.   You worked up to eight or nine computers?

20  A.   Probably at the end we did have all the stations with a

21  computer, yeah.

22  Q.   Sure.  Because it's expensive to buy all the equipment and

23  buy all the software, and it's tough when a company starts,

24  right?

25  A.   Correct.

Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    Q.   So you have eight or nine desks out in the area.  Did they

2    all have chairs?

3    A.   Yes.

4    Q.   And they had computers and monitors?

5    A.   Yes.

6    Q.   And then who was it that went out and purchased these

7    computers?  Was that you?

8    A.   Who was?

9    Q.   Who bought the computers?

10   A.   I did.

11   Q.   And did you buy them online or did you go to, like, a Best

12   Buy?

13   A.   Some of them were online and some of them were at a local

14   store, like OfferUp.

15   Q.   Okay.  And then as far as the software, did you go ahead

16   and input all the information into Radiusbob so you could start

17   using it for your business or did you have to pay another

18   company to do that?

19   A.   What's the question?  If I put in what information?

20   Q.   Radiusbob, that's a product that you buy a license for and

21   it's available on your web browser, right?

22   A.   Correct.

23   Q.   Now, when you get that product, it probably has a log-in

24   website AvantAssurance.Radiusbob.com or something?

25   A.   Yeah, something like that.

Direct Examination - Redirect Cortes
61
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1   Q.  Something like that.
 2       Which would pull up your company's version of Radiusbob?
 3   A.  Correct.
 4   Q.  Who was it that went ahead and customized the Radiusbob for
 5   your business?  Was it you or was it another company that you
 6   hired?
 7   A.  No.  Between Radiusbob and myself.
 8   Q.  So you went and you did all the programming that we talked
 9   about to add the information with the different insurance
10   companies and the processes that -- the steps that would have
11   to be done, right?
12   A.  Most of that was already built into the software.
13   Q.  And you would customize that for your business?
14   A.  I would just have the name of the insurance companies,
15   pretty much.
16   Q.  And what about the forms; weren't there forms that you
17   could send out through Radiusbob?
18   A.  Which form?
19   Q.  Well, wasn't there consent forms that insurers could sign?
20   A.  That was not through Radiusbob.
21   Q.  Okay.  That was through Blueink?
22   A.  Yes, Blueink.
23   Q.  So there were also -- besides Radiusbob, there were also
24   forms that your company used in its business that you
25   developed, right?
```

Direct Examination - Redirect Torres
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.   I did create forms, yes.

2    Q.   And so in order for an agent to go ahead and use their desk

3    and do whatever they needed to do, most of time they would come

4    into the office and work from there; is that right?

5    A.   Yes.

6    Q.   So they'd go into the office with just their computer

7    skills and their voice and they'd sit down at the desk that you

8    provided in the chair that you provided, use the keyboard and

9    mouse that you provided to log in to the computer that you

10   provided, and that's how they start their day, right?

11   A.   Correct.  Some of them provided their own equipment as

12   well.

13   Q.   But my clients, they used your desk, your chair, your

14   keyboard, your mouse, your computer and your monitor, right?

15   A.   Not all of them did.

16   Q.   Who didn't?

17   A.   Delio probably had some headsets.  Carlos was bringing some

18   laptop.  Rafaela was bringing her own mouse.  And I believe

19   Mariana may have changed the keyboard and the mouse because she

20   didn't like it.  So they brought their own equipment as well.

21   Q.   And they bring it into your office to do their work?

22   A.   Nobody brought their own chairs and their own desk.

23   Q.   But they would bring whatever, a keyboard or a mouse or a

24   headset, and they'd bring it into your office to do their work?

25   A.   Yeah.  And they would take it home; they would leave it

Direct Examination - Redirect Corces
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    there.

2    Q.  So they log into Radiusbob, and they'd get a screen that

3    would show, I guess, their home screen or the lead screen and

4    they would show that they are live, that they are online.  And

5    once they're online, would that send a notification to Avant

6    SAS or the other people you were buying leads from to start

7    sending these leads to whoever just logged in?  How does that

8    process work?

9    A.  What was the question again?

10   Q.  Well, there was a process.  Once you logged in and you were

11   live on Radiusbob, you could start to get leads?

12   A.  Correct.

13   Q.  And how would any of these lead sources -- how would Avant

14   Assurance SAS know that Delio just logged in to the computer

15   and that he could take calls?  How would they know?

16   A.  They wouldn't know.

17   Q.  Okay.  So how did Delio start to get leads?

18   A.  So they didn't need to send it to a specific agent.  It was

19   a random pool, whoever was available was free to take that call

20   or not.

21   Q.  So it goes into a pool, but how does the pool -- how does

22   somebody know that there is a call available to take?

23   A.  It would ring.

24   Q.  The phone would ring.  So would it ring every agent who was

25   online?

Direct Examination - Redirect copies
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   A.   Correct, yeah.

2   Q.   So if you got nine people and everybody's waiting for a

3   call, all the sudden the phone call would ring at once?

4   A.   Correct, regardless of their location.  They could have

5   been in Europe, Miami, Kendall or Doral.

6   Q.   None of my clients worked from Europe, did they?

7   A.   One of them worked from Colombia.

8   Q.   Right.  It was a family surgery issue, right?

9   A.   Yes.

10  Q.   And he worked there for a short period of time and came

11  back?

12  A.   Correct.

13  Q.   And he asked for your permission because he needed the

14  log-ins in order work from Colombia, correct?

15  A.   No.  He knew his own log-in credentials.  He didn't ask for

16  my permission.

17  Q.   He didn't ask for permission to work in Colombia?

18  A.   He did not.

19  Q.   So log in, the phone starts ringing, you click a button and

20  you answer the call?

21  A.   If you want to.

22  Q.   If you want to get paid, right?

23  A.   Some people did not want to take calls during certain

24  times.

25  Q.   Okay.  Was there any way that anybody could lose money

Direct Examination - Redirect Cortes
65
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   while working at Avant?

2   A.   Yeah, I'm sure.

3   Q.   How?

4   A.   If you show up to the office, you will drive from your

5   house.  That's an expense.  If you decide to be there or to be

6   from home and log in and not take any calls, yes, you will lose

7   money.

8   Q.   So it's basically just -- losing money is -- it's not

9   really losing money.  It's not making money that day, right?  I

10  mean, you can't go negative on the day?

11  A.   Yes, you can.

12  Q.   How do you go negative at Avant on the day?

13  A.   Well, if you bought some equipment.

14  Q.   What?

15  A.   If you bought equipment, a headset, right --

16  Q.   Okay.

17  A.   -- a mouse and you decide to drive and you go somewhere to

18  do what you said you were going to do and then you decide not

19  to pick up the phone, yes, you would lose money.  I don't think

20  any reasonable person would want to do that, right.

21  Q.   That's the only risk.  The only risk is you're driving to

22  work and whatever tolls and gas you spend.  That's the extent

23  of your risks for the day, right?

24  A.   What's the question?

25  Q.   The extent of your risk for any given day is you drive in

1    and you spend money on gas and tolls.  That's the total amount

2    of your risk per day at work at Avant, right?

3    A.   Yeah.  But they also have the option to not drive to the

4    office.

5    Q.   In that case, if you're working from home, what risk do you

6    have of losing money?

7    A.   You have to pay your own electricity, your own air

8    conditioning, right.

9    Q.   Well, those are just bills.  That's not a risk of losing

10   from work, right?

11   A.   It depends on what you put on your tax form.  If you are

12   working from home, if you were paying a lease, you would have

13   office expenses.

14       If you want to ask me a specific question, I would be able

15   to answer it more appropriately.

16   Q.   Sure.  Would Avant take any money away from any of the

17   clients -- in other words, charge them -- on a daily basis for

18   any use?

19   A.   From any of the clients?

20   Q.   No.  My clients.

21       Would it charge -- would Avant charge Delio, Rafaela,

22   Carlos or Mariana?  Would it charge them any money for using

23   any of the equipment?

24   A.   No.  It was there available.

25   Q.   Would they charge them any money for any of the leads that

Direct Examination - Reinier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1    they received?

 2    A.   For what?

 3    Q.   Any of the leads that they received.

 4    A.   No.   They were not charged for the leads.

 5    Q.   So when they went into work, they weren't going to get

 6    charged any money.   The only thing they could do at work was

 7    make money, right?

 8    A.   What is the question?

 9    Q.   The only thing they could do at work was make money?

10    A.   What is the question?

11    Q.   Is the only thing they could do at work at Avant was make

12    money?

13    A.   No.

14    Q.   No.   What else could they do at work?   They couldn't lose

15    money, right, because Avant couldn't take it away.

16    A.   They could have lost money.

17    Q.   How if Avant doesn't take the money away?

18    A.   By not picking up the phone, by driving to the office, by

19    staying at home and paying their electricity bill, by paying

20    their Internet, yeah.

21    Q.   In other words, the same bills that they would've had if

22    they didn't go to work that day?

23    A.   The same?

24    Q.   The same bills they would've had if they didn't go to work

25    that day.
```

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1   A.  I'm not sure.
 2   Q.  You're saying that they had these expenses only on the day
 3   that they were working for Avant?  They didn't have the
 4   expenses on the other days?  I don't get it.
 5   A.  So if you work from home, you're more prone to use more
 6   electricity from when there is nobody home, right.
 7   Q.  Okay.  Couple of bucks?
 8   A.  I don't know.
 9   Q.  That's their investment; it was a couple bucks that they
10   work from home?
11   A.  If that's what their tax returns would show, yes.
12   Q.  Have you seen their tax returns, by the way?
13   A.  No, I have not.  Have you?
14   Q.  So you're just guessing when you say, If that's what their
15   tax returns show?  You don't know?
16   A.  Say it again.
17   Q.  You don't know what their tax returns show.  You're just
18   guessing?
19   A.  What's your question?
20   Q.  Are you just guessing about what their tax returns show
21   because you haven't seen them?
22   A.  No.
23   Q.  No, you're not guessing, or yes, I am guessing?
24   A.  I don't understand your question.
25   Q.  Let's rewind.
```

Direct Examination - Redirect Cortes
69
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1   A.   Okay.

 2   Q.   You said, If that's what their returns show, did you not?

 3   A.   I said maybe their tax returns would show something else.

 4   Q.   And my next question was:  You haven't seen their tax

 5   returns, have you?  And you said no.

 6   A.   I haven't seen them.

 7   Q.   So as you sit here today, you don't know what their tax

 8   returns show or don't show?

 9   A.   Correct.  I don't know.

10   Q.   As far as the leads that went to my client from clients,

11   those leads could come from outside the state of Florida as

12   well, right?  It could be insureds who are looking for

13   insurance in Texas or in Illinois, as well as in Florida?

14   A.   Yes.

15   Q.   Because there are certain companies that you can sell to

16   outside of Florida, like Blue Cross Blue Shield, that you were

17   not authorized to sell in Florida, correct?

18   A.   Can you please repeat that question?

19   Q.   Sure.  You were authorized to sell Blue Cross Blue Shield

20   insurance in Texas and Illinois.  And is it true that you were

21   not allowed to sell that insurance in the state of Florida?

22   A.   Correct.  Because in Florida, the company that handles Blue

23   Cross Blue Shield is Florida Blue.  Even though they issue

24   independent contractors to their agents, they mandate that you

25   must be exclusive.  You can only sell their product.  So we
```

Case 1:22-cv-22671-CMA   Document 123-1   Entered on ELSD Docket 09/21/2023   Page 70 of
214                                                                                              70
Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    chose not to work with Florida Blue for that reason.  Because

2    as independent agents, we have the right to choose what company

3    we want to produce or not.

4    Q.   Right.  So you decided, as a company, what insurances you

5    were going to market?

6    A.   Correct.

7    Q.   And so my clients would then sell or market those insurance

8    products to the leads that they would be provided?

9    A.   Your clients what?

10   Q.   Were offered the insurance products that they were

11   authorized by your company to offer.

12   A.   Correct.

13   Q.   And so after my clients' phones would ring, they click a

14   button and they'd answer it.  The next thing is they'd be

15   speaking with somebody on the other line, on the other end of

16   the line?

17   A.   Well, for the most part, yes.

18   Q.   And there was a live transfer that there was already

19   somebody on the phone, Hey, I am going to have you speak with

20   an agent, and, boom, Mariana clicks a button and now she's on

21   the phone with somebody?

22   A.   Yes.

23   Q.   Is she provided with the information on Radiusbob of who

24   that person is?

25   A.   Is?

Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   Q.   Radiusbob shows up on the screen who is on her call?

2   A.   For the most part, yes, if it already existed in the

3   system.

4   Q.   So in order for that to exist in the system, let's say

5   Avant Assurance SAS would have already entered the information

6   into Radiusbob; is that correct?

7   A.   It's not just one lead vendor.

8   Q.   You had three or four?

9   A.   We have some more, correct.

10  Q.   But Avant SAS was the one who provided most of the leads to

11  your company; is that correct?

12  A.   During that time period, yes.

13  Q.   Okay.  So most likely it was your company in Colombia would

14  go on and first talk to the prospect, enter their information

15  into the computer system, into Radiusbob, and then transfer the

16  call and that information to my clients?

17  A.   Correct.

18  Q.   And then my clients would -- you know, Rafaela would be on

19  the phone, and she would talk to the client and talk to the

20  prospect and find out what kind of insurance they were looking

21  for, right?  That's basically what would happen?  And talk to

22  them about the different options that were available for

23  insurance for what they qualified for and what the pricing was?

24  A.   Correct.

25  Q.   And then once somebody said, Okay, this is the insurance I

Direct Examination - Redirect Corces
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    select.  I want to go with Oscar, their whatever plan, Rafaela

2    would then do what?  She would indicate which plan they wanted

3    in Radiusbob?

4    A.   She what?

5    Q.   Indicate in Radiusbob which plan that person wanted.

6    A.   Yes.  She would have to input the name of the company.

7    Q.   And once she did that, the next step was what?  To transfer

8    the call to the customer service department?

9    A.   No.  That was the end of the phone call.

10   Q.   Would the customer service department follow up and do the

11   rest of the paperwork?

12   A.   They did customer service, yes.

13   Q.   And customer service is following up and completing the

14   rest of the paperwork to enroll that person in the insurance;

15   is that correct?

16   A.   Sometimes, yes.

17   Q.   I mean, that's not something my clients did.  They weren't

18   the ones who were completing the paperwork and enrolling most

19   of the time, were they?

20   A.   Some of them also did it.  Delio did it, for example.

21   Q.   At the beginning, Delio did it, right?

22   A.   I don't recall when, but he did it.

23   Q.   And more often than not, it was your customer service

24   department?

25   A.   Say it again.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 73 of
214
Direct Examination - Redirect Cortes                           73
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   Q.  More often than not, it was your customer service

2   department that would handle this paperwork so my clients could

3   go and try to sign somebody else up?

4   A.  Correct.

5   Q.  And Avant still uses the same procedure of gathering leads,

6   sending leads and then signing up new members with its

7   insurance agent through today; is that correct?

8   A.  What's the question again?

9   Q.  Sure.  Avant uses the same procedure of gathering leads,

10  taking their information, sending it to the agent and then

11  having the agent try to get the lead to enroll in an insurance

12  policy?

13  A.  Yeah, that's pretty much the same.

14  Q.  It's the same then and the same now?

15  A.  Correct.

16  Q.  And it's the same for the agents who worked at Avant before

17  and the agents who work at Avant now?

18  A.  Correct.

19  Q.  And then after the agent completes their transaction, your

20  customer service team is next involved, right?

21  A.  The customer service team --

22  Q.  Is involved afterwards, after the agent's done talking.

23      And the insurance company finds out that they have a new

24  member because they are contacted -- or the information is

25  provided by your customer service team, right?

Direct Examination - Redirect Cortes
July 10, 2023                                                    74
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   A.   Correct.

2   Q.   And what they do is they do the data entry?

3   A.   Data entry, yes.

4   Q.   And you're familiar with the data entry because that's

5   something -- when you started with the company, you did it

6   yourself?

7   A.   I did it at the beginning, yes.

8   Q.   When Mr. Batista started working for you, did he have to

9   complete any paperwork?

10  A.   Paperwork, no.

11  Q.   Did you provide him with a W-9 to fill out so you knew who

12  and how to report the taxes?

13  A.   After we had an agreement that he was going to be an

14  independent contractor, he probably signed a W-9.

15          THE COURT REPORTER:   He signed a what?

16          THE WITNESS:   A W-9.

17  BY MR. POLLOCK:

18  Q.   So it was your responsibility to go ahead and provide him

19  with the W-9 so he could complete it, right?

20  A.   Anybody can get a W-9 from the IRS website.

21  Q.   Sure.

22  A.   So it wasn't my responsibility to provide that to him.

23  Q.   But it's your responsibility to accurately report the money

24  that you paid to him that year, right?

25  A.   Yes.

Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    Q.   And you do that on a 1099?

2    A.   Correct.

3    Q.   And in order to know how much -- who to report the money

4    to, you utilize a Form W-9 from the IRS?

5    A.   Correct.

6    Q.   And when you utilize a W-9 from the IRS, you're reporting

7    nonemployee compensation, are you not?

8    A.   Correct.

9    Q.   And so because you're utilizing a form where you're

10   reporting nonemployee compensation, you don't pay any

11   employment taxes for the money that you paid to Mr. Batista;

12   isn't that right?

13   A.   Yeah.  If they are not an employee, we don't pay employment

14   taxes.  That's correct.

15   Q.   Right.  If you don't pay them as an employee, then you

16   don't pay employment taxes, and you don't withhold any taxes as

17   well, correct?

18   A.   That's the process for 1099s.

19   Q.   Right.  And then if you also have a 1099, then you also

20   don't have to cover them with Workers' Compensation insurance,

21   do you?

22   A.   Correct.

23   Q.   And so you have Workers' Compensation insurance at your

24   company now because you have employees?

25   A.   Correct.

Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   Q.  And you know that the Workers' Compensation premiums are

2   based on a couple factors.  One of the factors is they want to

3   see how much your payroll is; isn't that correct?

4   A.  Correct.

5   Q.  So the more money that you pay to your employees, the more

6   you have to pay for your Workers' Compensation insurance

7   premiums; isn't that right?

8   A.  If that's how it works.  I'm not an expert in how to

9   calculate Workers' Compensation premium.

10  Q.  So it's less expensive for you as a company owner to

11  classify people as 1099s because you don't have to pay payroll

12  taxes and you don't have to pay Workers' Compensation

13  insurance, right?

14  A.  Let me give an example right now.

15  Q.  Is it yes or no?

16  A.  Can you please repeat your question?

17  Q.  Sure.  As a company owner, it's cheaper for you to classify

18  people as 1099s because you don't have to pay payroll taxes and

19  you don't have to pay Workers' Compensation insurance; isn't

20  that correct?

21  A.  No, that's not correct.  Those are your words.

22  Q.  So it's more expensive to classify people as 1099s.  Is

23  that what you're saying?

24  A.  No.

25  Q.  So it's not more expensive and it's not less expensive.

Direct Examination of Reinier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1    It's the same?  That's the only option we've got left.

 2    A.   I'm not sure what you are trying to ask.  You are not

 3    asking me the right question, so I can't help you.

 4    Q.   When Delio and Rafaela first started working for you, you

 5    issued 1099s to them individually, did you not?

 6    A.   Individually as first, right?

 7    Q.   Yeah.

 8    A.   Yes.

 9    Q.   I mean, at some point, did you issue a 1099 to

10    Ms. Valiente's company?

11    A.   Correct, at their request.

12    Q.   Well, did you help her form the company?

13    A.   Say again.

14    Q.   Did you help her form her company and tell her how to do

15    it?

16    A.   Yes.  It's very simple.  Anybody could do it.

17    Q.   And so you told her, Hey, it will be better for you from a

18    tax perspective if you open your own company and if I pay your

19    company instead of paying you, didn't you?

20    A.   Say again.

21    Q.   You told her it's better for her that you pay her through

22    her company instead of paying her directly?

23    A.   No.  That's not true.  Please don't put words in my mouth.

24    Q.   She just decided one day to open up a company and have you

25    pay it?
```

Case 1:22-cv-22671-CMA   Document 123-1   Entered on ELSD Docket 09/21/2023   Page 78 of
214                                                                                              78
Direct Examination / Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.   You'll have to ask Rafaela.  She will give you a better

2    answer to that.

3    Q.   Okay.  I'm sure she will.

4    A.   Yeah.

5    Q.   And how about Delio; you always paid him as an individual?

6    You never paid any company for Delio, right?

7    A.   No.  He chose to be paid individually.  And the only one

8    out of the four like this.

9    Q.   Now, in the Radiusbob software, once, let's say, Mariana is

10   able to sign up a lead with Ambetter insurance, in Radiusbob

11   her name is then associated with that new member, right?

12   A.   Correct.

13   Q.   And then we go through and repeat the process for Carlos

14   and Delio and Rafaela.

15        So no matter who the agent is, if you are the one who

16   signed up the new member, then your name gets attached to that

17   lead in Radiusbob?

18   A.   Correct.

19   Q.   All right.  I have put up what we have marked as Exhibit 6,

20   which is in evidence.

21        (Plaintiffs' Exhibit No. 6 was identified.)

22        (The exhibit was published to the jury.)

23   BY MR. POLLOCK:

24   Q.   This is one of the client consent statements that you

25   mentioned you had put together; is that correct?

Direct Examination - Redirect Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1    A.   What's the question again?

 2    Q.   Is this one of the client consent statements that you

 3    created?

 4    A.   Correct, yes.

 5    Q.   And you indicated that this document would not be sent out

 6    by the Blueink -- excuse me -- by the Radiusbob software; that

 7    you would send this out through something else.  It would be

 8    sent out through Blueink?

 9    A.   Yes.  It was a separate platform.

10    Q.   It was a separate platform.  Blueink is like a DocuSign.

11    It's a certified software that you can use to send out

12    something for electronic signature?

13    A.   Yes.  It's a platform to capture an electronic signature.

14             THE COURT REPORTER:  I'm sorry.  What was the answer?

15             THE WITNESS:  It's a platform to capture electronic

16    signatures.

17    BY MR. POLLOCK:

18    Q.   Why did you use this form?

19    A.   To protect the agents and to protect the agency from

20    consumers saying that they did not authorize the enrollment.

21    Q.   Was this a document that you required to be used?

22    A.   Say again.

23    Q.   Was this document required to be used?

24    A.   No.  They were free to send it or not at their own

25    discretion and judgment.  And some consumers were not able to
```

1   figure out how to electronically sign.

2   Q.  How did you tell your agents about this client consent

3   statement?

4   A.  I presented this to them.  I asked them, Would you like --

5   Would you guys like to be protected in case a consumer denies

6   that they gave you consent to be enrolled?  And they said, Yes,

7   we would love to have something like that.  So we put it in

8   place for them.

9   Q.  And besides this client consent statement, there were other

10  ways that Avant was protecting its agents from claims by

11  members that, I didn't authorize the transaction; isn't that

12  right?

13  A.  There could be the phone recordings.

14  Q.  Yes.  Because every phone call was also recorded through

15  the software, right?

16  A.  I'm not sure that every phone call was recorded, but that's

17  the purpose.  They should have been recorded.

18  Q.  It should've been recorded.

19      And again, that's an expense that was borne by Avant -- was

20  it was recording all the calls that the agents were on, right?

21  A.  Say again.

22  Q.  Avant was recording all the calls that the agents were on

23  while at work?

24  A.  Yes.

25  Q.  And not just recording, but you and your wife would listen

Direct Examination of Reinier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1  to those calls every once in a while just to make sure that

2  they were being done properly?

3  A.  Not necessarily.  I wasn't paying attention to what they

4  were doing on the phone, to be honest.

5  Q.  So you never listened to calls?

6  A.  I never --

7  Q.  Listened in on calls.

8  A.  Not when they were doing it for the purpose of listening,

9  no.

10 Q.  What about afterwards; would you listen to the recordings

11 afterwards?

12 A.  For one of the agents, yes, preventing them from committing

13 fraud.

14          THE COURT:  Should we stop here for lunch?  All right.

15          Ladies and gentlemen, we will take our lunch break.

16 My courtroom deputy, Mr. Condon, is going to meet you in the

17 jury room briefly to have you fill out some forms for us, as

18 well as to give each one of you my business card.  It has the

19 phone number of my chamber should you need to contact us during

20 anything -- at trial, if you're running late or encountering an

21 issue.

22          You're free to leave the jury room for lunch and go

23 anywhere in the building or outside.  I ask that you all return

24 by 1:45, giving you an hour and 15 minutes for lunch.  Again,

25 please avoid contact with the parties and those whom you see

Direct Examination - Redirect Cortes
82
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    have a relationship to the case and be back gathered in this

2    jury room.  This is the 13th floor.  Be back here by 1:45.

3    Thank you.

4              COURT SECURITY OFFICER:  All rise for the jury.

5         (The jury exited the courtroom at 12:30 p.m.)

6              THE COURT:  And, Mr. Cortes, you're still under oath.

7    Please don't discuss your testimony during this lunch break.

8              Are there any questions?

9              How much longer with this witness?

10             MR. POLLOCK:  It's going to be a little while.

11   Probably a couple more hours.

12             THE COURT:  Is he the only witness we're going to hear

13   from today?

14             MR. POLLOCK:  We also have Jennifer Manjarres.  And

15   then -- because we had to set up the interpreters and then the

16   interpreter will go tomorrow with the rest of the witnesses to

17   push through.

18             THE COURT:  All right.

19        (Pause in proceedings.)

20             MR. POLLOCK:  Judge, how do you want to do this?  Are

21   we going to do Plaintiffs case and Defense case, or do you want

22   the Defense to take their witness?

23             THE COURT:  They don't have to.  They can hold off on

24   cross-examining their clients until their case in chief.

25             MR. POLLOCK:  Okay.

Direct Examination - Reinier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

 1          **(Pause in proceedings.)**

 2              **THE COURT:  All right.  We'll see you all.**

 3              **MR. POLLOCK:  Thank you, Judge.**

 4              **MR. TROPP:  Thank you.**

 5              **THE COURT:  Have a good lunch.**

 6              **THE WITNESS:  Thank you.**

 7      **(Witness temporarily excused.)**

 8              **(A lunch recess was taken at 12:32 p.m.)**

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Direct Examination (Cont'd.)   Kenniel Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1              A F T E R N O O N   S E S S I O N

2          (1:46 p.m.)

3          THE COURT:  Can we bring the witness in, please, and

4    have the witness back on the stand?

5          Did you want to go in the back?

6          THE JUROR:  Thank you so much.

7      (Pause in proceedings.)

8          THE COURT:  Everyone, please be seated.

9          Please proceed.

10                 DIRECT EXAMINATION (Cont'd.)

11   BY MR. POLLOCK:

12   Q.  Mr. Cortes --

13          THE COURT:  Use the microphone, Mr. Pollock.

14   BY MR. POLLOCK:

15   Q.  Mr. Cortes, do you agree with me that it was important for

16   Avant Assurance to have insurance agents?

17   A.  To have insurance agents, yes.

18   Q.  Meaning, do you agree that you really couldn't run your

19   company without having insurance agents?

20   A.  Correct.

21   Q.  And I think before we went to lunch, you talked about how

22   you had different agreements with my clients about how they

23   would be paid, right, when they first started?

24   A.  That we had different agreements?

25   Q.  Yes.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 85 of
214                                                                                      85
Direct Examination (Contd.)    Kathiel Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.   Meaning --

2    Q.   Meaning they negotiated different agreements about how they

3    would be paid when they first started working for your company.

4    A.   For two of them, they had different agreements because

5    every year the compensation changes.

6    Q.   So for Rafaela, when she started, she was getting $10 per

7    member?

8    A.   Probably.  It's possible, yes.

9    Q.   At least when she started until the second open enrollment

10   period for '21/'22.

11   A.   It could be, yeah.

12   Q.   And then for Delio, Delio was getting about the same, $10

13   per member?

14   A.   Correct, the same.

15   Q.   And the difference was -- and those are the only two who

16   worked from 2020 to 2021 for that whole year?

17   A.   Yes.

18   Q.   Yes?

19   A.   Yes.

20   Q.   What Delio and Rafaela would receive is $10 per member for

21   every month that that member was still -- had insurance active;

22   isn't that right?

23   A.   Correct.

24   Q.   And then Mariana came on board.  And when Mariana came on

25   board, at first she was getting paid a combination.  She was

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 86 of
214                                                                              86
Direct Examination (Continued)    Kenrick Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    getting hourly pay at $20 an hour, plus she was getting a

2    certain amount for each member; is that right?

3    A.   It was either one or the other.

4    Q.   Your recollection is it was one or the other, but you don't

5    know for sure or you're definitely sure she was only getting

6    one or the other?

7    A.   It's one or the other.

8    Q.   Okay.  So at first, Mariana was getting $20 an hour?

9    A.   It's probably that amount.

10   Q.   All right.  So Mariana comes on board.  She's an

11   independent contractor, but she's paid hourly.  And then

12   afterwards, you convert her to getting paid the commission?

13   A.   We both got into an agreement that that did not work out

14   for her and she wanted to get paid straight commissions.

15           THE COURT REPORTER:  And she wanted to get -- I'm

16   sorry.  Could you move the microphone closer?

17           THE WITNESS:  I'm sorry.  Yeah.

18           That she wanted to get paid straight commissions.  She

19   wanted to get more compensation.

20   BY MR. POLLOCK:

21   Q.   You also told us that at first the Kendall office was

22   small.  It had eight or nine workstations in the middle and

23   then it had three private offices, right?

24   A.   Yes.

25   Q.   And then after that -- I think it was in May or June of

Direct Examination (Continued) - Kethlee Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    last year -- you moved to the office in Doral?

2    A.   Correct.

3    Q.   And the office in Doral was bigger.  It was what, like a

4    whole floor?

5    A.   No.  Just bigger, not a whole floor.

6    Q.   So it was bigger.  It had -- it had about how many private

7    offices?

8    A.   The new one?

9    Q.   The new one.

10   A.   Give me a minute.  I will give you the answer.  About six

11   to eight.

12   Q.   Six or eight private offices.  And then how many were in

13   the call center and the workstations in the building?

14   A.   Approximately 30, I believe.

15   Q.   Now, at first we talked about how Delio and Rafaela were

16   paid, and that was by commission where they were getting $10

17   per member for each month that the insurance policy was in

18   place.  And that paid practice changed for the next year for

19   November 1 of 2021 through 2022; is that right?

20   A.   Correct.

21   Q.   And in making that decision about changing how the agents

22   would be paid, that was your decision; is that right?

23   A.   It was my decision, and they also agreed to it.

24   Q.   Right.  They agreed to it because they either continued

25   working or they came on to start working with you once you

Direct Examination (cont'd) - Kennier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    offered that pay scale -- or that pay process of commission,

2    right?

3    A.   What is the question again?

4    Q.   Sure.  My clients agreed to it because they either

5    continued working for you -- right?

6    A.   That's one option.

7    Q.   -- or they started working for you.  In other words, if

8    they didn't like it, they could've left?

9    A.   Yeah.  They were free to accept the amount.

10   Q.   And they accepted the new pay structure that you put out

11   because they continued to work for you?

12   A.   Correct.

13   Q.   Okay.  The new pay structure was different because the

14   amount of money that would be paid to the agent depended on

15   which insurance company they were selling?

16   A.   I believe so.

17   Q.   And the other difference is that my clients, instead of

18   getting a commission for the whole year, they would only get

19   one month's worth of the commission.  Is that also true?

20   A.   Yeah.  And that month would have been three times as higher

21   as the first agreement.

22   Q.   And that's fair.

23   A.   Yeah.

24   Q.   Whereas in 2020 to 2021, my clients were getting about $10

25   a member.  The next year, the scale was different where they

Case 1:22-cv-22671-CMA Document 123-1 Entered on FLSD Docket 09/21/2023 Page 89 of 214

Direct Examination (Cont'd.) Kenneth Cortes
July 10, 2023
89
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1  could get anywhere from 15 to 35 dollars a member; is that

2  right?

3  A.   Correct.

4  Q.   I am going to show you what's in evidence as Exhibit 8.

5       (Plaintiffs' Exhibit No. 8 was identified.)

6       (The exhibit was published to the jury.)

7  BY MR. POLLOCK:

8  Q.   And see if you recognize that document.

9  A.   Yes.

10 Q.   This is a two-page document.

11      When we talk about the different amounts that Avant would

12 pay its insurance agents per member, this is the agreement that

13 we're talking about; is that right?

14 A.   That is one, yes.

15 Q.   I'm sorry?

16 A.   The latest agreement, correct.

17 Q.   This is the latest agreement.

18      And this talks about the policies and that they -- my

19 clients would receive commissions and bonuses and the different

20 amounts they would get paid depending on which insurance

21 company they were writing policies for.  Am I understanding

22 this correctly?

23 A.   What is the question?

24 Q.   If I'm understanding that this document shows how much

25 money my clients would get for each person they enrolled in

Case 1:22-cv-22671-CMA    Document 123-1    Entered on FLSD Docket 09/21/2023    Page 90 of
214

Direct Examination (Cont'd.)   Kenneth Cortes
July 10, 2023                                                    90
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    insurance.

2    A.   For each of the insurance companies, correct.

3    Q.   So if they enrolled somebody in Oscar, they would get $35

4    per member, and then if they enrolled somebody for Aetna, they

5    would only get $15 for that member.  Is my reading of this

6    document --

7    A.   Yes.

8    Q.   -- accurate?  Okay.

9         There was another part to the compensation, which was that

10   you were also incentivizing my clients to sell specific

11   insurance policies -- insurance plans through the bonus

12   structure that we have here.  Is that what you were doing?

13   A.   Correct.  Certain insurance companies offer the bonus, and

14   we made the offer -- we extended the offer to the agents as

15   well.

16   Q.   Now going back to the compensation plan, the $35 for

17   Ambetter and Frye and Oscar, the $15 for Aetna, Cigna and

18   UnitedHealth or the $5 for Bright, Blue Cross Blue Shield of

19   Illinois and Texas and Molina, are these amounts how much the

20   insurances would pay Avant each month?

21   A.   How much --

22   Q.   These insurance companies would pay Avant each month each

23   member.

24   A.   Different amounts.  It varies by insurance company.

25   Q.   Let's say for Ambetter, would Ambetter pay your company $35

Case 1:22-cv-22671-CMA  Document 123-1  Entered on FLSD Docket 09/21/2023  Page 91 of
214                                                                          91
Direct Examination (Cont'd)      Kenniel Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    a month for each member for each month?

2    A.  It also depends on the state that the member is placed.  So

3    it's not like a straightforward formula that I can explain.  If

4    you give me time, I will explain.

5    Q.  So what you're saying is that even though you were paying

6    an agent $35, it doesn't mean that Ambetter would be paying

7    your company $35 for that member?

8    A.  That's correct.  It could have been less.

9    Q.  Now, when your customer service team goes ahead and inputs

10   all the information to sign up a new member, is it true that

11   the customer service team would put your name as the producing

12   agent for each of those policies?

13   A.  Yes.  For certain insurance agencies, it is a standard that

14   the agent of record will have been the principal from the

15   agency, and that is done to prevent from theft and for

16   protecting the consumer's information.

17   Q.  And I appreciate that for other agencies.  I just wanted to

18   point out from your agency.  The practice at your agency was --

19   and please correct me if I'm wrong -- that your name would be

20   the producing agent for every insurance policy written?

21   A.  Correct.

22   Q.  Because your name was associated with each insurance

23   policy, is it true that the insurance companies would then

24   understand that you were the agent for each of those policies?

25   A.  Correct.

1  Q.  So the opposite of that is the insurance companies didn't

2  know that it was either Delio, Mariana or Rafaela or Carlos who

3  sold the policy?

4  A.  What's your question again?

5  Q.  That the insurance companies didn't know that it was Delio

6  or Rafaela or Mariana or Carlos who actually wrote that policy.

7  A.  Correct.  And that's standard in the insurance industry.

8  Q.  And more importantly, that's standard in your business,

9  right?

10  A.  Yes.  In order to protect consumer's information, yes.

11  Q.  Let's talk about why else you did that.  Insurance

12  companies we talked about earlier, they don't issue payment

13  right away to Avant, do they?

14  A.  Would you mind repeating the question?

15  Q.  Sure.  The insurance companies don't pay your company for

16  every policy that you wrote for them immediately?

17  A.  No.  Correct, yeah.

18  Q.  Is it true it takes anywhere from 30 to 60 days to get

19  payment?

20  A.  Yeah.

21  Q.  When those payments come in, do they come in by direct

22  deposit or wire?

23  A.  Direct deposit.

24  Q.  And when you get this direct deposit, does the insurance

25  company also send you a statement, a commission statement?

Case 1:22-cv-22671-CMA  Document 123-1  Entered on FLSD Docket 09/21/2023  Page 93 of
214

Direct Examination (Continued) - Kemuel Cortes                93
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   A.   Yes.

2   Q.   And on the commission statement, does it identify the agent

3   associated with each insurance policy?

4   A.   Correct.

5   Q.   And that agent would be you for every policy?

6   A.   For the most part.  Not for all of them.

7   Q.   Because for some of them, did you put your wife's name?

8   A.   It could have been.  Or during processing, it could have

9   been one of the Plaintiffs' name.

10  Q.   You're saying during processing it could've been one of my

11  clients' names, and that would've just been an error by the

12  processing department?

13  A.   I still would have got paid regardless.

14  Q.   So your name is the agent of record.  Then it also has what

15  for each insurer?  Does it have their name or what identifying

16  information for each insured on the commission statement?

17  A.   What is the question?

18  Q.   Does the -- how -- the commission statement that you

19  receive from the insurance company has your name for every

20  policy.  Does it have the names of the people who got insurance

21  or does it have a phone number or a customer number?  How are

22  they identified?

23  A.   It has the policyholder's name, yes.

24  Q.   And because every commission statement from every insurance

25  company almost for every insured you are named, is it you who

Case 1:22-cv-22671-CMA  Document 123-1  Entered on FLSD Docket 09/21/2023  Page 94 of 214
Direct Examination (cont'd) - Kenneth Cortes

94

1  decided which agent was going to get paid or credited for which

2  insured?

3  A.  So based on the records that they also input in their own

4  system, that's what I would recollect and match against their

5  records to make sure who was supposed to get paid.

6  Q.  What do you mean you would match against their records?

7  A.  Right.  So before we went on break, we put a statement that

8  in the box, CRM, their name would be the agent who sold the

9  member, correct?  So we will match the statement against that

10  same customers in the CRM to match out and see who was here and

11  who sold the policy.  Very simple process.

12  Q.  In this simple process, were you the one who would take the

13  commission statement and look at the Radiusbob CRM to match up

14  to see who should get paid for each policy?

15  A.  Yes.  Because I personally wanted to make sure that they

16  were getting paid the correct amount.

17  Q.  And you were the only one -- or you and your wife were the

18  only ones at Avant who would take a look at these commission

19  statements from the insurance companies; isn't that right?

20  A.  Not even my wife.  It was me.

21  Q.  So only you saw the commission statement and only you were

22  the one who would look at it against the information in

23  Radiusbob?

24  A.  Correct.  It was my responsibility to get the agents paid

25  what they worked for.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 95 of
214
95
Direct Examination (Cont'd) - Kenneth Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    Q.  So do you agree that it was very important for you to be

2    accurate in deciding who gets paid for which insurance policy?

3    A.  300 percent.

4    Q.  Do you agree that you're in a position of trust in doing

5    this because you're dealing with other people's -- my

6    clients' -- money?

7    A.  What was the question?

8    Q.  Do you agree that you were in a position of trust, that my

9    clients needed to trust you to be honest when you're doing this

10   accounting because in the end you're dealing with their money?

11   A.  Right.  And after we send in commission statements, they

12   had the opportunity to review them and to raise any claims, and

13   they never raised any claims.  So it's not like I was the only

14   source of truth.  They had all their records in their

15   possession to count their balance and commission statements

16   that I was sending to them.  They never raised any claims.

17   Q.  Well, they have all the records from Radiusbob, but they

18   don't have the commission statements from the insurance

19   companies, do they?

20   A.  Right.  It's very simple, Mr. Pollock.  If you see the

21   commission statement on your left hand and you have access to

22   your record from the CRM, you can cross reference to make sure

23   that you are getting paid everything you sold on.  And if you

24   don't get paid, you have all the right to raise a question and

25   send an e-mail and inquire about why you're not getting paid

Direct Examination (cont'd)   Kenneth Cortes
July 10, 2023                                            96
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    for a certain policy.  That never happened.

2    Q.   There were differences, though, between the records that

3    were in Radiusbob and the records that you would send out to my

4    clients showing that they were paid, weren't there?

5    A.   There were --

6    Q.   Differences.

7    A.   Meaning --

8    Q.   Well, the records were either the same for what you're

9    paying them or they're different.  And you were paying my

10   clients different than the records that they had; isn't that

11   right?

12   A.   I'm not sure what was the question.

13   Q.   Well, do you agree that you were paying my clients for less

14   policies than they believed they should be paid for?

15   A.   It could have been a certain time because we did not get

16   paid from the insurance company, and that was requirement

17   No. 1.

18   Q.   Well --

19   A.   Do you see requirement No. 1?

20   Q.   Does every insurance policy that my clients -- did every

21   insurance policy get paid by the insurance company?

22   A.   No.  It could have been that you, Mr. Pollock, as a

23   licensed agent sold me a policy to me as a customer and then

24   one of our members from the jury, also a licensed agent, would

25   have sold me the same policy.  So the last agent on the

Direct Examination (Cont'd) - Kenneth Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    application would have been the last agent that would have

2    gotten paid, and sometimes it even happened amongst the

3    Plaintiffs.

4    Q.   Well, on the application, is it your name every time?

5    A.   Say again.

6    Q.   On the application, isn't it your name every time?

7    A.   Right.  But there was a record for the CRM that they put in

8    themselves.

9    Q.   And so when there's two people with the same insured, you

10   would decide who got paid; is that correct?  Yes or no.

11   A.   What's the question again?

12   Q.   If there were two people --

13   A.   Two people.  Two licensed agents or two members?

14   Q.   Two agents.

15   A.   Okay.

16   Q.   -- at your insurance agency -- so the same policy to the

17   same person.

18   A.   Okay.

19   Q.   Was it you who decided which agent to pay for that

20   commission?

21   A.   No.  They decided that.

22   Q.   How did they decide that?  Did you give them the option?

23   A.   We held a meeting because we knew that was going to happen.

24   And they decided that the first agent who sold the policy was

25   going to be owner for commission of that policy.  That was

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 98 of 214                                                                    98

Direct Examination (Cont'd) - Kenneth Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    courtesy of most licensed agents.

2    Q.  Because a moment ago, I thought you said it was the last

3    person who was -- who sold the policy for the one who got paid.

4    So was it the first person, or was it the last person?

5    Because, frankly, I'm confused.

6    A.  I know.  So let me explain to you.  So what I mean the last

7    person, I mean somebody who does not work for Avant Assurance.

8    It could have been a third-party agent, but it's not related to

9    us.  So we have no control of what that third party might do or

10   not.  Amongst themselves, they agreed that the first agent was

11   going to be the one getting the credit, the commission, the

12   payment for that policy.

13   Q.  If it's an agent who doesn't work for Avant, that insured's

14   name isn't going to appear in your commission statement, will

15   it?

16   A.  It wouldn't, yeah.

17        (Pause in proceedings.)

18   BY MR. POLLOCK:

19   Q.  Would there normally be a difference between the number of

20   policies that were sold by my clients and the number of

21   commissions that you were paid for by the insurance company?

22   A.  Yes.

23   Q.  Is that because some people just didn't want to sign up?

24   A.  Some people did not complete the enrollment or they got

25   taken by another agency who is not within our agency.

Direct Examination (Cont'd) - Kennize Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   Q.  Isn't it true that some people didn't want to pay?

2   A.  Or that could have been so, yeah.

3   Q.  And so there would be a difference between the policies

4   that were in Radiusbob and the policies that were identified in

5   the commission statements; is that correct?

6   A.  Yes.  There could have been differences.

7   Q.  As far as my clients were concerned, they had no way to

8   tell which policies were in place and which policies weren't?

9   A.  Oh, yes, they did.

10  Q.  How is that?

11  A.  They could have called the consumer to confirm the

12  enrollment and they never did.

13  Q.  So my client sold -- let's say that your records show that

14  Delio -- I don't know -- sold 507 clients or insureds to Oscar

15  for one year, but he thought he sold 700.  Delio would have to

16  go ahead and call 293 people to find out what happened when you

17  had the commission statements?

18  A.  I cannot speak for what somebody could have done.  I can

19  tell you what I would have done.  If I am the sales agent and I

20  have my records that I sold 100 policies and I'm getting paid

21  50, I'm going to verify by calling my customers to actually see

22  if they completed the enrollment especially because I know that

23  there could have been some hiccups along the way.

24  Q.  Wouldn't it have been easier to show the commission

25  statements?

Direct Examination (Cont'd) - Reinaldo Corces
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.   Say again.

2    Q.   Wouldn't it have been just easier to share the commission

3    statements --

4    A.   Well, they're not the only agents --

5    Q.   Excuse me.

6         -- so the agents didn't have any questions, post them for

7    everybody to see?

8    A.   They're not the only agents that we have in the agency, so

9    there is confidentiality on the records that we have.  So once

10   you bring your question to us, yes, we can sit down, evaluate

11   with you all the policies.  They never raised any question.

12        And it's not like I could share the commission statement

13   for other agents that are not related to them.  That would be

14   me violating confidentiality with the other agents'

15   compensation.

16   Q.   My clients could log into Radiusbob and see what name in

17   there is associated with what insurance agent and what

18   insurance policy, couldn't they?

19   A.   What is the question?

20   Q.   In Radiusbob, my clients could log in; they could look for

21   Joe Smith.

22   A.   Correct.

23   Q.   And they can see that Joe Smith had a policy sold for Blue

24   Cross Blue Shield of Illinois by -- I don't know -- Raul Smith.

25   They can see that.  They weren't limited to seeing only the

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 101 of
214

Direct Examination (Cont'd)   Reinaldo Cortes
July 10, 2023                                          101
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1  policies that they sold.

2  A.   They can only see their own policies.

3  Q.   In Radiusbob?

4  A.   Correct.  Because why would you give access to an agent to

5  look at other agents' records?

6  Q.   And then the commission statements only had the names of

7  the insureds, your name and the amount of commission that was

8  paid from each insurance company, right?

9  A.   Correct.

10  Q.   So why don't you share the commission statements?  That has

11  nothing to do with how much another agent is making or not

12  making.

13  A.   Because my name was not the only name on the commission

14  statement.  I said it before.

15  Q.   Right.  It would be your wife's or possibly every once in a

16  while the customer service department had a hiccup and maybe

17  another agent's number here and there.

18  A.   Yeah.  Thank you for assuming, but we're not here to

19  assume.  We had more agents than just the Plaintiffs in place

20  in here.

21  Q.   And we have to assume because, of course, you're not going

22  to show us the commission statements at all.

23  A.   Why not?  Why not?

24  Q.   Well, because you never produced them during the course of

25  this case, and so, as a result, the jury's not going to be

1    allowed to see them, as much as we'd like to.

2        So in addition to paying these commissions, we also had the

3    bonuses.  And what the records are going to show in this

4    case -- and I think you'll agree with me -- is that most of --

5    that my clients, and I'm sure most of your agents, were pushing

6    for 2021 and 2022 to sell Oscar because of the bonuses that

7    were in place; isn't that right?

8    A.   No, it's not right.

9    Q.   Okay.

10   A.   Oscar was the most competitive carrier for that year.  So

11   by default, that would have been the carrier that they would

12   have sold the most, not just because of the bonus.  Again,

13   we're not here to assume.

14   Q.   And so what was happening was my clients were selling a lot

15   of Oscar policies because, one, they were competitive and, two,

16   because they knew if they sold over 300, over 350, over 600

17   policies, they were going to get a substantial bonus, according

18   to what you decided they would receive; isn't that right?

19   A.   Correct.

20   Q.   And then bonuses were supposed to be paid in April?

21   A.   They would receive compensation.  It says this right there.

22   Q.   Okay.  And, again, because you haven't showed the

23   commission statements, you're not going to show us when exactly

24   those policies were paid out; isn't that right?

25   A.   What is the question?

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 103 of
214                                                                                               103
Direct Examination (Cont'd) - Reinaldo Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1  Q.  I'm just saying:  You're not going to show us the records

2  to show when you were paid, are you?

3  A.  I don't understand the question.

4  Q.  Well, you said, We're not just going to pay April.  We're

5  going to pay when we get paid.

6  A.  Correct.

7  Q.  So, again, you don't have the records to show us when the

8  insurance companies paid you, that you didn't, you know, show

9  us in court, did you?

10  A.  Will you admit us to show it?

11  Q.  I haven't seen them in 11 months.  Today, tomorrow, the

12  next day ain't going to be the first day.

13  A.  Okay.

14  Q.  That time has passed.

15      So as far as my clients are considered, they've got to take

16  your -- they've got to take your word for it that you

17  accurately decided how many policies they were getting paid

18  for.  Do you agree?

19  A.  No, I do not.

20  Q.  You don't agree they had to take your word for it?

21  A.  No.  They had the right to go in there and find out for

22  themselves, like I said before.

23  Q.  And how do they verify if they don't have the commission

24  statements?  By calling every --

25  A.  They do have the commission statement because it was being

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 104 of
214

Direct Examination (Cont'd) - Reinaldo Cordero
July 10, 2023                                                      104
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    sent to them on a regular basis, like I explained before.

2    Perhaps let me rephrase it so you will be able to understand it

3    better.

4        They received the commission statement.  They have their

5    records on their right hand.  They could put one against the

6    other one.  For the ones that are missing, they have all the

7    right, first of all, to say that they were missing their

8    commission statement; second, to compare them themselves.

9    Maybe there was something that they're missing in the

10   enrollment process that the enrollment wasn't finished.  They

11   never did that.

12   Q.  You keep saying commission statement.  What you mean to say

13   is the Excel spreadsheets that you put together, right?

14   A.  Yes.  That is a commission statement by definition.

15   Q.  And so that Excel spreadsheet that you put together is

16   different than the commission statement that the insurance

17   companies would post in their portals for you?

18   A.  Yes.  They're both commission statements regardless.

19   Q.  They are.  One of them is from the insurance company to say

20   what policies they paid for.  The other is what you created on

21   your own; isn't that right?

22   A.  Correct.

23   Q.  And so my clients had to rely on what you sent around to be

24   correct in order to get paid; don't you agree?

25   A.  Yes.  We also have to rely on the commission statement that

Direct Examination (Cont'd) - Reinier Cordes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    we receive from the insurance company.  And if we had a
2    question, we would have consulted the insurance company why
3    we're not getting paid a certain member, but that actually
4    never happened because nobody raised any question about missing
5    commission before.
6    Q.  And so just like my clients had to rely on you, right, to
7    decide which policies they were going to get paid on, we also
8    have to rely on you to believe whether -- to believe you in
9    saying my clients never complained?
10   A.  What is the question?  You asked three questions in one and
11   it gets me confused.  I'm sorry.
12   Q.  I understand the questions you don't like you start getting
13   confused with.  So I will try to ask them a little bit more
14   simpler so even if you don't like them, you still have to
15   answer them.
16       So we have to believe you that you prepared these
17   commission statements with a hundred percent accuracy, don't
18   we?
19   A.  No.
20   Q.  We don't have to believe you?  Because what you're saying
21   is my clients could have complained to you.
22   A.  Yes.  They have their own records.  They could evaluate
23   what I produce for them.
24   Q.  And then we've got to believe you that they never
25   complained.  That's what you're saying?

```
 1   A.   No.

 2   Q.   We don't have to believe you?

 3   A.   No.

 4   Q.   Okay.

 5   A.   You can also hear them out and decide who you want to

 6   believe or not.

 7   Q.   Good advice.

 8             MR. CUMMINGS:  Excuse me, Your Honor.  My client's

 9   monitor hasn't been working.

10             THE COURT:  I am not your technical person, but I will

11   let my courtroom deputy know.

12   BY MR. POLLOCK:

13   Q.   Mr. Cortes, are you the one who came up with these bonus

14   plans?

15   A.   Correct, yes.

16   Q.   Is that -- would the insurance company also give you a

17   bonus if you had so many members sign up under one insurance

18   plan?

19   A.   No.  It's probably a different amount that we got from the

20   insurance company.

21   Q.   Because if an agent sells 600 policies, they're entitled to

22   get $25,000; is that right?

23   A.   Based on the scale, yes.

24   Q.   And as far as the insurance companies know -- Oscar in

25   particular -- you would've sold thousands of policies, right?
```

Direct Examination (Continued) - Reinaldo Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.   Correct.

2    Q.   And so you would've gotten a much bigger bonus because you

3    would've looked like an amazing producer who had thousands of

4    policies written; isn't that right?

5    A.   Yes.

6    Q.   And you had a condition on paying out the bonus, did you

7    not?

8    A.   I had a what?  I'm sorry.

9    Q.   A condition to pay out this bonus to your agents.

10   A.   Yes.  It's a similar condition than the one that we get

11   from the insurance companies.

12   Q.   And the condition, if I'm understanding you correctly, is

13   that the agent still needed to be producing for the insurance

14   company in order to be paid the bonus?

15   A.   They need to have a good-standing relationship with the

16   agency, yes.

17   Q.   Well, from the insurance company's standpoint, the agent of

18   record needed to still be producing for that insurance company;

19   isn't that right?

20   A.   In good standing, yes.

21   Q.   In good standing, meaning there's still an agent of record

22   for that company?

23   A.   Correct.

24   Q.   And so as far as every insurance company knew, you were the

25   agent of record and you were still in good standing; isn't that

1   right?

2   A.   What is the last question?

3   Q.   As far as every insurance company knew -- April, May, June,

4   July, August of 2022 -- you were the agent of record for almost

5   every policy and you were in good standing with them?

6   A.   Yes.

7   Q.   And so the fact that my clients had to be actively

8   producing for your company, that was totally unrelated to what

9   the insurance companies required of you; isn't that right?

10  A.   No.  It was the same requirement that they had on me.

11  Q.   Why would you impose that requirement on my clients if the

12  insurance companies never knew they existed?

13  A.   Well, it is a standard because there is a retention clause

14  attached to this one.  So for you to earn a bonus, you have to

15  be there in order to serve the member.  If you're no longer

16  engaged with the company, you cannot provide service to the

17  member, so they wouldn't pay you the bonus.

18  Q.   Doesn't your customer service department handle the

19  servicing with the clients?

20  A.   They only handle service when it comes to setting up a

21  doctor's appointment, looking up an ID card.  When it comes to

22  insurance-related matter, that was them, that was the licensed

23  agent, the one that needed to service the member.

24  Q.   What insurance-related matter comes up three, four, six

25  months after a policy is in place?

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 109 of 214

Direct Examination (Cont'd) - Reinaldo Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

109

1    A.  Very simple.  You go to a doctor; they charge you at the

2    doctor that you weren't aware that you had.  You forgot that it

3    was there.  So you have questions about your deductible.  You

4    have an out-of-pocket expense.  You have questions about that.

5    Customer service wouldn't know any of those answers, so it

6    would go back to all the licensed agents.

7    Q.  But don't the consumers normally just call the insurance

8    company itself and ask about that?

9    A.  No.  They will call us most of the time.

10   Q.  And you don't refer them back to the insurance company and

11   say, Hey, the insurance company has all the answers?

12   A.  It didn't work like that, Mr. Pollock.  As a licensed

13   agent, you have a duty to answer your customers' questions.

14   You can't just refer them to somebody else without trying to

15   resolve it yourself first.

16   Q.  And so for my clients, the only one who resigned was

17   Mariana, right?

18   A.  Mariana, yes.

19   Q.  And Mariana resigned after she got her bonus; is that true?

20   A.  Correct, yes.

21   Q.  And is it also true that Mariana is the only one who got

22   the $25,000 bonus paid to her?

23   A.  Out of the four individuals, yes.

24   Q.  Out of my clients, yes.

25       And Mariana got the bonus not in April, not in May, not in

Direct Examination (cont'd) - Reinaldo Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1    June; she got it -- when? -- July 6th?

 2    A.   In July.

 3    Q.   And Mariana got her bonus right after she was presented

 4    with a document; isn't that right?

 5    A.   Which document?

 6    Q.   Well, did you present Mariana with any documents to sign in

 7    July of 2022?

 8    A.   Not just to Mariana; to all the licensed agents we had at

 9    the time.

10    Q.   And that document was a noncompete agreement, wasn't it?

11    A.   What's that?

12    Q.   Noncompete agreement.

13    A.   Yeah.  And she didn't sign it and she still got her bonus,

14    so it was not contingent on signing that agreement to get the

15    bonus.

16    Q.   No.  But it was contingent on her continuing to work for

17    you, which is why she resigned; isn't that right?

18    A.   Say that again.

19    Q.   She had to sign it to continue working for you, so she

20    resigned; isn't that correct?

21    A.   I'm not sure of the question.

22    Q.   Didn't Mariana resign because she had to sign the

23    noncompete agreement in order to keep working with you?

24    A.   That's a question you need to ask Mariana -- not me -- her

25    reason for resigning.
```

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 111 of
214
Direct Examination (Cont'd.) - Reinaldo Cortes
July 10, 2023                                                   111
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   Q.  Well, wasn't it a requirement -- didn't you require all the

2   agents to sign a noncompete to keep working for you?

3   A.  I don't know why she resigned.

4   Q.  I didn't ask why she resigned.  I asked what you required.

5       And my question is:  Didn't you require your insurance

6   agents to sign a noncompete agreement in July of 2022 to keep

7   working for you?

8   A.  Not to keep working for us.

9   Q.  Then why have them sign it?

10  A.  Why not?

11  Q.  I'm asking you.  You're the one who had them sign it.  I'm

12  asking why.

13  A.  What is the question?

14  Q.  Why have them sign the noncompete agreement?

15  A.  Because it was recommended.

16  Q.  It was recommended by Mr. Cueto whose law firm you hired in

17  May of 2022; isn't that right?

18  A.  It wasn't recommended by Mr. Cueto.

19  Q.  All right.  Who was it recommended by?

20  A.  General industry standards.

21  Q.  All right.  So there are general industry standards, and

22  they just magically popped up one day in July of 2022?

23  A.  So I don't know if you recall when I mentioned earlier

24  today Florida Blue, right.  They exclusively -- they do not

25  allow the agents to sell other products other than Florida

Direct Examination (Cont'd.)   Reinaldo Cortes
July 10, 2023                                                112
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

 1   Blue, so that makes it an exclusivity agreement, even though
 2   the agents could have been independent contractors or not.  So
 3   when I say industry standard, that's very common in the
 4   industry.
 5   Q.   Okay.  But that has nothing to do with what I asked you.
 6   What I asked you was why, in July of 2022, you decided to ask
 7   your agents or require your agents to sign a nonagreement.  And
 8   your answer was, It was recommended to me.
 9        And my question is:  Who recommended it to you?
10   A.   I didn't say it was recommended to me.  I said it had been
11   recommended.
12   Q.   It had been recommended.  Okay.
13        How did it get recommended to you?
14   A.   Well, you read, you speak to other agencies and you hear
15   what they're doing, and you take it as a recommendation.
16   Q.   So -- okay.  And then you just created it on your own?
17   A.   No.
18   Q.   Who created it for you?
19   A.   So Mr. Cueto's office created the document.
20   Q.   Mr. Cueto's office who you hired in May of 2022?
21   A.   It was around that time, yes.
22   Q.   And then it was what, six months later you convert most of
23   your agents -- you have your agents now as employees, most of
24   them?
25   A.   Not most of them.

1  Q.   You don't have most of your agents now as employees?

2  A.   It could have been 50/50.

3  Q.   But back when my clients were there, it wasn't 50/50, was

4  it?

5  A.   Everybody was 1099, yeah.  Now we're able to offer other

6  benefits that they didn't have before, and that the sales force

7  that we have today, they do not want to be independent

8  contractors.  They did not want to have control of their own

9  hours; they did not want to have their own expenses.  They

10 wanted to become employees.  And we lost some agents because

11 they still wanted to continue being independent contractors.

12 Q.   And by not having their own expenses, what expenses are you

13 talking about?

14 A.   Their own expenses?

15 Q.   Yeah.

16 A.   The expenses that any independent contractor would incur in

17 doing their business.

18 Q.   Right.  You talked about expenses that my client would

19 incur if they came to work, and you can't deduct on your taxes

20 what it takes you to go and come from work, so what expenses

21 did they have to work for you as independent contractors, as

22 you contend?

23 A.   That's a question you need to ask your clients.

24 Q.   So you're saying that it was better for the agents because

25 they didn't have expenses, but you don't know what expenses

1   those are.  Is that what you're telling us?

2   A.   Everybody had different expenses, Mr. Pollock.

3          THE COURT REPORTER:  I'm sorry.  What was the answer?

4          MR. POLLOCK:  Everyone has different expenses,

5   Mr. Pollock.

6   BY MR. POLLOCK:

7   Q.   Understood.  But you threw out there expenses, so I wanted

8   to find out what you knew.  And you're saying you don't know;

9   is that right?

10  A.   Right.  Every agent would have their own accountings and

11  their own economics.

12  Q.   And so the jury should listen to what my clients are saying

13  as far as what expenses they had to work for you if they were

14  independent contractors.  Is that what you're telling us?

15  A.   No, that's not what I'm saying.

16  Q.   You shouldn't listen to them and hear what expenses they

17  said they had if they were independent contractors?

18  A.   What is the question?

19  Q.   Should we listen to my clients and hear what they have to

20  say about what expenses they had if they were independent

21  contractors?

22  A.   We should listen to everybody.

23  Q.   For Ms. Valiente, were you the one who opened up her

24  company for her with the State of Florida?

25  A.   No.  That's something she did herself.  I was there to

Direct Examination (Cont'd) - Reinaldo Corces
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
1    assist her in the process.
2    Q.  So you were with her, telling her what to do to open the
3    company?
4    A.  Yes.  I have done it many times, so I could help other
5    people do the same process.
6    Q.  So you told her how to open up her own company just like
7    you told other insurance agents how to open up their company
8    with the State of Florida?
9    A.  No.  Carlos had his own tax preparer or accountant that
10   opened up his own company.
11   Q.  Okay.  But for Rafaela -- for Rafaela, you opened her's
12   with her?
13   A.  Yes.  She asked for help, so I was there to help, of
14   course.
15   Q.  And you recommended that she open a company?
16   A.  No, I did not.
17   Q.  I will show you what's in evidence as Page 5 of Exhibit 1.
18       (Plaintiffs' Exhibit No. 1 was identified.)
19   BY MR. POLLOCK:
20   Q.  Have you seen this document before?
21   A.  I'm sorry.  What was the question?
22   Q.  Have you seen this spreadsheet before?
23   A.  I don't know if this is the one that I have seen, but I
24   have seen a similar one, yes.  I don't know these numbers
25   there, what they mean, if they're actual or not.
```

Direct Examination (Cont'd) - Reinier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   Q.   Okay.  According to the spreadsheet, Ms. Valiente sold

2   1,250 total policies and 1082 were Oscar.  Do you see that?

3   A.   Yes.  That's a spreadsheet that Ms. Valiente created

4   herself.

5   Q.   And so we'd expect to see on the spreadsheet that you

6   created something similar where we see how many total insurance

7   policies she sold and how many Oscar policies she sold, right?

8   A.   What is the question?

9   Q.   You created a spreadsheet for Ms. Valiente that you

10  created, did you not, for each year, for each enrollment

11  period?

12  A.   That I created?

13  Q.   Yes.

14  A.   A commission statement?

15  Q.   A commission spreadsheet.

16  A.   Correct.

17  Q.   And in that commission spreadsheet, you would say how many

18  Oscar policies and how many Ambetter policies she signed up?

19  A.   Correct.

20  Q.   And so those numbers should be similar to the numbers that

21  Ms. Valiente had, shouldn't they?

22  A.   Yes.  And if not, I would have been surprised if somebody

23  wouldn't have raised a question, right.

24  Q.   Yes, they would've been close.

25       And so Ms. Valiente on her spreadsheet has 1082 Oscar

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 117 of
214                                                                                    117
Direct Examination (Cont'd) - Reinaldo Corces
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    policies, and then you said you created your own spreadsheet,

2    your commission spreadsheet.

3             MR. TROPP:  I'm sorry.  I don't mean to interrupt, but

4    can we see the whole spreadsheet?  Because I have that same

5    document with different numbers.

6             MR. POLLOCK:  It's the next page.  It's the next page.

7             MR. TROPP:  The next page?

8             MR. POLLOCK:  The page before.

9             MR. TROPP:  Do you have it in full, that page?

10            MR. POLLOCK:  I have what was produced.  This is the

11   document that was produced.

12            MR. TROPP:  Okay.

13   BY MR. POLLOCK:

14   Q.  So as far as paying out bonuses and commissions, is it true

15   that you relied on your spreadsheet to pay bonuses and

16   commissions?

17   A.  On my spreadsheet?

18   Q.  Yes.

19   A.  Meaning?

20   Q.  Well, you created a spreadsheet, did you not?

21   A.  A commission statement, yes.

22   Q.  Okay.  Well, it's confusing because we have a commission

23   statement from the insurance company and then we have your

24   commission statement.  But your commission statement is a

25   spreadsheet?

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 118 of
214
Diece Examination (Cont'd) - Reams/Corces                    118
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.   No.   It's a commission statement as well.   We would call a

2    commission statement from an insurance company a commission

3    statement produced by Avant.   Is that fair?

4    Q.   Sure.   And the commission statement produced by Avant is in

5    Excel?

6    A.   In Excel.   And the one by the insurance company is also in

7    Excel.

8    Q.   And so we have this commission statement from Avant, and we

9    have it for our clients, and we have what you produced in the

10   case.   It looks like it's Exhibit 12.   All right.

11        (Plaintiffs' Exhibit No. 12 was identified.)

12   BY MR. POLLOCK:

13   Q.   Is that what you produced?   It's got a summary, deposits,

14   insurance companies, how much is paid by each insurance company

15   all the way through to Molina, Oscar and UnitedHealth.   Do you

16   see that?

17   A.   I see it.

18   Q.   Okay.   And then when we get to Oscar, you see at the top

19   there is a bunch of cells there hidden.   Do you see that?   I

20   don't know why they are hidden.   You just have to pull them out

21   and extend.   Do you see that?   It goes from 1 to 220 something.

22   A.   Correct.

23   Q.   And then, again, at the bottom, if you go down, it jumps

24   from 304 to 1,090, and, again, there's a bunch of cells that

25   are hidden.   Do you see that as well?

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 119 of 214

Direct Examination (cont'd by)   Reinaldo Corces
July 10, 2023                                            119
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.   Yes.  Is this an Excel document?

2    Q.   Yes.  It's a document that was produced.

3    A.   Yeah, if something is hidden, it's very simple to unhide

4    it.

5    Q.   Okay.  And we'll go through that.

6        And then we have here -- it starts with Mariana, goes to

7    Rafaela, a couple Marianas.

8    A.   These two are Rafaela and Mariana.

9    Q.   Yeah.  I mean, so what I've gone and I've done is I unhid

10   all of these, and I sorted them by name and by color.  So we

11   have the same -- it starts at No. 1.  We have 16 and 17.  And

12   on yours, 16 and 17.  It goes back up to 1.

13       So what I did was I sorted it.  And I color coded it just

14   to make it easy because it's a spreadsheet and it's easier to

15   see whose is what.

16       The next thing that I did was I calculated based on how

17   many lives -- which would be members, right?  Lives are members

18   that are enrolled?

19   A.   Correct.

20   Q.   And so we have different numbers because sometimes it's

21   somebody who's just enrolling themselves; other times, they are

22   enrolling a family, family members.

23   A.   What is the question?

24   Q.   Well, we have under lives, which are members -- we have

25   different numbers.  Sometimes it's one, two, three, four.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 120 of 214

Pierce Examination (Cont'd) - Reames/Cortes
July 10, 2023                                                    120
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1  Those numbers are how many people in the family enroll in that

2  insurance plan?

3  A.  Correct.

4  Q.  So we go down, and for Mr. Lopez, he had 570, according to

5  your spreadsheet, because we added up in Column B all the way

6  from No. 2 to No. 336 and he has 570 total members enrolled.

7  Do you see that?

8  A.  I see 570.

9  Q.  All right.  And you see the formula where it's -- you're

10  adding up 2 to 336.  Right?  You know how to sum up on Excel?

11  A.  Yes.

12  Q.  And that's the formula you use to get how many members.

13  And we just do that again for Delio.  507, same formula.  337

14  and 638.  The next one will be 639 -- 639 to 1065.  And Mariana

15  had 688.  And then we get to Rafaela.  1066, all the way

16  down -- 1066 to 1617 and she has 857.  Do you see that?

17  A.  Correct.

18  Q.  And so there's a difference between the 857 members that

19  you have and the 1,082, right?  You see there is a couple

20  thousand -- couple hundred people difference?

21  A.  They are different, yes.

22  Q.  What I did was instead of having to go through this every

23  time, we said, Okay.  Carlos was 570; Delio was 507; Mariana,

24  688 and Rafaela was 857.  Those are the same numbers taken

25  over.

1    And you already told us that it's important to be exact in

2   your spreadsheet so that it's down to the dollar, right?  It's

3   not fair to take any money from anybody at work, right?  You

4   agree with that?

5   A.   Correct.

6   Q.   So the next step for us to do is -- we can do this

7   together, right.  If we go to -- we can go to summary for how

8   much the different insurance companies paid.  Let's just use

9   Oscar.  So let me get rid of -- let me hide these columns.

10    So now we have how much you paid to each of my clients for

11   Oscar.  I will zoom in on that.  It's easier to see.  Okay.

12    So this is how much was paid, and Mariana's is 47,000.  So

13   let's take a look at how we got here.  So the next thing we do

14   is look at how many policies, how many members because that's

15   how we determine how much everybody is going to get paid.

16   Because for Oscar, it's $35 per member.  Do you agree with

17   that?

18   A.   Yes.

19   Q.   So what we do is -- let's see how many members each person

20   has.  So for Carlos, he has 570, according to your records.

21   For Delio, he's got 507.  For Mariana, according to your

22   records, she's got 688.  And for Rafaela, she's at 857.

23    The next thing that we do is to figure out how much they

24   should've been paid, we take the number of members times 35.

25   Do you agree with that?

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 122 of
214
Direct Examination (Cont'd) - Reinaldo Corces
July 10, 2023
122
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.   No.

2    Q.   No, it's not times 35?  Why is that?

3    A.   Because not all the company pays for all the members.  We

4    also have to check if any policy has more than five members

5    because those should have been deducted.  You only pay up to

6    five members.  So if you apply a filter to Column B and look

7    for everything that is five or above, that's a confirmation.

8    It's the right filter.  That's it, yeah.

9    Q.   It should be already filtered because this should have --

10   A.   I think you have the filter on.  You should be able to

11   click on it, and it will tell you -- exactly.  There you go.

12        So, for example, the one that says six should have been

13   five and the one that's seven should have been five.

14   Q.   Okay.

15   A.   No, five is five.

16   Q.   Same numbers.

17   A.   If it's the same number, then you did something wrong with

18   your formula, Mr. Pollock.  But you use some records and these

19   two add up to the same number.  There is no logic in that.  But

20   your formula is still adding those numbers that you selected

21   from the filter.  Now, I'm not saying to not count them.  I'm

22   saying to count them for five, not for six or for seven, for

23   compensation purposes.

24   Q.   Okay.

25   A.   You should not exclude them as well.

1   Q.   You don't have them on there.  So what we have is Carlos at

2   570; Delio, 507; Mariana, 688 and Rafaela at 857.

3   A.   Right.  And that's inaccurate.

4   Q.   And so then we have how many members times 35 a member.

5   The numbers are different.  And for Mariana, we know that's

6   because she had her bonus, and the numbers are still different.

7        And you're saying that's because there were that many

8   families with five members or more than five members?

9   A.   They don't pay for more than five members.

10   Q.   All right.  And so when we looked at this spreadsheet, we

11   did not identify anybody who had six or seven members in the

12   family.

13   A.   So on the first account, there seems to be a $140

14   difference.  A discrepancy, I will call it; a better word for

15   it.  On the second one, there is a $600 discrepancy.  On the

16   third one, there's a 1,215 discrepancy.  And on the third *[sic]*

17   one, about a $700 discrepancy.  Yeah.

18   Q.   But discrepancy is okay?

19   A.   Say again.

20   Q.   What discrepancy do you believe is okay?

21   A.   What is the question?  I don't know.

22   Q.   The question is:  What discrepancy do you believe is okay?

23   A.   A discrepancy is a discrepancy.  We will have to

24   cross-check the formula in order to resolve the discrepancy.

25   Q.   Do you agree with me there shouldn't be a discrepancy?

1   A.   Correct.  I don't have the spreadsheet myself to walk you

2   through it.

3   Q.   As far as the agents who are now paid as employees, did

4   they work out of your office?

5   A.   As far as?

6   Q.   Do they work out of your office, the agents who you now pay

7   as employees?

8   A.   They work out of the office for the most part.

9   Q.   Do you pay for their parking?

10  A.   No.

11  Q.   They don't have parking passes to get into the office?

12  A.   They have a key card, but it's included with our agreement

13  with the building.

14  Q.   And it's built into your lease?

15  A.   Say again.

16  Q.   The cost of parking --

17  A.   Yes.

18  Q.   -- is built into your lease?

19  A.   Yes.

20  Q.   They use your desks?  They sit at your desks in your

21  office, the agents?

22  A.   They stay at the office, yes.

23  Q.   And then the computers that we're talking about, back in

24  the Kendall office and the Doral office, the computers would

25  have two monitors; is that right?

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.   Most of them did have two monitors, yeah.

2    Q.   And that's the same whether they were paid -- the agents

3    were paid as independent contractors or employees; am I

4    correct?

5    A.   What is the question?

6    Q.   It didn't matter if they were paid as an independent

7    contractor or an employee, they would still get a computer with

8    two monitors?

9    A.   Yeah.  There will have been a difference.  The employees,

10   they're not allowed to change their own headset.  They're not

11   allowed to bring their own mouse.  They're not allowed to bring

12   their own keyboards.  They're not allowed to switch monitors.

13   They're not allowed to switch from their workstation and change

14   their seat.  They have to sit at the workstation that they

15   cannot switch up.

16       So those are the differences.  They're not allowed to pick

17   their own schedule either.

18   Q.   So they couldn't bring their own headset, mouse or

19   keyboard?

20   A.   Say again.

21   Q.   Couldn't bring their own headset, mouse or keyboard?

22   A.   Employees, no.

23   Q.   And that's the main difference, right?

24   A.   No, it's not the main difference.  It's one of many.

25   Q.   Okay.  The other difference is what you're saying, that

Case 1:22-cv-22671-CMA    Document 123-1    Entered on FLSD Docket 09/21/2023    Page 126 of
214
126
Direct Examination (Cont'd) - Reinier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    they can't pick their own schedule?

2    A.   Say again.

3    Q.   The employees aren't allowed to pick their own schedule?

4    A.   That's another difference.  They have to be at the office

5    at the time we tell them they have to be there.  If they don't

6    go at that time, there's going to be some disciplinary actions.

7         When you're an independent contractor, it's very different.

8    You don't show up; nothing happens to you.  You show up late;

9    nothing happens to you.  You decide to leave early; nothing

10   happens to you.  You don't want to go because you want to stay

11   home; that's fine.  Nothing happens to you.  You're free to go

12   on and off as you want.  As an employee, that is not the same.

13   Q.   Didn't you have schedules that my clients had to follow?

14   A.   That they arranged amongst themselves.

15   Q.   Well, my question was:  Didn't your company send out

16   schedules to my clients that they had to follow?

17   A.   They didn't have to follow it.

18   Q.   You just sent them out for fun?

19   A.   So you say you were going to be here at 8 a.m. and

20   everybody said that we're going to be here 8 a.m., so we put

21   everybody's name down on 8 a.m.  That doesn't mean that they

22   actually did show up at 8 a.m., right.  Or if they left

23   early --

24   Q.   Well, it was your expectation that they were going to be

25   there, wasn't it?

1    A.   What was?

2    Q.   It was your expectation that they were going to be there

3    when you scheduled them?

4    A.   Not really because I wasn't even scheduling them.  So I

5    don't know what you're referring by that.

6    Q.   You, meaning your company.  You had Ms. Ledesma scheduling

7    them, didn't you?

8    A.   She did not schedule them.

9    Q.   They made their own schedules?

10   A.   They made their own hours, Mr. Pollock.

11   Q.   They made their own hours?

12   A.   Yes.

13   Q.   There was no requirement that they be at the call center

14   during open enrollment from 9 a.m. to 9 p.m.?

15   A.   It wasn't my requirement, Mr. Pollock.

16   Q.   And it wasn't your requirement that they be there on

17   Saturdays from about 9 or 10 a.m. until about 2 or 3 in the

18   afternoon on Saturdays?

19   A.   So let me tell you what happened on Saturdays.  They wanted

20   to try Saturdays out to see if they could make more money, so I

21   guess they went ahead and tried it out.  And then they decided

22   that they did not want to work Saturdays because they did not

23   sell as much.  So they did not continue selling on Saturdays.

24   A few of them wanted to.  The other rest of the agents, they

25   did not want to call Saturdays.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 128 of
214                                                                          128
Direct Examination (Cont'd) - Reinaldo Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    Q.   When they were working from 9 to 9, you knew that they were

2    working those hours during opening enrollment, didn't you?

3    A.   No.

4    Q.   No?  You couldn't even tell that they were working 9 to 9,

5    could you?

6    A.   Correct.  I couldn't even tell you if they were at the

7    office or not.

8    Q.   I mean, you could tell if you were sitting in there, right?

9    A.   If I happen to see somebody, yes.  That doesn't mean that I

10   was paying attention who was at the office and at what time.

11   Q.   But you're not telling us that you had no idea the hours

12   that my clients were working, are you?

13   A.   Correct.

14   Q.   So you do know the hours they were working?

15   A.   Say again.

16   Q.   Do you or don't you know the hours that my clients were

17   working during open enrollment?

18   A.   I do not know the hours that they were working during open

19   enrollment.

20   Q.   And, frankly, you didn't care because you weren't paying

21   them by the hour; isn't that right?

22   A.   No.  It's not because of that.

23   Q.   And what is it because of?

24   A.   I didn't know the hours.

25   Q.   Okay.  The insurance agents who were employees, they still

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 129 of
214                                                                                  129
Direct Examination (cont'd.) - Reinier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    use Avant's phone system, do they not?

2    A.   What is the question, please?

3    Q.   The question is:  Don't the employees use Avant's phone

4    system just like my clients did?

5    A.   They use what?

6    Q.   The phone system.

7    A.   The CRM?

8    Q.   The CRM is part of it, right?

9    A.   Yes.  That's how they place phone calls.

10   Q.   And then the phone system is part of the CRM?

11   A.   It's integrated.  And while your Plaintiffs were working

12   with Avant, they were also using their own cell phones.  Now

13   that we have employees, they're not allowed to bring their own

14   cell phones in their workstations.

15   Q.   Well, the cell phones that they were using are different

16   than how they would get calls through Radiusbob; isn't that

17   right?

18   A.   They were also placing phone calls through their cell

19   phones.

20   Q.   They were placing phone calls through their cell phones.

21   A.   Right.  And through the platform, both.

22   Q.   But through the platform, they would receive calls, right?

23   A.   They would receive calls and to place calls, both.

24   Q.   But through their cell phones, they didn't receive calls

25   through Radiusbob.  They only received them through the

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1   computer?
 2   A.   I'm sure there are certain points somebody would receive a
 3   phone call that was generated by one of the lead vendors to
 4   their cell phone.
 5   Q.   How are you sure?
 6   A.   Because there were times that we had glitches in the CRM
 7   that the phone wasn't working properly.  So it could have been
 8   that one of them or two of them may have received a phone call
 9   or not.  I cannot ascertain whether they have or not, but it's
10   a possibility.
11   Q.   Okay.  So you're saying you don't know?
12   A.   What?
13   Q.   You don't know for sure?
14   A.   Yeah.  I know that we used the cell phone.  That doesn't
15   mean that I know if they took phone calls coming from Radius in
16   their cell phones.
17   Q.   And you don't know if they were using their cell phones for
18   work, do you?
19   A.   What's the question?
20   Q.   You don't know if they were even using their cell phones
21   for work or personal, do you?
22   A.   I know they were using them for work at some point.  But
23   they have their own referrals, their own clients, friends and
24   family, and they were placing those calls through their cell
25   phones.
```

Direct Examination (Cont'd) - Reanier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    Q.   So of the thousand or 2000 insurance members they placed,

2    there were -- what? -- 10, 15 family friends?

3    A.   I don't know, Mr. Pollock.

4    Q.   All right.  You're not saying that most of their work was

5    family and friends that they brought on their own?

6    A.   I'm not saying that either.

7    Q.   Okay.  And then the employees -- the agency or employees

8    now, they still use the back-office processing and the

9    administrative work done by Avant, right?

10   A.   Can you please repeat the question?

11   Q.   Sure.  The employees at Avant, they still have your company

12   doing the customer service in the back-office; isn't that

13   correct?

14   A.   Yes.

15   Q.   As far as all the accounting for the commissions, that's

16   all done by Avant still, isn't it?

17   A.   As far as?

18   Q.   The commissions.

19   A.   Right.

20   Q.   The commissions are still done for the agents by Avant?

21   A.   That's correct.

22   Q.   What's your e-mail address at work?

23   A.   RCortes@AvantAssurance.com.  You need a spelling on that?

24   Q.   That's okay.  Thank you.

25   A.   Okay.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 132 of
214
                                                                              132
Direct Examination (Cont'd) - Reinier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1  Q.  As far as you know, you agree that none of my clients

2  signed an independent contractor agreement with the company?

3  A.  Correct.  They didn't sign one.

4  Q.  At the beginning of open enrollment, my clients would not

5  have had any money coming in, would they?

6  A.  Your clients what?

7  Q.  Would not have any money, any income from commissions.

8  A.  Yes, they would.

9  Q.  Well, wouldn't you also pay advances on commissions?

10  A.  I also paid them some advances, good faith advances,

11  correct.

12  Q.  And so you would pay advances of how much to my clients

13  when they started working for you for open enrollment?

14  A.  By how much, I don't recall, to be honest.  And they also

15  received commission from Sure Bridge directly in their bank

16  accounts.  It's a supplemental insurance company that sells

17  dental, vision, accident plans, and they get paid weekly, twice

18  a week.

19  Q.  Well, let's take a look at Exhibit No. 13, the spreadsheet

20  that you -- let's take a look at that.  That's in evidence for

21  Carlos Lopez for January of 2022.

22      (Plaintiffs' Exhibit No. 13 was identified.)

23  BY MR. POLLOCK:

24  Q.  Do you recognize this document as the commission

25  spreadsheet or statement that you prepared for Mr. Lopez for

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 133 of
214
133
Direct Examination (Cont'd.) - Reinier Corces
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    January of 2022?

2    A.   Yes.   It's a similar format.   It could be the same

3    document, yes.

4    Q.   So this was the Oscar spreadsheet that you prepared for

5    Mr. Lopez which indicates an advance of $11,000.   Do you see

6    that?

7    A.   Okay.   Yes.

8    Q.   And so how much were you paying Mr. Lopez as an advance

9    towards the commissions that he was earning every month?

10   A.   What is the question?

11   Q.   How much were you paying Mr. Lopez every month as an

12   advance on his commissions?

13   A.   So there wasn't, like, a secret or a special formula to

14   that.   I was very concerned about them not getting paid for two

15   months, November and December, and then January, but that's how

16   insurance works.   You produce a policy today and, like you said

17   at the beginning, it could be 60 days before you get paid.

18        So based on the number that they were inputting themselves

19   into the spreadsheet and into the CRM, I provided a good faith

20   advance to them.   I have been in their shoes before with no

21   advances, and I didn't want that for them.

22   Q.   So for this, for Carlos, who you considered an independent

23   contractor, you paid him in advance of $11,000 over two months.

24   Is that what you're saying?

25   A.   I don't know if it was for two months or for one month.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 134 of 214

Direct Examination (Cont'd) - Reinier Corces
July 10, 2023
                                                                                        134
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

 1    The period isn't necessarily clear in here by looking at this

 2    statement.

 3    Q.   Do you know when Mariana resigned from working for you?

 4    A.   If I know what?

 5    Q.   When Mariana resigned.

 6    A.   July 2022, I believe.

 7    Q.   Do you know what date?

 8    A.   I know it was a Monday.

 9    Q.   And in the opening statement, your lawyer mentioned a cease

10    and desist letter.  You agree that that letter went out to

11    Ms. Lopez and her brother Carlos Lopez after Mariana resigned

12    and after Carlos left?

13    A.   Correct.  It was after.

14    Q.   And so everything that happened as far as that cease and

15    desist letter would've started to occur after they left working

16    for you?

17    A.   Yes.  So apparently when she left from us --

18    Q.   Answer my question.  You said yes.

19    A.   So you're going to cut me off.

20    Q.   So --

21    A.   Okay.

22    Q.   As far as the lawsuit, the lawsuit deals with what you

23    claim Mariana and Carlos did after they stopped working for

24    you; is that right?  Yes or no?

25    A.   Will you allow me to answer my statement before cutting me

1  off?

2  Q.  You can answer yes or no, and then if you need to explain

3  your answer, you can go ahead.

4  A.  You did not allow me to in the previous question,

5  Mr. Pollock.  Let's be fair, please.

6  Q.  My question was:  As far as the lawsuit that you brought

7  against Mariana and Carlos, that deals with issues that arose

8  after they stopped working for you; isn't that correct?  Yes or

9  no?

10  A.  Can you repeat your question?

11  Q.  The issues that are involved in the lawsuit that you

12  brought against Mariana and Carlos, those happened after they

13  stopped working for you; isn't that right?

14  A.  Yes.  That is correct.

15  Q.  Okay.  And so what Mariana and Carlos did after they

16  stopped working for you has nothing to do with whether you paid

17  them properly for everything.  Do you agree?

18  A.  A hundred percent, Mr. Pollock.

19  Q.  Now, Carlos, Rafaela and Delio, they all worked for you

20  until -- when? -- about June of 2022?

21  A.  Yeah, around that time.

22  Q.  And that means that Delio and Rafaela worked for you for

23  about -- what? -- a year and a half, maybe a little longer?

24  A.  Could have been a year and a half.

25  Q.  I mean, they started, let's say, October, around about,

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 136 of
214                                                                                                          136
Direct Examination (Cont'd.)   Ramirez Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1  2020 until June of 2022, somewhere around there.  Maybe a

2  little bit longer than a year and a half.

3  A.   Yeah.

4  Q.   And Mariana and Carlos, they worked for you for about

5  October until June, July, so another eight months?

6  A.   Correct.

7  Q.   And when they worked for you, they would come in the office

8  just about every day, wouldn't they?

9  A.   No.  Delio was coming only three days out of the week.

10  Q.   During the open enrollment, Delio was only working for you

11  three days a week?

12  A.   After open enrollment.

13  Q.   After open enrollment.

14      But during open enrollment, he was there every day,

15  wouldn't you agree?

16  A.   I would think so because they wanted to be there every day,

17  of course.

18  Q.   And then there was a time when Carlos asked you to be able

19  to work from Colombia.  Do you remember that?

20  A.   He said he was going to be traveling to Colombia, and he

21  asked me if he could connect from Colombia, asking me about the

22  CRM.  I said, Yes, if you have your credentials, you can do it

23  from anywhere you want.

24  Q.   Was there a time that the office was closed because

25  somebody had COVID in January of '21 or '22?

Direct Examination (Cont'd) - Reinier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   A.   If it was closed?

2   Q.   Yes.

3   A.   No.

4   Q.   Did anybody have to work from home in January of 2021

5   because they had COVID?

6   A.   Oh, COVID.

7   Q.   COVID, yes.

8   A.   Yeah.  They got COVID and they said that they wanted to

9   make some compensation and they wanted to work from home

10  because even though they had COVID, they were still feeling

11  okay to work.

12  Q.   Okay.  Let's see.  Within your company, you're the one who

13  decided that you wanted to fire Delio; is that right?

14  A.   He tried to assault a former employee at the company.

15  Q.   My question was whether you decided to terminate Delio.

16  A.   Yes.  As I stated before, he tried to assault an employee

17  at the company.  I had no choice, even though he's married to

18  my mom.

19  Q.   And you previously worked with Delio at a hotel, right?

20  A.   Correct.  And I used to would consider him my best friend.

21  Q.   What hotel did you work at?

22  A.   Trump National in Doral, Mr. Pollock.

23  Q.   And before that, you were at La Quinta?

24  A.   What?

25  Q.   Before that, you worked at the La Quinta?

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 138 of
214                                                                              138
Direct Examination (Cont'd.)   Reinier Cortes
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.   Before that -- no, that was after.

2    Q.   You worked at La Quinta after you worked at Trump --

3    A.   I believe so, yes.

4    Q.   All right.  And you said that Delio is basically married to

5    your wife *[sic]*?  Not legally married, but they were in a

6    relationship together?

7    A.   They've been together for years.

8    Q.   Before this lawsuit was filed, your mom lived with you at

9    your home?

10   A.   No.

11   Q.   No.

12   A.   I haven't lived with my mom since 2013 when I got married

13   with Andrea.

14   Q.   This lawsuit has impacted your relationship with your mom,

15   hasn't it?

16   A.   Say it again.

17   Q.   This relationship -- this lawsuit affected your

18   relationship with your mom, hasn't it?

19   A.   No, it hasn't.

20   Q.   No.

21   A.   Today she sent me a message that she is praying for me, by

22   the way.

23   Q.   Okay.  Do you let your mom see her grandchild?

24   A.   Say again.

25   Q.   Is your mom allowed to come over to your house and see her

Case 1:22-cv-22671-CMA    Document 123-1    Entered on FLSD Docket 09/21/2023    Page 139 of
214
Direct Examination (Cont'd) - Reinaldo Cortes
July 10, 2023                                                    139
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    grandkids?

2    A.   So she travelled to Cuba with Delio last week, and before

3    she went to Cuba, she went to my house.  She spent the whole

4    day with us.  Why?

5        I cannot hate my mom, Mr. Pollock, for being with Delio.  I

6    don't hate Delio either.

7    Q.   And you say that Delio threatened a coworker?

8    A.   Yes.  A very unfortunate situation.

9    Q.   And that's not something you were present for, was it?

10   A.   No.  We had many people in a Zoom meeting where he

11   expressed that he wanted to try to assault the former employee.

12   Q.   At least that's what you understood it to be, right?

13   A.   Say again.

14   Q.   That's what you heard?

15   A.   I was there in the meeting.

16   Q.   And so that's the reason why you fired Delio?

17   A.   Unfortunately, yes.

18   Q.   And then you fired Carlos too, didn't you?

19   A.   Yes.  The day before the meeting, Carlos did exactly the

20   same thing to the same employee.

21   Q.   And then within about a week or two later, Mariana gets her

22   bonus, right?

23   A.   It was probably like two weeks after or three weeks after.

24   Q.   And when that bonus comes in to your agency from Oscar, you

25   treated yourself, didn't you?

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 140 of 214

Direct Examination (Cont'd) - Reinaldo Cortes
July 10, 2023
140
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.  Say again.

2    Q.  You treated yourself when the bonus came in from Oscar,

3    didn't you?

4    A.  What does that mean?

5    Q.  Well, didn't you go out and buy a car?

6    A.  No, I did not.

7    Q.  You didn't go out and buy the Ferrari right after that

8    bonus came in in about May of 2022?

9    A.  I did buy a Ferrari, Mr. Pollock, but not because of that

10   reason.

11   Q.  And it was in May of 2022?

12   A.  Say again.

13   Q.  May 2022.

14   A.  Before we got the bonus.  Why?

15   Q.  And when do you claim the bonus came in?

16   A.  Say again.

17   Q.  When do you claim the bonus came in?

18   A.  It was probably around July.

19   Q.  When in July?

20   A.  The beginning of the month, probably.

21   Q.  So a week or two before Carlos is fired, Delio is fired.

22       What about Rafaela; was she fired too?

23   A.  Rafaela, that's very uncertain, Mr. Pollock, the reason why

24   she's no longer with the company.  At least it's uncertain to

25   me.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 141 of 214

Direct Examination (Cont'd) - Keinser Cortes
July 10, 2023                                                141
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

Q.  So within two, three weeks of that bonus coming in, they're all fired except for Mariana?

A.  Correct.

        MR. POLLOCK:  I think that's all I have.

        THE COURT:  Thank you.

        Cross-examination?

        MR. TROPP:  Reserve.  We'll call him back.

        THE COURT:  Very well.

        Mr. Cortes, you may step down.

    (Witness temporarily excused.)

        THE COURT:  Plaintiff's next witness.

        MR. POLLOCK:  I'm going to call Jennifer Manjarres.  I don't know if she's here yet.

        MR. CORTES:  She was supposed to be here at 4 o'clock. That's what she was told.

        THE COURT:  Next witness.

        MR. POLLOCK:  Everybody else needs an interpreter, Your Honor.  I was expecting there would be some kind of cross.

        THE COURT:  Why don't we give the jury a brief restroom break.

        We'll take a ten-minute recess.  Please don't discuss the case.

        MR. POLLOCK:  Thank you, Your Honor.  My apologies.

        COURT SECURITY OFFICER:  All rise for the jury.

    (The jury exited the courtroom at 3:32 p.m.)

Proceedings
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1          MR. POLLOCK:  Your Honor, I do expect we'll be done

 2    early today.

 3          THE COURT:  We're going late.  We need to move the

 4    trial along.  I have a case I need to pick a jury on Wednesday

 5    afternoon.

 6          MR. POLLOCK:  Let me call and see if I can get an

 7    interpreter.

 8          THE COURT:  Sounds good.

 9          And I have Mr. Condon here.  I asked him to come back

10    and let you all know his conversation with one of the jurors

11    when they first went back into the jury room prior to lunch.

12          THE COURTROOM DEPUTY:  So after I showed them how to

13    get back into the courtroom, I walked with them all to the

14    elevators.  And one gentleman stayed back, Mr. Caballero, and

15    he was saying that he doesn't know why he was picked because he

16    doesn't understand what's going on basically on either side.

17    That was about the extent.  I told him I would let everybody

18    know.

19          THE COURT:  Thank you, Warren.

20          THE COURTROOM DEPUTY:  You're welcome, Judge.

21          THE COURT:  We will take a ten-minute recess.

22       (A recess was taken from 3:33 p.m. to 3:42 p.m.)

23          THE COURT:  I thought we were proceeding with

24    Ms. Gonzalez Quintero as your next witness.  No.  All right.

25          MR. POLLOCK:  It was Ms. Manjarres.
```

Proceedings
July 10, 2023                                                    143
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
1              THE COURT:  How do you spell that?

2              MR. POLLOCK:  M-A-N-J-A-R-R-E-S.

3              THE COURT:  Okay.  She's not here yet?  Oh, she's

4    here.  Very good.

5              MR. POLLOCK:  But, Your Honor, we're going to finish

6    early, and I haven't been able to secure an interpreter yet.

7    She does not need an interpreter.

8              THE COURT:  Right.  Are you going to have her testify?

9              MR. POLLOCK:  Yes, Your Honor, but I don't think it's

10   going to take the next several hours.  So we may --

11             THE COURT:  So we'll have Ms. Manjarres and then

12   Ms. Gonzalez Quintero.

13             MR. POLLOCK:  Ms. Gonzalez Quintero testified through

14   a translator --

15             THE COURT:  As well.

16             MR. POLLOCK:  That's what everybody else did.  And so

17   I was anticipating cross-examination today and then tomorrow

18   start with the Plaintiffs, not -- go through three of the

19   Plaintiffs tomorrow and if we can get to the fourth, great.  If

20   not, that's what we were looking at because everybody else, I

21   think, is through an interpreter.

22             THE COURT:  Let's proceed with the cross-examination

23   of --

24             MR. POLLOCK:  Mr. Cortes?

25             THE COURT:  Yes, of Mr. Cortes.
```

Proceedings
July 10, 2023
144
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1          MR. POLLOCK:  Okay.  Thank you, Your Honor.

2          MR. CUETO:  I think counsel is in the restroom.

3      (Pause in proceedings.)

4          MR. POLLOCK:  If we're going to do the cross now of

5  Mr. Cortes --

6          THE COURT:  No.  We'll handle the witness who came in

7  so she can leave and then we'll --

8          MR. POLLOCK:  Okay.  Perfect.

9          THE COURT:  Mr. Tropp, the interpreter is needed for

10  the remaining witnesses for trial other than this witness,

11  Ms. Manjarres.  So we'll hear from her now, and then we'll pick

12  up with your cross-examination of your client so as not to

13  waste time, okay?

14          MR. TROPP:  Okay, Judge.

15          THE COURT:  Let's bring the jury in, please.

16          Ms. Manjarres, if you would approach, please.

17      (The jury entered the courtroom at 3:45 p.m.)

18          THE COURT:  Everyone, please be seated.

19          Ma'am, if you could raise your right hand.

20                       (Time 3:46 p.m.)

21                        JENNIFER MANJARRES,

22  a witness for the Plaintiffs, testified as follows:

23          THE WITNESS:  Yes.

24          THE COURT:  Please be seated.  And please state and

25  spell your name.

1        THE WITNESS:  First name, Jennifer, J-E-N-N-I-F-E-R;

2   last name, Manjarres, M-A-N-J-A-R-R-E-S.

3                        DIRECT EXAMINATION

4   BY MR. POLLOCK:

5   Q.  Ms. Manjarres, my name is Brian Pollock.  We haven't met.

6   I represent the Plaintiffs -- Delio, Mariana, Rafaela and

7   Carlos.

8        Where do you currently work?

9   A.  I work at Avant Assurance.

10  Q.  And what's your position there?

11  A.  Office administrator.

12  Q.  You started working at Avant in, what was it, May of 2022?

13  A.  April of 2022.

14  Q.  Were you hired as an executive office administrator?

15  A.  Yes.

16  Q.  When you were hired, was that by Mr. Cortes?

17  A.  Yes.

18  Q.  Did you also interview with Ms. Gonzalez Quintero?

19  A.  Yes.

20  Q.  Was that one interview, or was that a series of interviews?

21  In other words, did you just interview with both of them once

22  or did you have to come back?

23  A.  I interviewed once with both of them.

24  Q.  And then how long after the interview were you hired?

25  A.  I would say a week, a week to ten days.

1  Q.  When you were hired, you were hired as a 1099 independent

2  contractor; is that right?

3  A.  Yes.

4  Q.  And at the time that you started working at Avant in April

5  of 2022, was everyone else there also a 1099 contractor?  At

6  least they were paid that way.

7  A.  I couldn't tell you.

8  Q.  All right.  You were full-time when you started; is that

9  right?

10  A.  Yes.

11  Q.  And you worked in the office?

12  A.  Yes.

13  Q.  And then you keep files on the agents and the employees

14  there as part of your job, do you not?

15  A.  Yes.

16  Q.  And then as far as your job duties, have they pretty much

17  been the same since you started?

18  A.  Basically, yes.

19  Q.  As part of those job duties, you managed Mr. Cortes's

20  calendar?

21  A.  Yes.

22  Q.  And you onboard new hires?

23  A.  Yes.

24  Q.  And you made travel arrangements?

25  A.  Yes.

1    Q.   Anything else that you do?

2    A.   Phones, messages, coordination of meetings.

3    Q.   And when you talk about onboarding new hires, is your role

4    in the training or is your role in the paperwork?

5    A.   Paperwork.

6    Q.   So when you started in April of 2022, you would have

7    everybody complete a 1099?

8    A.   Ah, yes.

9    Q.   And then at some point -- was it in May or in June that you

10   were converted from an independent contractor to an employee?

11   A.   That's correct.

12   Q.   At that time, am I correct in my understanding that your

13   job duties didn't change; the only thing changed is how you

14   were paid?

15   A.   I mean, job duties always -- I mean, in my role, job duties

16   can change in a minute.

17   Q.   I mean, for practical purposes, your job duties evolved,

18   but it's not like you shifted from working in one place to

19   working in another?

20   A.   The position stayed the same.

21   Q.   And what changed was now Avant started having employees,

22   right?  You were employee No. 1?

23   A.   I was employee No. 1.

24   Q.   Fast forward to today, Avant has about 20 insurance agents?

25   A.   Just about.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 148 of
214                                                                    148
                        Direct Examination - Jennifer Manjarres
                                        July 10, 2023
          Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    Q.   Of the 20 insurance agents that work for Avant, how many

2    are W-2 employees?

3    A.   As of today?

4    Q.   Yes.

5    A.   They all are.

6    Q.   So the flip side of that would be, as far as you understand

7    it, there are no agents who are 1099s at Avant anymore?

8    A.   No.

9    Q.   That switch that happened from paying agents 1099 to

10   employees, that happened what, November 1st of this -- of last

11   year?

12   A.   Yes.

13   Q.   And were you responsible for making that switch with the

14   agents?

15   A.   When you say responsible --

16   Q.   Well, I mean, did you go ahead and have them fill out W-2s

17   so they could be paid like employees?

18   A.   Documents, yes.

19   Q.   And then was the way that they were paid any different?  In

20   other words, did you start using Paychex as a payroll provider

21   or was Paychex always payroll?

22   A.   Paychex was our provider.

23   Q.   Was Paychex -- I'm sorry.  Was Paychex your provider since

24   when you started in April of 2022, or did Paychex start being

25   the payroll provider afterwards?

1    A.   Afterwards.

2    Q.   How long after?

3    A.   I couldn't tell you.

4    Q.   I mean, if you became an employee about four weeks after

5    you started -- so that would be sometime in May -- is that when

6    Paychex -- you started using Paychex?

7    A.   Yes, could've been.

8    Q.   Now, the transition that we're talking about is setting

9    everybody up in Paychex so that they could log in there and

10   manage how they get paid as far as direct deposit?

11   A.   Manage the way they get paid?

12   Q.   Well, they can put in their direct deposit information.

13   A.   I would enter their direct deposit information.

14   Q.   And would you set up all the agents and the other employees

15   at Avant so they could log in and out of Paychex?

16   A.   Yes.

17   Q.   Because now Avant pays its insurance agents as employees,

18   isn't it true that everybody, all the agents, have to log in

19   and log out of Paychex?

20   A.   To my understanding.

21   Q.   To your understanding yes?

22   A.   I don't handle payroll, so I don't want to say the wrong

23   answer.  I know that we use Paychex, but I couldn't tell you if

24   they log in, log out.  That's not in my control.

25   Q.   Do you know if the agents use a punch in or punch out

Case 1:22-cv-22671-CMA    Document 123-1    Entered on FLSD Docket 09/21/2023    Page 150 of
214                                                                                           150
Direct Examination - Jennifer Manjarres
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    time-keeping system?

2    A.   I do not.

3    Q.   Now, about a month ago, do you remember giving a deposition

4    in this case by Zoom?

5    A.   Yes.

6    Q.   And in that deposition, did you have the court reporter

7    have you raise your hand and swear to tell the truth?

8    A.   Yes.

9    Q.   And at the time, did you understand that the testimony that

10   you were giving in your deposition is the same as the

11   deposition -- the testimony that you're giving here today is

12   the same oath?

13   A.   Okay.

14   Q.   You understood that?

15   A.   Yes.

16   Q.   And the testimony that you gave a month ago, that was true

17   and correct and we can rely on that, can't we?

18   A.   Yes.

19   Q.   Okay.  And so when Mr. Cummings, my associate, took your

20   deposition and he asked you on Page 31, Are the insurance

21   agents hours at work recorded?, and you answered, I don't know,

22   and then he said, Okay.  Do you know if they use a punch in or

23   punch out time-keeping system?, and your answer at Line 22 was,

24   I believe they use a clock in clock out system, is that an

25   actual, physical clock in clock out system or is it on a

Case 1:22-cv-22671-CMA  Document 123-1  Entered on FLSD Docket 09/21/2023  Page 151 of 214

Direct Examination - Jennifer Manjarres                     151
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    digital computer?  It's on a digital platform.

2        So the clock in system and the clock out system that the

3    insurance agents now use, is that the Paychex system?

4    A.  Yes.

5    Q.  So now -- I say now.  As of November 1st of 2022, Avant

6    tracks the hours that its insurance agents work and it pays

7    them as employees.  Am I correct in that?

8    A.  Yes.

9    Q.  Are there hours that the insurance agents at Avant

10   typically work?

11   A.  I don't know.

12   Q.  Well, what time do they have to be at work in the morning?

13   A.  I don't know.  I don't create their schedules.

14   Q.  Do you remember in your deposition when Mr. Cummings asked

15   you at Page 30, What time do insurance agents have to be at the

16   office to start work, and your answer on the following page

17   was, In the morning.  It's 9 a.m.?

18       Do you remember being asked that question and giving that

19   answer?

20   A.  No.

21   Q.  And you usually start work around 9, 9:15, don't you?

22   A.  I do.

23   Q.  And do you work out of an office?

24   A.  Yes.

25   Q.  And do you work out of one of the eight or nine offices

1    that have a door to close them off?

2    A.   Interior office, yes.

3    Q.   All right.  And we also have -- we have the interior

4    office, and then also Mr. Cortes described for us that there's

5    a call center area for about 20 or so insurance agents.  You

6    walk by that to get to your office?

7    A.   I walk around the call center, yes.

8    Q.   And when you walk in around 9 a.m., you know that you walk

9    by insurance agents who are there already working, right?

10   A.   At times.

11   Q.   You don't pay attention to when they work?

12   A.   Honestly, I go straight to my office.  There could be

13   agents; there could be other staff members.  I couldn't

14   identify who I see in the 20 seconds it takes me to get to my

15   desk.

16   Q.   And as far as you understand it, the insurance agents at

17   Avant now are required to log into Paychex at the start of

18   their shift and log out at the end of their shift; is that

19   true?

20   A.   That's -- from my understanding.

21   Q.   The insurance agents that are at Avant now after the open

22   enrollment period, they have shifts that are from 9 to 3 and 3

23   to 9.  Is that your understanding?

24   A.   I can't answer that because I don't manage the schedules or

25   the hours.

1  Q.  Again, referring back to your deposition that was taken on

2  June 8th -- 30-something days ago -- Mr. Cummings asked you the

3  following at Page 60 to 61, and these were your answers:  All

4  right.  And, now, as W-2 employees, are there different shifts

5  that those insurance agents are working on?  Your answer was

6  yes.  Does any insurance agent work from 9 in the morning to 9

7  at night in one day?  And your answer was no.  Okay.  Did they

8  work on a schedule from 9 to 3 and then certain agents work

9  from 3 to 9?  Yes.

10     Were those the answers that you gave back on June 8th of

11  this year to those questions?

12  A.  I don't recall.

13  Q.  Have you suffered any events or had any medical conditions

14  or taken any medications that would affect your ability to

15  remember what you said a month ago in a deposition?

16  A.  No.

17  Q.  For a couple of months while you were at Avant, my clients

18  also worked at Avant; is that right?

19  A.  Just a few weeks.

20  Q.  A few weeks.  From April until June or July, last one being

21  Mariana -- Mariana on July 11th.  You worked with my clients;

22  is that right?

23  A.  Yes.

24  Q.  So whether that's 8 weeks, 12 weeks, whatever it is --

25  right? -- we're talking the same time period.

1      Did you see them at the office?

2  A.  Yes.

3  Q.  And when you started working, that was before Avant moved

4  to the Kendall office?  Was it?

5  A.  I'm sorry.  What was the question?

6  Q.  You started at Avant while you were at the Kendall office

7  before they moved to Doral?

8  A.  I worked in the Kendall office, yes.

9  Q.  So you saw my clients working at the Kendall office and

10  then you saw them working at the Doral office; is that right?

11  A.  Yes.

12  Q.  And from being in the office for over a year now, I mean,

13  you understand that the insurance agents, their jobs involve

14  sitting at a desk at a computer, logging in and taking phone

15  calls, right?

16  A.  From my understanding.

17  Q.  We're not getting any deeper than that, but, I mean, that's

18  what you can see and you can hear while you're at work?

19  A.  I definitely can hear them.

20  Q.  All right.  But you can see them sitting at a desk on a

21  computer with headsets on?

22  A.  Yes.

23  Q.  And when you saw my clients, they were working similarly at

24  desks with computers with headsets on at Avant?

25  A.  Yes.

Direct Examination - Jennifer Manjarres
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    Q.  The insurance agents as of November 1st at Avant have to

2    log in and out of Paychex to track the hours that they work for

3    when they start and stop working.  We established that, right?

4    Yes?

5    A.  I can't -- I can't answer that because I don't know if they

6    clock in or out.  I don't know the platform, but they're --

7    they're using Paychex, but I don't -- I don't micromanage them.

8    I'm not their direct supervisor.

9    Q.  You don't have any role with payroll?

10   A.  I do not.

11   Q.  We talked -- in your deposition, you were asked, at Page

12   32, The insurance agents are required to log out -- log in to

13   Paychex at the start of their shift and then log out at the end

14   of their shift?, and your answer was yes.

15       Do you remember being asked that question --

16           THE COURT REPORTER:  I'm sorry.  That was way too

17   fast.

18           MR. POLLOCK:  And I don't drink coffee, if you can

19   believe it.

20           THE COURT REPORTER:  Can you repeat it?

21           MR. POLLOCK:  Absolutely.

22           THE COURT REPORTER:  Thank you.

23   BY MR. POLLOCK:

24   Q.  And so when you gave your deposition on July 8th by Zoom,

25   were you sitting in Avant's office?

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 156 of
214                                                                              156
Direct Examination - Jennifer Manjarres
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.  It wasn't July 8th.

2    Q.  June 8th.  I'm sorry.  You're right.

3    A.  I was not at the Avant office, no.

4    Q.  Okay.  Where were you?

5    A.  I was in my home office.

6    Q.  Okay.  So you were at your home office, and you gave the

7    deposition by Zoom.  Do you remember being asked that question

8    and giving that answer or you don't remember?

9    A.  Can you repeat the question?

10   Q.  Sure.  The question was at Page 32.  The insurance agents

11   are required to log in to Paychex at the start of their shift

12   and then log out at the end of their shift?  And your answer

13   was yes.

14       Do you remember being asked that question --

15   A.  Yes.

16   Q.  -- and giving that answer?  Okay.

17       And so as we sit here today, do you understand that Paychex

18   is just a program on their computer; it's a website that they

19   go to?

20   A.  Yes.

21   Q.  Do you have to log in to Paychex and log out of Paychex

22   every day at work?

23   A.  Me specifically, no.

24   Q.  You're salaried?

25   A.  Yes.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 157 of
214                                                                      157
Cross-Examination - Jennifer Manjarres
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

 1   Q.  All right.  And I'm not going to get into that.

 2       Do you have any reason to believe that my clients could not

 3   have logged into Paychex at the start of their shifts and

 4   logged out at the start of their shifts so that Avant would

 5   know the hours that they were working?

 6   A.  I'm not sure how you want me to respond to that.

 7   Q.  Just truthfully.

 8   A.  I don't know.

 9   Q.  And you said you were on salary.  That means Avant's paying

10   you to be here today?  You had to take a day off of work to

11   come in today.  You're still getting paid?

12   A.  Yes.

13   Q.  I guess that's all I have.  I appreciate your time.  Thank

14   you, Ms. Manjarres.

15           THE COURT:  Cross-examination.

16           MR. POLLOCK:  I think Mr. Tropp may have some

17   questions for you, just so that way you don't have to come back

18   and to least inconvenience you.

19           THE WITNESS:  Sure.

20                   CROSS-EXAMINATION

21   BY MR. TROPP:

22   Q.  Hello.

23   A.  Hello.

24   Q.  How are you?

25   A.  Good.  How are you?

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1    Q.  Good.  Good.
 2         You were just asked a bunch of questions about the
 3    employees after they left.  I guess the point was that --
 4    because they're W-2 now and they're controlled, I think he's
 5    making the point that these four Plaintiffs as well were
 6    employees.  But there is a difference --
 7              THE COURT:  Could you use the microphone, Mr. Tropp,
 8    please?
 9              MR. CUETO:  One moment, Your Honor.  I'm sorry to
10    interrupt.  My client just was alerted from her daughter's
11    school, received a message of something and they're concerned
12    it's an emergency.
13              THE COURT:  She can be excused if she would like to
14    leave.
15              MR. CUETO:  Okay.
16              THE COURT:  You may proceed, Mr. Tropp.
17              MR. TROPP:  Thank you.
18    BY MR. TROPP:
19    Q.  Is it fair to say that after these four Plaintiffs sued my
20    clients for this case that we're here today things changed at
21    Avant in terms of how employees are handled?
22    A.  Since they left?
23    Q.  Since they got sued -- Avant, Reinier and Andrea got
24    sued -- would it be fair to say that how employees or the
25    agents -- or the sales agents got treated changed?
```

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 159 of
214                                                                                      159
Cross-Examination - Jennifer Marquardez
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1  A.   No.   I'm sorry.   Changed in what way?   The way that

 2  Reinier --

 3  Q.   Well, let's look at the way the -- the sales agents were,

 4  the arrangements were before the lawsuit.

 5  A.   Oh, meaning a controlling way.

 6  Q.   Well, I mean, before the lawsuit, was there a difference

 7  then than after the lawsuit?   They're W-2s now, correct?

 8  A.   They're W-2s now, so, yes, there is a difference.

 9  Q.   Right.   After they got sued?

10  A.   Right.

11  Q.   Before they were sued, they were --

12  A.   They were contractors.

13  Q.   So there's a difference --

14  A.   Yes.

15  Q.   -- because of the lawsuit?

16  A.   Correct.

17  Q.   It's not that because after the lawsuit that's the way they

18  should be also factored in, correct?

19  A.   Correct, yes.

20  Q.   And, also, you were there also around the time where --

21  when Carlos and Delio, they were still working there at the

22  time?

23  A.   Yes.

24  Q.   Correct?

25  A.   Yes.
```

Cross-Examination of Jennifer Marquares
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1   Q.  Did you ever hear that any one of these four Plaintiffs

2   left because they were forced or had to sign a noncompete

3   agreement?

4   A.  No.

5   Q.  Have you heard that before?

6   A.  Never.

7   Q.  Have you ever heard any of these four Plaintiffs from the

8   time that they were working for you come to you or tell you or

9   anyone, Hey, I'm owed any money?

10  A.  No.

11  Q.  Were you the office manager at the time?

12  A.  Yes.

13  Q.  So would that be somewhere -- regularly where someone would

14  go to you to say, Hey, I'm owed some money?

15  A.  No.

16  Q.  They would go to Reinier?

17  A.  Correct.

18  Q.  Did you ever hear them, like -- or anyone complain that

19  they were owed overtime or hourly wages?

20  A.  I never heard anything.

21  Q.  How would you describe -- what was the difference between

22  post their lawsuit how employees got treated and before the

23  lawsuit, before the agents, the sales agents got treated?

24  A.  I wasn't there long before we transitioned to our full-time

25  agents W-2s.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 161 of
214
Cross-Examination of Jennifer Marguiles

July 10, 2023                                                   161
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

 1   Q.   Um-hmm.

 2   A.   So I would see them sporadically come and go.  I don't know

 3   what hours they had.  I don't know what arrangements they had.

 4   I would see them come into the office, do their work.  And,

 5   honestly, I always had an interior office, so I wouldn't see

 6   much.

 7   Q.   Okay.  But now what are your current duties with Avant?  I

 8   mean, what's your job?

 9   A.   I'm an office administrator, so I handle operations,

10   licensing, calendar management, event planning, travel

11   arrangements, everything that basically an executive assistant

12   would do.

13   Q.   And would you say when it comes to Avant, you know how --

14   you know about the business, you know pretty well how it

15   operates?

16   A.   On the back-office on the administrative side, yes, but on

17   the sales side and technicalities, no, I do not.

18   Q.   Would you agree that Avant is engaged in the selling of

19   services -- in the making of sales of -- or in the making of

20   services?

21            MR. POLLOCK:  I'm going to object to relevance, Your

22   Honor.  This issue was stricken by the Court.

23            THE COURT:  Overruled.

24            MR. TROPP:  I'm sorry?

25            THE COURT:  Overruled.

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 162 of
214

Cross-Examination of Jennifer Marquez                      162
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1              You may answer.

2              MR. TROPP:  Thank you.

3              THE WITNESS:  Yes.

4    BY MR. TROPP:

5    Q.  Yes.

6        And of the services, of its sales of its insurance

7    policies, would you say that 75 percent of those sales of the

8    policies were recognized as retail in this -- in that -- in

9    this industry?

10             MR. POLLOCK:  Objection, qualifications and --

11             THE COURT:  Sustained.

12             MR. TROPP:  Okay.  Let me ask you a different way.

13   BY MR. TROPP:

14   Q.  Would you say that -- would you agree that -- what

15   percentage would you say of the money that Avant makes comes

16   from the sale of their insurance policies?

17             MR. POLLOCK:  Frankly, Your Honor, this --

18             THE COURT:  She's an office manager.  Predicate.

19   Sustained.

20   BY MR. TROPP:

21   Q.  Do you -- are you -- you do know about how the agents are

22   paid, correct?

23   A.  Yes.

24   Q.  And when I say agents, I mean sales agents.

25   A.  Yes.

```
 1    Q.  Of the moneys that the sales agent get paid, would you say

 2    that over 50 percent of that amount comes from commissions?

 3    A.  Yes.

 4            MR. POLLOCK:  Predicate, again, Your Honor.

 5            THE COURT:  Sustained.  The answer is stricken.

 6    BY MR. TROPP:

 7    Q.  What percentage -- in your experience and what you know

 8    about how payments are made, what would you say is the

 9    percentage of -- from the earnings that the agents get, what

10    percentage would -- comes from commissions?

11            MR. POLLOCK:  Predicate, again, Your Honor.

12            THE COURT:  Sustained.

13            MR. TROPP:  That's all I have, Judge.

14            THE COURT:  Redirect?

15                      REDIRECT EXAMINATION

16    BY MR. POLLOCK:

17    Q.  Ms. Manjarres, what's your e-mail address?

18    A.  I'm sorry?

19    Q.  Your e-mail address?

20    A.  My corporate e-mail address?

21    Q.  Yes.

22    A.  JManjarres@AvantAssurance.com.

23    Q.  All right.  This will be quick.

24        Just to be clear, your position is administrative as an

25    executive assistant; is that right?
```

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 164 of
214

Redirect Examination / Jennifer Manzares

164
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1    A.   Yes.

2    Q.   Meaning you don't know about how my clients are paid or how

3    the company is paid.  That's all stuff that you don't handle?

4    A.   Right.

5    Q.   And as far as whether my clients are owed money, you're not

6    the person that they would've gone to complain about it.  That

7    would've been Mr. Cortes?

8    A.   No.

9    Q.   No?

10   A.   No, your clients would not come to me.

11   Q.   Okay.  And then as far as Mr. Cortes, he has his own office

12   that has a door?

13   A.   Yes.

14   Q.   Okay.  That's all I have.

15        THE COURT:  Thank you, ma'am.  You are excused.

16   (Witness excused.)

17        THE COURT:  Plaintiffs have no other witnesses?

18        MR. POLLOCK:  For today, no, Your Honor.  We're going

19   to go through with the cross of Mr. Cortes.

20        THE COURT:  Ladies and gentlemen, we will adjourn for

21   the day.  I'm going to ask that you all return tomorrow morning

22   at 8 o'clock.  Please be gathered in the jury room by 8 a.m.

23   At that time, we will continue with the trial.

24        Please leave your notebooks and pencils in the jury

25   room.  Please don't discuss this case, and avoid contact with

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 165 of
214
165
Proceedings
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1    those whom you see here in the courtroom.  We'll see you back

 2    tomorrow morning at 8.  Have a good evening.

 3              COURT SECURITY OFFICER:  All rise for the jury,

 4    please.

 5        (The jury exited the courtroom at 4:20 p.m.)

 6              THE COURT:  Given what I'm seeing on the Defense side,

 7    I thought it best to give Defense counsel the opportunity to

 8    prepare the examination of the Defendants.  So let's go through

 9    those remaining objections for the jury instructions, please,

10    and get the verdict form and jury instructions in final form.

11              MR. CUMMINGS:  Your Honor, may my clients be seated?

12              THE COURT:  Yes, of course.

13              MR. POLLOCK:  Your Honor, you ready?

14              THE COURT:  Yes.

15              MR. POLLOCK:  Sorry.  I was fumbling around.

16              We're looking at 3.7.2, affirmative defense for

17    preponderance burden -- burden of proof, and I think we seem to

18    be covering ground here because I thought last time the Court

19    had stricken the affirmative defenses, but they were reinserted

20    because the parties could not agree.

21              THE COURT:  I don't believe I struck affirmative

22    defenses, no.  That was not what I did.  There was no Rule

23    12(f) motion, and if there are affirmative defenses pled, I was

24    asking Defense counsel what affirmative defenses did they want

25    to carry the burden of proof on at trial.
```

1        MR. POLLOCK:  The first affirmative defense that they

2   pled involved the retail or services establishment, and so we

3   don't believe that that's appropriate in a case involving

4   insurance.  I can cite to the -- cite for the Court the law on

5   that, which initially stems from *Mitchell vs. Kentucky Finance*,

6   which is a 1959 U.S. Supreme Court case where it talks about

7   when the retail service exemption was included, the 207(i), the

8   court specifically determined -- talked about how it doesn't

9   exempt banks and insurance companies.

10       And we also have CFR 779 316 that talks about how

11  transactions of an insurance company are not considered retail

12  or servicing transactions for purposes of the FLSA.  And that

13  was talked about in the 11th Circuit case of *Hogan vs. Allstate*

14  *Insurance Company* at Page 626 and then again in *Merritt* vs.

15  Texas Farm Bureau, which was a May 16th, 2023, decision from

16  the Western District of Texas.

17       They surveyed the landscape and found that there was

18  no case that allowed -- that considered the sale of insurance

19  or insurance products to be retail or service, and so that in

20  every case, that exemption doesn't apply.

21       So we ask that the first affirmative defense be

22  removed as legally untenable.

23       THE COURT:  What page of the -- of Docket Entry 95?

24       MR. POLLOCK:  19.

25       THE COURT:  Page 19.  Okay.

Proceedings
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
1              All right.  I'll hear from Defense counsel.
2              MR. TROPP:  Your Honor, that -- the case law that he's
3     referring to about not including insurance is -- it's old law.
4              THE COURT:  Well, cite to me anything that supports
5     your position, please.  Old or new.
6              MR. TROPP:  Very well, Judge.
7              One of the specific -- in the CFR specifically, it
8     says insurance policy sales --
9              THE COURT:  I'm sorry.  What CFR?  What CFR section
10    are you reading from?
11             MR. TROPP:  I actually have it cited in the
12    instructions.
13             THE COURT:  207(1) -- or (i)?
14             MR. TROPP:  Its -- 7(1) is the -- that's where it is.
15    But the CFR actually lists insurance policy sales as part of
16    goods under 7(1) -- 7(i).
17             THE COURT:  Let's look at that.
18             MR. TROPP:  Yes.
19             I believe I cited in the last provision -- I just want
20    to get that for Your Honor -- 7.9.317.
21             THE COURT:  Let's see it.
22             MR. TROPP:  Just give me two seconds, Judge.  Let me
23    get the instructions.  The last instruction revision, I put all
24    that in there.
25             THE COURT:  All right.
```

Proceedings
July 10, 2023
168

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1        MR. TROPP:  If you just give me a minute to find it.

2     (Pause in proceedings.)

3        THE COURT:  I know Mr. Pollock cited some older cases,

4  but I can cite to you one from May of this year, if the date of

5  the case is persuasive at all.  And that's -- I'm not sure if

6  you cited it, Mr. Pollock -- *Merritt* vs. Texas Farm Bureau,

7  M-E-R-R-I-T-T.

8        MR. POLLOCK:  Yes, Your Honor, from the Western

9  District of Texas.

10        THE COURT:  You cited that one, right?

11        MR. POLLOCK:  I did.  That's where they surveyed the

12  law.

13        THE COURT:  Right.  And that was May 15, 2023.  It's

14  still awaiting a F.3d cite, and the Westlaw cite is 2023

15  Westlaw 3520322.  So that's fairly recent.  That's two months

16  ago.

17        MR. TROPP:  Right.  I believe that was a case

18  involving, like -- not insurance policy sales.  However, just

19  let me see if I can get this.

20        THE COURT:  In fact, the court does a fairly extensive

21  review, as Mr. Pollock just mentioned, of this whole exemption.

22        MR. TROPP:  Okay.  So under the -- I'm having a little

23  trouble with the HDMI.  I can tell you under 29 CFR 776.20 zero

24  -- 77620 zero, Subsection B --

25        THE COURT:  I'm sorry.  What do you mean by 20 zero?

July 10, 2023

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1          MR. TROPP:  776.20, Subsection B shows that insurance

2     policies are goods within the meaning of the act, and that's in

3     the CFR.  It says --

4          THE COURT REPORTER:  I'm sorry.

5          THE COURT:  We can't hear you.  I'm not sure if you

6     want this on the record or if you're just speaking to

7     cocounsel.

8          MR. TROPP:  Sorry, Judge.  I'm having a little trouble

9     with the HDMI to show you, but it is in my revised copy.

10          And under 776.20 on the definition of goods,

11     specifically says insurance policies are goods within the

12     meaning of the act.  And then 207(i), USC Section 207(i), and

13     29 CFR 779.412 are stating these requirements.

14       (Pause in proceedings.)

15          MR. TROPP:  And your second --

16          THE COURT:  I'm sorry.  I think we're going to be here

17     all night if we proceed in this fashion.  Have you taken a look

18     at *Merritt* vs. Texas Farm Bureau and its exhaustive discussion

19     of this issue?

20          MR. TROPP:  I believe so, Judge.  I might've addressed

21     that.

22          THE COURT:  Trashed it?

23          MR. TROPP:  I'm sorry, Judge?

24          THE COURT:  You trashed it?

25          MR. TROPP:  No, no.  I believe I addressed it.

Proceedings
July 10, 2023                                                        170
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1             THE COURT:  Oh, you addressed it.  Where?

2             MR. TROPP:  It's in the instructions, Your Honor.

3             THE COURT:  Would you like a copy of *Merritt*,

4   Mr. Tropp?  Have you read it?

5             MR. TROPP:  I have read it, Judge.

6         (Pause in proceedings.)

7             MR. TROPP:  I do recall this case, Your Honor.  In

8   that case, the parties did not dispute that insurance policies

9   are to be -- are included as goods as defined under 776.20(b),

10  which says insurance policies are goods.  And it discusses the

11  retail concept up until, like -- up until the -- May 20th,

12  2020.  I know there are some changes of appeals from the DOL.

13        (Pause in proceedings.)

14            MR. TROPP:  I know that in that case, Your Honor, it

15  wasn't a question about insurance policies being considered

16  goods.  In that case, there was -- it involved property,

17  automobile, homeowner's and life insurance and brokerage

18  products, and it said, Before a person could qualify for TFB

19  insurance policy, membership requirement to be a member of the

20  Farm Bureau's nonprofit arm.

21            THE COURT:  Mr. Tropp and Mr. Cueto, my courtroom

22  deputy is passing to you a copy of the actual case.

23            MR. TROPP:  Thank you.  Thank you.

24            THE COURT:  And a courtesy copy for Mr. Pollock.

25            So if you turn to discussion at Page 5, Subsection 4,

1    that's a fairly exhaustive treatment of the subject matter, and

2    I will be removing this proposed language from the jury

3    instructions unless you have anything else on the point that

4    you would like to share.

5          MR. POLLOCK:  That's all the -- that's the entirety of

6    the proposed Defendants' first affirmative defense.

7          THE COURT:  Right.  But let's give counsel a chance --

8    Mr. Tropp and Mr. Cueto a chance to review this case law that

9    we just passed over to them.

10         (Pause in proceedings.)

11         MR. TROPP:  Your Honor, if I may.

12         THE COURT:  Yes.

13         MR. TROPP:  Okay.  It's coming to me now.  And thank

14   you for being so patient.  Thank you, Judge.

15         I just want to point out that in this case, it says

16   that the first two prongs were met, and then the court goes

17   into, however, the issue -- the part about the retail --

18   establishments with the retail concept.  And it seems like,

19   like you said, the court is at odds about that, and then it

20   does say it's on a case-by-case approach.

21         But then on Page -- what page is this?  Before the

22   discussion, it says -- it says, Plaintiffs argue this

23   regulation dispositive settles the matter exclusively.  And if

24   the court were to find insurance industry as a retail concept,

25   it would still fail to show a retail concept because it does

Proceedings
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1   not sell goods and services to the general public.

 2            Plaintiff posits that the Defendants offer policies to

 3   members of their related nonprofit organization and not to the

 4   general insurance-buying public to a case in that case.

 5   Finally, plaintiffs claim that not every person could buy Farm

 6   Bureau insurance even if they wanted to because one must first

 7   submit an application determining whether the Bureau wants to

 8   do business with that person.

 9            THE COURT:  You're reading from the court's summary of

10   one of the parties' arguments.

11            MR. TROPP:  Well, ultimately, it finds that because

12   the Farm Bureau didn't sell to the general public, it didn't

13   meet the third prong of the test.  This was, like, an

14   underwriting company.  But here, Avant sells to the general

15   public.  It goes directly to the end consumer.  All the other

16   elements are met.  It's a good, services.  It's part of the

17   retail concept.

18            But in that, that was an underwriting company for

19   insurance underwriting that did not sell to the general public.

20   It's got to go to the people.  It's got to help the community.

21   It's got to be the end product.  The next key about Avant

22   Assurance is it does go to the end product.

23            THE COURT:  Did you read the discussion under

24   Subsection 4?

25            MR. TROPP:  Subsection 4.
```

```
 1            THE COURT:  Mr. Pollock, would you point it out for

 2   Mr. Tropp, please?

 3            MR. POLLOCK:  He's got it, Your Honor.

 4            THE COURT:  Thank you.

 5            MR. TROPP:  Okay.  So --

 6            THE COURT:  Just read it to yourself, Subsection 4,

 7   Pages 5 and 6.

 8       (Pause in proceedings.)

 9            MR. POLLOCK:  Your Honor, can I step out while

10   Mr. Tropp is reading this for a quick comfort break?

11            THE COURT:  Yes.

12            MR POLLOCK:  Thank you, Your Honor.

13       (Pause in proceedings.)

14            MR. TROPP:  I do see, Your Honor, where it says --

15            THE COURT:  Let's wait for Mr. Pollock to return.

16   Thank you.

17       (Pause in proceedings.)

18            THE COURT:  Please return.  Are we ready to move on?

19   Are we ready to move on in the jury instructions?

20            MR. TROPP:  Yes, Your Honor.  But can I just make a

21   quick point?  Thank you, Judge.

22            In the discussion, it says that all the cases that

23   have ruled whether insurance has a retail concept -- albeit,

24   pre-2020 -- had determined that one does not exist.  I would

25   say that the big focus on this case on Page 1 -- in that case,
```

1    the insurance -- before one could qualify for TFB insurance

2    policy, there was a membership requirement to be a member of

3    the Farm Bureau's nonprofit arm.  So the court says that the

4    first two prongs were met.

5            It seems like there was a big problem about it not

6    being a retail concept because it wasn't available for -- to

7    the end consumer.  It establishes that insurance policies are

8    goods.  And, I mean, just selling these masses of -- of

9    Obamacare insurance policies, it is a retail concept.  And I

10   also understand this is a Texas case, so --

11           THE COURT:  Well, it's certainly not controlling.

12           MR. TROPP:  Right.

13           THE COURT:  It's a fairly exhaustive treatment of the

14   issue, and you have presented me with nothing contrary to that.

15           MR. TROPP:  Well, I'm just saying in that --

16           THE COURT:  I understand the facts are somewhat

17   distinguishable, but I'm not even going on the facts.  I'm

18   going on the discussion, as I pointed out to you, and,

19   particularly, the court's reliance there on *Mitchell vs.*

20   *Kentucky*, M-I-T-C-H-E-L-L.  It's a 1959 U.S. Supreme Court

21   case.

22           So I will be removing this language from the proposed

23   jury instructions.  We had this discussion at the calendar

24   call, and if you had anything contrary to show me, now's the

25   time, and I don't see anything contrary to that other than your

```
 1   recitation to CFR and I'm not sure what else.  So this part
 2   will come out.
 3           What's the next objection so we can get these
 4   instructions in final form?
 5           MR. POLLOCK:  It continues, Your Honor.  I don't know
 6   whether Your Honor's striking the entirety of the first
 7   instruction because the second one talks about -- it talks
 8   about one -- I guess it's the whole instruction.  The next one
 9   would be the Defendants acted in good faith, the second
10   affirmative defense.
11           THE COURT:  All right.
12           MR. POLLOCK:  It's our position there is no defense of
13   good faith.  That's a defense to liquidate damages but not to
14   the imposition of liability.  So it's not something that should
15   be submitted to the jury because they would confuse the issues.
16           THE COURT:  Because the jury's not being asked about
17   liquidated damages.
18           MR. POLLOCK:  Correct.
19           THE COURT:  Right.
20           MR. POLLOCK:  And there's no --
21           THE COURT:  Advisory jury.
22           MR. POLLOCK:  -- advisory jury because we don't have a
23   three-year statute.
24           THE COURT:  All right.
25           I will hear from Plaintiffs' counsel -- Defense
```

Proceedings
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1    counsel.
 2              MR. TROPP:  So it would be Your Honor deciding
 3    ultimately the issue of liquidated damages.
 4              THE COURT:  The jury is not -- this is not a jury
 5    issue.
 6              MR. TROPP:  Well, I cited the cases as to -- I mean,
 7    for good faith defense.  It's pretty, like, standard defense,
 8    that I understand, that we could --
 9              THE COURT:  To what?
10              MR. TROPP:  To show that --
11              THE COURT:  To the FLSA?
12              MR. TROPP:  Yes.  To counter the --
13              THE COURT:  Are any of these cases FLSA cases, the
14    ones you have cited?
15              MR. TROPP:  Yes.
16              THE COURT:  Which one?
17              MR. TROPP:  I believe I have --
18              THE COURT:  I'm sorry.  Where?
19              MR. TROPP:  The City of Palm Beach --
20              THE COURT:  The City of West Palm Beach case?
21              MR. TROPP:  No, Your Honor.
22              THE COURT REPORTER:  Can you use the microphone?
23              MR. TROPP:  Yes.
24              THE COURT REPORTER:  Thank you.
25         (Pause in proceedings.)
```

1          MR. TROPP:  That's fine.  We can move on, Judge, if
2     the jury's not going to make that determination.  We're clear
3     about that.
4          THE COURT:  So all of that language on the second
5     affirmative defense is deleted.
6          Third affirmative defense, accord and satisfaction.
7          MR. TROPP:  Yes, Judge.
8          THE COURT:  Is there any such defense under the FLSA?
9          MR. TROPP:  Well, that's the thing, Your Honor.
10          THE COURT:  I suppose you're bringing it up due to the
11     breach of contract count and unjust enrichment?
12          MR. TROPP:  Yes, which is two-thirds of the whole
13     thing.
14          THE COURT:  All right.  And what are the elements of
15     this defense?
16          MR. TROPP:  That -- accord and satisfaction, that he
17     does not owe the amounts.
18          THE COURT:  That's a denial.  That's what the
19     Plaintiffs are saying.  This is no different than denying that
20     they're owed anything.
21          MR. TROPP:  It's not so much of a denial, but it would
22     shift the burden --
23          THE COURT:  To you.  You want to take on that burden?
24     Is that the burden your clients want to take on, or do you want
25     to leave the burden at the Plaintiffs' table?  Mr. Cueto?

Proceedings
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1              MR. CUETO:  It is to the Plaintiffs.

 2              THE COURT:  I think you do, right.  It's a denial that

 3    they're owed anything.

 4              MR. CUETO:  That's correct.

 5              THE COURT:  So are we withdrawing this accord and

 6    satisfaction?

 7              MR. CUETO:  Yes, Your Honor.

 8              THE COURT:  All right.

 9              Fourth affirmative defense, unclean hands.  That's not

10    a jury issue, is it?

11              MR. TROPP:  Again, that's on the contract-based

12    claims, Your Honor, and --

13              THE COURT:  Is it a jury issue?

14              MR. TROPP:  It is a jury issue --

15              THE COURT:  It is?

16              MR. TROPP:  -- on the contract --

17              THE COURT:  On anything.  Is unclean hands a defense

18    that's submitted to the jury?  Do you know?

19              MR. TROPP:  Well, I do know that those are standard

20    affirmative defenses for contract and unjust enrichment-based

21    cases.  Otherwise, I'm kind of restricted on, like, what our

22    arguments could be other than just whether or not he can meet

23    his burden or not.  Like, it really restricts my --

24              THE COURT:  You haven't answered my question,

25    Mr. Tropp.
```

1           MR. TROPP:  I'm sorry.

2           THE COURT:  Is it a jury issue?

3           MR. TROPP:  I would say it is, Judge, because --

4           THE COURT:  What do you cite for that?

5           MR. TROPP:  It's a jury issue because it goes to the

6     heart of, like, the credibility --

7           THE COURT:  It's an advisory.  It would be an advisory

8     verdict.

9        (Pause in proceedings.)

10          MR. TROPP:  I believe I cited the cases below.  A

11    doctrine of unclean hands requires a showing that plaintiff's

12    wrongdoing is directly related to the claim if that plaintiff

13    was an independent contractor.  And that was the *Nationwide*

14    *AutoPart* case.

15          And the doctrine of unclean hands requires a showing

16    that plaintiff's wrongdoing is directly related to the claim

17    against which it is asserted and defendants suffered a personal

18    injury as a result.  The court, at a minimum, should take into

19    account plaintiff's alleged misconduct when analyzing remedies,

20    or it should, at a minimum, take into account their misconduct.

21    That's in the *Kendrick* case.

22          THE COURT:  I think you're asking for an advisory

23    verdict on this defense of unclean hands, are you not?

24          MR. TROPP:  I'm not sure what you mean by that, Judge.

25          THE COURT:  No different than the issue of liquidated

1    damages.  It's not one that's submitted to the jury either.

2              MR. TROPP:  Right.

3              THE COURT:  There are some matters that require a jury

4    verdict, but unclean hands is not one of them.  It's an

5    equitable defense.

6              MR. TROPP:  It's an equitable defense, not on the

7    FLSA, per se, which it is includable in that.  But on the

8    question of whether or not there's implied or

9    nonimplied contract or there's unjust enrichment --

10             THE COURT:  What is the evidence of unclean hands

11   here?  I haven't heard from the Plaintiffs yet, but proffer

12   what the evidence will be.

13             MR. TROPP:  Well, proffer -- I proffer that the new --

14   that after -- they basically took his clients and took the

15   company.  And then the state case started once the cease and

16   desist letter came about, and it's not like I went into that.

17   Like you said, you don't want -- I didn't want -- I'm not

18   trying to do a sideshow.  But they have an ulterior motive by

19   this whole wage and hour thing in this whole claim that they're

20   doing.  They basically went on the offense as a defense.

21             You know, I didn't bring it up, but, like, Carlos and

22   Mariana, like, they took hundreds of clients, and now they

23   have, like, a huge Obamacare online company that basically

24   copycatted this business.  And it's like -- so the jury should

25   know everything that -- they have unclean hands in this.  And

1    to come here and say, Oh, we're owed hourly wages, is -- at

2    least should be considered as a remedy.

3            THE COURT:  I pointed you to a few cases, Mr. Tropp

4    and Mr. Cueto, so you can look at this issue because I don't

5    think you've answered my question about whether the doctrine of

6    unclean hands is one that is submitted to the jury for a

7    verdict or consideration.

8            I'll point you to *SMK Associates, LLC, vs. Lorali*,

9    L-O-R-A-L-I, 2015 Westlaw 11197776, Southern District of

10    Florida, January 21, 2015, where my colleague Judge Williams

11    wrote in Footnote 2 -- in the body of her order, she wrote,

12    "However, the court did not allow SMK's jury instructions on

13    unclean hands because this is not a recognized defense to a

14    claim for damages for breach of contract.  Thus, SMK's unclean

15    hands defense was not presented to the jury."

16            And at Footnote 2, she writes, "More specifically, the

17    court determined that the doctrine of unclean hands is

18    applicable only to a claim for equitable relief, not a claim

19    for damages."

20            She cites to another Southern District of Florida

21    case, and the parenthetical there that she quotes is:  "The

22    unclean hands doctrine traditionally applies only to claims for

23    equitable relief or in opposition to equitable defenses.

24    Whereas here a plaintiff seeks to recover only damages, the

25    unclean hands doctrine is not applicable."

Proceedings
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1          I will remove this from the jury instructions as well.

2     You have this evening to locate something contrary that shows

3     me that this is, in fact, a jury question, which is the issue

4     I've been asking you to address throughout our treatment of

5     this this afternoon.

6          Next issue, please.

7          MR. TROPP:  Okay.

8          THE COURT:  The next issue on the jury instructions.

9          MR. POLLOCK:  The next issue is set-off, Your Honor,

10    the fifth affirmative defense at Page 25 of Docket Entry 95.

11         THE COURT:  Fifth affirmative defense, set-off and

12    credits.  Well, this is an evidentiary issue, I take it.

13    You're saying that there is no evidence that the Defendants

14    paid the Plaintiffs money that went above and beyond the wages

15    that they earned to substantiate a claim for set-off.

16         MR. POLLOCK:  Correct.  Because under the FLSA,

17    that's -- the only way that set-off can occur is payment above

18    and beyond the wages.  In this case, it's kind of antithetical

19    because the claim is, We didn't get paid the commissions and

20    bonuses that we earned, so I don't know how that defense goes

21    to the jury.

22         THE COURT:  Okay.  I'm going to take this one out.

23    And if at the end of the case I see any evidence presented by

24    Defendants that Defendants paid Plaintiffs money that went

25    above and beyond commissions and bonuses, then we can have

Proceedings
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1    discussion on this.  You bring it up again.  But right now,

 2    this comes out.

 3          Next issue.

 4          MR. TROPP:  Your Honor, if I may.  I know the cases

 5    that I cited that -- a central question for the jury would be

 6    whether the Plaintiffs wages fell beneath the statutory minimum

 7    wage, minimum amount, and it says, you know, affirmative

 8    defenses can be properly -- a set-off can be asserted so long

 9    as the set-off does not reduce the amount you can recover below

10    the statutory minimum wage.

11          And -- and I know originally in the statement of claim

12    that the Plaintiffs made was always about the minimum wage.

13    They talked about the minimum wage, and they computed the

14    overtime based on this minimum wage.  But then all of a sudden

15    on the instructions, it's this calculation of taking the

16    commissions, these great amounts, and then, you know, figuring

17    out an hourly rate based on the high amounts of commissions

18    paid.

19          And what we're just saying is we should have the

20    set-off defense to show that at no point were the Plaintiffs --

21    did the Plaintiffs -- did they go periods without getting at

22    least minimum statutory minimum wage, like the cases we cite.

23          THE COURT:  Mr. Cueto, perhaps you can understand your

24    party's position on this because I'm not understanding

25    Mr. Tropp's argument.
```

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 184 of
214
Proceedings
July 10, 2023
184
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1          MR. CUETO:  I understand that it's our position that

2    they -- at no time did they ever receive minimum wages.

3          THE COURT:  They received more than minimum wage.

4          MR. CUETO:  Exactly.  I believe that's his point.

5          THE COURT:  So what?  It's not a minimum wage case, is

6    it?

7          MR. CUETO:  Well, the --

8          THE COURT:  I don't understand the point you're trying

9    to make.  The Plaintiffs haven't said this is a minimum wage

10   case; you haven't.  So I don't understand what you're saying by

11   either you or your cocounsel.  What is the defense?  Your

12   defense is that you paid them at least minimum wage?  Is that

13   what you want to say to the jury?

14         MR. CUETO:  That, frankly, they were not owed

15   anything.

16         THE COURT:  That's your denial, right?

17         MR. TROPP:  It's a denial.

18         THE COURT:  That's your denial.  All right.

19         Next issue.

20         MR. POLLOCK:  Your Honor, just as a housekeeping

21   matter and so the record's clear, on the affirmative defense of

22   unclean hands --

23         THE COURT:  Yes.

24         MR. POLLOCK:  Referable to the complaint, which is

25   Docket Entry 14, Page 5, the other objection, if there is some

1   researches, the affirmative defense is pled -- was that

2   Plaintiffs' claims are barred in whole or in part by the

3   doctrine of unclean hands because the Plaintiffs at all times

4   claimed 1099 independent contractor status with the United

5   States Department of Treasury, Internal Revenue Service and in

6   internal documents and communications.

7         Regardless of whether this is an advisory verdict

8   that's being requested or not, I don't believe that the defense

9   as pled is appropriate to submit to the -- to the jury for the

10  Court's consideration as a matter of law because there is no

11  action that my client's could've taken that resulted as a

12  matter of fact and their having unclean hands and resulting in

13  the issues that they complain about.

14        THE COURT:  Well, it's framed today by Mr. Tropp it's

15  a different theory of unclean hands than the one that was pled.

16        MR. POLLOCK:  Right.

17        THE COURT:  The other unclean hands that he described

18  pertained to taking confidential information or clients and

19  moving on and becoming very successful on their own right, and

20  so that doesn't match what was pled.  And in any event, this is

21  not a jury issue.

22        MR. POLLOCK:  Understood.  I just wanted to have the

23  record reflect that there was -- that that changed.

24        Moving on, on Page 29, if there is no exemption, then

25  the language in 29 should come out.

July 10, 2023

Proceedings

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1          THE COURT:  Right.

2          Next.

3          MR. POLLOCK:  Again, 31 is kind of a regurgitation of

4    exemptions which would likewise come out.

5          MR. CUETO:  Your Honor, Mr. Cortes would like to use

6    the restroom.

7          THE COURT:  He may.

8          MR. CUETO:  Thank you.

9          MR. POLLOCK:  We would request that from 31 through 32

10   in bold and underlined be stricken.

11         THE COURT:  I will hear from Defense counsel.

12         MR. TROPP:  Judge, I believe I took this one and

13   modelled jury instructions and -- and I understand you're

14   striking the part about the retail exemption.  But why would --

15   on their exemptions, the part about Plaintiffs were not

16   employees and properly classified as independent contractor,

17   what would be the problem with that, Your Honor?

18         MR. POLLOCK:  Your Honor, that's -- what the Defense

19   is asking you to do is include in the standard jury instruction

20   language which does not appear in there, including a statement,

21   affirmative statement, by the Court that would be instructing

22   the jury that Plaintiffs were not employees, which I think

23   would be improper.  It's, likewise, I think Defendants'

24   position, and I think that's just a mere denial and not a

25   defense and shouldn't be instructed to the jury.

Proceedings
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1              So I think this whole bold and underlined part, which

 2    is a denial and a regurgitation of the retail sales exemption,

 3    be removed.

 4              THE COURT:  Right.  I think the second paragraph

 5    that's underlined I've already addressed.  That doesn't come in

 6    at all, right?  It's all talking about being exempt or not

 7    exempt.  Where is the instruction on employee versus

 8    independent contractor?

 9              MR. TROPP:  I think it's 4.24.

10              THE COURT:  On this submission, on Docket Entry 95.

11              MR. POLLOCK:  It's the next page.  It goes to 4.24.

12              THE COURT:  Oh, it's covered there.

13              MR. POLLOCK:  Yeah.  So I don't think that language at

14    the top where it says exceptions -- exemptions --

15              THE COURT:  Exemptions, right.

16              MR. POLLOCK:  I think that comes out; the next part

17    comes out.

18              THE COURT:  It all comes out.

19              All right.  Next issue.

20              MR. POLLOCK:  Next issue starts at Page 39.  I guess

21    38 to 39 is -- I'm kind of unclear on what the part is objected

22    to by Defendants.  However, I think the Court already ruled,

23    and we prepared the instructions based on the Court's prior

24    ruling on including commissions in the regular rate of pay for

25    purposes of calculating overtime.
```

Case 1:22-cv-22671-CMA   Document 123-1   Entered on FLSD Docket 09/21/2023   Page 188 of
214
Proceedings
188
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1          THE COURT:  I will hear from Defendants.

2     (Pause in proceedings.)

3          THE COURT:  All right.  This matter that -- all the

4  underlining comes out that appears on Page 40 and the bottom of

5  39.

6          Next issue.  At the bottom of Page 44?

7          MR. POLLOCK:  Correct, Your Honor.  That's correct.

8          THE COURT:  This is on recordkeeping, and the

9  Defendants want the jury to know they're not required to keep

10  records on independent contractors.  What's Plaintiffs'

11  objection on that?

12          MR. POLLOCK:  The citation to the statutory language.

13          THE COURT:  No, we would take that out.  I think the

14  rest is fair.

15          MR. POLLOCK:  Okay.

16          THE COURT:  All right.  I think that's it, right?

17          MR. POLLOCK:  I think so.

18          THE COURT:  Okay.  I would love a clean version of

19  this tomorrow, please, at some point so I can review it.  It

20  doesn't have to be at 8 in the morning, but during the day, I'd

21  like that cleaned up so I can look at it.

22          Do we have a verdict form in final form?

23          MR. POLLOCK:  I think we do.  I think the -- there was

24  an asterisk in there.  There was a placekeeper just in case the

25  Court wanted a jury question on the exemption issue, but if

Proceedings
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

```
 1    there is no exemption issue, we don't need it.

 2              THE COURT:  All right.

 3              MR. POLLOCK:  So I think -- I can take a look, but I

 4    think that's where we're at.

 5              THE COURT:  Right.  The only remaining issue is

 6    that -- that exemption under retail sales.

 7              MR. POLLOCK:  Right.

 8              THE COURT:  All right.  Any other matters before we

 9    begin tomorrow morning at 8?

10              MR. POLLOCK:  We'll go from 8 to 6 tomorrow, Your

11    Honor?

12              THE COURT:  We will.  I have a calendar call at 9, so

13    we'll take a break at 9.  That should go fairly quickly.  All

14    right?

15              MR. POLLOCK:  We should have a translator available

16    for tomorrow, and then we should hear more from our case.  The

17    Defendants didn't agree to our translator, so I guess they'll

18    be bringing their own.

19              THE COURT:  All right.  Anything else?

20              MR. POLLOCK:  And then we'll break for lunch, and

21    then -- and then is Mr. Cortes going to be cross-examined?  I

22    guess he'll be cross-examined during Defendants' case in chief.

23              THE COURT:  That's correct.  That's my understanding.

24              Right, Mr. Tropp?

25              MR. TROPP:  Correct.
```

Court Reporter's Certificate
July 10, 2023
Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

1          THE COURT:  Okay.

2          MR. POLLOCK:  Perfect.  Thank you, Your Honor.

3          THE COURT:  So I do have a -- I believe I have a 12:30

4    brief status conference, so we'll definitely handle that during

5    the lunch break.

6          MR. POLLOCK:  Okay.  And, again, my apologies for the

7    timing issue, Your Honor.

8          THE COURT:  That's all right.  We needed the time,

9    anyway, for the jury charges.

10          MR. POLLOCK:  Understood.

11          THE COURT:  Okay.  You all have a good evening.

12          MR. POLLOCK:  Thank you.  You too.

13       (The proceedings excerpt adjourned at 5:23 p.m.)

14

15                      C E R T I F I C A T E

16

17       I hereby certify that the foregoing is an

18    accurate transcription of the proceedings in the

19    above-entitled matter.

20

21    __08/30/2023__

22       DATE                STEPHANIE A. McCARN, RPR
                             Official United States Court Reporter
23                           400 North Miami Avenue, Thirteenth Floor
                             Miami, Florida 33128
24                           (305) 523-5518

25

## $

**$10** [5] - 85:6, 85:12, 85:20, 87:16, 88:24
**$10,000** [1] - 16:8
**$11,000** [2] - 133:5, 133:23
**$140** [1] - 123:13
**$15** [2] - 90:5, 90:17
**$20** [2] - 86:1, 86:8
**$21,000** [3] - 24:16, 24:20
**$25,000** [3] - 16:9, 106:22, 109:22
**$27,000** [2] - 24:21, 24:22
**$3,337** [1] - 24:23
**$30,000** [1] - 24:20
**$35** [6] - 90:3, 90:16, 90:25, 91:6, 91:7, 121:16
**$42,000** [1] - 24:23
**$5,000** [1] - 16:7
**$600** [1] - 123:15
**$700** [1] - 123:17

## '

**'21** [2] - 39:3, 136:25
**'21/'22** [1] - 85:10
**'22** [2] - 39:3, 136:25

## 0

**08/30/2023** [1] - 190:21

## 1

**1** [15] - 1:8, 1:11, 3:15, 38:21, 87:19, 96:17, 96:19, 115:17, 115:18, 118:21, 119:11, 119:12, 147:22, 147:23, 173:25
**1,082** [1] - 120:19
**1,090** [1] - 118:24
**1,215** [1] - 123:16
**1,250** [1] - 116:2
**10** [3] - 1:5, 127:17, 131:2
**100** [1] - 99:20
**1065** [1] - 120:14
**1066** [2] - 120:15, 120:16
**1082** [2] - 116:2, 116:25
**1099** [13] - 14:2, 14:4, 14:6, 75:1, 75:19,

77:9, 113:5, 146:1, 146:5, 147:7, 148:9, 185:4
**1099s** [8] - 20:20, 20:22, 75:18, 76:11, 76:18, 76:22, 77:5, 148:7
**11** [2] - 3:22, 103:11
**11197776** [1] - 181:9
**115** [1] - 3:15
**118** [1] - 3:16
**11:21** [1] - 31:1
**11th** [4] - 36:23, 58:13, 153:21, 166:13
**12** [5] - 3:16, 15:7, 118:10, 118:11, 153:24
**12f** [1] - 165:23
**1250** [1] - 1:20
**12:30** [3] - 30:20, 82:5, 190:3
**12:32** [1] - 83:8
**13** [5] - 3:17, 24:14, 37:20, 132:19, 132:22
**13-3** [1] - 1:7
**13-week** [2] - 24:13, 26:16
**130** [1] - 18:1
**132** [1] - 3:17
**135** [1] - 1:16
**13th** [1] - 82:2
**14** [1] - 184:25
**142** [1] - 58:8
**145** [1] - 3:6
**15** [4] - 81:24, 89:1, 131:2, 168:13
**1500** [1] - 24:19
**157** [1] - 3:7
**16** [2] - 119:11, 119:12
**1617** [1] - 120:16
**163** [1] - 3:7
**16th** [1] - 166:15
**17** [2] - 119:11, 119:12
**19** [2] - 166:24, 166:25
**190** [2] - 1:8, 3:23
**1959** [2] - 166:6, 174:20
**1:45** [2] - 81:24, 82:2
**1:46** [1] - 84:2
**1st** [7] - 12:24, 39:5, 39:14, 148:10, 151:5, 155:1

## 2

**2** [6] - 28:21, 120:6, 120:10, 127:17, 181:11, 181:16
**20** [7] - 11:8, 49:4,

147:24, 148:1, 152:5, 152:14, 168:25
**2000** [1] - 131:1
**2013** [1] - 138:12
**2015** [2] - 181:9, 181:10
**2020** [16] - 17:2, 32:4, 32:8, 32:10, 34:3, 39:2, 39:3, 39:10, 39:21, 42:19, 43:22, 85:16, 88:24, 136:1, 170:12
**2021** [11] - 17:2, 17:6, 34:5, 39:3, 42:20, 43:23, 85:16, 87:19, 88:24, 102:6, 137:4
**2022** [35] - 16:10, 17:6, 33:23, 39:10, 43:11, 43:13, 43:14, 43:23, 47:9, 47:13, 47:25, 49:18, 87:19, 102:6, 108:4, 110:7, 111:6, 111:17, 111:22, 112:6, 112:20, 132:21, 133:1, 134:6, 135:20, 136:1, 140:8, 140:11, 140:13, 145:12, 145:13, 146:5, 147:6, 148:24, 151:5
**2023** [5] - 1:5, 36:23, 166:15, 168:13, 168:14
**207(1** [1] - 167:13
**207(i** [3] - 166:7, 169:12
**20th** [1] - 170:11
**21** [1] - 181:10
**2100** [1] - 1:20
**22** [2] - 3:22, 150:23
**22-cv-22671-CMA** [1] - 1:2
**220** [1] - 118:21
**230-4884** [1] - 1:17
**2300** [1] - 24:16
**24** [2] - 26:18, 26:19
**25** [2] - 24:18, 182:10
**29** [4] - 168:23, 169:13, 185:24, 185:25
**293** [1] - 99:16

## 3

**3** [7] - 26:7, 28:21, 127:17, 152:22, 153:8, 153:9
**3,000** [1] - 24:18

**3.7.2** [1] - 165:16
**30** [5] - 26:6, 49:4, 87:14, 92:18, 151:15
**30-something** [1] - 153:2
**300** [2] - 95:3, 102:16
**304** [1] - 118:24
**305** [5] - 1:17, 1:21, 1:24, 2:4, 190:24
**31** [4] - 3:5, 150:20, 186:3, 186:9
**316** [1] - 166:10
**32** [3] - 155:12, 156:10, 186:9
**33128** [2] - 2:4, 190:23
**33134-5267** [1] - 1:20
**33140-2316** [1] - 1:24
**33146-1878** [1] - 1:16
**336** [2] - 120:6, 120:10
**337** [1] - 120:13
**35** [4] - 89:1, 121:24, 122:2, 123:4
**350** [2] - 16:6, 102:16
**3520322** [1] - 168:15
**38** [1] - 187:21
**39** [3] - 187:20, 187:21, 188:5
**3:32** [1] - 141:25
**3:33** [1] - 142:22
**3:42** [1] - 142:22
**3:45** [1] - 144:17
**3:46** [1] - 144:20

## 4

**4** [6] - 3:21, 141:14, 170:25, 172:24, 172:25, 173:6
**4.24** [2] - 187:9, 187:11
**40** [2] - 49:4, 188:4
**400** [2] - 2:3, 190:23
**44** [1] - 188:6
**47,000** [1] - 121:12
**4:20** [1] - 165:5
**4A** [1] - 1:23

## 5

**5** [7] - 3:21, 23:11, 90:18, 115:17, 170:25, 173:7, 184:25
**50** [2] - 99:21, 163:2
**50/50** [2] - 113:2, 113:3
**507** [5] - 99:14, 120:13, 120:23, 121:21, 123:2
**523-5518** [2] - 2:4,

190:24
**570** [6] - 120:4, 120:6, 120:8, 120:23, 121:20, 123:2
**5750** [1] - 1:23
**599** [1] - 16:7
**5:23** [2] - 1:6, 190:13

## 6

**6** [5] - 3:15, 78:19, 78:21, 173:7, 189:10
**6,000** [1] - 24:19
**60** [3] - 92:18, 133:17, 153:3
**600** [3] - 16:8, 102:16, 106:21
**61** [1] - 153:3
**626** [1] - 166:14
**638** [1] - 120:14
**639** [2] - 120:14
**65** [1] - 17:25
**688** [4] - 120:15, 120:24, 121:22, 123:2
**6th** [1] - 110:1

## 7

**7(1** [2] - 167:14, 167:16
**7(i)** [1] - 167:16
**7.9.317** [1] - 167:20
**700** [1] - 99:15
**75** [1] - 162:7
**770** [1] - 1:16
**776.20** [3] - 168:23, 169:1, 169:10
**776.20(b** [1] - 170:9
**77620** [1] - 168:24
**777-0377** [1] - 1:21
**779** [1] - 166:10
**779.412** [1] - 169:13
**78** [1] - 3:15

## 8

**8** [15] - 3:16, 37:6, 89:4, 89:5, 126:19, 126:20, 126:21, 126:22, 153:24, 164:22, 165:2, 188:20, 189:9, 189:10
**814-2035** [1] - 1:24
**84** [1] - 3:5
**857** [5] - 120:16, 120:18, 120:24, 121:22, 123:2
**89** [1] - 3:16

**8th** [5] - 153:2, 153:10, 155:24, 156:1, 156:2

## 9

**9** [22] - 15:6, 23:11, 26:6, 127:14, 127:17, 128:1, 128:4, 151:17, 151:21, 152:8, 152:22, 152:23, 153:6, 153:8, 153:9, 189:12, 189:13
**95** [3] - 166:23, 182:10, 187:10
**9:15** [1] - 151:21
**9:16** [2] - 1:6, 4:1

## A

**a.m** [12] - 1:6, 4:1, 31:1, 126:19, 126:20, 126:21, 126:22, 127:14, 127:17, 151:17, 152:8, 164:22
**ability** [2] - 8:4, 153:14
**able** [14] - 11:14, 12:6, 16:16, 36:15, 58:2, 58:11, 66:14, 78:10, 79:25, 104:2, 113:5, 122:10, 136:18, 143:6
**above-entitled** [1] - 190:19
**absolutely** [1] - 155:21
**ACA** [1] - 41:12
**accept** [2] - 38:1, 88:9
**accepted** [2] - 17:6, 88:10
**access** [3] - 27:9, 95:21, 101:4
**accident** [1] - 132:17
**accord** [2] - 177:6, 177:16, 178:5
**according** [5] - 102:17, 116:1, 120:4, 121:20, 121:21
**account** [4] - 8:4, 123:13, 179:19, 179:20
**accountant** [1] - 115:9
**accounting** [3] - 22:2, 95:10, 131:15
**accountings** [1] - 114:10
**accounts** [1] - 132:16
**accuracy** [1] - 105:17

**accurate** [3] - 90:8, 95:2, 190:18
**accurately** [2] - 74:23, 103:17
**acquire** [1] - 10:9
**Act** [1] - 12:20
**act** [3] - 29:21, 169:2, 169:12
**acted** [1] - 175:9
**action** [1] - 185:11
**actions** [1] - 126:6
**active** [1] - 85:21
**actively** [1] - 108:7
**actual** [3] - 115:25, 150:25, 170:22
**add** [2] - 61:9, 122:19
**added** [1] - 120:5
**adding** [2] - 120:10, 122:20
**addition** [2] - 9:20, 102:2
**additional** [1] - 8:12
**address** [6] - 5:8, 131:22, 163:17, 163:19, 163:20, 182:4
**addressed** [4] - 169:20, 169:25, 170:1, 187:5
**adequate** [1] - 20:2
**adjourn** [1] - 164:20
**adjourned** [1] - 190:13
**administrative** [3] - 131:9, 161:16, 163:24
**administrator** [3] - 145:11, 145:14, 161:9
**admit** [1] - 103:10
**admitted** [2] - 7:21, 29:5
**ADMITTED** [1] - 3:14
**advance** [5] - 133:5, 133:8, 133:12, 133:20, 133:23
**advances** [5] - 132:9, 132:10, 132:12, 133:21
**advantage** [1] - 29:14
**advertisements** [2] - 34:12, 34:15
**advice** [1] - 106:7
**advisory** [6] - 175:21, 175:22, 179:7, 179:22, 185:7
**Aetna** [2] - 90:4, 90:17
**affect** [1] - 153:14
**affected** [1] - 138:17
**affecting** [1] - 8:11
**afraid** [1] - 22:11

**afternoon** [4] - 31:8, 127:18, 142:5, 182:5
**afterwards** [6] - 73:22, 81:10, 81:11, 86:12, 148:25, 149:1
**age** [1] - 9:19
**agencies** [3] - 91:13, 91:17, 112:14
**agency** [17] - 32:12, 32:13, 32:14, 35:20, 42:12, 42:16, 79:19, 91:15, 91:18, 97:16, 98:25, 100:8, 107:16, 131:7, 139:24
**agent** [57] - 13:5, 24:6, 43:25, 44:3, 44:7, 45:11, 45:14, 45:18, 45:23, 45:25, 46:18, 47:7, 47:11, 62:2, 63:18, 63:24, 70:20, 73:7, 73:10, 73:11, 73:19, 78:15, 88:14, 91:6, 91:12, 91:14, 91:20, 91:24, 93:2, 93:5, 93:14, 94:1, 94:8, 96:23, 96:24, 96:25, 97:1, 97:19, 97:24, 98:8, 98:10, 98:13, 99:19, 100:17, 101:4, 101:11, 106:21, 107:13, 107:17, 107:21, 107:25, 108:4, 108:23, 109:13, 114:10, 153:6, 163:1
**agent's** [2] - 73:22, 101:17
**agents** [122] - 14:3, 16:25, 18:12, 24:6, 26:3, 33:14, 33:17, 33:18, 34:2, 34:3, 34:5, 34:10, 34:16, 34:21, 34:23, 35:2, 35:4, 43:17, 44:20, 44:23, 46:25, 47:1, 47:3, 47:5, 47:15, 47:20, 47:24, 48:10, 49:19, 49:22, 49:23, 50:6, 50:7, 50:10, 53:21, 55:23, 56:24, 58:7, 69:24, 70:2, 73:16, 73:17, 79:19, 80:2, 80:10, 80:20, 80:22, 81:12, 84:16, 84:17, 84:19, 87:21, 89:12, 90:14, 94:24, 97:13, 97:14, 98:1, 100:4, 100:6, 100:8,
**agents'** [2] - 100:14, 101:5
**aggregate** [1] - 55:22
**ago** [6] - 98:2, 150:3, 150:16, 153:2, 153:15, 168:16
**agree** [26] - 20:17, 35:11, 42:13, 50:7, 84:15, 84:18, 95:1, 95:4, 95:8, 96:13, 102:4, 103:18, 103:20, 104:24, 121:4, 121:16, 121:25, 123:25, 132:1, 134:10, 135:17, 136:15, 161:18, 162:14, 165:20, 189:17
**agreed** [5] - 28:23, 87:23, 87:24, 88:4, 98:10
**agreement** [20] - 12:3, 20:13, 35:2, 35:4, 74:13, 86:13, 88:21, 89:12, 89:16, 89:17, 110:10, 110:12, 110:14, 110:23, 111:6, 111:14, 112:1, 124:12, 132:2, 160:3
**agreements** [4] - 84:22, 84:24, 85:2, 85:4

**agrees** [1] - 7:4
**ahead** [16] - 13:23, 15:16, 17:15, 38:13, 40:16, 41:2, 57:19, 60:15, 61:4, 62:2, 74:18, 91:9, 99:16, 127:21, 135:3, 148:16
**ain't** [1] - 103:12
**air** [2] - 51:21, 66:7
**albeit** [1] - 173:23
**alerted** [1] - 158:10
**ALL** [1] - 4:3
**alleged** [1] - 179:19
**allow** [6] - 7:20, 33:10, 111:25, 134:25, 135:4, 181:12
**allowed** [6] - 9:2, 25:25, 27:8, 33:6, 69:21, 102:1, 125:10, 125:11, 125:12, 125:13, 125:16, 126:3, 129:13, 138:25, 166:18
**allows** [1] - 19:7
**Allstate** [1] - 166:13
**almost** [3] - 24:18, 93:25, 108:4
**Altonaga** [1] - 19:19
**ALTONAGA** [1] - 1:12
**amazing** [1] - 107:3
**Ambetter** [7] - 35:17, 78:10, 90:17, 90:25, 91:6, 116:18
**amount** [14] - 19:25, 42:7, 42:17, 66:1, 86:2, 86:9, 88:9, 88:14, 94:16, 101:7, 106:19, 163:2, 183:7, 183:9
**amounts** [7] - 89:11, 89:20, 90:19, 90:24, 177:17, 183:16, 183:17
**analyzing** [1] - 179:19
**ANDREA** [1] - 1:8
**Andrea** [5] - 4:25, 30:3, 31:15, 138:13, 158:23
**answer** [44] - 7:5, 7:10, 7:13, 7:15, 15:25, 33:25, 37:9, 37:17, 37:18, 38:3, 38:7, 38:14, 57:19, 57:23, 58:9, 58:12, 64:20, 66:15, 70:14, 78:2, 79:14, 87:10, 105:15, 109:13, 112:8, 114:3,

134:18, 134:25, 135:2, 135:3, 149:23, 150:23, 151:16, 151:19, 152:24, 153:5, 153:7, 155:5, 155:14, 156:8, 156:12, 156:16, 162:1, 163:5
**answered** [4] - 37:16, 150:21, 178:24, 181:5
**answers** [5] - 6:24, 109:5, 109:11, 153:3, 153:10
**anticipating** [1] - 143:17
**antithetical** [1] - 182:18
**anyway** [1] - 190:9
**Apartment** [1] - 1:23
**apologies** [2] - 141:23, 190:6
**appeals** [1] - 170:12
**appear** [2] - 98:14, 186:20
**appearances** [1] - 4:4
**APPEARANCES** [2] - 1:13, 2:1
**applicable** [2] - 181:18, 181:25
**application** [4] - 97:1, 97:4, 97:6, 172:7
**applied** [3] - 33:5, 33:10, 36:10
**applies** [1] - 181:22
**apply** [6] - 5:22, 5:23, 36:12, 41:11, 122:6, 166:20
**appointed** [6] - 35:25, 36:3, 36:5, 36:15, 37:22, 37:24
**appointment** [8] - 36:14, 36:17, 36:18, 37:20, 38:9, 38:14, 38:16, 108:21
**appreciate** [2] - 91:17, 157:13
**approach** [3] - 30:24, 144:16, 171:20
**appropriate** [2] - 166:3, 185:9
**appropriately** [1] - 66:15
**April** [12] - 16:10, 36:23, 58:13, 102:20, 103:4, 108:3, 109:25, 145:13, 146:4, 147:6, 148:24,

153:20
**area** [4] - 58:24, 58:25, 60:1, 152:5
**argue** [1] - 171:22
**argument** [3] - 22:4, 29:23, 183:25
**argumentative** [4] - 10:19, 27:24, 27:25, 29:17
**arguments** [7] - 6:17, 6:18, 6:20, 9:15, 11:4, 172:10, 178:22
**arm** [2] - 170:20, 174:3
**arose** [1] - 135:7
**arranged** [1] - 126:14
**arrangements** [4] - 146:24, 159:4, 161:3, 161:11
**ascertain** [1] - 130:9
**assault** [3] - 137:14, 137:16, 139:11
**asserted** [2] - 179:17, 183:8
**assist** [1] - 115:1
**assistant** [2] - 161:11, 163:25
**associate** [2] - 36:24, 150:19
**associated** [4] - 78:11, 91:22, 93:3, 100:17
**Associates** [1] - 181:8
**assume** [3] - 101:19, 101:21, 102:13
**assuming** [2] - 37:11, 101:18
**Assurance** [17] - 12:8, 12:14, 12:16, 13:18, 35:10, 37:23, 54:15, 54:17, 55:8, 55:12, 55:21, 63:14, 71:5, 84:16, 98:7, 145:9, 172:22
**ASSURANCE** [1] - 1:8
**asterisk** [1] - 188:24
**attached** [2] - 78:16, 108:14
**attention** [5] - 11:12, 22:16, 81:3, 128:10, 152:11
**audible** [1] - 42:11
**August** [3] - 33:23, 47:25, 108:4
**authorize** [2] - 79:20, 80:11
**authorized** [7] - 13:18, 13:19, 35:16, 54:22, 69:17, 69:19, 70:11
**automobile** [1] - 170:17

**AutoPart** [1] - 179:14
**available** [13] - 50:20, 51:8, 51:15, 52:2, 54:7, 56:12, 60:21, 63:19, 63:22, 66:24, 71:22, 174:6, 189:15
**Avant** [124] - 12:8, 12:14, 12:16, 13:6, 13:17, 13:22, 14:25, 16:19, 16:22, 16:25, 17:12, 19:11, 19:24, 21:7, 26:17, 27:8, 27:12, 28:6, 31:18, 32:3, 32:12, 33:6, 33:11, 33:18, 34:20, 34:23, 35:10, 35:12, 35:15, 37:22, 37:23, 38:18, 42:1, 42:12, 43:22, 43:25, 46:6, 46:7, 47:7, 47:11, 48:5, 50:8, 51:22, 51:25, 52:5, 53:5, 53:22, 54:3, 54:6, 54:15, 54:17, 54:18, 54:21, 55:8, 55:12, 55:17, 55:21, 55:24, 57:10, 63:5, 63:13, 65:1, 65:12, 66:2, 66:16, 66:21, 67:11, 67:15, 67:17, 68:3, 71:5, 71:10, 73:5, 73:9, 73:16, 73:17, 80:10, 80:19, 80:22, 84:16, 89:11, 90:20, 90:22, 92:13, 94:18, 98:7, 98:13, 118:3, 118:4, 118:8, 129:12, 131:9, 131:11, 131:16, 131:20, 145:9, 145:12, 146:4, 147:21, 147:24, 148:1, 148:7, 149:15, 149:17, 151:5, 151:9, 152:17, 152:21, 153:17, 153:18, 154:3, 154:6, 154:24, 155:1, 156:3, 157:4, 158:21, 158:23, 161:7, 161:13, 161:18, 162:15, 172:14, 172:21
**AVANT** [1] - 1:8
**avant** [1] - 31:20
**Avant's** [5] - 32:23, 129:1, 129:3, 155:25, 157:9
**AvantAssurance.**

**Radiusbob.com** [1] - 60:24
**Avenue** [4] - 1:16, 1:23, 2:3, 190:23
**averaged** [1] - 24:23
**averaging** [1] - 24:16
**avoid** [2] - 81:25, 164:25
**awaiting** [1] - 168:14
**award** [1] - 12:11
**aware** [1] - 109:2

## B

**back-office** [3] - 131:8, 131:12, 161:16
**balance** [1] - 95:15
**balancing** [1] - 8:21
**bank** [1] - 132:15
**banks** [1] - 166:9
**barred** [1] - 185:2
**base** [3] - 10:6, 10:8, 11:1
**based** [17] - 12:4, 18:15, 20:22, 20:24, 23:13, 28:21, 41:20, 76:2, 94:3, 106:23, 119:16, 133:18, 178:11, 178:20, 183:14, 183:17, 187:23
**basic** [1] - 5:17
**basis** [2] - 66:17, 104:1
**Batista** [3] - 4:12, 74:8, 75:11
**BATISTA** [1] - 1:4
**Beach** [3] - 1:24, 176:19, 176:20
**bearing** [1] - 22:18
**became** [1] - 149:4
**become** [2] - 37:23, 113:10
**becoming** [1] - 185:19
**BEFORE** [1] - 1:12
**begin** [3] - 9:13, 9:16, 189:9
**beginning** [9] - 33:19, 33:20, 34:17, 38:23, 72:21, 74:7, 132:4, 133:17, 140:20
**BEHALF** [2] - 11:9, 22:21
**Behalf** [2] - 3:22, 3:22
**behalf** [4] - 4:5, 4:21, 4:22, 54:22
**behind** [3] - 17:15, 21:24, 22:2
**belief** [1] - 52:20

**believability** [1] - 8:11
**below** [2] - 179:10, 183:9
**beneath** [1] - 183:6
**benefits** [2] - 42:8, 113:6
**best** [4] - 23:9, 26:4, 137:20, 165:7
**Best** [1] - 60:11
**better** [6] - 77:17, 77:21, 78:1, 104:3, 113:24, 123:14
**between** [11] - 23:10, 23:13, 35:2, 35:4, 38:16, 61:7, 96:2, 98:19, 99:3, 120:18, 160:21
**beyond** [3] - 182:14, 182:18, 182:25
**bias** [1] - 8:7
**big** [7] - 22:25, 26:2, 27:7, 58:20, 58:22, 173:25, 174:5
**bigger** [6] - 43:15, 43:17, 87:3, 87:5, 87:6, 107:2
**biggest** [1] - 27:3
**bill** [1] - 67:19
**bills** [2] - 66:9, 67:21, 67:24
**bit** [2] - 105:13, 136:2
**black** [1] - 46:4
**Blue** [14] - 69:16, 69:19, 69:22, 69:23, 70:1, 90:18, 100:23, 100:24, 111:24, 112:1
**BlueInk** [6] - 51:14, 61:21, 61:22, 79:6, 79:8, 79:10
**board** [3] - 85:24, 85:25, 86:10
**body** [1] - 181:11
**boggling** [1] - 24:14
**bold** [2] - 186:10, 187:1
**bonus** [40] - 12:12, 16:4, 16:5, 16:6, 16:7, 16:8, 16:9, 17:5, 25:7, 27:13, 28:16, 29:6, 29:7, 90:11, 90:13, 102:12, 102:17, 106:13, 106:17, 107:2, 107:6, 107:9, 107:14, 108:14, 108:17, 109:19, 109:22, 109:25, 110:3, 110:13, 110:15, 123:6,

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

139:22, 139:24, 140:2, 140:8, 140:14, 140:15, 140:17, 141:1
**bonuses** [16] - 12:6, 14:17, 16:9, 16:21, 16:23, 17:13, 21:17, 29:4, 89:19, 102:3, 102:6, 102:20, 117:14, 117:15, 182:20, 182:25
**boom** [1] - 70:20
**borne** [1] - 80:19
**bottom** [3] - 118:23, 188:4, 188:6
**bought** [3] - 60:9, 65:13, 65:15
**Boulevard** [1] - 1:20
**box** [1] - 94:8
**breach** [2] - 177:11, 181:14
**break** [8] - 81:15, 82:7, 94:7, 141:20, 173:10, 189:13, 189:20, 190:5
**breaking** [1] - 30:20
**BRIAN** [1] - 1:15
**Brian** [2] - 4:7, 145:5
**brian@fairlawattorney.com** [1] - 1:18
**Bridge** [1] - 132:15
**brief** [2] - 141:19, 190:4
**briefly** [1] - 81:17
**Bright** [1] - 90:18
**bring** [21] - 5:4, 19:9, 27:6, 27:8, 46:17, 53:5, 58:1, 58:7, 62:21, 62:23, 62:24, 84:3, 100:10, 125:11, 125:18, 125:21, 129:13, 144:15, 180:21, 183:1
**bringing** [5] - 46:16, 62:17, 62:18, 177:10, 189:18
**brokerage** [1] - 170:17
**brother** [1] - 134:11
**brothers** [1] - 27:18
**brought** [10] - 25:3, 27:23, 51:3, 53:7, 54:2, 62:20, 62:22, 131:5, 135:6, 135:12
**browser** [1] - 60:21
**bucks** [2] - 68:7, 68:9
**building** [3] - 81:23, 87:13, 124:13
**buildings** [1] - 43:20

**built** [3] - 61:12, 124:14, 124:18
**bunch** [5] - 13:2, 27:16, 118:19, 118:24, 158:2
**burden** [10] - 8:14, 8:22, 165:17, 165:25, 177:22, 177:23, 177:24, 177:25, 178:23
**Bureau** [6] - 166:15, 168:6, 169:18, 172:6, 172:7, 172:12
**Bureau's** [2] - 170:20, 174:3
**bus** [1] - 23:12
**business** [26] - 12:15, 14:2, 21:9, 32:1, 32:8, 32:23, 34:11, 34:16, 38:1, 38:4, 38:5, 42:23, 45:4, 46:9, 56:16, 56:19, 60:17, 61:5, 61:13, 61:24, 81:18, 92:8, 113:17, 161:14, 172:8, 180:24
**busy** [1] - 42:13
**button** [3] - 64:19, 70:14, 70:20
**Buy** [1] - 60:12
**buy** [10] - 52:16, 56:13, 59:22, 59:23, 60:11, 60:20, 140:5, 140:7, 140:9, 172:5
**buying** [2] - 63:6, 172:4
**BY** [33] - 2:2, 31:7, 33:9, 40:2, 40:21, 50:5, 52:13, 53:20, 55:7, 56:4, 74:17, 78:23, 79:17, 84:11, 84:14, 86:20, 89:7, 98:18, 106:12, 114:6, 115:19, 117:13, 118:12, 132:23, 145:4, 155:23, 157:21, 158:18, 162:4, 162:13, 162:20, 163:6, 163:16

## C

**caballero** [1] - 142:14
**calculate** [1] - 76:9
**calculated** [1] - 119:16
**calculating** [1] - 187:25
**calculation** [1] -

183:15
**calendar** [7] - 26:3, 26:5, 146:20, 161:10, 174:23, 189:12
**calendars** [1] - 26:8
**cannot** [7] - 7:12, 7:13, 99:18, 108:16, 125:15, 130:9, 139:5
**capture** [2] - 79:13, 79:15
**car** [3] - 52:15, 52:16, 140:5
**card** [5] - 43:21, 53:25, 81:18, 108:21, 124:12
**cards** [1] - 43:18
**care** [8] - 12:1, 20:5, 20:6, 48:13, 48:21, 48:22, 49:5, 128:20
**cared** [1] - 48:23
**carefully** [1] - 30:10
**CARLOS** [1] - 1:4
**Carlos** [34] - 11:19, 17:21, 19:1, 24:15, 27:18, 28:7, 34:8, 46:23, 46:24, 62:17, 66:22, 78:13, 92:2, 92:6, 120:23, 121:20, 123:1, 132:21, 133:22, 134:11, 134:12, 134:23, 135:7, 135:12, 135:15, 135:19, 136:4, 136:18, 139:18, 139:19, 140:21, 145:7, 159:21, 180:21
**carlos** [1] - 115:9
**carrier** [2] - 102:10, 102:11
**carry** [1] - 165:25
**carrying** [1] - 6:6
**cars** [2] - 52:9, 52:14
**case** [91] - 5:25, 6:19, 7:19, 8:7, 8:15, 9:8, 9:11, 9:12, 9:21, 9:25, 10:3, 10:13, 12:11, 12:21, 18:24, 19:12, 19:14, 19:16, 19:17, 20:21, 22:3, 22:9, 22:10, 22:12, 23:24, 24:18, 24:24, 24:25, 25:11, 28:16, 29:7, 29:8, 30:9, 31:15, 36:19, 36:21, 39:13, 54:25, 58:13, 58:14, 66:5, 80:5, 82:1, 82:21, 82:24,

101:25, 102:4, 118:10, 141:22, 142:4, 150:4, 158:20, 164:25, 166:3, 166:6, 166:13, 166:18, 166:20, 167:2, 168:5, 168:17, 170:7, 170:8, 170:14, 170:16, 170:22, 171:8, 171:15, 171:20, 172:4, 173:25, 174:10, 174:21, 176:20, 179:14, 179:21, 180:15, 181:21, 182:18, 182:23, 184:5, 184:10, 188:24, 189:16, 189:22
**CASE** [1] - 1:2
**case-by-case** [1] - 171:20
**cases** [10] - 168:3, 173:22, 176:6, 176:13, 178:21, 179:10, 181:3, 183:4, 183:22
**cease** [5] - 28:6, 28:11, 134:9, 134:14, 180:15
**CECILIA** [1] - 1:12
**cell** [13] - 27:8, 129:12, 129:14, 129:15, 129:18, 129:20, 129:24, 130:4, 130:14, 130:16, 130:17, 130:20, 130:24
**cells** [2] - 118:19, 118:24
**center** [8] - 13:14, 15:17, 21:24, 54:9, 87:13, 127:13, 152:5, 152:7
**Center** [2] - 12:16, 42:24
**central** [1] - 183:5
**CEO** [1] - 31:21
**certain** [12] - 6:15, 41:10, 64:23, 69:15, 86:2, 90:13, 91:13, 96:1, 96:15, 105:3, 130:2, 153:8
**certainly** [1] - 174:11
**Certificate................ ....** [1] - 3:23
**certified** [1] - 79:11
**certify** [1] - 190:17
**CFR** [9] - 166:10,

167:7, 167:9, 167:15, 168:23, 169:3, 169:13, 175:1
**chain** [1] - 6:9
**chair** [2] - 62:8, 62:13
**chairs** [2] - 60:2, 62:22
**chamber** [1] - 81:19
**chance** [2] - 171:7, 171:8
**change** [7] - 23:19, 42:7, 42:8, 125:10, 125:13, 147:13, 147:16
**changed** [11] - 38:24, 39:1, 52:20, 62:19, 87:18, 147:13, 147:21, 158:20, 158:25, 159:1, 185:23
**changes** [3] - 23:19, 85:5, 170:12
**changing** [1] - 87:21
**charge** [6] - 66:17, 66:21, 66:22, 66:25, 109:1
**charged** [2] - 67:4, 67:6
**charges** [1] - 190:9
**cheaper** [1] - 76:17
**check** [4] - 29:21, 29:23, 122:4, 123:24
**CHIEF** [1] - 1:12
**chief** [2] - 82:24, 189:22
**choice** [1] - 137:17
**choose** [4] - 6:12, 39:24, 40:4, 70:2
**chose** [2] - 70:1, 78:7
**Cigna** [2] - 35:16, 90:17
**Circuit** [1] - 166:13
**circumstances** [1] - 6:10
**circumstantial** [1] - 6:9
**citation** [1] - 188:12
**cite** [8] - 166:4, 167:4, 168:4, 168:14, 179:4, 183:22
**cited** [9] - 167:11, 167:19, 168:3, 168:6, 168:10, 176:6, 176:14, 179:10, 183:5
**cites** [1] - 181:20
**City** [2] - 176:19, 176:20
**civil** [2] - 5:17, 11:21
**claim** [19] - 8:17, 9:5,

11:21, 13:24, 16:20, 134:23, 140:15, 140:17, 172:5, 179:12, 179:16, 180:19, 181:14, 181:18, 182:15, 182:19, 183:11
**claimed** [1] - 185:4
**claiming** [2] - 24:12, 24:14
**claims** [7] - 80:10, 95:12, 95:13, 95:16, 178:12, 181:22, 185:2
**clarify** [1] - 49:21
**classified** [5] - 11:24, 21:14, 47:8, 47:12, 186:16
**classify** [3] - 76:11, 76:17, 76:22
**clause** [1] - 108:13
**clean** [1] - 188:18
**cleaned** [1] - 188:21
**clear** [5] - 41:13, 134:1, 163:24, 177:2, 184:21
**click** [4] - 57:23, 64:19, 70:13, 122:11
**clicks** [1] - 70:20
**client** [10] - 69:10, 71:19, 78:24, 79:2, 80:2, 80:9, 99:13, 113:18, 144:12, 158:10
**client's** [3] - 15:18, 106:8, 185:11
**clients** [124] - 12:4, 12:9, 12:11, 12:14, 12:16, 13:5, 13:17, 13:21, 13:24, 14:1, 14:7, 14:9, 14:12, 14:15, 14:18, 15:4, 15:10, 16:2, 16:12, 16:18, 16:24, 17:6, 17:12, 18:19, 19:6, 19:11, 20:1, 20:2, 20:6, 20:8, 20:20, 20:23, 21:1, 21:3, 21:5, 21:6, 21:12, 21:14, 21:20, 34:8, 35:11, 39:1, 39:9, 44:12, 49:17, 50:13, 50:15, 53:11, 53:21, 57:16, 58:1, 62:13, 64:6, 66:17, 66:19, 66:20, 69:10, 70:7, 70:9, 71:16, 71:18, 72:17, 73:2, 82:24, 84:22, 88:4, 88:17, 88:24, 89:19, 89:25,

90:10, 95:9, 96:4, 96:10, 96:13, 96:20, 98:20, 99:7, 99:14, 100:16, 100:20, 102:5, 102:14, 103:15, 104:23, 105:6, 105:9, 105:21, 108:7, 108:11, 108:19, 109:16, 109:24, 113:3, 113:23, 114:12, 114:19, 118:9, 121:10, 126:13, 126:16, 128:12, 128:16, 129:4, 130:23, 132:1, 132:4, 132:6, 132:12, 153:17, 153:21, 154:9, 154:23, 157:2, 158:20, 164:2, 164:5, 164:10, 165:11, 177:24, 180:14, 180:22, 185:18
**clients'** [5] - 16:20, 17:20, 70:13, 93:11, 95:6
**clock** [8] - 48:17, 150:24, 150:25, 151:2, 155:6
**close** [2] - 116:24, 152:1
**closed** [2] - 136:24, 137:1
**closer** [1] - 86:16
**closing** [5] - 6:18, 9:15, 11:4, 22:4, 29:23
**CMS** [1] - 24:9
**cocounsel** [2] - 169:7, 184:11
**coded** [1] - 119:13
**coffee** [2] - 51:23, 155:18
**colleague** [1] - 181:10
**Collins** [1] - 1:23
**Colombia** [10] - 54:15, 54:21, 55:22, 64:7, 64:14, 64:17, 71:13, 136:19, 136:20, 136:21
**color** [2] - 119:10, 119:13
**Column** [2] - 120:5, 122:6
**columns** [1] - 121:9
**combination** [1] - 85:25
**comfort** [1] - 173:10

**coming** [5] - 130:15, 132:5, 136:9, 141:1, 171:13
**comission** [1] - 17:1
**commission** [71] - 16:3, 16:4, 17:5, 17:8, 17:17, 17:23, 17:25, 18:4, 18:5, 18:14, 21:12, 27:14, 28:16, 86:12, 87:16, 88:1, 88:18, 88:19, 92:25, 93:2, 93:16, 93:18, 93:24, 94:13, 94:18, 94:21, 95:11, 95:15, 95:18, 95:21, 97:20, 97:25, 98:11, 98:14, 99:5, 99:17, 99:24, 100:2, 100:12, 101:6, 101:7, 101:10, 101:13, 101:22, 102:23, 103:23, 103:25, 104:4, 104:8, 104:12, 104:14, 104:16, 104:18, 104:25, 105:5, 105:17, 116:14, 116:15, 116:17, 117:2, 117:21, 117:22, 117:24, 118:1, 118:2, 118:4, 118:8, 132:15, 132:24
**commissions** [38] - 12:4, 12:12, 14:16, 16:21, 16:22, 17:1, 17:13, 17:16, 21:17, 21:21, 29:4, 29:6, 49:8, 49:10, 49:12, 86:14, 86:18, 89:19, 98:21, 102:2, 117:14, 117:16, 131:15, 131:18, 131:20, 132:7, 132:9, 133:9, 133:12, 163:2, 163:10, 182:19, 182:25, 183:16, 183:17, 187:24
**committing** [1] - 81:12
**common** [2] - 22:7, 112:3
**communicate** [1] - 9:21
**communications** [1] - 185:6
**community** [1] - 172:20
**Comp** [1] - 14:6
**companies** [43] -

13:19, 17:15, 18:15, 19:24, 25:16, 25:18, 25:19, 27:19, 35:18, 36:1, 36:4, 36:8, 36:11, 36:13, 36:15, 37:21, 37:25, 53:14, 56:25, 57:1, 61:10, 61:14, 69:15, 90:2, 90:13, 90:22, 91:23, 92:1, 92:5, 92:12, 92:15, 94:19, 95:19, 103:8, 104:17, 106:24, 107:11, 108:9, 108:12, 118:14, 121:8, 166:9
**Company** [1] - 166:14
**company** [121] - 13:1, 17:17, 25:2, 25:10, 28:9, 28:15, 31:18, 31:20, 32:18, 33:21, 33:22, 34:13, 35:3, 35:5, 35:6, 35:8, 35:21, 36:7, 37:24, 41:20, 42:9, 42:19, 42:20, 42:23, 43:5, 45:2, 45:8, 53:13, 54:15, 54:23, 54:24, 55:8, 55:14, 55:15, 55:17, 56:5, 56:6, 56:20, 57:12, 59:23, 60:18, 61:5, 61:24, 69:22, 70:2, 70:4, 70:11, 71:11, 71:13, 72:6, 73:23, 74:5, 75:24, 76:10, 76:17, 77:10, 77:12, 77:14, 77:18, 77:19, 77:22, 77:24, 78:6, 84:19, 85:3, 88:15, 89:21, 90:24, 90:25, 91:7, 92:15, 92:25, 93:19, 93:25, 96:16, 96:21, 98:21, 101:8, 104:19, 105:1, 105:2, 106:16, 106:20, 107:14, 107:18, 107:22, 107:24, 108:3, 108:8, 108:16, 108:9, 109:10, 109:11, 114:24, 115:3, 115:6, 115:7, 115:10, 115:15, 117:23, 118:2, 118:6, 118:14, 122:3, 126:15, 127:6, 131:11, 132:2, 132:16, 137:12, 137:14, 137:17, 140:24, 164:3, 166:11,

172:14, 172:18, 180:15, 180:23
**company's** [3] - 28:13, 61:2, 107:17
**compare** [1] - 104:8
**compensated** [1] - 35:24
**compensation** [10] - 75:7, 75:10, 85:5, 86:19, 90:9, 90:16, 100:15, 102:21, 122:23, 137:9
**Compensation** [7] - 75:20, 75:23, 76:1, 76:6, 76:9, 76:12, 76:19
**competitive** [2] - 102:10, 102:15
**complain** [4] - 19:1, 160:18, 164:6, 185:13
**complained** [3] - 105:9, 105:21, 105:25
**complaint** [1] - 184:24
**complete** [4] - 74:9, 74:19, 98:24, 147:7
**completed** [1] - 99:22
**completes** [1] - 73:19
**completing** [2] - 72:13, 72:18
**compound** [1] - 40:18
**computed** [1] - 183:13
**computer** [25] - 13:4, 13:7, 13:11, 13:12, 16:16, 51:2, 51:7, 51:10, 51:24, 57:21, 57:23, 58:2, 58:10, 59:21, 62:6, 62:9, 62:14, 63:14, 71:15, 125:7, 130:1, 151:1, 154:14, 154:21, 156:18
**computers** [18] - 15:1, 16:14, 21:8, 50:16, 50:20, 50:25, 51:4, 51:8, 59:12, 59:13, 59:16, 59:19, 60:4, 60:7, 60:9, 124:23, 124:24, 154:24
**concept** [8] - 170:11, 171:18, 171:24, 171:25, 172:17, 173:23, 174:6, 174:9
**concerned** [5] - 6:11, 39:1, 99:7, 133:14, 158:11
**condition** [4] - 107:6, 107:9, 107:10, 107:12

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

**conditioning** [2] - 51:21, 66:8
**conditions** [1] - 153:13
**Condon** [2] - 81:16, 142:9
**conference** [1] - 190:4
**confidential** [1] - 185:18
**confidentiality** [2] - 100:9, 100:14
**confirm** [1] - 99:11
**confirmation** [1] - 122:7
**confuse** [1] - 175:15
**confused** [3] - 98:5, 105:11, 105:13
**confusing** [1] - 117:22
**connect** [1] - 136:21
**consent** [6] - 61:19, 78:24, 79:2, 80:2, 80:6, 80:9
**consider** [7] - 6:16, 7:18, 7:22, 9:1, 21:12, 22:7, 137:20
**consideration** [2] - 181:7, 185:10
**considered** [7] - 26:4, 103:15, 133:22, 166:11, 166:18, 170:15, 181:2
**considering** [2] - 8:3, 9:4
**constant** [1] - 23:22
**consulted** [1] - 105:2
**consumer** [4] - 80:5, 99:11, 172:15, 174:7
**consumer's** [1] - 91:16, 92:10
**consumers** [3] - 79:20, 79:25, 109:7
**Cont'd** [2] - 3:5, 84:10
**contact** [3] - 81:19, 81:25, 164:25
**contacted** [1] - 73:24
**contend** [1] - 113:22
**contingent** [2] - 110:14, 110:16
**continue** [6] - 30:21, 40:11, 110:19, 113:11, 127:23, 164:23
**CONTINUED** [1] - 2:1
**continued** [3] - 87:24, 88:5, 88:11
**continues** [1] - 175:5
**continuing** [1] - 110:16
**contract** [17] - 12:7, 20:11, 20:13, 28:22,

29:7, 35:23, 36:6, 36:12, 38:2, 38:5, 38:17, 177:11, 178:11, 178:16, 178:20, 180:9, 181:14
**contract-based** [1] - 178:11
**contracted** [1] - 53:13
**contractor** [18] - 23:13, 26:21, 47:8, 47:12, 74:14, 86:11, 113:16, 125:7, 126:7, 132:2, 133:23, 146:2, 146:5, 147:10, 179:13, 185:4, 186:16, 187:8
**contractors** [24] - 11:25, 13:25, 20:20, 20:21, 24:3, 25:15, 27:4, 47:20, 48:25, 49:2, 49:6, 49:7, 49:22, 69:24, 112:2, 113:8, 113:11, 113:21, 114:14, 114:17, 114:21, 125:3, 159:12, 188:10
**contracts** [2] - 28:21, 36:10
**contradicts** [1] - 8:9
**contrary** [4] - 174:14, 174:24, 174:25, 182:2
**control** [5] - 7:6, 15:9, 98:9, 113:8, 149:24
**controlled** [4] - 14:16, 15:14, 15:20, 158:4
**controlling** [3] - 29:14, 159:5, 174:11
**conversation** [1] - 142:10
**convert** [2] - 86:12, 112:22
**converted** [1] - 147:10
**cool** [1] - 15:2
**coordination** [1] - 147:2
**copy** [4] - 169:9, 170:3, 170:22, 170:24
**copycatted** [1] - 180:24
**Coral** [2] - 1:16, 1:20
**corporate** [1] - 163:20
**correct** [170] - 31:17, 31:25, 32:2, 32:4, 32:7, 33:1, 33:3, 33:4, 33:12, 34:3,

34:4, 34:5, 34:6, 34:16, 35:5, 37:9, 37:16, 38:7, 42:3, 42:18, 42:22, 43:4, 43:7, 43:16, 43:24, 44:2, 44:18, 45:6, 45:8, 45:9, 45:12, 45:13, 45:16, 45:19, 46:1, 46:11, 46:19, 47:13, 47:17, 48:6, 49:21, 50:1, 50:24, 51:1, 51:3, 52:5, 53:6, 53:14, 55:13, 55:25, 56:9, 56:22, 57:8, 57:24, 59:4, 59:11, 59:25, 60:22, 61:3, 62:11, 63:12, 64:1, 64:4, 64:12, 64:14, 69:9, 69:17, 69:22, 70:6, 70:12, 71:6, 71:9, 71:11, 71:17, 71:24, 72:15, 73:4, 73:7, 73:15, 73:18, 74:1, 75:2, 75:5, 75:8, 75:14, 75:17, 75:22, 75:25, 76:3, 76:4, 76:20, 76:21, 77:11, 78:12, 78:18, 78:25, 79:4, 84:20, 85:14, 85:23, 87:2, 87:20, 88:12, 89:3, 89:16, 90:2, 90:13, 91:8, 91:19, 91:21, 91:25, 92:7, 92:17, 93:4, 94:9, 94:16, 94:24, 97:10, 99:5, 100:22, 101:4, 101:9, 102:19, 103:6, 104:22, 104:24, 106:15, 107:1, 107:23, 109:20, 110:20, 116:16, 116:19, 118:22, 119:19, 120:3, 120:17, 121:5, 124:1, 125:4, 126:6, 128:13, 131:13, 131:21, 132:3, 132:11, 134:13, 135:8, 135:14, 136:6, 137:20, 141:3, 147:11, 147:12, 150:17, 151:7, 159:7, 159:16, 159:18, 159:19, 159:24, 160:17, 162:22, 175:18, 178:4, 182:16, 188:7, 189:23, 189:25

**correctly** [2] - 89:22, 107:12
**Cortes** [26] - 3:4, 4:24, 12:17, 17:14, 17:18, 18:18, 22:1, 30:22, 30:24, 31:8, 31:13, 82:6, 84:12, 84:15, 106:13, 141:9, 143:24, 143:25, 144:5, 145:16, 152:4, 164:7, 164:11, 164:19, 186:5, 189:21
**CORTES** [4] - 1:8, 4:24, 31:2, 141:14
**Cortes's** [2] - 18:4, 146:19
**cost** [1] - 124:16
**could've** [6] - 17:19, 42:6, 88:8, 93:10, 149:7, 185:11
**counsel** [9] - 22:20, 144:2, 165:7, 165:24, 167:1, 171:7, 175:25, 176:1, 186:11
**count** [6] - 28:18, 28:21, 95:15, 122:21, 122:22, 177:11
**Count** [1] - 28:21
**counter** [1] - 176:12
**counting** [1] - 18:7
**counts** [1] - 28:18
**couple** [12] - 22:17, 39:6, 49:18, 54:12, 68:7, 68:9, 76:2, 82:11, 119:7, 120:19, 120:20, 153:17
**course** [5] - 101:21, 101:24, 115:14, 136:17, 165:12
**court** [15] - 9:10, 11:16, 30:13, 37:7, 103:9, 150:6, 166:8, 168:20, 171:16, 171:19, 171:24, 174:3, 179:18, 181:12, 181:17
**COURT** [193] - 1:1, 4:2, 4:4, 4:10, 4:15, 4:17, 4:20, 5:2, 5:9, 5:13, 5:15, 22:20, 27:25, 29:18, 29:25, 30:6, 30:24, 31:5, 33:7, 40:1, 40:20, 50:4, 52:11, 53:17, 55:6, 56:2, 74:15, 79:14, 81:14, 82:4,

82:6, 82:12, 82:18, 82:23, 83:2, 83:5, 84:3, 84:8, 84:13, 86:15, 106:10, 114:3, 141:5, 141:8, 141:11, 141:16, 141:19, 141:24, 142:3, 142:8, 142:19, 142:21, 142:23, 143:1, 143:3, 143:8, 143:11, 143:15, 143:22, 143:25, 144:6, 144:9, 144:15, 144:18, 144:24, 155:16, 155:20, 155:22, 157:15, 158:7, 158:13, 158:16, 161:23, 161:25, 162:11, 162:18, 163:5, 163:12, 163:14, 164:15, 164:17, 164:20, 165:3, 165:6, 165:12, 165:14, 165:21, 166:23, 166:25, 167:4, 167:9, 167:13, 167:17, 167:21, 167:25, 168:3, 168:10, 168:13, 168:20, 168:25, 169:4, 169:5, 169:16, 169:22, 169:24, 170:1, 170:3, 170:21, 170:24, 171:7, 171:12, 172:9, 172:23, 173:1, 173:4, 173:6, 173:11, 173:15, 173:18, 174:11, 174:13, 174:16, 175:11, 175:16, 175:19, 175:21, 175:24, 176:4, 176:9, 176:11, 176:13, 176:16, 176:18, 176:20, 176:22, 176:24, 177:4, 177:8, 177:10, 177:14, 177:18, 177:23, 178:2, 178:5, 178:8, 178:13, 178:15, 178:17, 178:24, 179:2, 179:4, 179:7, 179:22, 179:25, 180:3, 180:10, 181:3, 182:8,

182:11, 182:22, 183:23, 184:3, 184:5, 184:8, 184:16, 184:18, 184:23, 185:14, 185:17, 186:1, 186:7, 186:11, 187:4, 187:10, 187:12, 187:15, 187:18, 188:1, 188:3, 188:8, 188:13, 188:16, 188:18, 189:2, 189:5, 189:8, 189:12, 189:19, 189:23, 190:1, 190:3, 190:8, 190:11
**Court** [17] - 2:2, 3:23, 7:7, 7:11, 7:13, 9:2, 11:10, 21:11, 161:22, 165:18, 166:4, 166:6, 174:20, 186:21, 187:22, 188:25, 190:22
**Court's** [3] - 3:21, 185:10, 187:23
**COURT'S** [1] - 5:14
**court's** [2] - 172:9, 174:19
**courtesy** [2] - 98:1, 170:24
**courthouse** [1] - 6:6
**Courtroom** [1] - 1:7
**COURTROOM** [3] - 5:12, 142:12, 142:20
**courtroom** [17] - 6:1, 10:7, 10:9, 22:24, 30:12, 37:10, 37:13, 58:5, 81:16, 82:5, 106:11, 141:25, 142:13, 144:17, 165:1, 165:5, 170:21
**cover** [1] - 75:20
**covered** [1] - 187:12
**covering** [1] - 165:18
**COVID** [6] - 136:25, 137:5, 137:6, 137:7, 137:8, 137:10
**coworker** [1] - 139:7
**Craigslist** [1] - 34:19
**create** [2] - 62:1, 151:13
**created** [12] - 79:3, 104:20, 112:16, 112:18, 112:19, 116:3, 116:6, 116:9, 116:10, 116:12, 117:1, 117:20
**credentials** [2] -

64:15, 136:22
**credibility** [2] - 8:13, 179:6
**credit** [1] - 98:11
**credited** [1] - 94:1
**credits** [1] - 182:12
**CRM** [14] - 51:11, 51:13, 56:7, 94:8, 94:10, 94:13, 95:22, 97:7, 129:7, 129:8, 129:10, 130:6, 133:19, 136:22
**Cross** [6] - 3:7, 69:16, 69:19, 69:23, 90:18, 100:24
**CROSS** [1] - 157:20
**cross** [15] - 10:24, 11:1, 82:24, 95:22, 123:24, 141:6, 141:18, 143:17, 143:22, 144:4, 144:12, 157:15, 164:19, 189:21, 189:22
**cross-check** [1] - 123:24
**cross-examination** [5] - 141:6, 143:17, 143:22, 144:12, 157:15
**Cross-Examination** [1] - 3:7
**CROSS-EXAMINATION** [1] - 157:20
**cross-examine** [1] - 11:1
**cross-examined** [2] - 189:21, 189:22
**cross-examining** [2] - 10:24, 82:24
**Cuba** [2] - 139:2, 139:3
**CUETO** [14] - 1:19, 4:22, 144:2, 158:9, 158:15, 178:1, 178:4, 178:7, 184:1, 184:4, 184:7, 184:14, 186:5, 186:8
**Cueto** [10] - 1:19, 4:22, 111:16, 111:18, 170:21, 171:8, 177:25, 181:4, 183:23
**Cueto's** [2] - 112:19, 112:20
**Cummings** [8] - 4:5, 4:11, 36:24, 37:19, 58:6, 150:19, 151:14, 153:2

**CUMMINGS** [4] - 1:14, 4:5, 106:8, 165:11
**current** [1] - 161:7
**curtain** [3] - 17:15, 21:24, 22:2
**customer** [21] - 13:14, 13:22, 21:23, 54:11, 72:8, 72:10, 72:12, 72:13, 72:23, 73:1, 73:20, 73:21, 73:25, 91:9, 91:11, 93:21, 96:23, 101:16, 108:18, 109:5, 131:12
**customers** [5] - 19:2, 54:21, 55:23, 94:10, 99:21
**customers'** [1] - 109:13
**customization** [1] - 56:19
**customize** [2] - 56:16, 61:13
**customized** [2] - 57:11, 61:4
**cut** [1] - 134:19
**cutting** [1] - 134:25

**D**

**daily** [1] - 66:17
**damages** [7] - 175:13, 175:17, 176:3, 180:1, 181:14, 181:19, 181:24
**DANIEL** [1] - 1:22
**Daniel** [2] - 1:23, 4:21
**dantropp@bellsouth.net** [1] - 1:25
**data** [4] - 57:4, 74:2, 74:3, 74:4
**DATE** [1] - 190:22
**date** [2] - 134:7, 168:4
**daughter's** [1] - 158:10
**DAY** [1] - 1:11
**days** [9] - 22:17, 26:9, 68:4, 92:18, 133:17, 136:9, 136:11, 145:25, 153:2
**DBA** [1] - 43:4
**De** [1] - 1:20
**dead** [1] - 26:24
**dead-end** [1] - 26:24
**deal** [3] - 22:25, 26:2, 27:7
**dealing** [2] - 95:5, 95:10
**deals** [2] - 134:22, 135:7

**December** [3] - 38:24, 39:19, 133:15
**decide** [26] - 5:21, 5:25, 6:25, 7:25, 8:24, 9:4, 10:13, 11:17, 12:16, 12:18, 13:20, 14:9, 18:17, 20:8, 23:2, 23:5, 30:9, 65:5, 65:17, 65:18, 97:10, 97:22, 105:7, 106:5, 126:9
**decided** [17] - 27:4, 27:5, 34:21, 34:23, 49:19, 70:4, 77:24, 94:1, 97:19, 97:21, 97:24, 102:18, 103:17, 112:6, 127:21, 137:13, 137:15
**deciding** [4] - 7:19, 21:13, 95:2, 176:2
**decision** [14] - 9:18, 10:6, 10:8, 11:1, 15:19, 19:22, 21:3, 22:18, 23:6, 43:23, 87:21, 87:22, 87:23, 166:15
**decision-makers** [1] - 23:6
**deduct** [1] - 113:19
**deducted** [1] - 122:5
**deductible** [1] - 109:3
**deeper** [1] - 154:17
**default** [1] - 102:11
**Defendant** [2] - 30:23, 31:15
**DEFENDANTS** [3] - 1:19, 3:10, 22:21
**Defendants** [32] - 1:10, 4:21, 4:23, 5:7, 8:20, 8:23, 10:23, 10:25, 11:25, 12:8, 12:21, 13:10, 14:14, 15:8, 16:13, 18:21, 20:1, 20:22, 20:23, 21:6, 21:12, 22:1, 165:8, 172:2, 175:9, 182:13, 182:24, 187:22, 188:1, 188:9, 189:17
**defendants** [1] - 179:17
**Defendants'** [3] - 171:6, 186:23, 189:22
**Defendants....** [1] - 3:22
**defense** [32] - 22:20, 165:16, 166:1, 166:21, 171:6,

175:10, 175:12, 175:13, 176:7, 177:5, 177:6, 177:8, 177:15, 178:9, 178:17, 179:23, 180:5, 180:6, 180:20, 181:13, 181:15, 182:10, 182:11, 182:20, 183:20, 184:11, 184:12, 184:21, 185:1, 185:8, 186:25
**Defense** [9] - 82:21, 82:22, 165:6, 165:7, 165:24, 167:1, 175:25, 186:11, 186:18
**defenses** [7] - 165:19, 165:22, 165:23, 165:24, 178:20, 181:23, 183:8
**defined** [2] - 24:2, 170:9
**definitely** [3] - 86:5, 154:19, 190:4
**definition** [2] - 104:14, 169:10
**definitions** [1] - 10:11
**deleted** [1] - 177:5
**deliberate** [1] - 11:6
**deliberating** [1] - 9:16
**deliberations** [2] - 6:22, 9:13
**Delio** [65] - 11:18, 17:25, 18:11, 19:12, 24:19, 26:8, 34:8, 44:13, 44:14, 44:16, 44:17, 44:20, 44:23, 44:25, 45:11, 45:14, 45:20, 45:21, 45:25, 46:1, 46:3, 46:4, 46:6, 46:7, 46:12, 46:21, 54:2, 62:17, 63:14, 63:17, 66:21, 72:20, 72:21, 77:4, 78:5, 78:6, 78:14, 85:12, 85:20, 87:15, 92:2, 92:5, 99:14, 99:15, 120:13, 120:23, 121:21, 123:2, 135:19, 135:22, 136:9, 136:10, 137:13, 137:15, 137:19, 138:4, 139:2, 139:5, 139:6, 139:7, 139:16, 140:21, 145:6, 159:21
**DELIO** [1] - 1:4
**Delio's** [2] - 17:20,

July 10, 2023

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

45:21
**demonstratives** [1] -
5:6
**denial** [8] - 177:18,
177:21, 178:2,
184:16, 184:17,
184:18, 186:24,
187:2
**denies** [1] - 80:5
**dental** [1] - 132:17
**denying** [1] - 177:19
**Department** [1] -
185:5
**department** [7] - 72:8,
72:10, 72:24, 73:2,
93:12, 101:16,
108:18
**depended** [2] - 21:6,
88:14
**deposit** [7] - 21:13,
92:22, 92:23, 92:24,
149:10, 149:12,
149:13
**deposition** [21] -
36:19, 36:21, 36:23,
36:25, 37:3, 37:6,
40:7, 58:4, 58:9,
58:13, 150:3, 150:6,
150:10, 150:11,
150:20, 151:14,
153:1, 153:15,
155:11, 155:24,
156:7
**deposits** [1] - 118:13
**deputy** [3] - 81:16,
106:11, 170:22
**DEPUTY** [3] - 5:12,
142:12, 142:20
**describe** [1] - 160:21
**described** [2] - 152:4,
185:17
**deserves** [1] - 6:14
**desist** [5] - 28:6,
28:12, 134:10,
134:15, 180:16
**desk** [12] - 13:13,
16:14, 21:7, 50:23,
58:19, 62:2, 62:7,
62:13, 62:22,
152:15, 154:14,
154:20
**desks** [7] - 58:20,
58:23, 59:10, 60:1,
124:20, 154:24
**detailed** [1] - 5:19
**determination** [1] -
177:2
**determine** [3] - 18:9,
29:3, 121:15
**determined** [3] -

166:8, 173:24,
181:17
**determining** [3] -
8:13, 15:20, 172:7
**developed** [1] - 61:25
**difference** [22] - 6:11,
11:20, 23:10, 23:12,
38:16, 85:15, 88:17,
98:19, 99:3, 120:18,
120:20, 123:14,
125:9, 125:23,
125:24, 125:25,
126:4, 158:6, 159:6,
159:8, 159:13,
160:21
**differences** [5] -
18:16, 96:2, 96:6,
99:6, 125:16
**different** [44] - 20:10,
21:23, 35:15, 35:25,
36:3, 36:10, 42:10,
53:13, 54:12, 56:24,
56:25, 61:9, 71:22,
84:22, 84:24, 85:2,
85:4, 88:13, 88:25,
89:11, 89:19, 90:24,
96:9, 96:10, 104:16,
106:19, 114:2,
114:4, 117:5,
119:20, 119:25,
120:21, 121:8,
123:5, 123:6, 126:7,
129:15, 148:19,
153:4, 162:12,
177:19, 179:25,
185:15
**digital** [2] - 151:1
**Direct** [3] - 3:5, 3:5,
3:6
**direct** [9] - 6:12,
21:13, 92:21, 92:23,
92:24, 149:10,
149:12, 149:13,
155:8
**DIRECT** [3] - 31:6,
84:10, 145:3
**directly** [6] - 34:2,
77:22, 132:15,
172:15, 179:12,
179:16
**disagree** [1] - 5:24
**disallow** [1] - 7:16
**disbelieve** [1] - 6:13
**disciplinary** [1] -
126:6
**discrepancy** [11] -
123:14, 123:15,
123:16, 123:17,
123:18, 123:20,
123:22, 123:23,

123:24, 123:25
**discretion** [2] - 51:16,
79:25
**discuss** [5] - 6:19,
9:10, 82:7, 141:21,
164:25
**discusses** [1] - 170:10
**discussion** [8] -
169:18, 170:25,
171:22, 172:23,
173:22, 174:18,
174:23, 183:1
**discussions** [1] - 9:17
**display** [1] - 19:16
**dispositive** [1] -
171:23
**dispute** [1] - 170:8
**disregard** [1] - 7:17
**distinguishable** [1] -
174:17
**distract** [4] - 18:22,
18:23, 23:16, 30:10
**distracted** [1] - 23:17
**distracting** [1] - 29:10
**District** [4] - 166:16,
168:9, 181:9, 181:20
**DISTRICT** [3] - 1:1,
1:1, 1:12
**DIVISION** [1] - 1:2
**Docket** [4] - 166:23,
182:10, 184:25,
187:10
**doctor** [2] - 109:1,
109:2
**doctor's** [1] - 108:21
**doctrine** [7] - 179:11,
179:15, 181:5,
181:17, 181:22,
181:25, 185:3
**document** [18] - 79:5,
79:21, 79:23, 89:8,
89:10, 89:24, 90:6,
110:4, 110:5,
110:10, 112:19,
115:20, 117:5,
117:11, 119:1,
119:2, 132:24, 133:3
**documents** [5] -
20:23, 20:24, 110:6,
148:18, 185:6
**DocuSign** [1] - 79:10
**DOL** [1] - 170:12
**dollar** [2] - 27:13,
121:2
**dollars** [1] - 89:1
**done** [17] - 15:14,
26:3, 27:16, 56:19,
56:20, 61:11, 73:22,
81:2, 91:15, 99:18,
99:19, 115:4, 119:9,

131:9, 131:16,
131:20, 142:1
**door** [4] - 13:6, 16:16,
152:1, 164:12
**Doral** [11] - 15:13,
43:15, 43:17, 55:18,
64:5, 87:1, 87:3,
124:24, 137:22,
154:7, 154:10
**down** [10] - 13:6,
26:24, 62:7, 100:10,
118:23, 120:4,
120:16, 121:2,
126:21, 141:9
**drink** [1] - 155:18
**drive** [4] - 65:4, 65:17,
65:25, 66:3
**driver** [4] - 23:12,
52:18, 52:21, 52:22
**driving** [2] - 65:21,
67:18
**due** [1] - 177:10
**during** [27] - 6:15,
12:23, 15:4, 16:18,
24:11, 24:13, 24:21,
26:13, 26:14, 38:18,
50:12, 64:23, 71:12,
81:19, 82:7, 93:8,
93:10, 101:24,
127:14, 128:2,
128:17, 128:18,
136:10, 136:14,
188:20, 189:22,
190:4
**duties** [7] - 146:16,
146:19, 147:13,
147:15, 147:17,
161:7
**duty** [3] - 5:18, 5:21,
109:13

---

# E

**e-mail** [5] - 95:25,
131:22, 163:17,
163:19, 163:20
**e-mails** [1] - 9:22
**early** [6] - 22:12,
22:13, 126:9,
126:23, 142:2, 143:6
**earn** [1] - 108:14
**earned** [5] - 12:12,
19:6, 21:22, 182:15,
182:20
**earning** [1] - 133:9
**earnings** [1] - 163:9
**easier** [4] - 99:24,
100:2, 119:14,
121:11
**easy** [3] - 17:24, 18:3,

119:14
**economic** [1] - 21:4
**economics** [1] -
114:11
**eight** [17] - 35:17,
36:9, 37:22, 47:3,
47:5, 58:19, 58:23,
59:10, 59:13, 59:16,
59:19, 60:1, 86:22,
87:11, 87:12, 136:5,
151:25
**either** [14] - 6:13, 12:7,
57:15, 86:3, 87:24,
88:4, 92:2, 96:8,
125:17, 131:6,
139:6, 142:16,
180:1, 184:11
**electricity** [3] - 66:7,
67:19, 68:6
**electronic** [4] - 51:13,
79:12, 79:13, 79:15
**electronically** [1] -
80:1
**elements** [2] - 172:16,
177:14
**elevators** [1] - 142:14
**ELMO** [2] - 56:1, 56:2
**emergency** [1] -
158:12
**emphasize** [1] - 9:19
**employed** [1] - 25:18
**employee** [16] - 23:10,
23:11, 27:2, 75:13,
75:15, 125:7,
126:12, 137:14,
137:16, 139:11,
139:20, 147:10,
147:22, 147:23,
149:4, 187:7
**employees** [60] -
11:24, 14:4, 14:9,
14:13, 17:8, 19:25,
20:1, 20:14, 21:1,
21:4, 21:14, 24:1,
24:4, 27:16, 29:11,
29:20, 47:15, 47:19,
47:24, 48:7, 48:9,
48:10, 48:19, 49:10,
49:13, 49:20, 49:23,
75:24, 76:5, 112:23,
113:1, 113:10,
124:3, 124:7, 125:3,
125:9, 125:22,
126:3, 128:25,
129:3, 129:13,
131:7, 131:11,
146:13, 147:21,
148:2, 148:10,
148:17, 149:14,
149:17, 151:7,

153:4, 158:3, 158:6, 158:21, 158:24, 160:22, 186:16, 186:22
**employer** [12] - 12:25, 20:18, 25:14, 32:16, 39:24, 40:16, 41:3, 41:4, 41:9, 41:11, 41:14, 41:16
**employers** [5] - 12:19, 29:14, 32:19, 32:21, 32:22
**employment** [3] - 75:11, 75:13, 75:16
**empty** [1] - 59:9
**encountering** [1] - 81:20
**end** [32] - 4:14, 5:19, 8:12, 9:16, 12:11, 12:24, 15:18, 19:14, 19:17, 22:3, 22:10, 22:12, 26:24, 29:9, 29:19, 38:22, 39:5, 39:10, 54:12, 54:13, 59:20, 70:15, 72:9, 95:10, 152:18, 155:13, 156:12, 172:15, 172:21, 172:22, 174:7, 182:23
**ended** [1] - 39:19
**ends** [1] - 17:3
**engaged** [2] - 108:16, 161:18
**English** [1] - 40:8
**enriched** [1] - 12:8
**enrichment** [4] - 28:22, 177:11, 178:20, 180:9
**enrichment-based** [1] - 178:20
**enroll** [3] - 72:14, 73:11, 120:1
**enrolled** [6] - 80:6, 89:25, 90:3, 90:4, 119:18, 120:6
**enrolling** [3] - 72:18, 119:21, 119:22
**enrollment** [44] - 12:23, 15:5, 17:2, 24:10, 24:12, 24:13, 24:21, 24:22, 26:13, 26:16, 38:19, 38:21, 39:2, 39:4, 39:8, 39:12, 39:19, 40:6, 40:14, 40:24, 41:1, 41:15, 42:3, 42:20, 79:20, 85:9, 98:24, 99:12, 99:22, 104:10, 116:10,

127:14, 128:2, 128:17, 128:19, 132:4, 132:13, 136:10, 136:12, 136:13, 136:14, 152:22
**enrollment's** [1] - 39:23
**enrollments** [1] - 39:21
**enter** [2] - 71:14, 149:13
**entered** [3] - 48:5, 71:5, 144:17
**entire** [1] - 14:1
**entirety** [2] - 171:5, 175:6
**entitled** [8] - 12:6, 20:3, 20:8, 20:17, 29:1, 30:18, 106:21, 190:19
**entry** [3] - 74:2, 74:3, 74:4
**Entry** [4] - 166:23, 182:10, 184:25, 187:10
**equipment** [7] - 27:9, 59:22, 62:11, 62:20, 65:13, 65:15, 66:23
**equitable** [5] - 180:5, 180:6, 181:18, 181:23
**error** [1] - 93:11
**especially** [2] - 15:5, 99:22
**ESQ** [4] - 1:14, 1:15, 1:19, 1:22
**Esquire** [1] - 1:23
**essential** [1] - 26:20
**established** [1] - 155:3
**establishes** [1] - 174:7
**establishment** [2] - 25:10, 166:2
**establishments** [1] - 171:18
**estimate** [1] - 20:3
**Europe** [2] - 64:5, 64:6
**evaluate** [2] - 100:10, 105:22
**evening** [2] - 165:2, 182:2, 190:11
**event** [2] - 161:10, 185:20
**events** [1] - 153:13
**EVIDENCE** [1] - 3:14
**evidence** [59] - 5:21, 5:25, 6:1, 6:4, 6:7, 6:8, 6:9, 6:12, 6:14,

6:16, 6:17, 6:20, 6:21, 6:24, 7:3, 7:6, 7:7, 7:9, 7:16, 7:17, 7:18, 7:20, 7:21, 8:8, 8:10, 8:16, 8:17, 8:19, 8:20, 8:25, 9:4, 9:6, 9:14, 10:7, 10:18, 11:2, 11:3, 11:5, 14:12, 16:17, 17:11, 19:15, 19:18, 20:25, 22:7, 22:11, 26:4, 28:1, 28:3, 29:24, 78:20, 89:4, 115:17, 132:20, 180:10, 180:12, 182:13, 182:23
**evidentiary** [1] - 182:12
**evolved** [1] - 147:17
**exact** [1] - 121:1
**exactly** [4] - 102:23, 122:11, 139:19, 184:4
**examination** [6] - 141:6, 143:17, 143:22, 144:12, 157:15, 165:8
**EXAMINATION** [5] - 31:6, 84:10, 145:3, 157:20, 163:15
**Examination** [5] - 3:5, 3:5, 3:6, 3:7, 3:7
**examine** [1] - 11:1
**examined** [2] - 189:21, 189:22
**examining** [2] - 10:24, 82:24
**example** [5] - 7:1, 10:9, 72:20, 76:14, 122:12
**Excel** [7] - 104:13, 104:15, 118:5, 118:6, 118:7, 119:1, 120:10
**except** [2] - 52:9, 141:2
**exceptions** [1] - 187:14
**EXCERPT** [1] - 1:11
**excerpt** [2] - 4:1, 190:13
**exclude** [1] - 122:25
**exclusive** [1] - 69:25
**exclusively** [2] - 111:24, 171:23
**exclusivity** [1] - 112:1
**excuse** [4] - 12:17, 79:6, 100:5, 106:8
**excused** [5] - 83:7, 141:10, 158:13,

164:15, 164:16
**executive** [3] - 145:14, 161:11, 163:25
**exempt** [3] - 166:9, 187:6, 187:7
**exemption** [7] - 166:7, 166:20, 168:21, 185:24, 186:14, 187:2, 188:25, 189:1, 189:6
**exemptions** [4] - 186:4, 186:15, 187:14, 187:15
**exercise** [1] - 36:25
**exhaustive** [3] - 169:18, 171:1, 174:13
**Exhibit** [15] - 3:15, 3:15, 3:16, 3:16, 3:17, 78:19, 78:21, 89:4, 89:5, 115:17, 115:18, 118:10, 118:11, 132:19, 132:22
**exhibit** [6] - 6:3, 7:8, 7:11, 7:13, 78:22, 89:6
**exhibits** [1] - 9:2
**EXHIBITS** [2] - 3:12, 3:14
**exist** [3] - 10:4, 71:4, 173:24
**existed** [2] - 71:2, 108:12
**exited** [3] - 82:5, 141:25, 165:5
**expect** [2] - 116:5, 142:1
**expectation** [2] - 126:24, 127:2
**expected** [1] - 46:12
**expecting** [2] - 46:1, 141:18
**expense** [2] - 65:5, 80:19, 109:4
**expenses** [19] - 45:7, 66:13, 68:2, 68:4, 113:9, 113:12, 113:14, 113:16, 113:18, 113:20, 113:25, 114:2, 114:4, 114:7, 114:13, 114:16, 114:20
**expensive** [5] - 59:22, 76:10, 76:22, 76:25
**experience** [2] - 52:21, 163:7
**expert** [2] - 23:4, 76:8
**explain** [6] - 5:17,

19:10, 91:3, 91:4, 98:6, 135:2
**explained** [1] - 104:1
**expressed** [1] - 139:11
**extend** [1] - 118:21
**extended** [1] - 90:14
**extension** [1] - 38:24
**extensive** [1] - 168:20
**extent** [3] - 65:22, 65:25, 142:17

**F**

**F.3d** [1] - 168:14
**face** [2] - 9:20
**face-to-face** [1] - 9:20
**Facebook** [1] - 9:23
**fact** [15] - 6:4, 6:10, 8:24, 9:5, 9:6, 14:19, 16:11, 19:8, 19:12, 27:7, 34:7, 108:7, 168:20, 182:3, 185:12
**factor** [1] - 27:3
**factored** [1] - 159:18
**factors** [6] - 8:11, 20:9, 21:13, 26:21, 76:2
**facts** [5] - 5:22, 11:17, 29:2, 174:16, 174:17
**fail** [2] - 8:22, 171:25
**failed** [1] - 16:22
**Fair** [1] - 12:20
**fair** [10] - 10:7, 10:14, 10:15, 88:22, 118:3, 121:3, 135:5, 158:19, 158:24, 188:14
**FairLaw** [1] - 1:15
**fairly** [5] - 168:15, 168:20, 171:1, 174:13, 189:13
**faith** [5] - 132:10, 133:19, 175:9, 175:13, 176:7
**familiar** [1] - 74:4
**families** [1] - 123:8
**family** [8] - 64:8, 119:22, 120:1, 123:12, 130:24, 131:2, 131:5
**fancy** [2] - 19:15
**far** [35] - 6:11, 21:17, 32:33, 33:14, 34:10, 34:20, 35:15, 36:14, 39:1, 43:5, 49:9, 59:12, 60:15, 69:10, 99:7, 103:15, 106:24, 107:24,

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

108:3, 114:13, 117:14, 124:3, 124:5, 131:15, 131:17, 132:1, 134:14, 134:22, 135:6, 146:16, 148:6, 149:10, 152:16, 164:5, 164:11
**Farm** [7] - 166:15, 168:6, 169:18, 170:20, 172:5, 172:12, 174:3
**fashion** [1] - 169:17
**fast** [3] - 29:10, 147:24, 155:17
**favor** [1] - 8:23
**favorable** [1] - 38:5
**favoring** [2] - 8:19, 8:20
**February** [1] - 17:3
**federal** [1] - 11:13
**feeding** [1] - 42:15
**fell** [1] - 183:6
**Ferrari** [2] - 140:7, 140:9
**few** [4] - 127:24, 153:19, 153:20, 181:3
**fictitious** [2] - 12:15, 42:24
**fifth** [2] - 182:10, 182:11
**figure** [2] - 80:1, 121:23
**figuring** [1] - 183:16
**filed** [13] - 11:20, 11:21, 18:25, 19:3, 20:20, 20:21, 20:23, 21:1, 25:17, 47:21, 47:25, 49:18, 138:8
**files** [1] - 146:13
**fill** [3] - 74:11, 81:17, 148:16
**filter** [4] - 122:6, 122:8, 122:10, 122:21
**filtered** [1] - 122:9
**final** [3] - 165:10, 175:4, 188:22
**finally** [2] - 11:6, 172:5
**Finance** [1] - 166:5
**fine** [2] - 126:11, 177:1
**finish** [2] - 29:9, 143:5
**finished** [1] - 104:10
**fire** [1] - 137:13
**fired** [6] - 139:16, 139:18, 140:21, 140:22, 141:2
**firm** [1] - 111:16

**Firm** [1] - 1:15
**first** [53] - 6:16, 10:16, 11:8, 11:23, 14:8, 14:11, 16:25, 23:25, 24:15, 24:20, 24:25, 25:13, 28:4, 28:5, 28:18, 29:20, 30:21, 42:20, 43:8, 43:25, 44:9, 44:12, 44:14, 44:20, 44:23, 45:12, 55:18, 71:14, 77:4, 77:6, 84:23, 85:3, 85:25, 86:8, 86:21, 87:15, 88:21, 97:24, 98:4, 98:10, 103:12, 104:7, 109:15, 123:13, 142:11, 145:1, 166:1, 166:21, 171:6, 171:16, 172:6, 174:4, 175:6
**five** [11] - 122:4, 122:6, 122:7, 122:13, 122:15, 122:22, 123:8, 123:9
**FL** [3] - 1:16, 1:20, 1:24
**flip** [1] - 148:6
**floor** [3] - 82:2, 87:4, 87:5
**Floor** [2] - 2:3, 190:23
**Flores** [1] - 31:13
**FLORIDA** [1] - 1:1
**Florida** [21] - 1:4, 2:4, 24:8, 32:24, 33:11, 43:3, 69:11, 69:13, 69:16, 69:17, 69:21, 69:22, 69:23, 70:1, 111:24, 111:25, 114:24, 115:8, 181:10, 181:20, 190:23
**florist** [1] - 26:14
**FLSA** [12] - 23:24, 24:1, 24:2, 28:18, 29:11, 29:21, 166:12, 176:11, 176:13, 177:8, 180:7, 182:16
**fluent** [1] - 40:8
**focus** [4] - 12:22, 21:5, 27:25, 173:25
**follow** [7] - 5:24, 6:19, 19:22, 72:10, 126:13, 126:16, 126:17
**following** [6] - 37:6, 58:6, 58:7, 72:13, 151:16, 153:3
**follows** [2] - 31:3,

144:22
**Footnote** [2] - 181:11, 181:16
**FOR** [4] - 1:14, 1:19, 3:3, 3:10
**forbids** [1] - 10:2
**force** [1] - 113:6
**forced** [1] - 160:2
**foregoing** [1] - 190:17
**forgot** [1] - 109:2
**form** [15] - 22:4, 22:10, 24:1, 29:19, 61:18, 66:11, 75:9, 77:12, 77:14, 79:18, 165:10, 175:4, 188:22
**Form** [1] - 75:4
**format** [1] - 133:2
**formed** [4] - 32:5, 32:6, 33:21, 33:22
**former** [2] - 137:14, 139:11
**forming** [1] - 22:8
**forms** [8] - 6:1, 25:17, 61:16, 61:19, 61:24, 62:1, 81:17
**formula** [8] - 91:3, 120:9, 120:12, 120:13, 122:18, 122:20, 123:24, 133:13
**forward** [1] - 147:24
**foundations** [2] - 11:14, 11:15
**four** [12] - 46:13, 47:1, 71:8, 78:8, 108:24, 109:23, 119:25, 149:4, 158:5, 158:19, 160:1, 160:7
**fourth** [2] - 143:19, 178:9
**frame** [1] - 50:12
**framed** [1] - 185:14
**frankly** [4] - 98:5, 128:20, 162:17, 184:14
**fraud** [1] - 81:13
**free** [7] - 23:2, 51:15, 63:19, 79:24, 81:22, 88:9, 126:11
**frenzy** [1] - 42:15
**friend** [3] - 44:5, 44:6, 137:20
**friends** [3] - 130:23, 131:2, 131:5
**front** [1] - 54:12
**fruition** [1] - 28:4
**Frye** [1] - 90:17
**full** [6] - 31:10, 31:12, 32:11, 117:9, 146:8,

160:24
**full-time** [3] - 32:11, 146:8, 160:24
**fumbling** [1] - 165:15
**fun** [1] - 126:18
**fundamental** [1] - 23:1

## G

**Gables** [2] - 1:16, 1:20
**garage** [2] - 43:19, 43:21, 53:22
**gas** [2] - 65:22, 66:1
**gathered** [2] - 82:1, 164:22
**gathering** [2] - 73:5, 73:9
**general** [7] - 111:20, 111:21, 172:1, 172:4, 172:12, 172:14, 172:19
**generated** [1] - 130:3
**gentleman** [1] - 142:14
**gentlemen** [5] - 11:11, 22:23, 30:6, 81:15, 164:20
**given** [2] - 65:25, 165:6
**glitches** [1] - 130:6
**goatee** [1] - 46:3
**gonna** [1] - 15:18
**Gonzalez** [8] - 5:1, 12:17, 12:18, 31:15, 142:24, 143:12, 143:13, 145:18
**GONZALEZ** [2] - 1:9, 4:25
**good-standing** [1] - 107:15
**goods** [9] - 167:16, 169:2, 169:10, 169:11, 170:9, 170:10, 170:16, 172:1, 174:8
**Google** [1] - 9:24
**grandchild** [1] - 138:23
**grandkids** [1] - 139:1
**grass** [1] - 6:5
**great** [4] - 11:12, 11:14, 143:19, 183:16
**greater** [1] - 30:18
**ground** [2] - 25:3, 165:18
**grounds** [2] - 28:12, 50:3
**guess** [9] - 7:15, 63:3, 127:21, 157:13,

158:3, 175:8, 187:20, 189:17, 189:22
**guessing** [5] - 68:14, 68:18, 68:20, 68:23
**guidelines** [1] - 8:13
**guys** [1] - 80:5

## H

**half** [5] - 23:11, 29:13, 135:23, 135:24, 136:2
**hand** [6] - 30:25, 57:20, 95:21, 104:5, 144:19, 150:7
**handle** [10] - 13:23, 15:18, 73:2, 108:18, 108:20, 144:6, 149:22, 161:9, 164:3, 190:4
**handled** [1] - 158:21
**handles** [1] - 69:22
**hands** [19] - 178:9, 178:17, 179:11, 179:15, 179:23, 180:4, 180:10, 180:25, 181:6, 181:13, 181:15, 181:17, 181:22, 181:25, 184:22, 185:3, 185:12, 185:15, 185:17
**hate** [2] - 139:5, 139:6
**HDMI** [3] - 56:3, 168:23, 169:9
**headset** [8] - 13:12, 54:8, 57:21, 62:24, 65:15, 125:10, 125:18, 125:21
**headsets** [7] - 54:2, 54:3, 54:6, 54:7, 62:17, 154:21, 154:24
**health** [24] - 12:21, 32:12, 32:13, 32:14, 32:15, 32:18, 32:19, 32:21, 33:6, 33:11, 33:17, 39:24, 40:4, 41:2, 41:8, 42:2, 42:8, 42:12, 42:16, 45:18
**hear** [46] - 6:15, 8:4, 10:11, 11:7, 11:8, 14:5, 14:14, 15:1, 15:5, 17:14, 18:19, 18:21, 19:2, 19:7, 19:14, 19:18, 19:23, 20:4, 20:7, 20:9, 20:10, 20:18, 20:19,

21:4, 21:10, 22:10, 22:12, 22:13, 25:15, 38:17, 82:12, 106:5, 112:14, 114:16, 114:19, 144:11, 154:18, 154:19, 160:1, 160:18, 167:1, 169:5, 175:25, 186:11, 188:1, 189:16

**heard** [7] - 6:2, 9:14, 139:14, 160:5, 160:7, 160:20, 180:11

**heart** [1] - 179:6

**held** [2] - 4:1, 97:23

**hello** [3] - 31:9, 157:22, 157:23

**help** [15] - 6:19, 29:15, 30:4, 30:7, 30:17, 44:19, 46:16, 46:17, 77:3, 77:12, 77:14, 115:4, 115:13, 172:20

**her's** [1] - 115:11

**hereby** [1] - 190:17

**herself** [2] - 114:25, 116:4

**hiccup** [1] - 101:16

**hiccups** [1] - 99:23

**hidden** [5] - 30:13, 118:19, 118:20, 118:25, 119:3

**hide** [1] - 121:9

**high** [1] - 183:17

**higher** [1] - 88:20

**hire** [3] - 45:10, 45:11, 45:21

**hired** [24] - 14:1, 24:25, 33:17, 34:3, 34:5, 34:7, 44:9, 44:12, 45:25, 46:6, 46:12, 46:19, 46:21, 46:25, 61:6, 111:16, 112:20, 145:14, 145:16, 145:24, 146:1

**hires** [2] - 146:22, 147:3

**hiring** [3] - 33:14, 33:17, 34:2

**hit** [1] - 7:2

**hmm** [1] - 161:1

**Hogan** [1] - 166:13

**hold** [1] - 82:23

**home** [16] - 26:1, 62:25, 63:3, 65:6, 66:5, 66:12, 67:19, 68:5, 68:6, 68:10, 126:11, 137:4,

137:9, 138:9, 156:5, 156:6

**homeowner's** [1] - 170:17

**honest** [3] - 81:4, 95:9, 132:14

**honestly** [2] - 152:12, 161:5

**Honor** [50] - 4:7, 4:16, 27:21, 29:16, 29:22, 50:2, 55:4, 106:8, 141:18, 141:23, 142:1, 143:5, 143:9, 144:1, 158:9, 161:22, 162:17, 163:4, 163:11, 164:18, 165:11, 165:13, 167:2, 167:20, 168:8, 170:2, 170:7, 170:14, 171:11, 173:3, 173:9, 173:12, 173:14, 173:20, 175:5, 176:2, 176:21, 177:9, 178:7, 178:12, 182:9, 183:4, 184:20, 186:5, 186:17, 186:18, 188:7, 189:11, 190:2, 190:7

**honor** [1] - 22:24

**Honor's** [2] - 19:21, 175:6

**HONORABLE** [1] - 1:12

**hotel** [2] - 137:19, 137:21

**hour** [15] - 23:4, 23:11, 23:24, 24:24, 25:11, 28:3, 28:16, 28:18, 29:7, 29:21, 81:24, 86:1, 86:8, 128:21, 180:19

**hourly** [6] - 24:25, 86:1, 86:11, 160:19, 181:1, 183:17

**hours** [32] - 12:1, 15:7, 16:18, 19:24, 20:3, 25:24, 25:25, 26:6, 26:18, 26:19, 49:4, 49:5, 82:11, 113:9, 127:10, 127:11, 128:2, 128:11, 128:14, 128:16, 128:18, 128:24, 143:10, 150:21, 151:6, 151:9, 152:25, 155:2, 157:5, 161:3

**house** [3] - 65:5, 138:25, 139:3

**housekeeping** [1] - 184:20

**huge** [1] - 180:23

**hundred** [3] - 105:17, 120:20, 135:18

**hundreds** [1] - 180:22

**hurt** [1] - 30:3

## I

**ID** [1] - 108:21

**idea** [3] - 23:23, 25:8, 128:11

**IDENTIFIED** [1] - 3:14

**identified** [7] - 78:21, 89:5, 93:22, 99:4, 115:18, 118:11, 132:22

**identify** [3] - 93:2, 123:11, 152:14

**identifying** [1] - 93:15

**ignore** [2] - 7:14, 7:18

**Illinois** [6] - 33:3, 33:11, 69:13, 69:20, 90:19, 100:24

**immediately** [1] - 92:16

**impacted** [1] - 138:14

**implied** [1] - 180:8

**import** [1] - 57:4

**important** [7] - 10:4, 10:5, 10:10, 28:17, 84:15, 95:1, 121:1

**importantly** [2] - 22:7, 92:8

**impose** [1] - 108:11

**imposition** [1] - 175:14

**impression** [1] - 30:19

**improper** [1] - 186:23

**IN** [1] - 3:14

**inaccurate** [1] - 123:3

**inbound** [2] - 13:2, 54:17

**INC** [1] - 1:8

**incentivize** [1] - 25:8

**incentivizing** [1] - 90:10

**includable** [1] - 180:7

**include** [2] - 35:16, 186:19

**included** [3] - 124:12, 166:7, 170:9

**includes** [1] - 9:22

**including** [5] - 9:23, 53:22, 167:3, 186:20, 187:24

**income** [2] - 21:6,

132:7

**inconvenience** [1] - 157:18

**incorrect** [1] - 47:14

**incur** [2] - 113:16, 113:19

**independent** [42] - 11:25, 13:25, 20:20, 20:21, 23:13, 24:3, 25:14, 26:20, 27:4, 44:7, 47:8, 47:12, 47:19, 48:25, 49:2, 49:5, 49:7, 49:22, 69:24, 70:2, 74:14, 86:11, 112:2, 113:7, 113:11, 113:16, 113:21, 114:14, 114:17, 114:20, 125:3, 125:6, 126:7, 132:2, 133:22, 146:1, 147:10, 179:13, 185:4, 186:16, 187:8, 188:10

**indicate** [2] - 72:2, 72:5

**indicated** [1] - 79:5

**indicates** [1] - 133:5

**indirect** [3] - 6:7, 6:8, 6:12

**indirectly** [1] - 6:4

**individual** [1] - 78:5

**individually** [4] - 31:14, 77:5, 77:6, 78:7

**individually-named** [1] - 31:14

**individuals** [1] - 109:23

**industry** [8] - 56:21, 92:7, 111:20, 111:21, 112:3, 112:4, 162:9, 171:24

**information** [25] - 9:9, 9:25, 10:8, 13:23, 15:3, 56:23, 57:1, 57:6, 60:16, 60:19, 61:9, 70:23, 71:5, 71:14, 71:16, 73:10, 73:24, 91:10, 91:16, 92:10, 93:16, 94:22, 149:12, 149:13, 185:18

**infringement** [2] - 28:8, 28:13

**injured** [2] - 30:2, 30:3

**injury** [1] - 179:18

**input** [4] - 56:23, 60:16, 72:6, 94:3

**inputs** [1] - 91:9

**inputting** [1] - 133:18

**inquire** [1] - 95:25

**inquiry** [1] - 37:25

**inrollment** [1] - 40:3

**inside** [1] - 5:5

**instead** [7] - 11:24, 18:3, 29:2, 77:19, 77:22, 88:17, 120:22

**instruct** [4] - 7:21, 8:25, 19:19, 21:11

**instructed** [1] - 186:25

**instructing** [1] - 186:21

**instruction** [5] - 167:23, 175:7, 175:8, 186:19, 187:7

**INSTRUCTIONS** [1] - 5:14

**instructions** [21] - 5:18, 5:19, 9:15, 11:5, 19:20, 22:14, 165:9, 165:10, 167:12, 167:23, 170:2, 171:3, 173:19, 174:23, 175:4, 181:12, 182:1, 182:8, 183:15, 186:13, 187:23

**Instructions............** [1] - 3:21

**insurance** [248] - 12:5, 12:22, 12:25, 13:5, 13:9, 13:15, 13:17, 13:20, 14:3, 17:9, 17:15, 17:19, 18:10, 18:12, 18:15, 22:1, 24:5, 24:6, 24:7, 32:12, 32:13, 32:14, 32:15, 32:16, 32:18, 32:19, 32:20, 32:21, 32:24, 33:3, 33:6, 33:11, 33:18, 34:10, 34:16, 35:20, 35:21, 35:25, 36:3, 36:7, 36:8, 36:15, 37:21, 37:24, 38:18, 39:24, 39:25, 40:4, 40:5, 40:15, 40:16, 40:17, 41:2, 41:3, 41:5, 41:8, 41:9, 41:11, 41:16, 41:20, 41:22, 41:24, 42:1, 42:2, 42:4, 42:5, 42:6, 42:7, 42:8, 42:12, 42:16, 45:1, 45:4, 45:8, 45:10, 45:12, 45:14, 45:15, 45:18, 45:25, 46:18, 47:7, 47:11, 47:15, 47:20,

47:24, 48:10, 49:19, 49:22, 49:23, 50:6, 50:7, 50:10, 52:8, 53:12, 53:14, 54:13, 55:9, 55:15, 56:21, 56:24, 57:1, 61:9, 61:14, 69:13, 69:20, 69:21, 70:7, 70:10, 71:20, 71:23, 71:25, 72:14, 73:7, 73:11, 73:23, 75:20, 75:23, 76:6, 76:13, 76:19, 78:10, 84:16, 84:17, 84:19, 85:21, 87:17, 88:15, 89:12, 89:20, 90:1, 90:2, 90:11, 90:13, 90:22, 90:24, 91:13, 91:20, 91:22, 91:23, 92:1, 92:5, 92:7, 92:11, 92:15, 92:24, 93:3, 93:19, 93:20, 93:24, 94:19, 95:2, 95:18, 96:16, 96:20, 96:21, 97:16, 98:21, 100:17, 100:18, 101:8, 103:8, 104:16, 104:19, 105:1, 105:2, 106:16, 106:17, 106:20, 106:24, 107:11, 107:13, 107:17, 107:18, 107:24, 108:3, 108:9, 108:12, 108:22, 108:24, 109:7, 109:10, 109:11, 111:5, 115:7, 116:6, 117:23, 118:2, 118:6, 118:14, 120:2, 121:8, 128:25, 131:1, 132:16, 133:16, 147:24, 148:1, 149:17, 150:20, 151:3, 151:6, 151:9, 151:15, 152:5, 152:9, 152:16, 152:21, 153:5, 153:6, 154:13, 155:1, 155:12, 156:10, 162:6, 162:16, 166:4, 166:9, 166:11, 166:18, 166:19, 167:3, 167:8, 167:15, 168:18, 169:1, 169:11, 170:8, 170:10, 170:15, 170:17, 170:19, 171:24,

172:4, 172:6, 172:19, 173:23, 174:1, 174:7, 174:9
**Insurance** [3] - 12:15, 42:24, 166:14
**insurance-buying** [1] - 172:4
**insurance-related** [2] - 108:22, 108:24
**insurances** [3] - 35:15, 70:4, 90:20
**insure** [1] - 18:12
**insured** [4] - 93:16, 93:25, 94:2, 97:9
**insured's** [1] - 98:13
**insureds** [5] - 13:9, 21:23, 69:12, 99:14, 101:7
**insurer** [2] - 18:5, 93:15
**insurers** [1] - 61:19
**integrated** [1] - 129:11
**intends** [1] - 10:20
**interest** [1] - 8:7
**interested** [1] - 19:17
**interesting** [2] - 23:3, 23:6
**interior** [3] - 152:2, 152:3, 161:5
**Internal** [1] - 185:5
**internal** [1] - 185:6
**Internet** [2] - 9:23, 67:20
**interpret** [1] - 11:4
**interpreter** [8] - 40:7, 82:16, 141:17, 142:7, 143:6, 143:7, 143:21, 144:9
**interpreters** [1] - 82:15
**interrupt** [2] - 117:3, 158:10
**interview** [4] - 145:18, 145:20, 145:21, 145:24
**interviewed** [1] - 145:23
**interviews** [1] - 145:20
**introduce** [2] - 4:9, 11:18
**investment** [1] - 68:9
**involve** [1] - 154:13
**involved** [4] - 33:24, 73:20, 73:22, 135:11, 166:2, 170:16
**involving** [2] - 166:3, 168:18
**IRS** [3] - 74:20, 75:4, 75:6

**issue** [38] - 5:6, 14:8, 14:11, 38:2, 38:5, 64:8, 69:23, 77:9, 81:21, 92:12, 161:22, 169:19, 171:17, 174:14, 176:3, 176:5, 178:10, 178:13, 178:14, 179:2, 179:5, 179:25, 181:4, 182:3, 182:6, 182:8, 182:9, 182:12, 183:3, 184:19, 185:21, 187:19, 187:20, 188:6, 188:25, 189:1, 189:5, 190:7
**issued** [5] - 17:19, 20:22, 20:23, 20:24, 77:5
**issues** [7] - 5:4, 11:17, 23:2, 135:7, 135:11, 175:15, 185:13
**item** [1] - 7:21
**itself** [2] - 9:11, 109:8

## J

**January** [13] - 12:24, 38:22, 38:25, 39:3, 39:5, 39:10, 39:14, 132:21, 133:1, 133:15, 136:25, 137:4, 181:10
**JENNIFER** [2] - 144:21, 145:1
**Jennifer** [4] - 3:6, 82:14, 141:12, 145:1
**JManjarres@ AvantAssurance. com** [1] - 163:22
**job** [19] - 5:22, 6:13, 23:13, 24:4, 24:5, 24:6, 24:17, 26:24, 32:10, 32:11, 44:18, 146:14, 146:16, 146:19, 147:13, 147:15, 147:17, 161:8
**jobs** [4] - 24:7, 26:25, 58:8, 154:13
**Joe** [2] - 100:21, 100:23
**Jones** [2] - 7:2, 7:4
**Judge** [23] - 4:18, 5:12, 19:7, 19:18, 23:4, 27:23, 83:3, 142:20, 144:14, 163:13, 167:6, 167:22, 169:8,

169:20, 169:23, 170:5, 171:14, 173:21, 177:1, 177:7, 179:3, 179:24, 181:10
**judge** [3] - 11:17, 82:20, 186:12
**JUDGE** [1] - 1:12
**judgment** [1] - 79:25
**July** [17] - 1:5, 33:23, 108:4, 110:1, 110:2, 110:7, 111:6, 111:22, 112:6, 134:6, 136:5, 140:18, 140:19, 153:20, 153:21, 155:24, 156:1
**jumps** [1] - 118:23
**June** [13] - 43:10, 43:13, 86:25, 108:3, 110:1, 135:20, 136:1, 136:5, 147:9, 153:2, 153:10, 153:20, 156:2
**JUROR** [1] - 84:6
**juror** [1] - 9:9
**jurors** [6] - 5:5, 5:18, 10:2, 10:3, 10:13, 142:10
**JURY** [2] - 1:11, 5:14
**jury** [73] - 5:4, 5:8, 5:9, 5:16, 9:7, 11:6, 11:13, 19:20, 22:14, 22:23, 22:25, 23:2, 23:7, 23:8, 30:9, 30:13, 78:22, 81:17, 81:22, 82:2, 82:4, 82:5, 89:6, 96:24, 114:12, 141:19, 141:24, 141:25, 142:4, 142:11, 144:15, 144:17, 164:22, 164:24, 165:3, 165:5, 165:9, 165:10, 171:2, 173:19, 174:23, 175:15, 175:21, 175:22, 176:4, 178:10, 178:13, 178:14, 178:18, 179:2, 179:5, 180:1, 180:3, 180:24, 181:6, 181:12, 181:15, 182:1, 182:3, 182:8, 182:21, 183:5, 184:13, 185:9, 185:21, 186:13, 186:19, 186:22, 186:25, 188:9,

188:25, 190:9
**Jury** [1] - 3:21
**jury's** [2] - 101:25, 175:16, 177:2
**justice** [1] - 11:16

## K

**keep** [19] - 9:16, 11:19, 15:23, 19:24, 20:2, 22:5, 22:6, 23:17, 25:14, 26:17, 29:13, 48:16, 104:12, 110:23, 111:2, 111:6, 111:8, 146:13, 188:9
**keeping** [3] - 48:8, 150:1, 150:23
**keeps** [1] - 23:1
**Kendall** [12] - 15:12, 43:8, 43:9, 55:18, 58:15, 64:5, 86:21, 124:24, 154:4, 154:6, 154:8, 154:9
**Kendrick** [1] - 179:21
**Kentucky** [2] - 166:5, 174:20
**kept** [1] - 16:24
**key** [3] - 43:21, 124:12, 172:21
**keyboard** [6] - 62:8, 62:14, 62:19, 62:23, 125:19, 125:21
**keyboards** [1] - 125:12
**kind** [9] - 6:13, 13:14, 19:15, 71:20, 141:18, 178:21, 182:18, 186:3, 187:21
**knowing** [1] - 34:18

## L

**Labor** [1] - 12:20
**ladies** [5] - 11:11, 22:23, 30:6, 81:15, 164:20
**landscape** [1] - 166:17
**language** [7] - 171:2, 174:22, 177:4, 185:25, 186:20, 187:13, 188:12
**laptop** [1] - 62:18
**laptops** [2] - 51:3, 51:6
**last** [16] - 23:16, 43:12, 87:1, 96:25, 97:1, 98:2, 98:4,

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

98:6, 108:2, 139:2, 145:2, 148:10, 153:20, 165:18, 167:19, 167:23
**lasted** [1] - 15:25
**late** [3] - 81:20, 126:8, 142:3
**latest** [2] - 89:16, 89:17
**Law** [1] - 1:23
**law** [30] - 5:22, 5:23, 5:24, 6:11, 8:15, 9:15, 10:1, 10:2, 10:9, 10:14, 11:5, 12:20, 19:7, 19:19, 19:21, 19:22, 19:23, 20:14, 23:4, 25:13, 38:24, 39:1, 111:16, 166:4, 167:2, 167:3, 168:12, 171:8, 185:10
**lawsuit** [23] - 11:21, 18:25, 19:3, 28:5, 28:6, 28:17, 47:21, 47:25, 49:19, 134:22, 135:6, 135:11, 138:8, 138:14, 138:17, 159:4, 159:6, 159:7, 159:15, 159:17, 160:22, 160:23
**lawyer** [5] - 7:1, 7:7, 7:8, 55:1, 134:9
**lawyer's** [1] - 6:25
**lawyers** [2] - 6:18, 11:3
**lawyers'** [3] - 6:17, 6:23, 9:14
**lead** [11] - 9:17, 13:19, 15:15, 15:24, 63:3, 63:13, 71:7, 73:11, 78:10, 78:17, 130:3
**leads** [31] - 13:2, 13:4, 13:9, 15:3, 15:22, 15:23, 21:9, 53:5, 53:9, 53:10, 53:11, 54:18, 55:13, 55:22, 55:23, 57:5, 63:6, 63:7, 63:11, 63:17, 66:25, 67:3, 67:4, 69:10, 69:11, 70:8, 71:10, 73:5, 73:6, 73:9
**lease** [4] - 52:15, 66:12, 124:14, 124:18
**least** [9] - 33:22, 85:9, 139:12, 140:24, 146:6, 157:18, 181:2, 183:22,

184:12
**leave** [9] - 30:12, 62:25, 81:22, 126:9, 144:7, 158:14, 164:24, 177:25
**Ledesma** [1] - 127:6
**left** [19] - 4:11, 4:12, 4:13, 17:19, 19:2, 19:11, 46:3, 48:5, 77:1, 88:8, 95:21, 126:22, 134:12, 134:15, 134:17, 158:3, 158:22, 160:2
**legal** [2] - 11:17, 55:3
**legality** [1] - 36:5
**legally** [2] - 138:5, 166:22
**Leon** [1] - 1:20
**less** [7] - 12:13, 20:18, 59:15, 76:10, 76:25, 91:8, 96:13
**letter** [9] - 19:1, 19:12, 19:13, 28:7, 134:10, 134:15, 180:16
**liability** [1] - 175:14
**license** [5] - 44:16, 56:13, 56:14, 56:15, 60:20
**licensed** [17] - 24:5, 24:9, 32:24, 33:2, 45:12, 45:14, 45:18, 45:20, 46:18, 96:23, 96:24, 97:13, 98:1, 108:22, 109:6, 109:12, 110:8
**licenses** [3] - 24:8, 33:5, 33:10
**licensing** [1] - 161:10
**life** [1] - 170:17
**light** [2] - 8:10, 8:17
**lights** [1] - 51:21
**likely** [4] - 6:10, 8:17, 9:5, 71:13
**likewise** [2] - 186:4, 186:23
**limited** [3] - 7:20, 7:22, 100:25
**line** [3] - 55:17, 70:15, 70:16
**Line** [1] - 150:23
**liquidate** [1] - 175:13
**liquidated** [3] - 175:17, 176:3, 179:25
**listen** [7] - 5:21, 80:25, 81:10, 114:12, 114:16, 114:19, 114:22
**listened** [2] - 81:5, 81:7

**listening** [3] - 22:17, 30:10, 81:8
**lists** [1] - 167:15
**live** [3] - 63:4, 63:11, 70:18
**lived** [2] - 138:8, 138:12
**lives** [5] - 22:17, 23:14, 119:17, 119:24
**LLC** [1] - 181:8
**LLCs** [1] - 25:16
**local** [1] - 60:13
**locate** [1] - 182:2
**location** [2] - 55:19, 64:4
**log** [29] - 13:6, 13:11, 15:2, 52:6, 60:23, 62:9, 63:2, 64:14, 64:15, 64:19, 65:6, 100:16, 100:20, 149:9, 149:15, 149:18, 149:19, 149:24, 152:17, 152:18, 155:2, 155:12, 155:13, 156:11, 156:12, 156:21
**log-in** [2] - 60:23, 64:15
**log-ins** [1] - 64:14
**logged** [8] - 13:13, 15:23, 21:8, 63:7, 63:10, 63:14, 157:3, 157:4
**logging** [1] - 154:14
**logic** [1] - 122:19
**look** [19] - 17:25, 27:15, 29:2, 94:13, 94:18, 94:22, 100:20, 101:5, 121:13, 121:14, 122:6, 132:19, 132:20, 159:3, 167:17, 169:17, 181:4, 188:21, 189:3
**looked** [2] - 107:3, 123:10
**looking** [9] - 12:10, 40:15, 46:7, 69:12, 71:20, 108:21, 134:1, 143:20, 165:16
**looks** [1] - 118:10
**Lopez** [10] - 4:13, 4:14, 120:4, 132:21, 132:25, 133:5, 133:8, 133:11, 134:11
**LOPEZ** [2] - 1:4, 1:4

**Lorali** [1] - 181:8
**LORALI** [1] - 181:9
**Lorenzo** [1] - 1:16
**lose** [4] - 64:25, 65:6, 65:19, 67:14
**losing** [6] - 14:18, 14:24, 65:8, 65:9, 66:6, 66:9
**loss** [2] - 26:22, 27:2
**lost** [2] - 67:16, 113:10
**love** [2] - 80:7, 188:18
**lunch** [13] - 23:11, 30:20, 81:14, 81:15, 81:22, 81:24, 82:7, 83:5, 83:8, 84:21, 142:11, 189:20, 190:5

## M

**M-A-N-J-A-R-R-E-S** [2] - 143:2, 145:2
**M-E-R-R-I-T-T** [1] - 168:7
**M-I-T-C-H-E-L-L** [1] - 174:20
**ma'am** [2] - 144:19, 164:15
**mad** [2] - 40:12, 40:13
**magically** [1] - 111:22
**mail** [5] - 95:25, 131:22, 163:17, 163:19, 163:20
**mails** [1] - 9:22
**main** [2] - 125:23, 125:24
**majority** [1] - 49:23
**makers** [1] - 23:6
**manage** [3] - 149:10, 149:11, 152:24
**managed** [1] - 146:19
**management** [1] - 161:10
**manager** [2] - 160:11, 162:18
**mandate** [1] - 69:24
**Manjarres** [11] - 3:6, 82:14, 141:12, 142:25, 143:11, 144:11, 144:16, 145:2, 145:5, 157:14, 163:17
**MANJARRES** [1] - 144:21
**manner** [1] - 8:6
**Mariana** [53] - 11:18, 17:22, 18:10, 19:1, 19:4, 24:21, 27:18, 28:7, 29:5, 34:8, 46:23, 46:24, 62:19,

66:22, 70:20, 78:9, 85:24, 86:8, 86:10, 92:2, 92:6, 109:17, 109:18, 109:19, 109:21, 109:25, 110:3, 110:6, 110:8, 110:22, 110:24, 119:6, 119:8, 120:14, 120:23, 121:21, 123:2, 123:5, 134:3, 134:5, 134:11, 134:23, 135:7, 135:12, 135:15, 136:4, 139:21, 141:2, 145:6, 153:21, 180:22
**MARIANA** [1] - 1:4
**Mariana's** [1] - 121:12
**Marianas** [1] - 119:7
**marked** [1] - 78:19
**market** [2] - 70:5, 70:7
**marketing** [4] - 53:5, 53:6, 55:14, 55:15
**Marketplace** [3] - 13:1, 40:17, 41:9
**markets** [2] - 32:15, 32:18
**married** [4] - 31:14, 44:19, 137:17, 138:4, 138:5, 138:12
**masses** [1] - 174:8
**match** [6] - 94:4, 94:6, 94:9, 94:10, 94:13, 185:20
**matter** [17] - 11:2, 19:13, 20:12, 20:17, 37:15, 54:25, 78:15, 108:22, 108:24, 125:6, 171:1, 171:23, 184:21, 185:10, 185:12, 188:3, 190:19
**matters** [2] - 180:3, 189:8
**McCARN** [2] - 2:2, 190:22
**mean** [37] - 18:22, 26:23, 35:6, 42:15, 48:20, 52:3, 65:10, 72:17, 77:9, 91:6, 94:6, 98:6, 98:7, 104:12, 115:25, 117:3, 119:9, 126:21, 128:8, 128:9, 130:15, 135:25, 140:4, 147:15, 147:17, 148:16, 149:4, 154:12, 154:17,

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

159:6, 161:8, 162:24, 168:25, 174:8, 176:6, 179:24
**meaning** [12] - 33:20, 84:18, 85:1, 85:2, 96:7, 107:21, 117:19, 127:6, 159:5, 164:2, 169:2, 169:12
**means** [5] - 7:18, 8:16, 9:22, 135:22, 157:9
**meant** [3] - 29:11, 29:12, 29:15
**medical** [1] - 153:13
**medications** [1] - 153:14
**meet** [5] - 8:22, 44:4, 81:16, 172:13, 178:22
**meeting** [4] - 97:23, 139:10, 139:15, 139:19
**meetings** [1] - 147:2
**member** [34] - 15:16, 17:21, 17:22, 17:23, 45:5, 73:24, 78:11, 78:16, 85:7, 85:13, 85:20, 85:21, 86:2, 87:17, 88:25, 89:1, 89:12, 90:4, 90:5, 90:23, 91:1, 91:2, 91:7, 91:10, 94:9, 105:3, 108:15, 108:17, 108:23, 121:16, 123:4, 170:19, 174:2
**members** [33] - 5:16, 12:5, 13:9, 16:6, 16:8, 17:10, 18:19, 73:6, 80:11, 96:24, 97:13, 106:17, 119:17, 119:22, 119:24, 120:6, 120:12, 120:18, 121:14, 121:19, 121:24, 122:3, 122:4, 122:6, 123:4, 123:8, 123:9, 123:11, 131:1, 152:13, 172:3
**membership** [2] - 170:19, 174:2
**memory** [4] - 8:6, 30:17, 30:18, 30:19
**mentioned** [8] - 7:24, 8:14, 28:4, 39:18, 78:25, 111:23, 134:9, 168:21
**mere** [1] - 186:24
**Merritt** [4] - 166:14,

168:6, 169:18, 170:3
**message** [2] - 138:21, 158:11
**messages** [2] - 9:22, 147:2
**met** [4] - 145:5, 171:16, 172:16, 174:4
**MIAMI** [1] - 1:2
**Miami** [11] - 1:4, 1:24, 2:3, 2:4, 23:7, 23:8, 55:24, 64:5, 190:23, 190:23
**mic** [1] - 23:1
**micromanage** [1] - 155:7
**microphone** [5] - 4:19, 84:13, 86:16, 158:7, 176:22
**middle** [1] - 86:22
**might** [3] - 7:15, 41:11, 98:9
**might've** [1] - 169:20
**mind** [5] - 9:16, 22:5, 22:6, 24:14, 92:14
**mind-boggling** [1] - 24:14
**minds** [3] - 22:6, 22:13, 22:15
**minimum** [20] - 24:17, 24:24, 26:25, 29:13, 179:18, 179:20, 183:6, 183:7, 183:10, 183:12, 183:13, 183:14, 183:22, 184:2, 184:3, 184:5, 184:9, 184:12
**minute** [5] - 87:10, 141:21, 142:21, 147:16, 168:1
**minutes** [2] - 11:8, 81:24
**mirroring** [1] - 27:20
**MISCELLANEOUS** [1] - 3:19
**misconduct** [2] - 179:19, 179:20
**missing** [4] - 104:6, 104:7, 104:9, 105:4
**Mitchell** [2] - 166:5, 174:19
**modelled** [1] - 186:13
**Molina** [2] - 90:19, 118:15
**mom** [9] - 44:19, 137:18, 138:8, 138:12, 138:14, 138:18, 138:23, 138:25, 139:5

**moment** [2] - 98:2, 158:9
**Monday** [1] - 134:8
**money** [62] - 14:18, 14:19, 14:21, 14:22, 14:23, 14:24, 16:24, 17:8, 17:10, 19:5, 20:6, 21:19, 25:4, 25:5, 25:9, 26:15, 26:19, 29:1, 42:17, 44:7, 44:8, 45:7, 64:25, 65:7, 65:8, 65:9, 65:19, 66:1, 66:6, 66:16, 66:22, 66:25, 67:6, 67:7, 67:9, 67:12, 67:15, 67:16, 67:17, 74:23, 75:3, 75:11, 76:5, 88:14, 89:25, 95:6, 95:10, 121:3, 127:20, 132:5, 132:7, 160:9, 160:14, 162:15, 164:5, 182:14, 182:24
**moneys** [1] - 163:1
**monitor** [2] - 62:14, 106:9
**monitors** [8] - 16:14, 51:2, 51:9, 60:4, 124:25, 125:1, 125:8, 125:12
**month** [18] - 24:17, 24:19, 24:20, 85:21, 87:17, 88:20, 90:20, 90:22, 91:1, 133:9, 133:11, 133:25, 140:20, 150:3, 150:16, 153:15
**month's** [1] - 88:19
**months** [13] - 24:16, 24:21, 39:5, 49:18, 103:11, 108:25, 112:22, 133:15, 133:23, 133:25, 136:5, 153:17, 168:15
**morning** [16] - 4:2, 4:3, 4:7, 4:18, 4:20, 4:24, 4:25, 5:2, 15:6, 151:12, 151:17, 153:6, 164:21, 165:2, 188:20, 189:9
**most** [34] - 22:7, 23:3, 23:14, 26:15, 30:2, 30:3, 41:15, 41:19, 41:23, 42:1, 42:17, 43:20, 61:12, 62:3, 70:17, 71:2, 71:10, 71:13, 72:18, 93:6,

98:1, 102:4, 102:5, 102:10, 102:12, 109:9, 112:22, 112:23, 112:25, 113:1, 124:8, 125:1, 131:4
**motion** [1] - 165:23
**motivation** [1] - 21:18
**motive** [1] - 180:18
**mouse** [9] - 62:9, 62:14, 62:18, 62:19, 62:23, 65:17, 125:11, 125:18, 125:21
**mouth** [4] - 34:17, 44:1, 48:22, 77:23
**move** [5] - 86:16, 142:3, 173:18, 173:19, 177:1
**moved** [5] - 43:15, 43:17, 87:1, 154:3, 154:7
**moving** [2] - 185:19, 185:24
**MR** [223] - 4:5, 4:7, 4:11, 4:16, 4:18, 4:21, 4:22, 4:24, 5:6, 5:10, 11:10, 22:23, 27:21, 27:23, 27:24, 28:2, 29:16, 29:19, 29:22, 30:1, 30:22, 31:7, 33:9, 40:2, 40:18, 40:21, 50:2, 50:5, 52:13, 53:20, 55:4, 55:7, 56:1, 56:3, 56:4, 74:17, 78:23, 79:17, 82:10, 82:14, 82:20, 82:25, 83:3, 83:4, 84:11, 84:14, 86:20, 89:7, 98:18, 106:8, 106:12, 114:4, 114:6, 115:19, 117:3, 117:6, 117:7, 117:8, 117:9, 117:10, 117:12, 117:13, 118:12, 132:23, 141:4, 141:7, 141:12, 141:14, 141:17, 141:23, 142:1, 142:6, 142:25, 143:2, 143:5, 143:9, 143:13, 143:16, 143:24, 144:1, 144:2, 144:4, 144:8, 144:14, 145:4, 155:18, 155:21, 155:23, 157:16, 157:21, 158:9,

158:15, 158:17, 158:18, 161:21, 161:24, 162:2, 162:4, 162:10, 162:12, 162:13, 162:17, 162:20, 163:4, 163:6, 163:11, 163:13, 163:16, 164:18, 165:11, 165:13, 165:15, 166:1, 166:24, 167:2, 167:6, 167:11, 167:14, 167:18, 167:22, 168:1, 168:8, 168:11, 168:17, 168:22, 169:1, 169:8, 169:15, 169:20, 169:23, 169:25, 170:2, 170:5, 170:7, 170:14, 170:23, 171:5, 171:11, 171:13, 172:11, 172:25, 173:3, 173:5, 173:9, 173:12, 173:14, 173:20, 174:12, 174:15, 175:5, 175:12, 175:18, 175:20, 175:22, 176:2, 176:6, 176:10, 176:12, 176:15, 176:17, 176:19, 176:21, 176:23, 177:1, 177:7, 177:9, 177:12, 177:16, 177:21, 178:1, 178:4, 178:7, 178:11, 178:14, 178:16, 178:19, 179:1, 179:3, 179:5, 179:10, 179:24, 180:2, 180:6, 180:13, 182:7, 182:9, 182:16, 183:4, 184:1, 184:4, 184:7, 184:14, 184:17, 184:20, 184:24, 185:16, 185:22, 186:3, 186:5, 186:8, 186:9, 186:12, 186:18, 187:9, 187:11, 187:13, 187:16, 187:20, 188:7, 188:12, 188:15, 188:17, 188:23, 189:3, 189:7, 189:10, 189:15,

189:20, 189:25,
190:2, 190:6,
190:10, 190:12
**MS** [1] - 4:25
**must** [16] - 5:23, 5:25,
6:16, 7:14, 7:18,
7:22, 8:16, 8:23,
9:10, 9:21, 10:6,
27:16, 69:25, 172:6
**mutual** [2] - 35:2, 44:5

## N

**name** [39] - 12:15,
17:18, 17:20, 18:3,
18:5, 18:8, 22:1,
31:10, 31:12, 42:24,
43:2, 57:5, 61:14,
72:6, 78:11, 78:16,
91:11, 91:19, 91:22,
93:7, 93:9, 93:14,
93:15, 93:19, 93:23,
94:8, 97:4, 97:6,
98:14, 100:16,
101:7, 101:13,
119:10, 126:21,
144:25, 145:1,
145:2, 145:5
**named** [2] - 31:14,
93:25
**names** [4] - 17:20,
93:11, 93:20, 101:6
**National** [1] - 137:22
**Nationwide** [1] -
179:13
**necessarily** [8] -
34:25, 41:4, 41:13,
48:15, 49:24, 58:3,
81:3, 134:1
**need** [22] - 5:17, 8:21,
13:5, 35:23, 35:25,
36:3, 36:6, 43:21,
50:8, 52:24, 58:7,
63:18, 81:19,
107:15, 110:24,
113:23, 131:23,
135:2, 142:3, 142:4,
143:7, 189:1
**needed** [15] - 14:15,
16:15, 50:17, 50:19,
58:1, 58:10, 62:3,
64:13, 95:9, 107:13,
107:18, 108:23,
144:9, 190:8
**needs** [1] - 141:17
**negative** [4] - 14:20,
14:23, 65:10, 65:12
**negotiated** [1] - 85:2
**networking** [1] - 9:23
**never** [17] - 27:11,

78:6, 81:5, 81:6,
95:13, 95:16, 96:1,
99:12, 100:11,
101:24, 104:11,
105:4, 105:9,
105:24, 108:12,
160:6, 160:20
**new** [16] - 15:12, 17:4,
45:5, 73:6, 73:23,
78:11, 78:16, 87:8,
87:9, 88:10, 88:13,
91:10, 146:22,
147:3, 167:5, 180:13
**next** [40] - 10:21, 12:3,
22:17, 39:25, 40:5,
40:6, 46:23, 69:4,
70:14, 72:7, 73:20,
87:18, 88:25,
103:12, 117:6,
117:7, 119:16,
120:14, 121:6,
121:13, 121:23,
141:11, 141:16,
142:24, 143:10,
172:21, 175:3,
175:8, 182:6, 182:8,
182:9, 183:3,
184:19, 186:2,
187:11, 187:16,
187:19, 187:20,
188:6
**night** [3] - 15:6, 153:7,
169:17
**nine** [9] - 58:19, 59:10,
59:13, 59:16, 59:19,
60:1, 64:2, 86:22,
151:25
**NO** [1] - 1:2
**nobody** [3] - 62:22,
68:6, 105:4
**nobody's** [1] - 40:13
**nonagreement** [1] -
112:7
**noncompete** [7] -
110:10, 110:12,
110:23, 111:2,
111:6, 111:14, 160:2
**none** [4] - 8:2, 48:25,
64:6, 132:1
**nonemployee** [2] -
75:7, 75:10
**nonetheless** [1] -
13:24
**nonimplied** [1] - 180:9
**nonprofit** [3] - 170:20,
172:3, 174:3
**normally** [2] - 98:19,
109:7
**North** [2] - 2:3, 190:23
**note** [1] - 30:9

**note-taking** [1] - 30:9
**notebooks** [2] - 30:14,
164:24
**notes** [5] - 30:7, 30:8,
30:13, 30:16, 30:17
**nothing** [11] - 12:12,
12:13, 30:1, 101:11,
112:5, 126:8, 126:9,
126:11, 135:16,
174:14
**notification** [1] - 63:5
**November** [17] -
12:24, 17:3, 38:21,
38:23, 39:3, 39:5,
39:10, 39:14, 47:9,
47:12, 49:18, 49:25,
87:19, 133:15,
148:10, 151:5, 155:1
**now's** [1] - 174:24
**number** [11] - 47:6,
81:19, 93:21, 98:19,
98:20, 101:17,
121:24, 122:17,
122:19, 133:18
**numbers** [12] -
115:24, 116:20,
117:5, 119:20,
119:25, 120:1,
120:24, 122:16,
122:20, 123:5, 123:6

## O

**o'clock** [2] - 141:14,
164:22
**oath** [5] - 37:8, 37:12,
58:13, 82:6, 150:12
**Obamacare** [7] -
12:15, 24:10, 38:18,
41:12, 42:24, 174:9,
180:23
**object** [3] - 7:9, 50:2,
161:21
**objected** [1] - 187:21
**objection** [13] - 7:10,
7:12, 7:14, 27:21,
29:16, 29:22, 40:18,
55:1, 55:4, 162:10,
175:3, 184:25,
188:11
**objections** [2] - 6:23,
165:9
**obligation** [1] - 19:22
**observing** [1] - 30:10
**obviously** [2] - 37:10,
44:19
**occur** [2] - 134:15,
182:17
**October** [2] - 135:25,
136:5

**odds** [1] - 171:19
**OF** [3] - 1:1, 11:9,
22:21
**offense** [1] - 180:20
**offer** [8] - 41:11,
42:10, 70:11, 90:13,
90:14, 113:5, 172:2
**offered** [4] - 16:25,
41:13, 70:10, 88:1
**offering** [1] - 13:17
**OfferUp** [1] - 60:14
**office** [80] - 14:20,
15:12, 16:14, 21:7,
37:11, 37:12, 43:5,
43:8, 43:10, 43:15,
43:17, 48:19, 48:20,
50:21, 50:22, 51:21,
52:4, 53:15, 53:23,
58:15, 58:18, 58:23,
59:8, 62:4, 62:6,
62:21, 62:24, 65:4,
66:4, 66:13, 67:18,
86:21, 87:1, 87:3,
112:19, 112:20,
124:4, 124:6, 124:8,
124:11, 124:21,
124:22, 124:24,
126:4, 128:7,
128:10, 131:8,
131:12, 136:7,
136:24, 145:11,
145:14, 146:11,
151:16, 151:23,
152:2, 152:4, 152:6,
152:12, 154:1,
154:4, 154:6, 154:8,
154:9, 154:10,
154:12, 155:25,
156:3, 156:5, 156:6,
160:11, 161:4,
161:5, 161:9,
161:16, 162:18,
164:11
**OFFICER** [3] - 82:4,
141:24, 165:3
**officer** [1] - 30:14
**Offices** [1] - 1:23
**offices** [9] - 15:1,
58:21, 59:1, 59:3,
59:5, 86:23, 87:7,
87:12, 151:25
**Official** [1] - 190:22
**official** [1] - 2:2
**offline** [1] - 9:25
**often** [3] - 10:9, 72:23,
73:1
**old** [3] - 15:11, 167:3,
167:5
**older** [1] - 168:3
**ON** [2] - 11:9, 22:21

**onboard** [1] - 146:22
**onboarding** [1] -
147:3
**once** [2] - 13:13,
13:19, 15:17, 22:10,
27:11, 27:14, 55:16,
63:5, 63:10, 64:3,
71:25, 72:7, 78:9,
81:1, 87:25, 100:9,
101:15, 145:21,
145:23, 180:15
**One** [2] - 64:7, 158:9
**one** [118] - 10:15,
11:14, 11:15, 17:21,
23:17, 23:25, 25:22,
26:20, 33:5, 33:10,
33:14, 33:17, 34:1,
34:3, 34:5, 34:7,
34:11, 34:15, 34:20,
34:23, 36:9, 36:12,
36:24, 39:21, 42:20,
44:9, 44:20, 44:23,
45:22, 46:10, 52:24,
57:21, 59:3, 59:5,
71:7, 71:10, 76:2,
77:24, 78:7, 78:15,
78:24, 79:2, 81:12,
81:18, 86:3, 86:4,
86:6, 86:7, 87:8,
87:9, 88:6, 88:19,
89:14, 93:9, 93:10,
94:12, 94:17, 94:22,
96:24, 98:3, 98:11,
99:15, 102:15,
104:5, 104:6,
104:19, 105:10,
106:13, 106:17,
107:10, 108:14,
108:23, 109:16,
109:21, 111:11,
111:22, 114:23,
115:23, 115:24,
118:6, 119:25,
120:14, 122:12,
122:13, 123:15,
123:16, 123:17,
125:24, 130:3,
130:8, 132:3,
133:25, 137:12,
142:10, 142:14,
145:20, 147:18,
151:25, 153:7,
153:20, 160:1,
167:7, 168:4,
168:10, 172:6,
172:10, 173:24,
174:1, 175:7, 175:8,
176:16, 180:1,
180:4, 181:6,
182:22, 185:15,

186:12
**ones** [4] - 72:18, 94:18, 104:6, 176:14
**online** [7] - 9:24, 60:11, 60:13, 63:4, 63:5, 63:25, 180:23
**open** [46] - 9:16, 15:4, 17:2, 22:5, 22:6, 24:11, 24:13, 24:21, 26:13, 26:18, 35:20, 38:18, 38:21, 39:8, 39:12, 39:21, 39:23, 40:3, 40:6, 40:14, 40:24, 41:1, 41:15, 42:3, 42:20, 58:20, 58:22, 58:24, 58:25, 77:18, 77:24, 85:9, 115:2, 115:6, 115:7, 115:15, 127:14, 128:17, 128:18, 132:4, 132:13, 136:10, 136:12, 136:13, 136:14, 152:21
**opened** [4] - 32:3, 114:23, 115:10, 115:11
**Opening** [2] - 3:22, 3:22
**opening** [9] - 5:7, 6:18, 10:17, 10:18, 11:7, 12:23, 24:22, 128:2, 134:9
**OPENING** [2] - 11:9, 22:21
**operates** [1] - 161:15
**operations** [1] - 161:9
**opinion** [2] - 6:4, 22:8
**opportunities** [1] - 26:24
**opportunity** [7] - 8:4, 26:19, 26:22, 27:3, 42:4, 95:12, 165:7
**opposing** [1] - 7:8
**opposite** [2] - 8:20, 92:1
**opposition** [1] - 181:23
**option** [4] - 66:3, 77:1, 88:6, 97:22
**options** [1] - 71:22
**order** [18] - 7:17, 11:19, 33:2, 36:1, 46:22, 57:9, 57:25, 62:2, 64:14, 71:4, 75:3, 92:10, 104:24, 107:14, 108:15, 110:23, 123:24, 181:11
**organization** [1] -

172:3
**originally** [1] - 183:11
**Oscar** [20] - 35:16, 72:1, 90:3, 90:17, 99:14, 102:6, 102:15, 106:24, 116:2, 116:7, 116:18, 116:25, 118:15, 118:18, 121:9, 121:11, 121:16, 133:4, 139:24, 140:2
**oscar** [1] - 102:10
**otherwise** [3] - 9:1, 14:22, 178:21
**out-of-pocket** [1] - 109:4
**outbound** [2] - 13:7, 54:18
**outcome** [1] - 8:7
**outline** [1] - 10:19
**outside** [10] - 6:5, 10:9, 23:7, 27:22, 55:5, 59:6, 59:7, 69:11, 69:16, 81:23
**overrule** [1] - 7:10
**overruled** [6] - 29:25, 40:20, 50:4, 55:6, 161:23, 161:25
**overtime** [26] - 11:24, 12:1, 12:12, 12:19, 14:7, 14:10, 14:13, 17:12, 20:5, 20:9, 20:10, 20:12, 20:14, 20:16, 21:16, 24:12, 24:15, 26:16, 27:13, 28:19, 48:25, 49:2, 160:19, 183:14, 187:25
**owe** [1] - 177:17
**owed** [20] - 11:21, 11:22, 27:10, 27:12, 27:13, 28:21, 29:3, 29:4, 30:1, 160:9, 160:14, 160:19, 164:5, 177:20, 178:3, 181:1, 184:14
**owes** [1] - 17:12
**own** [60] - 25:16, 25:19, 27:19, 30:17, 51:3, 51:6, 51:7, 52:22, 52:24, 53:6, 53:7, 53:11, 54:2, 57:13, 62:11, 62:18, 62:20, 62:22, 64:15, 66:7, 77:18, 79:24, 94:3, 101:2, 104:21, 105:22, 112:16, 113:8, 113:9, 113:12, 113:14,

114:10, 114:11, 115:6, 115:9, 115:10, 117:1, 125:10, 125:11, 125:12, 125:17, 125:18, 125:21, 126:1, 126:3, 127:9, 127:10, 127:11, 129:12, 129:13, 130:23, 131:5, 164:11, 185:19, 189:18
**owner** [3] - 76:10, 76:17, 97:25
**owners** [2] - 12:17, 14:25

## P

**p.m** [12] - 1:6, 82:5, 83:8, 84:2, 127:14, 141:25, 142:22, 144:17, 144:20, 165:5, 190:13
**page** [10] - 89:10, 117:6, 117:7, 117:8, 117:9, 151:16, 166:23, 171:21, 187:11
**Page** [23] - 3:3, 3:10, 3:20, 37:6, 37:20, 58:8, 115:17, 150:20, 151:15, 153:3, 155:11, 156:10, 166:14, 166:25, 170:25, 171:21, 173:25, 182:10, 184:25, 185:24, 187:20, 188:4, 188:6
**Pages** [2] - 1:8, 173:7
**paid** [111] - 11:23, 14:1, 14:16, 16:4, 16:10, 19:25, 20:12, 20:17, 21:12, 21:14, 21:15, 25:23, 26:15, 28:19, 30:2, 34:21, 34:24, 35:12, 36:6, 45:1, 45:4, 47:8, 47:12, 48:24, 49:9, 49:12, 51:17, 51:19, 64:22, 74:24, 75:11, 78:5, 78:6, 78:7, 84:23, 85:3, 85:25, 86:11, 86:12, 86:14, 86:18, 87:16, 87:18, 87:22, 88:14, 89:20, 93:13, 94:1, 94:5, 94:14, 94:16, 94:24, 95:2, 95:23, 95:24, 95:25, 96:4, 96:14,

96:16, 96:21, 97:2, 97:10, 98:3, 98:21, 99:20, 101:8, 102:20, 102:24, 103:2, 103:5, 103:8, 103:17, 104:20, 104:24, 105:3, 105:7, 107:14, 109:22, 118:14, 121:8, 121:10, 121:12, 121:15, 121:24, 124:3, 125:2, 125:3, 125:6, 132:10, 132:17, 133:14, 133:17, 133:23, 135:16, 146:6, 147:14, 148:17, 148:19, 149:10, 149:11, 157:11, 162:22, 163:1, 164:2, 164:3, 182:14, 182:19, 182:24, 183:18, 184:12
**Palm** [2] - 176:19, 176:20
**paperwork** [8] - 72:11, 72:14, 72:18, 73:2, 74:9, 74:10, 147:4, 147:5
**paragraph** [1] - 187:4
**parenthetical** [1] - 181:21
**parking** [4] - 43:18, 43:20, 53:14, 53:16, 53:22, 53:25, 124:9, 124:11, 124:16
**part** [22] - 8:2, 24:7, 28:20, 70:17, 71:2, 90:9, 93:6, 124:8, 129:8, 129:10, 146:14, 146:19, 167:15, 171:17, 172:16, 175:1, 185:2, 186:14, 186:15, 187:1, 187:16, 187:21
**particular** [1] - 106:25
**particularly** [1] - 174:19
**parties** [6] - 9:25, 10:8, 11:2, 81:25, 165:20, 170:8
**PARTIES** [1] - 4:3
**parties'** [2] - 11:3, 172:10
**parts** [1] - 26:20
**party** [3] - 10:19, 98:8, 98:9
**party's** [1] - 183:24

**passed** [2] - 103:14, 171:9
**passes** [1] - 124:11
**passing** [3] - 21:23, 30:14, 170:22
**past** [1] - 39:19
**patient** [1] - 171:14
**Pause** [18] - 5:11, 22:22, 82:19, 83:1, 84:7, 98:17, 144:3, 168:2, 169:14, 170:6, 170:13, 171:10, 173:8, 173:13, 173:17, 176:25, 179:9, 188:2
**pay** [56] - 12:1, 14:5, 14:6, 14:7, 16:22, 16:25, 17:16, 18:1, 19:8, 28:23, 28:24, 34:20, 49:10, 49:12, 49:19, 60:17, 66:7, 75:10, 75:13, 75:15, 75:16, 76:5, 76:6, 76:11, 76:12, 76:18, 76:19, 77:18, 77:21, 77:25, 86:1, 88:1, 88:10, 88:13, 89:12, 90:20, 90:22, 90:25, 92:15, 97:19, 99:1, 103:4, 103:5, 107:9, 108:17, 117:15, 122:5, 123:9, 124:6, 124:9, 132:9, 132:12, 152:11, 187:24
**Paychex** [22] - 148:20, 148:21, 148:22, 148:23, 148:24, 149:6, 149:9, 149:15, 149:19, 149:23, 151:3, 152:17, 155:2, 155:7, 155:13, 156:11, 156:17, 156:21, 157:3
**paying** [28] - 11:25, 16:2, 16:3, 20:5, 21:18, 45:7, 49:6, 49:7, 66:12, 67:19, 77:19, 77:22, 81:3, 91:5, 91:6, 96:9, 96:13, 102:2, 107:6, 117:14, 128:10, 128:20, 133:8, 133:11, 148:9, 157:9
**payment** [5] - 17:4, 92:12, 92:19, 98:12, 182:17
**payments** [2] - 92:21, 163:8

July 10, 2023

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

**payroll** [9] - 14:5, 76:3, 76:11, 76:18, 148:20, 148:21, 148:25, 149:22, 155:9

**pays** [3] - 122:3, 149:17, 151:6

**pencils** [2] - 30:14, 164:24

**pens** [1] - 30:14

**people** [53] - 6:5, 9:8, 11:13, 12:24, 13:16, 15:21, 25:3, 25:7, 26:23, 26:25, 27:17, 29:12, 30:2, 30:4, 32:15, 32:18, 34:12, 34:18, 39:23, 40:3, 40:15, 41:1, 41:15, 41:20, 41:23, 42:1, 46:13, 48:4, 48:24, 54:2, 54:3, 54:18, 55:9, 63:6, 64:2, 64:23, 76:11, 76:18, 76:22, 93:20, 97:9, 97:12, 97:13, 98:23, 98:24, 99:1, 99:16, 115:5, 120:1, 120:20, 139:10, 172:20

**people's** [1] - 95:5

**per** [9] - 66:2, 85:6, 85:13, 85:20, 87:17, 89:12, 90:4, 121:16, 180:7

**percent** [5] - 95:3, 105:17, 135:18, 162:7, 163:2

**percentage** [5] - 25:6, 162:15, 163:7, 163:9, 163:10

**perfect** [2] - 144:8, 190:2

**performed** [2] - 12:9, 22:2

**performing** [1] - 11:12

**perhaps** [2] - 104:2, 183:23

**period** [26] - 12:7, 12:23, 15:5, 24:13, 24:21, 24:22, 26:16, 38:19, 38:21, 39:2, 39:4, 39:8, 39:9, 39:12, 40:24, 41:1, 42:3, 42:20, 64:10, 71:12, 85:10, 116:11, 134:1, 152:22, 153:25

**periods** [2] - 39:19, 183:21

**permission** [3] -

64:13, 64:16, 64:17

**permit** [1] - 7:9

**person** [18] - 25:6, 44:4, 65:20, 70:24, 72:5, 72:14, 89:25, 97:17, 98:3, 98:4, 98:7, 106:10, 121:19, 164:6, 170:18, 172:5, 172:8

**person's** [1] - 57:5

**personal** [2] - 53:11, 57:6, 130:21, 179:17

**personally** [5] - 6:8, 12:19, 33:24, 34:1, 94:15

**perspective** [1] - 77:18

**persuasive** [1] - 168:5

**pertained** [1] - 185:18

**phone** [38] - 13:13, 44:4, 51:24, 52:4, 55:19, 55:20, 57:19, 57:20, 63:24, 64:3, 64:19, 65:19, 67:18, 70:19, 70:21, 71:19, 72:9, 80:13, 80:14, 80:16, 81:4, 81:19, 93:21, 129:1, 129:3, 129:6, 129:9, 129:10, 129:18, 129:20, 130:3, 130:4, 130:7, 130:8, 130:14, 130:15, 154:14

**phones** [14] - 15:1, 27:9, 70:13, 129:12, 129:14, 129:15, 129:19, 129:20, 129:24, 130:16, 130:17, 130:20, 130:25, 147:2

**photograph** [1] - 6:3

**phrases** [1] - 10:10

**physical** [2] - 13:13, 150:25

**pick** [7] - 5:9, 65:19, 125:16, 126:1, 126:3, 142:4, 144:11

**picked** [1] - 142:15

**picking** [1] - 67:18

**pictures** [1] - 27:19

**piece** [2] - 6:14, 56:12

**place** [14] - 12:3, 12:5, 17:9, 26:18, 42:2, 80:8, 87:18, 99:8, 101:19, 102:7, 108:25, 129:9, 129:23, 147:18

**placed** [7] - 18:10, 18:11, 18:12, 91:2,

131:1

**placekeeper** [1] - 188:24

**placing** [3] - 129:18, 129:20, 130:24

**plaintiff** [2] - 179:12, 181:24

**Plaintiff** [4] - 4:6, 8:14, 8:16, 172:2

**plaintiff's** [4] - 141:11, 179:11, 179:16, 179:19

**plaintiffs** [2] - 164:17, 172:5

**Plaintiffs** [39] - 1:6, 4:8, 8:20, 8:21, 8:22, 10:21, 10:22, 10:25, 11:8, 26:18, 30:22, 31:3, 58:14, 82:21, 97:3, 101:19, 129:11, 143:18, 143:19, 144:22, 145:6, 158:5, 158:19, 160:1, 160:7, 171:22, 177:19, 178:1, 180:11, 182:14, 182:24, 183:6, 183:12, 183:20, 183:21, 184:9, 185:3, 186:15, 186:22

**PLAINTIFFS** [3] - 1:14, 3:3, 11:9

**Plaintiffs'** [15] - 3:15, 3:15, 3:16, 3:16, 3:17, 78:21, 89:5, 93:9, 115:18, 118:11, 132:22, 175:25, 177:25, 185:2, 188:10

**Plaintiffs....** [1] - 3:22

**plan** [16] - 16:5, 17:5, 38:1, 38:4, 38:5, 39:25, 40:5, 41:2, 41:8, 72:1, 72:2, 72:5, 90:16, 106:18, 120:2

**planning** [1] - 161:10

**plans** [8] - 17:4, 41:21, 42:4, 42:10, 56:25, 90:11, 106:14, 132:17

**platform** [11] - 52:6, 52:7, 52:8, 79:9, 79:10, 79:13, 79:15, 129:21, 129:22, 151:1, 155:6

**play** [2] - 6:21, 21:13

**pled** [6] - 165:23,

166:2, 185:1, 185:9, 185:15, 185:20

**plugged** [2] - 13:12, 57:21

**plus** [1] - 86:1

**pocket** [1] - 109:4

**point** [15] - 77:9, 91:18, 130:22, 147:9, 158:3, 158:5, 171:3, 171:15, 173:1, 173:21, 181:8, 183:20, 184:4, 184:8, 188:19

**pointed** [2] - 174:18, 181:3

**points** [1] - 130:2

**policies** [50] - 12:5, 12:22, 17:9, 18:1, 18:3, 18:10, 41:19, 89:18, 89:21, 90:11, 91:12, 91:24, 96:14, 98:20, 99:3, 99:4, 99:8, 99:20, 100:11, 101:1, 101:2, 102:15, 102:17, 102:24, 103:17, 104:20, 105:7, 106:21, 106:25, 107:4, 116:2, 116:7, 116:18, 117:1, 121:14, 162:7, 162:8, 162:16, 169:2, 169:11, 170:8, 170:10, 170:15, 172:2, 174:7, 174:9

**policy** [40] - 13:20, 17:19, 17:20, 17:21, 18:8, 22:1, 73:12, 87:17, 91:20, 91:23, 92:3, 92:6, 92:16, 93:3, 93:5, 93:20, 94:11, 94:14, 95:2, 96:1, 96:20, 96:21, 96:23, 96:25, 97:16, 97:24, 97:25, 98:3, 98:12, 100:18, 100:23, 108:5, 108:25, 122:4, 133:16, 167:8, 167:15, 168:18, 170:19, 174:2

**policyholder's** [1] - 93:23

**Pollock** [29] - 3:5, 3:5, 3:6, 3:7, 4:7, 23:5, 84:13, 95:20, 96:22, 109:12, 114:2, 114:5, 122:18, 127:10, 127:15,

131:3, 135:5, 135:18, 137:22, 139:5, 140:9, 140:23, 145:5, 168:3, 168:6, 168:21, 170:24, 173:1, 173:15

**POLLOCK** [116] - 1:15, 4:7, 4:11, 4:16, 5:6, 5:10, 11:10, 27:21, 27:24, 29:16, 29:22, 30:22, 31:7, 33:9, 40:2, 40:21, 50:5, 52:13, 53:20, 55:7, 56:1, 56:3, 56:4, 74:17, 78:23, 79:17, 82:10, 82:14, 82:20, 82:25, 83:3, 84:11, 84:14, 86:20, 89:7, 98:18, 106:12, 114:4, 114:6, 115:19, 117:6, 117:8, 117:10, 117:13, 118:12, 132:23, 141:4, 141:12, 141:17, 141:23, 142:1, 142:6, 142:25, 143:2, 143:5, 143:9, 143:13, 143:16, 143:24, 144:1, 144:4, 144:8, 145:4, 155:18, 155:21, 155:23, 157:16, 161:21, 162:10, 162:17, 163:4, 163:11, 163:16, 164:18, 165:13, 165:15, 166:1, 166:24, 168:8, 168:11, 171:5, 173:3, 173:9, 173:12, 175:5, 175:12, 175:18, 175:20, 175:22, 182:9, 182:16, 184:20, 184:24, 185:16, 185:22, 186:3, 186:9, 186:18, 187:11, 187:13, 187:16, 187:20, 188:7, 188:12, 188:15, 188:17, 188:23, 189:3, 189:7, 189:10, 189:15, 189:20, 190:2, 190:6, 190:10, 190:12

**Ponce** [1] - 1:20

**pool** [3] - 63:19, 63:21

July 10, 2023

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

**popped** [1] - 111:22
**portals** [1] - 104:17
**position** [10] - 95:4, 95:8, 145:10, 147:20, 163:24, 167:5, 175:12, 183:24, 184:1, 186:24
**posits** [1] - 172:2
**possession** [1] - 95:15
**possibility** [1] - 130:10
**possible** [2] - 55:13, 85:8
**possibly** [1] - 101:15
**post** [3] - 100:6, 104:17, 160:22
**posted** [3] - 34:11, 34:15, 34:19
**potential** [1] - 13:8
**practical** [1] - 147:17
**practice** [2] - 87:18, 91:18
**praying** [1] - 138:21
**pre-2020** [1] - 173:24
**predicate** [3] - 162:18, 163:4, 163:11
**prejudice** [1] - 8:8
**PRELIMINARY** [1] - 5:14
**Preliminary** [1] - 3:21
**preliminary** [1] - 5:18
**premature** [2] - 9:17
**premium** [1] - 76:9
**premiums** [2] - 76:1, 76:7
**prepare** [1] - 165:8
**prepared** [4] - 105:16, 132:25, 133:4, 187:23
**preparer** [1] - 115:9
**preponderance** [4] - 8:15, 8:25, 9:6, 165:17
**present** [7] - 10:21, 10:25, 11:4, 11:8, 38:1, 110:6, 139:9
**presentation** [1] - 6:20
**presented** [8] - 6:1, 10:7, 11:2, 80:4, 110:3, 174:14, 181:15, 182:23
**presents** [1] - 7:8
**president** [3] - 31:22, 31:24, 54:24
**pretty** [6] - 58:9, 61:15, 73:13, 146:16, 161:14,

176:7
**prevent** [1] - 91:15
**prevented** [1] - 46:16
**preventing** [1] - 81:12
**prevents** [1] - 10:3
**previous** [1] - 135:4
**previously** [1] - 137:19
**pricing** [1] - 71:23
**principal** [1] - 91:14
**principles** [1] - 5:17
**private** [8] - 58:21, 59:1, 59:3, 59:5, 59:8, 86:23, 87:6, 87:12
**privileges** [1] - 28:9
**problem** [4] - 5:10, 21:2, 174:5, 186:17
**procedure** [2] - 73:5, 73:9
**proceed** [4] - 84:9, 143:22, 158:16, 169:17
**proceeding** [1] - 142:23
**proceedings** [21] - 4:1, 5:11, 22:22, 82:19, 83:1, 84:7, 98:17, 144:3, 168:2, 169:14, 170:6, 170:13, 171:10, 173:8, 173:13, 173:17, 176:25, 179:9, 188:2, 190:13, 190:18
**Proceedings............**
**........................** [1] - 3:21
**process** [19] - 35:22, 36:14, 36:17, 37:20, 37:24, 38:9, 38:11, 38:15, 41:16, 63:8, 63:10, 75:18, 78:13, 88:1, 94:11, 94:12, 104:10, 115:1, 115:5
**processes** [2] - 15:15, 61:10
**processing** [6] - 15:17, 54:9, 93:8, 93:10, 93:12, 131:8
**produce** [4] - 46:9, 70:3, 105:23, 133:16
**produced** [9] - 9:3, 101:24, 117:10, 117:11, 118:3, 118:4, 118:9, 118:13, 119:2
**producer** [1] - 107:3
**producing** [6] - 46:10, 91:11, 91:20,

107:13, 107:18, 108:8
**product** [5] - 60:20, 60:23, 69:25, 172:21, 172:22
**production** [1] - 16:3
**products** [6] - 53:12, 70:8, 70:10, 111:25, 166:19, 170:18
**proffer** [3] - 180:11, 180:13
**profit** [2] - 26:22, 27:2
**program** [3] - 51:13, 52:15, 156:18
**programming** [1] - 61:8
**promised** [1] - 10:14
**prone** [1] - 68:5
**prong** [1] - 172:13
**prongs** [2] - 171:16, 174:4
**proof** [2] - 165:17, 165:25
**properly** [5] - 81:2, 130:7, 135:17, 183:8, 186:16
**property** [1] - 170:16
**proposed** [3] - 171:2, 171:6, 174:22
**prospect** [2] - 71:14, 71:20
**protect** [4] - 29:12, 79:19, 92:10
**protected** [1] - 80:5
**protecting** [2] - 80:10, 91:16
**prove** [3] - 6:4, 8:16, 10:20
**proved** [2] - 8:24, 9:6
**proves** [1] - 6:10
**provide** [16] - 5:23, 13:2, 13:3, 13:10, 17:10, 50:17, 51:6, 52:9, 52:14, 54:6, 55:1, 55:23, 74:11, 74:18, 74:22, 108:16
**provided** [34] - 14:14, 14:25, 16:13, 40:16, 50:8, 51:4, 51:6, 51:7, 51:10, 51:22, 52:1, 52:5, 52:22, 52:24, 53:1, 53:3, 53:9, 53:10, 53:12, 53:14, 54:3, 56:6, 62:8, 62:9, 62:10, 62:11, 70:8, 70:23, 71:10, 73:25, 133:19
**provider** [4] - 148:20, 148:22, 148:23, 148:25

**proving** [1] - 8:15
**provision** [1] - 167:19
**public** [6] - 11:12, 172:1, 172:4, 172:12, 172:15, 172:19
**published** [2] - 78:22, 89:6
**pull** [2] - 61:2, 118:20
**punch** [4] - 149:25, 150:22, 150:23
**purchase** [3] - 56:13, 56:14, 56:15
**purchased** [1] - 60:6
**purpose** [5] - 7:20, 7:22, 7:23, 80:17, 81:8
**purposes** [4] - 122:23, 147:17, 166:12, 187:25
**push** [1] - 82:17
**pushing** [1] - 102:5
**put** [25] - 8:19, 12:5, 13:23, 17:18, 18:3, 18:8, 26:5, 48:22, 60:19, 66:11, 77:23, 78:19, 78:25, 80:7, 88:10, 91:11, 93:7, 94:7, 97:7, 104:5, 104:13, 104:15, 126:20, 149:12, 167:23
**putting** [1] - 4:12

**Q**

**qualifications** [2] - 41:10, 162:10
**qualified** [2] - 10:15, 71:23
**qualify** [2] - 170:18, 174:1
**questions** [17] - 6:23, 10:22, 10:24, 23:25, 37:2, 37:5, 82:8, 100:6, 105:10, 105:12, 109:3, 109:4, 109:13, 153:11, 157:17, 158:2
**quick** [3] - 163:23, 173:10, 173:21
**quickly** [1] - 189:13
**Quinta** [3] - 137:23, 137:25, 138:2
**QUINTERO** [2] - 1:9, 4:25
**Quintero** [5] - 31:15, 142:24, 143:12, 143:13, 145:18

**quotes** [1] - 181:21

**R**

**Radius** [1] - 130:15
**Radiusbob** [36] - 56:8, 56:10, 56:20, 57:6, 57:9, 57:16, 60:16, 60:20, 61:2, 61:4, 61:7, 61:17, 61:20, 61:23, 63:2, 63:11, 70:23, 71:1, 71:6, 71:15, 72:3, 72:5, 78:9, 78:10, 78:17, 79:6, 94:13, 94:23, 95:17, 96:3, 99:4, 100:16, 100:20, 101:3, 129:16, 129:25
**rafaela** [1] - 140:23
**RAFAELA** [1] - 1:4
**Rafaela** [36] - 11:19, 15:5, 17:22, 18:11, 19:3, 19:13, 24:22, 34:8, 44:3, 44:9, 46:21, 62:18, 66:21, 71:18, 72:1, 77:4, 78:1, 78:14, 85:6, 85:20, 87:15, 92:2, 92:6, 115:11, 119:7, 119:8, 120:15, 120:24, 121:22, 123:2, 135:19, 135:22, 140:22, 145:6
**rain** [1] - 6:8
**rained** [1] - 6:7
**raise** [5] - 30:25, 95:12, 95:24, 144:19, 150:7
**raised** [5] - 95:13, 95:16, 100:11, 105:4, 116:23
**random** [1] - 63:19
**rate** [2] - 183:17, 187:24
**Raul** [1] - 100:24
**RCortes@**
**AvantAssurance.**
**com** [1] - 131:23
**reach** [1] - 7:24
**read** [6] - 16:22, 112:14, 170:4, 170:5, 172:23, 173:6
**reading** [4] - 90:5, 167:10, 172:9, 173:10
**ready** [4] - 5:4, 5:12, 165:13, 173:18, 173:19

realities [1] - 21:4
really [11] - 14:9,
  14:13, 16:12, 21:10,
  21:19, 22:25, 28:20,
  65:9, 84:18, 127:4,
  178:23
reason [7] - 49:14,
  70:1, 110:25,
  139:16, 140:10,
  140:23, 157:2
reasonable [1] - 65:20
reasonableness [1] -
  8:9
receive [17] - 7:7,
  7:11, 7:13, 12:4,
  54:17, 55:10, 85:20,
  89:19, 93:19,
  102:18, 102:21,
  105:1, 129:22,
  129:23, 129:24,
  130:2, 184:2
received [9] - 53:22,
  67:1, 67:3, 104:4,
  129:25, 130:8,
  132:15, 158:11,
  184:3
recent [1] - 168:15
recess [4] - 83:8,
  141:21, 142:21,
  142:22
recitation [1] - 175:1
recognize [2] - 89:8,
  132:24
recognized [2] -
  162:8, 181:13
recollect [1] - 94:4
recollection [1] - 86:4
recommendation [1] -
  112:15
recommended [11] -
  111:15, 111:16,
  111:18, 111:19,
  112:8, 112:9,
  112:10, 112:11,
  112:12, 112:13,
  115:15
recopying [1] - 28:14
record [10] - 91:14,
  93:14, 95:22, 97:7,
  107:18, 107:21,
  107:25, 108:4,
  169:6, 185:23
record's [1] - 184:21
recorded [5] - 80:14,
  80:16, 80:17, 80:18,
  150:21
recording [3] - 80:20,
  80:22, 80:25
recordings [2] -
  80:13, 81:10

recordkeeping [3] -
  25:13, 27:9, 188:8
records [27] - 19:24,
  20:2, 20:4, 25:14,
  25:17, 94:3, 94:5,
  94:6, 95:14, 95:17,
  96:2, 96:3, 96:8,
  96:10, 99:13, 99:20,
  100:9, 101:5, 102:3,
  103:1, 103:7, 104:5,
  105:22, 121:20,
  121:22, 122:18,
  188:10
recover [3] - 28:22,
  181:24, 183:9
recruit [1] - 34:16
recruiting [1] - 34:10
Redirect [1] - 3:7
redirect [1] - 163:14
REDIRECT [1] -
  163:15
reduce [1] - 19:7,
  183:9
refer [2] - 109:10,
  109:14
referable [1] - 184:24
reference [2] - 58:14,
  95:22
referrals [3] - 34:18,
  53:7, 130:23
referred [2] - 44:5,
  44:8
referring [6] - 35:9,
  36:18, 39:22, 127:5,
  153:1, 167:3
reflect [1] - 185:23
regardless [8] - 9:1,
  9:3, 32:21, 55:19,
  64:4, 93:13, 104:18,
  185:7
registered [1] - 43:2
regular [2] - 104:1,
  187:24
regularly [1] - 160:13
regulation [1] - 171:23
regurgitation [2] -
  186:3, 187:2
Reinier [9] - 3:4, 4:24,
  25:2, 30:3, 30:22,
  31:13, 158:23,
  159:2, 160:16
REINIER [2] - 1:8,
  31:2
reinserted [1] - 165:19
related [8] - 9:8, 98:8,
  100:13, 108:22,
  108:24, 172:3,
  179:12, 179:16
relationship [6] - 82:1,
  107:15, 138:6,

138:14, 138:17,
  138:18
relevance [3] - 50:3,
  55:4, 161:21
relevant [1] - 54:25
reliance [1] - 174:19
relied [1] - 117:15
relief [2] - 181:18,
  181:23
rely [6] - 30:16,
  104:23, 104:25,
  105:6, 105:8, 150:17
remaining [3] -
  144:10, 165:9, 189:5
remarks [2] - 6:19,
  6:20
remedies [1] - 179:19
remedy [1] - 181:2
remember [19] -
  10:17, 30:7, 36:19,
  36:21, 36:25, 37:2,
  37:5, 37:15, 37:16,
  37:20, 136:19,
  150:3, 151:14,
  151:18, 153:15,
  155:15, 156:7,
  156:8, 156:14
remind [1] - 37:14
remove [1] - 182:1
removed [2] - 166:22,
  187:3
removing [1] - 171:2,
  174:22
render [2] - 19:22,
  22:19
renew [2] - 40:5, 40:15
repeat [9] - 32:17,
  34:22, 69:18, 76:16,
  78:13, 131:10,
  135:10, 155:20,
  156:9
repeating [1] - 92:14
rephrase [1] - 104:2
report [3] - 74:12,
  74:23, 75:3
REPORTED [1] - 2:2
REPORTER [15] -
  33:7, 40:1, 52:11,
  53:17, 56:2, 74:15,
  79:14, 86:15, 114:3,
  155:16, 155:20,
  155:22, 169:4,
  176:22, 176:24
reporter [2] - 37:8,
  150:6
Reporter [2] - 2:2,
  190:22
Reporter's [1] - 3:23
reporting [2] - 75:6,
  75:10

represent [1] - 145:6
representante [1] -
  55:3
request [2] - 77:11,
  186:9
requested [1] - 185:8
require [4] - 111:1,
  111:5, 112:7, 180:3
required [8] - 79:21,
  79:23, 108:9, 111:4,
  152:17, 155:12,
  156:11, 188:9
requirement [10] -
  96:16, 96:19,
  108:10, 108:11,
  111:1, 127:13,
  127:15, 127:16,
  170:19, 174:2
requirements [1] -
  169:13
requires [3] - 19:23,
  179:11, 179:15
researches [1] - 185:1
reserve [1] - 141:7
resign [1] - 110:22
resigned [9] - 109:16,
  109:19, 110:17,
  110:20, 111:3,
  111:4, 134:3, 134:5,
  134:11
resigning [1] - 110:25
resolve [2] - 109:15,
  123:24
respond [1] - 157:6
responded [1] - 28:15
response [5] - 28:11,
  37:6, 42:11, 58:7
responsibility [2] -
  20:8, 74:18, 74:22,
  74:23, 94:24
responsible [3] -
  12:19, 148:13,
  148:15
rest [6] - 13:23, 72:11,
  72:14, 82:16,
  127:24, 188:14
restricted [1] - 178:21
restricts [1] - 178:23
restroom [3] - 141:20,
  144:2, 186:6
result [2] - 101:25,
  179:18
resulted [1] - 185:11
resulting [1] - 185:12
retail [20] - 24:5,
  25:10, 26:10, 162:8,
  166:2, 166:7,
  166:11, 166:19,
  170:11, 171:17,
  171:18, 171:24,

171:25, 172:17,
  173:23, 174:6,
  174:9, 186:14,
  187:2, 189:6
retention [1] - 108:13
return [4] - 81:23,
  164:21, 173:15,
  173:18
returns [10] - 25:17,
  68:11, 68:12, 68:15,
  68:17, 68:20, 69:2,
  69:3, 69:5, 69:8
Revenue [1] - 185:5
review [5] - 19:18,
  95:12, 168:21,
  171:8, 188:19
revised [1] - 169:9
revision [1] - 167:23
rewind [1] - 68:25
rid [1] - 121:9
rights [1] - 28:13
ring [5] - 63:23, 63:24,
  64:3, 70:13
ringing [1] - 64:19
rise [3] - 82:4, 141:24,
  165:3
risk [10] - 14:18,
  14:24, 16:11, 16:12,
  65:21, 65:25, 66:2,
  66:5, 66:9
risks [1] - 65:23
role [5] - 6:21, 147:3,
  147:4, 147:15, 155:9
roll [1] - 17:3
room [9] - 11:6, 30:9,
  30:13, 81:17, 81:22,
  82:2, 142:11,
  164:22, 164:25
RPR [2] - 2:2, 190:22
Rule [1] - 165:22
ruled [2] - 173:23,
  187:22
rules [2] - 7:6, 7:9,
  10:4
ruling [1] - 187:24
run [1] - 84:18
running [1] - 81:20
runs [2] - 12:23, 38:21

S

salaried [4] - 48:9,
  48:10, 48:11, 156:24
salary [5] - 23:13,
  24:4, 48:14, 48:21,
  157:9
salary-based [1] -
  23:13
sale [3] - 13:19,
  162:16, 166:18

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

**sales** [19] - 24:5, 24:7, 99:19, 113:6, 158:25, 159:3, 160:23, 161:17, 161:19, 162:6, 162:7, 162:24, 163:1, 167:8, 167:15, 168:18, 187:2, 189:6
**San** [1] - 1:16
**SANTIAGO** [1] - 1:19
**Santiago** [2] - 1:19, 4:22
**SAS** [11] - 54:15, 54:17, 54:18, 54:21, 55:8, 55:12, 55:21, 63:6, 63:14, 71:5, 71:10
**sat** [1] - 21:7
**satisfaction** [3] - 177:6, 177:16, 178:6
**Saturdays** [8] - 26:7, 127:17, 127:18, 127:19, 127:20, 127:22, 127:23, 127:25
**saw** [9] - 6:2, 6:5, 7:2, 7:3, 17:5, 94:21, 154:9, 154:10, 154:23
**sc@cuetolawgroup.com** [1] - 1:21
**scale** [3] - 88:1, 88:25, 106:23
**scales** [2] - 8:21
**schedule** [6] - 48:18, 125:17, 126:1, 126:3, 127:8, 153:8
**scheduled** [1] - 127:3
**schedules** [6] - 15:10, 126:13, 126:16, 127:9, 151:13, 152:24
**scheduling** [2] - 127:4, 127:6
**school** [2] - 23:12, 158:11
**scope** [2] - 27:22, 55:5
**screen** [5] - 56:10, 63:2, 63:3, 71:1
**screenshot** [1] - 56:11
**se** [1] - 180:7
**search** [1] - 9:24
**seat** [1] - 125:14
**seated** [7] - 5:3, 5:15, 31:5, 84:8, 144:18, 144:24, 165:11
**second** [12] - 6:23, 24:19, 51:12, 56:1, 85:9, 104:8, 123:15,

169:15, 175:7, 175:9, 177:4, 187:4
**seconds** [2] - 152:14, 167:22
**secret** [1] - 133:13
**secrets** [2] - 28:9, 28:13
**Section** [1] - 169:12
**section** [1] - 167:9
**secure** [1] - 143:6
**SECURITY** [3] - 82:4, 141:24, 165:3
**security** [1] - 30:13
**see** [64] - 6:8, 8:4, 23:19, 26:8, 27:10, 28:20, 29:8, 30:1, 30:5, 76:3, 81:25, 83:2, 89:8, 94:10, 94:14, 95:20, 96:19, 99:21, 100:7, 100:16, 100:23, 100:25, 101:2, 102:1, 116:2, 116:5, 116:6, 117:4, 118:16, 118:17, 118:18, 118:19, 118:21, 118:25, 119:15, 120:7, 120:8, 120:9, 120:16, 120:19, 121:11, 121:19, 127:20, 128:9, 133:5, 137:12, 138:23, 138:25, 142:6, 152:14, 154:1, 154:18, 154:20, 161:2, 161:4, 161:5, 165:1, 167:21, 168:19, 173:14, 174:25, 182:23
**seeing** [2] - 100:25, 165:6
**seeks** [1] - 181:24
**seem** [1] - 165:17
**sees** [1] - 10:14
**select** [2] - 41:2, 72:1
**selected** [1] - 122:20
**self** [1] - 25:18
**self-employed** [1] - 25:18
**sell** [35] - 12:21, 13:15, 13:18, 15:21, 16:6, 16:7, 25:5, 25:7, 25:22, 32:24, 33:3, 33:6, 33:11, 35:16, 36:1, 36:4, 36:15, 45:12, 45:15, 46:17, 53:13, 69:15, 69:17, 69:19, 69:21, 69:25,

70:7, 90:10, 102:6, 111:25, 127:23, 172:1, 172:12, 172:19
**selling** [7] - 12:22, 35:21, 88:15, 102:14, 127:23, 161:18, 174:8
**sells** [5] - 14:3, 32:14, 106:21, 132:16, 172:14
**send** [15] - 15:15, 19:12, 19:13, 37:25, 61:17, 63:5, 63:18, 79:7, 79:11, 79:24, 92:25, 95:11, 95:25, 96:3, 126:15
**sending** [4] - 63:7, 73:6, 73:10, 95:16
**sends** [1] - 15:3
**sense** [2] - 18:23, 22:8
**sent** [8] - 18:25, 28:6, 79:5, 79:8, 104:1, 104:23, 126:18, 138:21
**separate** [2] - 79:9, 79:10
**series** [2] - 37:2, 145:20
**serve** [1] - 108:15
**service** [23] - 11:12, 21:24, 54:11, 72:8, 72:10, 72:12, 72:13, 72:23, 73:1, 73:20, 73:21, 73:25, 91:9, 91:11, 101:16, 108:16, 108:18, 108:20, 108:23, 109:5, 131:12, 166:7, 166:19
**Service** [1] - 185:5
**serviced** [1] - 21:8
**services** [6] - 161:19, 161:20, 162:6, 166:2, 172:1, 172:16
**servicing** [2] - 108:19, 166:12
**serving** [2] - 9:7, 11:13
**set** [13] - 16:4, 25:15, 25:16, 58:15, 82:15, 149:14, 182:9, 182:11, 182:15, 182:17, 183:8, 183:9, 183:20
**set-off** [7] - 182:9, 182:11, 182:15, 182:17, 183:8, 183:9, 183:20
**setting** [4] - 37:10,

37:13, 108:20, 149:8
**settles** [1] - 171:23
**seven** [5] - 47:3, 47:5, 122:13, 122:22, 123:11
**several** [1] - 143:10
**share** [6] - 30:8, 44:6, 100:2, 100:12, 101:10, 171:4
**Shield** [5] - 69:16, 69:19, 69:23, 90:18, 100:24
**shift** [7] - 152:18, 155:13, 155:14, 156:11, 156:12, 177:22
**shifted** [1] - 147:18
**shifts** [4] - 152:22, 153:4, 157:3, 157:4
**shoes** [1] - 133:20
**short** [1] - 64:10
**shortest** [1] - 42:17
**shortly** [1] - 30:15
**should've** [10] - 11:23, 14:10, 14:13, 16:24, 21:14, 21:15, 28:19, 80:18, 121:24
**show** [52] - 14:12, 15:10, 15:11, 17:11, 18:14, 20:22, 20:25, 23:11, 23:21, 25:23, 25:24, 26:11, 28:1, 28:3, 28:25, 29:5, 29:24, 57:10, 57:16, 63:3, 63:4, 65:4, 68:11, 68:15, 68:17, 68:20, 69:2, 69:3, 69:8, 89:4, 99:13, 99:24, 101:22, 102:3, 102:23, 103:1, 103:2, 103:7, 103:8, 103:10, 115:17, 126:8, 126:22, 169:9, 171:25, 174:24, 176:10, 183:20
**showed** [2] - 102:22, 142:12
**showing** [2] - 96:4, 179:11, 179:15
**shows** [6] - 16:17, 26:5, 71:1, 89:24, 169:1, 182:2
**sic** [2] - 123:16, 138:5
**side** [8] - 8:22, 10:16, 11:7, 142:16, 148:6, 161:16, 161:17, 165:6
**side's** [1] - 6:20
**sides** [1] - 8:21

**sideshow** [1] - 180:18
**sign** [26] - 12:6, 13:16, 13:20, 15:16, 20:13, 20:16, 45:5, 61:19, 73:3, 78:10, 80:1, 91:10, 98:23, 106:17, 110:6, 110:13, 110:19, 110:22, 111:2, 111:6, 111:9, 111:11, 111:14, 112:7, 132:3, 160:2
**signature** [3] - 51:13, 79:12, 79:13
**signatures** [1] - 79:16
**signed** [6] - 18:20, 74:14, 74:15, 78:16, 116:18, 132:2
**signing** [3] - 21:22, 73:6, 110:14
**silence** [2] - 20:11, 20:15
**similar** [6] - 52:7, 107:10, 115:24, 116:6, 116:20, 133:2
**similarly** [1] - 154:23
**simple** [9] - 23:22, 23:24, 57:18, 77:16, 94:11, 94:12, 95:20, 109:1, 119:3
**simpler** [1] - 105:14
**simply** [1] - 6:9
**sister** [1] - 7:2
**sisters** [1] - 27:18
**sit** [7] - 13:6, 62:7, 69:7, 100:10, 124:20, 125:14, 156:17
**sitting** [7] - 16:19, 46:3, 52:4, 128:8, 154:14, 154:20, 155:25
**situation** [2] - 23:9, 139:8
**six** [8] - 20:9, 87:10, 87:12, 108:24, 112:22, 122:12, 122:22, 123:11
**skills** [3] - 58:2, 58:10, 62:7
**slower** [1] - 33:8
**small** [3] - 28:20, 58:22, 86:22
**smelled** [1] - 6:2
**Smith** [3] - 100:21, 100:23, 100:24
**SMK** [1] - 181:8
**SMK's** [2] - 181:12, 181:14
**social** [1] - 9:23

society [1] - 11:15
Softphone [2] - 13:12, 51:25
software [24] - 13:4, 15:1, 15:2, 16:14, 18:9, 18:16, 21:8, 51:10, 53:1, 53:3, 53:4, 56:7, 56:12, 56:16, 57:2, 57:11, 57:17, 59:23, 60:15, 61:12, 78:9, 79:6, 79:11, 80:15
softwares [2] - 51:17, 51:19
sold [28] - 14:21, 16:8, 17:25, 25:5, 25:6, 38:18, 41:19, 92:3, 94:8, 94:11, 95:23, 96:23, 96:25, 97:24, 98:3, 98:20, 99:13, 99:14, 99:15, 99:20, 100:23, 101:1, 102:12, 102:16, 106:25, 116:1, 116:7
solicit [1] - 34:12, 46:9
someone [2] - 6:2, 160:13
sometime [1] - 149:5
sometimes [5] - 7:16, 72:16, 97:2, 119:20, 119:25
somewhat [1] - 174:16
somewhere [3] - 65:17, 136:1, 160:13
sorry [33] - 31:19, 33:7, 40:1, 51:18, 52:11, 53:17, 56:3, 79:14, 86:16, 86:17, 89:15, 105:11, 107:8, 114:3, 115:21, 117:3, 148:23, 154:5, 155:16, 156:2, 158:9, 159:1, 161:24, 163:18, 165:15, 167:9, 168:25, 169:4, 169:8, 169:16, 169:23, 176:18, 179:1
sorted [2] - 119:10, 119:13
sounds [1] - 142:8
source [2] - 10:12, 95:14
sources [1] - 63:13
Southern [2] - 181:9, 181:20
SOUTHERN [1] - 1:1

space [5] - 16:14, 58:20, 58:22, 58:23, 59:1
speaking [2] - 70:15, 169:6
special [2] - 10:10, 133:13
specific [4] - 63:18, 66:14, 90:10, 167:7
specifically [5] - 156:23, 166:8, 167:7, 169:11, 181:16
spell [2] - 143:1, 144:25
spelling [1] - 131:23
spend [2] - 65:22, 66:1
spending [1] - 14:21
spent [2] - 14:19, 139:3
sporadically [1] - 161:2
spreadsheet [25] - 104:15, 115:22, 116:1, 116:3, 116:5, 116:9, 116:15, 116:17, 116:25, 117:1, 117:2, 117:4, 117:15, 117:17, 117:20, 117:25, 119:14, 120:5, 121:2, 123:10, 124:1, 132:19, 132:25, 133:4, 133:19
spreadsheets [1] - 104:13
staff [1] - 152:13
stand [1] - 84:4
standard [8] - 91:13, 92:7, 92:8, 108:13, 112:3, 176:7, 178:19, 186:19
Standards [1] - 12:20
standards [2] - 111:20, 111:21
standing [1] - 107:15, 107:20, 107:21, 107:25, 108:5
standpoint [1] - 107:17
start [24] - 13:7, 13:14, 13:15, 35:21, 57:10, 59:15, 60:16, 62:10, 63:6, 63:11, 63:17, 87:25, 105:12, 143:18, 148:20, 148:24, 151:16, 151:21, 152:17,

155:3, 155:13, 156:11, 157:3, 157:4
started [31] - 25:2, 27:19, 28:5, 28:6, 42:19, 44:20, 44:23, 59:16, 74:5, 74:8, 77:4, 84:23, 85:3, 85:6, 85:9, 88:7, 132:13, 134:15, 135:25, 145:12, 146:4, 146:8, 146:17, 147:6, 147:21, 148:24, 149:5, 149:6, 154:3, 154:6, 180:15
starts [6] - 17:2, 59:23, 64:19, 119:6, 119:11, 187:20
State [5] - 24:8, 32:24, 43:2, 114:24, 115:8
state [7] - 4:4, 45:15, 69:11, 69:21, 91:2, 144:24, 180:15
statement [46] - 10:17, 10:18, 17:17, 17:23, 17:25, 18:4, 80:3, 80:9, 92:25, 93:2, 93:16, 93:18, 93:24, 94:7, 94:9, 94:13, 94:21, 95:21, 98:14, 100:12, 101:14, 103:25, 104:4, 104:8, 104:12, 104:14, 104:16, 104:25, 116:14, 117:21, 117:23, 117:24, 118:1, 118:2, 118:3, 118:4, 118:8, 132:25, 134:2, 134:9, 134:25, 183:11, 186:20, 186:21
Statement [2] - 3:22, 3:22
STATEMENT [2] - 11:9, 22:21
statements [21] - 6:17, 6:18, 11:7, 18:14, 78:24, 79:2, 94:19, 95:11, 95:15, 95:18, 99:5, 99:17, 99:25, 100:3, 101:6, 101:10, 101:22, 102:23, 103:24, 104:18, 105:17
States [2] - 185:5, 190:22
STATES [2] - 1:1, 1:12
states [1] - 33:2
stating [1] - 169:13

stations [1] - 59:20
status [2] - 185:4, 190:4
statute [1] - 175:23
statutory [4] - 183:6, 183:10, 183:22, 188:12
stay [3] - 19:17, 124:22, 126:10
stayed [2] - 142:14, 147:20
staying [1] - 67:19
stays [1] - 23:18
stealing [1] - 19:2
stems [1] - 166:5
step [4] - 72:7, 121:6, 141:9, 173:9
STEPHANIE [2] - 2:2, 190:22
Stephanie_McCarn @flsd.uscourts. gov [1] - 2:5
steps [1] - 61:10
still [26] - 41:11, 49:21, 73:5, 82:6, 85:21, 93:13, 105:14, 107:13, 107:18, 107:21, 107:25, 110:13, 113:11, 122:20, 123:6, 125:7, 128:25, 131:8, 131:11, 131:16, 131:20, 137:10, 157:11, 159:21, 168:14, 171:25
stop [4] - 28:7, 28:8, 81:14, 155:3
stopped [4] - 134:23, 135:8, 135:13, 135:16
store [1] - 60:14
straight [3] - 86:14, 86:18, 152:12
straightforward [1] - 91:3
stricken [4] - 161:22, 163:5, 165:19, 186:10
striking [3] - 7:17, 175:6, 186:14
struck [1] - 165:21
structure [4] - 34:20, 88:10, 88:13, 90:12
stuck [1] - 26:23
stuff [2] - 28:14, 164:3
subject [1] - 171:1
submission [1] - 187:10
submissions [1] -

12:7
submit [3] - 38:4, 172:7, 185:9
submitted [4] - 175:15, 178:18, 180:1, 181:6
subscriptions [2] - 51:17, 51:19
Subsection [6] - 168:24, 169:1, 170:25, 172:24, 172:25, 173:6
substantial [1] - 102:17
substantiate [1] - 182:15
successful [1] - 185:19
sudden [2] - 64:3, 183:14
sued [6] - 19:3, 158:19, 158:23, 158:24, 159:9, 159:11
suffered [2] - 153:13, 179:17
suggests [1] - 7:1
suing [1] - 12:17
Suite [1] - 1:16, 1:20
sum [1] - 120:10
summarize [1] - 11:4
summary [3] - 118:13, 121:7, 172:9
Sundays [1] - 26:7
super [1] - 19:15
supervisor [1] - 155:8
supplemental [1] - 132:16
support [2] - 13:14, 13:22
supports [1] - 167:4
suppose [1] - 177:10
supposed [5] - 10:18, 45:15, 94:5, 102:20, 141:14
Supreme [2] - 166:6, 174:20
surgery [1] - 64:8
surprised [1] - 116:22
surveyed [2] - 166:17, 168:11
sustain [2] - 7:12, 7:14
sustained [5] - 29:18, 162:11, 162:19, 163:5, 163:12
swear [1] - 150:7
sweater [1] - 4:12
switch [6] - 42:4, 125:12, 125:13,

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

125:15, 148:9,
148:13
**swore** [2] - 37:8, 58:4
**sworn** [2] - 5:16,
37:12
**system** [21] - 11:16,
22:25, 23:15, 51:24,
51:25, 52:4, 71:3,
71:4, 71:15, 94:4,
129:1, 129:4, 129:6,
129:10, 150:1,
150:23, 150:24,
150:25, 151:2, 151:3

# T

**table** [2] - 4:8, 177:25
**talks** [5] - 89:18,
166:6, 166:10, 175:7
**taught** [1] - 25:3
**tax** [14] - 25:17, 66:11,
68:11, 68:12, 68:15,
68:17, 68:20, 69:3,
69:4, 69:7, 77:18,
115:9
**taxes** [10] - 14:5,
20:24, 74:12, 75:11,
75:14, 75:16, 76:12,
76:18, 113:19
**teacher** [1] - 23:12
**team** [7] - 13:22,
54:11, 73:20, 73:21,
73:25, 91:9, 91:11
**teams** [1] - 54:12
**technical** [1] - 106:10
**technicalities** [1] -
161:17
**technology** [1] - 9:19
**temporarily** [2] - 83:7,
141:10
**ten** [9] - 27:1, 35:17,
36:9, 37:22, 58:19,
58:23, 141:21,
142:21, 145:25
**ten-minute** [2] -
141:21, 142:21
**tenants** [2] - 53:16,
53:19
**terminate** [1] - 137:15
**terms** [1] - 158:21
**test** [2] - 21:10, 172:13
**testified** [3] - 31:3,
143:13, 144:22
**testify** [2] - 19:18,
143:8
**testifying** [2] - 8:5, 8:6
**testimony** [16] - 6:2,
7:25, 8:3, 8:9, 8:10,
9:1, 10:6, 25:15,
28:1, 30:17, 30:19,

82:7, 150:9, 150:11,
150:16
**Texas** [11] - 33:3,
33:11, 69:13, 69:20,
90:19, 166:15,
166:16, 168:6,
168:9, 169:18,
174:10
**text** [1] - 9:22
**TFB** [2] - 170:18,
174:1
**THE** [211] - 1:12, 1:14,
1:19, 3:3, 3:10, 4:2,
4:4, 4:10, 4:15, 4:17,
4:20, 5:2, 5:9, 5:12,
5:13, 5:15, 11:9,
22:20, 22:21, 27:25,
29:18, 29:25, 30:6,
30:24, 31:4, 31:5,
33:7, 40:1, 40:19,
40:20, 50:4, 52:11,
53:17, 53:19, 55:6,
56:2, 74:15, 74:16,
79:14, 79:15, 81:14,
82:6, 82:12, 82:18,
82:23, 83:2, 83:5,
83:6, 84:3, 84:6,
84:8, 84:13, 86:15,
86:17, 106:10,
114:3, 141:5, 141:8,
141:11, 141:16,
141:19, 142:3,
142:8, 142:12,
142:19, 142:20,
142:21, 142:23,
143:1, 143:3, 143:8,
143:11, 143:15,
143:22, 143:25,
144:6, 144:9,
144:15, 144:18,
144:23, 144:24,
145:1, 155:16,
155:20, 155:22,
157:15, 157:19,
158:7, 158:13,
158:16, 161:23,
161:25, 162:3,
162:11, 162:18,
163:5, 163:12,
163:14, 164:15,
164:17, 164:20,
165:6, 165:12,
165:14, 165:21,
166:23, 166:25,
167:4, 167:9,
167:13, 167:17,
167:21, 167:25,
168:3, 168:10,
168:13, 168:20,
168:25, 169:4,
169:5, 169:16,

169:22, 169:24,
170:1, 170:3,
170:21, 170:24,
171:7, 171:12,
172:9, 172:23,
173:1, 173:4, 173:6,
173:11, 173:15,
173:18, 174:11,
174:13, 174:16,
175:11, 175:16,
175:19, 175:21,
175:24, 176:4,
176:9, 176:11,
176:13, 176:16,
176:18, 176:20,
176:22, 176:24,
177:4, 177:8,
177:10, 177:14,
177:18, 177:23,
178:2, 178:5, 178:8,
178:13, 178:15,
178:17, 178:24,
179:2, 179:4, 179:7,
179:22, 179:25,
180:3, 180:10,
181:3, 182:8,
182:11, 182:22,
183:23, 184:3,
184:5, 184:8,
184:16, 184:18,
184:23, 185:14,
185:17, 186:1,
186:7, 186:11,
187:4, 187:10,
187:12, 187:15,
187:18, 188:1,
188:3, 188:8,
188:13, 188:16,
188:18, 189:2,
189:5, 189:8,
189:12, 189:19,
189:23, 190:1,
190:3, 190:8, 190:11
**theft** [1] - 91:15
**theirs** [1] - 15:19
**themselves** [9] - 6:21,
21:9, 97:8, 98:10,
103:22, 104:8,
119:21, 126:14,
133:18
**theory** [1] - 185:15
**they've** [3] - 103:15,
103:16, 138:7
**thinks** [1] - 7:9
**third** [7] - 24:20, 98:8,
98:9, 123:16,
172:13, 177:6
**third-party** [1] - 98:8
**thirds** [1] - 177:12
**Thirteenth** [2] - 2:3,

190:23
**thousand** [2] - 120:20,
131:1
**thousands** [2] -
106:25, 107:3
**threatened** [1] - 139:7
**three** [18] - 24:15,
24:20, 26:9, 28:18,
47:1, 59:2, 71:8,
86:23, 88:20,
105:10, 108:24,
119:25, 136:9,
136:11, 139:23,
141:1, 143:18,
175:23
**three-year** [1] - 175:23
**threw** [1] - 114:7
**throughout** [2] - 22:8,
182:4
**time-keeping** [2] -
150:1, 150:23
**timing** [1] - 190:7
**tip** [1] - 8:22
**today** [22] - 4:19,
22:24, 58:5, 69:7,
73:7, 82:13, 103:11,
111:24, 113:7,
133:16, 138:21,
142:2, 143:17,
147:24, 148:3,
150:11, 156:17,
157:10, 157:11,
158:20, 164:18,
185:14
**together** [7] - 26:5,
78:25, 104:13,
104:15, 121:7,
138:6, 138:7
**tolls** [2] - 65:22, 66:1
**tomorrow** [10] - 82:16,
103:11, 143:17,
143:19, 164:21,
165:2, 188:19,
189:9, 189:10,
189:16
**took** [9] - 13:8, 27:19,
36:24, 130:15,
150:19, 180:14,
180:22, 186:12
**top** [2] - 118:18,
187:14
**total** [6] - 35:18, 36:9,
66:1, 116:2, 116:6,
120:6
**totally** [1] - 108:8
**tough** [2] - 16:22,
59:23
**TOUSSAINT** [1] - 1:14
**Toussaint** [2] - 4:5,
11:18

**toussaint@**
**fairlawattorney.**
**com** [1] - 1:17
**towards** [1] - 133:9
**track** [3] - 48:8, 48:16,
155:2
**tracking** [2] - 48:4,
49:3
**tracks** [2] - 15:3, 151:6
**trade** [1] - 28:13
**traditionally** [1] -
181:22
**training** [2] - 57:18,
147:4
**transaction** [4] -
13:24, 54:13, 73:19,
80:11
**transactions** [2] -
166:11, 166:12
**transcription** [1] -
190:18
**transfer** [5] - 13:22,
55:17, 70:18, 71:15,
72:7
**transition** [1] - 149:8
**transitioned** [1] -
160:24
**translator** [3] - 143:14,
189:15, 189:17
**trashed** [2] - 169:22,
169:24
**travel** [2] - 146:24,
161:10
**traveling** [1] - 136:20
**travelled** [1] - 139:2
**Treasury** [1] - 185:5
**treated** [5] - 139:25,
140:2, 158:25,
160:22, 160:23
**treatment** [3] - 171:1,
174:13, 182:4
**trial** [11] - 5:17, 5:20,
6:15, 8:12, 9:17,
10:16, 81:20, 142:4,
144:10, 164:23,
165:25
**TRIAL** [1] - 1:11
**tried** [4] - 30:4,
127:21, 137:14,
137:16
**tries** [1] - 55:12
**TROPP** [91] - 1:22,
4:18, 4:21, 22:23,
27:23, 28:2, 29:19,
30:1, 40:18, 50:2,
55:4, 83:4, 117:3,
117:7, 117:9,
117:12, 141:7,
144:14, 157:21,
158:17, 158:18,

July 10, 2023

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

161:24, 162:2,
162:4, 162:12,
162:13, 162:20,
163:6, 163:13,
167:2, 167:6,
167:11, 167:14,
167:18, 167:22,
168:1, 168:17,
168:22, 169:1,
169:8, 169:15,
169:20, 169:23,
169:25, 170:2,
170:5, 170:7,
170:14, 170:23,
171:11, 171:13,
172:11, 172:25,
173:5, 173:14,
173:20, 174:12,
174:15, 176:2,
176:6, 176:10,
176:12, 176:15,
176:17, 176:19,
176:21, 176:23,
177:1, 177:7, 177:9,
177:12, 177:16,
177:21, 178:11,
178:14, 178:16,
178:19, 179:1,
179:3, 179:5,
179:10, 179:24,
180:2, 180:6,
180:13, 182:7,
183:4, 184:17,
186:12, 187:9,
189:25
**Tropp** [16] - 1:23, 3:7,
4:21, 144:9, 157:16,
158:7, 158:16,
170:4, 170:21,
171:8, 173:2,
173:10, 178:25,
181:3, 185:14,
189:24
**Tropp's** [1] - 183:25
**trouble** [2] - 168:23,
169:8
**true** [23] - 6:25, 8:17,
9:5, 31:24, 32:25,
45:18, 54:4, 54:16,
56:13, 57:25, 69:20,
77:23, 88:19, 91:10,
91:23, 92:18, 99:1,
109:19, 109:21,
117:14, 149:18,
150:16, 152:19
**truly** [1] - 22:23
**trump** [1] - 137:22
**Trump** [1] - 138:2
**trust** [9] - 18:7, 18:8,
18:12, 18:17, 18:18,

95:4, 95:8, 95:9
**truth** [11] - 23:18,
23:22, 37:8, 37:13,
37:14, 58:4, 58:5,
95:14, 150:7
**truthfully** [1] - 157:7
**try** [13] - 11:19, 15:16,
18:22, 18:23, 23:17,
29:9, 40:5, 55:22,
73:3, 73:11, 105:13,
127:20, 139:11
**trying** [4] - 77:2,
109:14, 180:18,
184:8
**turn** [2] - 22:25,
170:25
**tutorials** [2] - 57:14,
57:15
**twice** [1] - 132:17
**Twitter** [1] - 9:24
**two** [32] - 25:24,
25:25, 39:5, 85:4,
85:15, 89:10, 97:9,
97:12, 97:13, 97:14,
102:15, 119:8,
119:25, 122:19,
124:25, 125:1,
125:8, 130:8,
133:14, 133:23,
133:25, 139:21,
139:23, 140:21,
141:1, 167:22,
168:15, 171:16,
174:4, 177:12
**two-page** [1] - 89:10
**two-thirds** [1] - 177:12
**type** [2] - 58:2, 58:11
**typical** [1] - 24:4
**typically** [1] - 151:10

## U

**U.S** [3] - 11:15, 166:6,
174:20
**Uber** [8] - 52:9, 52:14,
52:18, 52:19, 52:21,
52:22, 52:24, 53:1
**ulterior** [1] - 180:18
**ultimately** [5] - 22:19,
23:5, 29:2, 172:11,
176:3
**um-hmm** [1] - 161:1
**umbrellas** [1] - 6:6
**uncertain** [2] - 140:23,
140:24
**unclean** [19] - 178:9,
178:17, 179:11,
179:15, 179:23,
180:4, 180:10,
180:25, 181:6,

181:13, 181:14,
181:17, 181:22,
181:25, 184:22,
185:3, 185:12,
185:15, 185:17
**unclear** [1] - 187:21
**under** [24] - 12:7,
12:15, 12:20, 24:1,
25:13, 28:18, 29:11,
29:20, 37:8, 37:12,
58:13, 82:6, 106:17,
119:24, 167:16,
168:22, 168:23,
169:10, 170:9,
172:23, 177:8,
182:16, 189:6
**underlined** [3] -
186:10, 187:1, 187:5
**underlining** [1] -
188:4
**understood** [9] - 37:7,
37:16, 40:11, 46:15,
114:7, 139:12,
150:14, 185:22,
190:10
**underwriting** [3] -
172:14, 172:18,
172:19
**unfortunate** [1] -
139:8
**unfortunately** [1] -
139:17
**unhid** [1] - 119:9
**unhide** [1] - 119:3
**unison** [2] - 27:17,
28:15
**UNITED** [2] - 1:1, 1:12
**United** [2] - 185:4,
190:22
**UnitedHealth** [2] -
90:18, 118:15
**UnitedHealthcare** [1]
- 35:17
**unjust** [4] - 28:22,
177:11, 178:20,
180:9
**unjustly** [1] - 12:8
**unless** [3] - 7:4, 8:25,
171:3
**unrelated** [1] - 108:8
**untenable** [1] - 166:22
**up** [81] - 12:6, 13:16,
13:20, 15:11, 15:16,
16:6, 16:7, 18:20,
19:9, 21:22, 22:6,
22:13, 22:15, 23:11,
25:3, 25:16, 25:23,
25:24, 26:10, 26:11,
26:24, 27:6, 27:23,
28:5, 35:20, 45:5,

46:4, 56:10, 58:16,
59:17, 59:19, 61:2,
65:4, 65:19, 67:18,
71:1, 72:10, 72:13,
73:3, 73:6, 77:24,
78:10, 78:16, 78:19,
82:15, 91:10, 94:13,
98:23, 106:13,
106:17, 108:20,
108:21, 108:24,
111:22, 114:23,
115:6, 115:7,
115:10, 116:18,
119:12, 120:5,
120:10, 122:5,
122:19, 125:15,
126:8, 126:22,
144:12, 149:9,
149:14, 170:11,
177:10, 180:21,
183:1, 188:21
**USC** [1] - 169:12
**uses** [3] - 10:10, 73:5,
73:9
**utilize** [2] - 75:4, 75:6
**utilizing** [1] - 75:9

## V

**Valentines** [1] - 26:14
**VALIENTE** [1] - 1:5
**Valiente** [7] - 4:13,
114:23, 116:1,
116:3, 116:9,
116:21, 116:25
**Valiente's** [1] - 77:10
**varies** [1] - 90:24
**vehicle** [2] - 52:23,
52:25
**vendor** [1] - 71:7
**vendors** [1] - 130:3
**verbally** [1] - 16:25
**verdict** [12] - 7:24,
10:13, 22:4, 24:1,
29:19, 165:10,
179:8, 179:23,
180:4, 181:7, 185:7,
188:22
**verify** [2] - 99:21,
103:23
**version** [2] - 61:2,
188:18
**versus** [1] - 187:7
**via** [1] - 13:12
**vice** [1] - 31:24
**videos** [1] - 57:13
**view** [1] - 30:13
**violating** [1] - 100:14
**vision** [1] - 132:17
**visitor** [2] - 53:16,

53:17
**voice** [3] - 58:2, 58:9,
62:7
**vs** [8] - 1:7, 166:5,
166:13, 166:14,
168:6, 169:18,
174:19, 181:8

## W

**W-2** [5] - 14:10, 23:10,
148:2, 153:4, 158:4
**W-2s** [6] - 20:25,
25:19, 148:16,
159:7, 159:8, 160:25
**W-9** [7] - 74:11, 74:14,
74:16, 74:19, 74:20,
75:4, 75:6
**wage** [25] - 23:4,
23:24, 24:17, 24:18,
24:24, 25:11, 26:25,
28:3, 28:15, 28:18,
29:7, 29:13, 29:20,
180:19, 183:7,
183:10, 183:12,
183:13, 183:14,
183:22, 184:3,
184:5, 184:9, 184:12
**wages** [13] - 11:22,
11:24, 12:11, 12:19,
14:7, 19:16, 49:6,
160:19, 181:1,
182:14, 182:18,
183:6, 184:2
**wait** [2] - 22:14,
173:15
**waiting** [1] - 64:2
**waive** [2] - 20:11,
20:16
**walk** [10] - 10:16, 13:6,
14:22, 16:15, 58:18,
124:1, 152:6, 152:7,
152:8
**walked** [3] - 14:21,
21:7, 142:13
**walking** [1] - 6:6
**wants** [1] - 172:7
**Warren** [1] - 142:19
**waste** [1] - 144:13
**water** [1] - 51:21
**ways** [2] - 10:10,
80:10
**web** [1] - 60:21
**website** [3] - 60:24,
74:20, 156:18
**websites** [1] - 9:23
**Wednesday** [1] -
142:4
**week** [12] - 24:18,
24:23, 26:6, 26:9,

July 10, 2023

Delio Batista, et al. v. Avant Assurance, Inc., et al., 22-cv-22671-CMA

132:18, 136:9,
136:11, 139:2,
139:21, 140:21,
145:25
**weekly** [1] - 132:17
**weeks** [9] - 24:14,
139:23, 141:1,
149:4, 153:19,
153:20, 153:24
**weight** [2] - 6:14,
30:18
**welcome** [1] - 142:20
**West** [1] - 176:20
**Western** [2] - 166:16,
168:8
**Westlaw** [3] - 168:14,
168:15, 181:9
**wet** [2] - 6:5, 6:6
**whereas** [2] - 88:24,
181:24
**whole** [19] - 22:25,
23:23, 25:8, 27:14,
28:3, 53:7, 85:16,
87:4, 87:5, 88:18,
117:4, 139:3,
168:21, 175:8,
177:12, 180:19,
185:2, 187:1
**wife** [10] - 12:18, 25:2,
30:3, 31:24, 57:16,
59:5, 80:25, 94:17,
94:20, 138:5
**wife's** [2] - 93:7,
101:15
**Williams** [1] - 181:10
**wire** [1] - 92:22
**wish** [1] - 30:6
**withdrawing** [1] -
178:5
**withhold** [1] - 75:16
**WITNESS** [11] - 31:4,
40:19, 53:19, 74:16,
79:15, 83:6, 86:17,
144:23, 145:1,
157:19, 162:3
**Witness** [3] - 83:7,
141:10, 164:16
**witness** [25] - 6:5, 6:7,
7:1, 7:3, 7:4, 7:7,
7:10, 7:12, 8:1, 8:5,
8:7, 8:8, 30:21, 31:3,
82:9, 82:12, 82:22,
84:3, 84:4, 141:11,
141:16, 142:24,
144:6, 144:10,
144:22
**witness's** [8] - 7:5,
8:3, 8:4, 8:6, 8:9,
8:10, 8:13
**WITNESSES** [3] - 3:2,

3:3, 3:10
**witnesses** [12] - 9:1,
10:21, 10:23, 10:24,
10:25, 19:18, 30:7,
30:11, 82:16,
144:10, 164:17
**witnesses'** [1] - 6:24
**wizard** [1] - 17:14
**word** [6] - 34:17, 44:1,
53:18, 103:16,
103:20, 123:14
**words** [10] - 10:10,
24:9, 48:22, 66:17,
67:21, 76:21, 77:23,
88:7, 145:21, 148:20
**workers** [1] - 29:14
**Workers** [8] - 14:6,
75:20, 75:23, 76:1,
76:6, 76:9, 76:12,
76:19
**workforce** [1] - 14:2
**works** [8] - 23:8,
23:15, 25:10, 25:22,
26:10, 32:1, 76:8,
133:16
**workspace** [1] - 13:3
**workstation** [3] - 13:3,
125:13, 125:14
**workstations** [3] -
86:22, 87:13, 129:14
**workweek** [1] - 26:5
**worth** [1] - 88:19
**would've** [14] - 18:2,
20:24, 26:18, 34:11,
67:21, 67:24, 93:11,
106:25, 107:2,
107:3, 116:24,
134:15, 164:6, 164:7
**writes** [1] - 181:16
**writing** [1] - 89:21
**written** [5] - 16:5,
17:5, 22:2, 91:20,
107:4
**wrongdoing** [2] -
179:12, 179:16
**wrote** [4] - 92:6,
92:16, 181:11

## Y

**year** [25] - 17:2, 17:4,
38:22, 39:25, 40:5,
40:6, 43:12, 74:24,
85:5, 85:16, 87:1,
87:18, 88:18, 88:25,
99:15, 102:10,
116:10, 135:23,
135:24, 136:2,
148:11, 153:11,
154:12, 168:4,

175:23
**years** [4] - 27:1, 34:18,
39:6, 138:7
**yourself** [6] - 35:4,
74:6, 109:15,
139:25, 140:2, 173:6
**yourselves** [1] - 21:18
**YouTube** [1] - 57:13

## Z

**zero** [3] - 168:23,
168:24, 168:25
**zip** [1] - 46:4
**zip-up** [1] - 46:4
**Zoom** [6] - 36:23,
37:11, 139:10,
150:4, 155:24, 156:7
**zoom** [1] - 121:11