1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
2                    MIAMI DIVISION
               CASE NO. 22-cv-22671-CMA
3

4   DELIO BATISTA, CARLOS LOPEZ,     Miami, Florida
    MARIANA LOPEZ and RAFAELA
5   VALIENTE,                        July 11, 2023

6         Plaintiffs,                8:24 a.m. to 6:09 p.m.

7      vs.                           Courtroom 13-3

8   AVANT ASSURANCE, INC.,           (Pages 1 to 206)
    REINIER CORTES and ANDREA
9   GONZALEZ QUINTERO,

10         Defendants.
   _____
11
                    JURY TRIAL - DAY 2
12       BEFORE THE HONORABLE CECILIA M. ALTONAGA,
             CHIEF UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

     FOR THE PLAINTIFFS:    BRIAN H. POLLOCK, ESQ.
15                          TOUSSAINT M. CUMMINGS, ESQ.
                            FairLaw Firm
16                          135 San Lorenzo Ave, Ste 770
                            Coral Gables, FL 33146-1878
17                          (305) 230-4884
                            brian@fairlawattorney.com
18                          toussaint@fairlawattorney.com

19   FOR THE DEFENDANTS:    DANIEL E. TROPP, ESQ.
                            Law offices of Daniel E. Tripp, Esquire
20                          5750 Collins Ave, Apt 4A
                            Miami Beach, FL 33140-2316
21                          (305) 814-2035
                            dantropp@bellsouth.net
22
                            SANTIAGO A. CUETO, ESQ.
23                          Santiago A. Cueto
                            2100 Ponce De Leon Blvd., Ste 1250
24                          Coral Gables, FL 33134-5267
                            (305) 777-0377
25                          sc@cuetolawgroup.com

1    APPEARANCES CONTINUED:

2

      Also Present:          Jose Vega, Interpreter
3

4    REPORTED BY:            STEPHANIE A. McCARN, RPR
                             Official Court Reporter
5                            400 North Miami Avenue
                             Thirteenth Floor
6                            Miami, Florida 33128
                             (305) 523-5518
7                            Stephanie_McCarn@flsd.uscourts.gov

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

2                             **WITNESSES**

3
    **WITNESSES FOR THE PLAINTIFFS:**                    **Page**
4
    **Alix Ledesma**
5       Direct Examination by Mr. Cummings                  **5**
        Cross-examination by Mr. Tropp                     **33**
6       Redirect examination by Mr. Cummings               **50**
        Recross Examination by Mr. Tropp                   **54**
7   **Mariana Lopez Alcala**
        Direct Examination by Mr. Pollock                  **56**
8       Cross-examination by Mr. Tropp                    **101**
        Redirect Examination by Mr. Pollock               **120**
9   **Rafaela Valiente**
        Direct Examination by Mr. Cummings                **121**
10      Cross-Examination by Mr. Tropp                    **170**

11

12
    **WITNESSES FOR THE DEFENDANTS:**                     **Page**
13                                                          **--**

14

15  **EXHIBITS IN EVIDENCE**          **IDENTIFIED**    **ADMITTED**

16
    **Defendants' Exhibit No.**              **--**         **--**
17
    **Plaintiffs' Exhibit No. 3**            **92**         **--**
18  **Composite Exhibit No. 4**              **19**         **--**
    **Plaintiffs' Exhibit No. 4**            **60**         **--**
19  **Composite Exhibit No. 7**              **24**         **--**
    **Composite Exhibit No. 13**            **139**         **--**
20  **Plaintiffs' Exhibit No. 20**          **132**         **--**

21

22
                            **MISCELLANEOUS**
23
                                                        **Page**
24  **Proceedings.......................................**   **4**
    **Court Reporter's Certificate.....................**  **185**
25

Proceedings
July 11, 2023                                                    4
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1           (The following proceedings were held at 8:24 a.m.)

 2              COURT SECURITY OFFICER:  All rise.

 3              THE COURT:  Good morning.  You may be seated.  You are

 4      aware that our one juror has not come.  Are we ready to proceed

 5      without him?

 6              MR. POLLOCK:  Ready, Your Honor.

 7              MR. CUETO:  Ready, Your Honor.

 8              MR. TROPP:  Yes, Judge.

 9              THE COURT:  All right.  Let's bring the jury in.

10              COURT SECURITY OFFICER:  All rise for the jury,

11      please.

12              THE COURT:  Who is your next witness?

13              MR. POLLOCK:  Alix Ledesma.

14              THE COURT:  Bring him [sic] up, please.

15           (The jury entered the courtroom at 8:25 a.m.)

16              THE COURT:  Good morning, ladies and gentlemen.  My

17      apologies for keeping you waiting.  Please be seated.

18              To the witness, please raise your right hand.

19                       (Time 8:26 a.m.)

20                       ALIX LEDESMA,

21      a witness for the Plaintiff, testified as follows:

22              THE WITNESS:  Yes, I swear.

23              THE COURT:  Please be seated.  And our interpreter

24      needs a microphone.

25
```

1                      DIRECT EXAMINATION

2    BY MR. CUMMINGS:

3    Q.   Good morning, Mrs. Ledesma.

4    A.   Good morning.

5    Q.   Could you please state your name?

6    A.   Alice *[sic]* Ledesma.

7    Q.   And you were the call center manager at Avant, correct?

8    A.   I am.

9    Q.   In fact, you were the senior call center manager; is that

10   right?

11   A.   That is correct.

12   Q.   And the call center is where Avant's insurance agents makes

13   sales?

14           THE INTERPRETER:  I'm sorry, Counsel, I am having

15   difficulty hearing you.

16   BY MR. CUMMINGS:

17   Q.   The call center is where Avant's insurance agents sell

18   health insurance?

19   A.   Yes.

20   Q.   You became the call center manager in May of 2022?

21   A.   Yes.

22   Q.   And that was right before Avant moved its offices from

23   Kendall to Doral?

24   A.   Yes.

25   Q.   And the office in Doral is much bigger than the office in

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 6 of 206

Direct Examination - Alix Ledesma
July 11, 2023                                                    6
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

 1  Kendall, correct?

 2  A.   Correct.

 3  Q.   The Kendall office had about -- space for about -- I'm

 4  sorry.

 5       The Kendall call center had space for about eight to ten

 6  insurance agents?

 7  A.   Yes.

 8  Q.   But the Doral office has space for about 40 insurance

 9  agents?

10           THE INTERPRETER:   I'm sorry, Counsel?

11  BY CUMMINGS:

12  Q.   The Doral office -- or the Doral call center has space for

13  about 40 insurance agents to work?

14  A.   Or less.

15  Q.   Okay.  And those work spaces where the insurance agents are

16  in Doral, are desks separated by glass?

17  A.   Yes.

18  Q.   And there are currently 21 insurance agents working for

19  Avant right now?

20  A.   Yes.

21  Q.   And you manage all 21 of those insurance agents?

22  A.   Yes.

23  Q.   And the glass dividers allow you to see what all of them

24  are doing while they work?

25  A.   Not necessarily.

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 7 of 206

Direct Examination - Alix Ledesma
July 11, 2023                                                    7
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   Q.  Well, your job is to make sure that the insurance agents

2   are doing their work correctly?

3   A.  Yes.

4   Q.  And the glass is transparent, correct?

5   A.  No.

6   Q.  Is it tinted?

7   A.  It isn't transparent, but it isn't black either.  It's like

8   a beige color.

9   Q.  Can you see through the glass?

10  A.  No.

11  Q.  You cannot see through the glass, okay.

12      Now, another part of your job is to hire insurance agents

13  for Avant, correct?

14  A.  Well, right now, yes.

15  Q.  And another part of your job is to train those insurance

16  agents?

17  A.  Within our system, yes.

18  Q.  What do you mean by "within our system"?

19  A.  That they need to learn how to use the system that we use

20  in our job.

21  Q.  Systems specific to Avant?

22  A.  Correct.

23  Q.  Okay.  Could you be more specific about what those types of

24  systems are?

25  A.  Well, for example, I have to train agents on how to quote a

1    policy.

2    Q.   What else?

3    A.   And teach them how to handle clients within the system.

4    Q.   And when you refer to "the system," are you referring to

5    the CRM?

6    A.   Yes.

7    Q.   Is that a system also known as "Radius Bob," B-O-B?

8    A.   I don't know.

9    Q.   But the CRM is where the list of Avant's clients are

10   maintained, it's a database?

11   A.   Yes.

12   Q.   Now, you haven't always been the call center manager at

13   Avant, correct?

14   A.   Correct.

15   Q.   In fact, you started as an insurance agent yourself?

16   A.   I started as an insurance agent working part time.

17   Q.   And you were paid as a 1099 worker when you were an

18   insurance agent at Avant?

19   A.   That is correct.

20   Q.   But now you get paid as a W-2 employee?

21   A.   Yes.

22   Q.   And you switched from being a 1099 worker to a W-2 employee

23   around the same time that you became the call center manager?

24   A.   That's correct.

25   Q.   And Reinier asked you to make that switch so that you could

1    have benefits?

2    A.   Yes.

3    Q.   Okay.  So now you have health insurance through Avant?

4    A.   Yes.

5    Q.   And you also have a retirement plan through Avant?

6    A.   Yes.

7    Q.   You first met Mr. Cortes in 2020?

8    A.   October of 2020.

9    Q.   And in October of 2020, you were interviewed by Mr. Cortes

10   to work as an insurance agent, correct?

11   A.   Correct.

12   Q.   That was back in the Kendall office?

13   A.   Yes.

14   Q.   And Mr. Cortes hired you on the spot?

15   A.   Yes.  He explained to me what the job consisted of and I

16   accepted it.

17   Q.   And you didn't --

18           THE COURT REPORTER:  I'm sorry, begin the question

19   again, slower.

20   BY MR. CUMMINGS:

21   Q.   You did not sign a written contract when you started

22   working at Avant?

23   A.   No, I did not.

24   Q.   And Mr. Cortes trained you how to be an insurance agent at

25   Avant?

Direct Examination - Alex Ledesma
July 11, 2023                                                   10
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    A.   Yes.

2    Q.   Similar to the way you train the insurance agents now?

3    A.   Yes.

4    Q.   And he showed you how to sell health insurance through the

5    federal government's marketplace?

6    A.   Yes.

7    Q.   Now, when you were working as an insurance agent, you used

8    a computer to sell health insurance at Avant?

9    A.   Yes.

10   Q.   And you did not -- that computer was owned by Avant,

11   correct?

12   A.   Well, when I was at the office, I would use Avant's

13   computer, but sometimes when at home, I would be able to log in

14   from my computer at home.

15   Q.   When you say you were at home logging in to your computer,

16   was it because you were working from home?

17   A.   Yes.

18   Q.   And that's because Mr. Cortes allowed you to work from

19   home?

20   A.   That is correct.

21   Q.   Now, the computer at the Kendall office had the CRM

22   software on it, correct?

23   A.   Yes.

24   Q.   And you didn't have to pay to use that CRM -- you didn't

25   have to pay Avant to use that software?

Direct Examination - Alex Ledesma
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    A.   No.

2    Q.   And you don't have to pay a subscription to use the CRM

3    either?

4    A.   I did not.

5    Q.   No -- no monthly fee that you had to pay?

6    A.   No.

7    Q.   And no annual fee that you had to pay in terms of the CRM?

8    A.   No.

9    Q.   Now, Avant also provided you with leads, right?

10   A.   Yes.

11   Q.   And leads are potential customers that you have to try to

12   sell health insurance to?

13   A.   Yes.

14   Q.   You didn't pay for those leads, right?

15   A.   No.

16   Q.   Those leads come from a company in Colombia?

17   A.   Yes.

18   Q.   So the phone would ring in the office and then a potential

19   customer would be on the other line already?

20   A.   Correct.

21   Q.   And the phone that you used was provided by Avant as well?

22   A.   Correct.

23   Q.   And you never used your cellular phone to sell insurance at

24   Avant, correct?

25   A.   No.

1  Q.  And since the day that you started working at Avant as an

2  insurance agent, you have been using the same CRM software?

3  A.  Yes.

4  Q.  And even when you worked from home on your own computer,

5  you were using the CRM software?

6  A.  Yes.

7  Q.  The software provided by Avant?

8  A.  Yes.

9  Q.  And as an insurance agent, you logged into that CRM

10  software every day, right?

11          THE INTERPRETER:  Sorry, Counsel, can I get that

12  question again?

13          MR. CUMMINGS:  No problem.

14  BY MR. CUMMINGS:

15  Q.  As an insurance agent, when you were still working as an

16  insurance agent, you had to log into the CRM software every

17  day?

18  A.  Yes, each person has their own credentials.

19  Q.  But you are not sure if the software is called Radius Bob?

20  A.  I've just always known it as CRM.

21  Q.  So it is not that it isn't called Radius Bob, you are just

22  not sure?

23  A.  Correct.

24  Q.  Now, all of the insurance agents that currently work at

25  Avant are W-2 employees, right?

1    A.   Correct.

2    Q.   And all 21 of those insurance agents use the CRM to do

3    their work?

4    A.   Yes.

5    Q.   And all 21 of those insurance agents that you manage still

6    get leads from Colombia?

7    A.   Yes.

8    Q.   Those insurance agents that you manage now cannot work from

9    home though, correct?

10   A.   They cannot do that currently.

11   Q.   You mentioned that you were able to work from home; is that

12   before when you were an insurance agent, or is that now as a

13   call center manager?

14   A.   Before I was able to access the CRM, and currently I cannot

15   access it from home.

16   Q.   Why is that?

17   A.   Because you have to access it from the Doral office.

18   Q.   Who said that you have to access it from the Doral office?

19   A.   Those are the current company policies right now.

20   Q.   And those company policies are made by Reinier Cortes?

21   A.   Yes.

22   Q.   Now, when you were still an insurance agent, were you

23   working from home at one point because you contracted the COVID

24   virus?

25   A.   Yes, that happened too.

Direct Examination - Alix Ledesma
July 11, 2023                                                  14
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   Q.   And you told Reinier Cortes that you had COVID?

2   A.   Yes.

3   Q.   And he allowed you to work from home by giving you access

4   to the CRM on your computer at home?

5   A.   Yes, but also, I was a part-time worker, so the two or

6   three hours that I would work part time, I would also work

7   those from home.

8   Q.   If Mr. Cortes told you that you could not work from home

9   while you were an independent contractor, would you still --

10  would you have still worked from home?

11  A.   Well, if he would have said that I could not, I would have

12  gone to the office.

13  Q.   And that's because Mr. Cortes is your boss, correct?

14  A.   Well, right now he's my boss.

15  Q.   Now, getting back to the 21 insurance agents that you

16  managed.  They don't all work on the same shifts now, right?

17  A.   They do not all work on the same shifts.

18  Q.   You create a schedule for the shifts that they will work?

19  A.   They choose their shifts, and those are the shifts that

20  they work during that given week.

21  Q.   Now, the insurance agents are able to choose their shifts

22  now?

23  A.   That's always been the case.

24  Q.   And some agents start working at 9 o'clock in the morning?

25  A.   That is correct.

Direct Examination - Alex Ledesma
July 11, 2023                                         15
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   Q.   And some agents start later in the afternoon, correct?

2   A.   That is correct.

3   Q.   Some at 12:00 in the afternoon?

4   A.   Correct.

5   Q.   Some come in as late as 1:30 in the afternoon?

6   A.   Correct.

7   Q.   And you create a schedule after they tell you what time

8   they want to work?

9   A.   Yes, I create a graph or a table.

10  Q.   And the times or the shifts that the insurance agents work

11  are staggered so there would always be coverage on the call

12  center floor?

13  A.   Correct.

14  Q.   And Avant -- the Avant office in Doral is currently open

15  from 9 a.m. in the morning to 8 p.m. at night?

16  A.   Correct.

17  Q.   But none of those 21 insurance agents that you manage work

18  from 9 a.m. to 8 p.m., right?

19  A.   They do not.

20  Q.   And all 21 of the insurance agents can't choose to start at

21  9 a.m., right?

22       All 21 of the insurance agents that you manage cannot

23  choose to start working at 9 a.m.?

24  A.   I don't understand that question.

25  Q.   Well, what if -- you said you ask the insurance agents what

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 16 of 206
Direct Examination - Alex Ledesma
July 11, 2023                                                16
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    time they want to work, correct?

2    A.   Yes.

3    Q.   And it's your testimony that you just take these times and

4    put them on the schedule?

5    A.   Yes.

6    Q.   Okay.  So what if all 21 of the insurance agents said, We

7    all want to start working at 9 a.m., would that be possible?

8    A.   Right now it would not be possible.

9    Q.   Because if they all started working at 9 a.m., then they

10   could not all work until 8 p.m., correct?

11   A.   Correct.

12   Q.   Because --

13   A.   That's why each one selects their shifts.

14   Q.   Because then they would be working more than 40 hours per

15   week?

16   A.   Yes, or 30, depending on the agent.

17   Q.   Well, I'm asking a different question.  If every insurance

18   agent -- or if one of the insurance agents that you managed

19   worked from 9 a.m. to 8 p.m., Monday through Friday, they would

20   be working more than 40 hours a week, correct?

21   A.   Yes.

22   Q.   And Avant is not paying its W-2 employees overtime,

23   correct?

24   A.   No.  It's not necessary.

25   Q.   Now, you remember that we spoke before meeting in the

Case 1:22-cv-22671-CMA Document 123-2 Entered on FLSD Docket 09/21/2023 Page 17 of 206

Direct Examination - Alex Ledesma
July 11, 2023                                                    17
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    courtroom today, correct?

2    A.   Yes.

3    Q.   And I actually conducted a deposition of you about a month

4    ago, on June 9th; do you remember that?

5    A.   Yes.

6    Q.   And at the beginning of that deposition, I instructed you

7    that you were providing testimony just like you would be

8    providing if you were in a courtroom; do you remember?

9    A.   Yes.

10   Q.   And for that reason, it was important that you tell the

11   truth at that deposition; do you remember?

12   A.   Yes.

13   Q.   And you did tell the truth at that deposition, correct?

14   A.   Yes.

15   Q.   So a moment ago I asked you whether or not you created the

16   insurance -- I'm sorry, whether you created the work schedules

17   for the Avant agents, and your testimony is that -- your

18   testimony today is that you don't create the schedule, the

19   agents tell you what time they want to work, right?

20   A.   And I said the same thing during deposition.

21   Q.   Well, let's see what you said.  So on Page 47 of your

22   deposition at Line 22 I asked you:

23            "What determines what time insurance agents will come

24   -- or who determines what time insurance agents will come and

25   start work?"

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 18 of 206

Direct Examination - Alix Ledesma
July 11, 2023                                              18
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
1              "ANSWER:  I do.

2              "QUESTION:  Do you create a schedule for the 21

3    insurance agents that currently work there?

4              "ANSWER:  Yes."

5    A.   I'm the one that makes the chart so that everyone knows at

6    what time they are coming in.

7              MR. CUMMINGS:  I am going to object to nonresponsive.

8    There is no question pending, Your Honor.

9              THE COURT:  Finish the translation, please.

10             THE WITNESS:  But they are the ones that choose what

11   shift they want.

12             MR. CUMMINGS:  Your Honor, I am going to object to

13   nonresponsive, there is no question pending and ask that that

14   last response be stricken from the record.

15             THE COURT:  Denied.

16   BY MR. CUMMINGS:

17   Q.   On June 9th, 2023, you didn't give me the response that you

18   just told the jury now, correct?

19   A.   I think I did.

20   Q.   Would looking at this deposition refresh your recollection?

21   A.   Okay.

22   Q.   You remember that -- and so since you were sworn in under

23   oath to tell the truth on June 9th during your deposition, you

24   were telling the truth then, correct?

25   A.   Can you repeat the question?
```

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 19 of
206
Direct Examination - Alix Ledesma
July 11, 2023                                                          19
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    Q.   Right.  You were telling the truth back on June 9th when I

2    took your deposition?

3    A.   Yes.

4    Q.   A month ago?

5    A.   Yes.

6    Q.   And you took an oath to tell the truth here today, correct?

7    A.   That's correct.

8    Q.   So should the jury believe what you said a month ago or

9    should the jury believe what you are saying now?

10   A.   I think I said the same thing.

11   Q.   Now, your e-mail address at work is Alix, A-L-I-X,

12   @AvantAssurance.com?

13   A.   Yes.

14   Q.   And currently, insurance agents need to let you know if

15   they have to take time off of work when they are scheduled,

16   right?

17   A.   Correct.

18   Q.   And the insurance agents have to let you know if they are

19   going to be late to work, right?

20   A.   Correct.

21   Q.   Now, Ms. Ledesma, I am showing you Composite Exhibit 4,

22   which is a set of e-mails that have already been marked into

23   evidence.

24        (Composite Exhibit No. 4 was identified.)

25

Case 1:22-cv-22671-CMA  Document 123-2  Entered on FLSD Docket 09/21/2023  Page 20 of
206
Direct Examination - Alix Ledesma
July 11, 2023                                                    20
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    BY MR. CUMMINGS:

2    Q.  You have confirmed that your e-mail is

3    Alix@AvantAssurance.com, correct?

4    A.  Correct.

5    Q.  And this is an e-mail that you wrote on June 15, 2022, in

6    the highlighted part, correct?

7    A.  Correct.

8        (Pause in proceedings.)

9    BY CUMMINGS:

10   Q.  Okay.  Thank you for bearing with me, but, Ms. Ledesma, I

11   am now showing you that same e-mail, just in a different

12   format.  Do you agree that this is an e-mail that you wrote on

13   June 15th, 2022?

14   A.  Yes.

15   Q.  And at that time, you were already the call center manager

16   for Avant, right?

17   A.  Correct.

18   Q.  Now, as the call center manager, you supervised the

19   Plaintiffs in this case?

20   A.  They were independent agents.

21   Q.  Okay.  But my question was, when you were the call center

22   manager, they were working under you at the Doral office,

23   correct?

24   A.  Well, I was -- I was the manager of the call center and

25   they were independent agents.

Direct Examination - Alix Ledesma
July 11, 2023                                    21
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1    Q.  And as the manager of the call center, your job is to

 2    manage?

 3    A.  Yes.

 4    Q.  And so you were managing my Plaintiffs who were being paid

 5    as independent contractors at the time?

 6    A.  Yes.

 7    Q.  And this e-mail that we are looking at on the screen is

 8    addressed to some of my clients and other insurance agents that

 9    worked at Avant at the time, right?

10    A.  Correct.

11    Q.  Now, I was able to have an official Spanish translation of

12    this e-mail made, so I am going to read it in English.  And

13    what I am showing you now is also a part of Composite Exhibit

14    4, it is already marked.

15        (Pause in proceedings.)

16    BY MR. CUMMINGS:

17    Q.  Okay.  And so the text of that e-mail says, "Good

18    afternoon.  As you know, there have been changes in the office

19    and from now on it is requested that any communication

20    regarding requests for time off or late arrivals to the office

21    be made by e-mail to my e-mail address, Alix@AvantAssurance.com

22    and copied to Jennifer Manjarres, office manager, to her

23    e-mail, JManjarres@AvantAssurance.com.  This is in order to

24    keep the agents' shifts covered.  Thank you for your

25    understanding."
```

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 22 of
206

Direct Examination - Arily Ledesma
July 11, 2023                                                              22
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1      And that would be an accurate translation in English of the

2   e-mail you wrote on June 15th to my clients?

3   A.  Well, here it says that it's required, and in the e-mail

4   that I wrote, it didn't say that it was required.  It was a

5   request that it be done, please.

6           THE COURT:  How much longer with this witness, more or

7   less?

8           MR. CUMMINGS:  Maybe 20 or 30 minutes.

9           THE COURT:  All right.  We will take a break now.

10          Ladies and gentlemen, we will take a brief morning

11   recess.  Please don't discuss the case.

12          COURT SECURITY OFFICER:  All rise.

13      (The jury exited the courtroom at 9:04 a.m.)

14          THE COURT:  Please don't discuss your testimony during

15   the break.  You may step outside if you like.  Thank you.

16      (Witness temporarily excused.)

17      (A recess was taken from 9:04 a.m. to 9:26 a.m.)

18          THE COURT:  Let's bring the jury back, please.

19      (The jury entered the courtroom at 9:26 a.m.)

20          THE COURT:  Please seated.

21      (Pause in proceedings.)

22          THE COURT:  Please proceed.

23                  DIRECT EXAMINATION (Cont'd.)

24   BY MR. CUMMINGS:

25   Q.  Ms. Ledesma, when we left off, we were discussing the

1    e-mail you see on the screen there, and I believe the last

2    thing that you said was that there was a word here that you

3    disputed.  You said that you were requesting the agents at the

4    time to tell you if they were taking off or if they would be

5    late?

6    A.  Correct.  It was a request as a favor, as a matter of

7    courtesy.

8    Q.  Okay.  But the purpose of this e-mail was to advise the

9    insurance agents at that time to tell you when they want to

10   take off or when they would come late, right?

11   A.  Yes.  I mean, they would always inform me by WhatsApp, but

12   now I wanted to it to be done by e-mail.

13   Q.  And you needed to make sure that the call center had floor

14   coverage at all times, right?

15   A.  Correct.

16   Q.  You didn't want a situation where there was no insurance

17   agents on the call floor to take the incoming leads?

18   A.  Correct.

19   Q.  And my client Carlos Lopez complained when he received that

20   e-mail, right?

21   A.  Yes.

22   Q.  And Mariana Lopez complained also when she received that

23   e-mail?

24   A.  Correct.

25   Q.  Now, Ms. Ledesma, before you sent that e-mail to my clients

Direct Examination - Alex Ledesma
July 11, 2023                                                    24
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    on June 15th, 2022, you had already been creating work

2    schedules for the insurance agents at Avant, right?

3    A.   Correct.

4    Q.   And I am going show you what has been previously marked as

5    Composite Exhibit No. 7.

6         (Composite Exhibit No. 7 was identified.)

7    BY MR. CUMMINGS:

8    Q.   This is a schedule that you created, correct?

9    A.   Correct.

10   Q.   And you created this schedule after becoming the call

11   center manager?

12   A.   Yes.

13   Q.   And when we look on the left-hand side, we see names.  That

14   first name, Ana M, that stands for Ana Monge, M-O-N-G-E?

15   A.   Yes.

16   Q.   And Mariana L, that stands for my client, Mariana Lopez?

17   A.   Yes.

18   Q.   And Delio B is Delio Batista?

19   A.   Yes.

20   Q.   And Carlos L is Carlos Lopez?

21   A.   Yes.

22   Q.   Rafaela V is Rafaela Valiente?

23   A.   Yes.

24   Q.   And Katrina G is Katrina Guerra?

25   A.   Yes.

Direct Examination - Alix Ledesma
July 11, 2023                                    25
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    Q.   And Alix L is yourself, Alix Ledesma?

2    A.   Correct.

3    Q.   These were all actively producing insurance agents at the

4    time?

5    A.   Yes.

6    Q.   And as you previously mentioned, this -- this schedule was

7    created so there would be coverage on the call center floor at

8    all times?

9    A.   Correct.

10   Q.   Now, you created the schedule at Avant before any insurance

11   agents became employees?

12   A.   Yes.

13   Q.   Just like you create the schedules of the insurance agents

14   that are employees at Avant now?

15   A.   Yes.

16        (Pause in proceedings.)

17   BY CUMMINGS:

18   Q.   And the schedule that I just showed you from May 9th, 2022,

19   to May 13th, 2022, that's not the only schedule that you

20   created, correct?

21   A.   Correct.

22   Q.   And in fact, you sent these schedules out on a weekly basis

23   to the insurance agents, right?

24   A.   Correct.

25   Q.   And so here, we see another schedule that you would send

1   out to the insurance agents, and this one is dated May 23rd,

2   2022, to May 27th, 2022, right?

3   A.  Correct.

4   Q.  And here is another schedule you created from May 30th to

5   June 3rd, right?

6   A.  Correct.

7   Q.  And another one from June 6th to June 10th?

8   A.  Yes.

9   Q.  Okay.  So this was just a weekly practice, correct?

10  A.  Yes.

11  Q.  Now, you know who Ms. Andrea Quintero is, correct?

12  A.  Yes.

13  Q.  And she is the vice president at Avant?

14  A.  Yes.

15  Q.  And her job is to handle the processing of insurance

16  policies at Avant?

17  A.  No.

18  Q.  What is her job?

19  A.  Well, in my point of view, what I think Andrea does, is she

20  manages the processing section, but she doesn't process the

21  policies herself.

22  Q.  So she -- when you say she manages the processing section,

23  please be a little bit more clear for the jury so they

24  understand what you mean.

25  A.  Well, when a policy is sold, you have to put it into the

1   system, and that part of putting it into the system, that's

2   what she handles.

3   Q.  So after an insurance agent sells a policy, then

4   Ms. Quintero's job is to come in on the back end and process

5   some part of that transaction?

6   A.  No, she does not process the policies.  There's other

7   people that process the policies, but she's the one that

8   handles that section.

9   Q.  Are you saying that she manages the people who do the

10  processing?

11  A.  You could say so.

12  Q.  And Ms. Quintero knows that you are the call center manager

13  at Avant, correct?

14  A.  Yes.

15  Q.  And you commit -- you communicate with Ms. Quintero from

16  time to time if there is an issue processing an insurance

17  policy?

18  A.  From time to time, yes.

19  Q.  So, for example, she may need to help you process a policy

20  where a client has an immigration issue?

21  A.  Like, I would consult her.  It is more of a consultation

22  rather than her -- having her do something for me.

23  Q.  And you consult with her for her expertise in the

24  processing?

25  A.  Yes, correct.

1    Q.   When you were still working as an insurance agent before

2    May 2022, you were paid by commissions, correct?

3    A.   Correct.

4    Q.   And you worked during the 2020 -- or let me say the 2020 to

5    2021 open enrollment period?

6    A.   Yes.

7    Q.   During that first open enrollment period, you kept track of

8    every policy that you sold on a Google sheet, right?

9    A.   Correct.

10   Q.   And Reinier Cortes provided that Google sheet for you to

11   use?

12   A.   Yes.

13   Q.   And he told you to record every policy that you sold on

14   that Google sheet, right?

15   A.   Correct.

16   Q.   Now, this was one Google spreadsheet, but it had different

17   columns for every insurance company that you sold for?

18   A.   Correct.

19   Q.   And you did record every policy that you sold on that

20   Google sheet, right?

21   A.   Correct.

22   Q.   And that Google sheet was shared with Reinier Cortes?

23   A.   Yes.

24   Q.   So he had access to it?

25   A.   Yes.

1   Q.  And at that time, the Google sheet was also shared with

2   other insurance agents at Avant, right?

3   A.  Yes.

4   Q.  So you had the ability to see sales that other insurance

5   agents made through the shared Google Sheets?

6   A.  Yes.

7   Q.  And any commissions that you earned during the open

8   enrollment period were paid later in 2021, right?

9   A.  Yes.

10  Q.  So, for example, you know, if the open enrollment period in

11  2021 ended in January 2021, you didn't receive any commissions

12  until maybe later in February or March, right?

13  A.  Correct.

14  Q.  And you're not sure if you were paid a commission for every

15  member that registered -- registered through your sales

16  efforts?

17  A.  Well, they would send me a statement with all of the

18  policies that I was getting paid for.

19  Q.  Right.  And when you say they sent you a statement, who are

20  you referring to?

21  A.  The accounting department.

22  Q.  Accounting department at Avant?

23  A.  Yes.

24  Q.  And you would literally receive an e-mail that -- from an

25  address that said accounting@AvantAssurance.com, right?

1   A.   I don't recall the actual e-mail address, per se, but it

2   did read accounting department.

3   Q.   Now, you're saying that you are sure that you were paid a

4   commission for every member that you had on your Google sheet?

5   A.   No.  I'm saying -- no.  I'm saying that they would send me

6   a statement with the members that I was getting paid for.

7   Q.   So on one hand, you have a Google sheet where you recorded

8   every policy that you sold during an open enrollment period,

9   right?

10  A.   Yes.

11  Q.   And then on the other hand, you receive a commission

12  statement from the accounting department at Avant showing you

13  how many policies you were being paid for?

14  A.   Correct.

15  Q.   For sales that you made during the open enrollment period?

16  A.   Yes.

17  Q.   Okay.  And so my question to you is, are you sure that you

18  were paid for every member that you sold on that Google sheet

19  when you received your commission statement?

20  A.   I am not sure.  I never checked.

21  Q.   But you could have checked the commissions you received

22  against the Google sheet that you recorded -- where you

23  recorded all your sales, right?

24  A.   Yes.

25  Q.   And you want all the money that you earned for your sales

1   efforts, right?

2   A.   Of course.

3   Q.   But you never checked to see if the commissions that you

4   were being paid matched the Google sheet where -- I'm sorry.

5        You never checked to see if the commission statement

6   matched the Google sheet where you recorded your policies sold,

7   right?

8   A.   I never checked member by member, person by person, but I

9   did have a general calculation of more or less what the amount

10  was supposed to be, and that was the amount that I received in

11  the bank.

12  Q.   And you just -- you assumed that Reinier Cortes was paying

13  you correctly, right?

14  A.   Yes.

15  Q.   And then after the open enrollment period, you continued

16  selling policies on a commission basis?

17  A.   Yes.

18  Q.   From February 2021 to October 2021?

19  A.   Yes.

20  Q.   And you still kept track of your sales on that Google

21  sheet?

22  A.   Yes, but later on it switched.  It was still a spreadsheet

23  but it was for each person.

24  Q.   However, your --

25            THE INTERPRETER:  That's correct, the interpreter

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 32 of 206

Direct Examination of Alix Ledesma                    32
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    repeated the translation.

2    BY MR. CUMMINGS:

3    Q.   So what you are saying is that the spreadsheet was not

4    shared with other insurance agents at that time; is that right?

5    A.   It was not.  Each agent had their own spreadsheet.

6    Q.   But your spreadsheet was still being shared with Reinier

7    Cortes?

8    A.   Correct.

9    Q.   And you would receive commission statements through e-mail

10   from Avant's accounting department, right?

11   A.   Yes.

12   Q.   And that commission statement had a list of the policies

13   you sold?

14   A.   Yes.

15   Q.   The statement included the name of the member, right?

16   A.   Correct.

17   Q.   The member's phone number?

18   A.   I don't remember the phone number being there.

19   Q.   Is it possible that a phone number could have been in

20   there?

21   A.   I don't remember.

22   Q.   But it did show the total members that you sold for each

23   insurance company, this commission statement?

24   A.   It was a -- one statement for each insurance company.

25   Q.   And the Google sheet that you kept had each policy you sold

 1  for each insurance company after the open enrollment period,

 2  right?

 3  A.  Yes, correct.

 4  Q.  But, again, you never checked your commission statements

 5  against the Google sheet?

 6  A.  I did not.

 7  Q.  Because you assumed that Avant was paying you correctly?

 8  A.  Yes, because -- and I'll repeat.  I did have a general idea

 9  of what the amount was that I was supposed to receive.  So if I

10  did receive that amount, I had no reason to check.  I did not

11  check.

12          MR. CUMMINGS:  No further questions at this time.

13          THE COURT:  Cross-examination?

14                      CROSS-EXAMINATION

15  BY MR. TROPP:

16  Q.  Hi, Alexa [sic].  How are you?

17  A.  Good, thank you.

18  Q.  Can you hear me okay?

19  A.  Yes.

20  Q.  Okay.  So you have experience working at Avant as an

21  independent contractor and as an employee, right?

22  A.  That's correct.

23  Q.  Do you know the difference?

24  A.  Yes.

25  Q.  And we spent a lot of time talking about how employees or

1    independent contractors are treated after the Plaintiffs left.

2    I want to talk about how the -- how the contractors or

3    employees were treated while they were there.

4    A.   Okay.

5    Q.   That's what really matters.

6            THE INTERPRETER:  I'm sorry, the interpreter wants to

7    get the last part of the question again.  I think I may have --

8            MR. TROPP:  That's what really matters.

9            THE INTERPRETER:  The part of the question, I may have

10   mistranslated it.  Sorry, Your Honor.

11           MR. CUMMINGS:  Objection, Your Honor, counsel

12   testified.

13           THE INTERPRETER:  How they are treated before?

14           MR. TROPP:  I want to talk about how Plaintiffs were

15   treated before they left and while they were working there.

16           THE WITNESS:  Okay.

17   BY MR. TROPP:

18   Q.   Because they are not asking for wages after they left.

19   A.   Okay.

20   Q.   And -- and before we do that, before you worked at Avant,

21   you worked for a staffing company?

22   A.   Yes.

23   Q.   And were you a W-2 employee?

24   A.   Yes.

25   Q.   And when you -- you worked -- what was your job -- what did

```
 1    you do at the staffing company?

 2    A.   The name of the company I was working for was called Career

 3    Source, and I was assistant -- assistant of -- I don't recall

 4    right now the name of the position itself.

 5    Q.   Okay.

 6    A.   Well, what I would do is that when people would come over,

 7    clients would come over, I would help them find a job; get

 8    Medicare, Medicaid; help them out with their food stamps; fill

 9    out the application forms.

10    Q.   All right.

11    A.   I help them fill out their résumés.

12    Q.   Okay.  But you were at that time an employee?

13            MR. CUMMINGS:  Objection, relevance.

14            THE WITNESS:  Yes.

15    BY MR. TROPP:

16    Q.   You had to show up at a certain time?

17            MR. CUMMINGS:  Objection, relevance.

18            THE COURT:  Overruled.

19    BY MR. TROPP:

20    Q.   You had -- an employer told you what to do and you had to

21    do it or you would be fired, right?

22    A.   Yes.

23    Q.   You had to show up at a certain time?

24    A.   Yes.

25    Q.   They had control over you?
```

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 36 of
206

Cross-examination - Felix Ledesma
July 11, 2023                                                            36
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1   A.   Yes.

 2             MR. CUMMINGS:  Objection to relevance, Your Honor.

 3             THE COURT:  Overruled.

 4   BY MR. TROPP:

 5   Q.   And -- okay.  So at some point, you become a sales agent,

 6   correct, for Avant?

 7   A.   Yes.

 8   Q.   Were you an independent contractor while working as a sales

 9   agent when you started?

10   A.   Yes, I would -- I considered myself to be one.

11   Q.   Just like the Plaintiffs?

12   A.   Yes.

13   Q.   Did you all --

14             MR. CUMMINGS:  Objection.

15             THE COURT:  Overruled.

16   BY MR. TROPP:

17   Q.   Did you all consider yourselves as independent contractors?

18             MR. CUMMINGS:  Objection.

19             THE COURT:  Sustained.

20   BY MR. TROPP:

21   Q.   Why did you consider yourself an independent contractor?

22             MR. CUMMINGS:  Objection, foundation.

23             THE COURT:  Overruled.

24             THE WITNESS:  Because it was something I would do

25   after my full-time job.  It was something -- a job wherein I
```

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 37 of 206

Cross-examination - Felix Ledesma                    37
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    was using my license.  And it was some -- it was a job that I

2    could do on the days that I was available.

3    BY MR. TROPP:

4    Q.  Did you have more freedom?

5    A.  Well, if you have two jobs, a full-time job and then you

6    are also working in the afternoon.

7    Q.  You were doing both?

8    A.  Yes.

9    Q.  Did you have more freedom as an independent contractor

10   working for Avant?

11   A.  Yes.

12   Q.  How?

13   A.  Because I would choose -- I could choose what days I wanted

14   to work.  I would choose to work every day, but that's because

15   I needed the work.

16   Q.  Did you have the opportunity to decide if you want to make

17   more money or less money by how much hours you work?

18   A.  Sure.  But I would work eight hours at a full-time job, and

19   after my full-time job, I would connect or log in to work in

20   the insurance thing.

21   Q.  Right.  That's what I want -- that's the questions I want

22   to ask you about, the work you did for Avant.

23       And you said you got to choose your schedule?

24   A.  I would choose the days I would work, yes.

25   Q.  Now, let's say one day you just decided, and I am talking

Cross-examination - Alix Ledesma
July 11, 2023                                    38
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1   about the work for Avant, and you only wanted to work three
 2   hours; would that be okay?
 3   A.   Yes.
 4   Q.   Would anyone say, No, you need to come in for more hours?
 5   A.   No.
 6   Q.   And what if you didn't want to show up one day for work;
 7   would that be okay, I am talking about for Avant?
 8   A.   Yes.
 9   Q.   Would you say all the independent contractors had that same
10   type of freedom?
11   A.   Yes.
12   Q.   And when -- there was a period where you would work signing
13   up policies with the Plaintiffs?
14   A.   Yes.
15   Q.   You considered yourself a colleague of them -- of theirs,
16   you were an agent just like them?
17   A.   Yes.
18        (Pause in proceedings.)
19   BY MR. TROPP:
20   Q.   So this is a schedule for 5/9, Alix; do you see this?
21   A.   Yes.
22   Q.   And then you see where it says, Carlos off and off?
23   A.   Yes.
24   Q.   And would he request that, or would that be requested from
25   one of the agents?
```

Cross-examination - Felix Ledesma
July 11, 2023                                          39
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1  A.  Well, they would choose the schedule and choose what days

2  they wanted to work.

3  Q.  Okay.  How about here, "Rafaela off on Monday, Carlos off,"

4  they would choose that?  Did you put together the schedule

5  based on what they would choose like that?

6  A.  Correct.

7  Q.  That's from May 30th?

8  A.  Uh-huh.

9  Q.  And then Mariana also wanted the day off?

10  A.  Yes.

11  Q.  And then...

12      (Pause in proceedings.)

13  BY MR. TROPP:

14  Q.  Okay.  This is June 13th, June 17th.  And here, Delio took

15  a couple days off?

16  A.  Yes.

17  Q.  And all the other hours are -- were for six-hour shifts?

18  A.  Yes.

19  Q.  And all these schedules are Lunes, that's Monday through

20  Friday?

21  A.  Yes.

22  Q.  Because you didn't work weekends?

23  A.  No.

24  Q.  So these schedules all show six hours a day, five days a

25  week?

1   A.   Yes.

2        (Pause in proceedings.)

3   BY MR. TROPP:

4   Q.   We've got one on June 4th.  What's going on here?  Everyone

5   here took the Monday off?

6        MR. CUMMINGS:  Objection, mischaracterization of the

7   evidence.

8        THE COURT:  Overruled.

9        MR. CUMMINGS:  July 4th.  I believe Mr. Tropp said

10  June 4th.

11       THE WITNESS:  The office was closed on the 4th of

12  July.

13  BY MR. TROPP:

14  Q.   Oh, okay.  All right.

15  A.   When the office isn't open, we don't go.

16  Q.   All right.  And then on -- on -- Katrina took -- what

17  happened, she didn't come in on Tuesday?

18  A.   That's correct.

19  Q.   Now, you said that you would put these schedules together

20  with the agents.  Was it because it was a forced schedule or

21  was it -- what was the purpose of these schedules?

22  A.   No, it wasn't a forced schedule.  It wasn't forced.  It

23  wasn't a forced schedule.  Each person would say what days they

24  wanted to work and what hours within that day.  And if there

25  was -- if there was any problem, some issue wherein they

1    couldn't work, they would just simply say so or they would have

2    to arrive late or something.

3    Q.   There was an interest, would you agree, that there would be

4    people on the floor or people that needed to be taken care of,

5    and the idea was to make sure that agents were there to take

6    care of customers?

7    A.   Of course.

8    Q.   And would you agree that these schedules were made as a

9    form of courtesy with each other and courtesy amongst the

10   agents?

11   A.   Yes.

12   Q.   Okay.  Let me show you another e-mail real quick.

13       Also, do you know around the time that Carlos stopped

14   working, that he stopped being an agent for Avant?

15   A.   Like around June of last year.

16   Q.   That's when all the changes started?  Around that time?

17   A.   After.

18   Q.   After he left.  Okay.

19       Here's an e-mail right around the time we --

20           MR. CUMMINGS:  Counsel, please identify that exhibit.

21           MR. TROPP:  It's one of yours, on your e-mail.

22           MR. POLLOCK:  Right.  We understand.  We just want to

23   have it for the record so we can all understand.  Which exhibit

24   number is that, please?

25           MR. TROPP:  I'm not sure if you numbered it, but it is

Cross-examination - Felix Ledesma
July 11, 2023                                                    42
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1   under the Plaintiffs' exhibits under e-mails.  All right?

 2   BY MR. TROPP:

 3   Q.  I don't know if you can see this, but it says -- this is

 4   Mariana around August of 2022, sent to you saying that she

 5   needs some time off for surgery.

 6       Do you see that?

 7   A.  Uh-huh, yes.

 8   Q.  It was around the same times that you were talking about

 9   those changes to the office; yes?

10   A.  Yes.

11   Q.  Who -- at the top it says Mariana Lopez.  This isn't -- and

12   then who is that sent to, can you tell?

13           THE INTERPRETER:  I'm sorry, Counsel, what was the

14   question again?

15   BY MR. TROPP:

16   Q.  At the top of the e-mail, it says from Mariana Lopez and it

17   is sent to somewhere; who is it sent to?

18   A.  It says Jorge Tamayo.

19   Q.  And Jorge@?

20   A.  Jorge@fairlawattorney.com.

21   Q.  That's lawyers for the Plaintiffs?

22   A.  I don't know.

23   Q.  So there -- there in this e-mail, Mariana is telling you

24   she is not able to show up to the office?

25   A.  Well, yes, it is not really -- the print is not really that
```

 1   clear, but yeah.

 2   Q.   All right.

 3        How long have you been working for Avant?

 4   A.   Three years.

 5   Q.   Would you agree that all the commissions that you made,

 6   that the bonuses that you made you were paid, all of them?

 7   A.   Yes.

 8   Q.   Would you characterize Reinier and his wife as being very

 9   honest people?

10   A.   Yes.

11   Q.   And would you agree that -- that if people are owed

12   commissions and bonuses, Reinier and Andrea make a point to pay

13   that -- pay it out so people will produce more?

14   A.   Yes.

15   Q.   Since from 2020 to now, how many, like, insurance sales

16   agents, more or less, would you say there have been?

17           MR. CUMMINGS:   Objection, speculation.

18           THE COURT:   Overruled.

19           THE WITNESS:   I would say between 30 and 40.

20   BY MR. TROPP:

21   Q.   Has anyone ever complained of not receiving commissions or

22   bonuses, except for the Plaintiffs?

23           MR. CUMMINGS:   Objection, speculation as to her

24   knowledge.

25           THE COURT:   Overruled.

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 44 of 206

Cross-examination - Felix Ledesma
July 11, 2023                                                    44
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1              THE WITNESS:  No.
 2   BY MR. TROPP:
 3   Q.  Has anyone asked or complained that they are entitled to an
 4   hourly wage and overtime, other than the Plaintiffs?
 5   A.  No.
 6   Q.  Was it always understood from the moment any agent, or like
 7   yourself, started, that the basis of getting paid was on
 8   commissions and bonuses?
 9   A.  Yes.
10   Q.  And would you say also that the agents and the sales agents
11   are treated like professionals?
12   A.  Yes.
13   Q.  Treated like licensed professionals?
14   A.  That's correct.
15   Q.  Okay.  And I want to ask you a quick question about being a
16   sales agent.
17   A.  Okay.
18   Q.  Would you agree that it requires a skill, special skill of
19   being very patient with people?
20              MR. CUMMINGS:  Objection, calls for a legal
21   conclusion.
22              THE COURT:  Overruled.
23              THE WITNESS:  Yes.
24   BY MR. TROPP:
25   Q.  Sometimes you have to talk to somebody and answer a lot of
```

Cross-examination - Felix Ledesma
July 11, 2023                                                    45
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    questions, maybe for an hour or two?

2    A.   Yes.

3    Q.   And sometimes for these -- some of these commissions, you

4    just get, like, 10 or $15?

5    A.   Yes.

6    Q.   You have to still talk and answer a bunch of questions?

7    A.   That's correct.

8    Q.   Would you consider that a special skill?

9    A.   Yes.

10   Q.   Let me ask you a question.  Let's say Reinier or Avant had

11   the system that they had in place when the Plaintiffs were

12   there.  Right?  He gives -- and he would give the agents the

13   opportunity to get policies sold because of his referrals?

14   A.   Yes.

15   Q.   Do you think it would have been made -- it would have made

16   better sense for him not to tell them -- the agents to buy

17   their own Internet service and bring their own computers?

18   A.   Well, to me, personally speaking for myself, the system

19   that Avant uses is really good because I don't have to bring

20   anything.

21   Q.   Right.  But let's say Avant and Reinier said, No, you can't

22   use your computer, you have to bring your own and you have to

23   bring your own Internet service, do you think that would make

24   you more of an independent contractor?

25   A.   No.

Cross-examination - Felix Ledesma
July 11, 2023                                                    46
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

 1    Q.   Would it make sense?

 2    A.   It would.

 3    Q.   Let's say you brought -- you wanted to bring or the

 4    Plaintiffs wanted to bring their laptops and said, You know

 5    what?  I am not going to use your computer, I have got to use

 6    mine, would they have been able to do that?

 7    A.   Yes, they would have.  Yes, they would have.

 8    Q.   All you would have to do is ask for the access code?

 9    A.   Of course.

10    Q.   And when you asked him -- when you asked anyone from Avant,

11    Reinier or Andrea, for the access to code to work from home or

12    away, would they give it to you?

13    A.   Yes.

14    Q.   And let me ask you this:  Let's say that you wanted to work

15    for somebody else at the same time as you were working for

16    Avant, just like you did?

17    A.   I did.

18    Q.   Did anyone ever say to you or to any of the Plaintiffs, Oh,

19    no, you can only work here --

20            MR. CUMMINGS:  Objection, calls for speculation.

21            THE COURT:  I can't hear the objection.

22            MR. CUMMINGS:  Objection, calls for speculation as to

23    what people said to other Plaintiffs.

24            THE COURT:  Sustained.

25

1    BY MR. TROPP:

2    Q.   Were you ever told by anybody at Avant, as a sales agent,

3    that you were not allowed to work for other -- selling other

4    policies or doing any other type of job?

5    A.   No.

6    Q.   And in open enrollment, that's a very busy time, right?

7    A.   Yes.

8    Q.   Would there be days -- would there be times and days where

9    you worked more than eight hours during open enrollment?

10   A.   Yes.

11   Q.   And did you do it because you had to or because you wanted

12   to?

13   A.   Because I wanted to, to make more money.

14   Q.   Did you ever hear anyone from Avant, Reinier or Andrea,

15   tell any of the Plaintiffs, Delio Batista, Mariana and Carlos

16   Lopez or Rafaela Valiente, that they had to work more than

17   eight hours?

18           MR. CUMMINGS:  Objection, hearsay.

19           THE COURT:  Sustained.

20           MR. TROPP:  It would be from a party, Judge, party

21   admission.

22           THE COURT:  Party opponent.

23           MR. TROPP:  Okay.  All right.

24   BY MR. TROPP:

25   Q.   Did -- were there any rules or any -- were there any rules

1    from Avant that you were aware of that at any point said that

2    the Plaintiffs had to work more than eight hours a day?

3    A.   No.

4    Q.   You were there when Carlos left, right?

5    A.   Yes.

6    Q.   That was pretty -- there was a lot of excitement on that

7    day?

8    A.   Yes.

9    Q.   What happened?

10   A.   There was somebody that used to work at Avant and called

11   Carlos to his office to confront him about what was said, and

12   in -- as part of that conversation, Carlos said to him that he

13   would invite him -- is inviting him over to --

14           MR. CUMMINGS:  Objection, hearsay.

15           THE COURT:  I can't hear the objection.

16           MR. CUMMINGS:  Calls for narrative and is soliciting

17   hearsay.  She's testifying as to what other people are saying.

18           THE COURT:  Sustained.

19   BY MR. TROPP:

20   Q.   Did you witness any violence?

21   A.   Witness a threat?

22   Q.   Okay.  We will talk about that more when Carlos get --

23   comes up.  But a few more questions.

24       While you were an agent, and this is '21 and '22?

25   A.   Yes.

```
 1   Q.  And you were there basically the whole time, the whole

 2   periods while the Plaintiffs were there?

 3   A.  Yes.

 4   Q.  Did you get along with them?

 5   A.  Yes.

 6   Q.  Did any of them ever tell you, Oh, we should be getting

 7   paid overtime or hourly?

 8   A.  No.

 9   Q.  And while -- let's say you sold and you've made a bunch of

10   commissions.  You would -- and you would have access to the

11   system.  Would you be able to check to make sure that you were

12   paid right?

13   A.  Through the Excel sheets of the clients that were

14   registered.

15   Q.  What would you do to make sure you were paid right?

16   A.  I would have asked Reinier.

17   Q.  What about -- would you have access to the -- to the

18   clients that you closed on?

19   A.  Yes.

20   Q.  And would the agents monitor or make sure that they were

21   being paid right and correctly while they -- while you were

22   working there?

23           MR. CUMMINGS:  Objection, calls for speculation.

24           Objection, calls for speculation, Your Honor.

25           THE COURT:  Overruled.
```

Redirect Examination - Alex Ledesma
July 11, 2023                                                    50
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1           THE WITNESS:  What was the question again?
2   BY MR. TROPP:
3   Q.  While you were there as an agent, were you and -- as an
4   agent, able to verify and check to make sure that while you
5   were there, to go through the system and make sure you are
6   being paid correctly?
7           MR. CUMMINGS:  Objection, asked and answered.
8           THE COURT:  I can't hear the objection over the
9   interpreter, so you have to speak louder into the microphone.
10          MR. CUMMINGS:  Objection, asked and answered.
11          THE COURT:  Overruled.
12          MR. TROPP:  Thank you.  Thank you.  That's all I have.
13          THE COURT:  Redirect?
14          MR. CUMMINGS:  Yes, Your Honor.
15                      REDIRECT EXAMINATION
16  BY MR. CUMMINGS:
17  Q.  Ms. Ledesma, you are not trained in human resources, are
18  you?
19  A.  No.
20  Q.  You don't have a certification in human resources?
21  A.  No.
22  Q.  Okay.  And do you know what the legal difference is between
23  an independent contractor and employee?
24  A.  No.
25  Q.  Now, are you aware of all of the complaints that my clients

1    may have made while they were still working at Avant?

2    A.   No.

3    Q.   Did you know any insurance agents at Avant who were working

4    for other insurance agencies at the same time?

5    A.   I believe Rafaela was working for a different agency.

6    Q.   Why do you think that?

7    A.   Because she -- because she told me she was working with

8    Lincoln, something about final expenses.

9    Q.   Something about what?

10   A.   Final expenses.

11   Q.   What does that have to do with selling insurance?

12   A.   That is an insurance policy, a type of insurance policy

13   that is sold for people that want to have the funeral expenses

14   ready.

15   Q.   And when did she tell you that?

16   A.   When we were at the Kendall office.

17   Q.   And did you ever see Ms. Valiente selling other insurance

18   policies for another insurance agency while she worked at

19   Avant?

20   A.   No.

21   Q.   In fact, when you are an insurance agent at Avant, isn't

22   your insurance license attached to Avant?

23   A.   The health insurance license, yes.

24   Q.   Okay.  And you have to be released from one insurance

25   agency to work at another insurance agency, correct, if you are

1    selling the same type of insurance?

2    A.   Yes.

3    Q.   You mentioned that being an insurance agent at Avant

4    requires special skills?

5    A.   Yes.   In a certain way, yes.

6    Q.   Okay.   I believe Mr. Tropp said that you talk to people for

7    hours?

8    A.   There's short phone calls, but you also have long ones.

9    Q.   Okay.   And so if you have a long phone call, that requires

10   a special skill?

11   A.   For any sort of call, you need to have special skills,

12   like, for example, having patience, knowing how to deal with

13   clients, knowing how to manage objections.

14   Q.   And so having patience is a special skill?

15   A.   In this case, I would say so.

16   Q.   Would you consider being a carpenter a special skill?

17   Somebody who knows how to build a house?

18   A.   Yes.

19   Q.   Somebody who has to go to school to learn different types

20   of wood and all the different types of frames that it takes to

21   construct buildings, do you consider that a special skill?

22   A.   It could be.

23   Q.   And do you -- do you think that carpenters have to receive

24   special training to learn their trade?

25   A.   I think so, but I'm not a carpenter.

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 53 of
206
Redirect Examination - Apex Ledesma                    53
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   Q.  If somebody came to build you a house, would you ask them

2   what kind of training they have?

3   A.  I suppose so.

4   Q.  And you would ask to see whatever certifications they have

5   and whether they went to school for carpentry?

6   A.  Possibly.

7   Q.  You don't want your house to fall down on you, do you?

8   A.  Uh-huh, yes, I don't.

9   Q.  And would you consider all of the training that a carpenter

10  has the same as talking to somebody on the phone for a long

11  time?

12  A.  The thing is that in this case, it's not just a matter of

13  talking.  It's being able to understand what different plans

14  you are going to be offering them, what they need.  You have to

15  build empathy for the client and then customize the plan to

16  their needs.

17  Q.  And everything that you just mentioned, these were things

18  that you learned on the job, correct?

19  A.  Yes, that's experience.

20      (Pause in proceedings.)

21          THE COURT:  Are we done with the witness?

22          MR. CUMMINGS:  Yes, Your Honor, nothing further.

23          THE COURT:  Thank you, you are excused, ma'am.  Have a

24  good day.

25          MR. TROPP:  Can I just --

```
 1              THE COURT:  And ladies and gentlemen -- I'm sorry?

 2              MR. TROPP:  Can I do a quick redirect [sic], one quick

 3     based on that, real quick?

 4              THE COURT:  Yes.

 5              MR. TROPP:  Real quick.

 6                         RECROSS EXAMINATION

 7     BY MR. TROPP:

 8     Q.  We talk about working -- having to have a release from

 9     other agencies that you just mentioned.

10         Now, Avant has some arrangements with some of these

11     policies, like Oscar or Ambetter, correct?

12     A.   I believe so.

13     Q.  And are you aware that those -- some of these particular

14     agencies, like Oscar or Ambetter, require that the agents don't

15     work -- that those agencies aren't sold by the agents at other

16     places?

17              MR. CUMMINGS:  Objection, assumes facts not in

18     evidence, Your Honor.

19              THE COURT:  Sustained.

20     BY MR. TROPP:

21     Q.  Are the restrictions with -- involving the release and --

22     and the requirements of working with particular insurance

23     policies, was it -- was it regarding -- were there restrictions

24     on specific policies, or overall you can't work for other --

25              MR. CUMMINGS:  Objection, assumes facts not in
```

Recross Examination - Aldo Ledesma
July 11, 2023                                                    55
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    evidence, Your Honor.

2          THE COURT:  Overruled.

3          THE WITNESS:  I think it's per insurance company.

4          MR. TROPP:  Thank you.

5          THE COURT:  Thank you, ma'am.  You have a good day.

6          Ladies and gentlemen, we will take a morning recess,

7    ten minutes.  Please don't discuss the case.

8          COURT SECURITY OFFICER:  All rise.

9       (The jury exited the courtroom at 10:43 a.m.)

10         MR. POLLOCK:  Judge, I will go ahead and shoot over

11   these jury instructions.

12         THE COURT:  Thank you.  We are in recess.

13      (A recess was taken from 10:44 a.m. to 10:58 a.m.)

14         THE COURT:  Your next witness, please.

15         MR. POLLOCK:  Thank you, Your Honor.  Plaintiffs call

16   Mariana Lopez Alcala.

17         THE COURT:  Please come forward.

18      (Pause in proceedings.)

19         COURT SECURITY OFFICER:  All rise for the jury.

20      (The jury entered the courtroom at 10:59 a.m.)

21         THE COURT:  Everyone, please be seated.

22         Please raise your right hand.

23                  (Time 10:59 a.m.)

24                  MARIANA LOPEZ ALCALA,

25   a witness for Plaintiff, testified as follows:

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 56 of 206

Direct Examination - Mariana Lopez Alcala
July 11, 2023
56
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1          THE WITNESS:  Yes, I swear.

2          THE COURT:  Please be seated.

3                    DIRECT EXAMINATION

4    BY MR. POLLOCK:

5    Q.  Good morning, Mariana.

6    A.  Good morning.

7    Q.  Good morning.  Would you please introduce yourself to the

8    ladies and gentlemen of the jury?

9    A.  Yes.  Hi, good morning.  My name is Mariana Lopez Alcala.

10   Q.  You nervous?

11   A.  Yes.

12   Q.  Was yesterday your first time in the courtroom?

13   A.  Yes, first time.

14   Q.  Okay.  I am going to ask you some questions, and if you can

15   just tell us the truth, this will be easy for you.  Okay?

16   A.  Okay.

17   Q.  Where are you from?

18   A.  Venezuela.

19   Q.  Are you married?

20   A.  Yes.

21   Q.  What's your husband's name?

22   A.  Francisco Suprani.

23   Q.  When did you come to the U.S.?

24   A.  2016.

25   Q.  And when did you get married to Francisco, before or after

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 57 of 206
Direct Examination - Marlene Lopez-Alcala                57
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

 1   you came to the U.S.?

 2   A.   Before.

 3   Q.   Do you and Francisco have any children?

 4   A.   Yes.

 5   Q.   How many?

 6   A.   Two.

 7   Q.   Two; boys, girls, boy and a girl?

 8   A.   Boys.

 9   Q.   How old are they?

10   A.   Ten and five.

11   Q.   Now, we're here about the lawsuit that you brought against

12   Avant Assurance, Mr. Cortes and Ms. Gonzalez Quintero.

13       Let's talk about Avant Assurance.  How did you find out

14   about the job at Avant Assurance?

15   A.   Through an Internet app.

16   Q.   On which website, if you can remember?

17   A.   I do remember, Innet *[sic]*.

18   Q.   Indeed?

19   A.   Indeed.

20   Q.   At the time that you saw the job posting for Avant, what

21   were -- what was the ad or what were you applying for, what

22   position?

23   A.   They were looking for health insurance agents.  And at that

24   point in time, I was going to school to get my health insurance

25   and life insurance license on my own, so I applied for the job.

1   And they called me over for an interview.

2   Q.  The health and life insurance license that you were

3   studying for, does that license have a number?

4   A.  The license, I'm not exactly sure -- the health and life

5   insurance license, I am not exactly sure whether it is 220 or

6   440.

7   Q.  That raises a good question.  Does the State of Florida

8   issue different license numbers for somebody who has a health

9   -- a license to sell health insurance versus somebody who is

10  licensed to sell both life and health and annuity insurance?

11          THE INTERPRETER:  What was the last type of insurance,

12  Counsel?  Sorry.

13          MR. POLLOCK:  Health, life and annuity insurance.

14          THE WITNESS:  Ah, yes, there are different types of

15  licenses.  There is one that's complete for everything and

16  there's one that's just for health insurance, which is the one

17  that I hold right now.

18  BY MR. POLLOCK:

19  Q.  Now, when you saw this ad for a health insurance agent on

20  Indeed from Avant Assurance, what did you do?

21  A.  I applied for the position, and I received a phone call for

22  the interview.

23  Q.  Who called you?

24  A.  Alix Ledesma did.

25  Q.  About how long after applying online do you recall her

Direct Examination - Mariana Lopez Alcala
July 11, 2023                                    59
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    calling you?

2    A.   Approximately some 40 minutes after I applied.

3    Q.   Did you have to interview to get this job at Avant?

4    A.   Yes, I went to an interview at Avant's offices.

5    Q.   Who did you interview with?

6    A.   Mr. Cortes did it.

7    Q.   What did Mr. -- well, did you tell Mr. Cortes about the

8    license you were studying for?

9    A.   Yes, that's correct.

10   Q.   And what did he tell you about the license that you were

11   applying for?

12   A.   He said that I should study to get only the health

13   insurance license, which was shorter, so that I could start

14   working at the office.  And later on if I wanted to get my life

15   insurance license, I could study that and get my license

16   separately.

17   Q.   Did you have any discussions with Mr. Cortes about how he

18   would pay you for working at his agency?

19   A.   During the interview, he drew some things on the white

20   board about the approximate amounts that a health insurance

21   agent would be able to make during the enrollment period.

22   Q.   Did Mr. Cortes offer to pay you while you were studying for

23   your health insurance license?

24   A.   Yes, that is correct; that is our agreement.

25   Q.   How much did Mr. Cortes offer to pay you while you were

1    studying?

2    A.   $600 per week.

3    Q.   Did Mr. Cortes tell you whether he was going to pay you as

4    an employee or independent contractor?

5    A.   No.

6    Q.   How did Mr. Cortes pay that first week you were studying?

7    Did he pay it in a check, direct deposit, Zelle?

8    A.   Zelle.

9    Q.   When you received the Zelle from Mr. Cortes or Avant

10   Assurance, did that Zelle deposit come in for $600 or was it

11   $600 minus the taxes and deductions that would normally be

12   taken for an employee?

13   A.   The full $600.

14   Q.   And in order to get the health insurance only license, did

15   you have to restart the course?

16   A.   Yes, I had to restart it, start over again because it was a

17   different course.

18   Q.   For how many weeks did Mr. Cortes and his company pay you

19   this weekly salary to study for the health insurance license?

20   A.   Two weeks.

21   Q.   I am going to show you what's in evidence as part of

22   Exhibit 4.

23       (Plaintiffs' Exhibit No. 4 was identified.)

24   BY MR. POLLOCK:

25   Q.   Do you recognize this e-mail?

Direct Examination - Mariana Lopez Alzura
July 11, 2023                                               61
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   A.   Yes, I recognize it.

2   Q.   Who sent the e-mail?

3   A.   I sent it.

4   Q.   When did you send it?

5   A.   September the 27th, 2021.

6   Q.   To whom did you send the e-mail?

7   A.   To Andrea Gonzalez.

8   Q.   Why did you send this e-mail to Ms. Gonzalez?

9   A.   As evidence that as part of my course, I had already

10  obtained the pre-licensing.

11  Q.   And why, in particular, did you send the e-mail to

12  Ms. Gonzalez Quintero instead of Mr. Cortes?

13  A.   I think that at that point in time, I asked Andrea to print

14  the pre-license for me; that's why I think I sent it to her.

15  Q.   Did you ultimately get your health insurance license?

16  A.   Yes, I did.  A few days after that e-mail.

17  Q.   Do you remember when, what date?

18  A.   Yes, I do.  I obtained it on October the 8th.

19  Q.   Why do you remember October 8th as the date you got your

20  license?

21  A.   Because it was my birthday when I was finally able to pass

22  the exam.

23  Q.   And that was October 8th of 2021?

24  A.   Correct.

25  Q.   Now, after you get your health insurance license, do you

Direct Examination - Mariana Lopez-Alfaro
July 11, 2023                                                    62
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

 1   continue to work in the office at Avant?

 2   A.   Yes, that is correct.  I began doing sales on October the

 3   11th.

 4   Q.   Do you remember what day of the week October the 11th was?

 5   A.   Yes, it was a Monday.

 6   Q.   So you go into the office on Monday.  Did you have any

 7   discussions with Mr. Cortes about how you would be paid once

 8   you became a licensed insurance agent?

 9   A.   Yes, that's correct.

10   Q.   What did Mr. Cortes tell you about how you would be paid

11   once you became a licensed insurance agent?

12   A.   Initially it would be $20 per hour, plus $10 per each

13   member.

14   Q.   Did you have this discussion with him before you came into

15   the office on Monday morning, October 11th of 2021?

16   A.   No, not before.  I mean, it was that same week once I

17   already had my license.

18   Q.   Okay.  Once you got your license, you go into Avant on

19   Monday morning?

20   A.   Yes, correct.

21   Q.   Did you have any knowledge about how to sell insurance at

22   that point?

23   A.   No.

24   Q.   I mean, were there any skills that you had developed that

25   were particular to selling insurance before you started on

1    Monday, October 11th?

2    A.   No, none.

3    Q.   Now, in order to work as an insurance agent at Avant, did

4    you have to receive any training?

5    A.   Yes.  The week before I graduated with my license, I

6    received training through another company that I was also

7    looking into.  Andrea explained to me how to use the CRM, and

8    then once I obtained my license on that Monday, the 11th, I

9    shadowed Alix Ledesma to learn about the process of how she

10   would do the patient registration -- the client registration.

11   Q.   Now, when Ms. -- Ms. Gonzalez Quintero showed you how to

12   use the CRM, was that the Radius Bob software?

13   A.   Yes, correct.

14   Q.   Had you ever worked with this program before you started at

15   Avant?

16   A.   No, never.

17   Q.   And about how long did it take Ms. Quintero to train you to

18   use this software that Avant uses in their business?

19   A.   Not more than one hour.

20   Q.   Do you consider yourself as having any special computer

21   skills that would allow you to learn this software in an hour?

22   A.   No.

23   Q.   As far as selling the insurance products themselves, how

24   did you learn how to do that?

25   A.   Well, during the weeks that I was still studying, I -- I

1    had a chance to hear everyone do their own sales.

2    Q.  So you were listening to what the agents around you were

3    saying on the phone?

4    A.  Yes, that's correct.

5    Q.  Was there any agent who you would sit with or sit next to

6    to learn how they sold insurance policies?

7    A.  No.  During the time that I was still studying, I was in an

8    office, but from that office, I could hear everybody because it

9    was a very small office.

10   Q.  After you got your license, were you still in an office?

11   A.  No.  At that point in time, I was already seated outside

12   with the rest of the agents that worked there.

13   Q.  Was there any -- who were you sitting next to, as far as

14   the other agents?

15   A.  Well, over to my right, there was Christopher Vasquez;

16   behind me there was Ana Gomez -- Monge, Ana Monge.

17   Q.  Where was Alix Ledesma in relation to you?

18   A.  She was behind Ana.

19   Q.  Once you became an insurance agent, did Ms. Gonzalez

20   supervise you in your work at all?

21   A.  Yes, of course.

22   Q.  How did she supervise you in your work?

23   A.  She could hear everything that each one of us agents were

24   saying over the phone, and if she had any correction to give

25   us, she would either say it from where she was seated or she

1    would come to you to let you know.

2    Q.  Did she give you these corrections while you were on the

3    phone with leads or potential clients?

4    A.  Yes.  On many occasions we would even put our headsets on

5    mute and we would hear her suggestions and then continue on

6    with the sale.

7    Q.  Did Mr. Cortes do this also?

8    A.  No.  He would always be inside his office.

9    Q.  As far as you could see, what role did Ms. Quintero --

10   Ms. Gonzalez Quintero have at Avant?

11   A.  She handled the part regarding customer support in

12   Colombia.  She also handled the section that had to do with

13   external agents, those agents that did not work inside the

14   office, verifying their licenses and the different appointments

15   that they had with the companies.

16   Q.  Then you said that she would also monitor your phone calls?

17   A.  Yes.  And if there was something wrong that we were doing,

18   the people in Colombia would also listen to the phone calls,

19   they would let her know and she would then have a talk with us.

20   Q.  How often would Ms. Gonzalez Quintero talk with you about

21   how you were selling policies during your first, let's say,

22   month there?

23   A.  No, it was very few times.

24   Q.  Now, you mentioned that Mr. Cortes promised to pay you $20

25   an hour, plus $10 for each member that you signed up before

1    open enrollment?

2    A.   Before opening enrollment began.

3    Q.   Now, when you received payment for that period of time when

4    you were an agent before open enrollment, did you find that

5    Mr. Cortes kept his promise or not?

6    A.   No, he did not.  Because we had agreed to $20 per hour,

7    plus $10 per member, but when I received the payment, I did get

8    the $20 per hour but only $5 per member.

9    Q.   Now, you heard Mr. Cortes testify that nobody ever

10   complained to him about how much they were paid.

11       Did you complain to Mr. Cortes about only receiving $5 per

12   member when he promised you $10 per member?

13   A.   Yes, I went to his office and I asked him why.

14   Q.   What did he say?

15   A.   That it wasn't 10, that it was supposed to be 5.

16   Q.   For open enrollment 2021/2022, did you work at Avant the

17   whole time?

18   A.   Most of the open enrollment period, I did.

19   Q.   When did the open enrollment period start for '21/'22?

20   A.   Officially they begin on November the 1st, but we begin,

21   approximately, on October 26th.

22   Q.   How were you able to start selling policies early?

23   A.   Because the plans are already available by then.

24   Q.   And when did open enrollment end in the '21/'22 year?

25   A.   January 2022.

Case 1:22-cv-22671-CMA  Document 123-2  Entered on FLSD Docket 09/21/2023  Page 67 of 206

Direct Examination - Marianne Lopez-Alecca      67
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1  Q.  Was that the beginning of January or the end of January?

2  A.  I really think it ended on January the 15th, but either

3  way, we remained doing sales up until January 31st.

4  Q.  Now, when you start selling insurance policies, do you get

5  paid immediately?

6  A.  Before the open enrollment began, I did receive that $20

7  per hour payment plus the $5 per member.

8  Q.  Did that change during open enrollment?

9  A.  Yes.  Once open enrollment began, what I started getting

10  was an advance on the payment.

11  Q.  And what do you mean you were getting in advance on the

12  payment?

13  A.  Regardless of the amount I would make as far as sales are

14  concerned, I would receive $1,000 per week to be able to cover

15  for expenses that I may have had during November and December

16  until he would be able to collect on the policies that were

17  sold.

18  Q.  So during open enrollment, did you receive money as soon as

19  you sold the policy, or did you have to wait to get paid for

20  those sales?

21  A.  I did not.  He would give us an advance, once every two

22  weeks.

23  Q.  And then how long after the sales would be made would you

24  get paid by Avant for those sales?

25  A.  What we sold in November and December, we received,

1    approximately, in the month of February.

2    Q.  I am going show you what's in evidence as Exhibit 8, which

3    is a two-page exhibit.  We have seen this before.

4        (The exhibit was published to the jury.)

5    BY MR. POLLOCK:

6    Q.  My question to you is, before this trial, did you see this

7    document while you were working as an insurance agent at Avant?

8    A.  Yes, I did receive it.

9    Q.  When did you receive this compensation plan from Avant?

10   A.  Approximately one week after open enrollment began.

11   Q.  How did you receive it?

12   A.  They left this sheet on the desk of each agent.

13   Q.  Did someone have a meeting or give a talk or an explanation

14   about what the document was that they left on your desk?

15   A.  Yes, that is correct.

16   Q.  Who led that discussion?

17   A.  Mr. Cortes did.

18   Q.  What did he explain about this compensation plan?

19   A.  He explained to us the different prices, the different

20   commissions that each one of the companies were paying.  And he

21   explained to us what types of bonuses were being offered by

22   each one of the companies for the open enrollment period.

23   Q.  You mentioned the bonuses, and we are looking at Page 2 of

24   Exhibit 4.  Are these the bonuses that you are talking about?

25   A.  Yes, that's correct.

1    Q.   Did Mr. Cortes say anything about the Oscar bonus?

2    A.   Yes.  We spoke about all the different bonuses from all the

3    companies that appear in this sheet of paper.

4    Q.   Did Mr. Cortes explain that if you continued working for

5    his company, that this is how you were going to get paid

6    according to the compensation and bonuses identified on this

7    exhibit?

8    A.   That's correct.

9    Q.   If you didn't like this compensation plan, what would you

10   do?

11   A.   Yes, you could leave.  That's the only offering made by the

12   company.

13   Q.   Did you accept the offer by continuing to work?

14   A.   Yes, correct.

15   Q.   And did you sell insurance policies based on this

16   compensation and bonus structure that was offered to you?

17   A.   Yes, correct.

18   Q.   I'll come back to this in a moment.

19        You were here when Ms. Ledesma went through with -- and

20   talked about a couple of schedules that were shown.

21   A.   Yes, correct.

22   Q.   Did Avant Assurance provide written schedules for when it

23   -- for when the agents were going to work during the open

24   enrollment period?

25   A.   No.

Direct Examination - Mariana Lopez Alzota
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    Q.  Were you told the hours that you were supposed to work

2    during the open enrollment period?

3    A.  The office was open from 9 a.m. to 9 p.m.  You had to cover

4    both shifts so that there could always be people in the office

5    available to do sales.

6    Q.  And you mentioned 9 a.m. to 9 p.m.  What days of the week

7    did you normally work during the open enrollment period?

8    A.  During open enrollment, I personally worked from Monday

9    through Friday.

10   Q.  So you worked 12 hours a day for about five days a week for

11   60 hours a week on average?

12   A.  Most of the days.

13   Q.  Were there days when you would have to leave to go pick up

14   your son from baseball or school?

15   A.  Yes, that's correct.

16   Q.  And then would you stay home or go back to the office?

17   What did you do?

18   A.  Sometimes I would stay, and other times I would go back.

19   Q.  Were there times when you worked on Saturdays?

20   A.  During the entire open enrollment period, I only worked two

21   Saturdays.

22   Q.  What hours did you work?

23   A.  On Saturdays, I think it was either from 9:00 to 3:00 or

24   10:00 to 4:00, something like that.

25   Q.  For those of us that haven't worked at a call center

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 71 of 206

Direct Examination - Mariane Lopez Alcova                    71
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    selling insurance during open enrollment, how would you

2    describe it?

3    A.   Madness.

4    Q.   Madness how?

5    A.   Many clients wanting to get their health insurance all at

6    the same time.  It's a pretty large volume of phone calls.

7    Q.   You are in an area where there's about seven or eight

8    workstations that are all near each other?

9    A.   Yes, that is correct.  At that point in time, there were

10   eight of us working at the office at the same time.

11   Q.   When a phone -- a soft phone would ring -- let me back up

12   for a second.

13       Were there physical phones at the office on the desk where

14   you would pick it up and answer it?

15   A.   No.  We would answer through our computers, using our

16   mouse.

17   Q.   When -- when the inbound leads would come through to your

18   computer, would you hear the phone ring?

19   A.   Yes, correct.

20   Q.   Would it play through your headset, or would it play

21   through the speakers?

22   A.   The headset.

23   Q.   And then you would go ahead and you would click your mouse

24   to open -- to turn on the call?

25   A.   You would click on answer and there you would have the

1    call.

2    Q.  Before we get into the call, I want to talk about

3    afterwards.

4           THE INTERPRETER:  I'm sorry, Counsel, what was that?

5    BY MR. POLLOCK:

6    Q.  Before we get into the call, I want to talk about

7    afterwards.

8           THE INTERPRETER:  After?

9           MR. POLLOCK:  After the call.

10          THE WITNESS:  Okay.

11   BY MR. POLLOCK:

12   Q.  When you would click the mouse to hang up the call, during

13   open enrollment, how much time was there between calls that you

14   were getting?

15   A.  During the open enrollment, it was usually one call right

16   after the other, like all of us talking at the same time.  And

17   as soon as you would hang up, there was another call just

18   waiting for you right after that.

19   Q.  So if you were working 12 hours a day during open

20   enrollment, how many of those hours do you think you were on

21   the phone talking to leads?

22   A.  Most of the time, except when you would go and take a

23   break.  I would go to the bathroom and -- or go to get a smoke

24   and then come back to my position.

25   Q.  After being on the phone for the better part of 12 hours a

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 73 of
206                                                                                      73
Direct Examination: Marlene Lopez Alcala
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    day, how did you feel when you left work?

2    A.  Exhausted.  You didn't want to talk, not even with

3    yourself.

4    Q.  What'd you listen to when you got in your car to drive

5    home?

6    A.  Nothing.  I don't -- I didn't want to hear anything at all.

7    Q.  The other agents that were working with you during this

8    open enrollment period, what were their names?

9    A.  Christopher Vasquez, Ana Monge, Katrina Guerra, Rafaela

10   Valiente, Delio Batista, Alix Ledesma and Carlos Lopez.

11   Q.  When you were on the phone with a lead, on average, how

12   long would you say that you would be on the phone for that

13   call?

14   A.  Before the consent was implemented, I would personally take

15   about five minutes with each call.  Now, once the consent was

16   implemented, it was a little bit longer because you have to

17   wait for the time period that it would take for the clients to

18   respond to the questions of the consent.

19   Q.  And the consent form that you are talking about, is that

20   the consent form that Mr. Cortes required each of the members

21   to sign to protect the agency?

22   A.  Yes, correct.

23   Q.  I will show you what was -- what's in evidence as Exhibit

24   6.

25       (The exhibit was published to the jury.)

Direct Examination - Mariana Lopez Alzate
July 11, 2023                                                        74
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    BY MR. TROPP:

2    Q.  Which says "Client Consent Statement" at the top.  Have you

3    seen the form of this document before?

4    A.  Yes, of course.

5    Q.  Is there another version of this document that was used at

6    Avant that's in Spanish?

7    A.  Yes, that's correct.

8    Q.  Now, do you remember when these consent statements started

9    to be used at Avant?

10   A.  Yes, November 17th, 2021.

11   Q.  Is there a reason why you remembered that day, or are you

12   just good with dates?

13   A.  No, I just remember it.  Just a thing I remember.

14   Q.  Now, for these consents, client consent statements, were

15   you told that these should be used, or were you told that these

16   must be used?

17   A.  No, we were told it was mandatory beginning then.

18           THE COURT REPORTER:  I'm sorry, no, we were told it

19   was what?

20           THE INTERPRETER:  That it was mandatory beginning

21   then.

22   BY MR. POLLOCK:

23   Q.  Did anyone at Avant or the -- or in Colombia for Avant make

24   sure that these consent statements were signed by each member

25   who enrolled?

1    A.   Yes.  Unless we would attach this as part of the CRM file,

2    our sales would be tagged as an issue and we would not be paid

3    for that sale.

4    Q.  Did that ever happen to you where you had sales that were

5    flagged and not paid because this consent statement was not

6    attached to the CRM file?

7    A.   No, because at that point in time -- we could see, as soon

8    as we arrived at the office, we could see the issues in the

9    system.  So as soon as we would get in for the day, we would

10   try to contact the clients to be able to resolve all of the

11   issues so that we could get paid for those sales.

12   Q.   Now, you said you have to attach the client consent

13   statement to the CRM?

14   A.   Correct.

15   Q.   Was there a process for -- for doing that, for getting the

16   consent, having it signed and having it attached?

17   A.   That is correct.

18   Q.   What was the process?

19   A.   You would send it to the customer at their cell phone.  You

20   would explain to the client what it is that they needed to do

21   in order to finalize it.  Once the client would continue

22   clicking -- would finish clicking on it, the agent would

23   download the consent form from the Blue Ink system, and once it

24   was downloaded into our computers, we would attach it as part

25   of the CRM file.

Direct Examination - Marianne Lopez Alcala
July 11, 2023                                                                    76
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    Q.   Okay.  So you had to send it by -- you would send it to the

2    customer's cell phone; was that something you would do through

3    Blue Ink?

4    A.   Yes, correct.

5    Q.   When you would receive the signed consent form back through

6    Blue Ink, would that be through the billing software or would

7    it be through an e-mail attachment?

8    A.   Through Blue Ink itself.

9    Q.   Then you would download it and then upload it to Radius Bob

10   for the particular client?

11   A.   Correct.

12   Q.   Was there someone at Avant that showed you how to perform

13   this procedure?

14   A.   Yes, Mr. Cortes did when he first implemented the Blue Ink

15   system.

16   Q.   At the time, did Mr. Cortes explain that if this signed

17   consent was not in the client's file in Radius Bob, that you

18   would not be paid for that sale?

19   A.   Yes, that is correct.  We received the instruction that

20   from that point on, it was mandatory for the sale to have that

21   consent form, otherwise -- in this -- in the system of Blue

22   Ink, otherwise the sale would not be processed.

23   Q.   Was the consent form required by any of the insurance

24   carriers themselves?

25   A.   At that point in time, no.

Direct Examination -- Marianne Lopez Alcova
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1   Q.  So this was a requirement that Mr. Cortes put on each of

 2   his agents in order to pay them; is that a true understanding?

 3   A.  At that point in time, that form did not constitute a part

 4   of the requirements within the insurance marketplace.  I

 5   understood it to be a document for protection, an internal

 6   document for the company's protection.

 7   Q.  I am going to refer you back to Exhibit No. 8.

 8       (The exhibit was published to the jury.)

 9          MR. POLLOCK:  And I am going move to Page 2.

10   Actually, let me start with Page 1.

11   BY MR. POLLOCK:

12   Q.  Was there any insurance that the agents in the office tried

13   to sell the most?

14   A.  Yes, of course.  The ones for Ambetter, Friday and Oscar.

15   Q.  Why is that?

16   A.  Because these are the ones that paid the highest

17   commissions and the ones that offered bonuses.

18   Q.  And so how much were you supposed to get paid for every

19   member that you signed up under Ambetter, Friday and/or Oscar?

20   A.  $35 per member.

21   Q.  For those three insurance carriers?

22   A.  Either one of the three.

23   Q.  Now, was there any one of those three that the agents in

24   the office tried to sell more of?

25   A.  Yes.
```

1   Q.   Which?

2   A.   Oscar.

3   Q.   Why is that?

4   A.   Because it was the one that had the highest bonus.

5   Q.   What was the bonus that you and the other agents were

6   trying to earn?

7   A.   We all would try to sell Oscar in order to earn the bonus.

8   Q.   Now, when you would sell an insurance policy, was there any

9   record that would be created to show what you sold?

10  A.   Yes, we did have a record in an Excel sheet.

11  Q.   Who created and shared this spreadsheet?

12  A.   Mr. Cortes did.

13  Q.   Now, the spreadsheet that was shared with you, did it have

14  only your policies, or did it have all the policies sold by all

15  the agents in the office?

16  A.   The first one that I received before open enrollment began,

17  my fellow coworkers did appear, but then after open enrollment

18  began, the ones that I received, they were mine individually.

19  Q.   And the spreadsheet that Mr. Cortes created and shared with

20  you that had the sales that you made during open enrollment,

21  until when did he share that document with you?

22  A.   That one ended on January the 31st.

23  Q.   So after January 31, 2022, did you have access to the

24  spreadsheet that Mr. Cortes created with all of the insurance

25  sales that you made?

1  A.  No, we no longer had any access to it.

2  Q.  Now, at the time that the -- let me start over.

3      The insurance policies that you had sold during open

4  enrollment, had you gotten paid for those by January 31 of

5  2022?

6  A.  No.

7  Q.  So when did you first get paid for insurance policies that

8  you sold during open enrollment?

9  A.  Well, we started receiving the advances in November and

10  December, and if I remember correctly, as far as commissions

11  are concerned, we started receiving Oscar's either in February

12  or March.

13  Q.  So how were you able to compare the policies you paid --

14  you were paid for versus the policies that you sold?

15  A.  No, once you lost access to that Excel sheet, there was no

16  way for you to check.  Now, I personally had my own chart where

17  I could compare with what I was getting paid with the sales

18  that I made.

19  Q.  Mr. Cortes mentioned that if you wanted to know what

20  happened between the number of sales that you had and the

21  number of sales you were paid for, that you could have called

22  each of the members you signed up you didn't get paid for.

23      Do you remember hearing that?

24  A.  Yes, I recall that.

25  Q.  Would a member know why their policy wasn't credited to

1    your name for a sale?

2    A.   No.  Because we didn't have access to the Excel sheet any

3    longer, so we had no way of comparing the statement -- the

4    commissions we were getting paid for versus the statement of

5    what we had sold.

6    Q.   Mr. Cortes suggested that you could have called the

7    individual members who you thought you signed up but who you

8    didn't get paid for.

9    A.   We had -- we didn't have access to the Excel sheet which

10   told us the phone number of that sale, and therefore, we had no

11   way of knowing which one of the numbers or the sales was

12   missing.  There was no way to compare the two.

13   Q.   For Oscar, how many policies did you sell?

14   A.   955 members.

15   Q.   How do you know that?

16   A.   Because I took a picture of my sales sheet.

17        (Pause in proceedings.)

18   BY MR. POLLOCK:

19   Q.   Now I want to show you Exhibit 12, which I went through

20   with Mr. Cortes yesterday and came up with some totals.

21        (The exhibit was published to the jury.)

22   BY MR. POLLOCK:

23   Q.   So Mr. Cortes and the Defendants credited you with 688

24   sales.  Were you bothered by this difference?

25   A.   I sent him an e-mail with all the different carriers which

1    I considered I had money missing from and the differences that

2    I found regarding the sales performance and what I had received

3    as far as payments.

4    Q.   Did Mr. Cortes respond to your e-mail?

5    A.   No.

6    Q.   There was talk about you could work from home whenever you

7    wanted.  Were you allowed to work from home whenever you wanted

8    to?

9    A.   No, that isn't correct.

10   Q.   Where were you required to work?

11   A.   At the Kendall office.

12   Q.   Was there a time when you got COVID?

13   A.   Yes, that's correct.

14   Q.   When was that, when did you have COVID?

15   A.   End of December 2021, early January 2022.

16   Q.   Okay.  I am going to show you this part of Exhibit 4.

17        (The exhibit was published to the jury.)

18   BY MR. POLLOCK:

19   Q.   Do you recognize this e-mail?

20   A.   Yes.

21   Q.   Mr. Tropp, when he was examining Ms. Ledesma, was asking

22   about Jorge Tomayo.  Do you recognize Jorge Tomayo as somebody

23   who used to work for my office?

24   A.   Yes.

25   Q.   And Brigitte, does Brigitte work for my office?

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 82 of
206

Direct Examination / Marlene Lopez Alcala
July 11, 2023                                                    82
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    A.   Yes.

2    Q.   And so at the top where you're forwarding this e-mail, is

3    this so that you could send the e-mail to my office?

4    A.   Yes, correct.

5    Q.   Now, the e-mail that you really should pay attention to is

6    below; is that right?

7    A.   Yes, that's correct.

8    Q.   Okay.   Let's look at it without the distractions.   Now, on

9    Tuesday, January 20 -- January 4th, 2022 at 7:19 p.m., what did

10   you do?

11   A.   I contacted the users that Mr. Cortes sent me by e-mail.

12   Q.   When you sent an e-mail to Mr. Cortes, how did you refer to

13   him in this e-mail?

14   A.   "Hello, boss."

15   Q.   Is that how you referred to Mr. Cortes, as boss?

16   A.   I would always call him boss, yes.

17   Q.   Would he ever tell you, Hey, don't call me that, I'm not

18   your boss?

19   A.   No, never.

20   Q.   And so you are asking him to send you what in this e-mail?

21   A.   He wrote me -- so that I wouldn't lose sales or miss out on

22   sales due to the fact that I had contracted COVID -- to my cell

23   phone asking me if I could connect or log in from home.   He

24   asked me if I had good Internet or if I had headphones.   And

25   then afterwards, he sent me the links so that I could open the

1   links from home.

2   Q.   So did this e-mail, where Mr. Cortes sends you the log-in

3   information for the websites that you needed to work, come

4   about because you asked him to work from home, or did he ask

5   you to work while you were home sick?

6   A.   He asked me.

7   Q.   Now, the first link is to access what software?

8   A.   It's for the Radius Bob, CRM.

9   Q.   Before -- before January 4th, 2022, did you know the e-mail

10  -- the Internet address of where to access Radius Bob from your

11  home?

12  A.   As far as knowing it is considered, yes, we knew it because

13  we would work on a daily basis with the CRM.  But we were not

14  authorized to access it from our homes.

15  Q.   Who authorized it -- who authorized you to work from home

16  in early January of 2022?

17  A.   Mr. Cortes did.

18  Q.   And for how long did he authorize you to work from home in

19  January of 2022?

20  A.   Until my COVID went away and I could go back to the office.

21  Q.   What about the website below, what's that one stand for?

22  A.   That's the site where you quote the different policies in

23  the insurance marketplace.

24       (Pause in proceedings.)

25  BY MR. POLLOCK:

Direct Examination - Mariana Lopez Alcala
July 11, 2023                                        84
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1   Q.  If you were going to miss a day of work, were you expected
 2   to let --
 3              THE COURT REPORTER:  I'm sorry, let what?
 4              MR. POLLOCK:  Let Avant know.
 5              THE WITNESS:  Yes, we would let Alix know.
 6   BY MR. POLLOCK:
 7   Q.  I mean, were you allowed to just not show up for days on
 8   end during open enrollment?
 9   A.  It was our duty to show up to work every day.
10   Q.  Now, did you bring any of your own items to work?
11   A.  No.
12   Q.  Did you bring any headsets or keyboards or monitors or a
13   mouse or a computer, anything like that to the office so that
14   you could work?
15   A.  Yes, I did buy my own mouse out of my own comfort, for my
16   own comfort.
17   Q.  Did you buy anything else?
18   A.  No.
19   Q.  And about how much did you spend on that mouse?
20   A.  Like $14 on Amazon.
21        (Pause in proceedings.)
22   BY MR. POLLOCK:
23   Q.  When you received your insurance license for Florida, did
24   you receive or apply for insurance licenses to sell insurance
25   anywhere else?
```

1    A.   No.

2    Q.   So you wouldn't have sold any insurance for Blue Cross Blue

3    Shield of Texas or Illinois?

4         THE INTERPRETER:   I'm sorry, Counsel, what was that?

5    BY MR. POLLOCK:

6    Q.   Would you have -- did you sell insurance for Blue Cross

7    Blue Shield of Texas or Illinois?

8    A.   No.   It was Mr. Cortes that filed those applications for

9    me.

10   Q.   How did he file those applications for you?

11   A.   Because I didn't know how to do that, and he applied in

12   every state where he had learned that he could sell insurance.

13   Q.   What was your involvement in applying for these licenses to

14   sell insurance in the different states?

15   A.   Well, I went over to his office, and as he was filling out

16   the applications, he made the payment.   I think that in total

17   -- for the different states.   In total, he paid, like, $800 for

18   all the applications for all the different states.   So what it

19   was is that he would fill those out while I was there, and then

20   in some of them, I had to provide my Social Security number,

21   and some others I think there were some signatures, like

22   digital signatures and in others, my ID needed to be attached

23   as well and so he handled all of that.

24        MR. POLLOCK:   Your Honor, at what point do you want to

25   take a break, just so I can gauge my exam?   If it's a good

Direct Examination - Mariana Lopez-Alzaga
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

 1    point now.

 2            THE COURT:  How much longer?

 3            MR. POLLOCK:  I'm going to have a bit, probably an

 4    hour.

 5            THE COURT:  You have three other witnesses for today,

 6    so how much longer?

 7            MR. POLLOCK:  I'm sorry?

 8            THE COURT:  You have three other witnesses for today;

 9    how much longer with her?

10            MR. POLLOCK:  Um, probably 30, 40 minutes.

11            THE COURT:  Well, we will break at 12:30, in five

12    minutes.

13            MR. POLLOCK:  And I'll be -- I will try to run

14    through, be quick and then move on.

15            THE COURT:  Okay.

16            MR. POLLOCK:  Your Honor, if you want to break now,

17    then I can just run through it after.

18            THE COURT:  Very well.

19            MR. POLLOCK:  So it's 12:30 and then we can resume and

20    I will just try to finish by 1:00.

21            THE COURT:  Thank you.

22            MR. POLLOCK:  Thank you, Your Honor.

23            THE COURT:  Ladies and gentlemen, we will take our

24    lunch recess.  Please do not discuss this case.  Please avoid

25    contact with the parties.  And we will see you back at 1:30.

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 87 of
206                                                                                    87
Direct Examination - Mariane Lopez Alcala
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   Have a good lunch.

2           COURT SECURITY OFFICER:  All rise for the jurors.

3       (The jury exited the courtroom at 12:26 p.m.)

4           THE COURT:  You all have a good lunch.

5           MR. CUETO:  Thank you, Your Honor.

6           (A lunch recess was taken at 12:26 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              A F T E R N O O N   S E S S I O N

2         (1:37 p.m.)

3         COURT SECURITY OFFICER:  All rise.

4         MR. POLLOCK:  Your Honor, before the jury comes in,

5    real quick.  I don't recall that Your Honor gave the usual

6    instruction about if the jurors encounter lawyers in the

7    hallway.

8         THE COURT:  Not to have contact with them.

9         MR. POLLOCK:  Not to have contact with them.  So I

10   just want to make sure that that was given.

11        THE COURT:  I have given that before.  Why?

12        MR. POLLOCK:  It just popped into my head, and one of

13   the jurors said, you know, hello and I didn't say anything.

14        THE COURT:  Oh, all right.

15        MR. POLLOCK:  I didn't want them to think I was rude.

16   I didn't respond, but I just smiled.

17        THE COURT:  That's fine.  All right.  Thank you.

18      (The jury entered the courtroom at 1:38 p.m.)

19        THE COURT:  Everyone, please be seated.

20        Please continue.

21        MR. POLLOCK:  Thank you, Your Honor.

22              DIRECT EXAMINATION (Cont'd.)

23   BY MR. POLLOCK:

24   Q.  Mariana, I want to just talk a little bit about the end of

25   your employments with the Defendants.  Do you remember when
```

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 89 of 206

Direct Examination - Mariana Lopez Alcala
July 11, 2023                                              89
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1   that was?
 2           THE INTERPRETER:  I'm sorry, Counsel, can I get that
 3   question again?
 4   BY MR. POLLOCK:
 5   Q.  I want to talk about the end of your employment with the
 6   Defendants.  Do you remember when that was?
 7   A.  July the 11th.
 8   Q.  And I want to show you what's been marked as part of --
 9   what's been introduced into evidence as part of Exhibit 4, and
10   tell me if you recognize this e-mail.
11       (The exhibit was published to the jury.)
12   BY MR. POLLOCK:
13   Q.  Do you recognize the e-mail?
14   A.  I do.
15   Q.  And why did you send this e-mail?
16   A.  Because that day, July the 11th, I had surgery scheduled
17   for one of my wisdom teeth, and I was notifying that I was not
18   going to be showing up to work.
19   Q.  Were you required to let the Defendants know that you
20   weren't going to be at work in advance?
21   A.  As per the prior e-mails and the new instructions regarding
22   the company policies, we had to inform Alix by e-mail and
23   Jennifer Manjarres whenever we were going to miss work or
24   arrive late.
25   Q.  Did you send any other e-mails on July 11th of last year?
```

1          THE INTERPRETER:  On July 1?

2          MR. POLLOCK:  July 11th of last year.

3          THE WITNESS:  Yes, correct.  Correct.  After my

4    surgery when I notified them that I was no longer going to be

5    working at the office.

6    BY MR. POLLOCK:

7    Q.  Now, can you read for us in Spanish the e-mail that you

8    sent on July 11th of 2022, at 3:24 in the afternoon?

9    A.  Yes, of course.

10   Q.  Please go ahead and read it out loud.

11   A.  (Witness reading in Spanish.)

12       "Good afternoon.  Given to the uncomfort that I have been

13   feeling lately in the work environment, added to the anxiety

14   that generates having to work on a daily basis with the police

15   officer within the installations after the supposed threat from

16   an ex former coworker, I have decided to no longer provide

17   services as an insurance agent -- health insurance agent which

18   I have been providing up until Friday, July the 8th of 2022.

19   With nothing to add, Mariana Lopez."

20   Q.  So were you saying that July 8th of 2022, was going to be

21   your last day, or was it August 7th of 2022 going to be your

22   last day?

23   A.  July the 8th was the last day that I worked there.

24   Q.  And you are saying that there was a police officer who was

25   inside of the office?

1    A.   Yes, that's correct.

2    Q.   And who is the ex-coworker that had been making those

3    threats that you were concerned about?

4    A.   Alberto Garza.

5    Q.   What kind of threats did Mr. Garza make?

6    A.   According to what Mr. Cortes told us, supposedly Mr. Garza

7    had gone to the office due to what had occurred with Carlos and

8    Delio in the morning, and he had come -- he arrived armed.

9    That's why he called the police of Doral.

10   Q.   I need to move on.

11        Your husband, Francisco Suprani, does he work outside the

12   home?

13   A.   Yes.

14   Q.   What does he do?

15   A.   He's into boat maintenance.

16   Q.   Before his current job, did he work for himself?

17   A.   Yes.

18   Q.   What was the company that he worked for?

19   A.   Uber.

20   Q.   Okay.  Did you husband have his own company?

21   A.   In 2021, both him and I created, opened a company.

22   Q.   What's the name of the company that you and your husband

23   built?

24   A.   Suprani Service LLC.

25   Q.   Did you and your husband do any business through Suprani

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 92 of 206

Direct Examination - Mariana Lopez Alcala                    92
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    Services LLC?

2    A.   Yes.

3    Q.   Before working with Avant, did you perform any services

4    through Suprani Services?

5    A.   No, I never did.

6    Q.   Now, when you worked at Avant, because they decided you

7    were an independent contractor, how many 1099s did you receive

8    from them?

9    A.   One.  One for 2021.

10   Q.   What about for 2022, did they ever send you any?

11   A.   Yes, I received this year the ones for 2022.

12   Q.   You said the ones.  Did they send you more than one 1099

13   for 2022?

14   A.   I received two for the year 2022.

15   Q.   Okay.  Why did you receive two 1099s for 2022?

16   A.   Because the months of January and February were paid to me

17   as Mariana Lopez as an individual, and from March forward, I

18   was paid under Suprani Service LLC.

19   Q.   I am going to show you what's in evidence as Exhibit 3 as

20   redacted and see if you recognize this document.

21        (Plaintiffs' Exhibit No. 3 was identified.)

22        (The exhibit was published to the jury.)

23   BY MR. POLLOCK:

24   Q.   Do you recognize this?

25   A.   I do.

Direct Examination - Mariana Lopez Alzola
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    Q.   What is this; is this a 1099?

2    A.   It is a 1099 that I received for 2021.

3    Q.   Now, this 1099 indicates that Avant Assurance paid you

4    personally $23,465; is that what it says?

5    A.   Yes, that's correct.

6    Q.   Okay.  Now, this $23,465, does this include the weeks that

7    you were paid $600 while you were studying?

8    A.   Yes, that's correct.

9    Q.   And does this 23,465 also include the weeks that you were

10   paid $800 before open enrollment?

11   A.   Yes, that's correct.

12        (Pause in proceedings.)

13   BY MR. POLLOCK:

14   Q.   And then did you make commissions that were included in

15   this 1099 before open enrollment started?

16   A.   Yes, that's correct.

17   Q.   How much in commissions did you receive before open

18   enrollment?

19   A.   I believe I had a deposit for the amount of 1,265.  And

20   another one for 800.

21   Q.   The 800 was commissions, or was that the weekly pay?

22   A.   The 800 were for the weekly pay.

23   Q.   Okay.  So with the rest of the money that you were paid

24   after deducting the commissions and the weekly pay before open

25   enrollment, represent the advances that you received from Avant

Direct Examination - Mariana Lopez Alcala
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    towards the money you make in open enrollment?

2    A.  Yes, that's correct.

3    Q.  Okay.  Now I will show you what's in evidence as Exhibit

4    12, which is the spreadsheet that I had previous reviewed with

5    Mr. Cortes.

6        (The exhibit was published to the jury.)

7    BY MR. POLLOCK:

8    Q.  I'm trying to make it a little bit bigger so we can see

9    what's going on here.

10       Mr. Cortes said that this was a spreadsheet that represents

11   all the payments to you and Delio and Rafaela, Anna and Carlos.

12   And then here we had looked at the amount that he had paid to

13   everybody for Oscar.

14       Do you remember seeing that?

15   A.  Yes, I remember.

16   Q.  And then in here, he's included the amounts that he's paid

17   and who he paid those moneys to.  Do you see that?

18   A.  Yes, I can see that.

19   Q.  And we see that the first payment was made to you in 2022

20   on what date?

21       This was the deliver by date.  So if we go down to you, it

22   was delivered by direct deposit, money to you on what date?

23   A.  January the 1st of 2022.

24           MR. POLLOCK:  January or February?

25           THE INTERPRETER:  February the 1st of 2022.

Direct Examination - Mariano Lopez-Alcala
July 11, 2023                                                        95
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
1    BY MR. POLLOCK:
2    Q.  Okay.  And he then paid you $9,110?
3    A.  Yes, that's correct.
4    Q.  And then he paid you -- and that was the only amount that
5    he paid you in January -- excuse me, in February; do you see
6    that?
7    A.  Correct.
8    Q.  Now, if we look at this $9,110, Mr. Cortes had summarized
9    the amount that he paid to you every month in the first page of
10   this document.  So let me jump there.
11   A.  Okay.
12   Q.  And he said he paid you $15,080 in February?
13   A.  Correct.
14   Q.  Okay.  So we would see another deposit of $5,970 in
15   February, on the 23rd; do you see that?
16   A.  I can see that.
17   Q.  So those two numbers together should add up to the $15,080.
18   A.  Okay.
19   Q.  Now the $15,080, was that supposed to pay you for part of
20   the money you earned in open enrollment?
21   A.  That's correct.
22   Q.  Again, in March, Mr. Cortes indicates he paid you $12,525;
23   do you see that?
24   A.  I can see that.
25   Q.  Do you agree that's the amount he paid you in March?
```

1   A.   I believe so.

2   Q.   And is that the amount -- does that amount represent

3   commissions you made during open enrollment?

4   A.   Correct.

5   Q.   So when we look at the advances, the money that was paid to

6   you in February and the money that was paid to you in March,

7   would that be the total of the amount that Mr. -- that the

8   Defendants paid to you during open enrollment?

9   A.   Probably so.

10  Q.   Okay.  So you made -- you received about $47,800 or so in

11  open enrollment, as far as what you were paid, 47,796; is that

12  what you understood you made?

13  A.   No.

14  Q.   Did you believe you made more money than 47,700 -- $47,796

15  during open enrollment?

16  A.   Yes.

17  Q.   How much should you have made?

18  A.   It was approximately $54,000, and I informed Mr. Cortes

19  about that through an e-mail that I sent him.

20  Q.   Now, this $54,000, that was the money you made for which

21  months, or you should have made during which months?

22  A.   During the period of open enrollment, those 54,000 are my

23  sales compared to what I received as far as deposits.

24  Q.   How many weeks is open enrollment?

25  A.   13 weeks, approximately.

Direct Examination - Mariano Lopez Alcala
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

97

1  Q.  So are you telling us that you would have made -- that you

2  should have received $4,153.58 a week during open enrollment?

3  A.  Well, probably.  According to this calculation, yes.

4  Q.  I mean, are these the calculations that you would like us

5  to use?

6  A.  Yes, I have no problem with it.

7  Q.  And then you said you were working about 60 hours a week?

8  A.  Approximately.

9  Q.  And you weren't paid hourly, were you?

10  A.  Only in the beginning --

11        THE INTERPRETER:  Sorry, Counsel.

12        THE WITNESS:  Only at the beginning.

13  BY MR. POLLOCK:

14  Q.  All right.  During open enrollment, were you paid hourly?

15  A.  No.  During open enrollment, all the agents, we would all

16  get paid the same commissions, the same rates for everybody.

17  Q.  Okay.  Did you earn a bonus for open enrollment?

18  A.  Yes.

19  Q.  Okay.  So in addition to the $54,000 in commissions, should

20  you -- you also earned a bonus because of the number of sales

21  that you made during open enrollment; is that right?

22  A.  Yes, that's correct.

23  Q.  And is that the $25,000 bonus?

24  A.  I earned the bonus for the $25,000, yes.

25  Q.  So for open enrollment, what you really earned was $54,000

1   plus the $25,000 bonus?

2   A.  I also earned two additional bonuses.

3   Q.  What other bonuses did you earn?

4   A.  I got the one from Bright Health, which was $6,000, more or

5   less, and that was deposited around December the 18th,

6   approximately.  And I also earned another bonus from Friday,

7   which was $5,000, and that was deposited in May, I believe,

8   because we were still over at the Kendall location.

9   Q.  Okay.  The money that you earned in December, the bonus,

10  that would have been included in your W -- in your 1099 for

11  2021, would it not?

12  A.  Yes, I suppose they included it as part of that.

13  Q.  But we should include the $5,000 bonus you received in May,

14  because that's the amount -- that's the bonus you earned during

15  open enrollment; is that what you are telling us?

16  A.  The three bonuses, all three bonuses that I earned, I

17  earned all of them because of the sales during the open

18  enrollment period.

19  Q.  Okay.  So we take the 54,000 that you should have earned,

20  plus the 30,000 in bonuses, so you should have received a total

21  of $84,000 for the -- for open enrollment for your work?

22  A.  Yes.

23  Q.  And you worked 13 weeks?

24  A.  Correct.

25  Q.  And that would have given you $6,461.54 a week?

1    A.  Okay.

2    Q.  And we know you weren't paid hourly for open enrollment,

3    but we have to calculate overtime on an hourly basis, so --

4    A.  Okay.

5    Q.  Now, if we -- if you're already paid this --

6            MR. TROPP:  Objection, Judge.  Is counsel testifying

7    as to what she's owed?  Can he ask her?

8            THE COURT:  Is your objection to leading?

9            MR. TROPP:  Yes.

10           THE COURT:  Sustained.

11   BY MR. POLLOCK:

12   Q.  Ms. Lopez, if you are working 60 hours a week and you told

13   us that you should have made $6,461.54, how do we find out how

14   much you were paid per hour; do we add, do we subtract, do we

15   divide?

16   A.  I don't know.

17   Q.  We need to come up with an hourly rate for you in order to

18   figure out overtime, right?

19   A.  Yes.

20   Q.  And what you are seeking is money that you weren't paid for

21   overtime from the Defendants; is that what you are asking for

22   as part of this lawsuit?

23   A.  Yes.

24   Q.  And so if overtime is time and a half, then you were

25   already paid -- you are claiming, what, the half time?

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 100 of
206                                                                    100
Direct Examination - Mariana Lopez Alcala
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    A.  Yes, whatever's owed to me.

2    Q.  So whatever's owed to you would be for overtime, the other

3    half of your hourly rate what you should have been paid; is

4    that what you are asking for?

5    A.  Yes, correct.

6    Q.  Now, for that half that you are owed for every hour, how

7    many overtime hours a week did you work during open enrollment?

8    How many hours?

9    A.  Approximately, between 15 and 20.

10   Q.  So to figure out how much you are owed a week, we look at

11   the half time you are owed for each -- the overtime hours; is

12   that what you want us to do?

13   A.  Okay.

14           MR. TROPP:  Objection, leading and -- leading also.

15           THE COURT:  Sustained.

16   BY MR. POLLOCK:

17   Q.  Ms. Lopez, how should we determine -- let me ask this a

18   different way.

19       Do you know how much overtime you are owed per week

20   offhand?

21   A.  Approximately, in total, it is like 16,000.

22   Q.  Okay.  And besides the overtime that you are owed, is there

23   other money that you believe that you are owed from the

24   Defendants?

25   A.  Yes.  The difference, the amount that I was not paid and

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 101 of
206
101
Cross-Examination - Mariana Lopez Alcazar
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    should have been paid due to the open enrollment that I sent

2    over to Mr. Cortes through e-mail.

3    Q.   And how much is that?

4    A.   I think it was 5700, approximately.

5    Q.   Is there any other money that you believe that Defendants

6    owe you from your employment with them?

7    A.   Yes.   There's also a balance of approximately $10,000 from

8    commissions outside the open enrollment period.

9    Q.   So how much are you -- how much are you asking the jury to

10   award you for the wages that you earned for your employment

11   with the Defendants for overtime, the commissions that weren't

12   paid to you during open enrollment and the commissions that you

13   earned after open enrollment?

14   A.   Approximately 31,000.

15            MR. POLLOCK:   Nothing further from this witness, Your

16   Honor.

17            Thank you, Mariana.

18            THE COURT:   Cross-examination?

19                     CROSS-EXAMINATION

20   BY MR. TROPP:

21   Q.   Hi, Mariana Lopez.   How are you?

22   A.   Good afternoon, Mr. Tropp.

23   Q.   Okay.   So when you first started working, you were paid

24   $600 just to study to get the license, right?

25   A.   Correct.

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 102 of 206
Cross-Examination - Mariana Lopez Alcala
July 11, 2023                                    102
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   Q.  And then you were told the other agents had the opportunity

2   starting out to get $20 an hour, you would get a lesser

3   commission?

4   A.  Correct.

5        THE COURT REPORTER:  Mr. Tropp, is your microphone on?

6        (Pause in proceedings.)

7   BY MR. TROPP:

8   Q.  So you, yourself, approached Reinier Cortes and said, You

9   don't have to pay me the $20 anymore, and you were able to get

10  a higher commission, up to, like, $35 per policy, correct?

11  A.  No.  Those $35 were after open enrollment.  When open

12  enrollment began.

13  Q.  When you stopped getting the $20, your commission went up?

14  A.  Starting November 1st, with open enrollment.

15  Q.  Okay.  And when did you start?

16  A.  Well, I got my license on October the 8th, and I got my

17  first sale -- sorry, October the 11th.

18  Q.  And you started selling, like, after a day of training?

19  A.  I started selling the same day.

20  Q.  And so you started around October, and then the national

21  registration was November?

22  A.  It was on November the 1st, but we started selling for the

23  open enrollment approximately in October the 26th.

24  Q.  Okay.  And how many hours a week did you say earlier that

25  you worked for that national registration period?

Cross-Examination - Marlene Lopez Alcala
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    A.  Most of the time I would work for the entire time there,

2    from 9:00 to 9:00, with some few exceptions.

3    Q.  So how many hours, how many days a week?  12 hours a day?

4    A.  I was working Monday through Fridays.

5    Q.  So, um, that's how many hours, 62?  62 hours for that week?

6    A.  60, tops.

7         MR. TROPP:  One second, please.

8      (Pause in proceedings.)

9         THE COURT:  Are you done with the Plaintiff,

10   Mr. Tropp?

11        MR. TROPP:  I just need about 30 seconds.  Almost

12   there, Judge.  Sorry.

13     (Pause in proceedings.)

14        MR. TROPP:  Let me move on and come back to that.

15   BY MR. TROPP:

16   Q.  Okay.  Did you ever -- if you ever wanted to not show up or

17   report to work, you were able to work from home, if you wanted

18   to?

19   A.  No.

20   Q.  You were not allowed?

21   A.  It was only when I got COVID that Mr. Cortes authorized me

22   to.

23   Q.  And did you ever ask any other time if you could work from

24   home or not have to show up?

25   A.  Well, when I was first there, when I first started there, I

Cross-Examination - Mariana Lopez Alcala
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    realized that there was a lot of -- in the chat, I could see

2    there was a lot of work, things were very fluid, and I asked

3    Andrea if I could help out from home, and she said to me, No,

4    you cannot because there's a lot of confidential information.

5    Q.   Okay.  Now, in 2022, did you work for yourself as a -- as

6    an independent insurance agent?

7    A.   You mean at Avant's office?

8    Q.   Yeah, besides Avant's office.

9    A.   Well, after I resigned.

10   Q.   And how about before you resigned?

11   A.   Only at Mr. Cortes's office.  I always worked at Cortes's

12   office.

13   Q.   What -- when did you start working -- did you ever work for

14   Carlos Lopez Alcala P.A.?

15   A.   I didn't work for him.  He is my relative.  We worked

16   together within the same company, but not that he was my

17   employer.

18   Q.   And when did you start working -- when did you work for or

19   with Carlos Lopez Alcala P.A.?

20   A.   Approximately in --

21            THE COURT REPORTER:  I'm sorry, what was the answer

22   again?

23            THE INTERPRETER:  Approximately in August of 2022.

24            MR. TROPP:  Your Honor, I am going to move fast

25   through this witness.  If you could just give me just 25

1    seconds to find something, if I could.

2              THE COURT:  Yes.

3              MR. TROPP:  Thank you.

4         (Pause in proceedings.)

5    BY MR. TROPP:

6    Q.  Okay.  When you -- when you started working for Avant, were

7    you an independent contractor?

8    A.  Well, that's what they told me at the end of the period.

9    Q.  Well, what about in the beginning, did you consider

10   yourself an independent contractor?

11             MR. POLLOCK:  Objection, Your Honor, we have a motion

12   *in limine* on this issue.

13             THE COURT:  Sustained.

14   BY MR. TROPP:

15   Q.  Now, aside from the $20 an hour from the beginning, did you

16   ever discuss overtime, or was that ever part of any agreement

17   with -- with Avant or Reinier?

18   A.  No.  And back then, I would leave at 5:30 p.m.

19   Q.  But your answer is no, there was no overtime discussion or

20   promise?

21   A.  No.

22   Q.  Suprani LLC, that was your company?

23   A.  Correct.

24   Q.  And did Suprani LLC have its own insurance license as you

25   put your insurance license with Suprani LLC?

1   A.   Yes.   Mr. Cortes helped me out to get that processed.

2   Q.   How does that work?   How does it work to put your insurance

3   license with this Suprani company?

4   A.   I have no clue.   You would have to ask Mr. Cortes about

5   that.   He's the one that did it.

6   Q.   But it was your company?

7   A.   Yes, but I just gave him the information and he handled the

8   rest.

9   Q.   So do you take any responsibility for how your license or

10   your company is?   You are blaming that also on Mr. Cortes?

11   A.   I trusted in that he knew how all -- how these agencies

12   work.   So I just gave him the information, provided the data,

13   he filled it out and then I got an e-mail saying that the

14   registration had been accepted and then I forwarded that e-mail

15   to him.   That was it.

16   Q.   Okay.   And how about Suprani LLC, did you file that as

17   self-employed or your own business?   Like when you did your

18   taxes, did you say you were an employee for Suprani LLC?

19   A.   Well, before I had never worked for Suprani LLC.

20   Q.   When did you start working for Suprani LLC?

21   A.   I started getting paid by Suprani LLC in March of 2022.

22   Q.   March.   You left -- you stopped working around July of

23   2022, July or August?

24   A.   In July of 2022.

25   Q.   So April, May, June, July, so about five months you --

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 107 of
206
Cross-Examination - Mariana Lopez Alcala
July 11, 2023
107
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    okay.  Thank you.

2          THE INTERPRETER:  The interpreter would like to make a

3    correction for the record, Your Honor.

4          THE COURT:  Yes.

5          THE INTERPRETER:  The prior answer that I translated

6    as, I started getting paid by Suprani LLC at around March.  It

7    should have been properly interpreted as, I started getting

8    paid through Suprani LLC around March.  I made an interpreter

9    notation.

10          THE COURT:  Thank you.

11          MR. POLLOCK:  Your Honor, I object.  Is counsel trying

12    to introduce a deposition into evidence that --

13          THE COURT:  I don't know.  All we have is the front

14    page, so let's see where we go from here.

15          Your next question, please.

16    BY MR. TROPP:

17    Q.  Okay.  Do you remember, Ms. Lopez, coming to -- I mean,

18    having your deposition where I asked you some questions?

19    A.  Yes, I remember.

20    Q.  And were you -- do you remember you were under oath during

21    the deposition, and you were informed that you had to tell the

22    truth?

23    A.  Yes, I remember.

24    Q.  Okay.

25          MR. POLLOCK:  Your Honor, can we take down the

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 108 of
206
108
Cross-Examination - Marlene Lopez-Alcala
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1    deposition transcript from the monitors?  I don't believe it is

 2    in evidence.

 3            THE COURT:  The deposition of a party can be used for

 4    any purpose, not just impeachment.

 5            MR. POLLOCK:  It can be read, but not -- there wasn't

 6    any designations that were filed.

 7            THE COURT:  Why don't you -- Mr. Tropp, why don't you

 8    speak to Plaintiffs' counsel.

 9            You can have a conversation, see if there's still an

10    issue.

11        (Pause in proceedings.)

12            MR. POLLOCK:  So, Your Honor, it appears that Counsel

13    is not seeking to introduce testimony, he is seeking to

14    cross-examine.  And if that's the case, this would be

15    improper -- his seeking impeachment, would be improper

16    impeachment.

17            THE COURT:  Right, then it's not proper impeachment,

18    correct.  Sustained.

19            MR. TROPP:  I will re-ask the question, if I could.

20            THE COURT:  Well, you never asked a question.

21            MR. TROPP:  Okay.

22            THE COURT:  You never obtained a response that you

23    would then seek to impeach with prior inconsistent testimony.

24    You only asked if she remembered being deposed and swearing to

25    tell the truth.
```

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 109 of
206

Cross-Examination - Marielena Lopez-Alcazar                    109
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

 1         (Pause in proceedings.)

 2              MR. TROPP:  Okay.

 3    BY MR. TROPP:

 4    Q.  During -- I asked you earlier, during the national

 5    registration period, you -- you -- you enrolled about 1800

 6    people, correct?

 7    A.  Yes, you did ask me in the deposition.

 8    Q.  And today you are saying that you, during that period,

 9    worked 12 hours a day, five days a week, over 60 hours?

10    A.  Approximately so.

11    Q.  Okay.  And when you came -- when you had your deposition

12    and I asked you how many hours a week did you work, did you

13    remember what -- the answer that you gave?

14    A.  I think my answer was between 40 and 60.

15    Q.  Okay.

16              MR. TROPP:  Judge, if I may, I would like to impeach

17    the witness with -- may I read what she actually said?

18              THE COURT:  I'm not sure what you are asking me to do,

19    Mr. Tropp.

20              MR. TROPP:  All right.

21              THE COURT:  Ask your next question.

22    BY MR. TROPP:

23    Q.  At your deposition when I asked you, "So from September --

24              THE COURT:  Line and page, please?

25              MR. TROPP:  Yes, Judge.  I'm sorry.

Case 1:22-cv-22671-CMA  Document 123-2  Entered on FLSD Docket 09/21/2023  Page 110 of
206
Cross-Examination of Marlene Lopez-Alcala
July 11, 2023
110
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1        (Pause in proceedings.)

2            MR. TROPP:  Page 12, Line 15.  Sorry, question's on

3    Page 13 -- Page 12, Line 13.

4    BY MR. TROPP:

5    Q.  So in September, I asked at your deposition:

6            "In September when you started, you were getting paid

7    600 a week.  Do you know how many hours a week you worked

8    during that period?

9            "Yes.

10           "How many?

11           "40.

12           And then I asked you,

13           "QUESTION:  Did you -- all of those 40 hours at the

14   location at Avant Assurance?"

15           And you said, "Yes."

16           And then I asked you:  "Let me make sure I do the math

17   right.  Hold on.  40 times 20 is 800 a week, right?"

18           Do you remember answering that?

19   A.  Yes, I remember.

20   Q.  Your answer would be 40 hours a week, that you worked 40

21   hours during the national period?

22           MR. POLLOCK:  Objection, Your Honor, that's

23   mischaracterizing testimony that my client gave in deposition.

24           THE COURT:  How so?  I don't know.  I don't have the

25   deposition in front of me.  Nobody has given it to me, and I

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 111 of
206

Cross-Examination - Mariana Lopez-Alcazar
July 11, 2023                                                111
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

 1   don't know how it -- if it's being read incorrectly.

 2           MR. POLLOCK:  I wasn't saying it was being read

 3   incorrectly.  I'm saying that's a mischaracterization of the

 4   testimony that my client gave in deposition that she worked

 5   only 40 hours.

 6           THE COURT:  I don't know.  He just read it.  So if you

 7   have a different answer, if you want to have him read, direct

 8   Mr. Tropp to read the remaining question and answer.

 9           MR. POLLOCK:  I will just take it up on redirect.

10   BY MR. TROPP:

11   Q.  I will ask you a question to clear it up.  Now, on Page 12.

12       So during the national registration period, you had -- you

13   had approximately 1800 members you signed up?

14   A.  Are you reading that, or is that a question you are asking

15   me now?

16   Q.  I'm asking you now.

17   A.  Yes, that's correct.

18   Q.  Also, earlier...

19       (Pause in proceedings.)

20           THE COURT:  I'm sorry, we need to move this along,

21   Mr. Tropp.

22       (Pause in proceedings.)

23   BY MR. TROPP:

24   Q.  So, um, I -- I asked you, um, when you started working for

25   Avant and were you working for yourself as an insurance agent,

1    an independent insurance agent, what was your answer on that,

2    or what is your answer on that?

3         MR. POLLOCK:  Objection, Your Honor, that seems to be

4    improper impeachment.  I don't know what he is impeaching or

5    what he is asking.

6         MR. TROPP:  I'm asking her now what her -- I'm asking

7    the question now which -- did she hold herself out to be an

8    independent insurance agent.

9         MR. POLLOCK:  The objection would be when.

10        THE COURT:  Overruled, if she understands the

11   question.

12        THE WITNESS:  Can you re-ask the question, because I

13   did not understand it.

14   BY MR. TROPP:

15   Q.  Were you -- did you hold -- were you an independent sales

16   agent when you started working for Avant?

17   A.   No, I would not hold myself out as anyone.  I was a health

18   agent.

19        (Pause in proceedings.)

20        THE COURT:  Mr. Tropp, now is not the time to have us

21   all waiting here while you read through a deposition, sir.

22        MR. TROPP:  Okay.

23        THE COURT:  Please, let's move this along.

24   BY MR. TROPP:

25   Q.  So for -- for 2022, you had $60,000 paid to you -- paid to

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 113 of 206

Cross-Examination - Mariana Lopez Alcaraz     113
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1  your company, Suprani?

2  A.  Yes, that's the amount I received.

3  Q.  And for 2021, you were paid $18,000 in commissions for

4  2021?

5  A.  No.  I received a 1099 for 23,000.

6  Q.  And then for 2022, 80,000?

7  A.  60,000.

8  Q.  Did you receive a 1099 that you were -- that you were paid

9  80,000 for 2022?

10  A.  You asked me about the 1099 for Suprani LLC, and the 1099

11  for Suprani LLC was 60,000, not 80,000.

12  Q.  Okay.  And then how much were you -- how much did you

13  receive in 2022?

14  A.  Approximately 25,000.

15  Q.  Wait.  In 2022, you only received how much?

16  A.  As Mariana individual, 25,000.

17  Q.  So 25,000 for Mariana and 60,000 to your company?

18  A.  Exactly.

19  Q.  Now, in 2021, would you agree that all your commissions

20  were paid for 2021?

21  A.  No.  That was for a period of open enrollment, and

22  Mr. Cortes received an e-mail from me where I break down for

23  him the numbers of the members that I had registered that were

24  missing where I did not receive commission payments.

25  Q.  We are talking about 2021?

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 114 of
206
Cross-Examination - Marlene Lopez-Alcaraz
July 11, 2023
114
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   A.  Yes, that's correct.

2       (Pause in proceedings.)

3   BY MR. TROPP:

4   Q.  So at the deposition when you came to my office -- I mean,

5   when we had your deposition, I'd asked for the total amount

6   of --

7           THE COURT:  Page and line?

8           MR. TROPP:  Page 42, Line 13.

9       (Pause in proceedings.)

10          MR. TROPP:  Okay.  I'm sorry, this is Page 44, Line

11  12.

12          "For 2021, how much did you think you were supposed to

13  receive from Avant?  How much did they owe you?  And we

14  clarified that they paid you everything for 2021, right, for

15  the commissions?"

16          And your answer was:  "The commissions were all paid

17  in full for 2021."

18          THE WITNESS:  Well, I probably didn't remember back

19  then, but I do have the e-mail that I sent over to Mr. Cortes,

20  dated February the 24th, if I'm not mistaken.

21  BY MR. TROPP:

22  Q.  When you said that all the commissions were paid to you for

23  2021, were you being truthful then or mistaken, or were you

24  being untruthful?

25  A.  It's not that I was being untruthful.  It's that I probably

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 115 of
206
Cross-Examination - Maryanne Lopez Alcala
July 11, 2023                                                          115
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    had not remembered at that moment in time the e-mail that I had

2    sent Mr. Cortes.

3    Q.   Okay.  I will get to that.

4         And the $25,000 bonus for July 2022, did you receive that?

5    A.   Yes, I did receive it.

6    Q.   Okay.  Earlier you said -- would you agree or disagree that

7    Andrea was there to help you while you were working at Avant?

8    A.   Not just for me, but for all the staff that was working in

9    the office.

10   Q.   So she did help you?

11   A.   Yes, that's correct.

12   Q.   And she didn't control you?

13   A.   No, she didn't control us.  She would supervise us.

14   Q.   Okay.  And then when you had -- after you had your

15   training, would you agree that you developed your own sales

16   technique on how to make sales?

17   A.   Well, every one of us would say basically the same thing,

18   because we were all selling the same products.

19   Q.   Okay.

20        (Pause in proceedings.)

21           THE COURT:  Are you done with your cross, Mr. Tropp?

22           MR. TROPP:  Almost done, Judge.

23   BY MR. TROPP:

24   Q.   Okay.  I asked you earlier when you stared working for

25   Avant, you understood that you would be an independent

1   contractor.  Would you agree that that was the case?

2   A.  At that point in time, we didn't talk about what we were

3   going to be, if we were going to be anything.  We were just

4   simply insurance agents working from an office.

5   Q.  Again, do you recall when you -- I took your deposition?

6   A.  Yes, but I don't remember every question you asked me, not

7   memorized.

8   Q.  But do you remember that you were under oath to tell the

9   truth when you took that deposition?

10  A.  Yes, correct.

11  Q.  Like you are here today?

12  A.  Yes, that's correct.

13  Q.  I would like just to point out on Page 22, and I asked you:

14      "When you started working, working for Avant Assurance,

15  were you an independent contractor?"

16      And your answer was, "Yes."

17  A.  Because that's the form that we received, but we never

18  talked about it, on about whether we're going to be -- we're

19  going to contractors or not.  I was just simply working from an

20  office, inside an office.

21          MR. TROPP:  I will wrap this up in less than five

22  minutes.

23      (Pause in proceedings.)

24          MR. TROPP:  Can you turn this back on?

25          MR. POLLOCK:  Your Honor, I am going to object to this

Cross-Examination - Marlene Lopez Alcazar
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   document, which not in evidence.  Can we shut the ELMO off?

2   It's not in evidence.

3           MR. TROPP:  It is a statement in the case.

4           THE COURT:  That's not in evidence, Mr. Tropp.  You

5   don't show the jury items that are not in evidence, unless it

6   is a demonstrative, and that is not demonstrative.

7   BY MR. TROPP:

8   Q.  How much are you saying that you are owed by Avant today?

9   A.  Approximately 31,000.

10  Q.  Before today, have you ever told anyone or said that you

11  were owed -- what did you say, almost -- was it 30-something

12  thousand?

13  A.  Mr. Cortes did receive the e-mail with the balance owed for

14  my commissions, and that is part of those 31,000.

15  Q.  Did you have a copy -- did you ever -- do you have a copy

16  of that e-mail?

17  A.  My attorney has it.  And I am sure Mr. Cortes also has it

18  in his inbox, and I have it in my outbox, as well, in my sent

19  e-mail folder.

20  Q.  You're saying your attorney has a copy of an e-mail where

21  you asked for $36,000?

22          THE INTERPRETER:  $3600?

23          THE WITNESS:  No, Mr. Tropp.  What my attorney has is

24  an e-mail that I sent to Mr. Cortes of the balance owed of my

25  commissions.

 1  BY MR. TROPP:

 2  Q.  Have we seen that e-mail today?

 3  A.  No, I don't know if your client has showed it to you, but I

 4  did show it to my attorney.

 5  Q.  And in this e-mail, does it specify the amount that you are

 6  claiming was owed to you?

 7  A.  Yes, the pending commissions not yet received for the open

 8  enrollment period.

 9  Q.  And that amount is how much again?

10        MR. POLLOCK:  Asked and answered.

11        THE COURT:  Overruled.

12        THE WITNESS:  If I'm not mistaken, it was 5700.

13        MR. TROPP:  5700.

14  BY MR. TROPP:

15  Q.  That's what the e-mail says?

16  A.  Yes, Mr. Tropp, that we are talking about the commissions

17  for the open enrollment.

18  Q.  And that's included in this e-mail?

19  A.  Only the commissions regarding the open enrollment, that's

20  correct.

21  Q.  And what about the other -- what about the other 25,000

22  plus?

23  A.  That is -- that is nowhere in any e-mail.

24  Q.  That's not in the e-mail?

25  A.  No, it is not in the e-mail.

1    Q.   Okay.  So is it fair to say that you had sent some e-mail

2    to Reinier saying he -- you're owed or asking for something

3    about 5,000, more or less, in commissions?

4    A.   Correct.

5    Q.   But the reason why we haven't seen that e-mail yet is

6    because you gave it to your lawyer?

7    A.   That was an e-mail that I sent from my personal e-mail

8    address to the e-mail address of Reinier Cortes before I

9    resigned from my job at the office.

10   Q.   But you are also blaming Reinier for us not seeing that

11   e-mail?

12   A.   No, I'm not blaming him.  I do not know what it is that

13   Mr. Cortes produces to you, but I can only speak about what I

14   have produced to my attorney.

15        MR. TROPP:  Well, how about we clear this up.  Is

16   there any way we can see this e-mail?  We have never seen any

17   e-mail.

18        THE COURT:  This is not discovery, this is trial,

19   Mr. Tropp.  Any other questions for the witness?

20   BY MR. TROPP:

21   Q.   If you ever asked or if you wanted to know if commissions

22   were paid to you and you asked Reinier, wouldn't -- wouldn't he

23   send you e-mails, or did you ever get e-mails with Excel

24   statements?

25        MR. POLLOCK:  Objection, compound.

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 120 of
206
120
Redirect Examination - Mariana Lopez-Arcaira
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1             THE COURT:  Overruled.

2             THE WITNESS:  Well, when we would receive the

3    payments, it would come along with the statement of what was

4    being paid, but we didn't get a statement of what wasn't being

5    paid to us.

6    BY MR. TROPP:

7    Q.  Okay.  And when you would get those statements, you would

8    take pictures of them?

9    A.  No, it wasn't necessary to take pictures of them.  They

10   were in our inboxes.

11            MR. TROPP:  That's all I have, Judge.

12            THE COURT:  Thank you.  Redirect?

13                      REDIRECT EXAMINATION

14   BY MR. POLLOCK:

15   Q.  Ms. Lopez, did you file your taxes based on the tax

16   reporting documents, the 1099s that were issued to you and to

17   your Suprani Services?

18   A.  Yes, that's correct.

19   Q.  And as far as knowing exactly when you worked, were there

20   -- did Avant have in place a way for you clock in and clock out

21   of work?

22   A.  No, we did not have that.

23   Q.  And if you had time records, would you be able to be more

24   exact about how many hours you worked during the open

25   enrollment period?

1   A.   Sorry, when you mean if I had time records, are you

2   referring to if Mr. Cortes had them?

3   Q.   I am saying if Avant had a way for you to clock in and

4   clock out, would that help us determine exactly how many hours

5   you worked?

6   A.   Of course.

7   Q.   Sitting here today, do you -- let's see.

8           MR. POLLOCK:  I have nothing further.

9           THE COURT:  Thank you, ma'am.  You may step down.

10          MR. POLLOCK:  Can we get a comfort break, Your Honor,

11   or no?

12          THE COURT:  No.  We will break at 3:30.  Your next

13   witness?

14          MR. CUMMINGS:  Plaintiff calls next Rafaela Valiente.

15          THE COURT:  Please approach.

16          Please raise your right hand.

17                      (Time 3:15 p.m.)

18                      RAFAELA VALIENTE,

19   a witness for Plaintiff, testified as follows:

20          THE WITNESS:  Yes.

21          THE COURT:  Please be seated.

22                      DIRECT EXAMINATION

23   BY MR. CUMMINGS:

24   Q.   Good afternoon, Ms. Valiente.

25   A.   Good afternoon.

Direct Examination - Rafaela Valiente
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1   Q.  Ms. Valiente, could you please state your full name?

 2   A.  Rafaela Valiente Leon.

 3   Q.  And where are you born?

 4   A.  In Cuba.

 5   Q.  How long did you live in Cuba?

 6   A.  Up until 2010.

 7   Q.  Did you move directly to Miami in 2010?

 8   A.  Yes.

 9   Q.  How did you find out about the Avant Assurance agency?

10   A.  Through an acquaintance in common, in common between

11   Mr. Reinier and myself.

12   Q.  And what year did you find out about Avant?

13   A.  2020.

14   Q.  Did you already have an insurance license in 2020?

15   A.  Yes.  I had it since 2019.

16   Q.  Did you have to interview for your job at Avant?

17   A.  Oh, yes.  I did go over there, yes.

18   Q.  Who did you interview with?

19   A.  Mr. Reinier.

20   Q.  And where did you meet Mr. Reinier?

21   A.  At the office that was in Kendall.

22   Q.  When you interviewed, were you hired on the spot?

23   A.  Yes.

24   Q.  And did you interview with anybody else on that day when

25   you met with Mr. Cortes?
```

1    A.   No.

2    Q.   Did you ever sign a written employment agreement or a

3    written contract before -- sorry, before you started working at

4    Avant?

5    A.   No.

6    Q.   Did you ever sign any written contract or agreement while

7    you were working at Avant?

8    A.   No.  The only document I did fill out was a W-9.

9    Q.   On the day that you met and interviewed with Mr. Cortes,

10   did you meet anybody else at Avant that day?

11   A.   I met the other people that were working at the office.

12   Q.   Do you remember who they were?

13   A.   Well, Delio Batista was there, Andrea Quintero was there

14   and there were two other people whose names I don't remember

15   because they worked at the office for a very short time.

16          MR. CUETO:  Excuse me, may Mr. Cortes be excused to

17   the restroom?

18   BY MR. CUMMINGS:

19   Q.   When you met Andrea Quintero the day you interviewed, what

20   was her role at Avant at that time?

21   A.   Well, that specific day that I went there, I don't know

22   what functions or duties she had at that particular moment.

23   Q.   And the other two people that you mentioned meeting, what

24   were they doing at Avant?

25   A.   They were also health insurance sales people.

1   Q.  Now, during your interview, did you discuss how you would

2   be paid?

3   A.  Yes.

4   Q.  What was your understanding of how you would be paid while

5   working for Avant?

6   A.  Well, during the interview, as per what Reinier explained

7   to me, he said that they were looking for agents to help out

8   during the open enrollment period and that they were going to

9   pay $10 for each registered member.

10   Q.  And when you first started working for Avant, how often

11   would you receive that $10 payment for selling a health

12   insurance policy?

13   A.  During that entire period, I didn't collect any.

14   Q.  And when you say during that period, you mean during the

15   open enrollment period?

16   A.  All October, November and December, I did not receive any

17   salary.

18   Q.  And were you expecting not to receive any salary during

19   opening enrollment period?

20   A.  Yes, because normally those companies start paying starting

21   in February.

22   Q.  So that payment arrangement wasn't unusual to you?

23   A.  It was not.

24   Q.  However, what was your understanding of how you would be

25   paid for the policies you sold during the open enrollment

1   period after it ended?

2   A.   $10 per each member.

3   Q.   Right.  And so, for example, did the open enrollment period

4   end in January?

5   A.   That's correct.

6   Q.   And if you sold a policy during the open enrollment period,

7   did you receive $10 for selling that policy?

8   A.   No.  Different companies start paying beginning February.

9   So I was supposedly gonna be -- was going to be paid eventually

10  once the companies would pay in turn.

11  Q.   If you sold a policy and you got paid in February, you were

12  paid $10, did you also receive payment for that same policy in

13  March?

14  A.   Not initially, because I was only going to work for the

15  registration period.

16  Q.   And that was your initial agreement with Mr. Cortes?

17  A.   Correct.

18  Q.   What happened at the end of the enrollment period; did you

19  have another conversation about your working arrangement?

20  A.   Yes.  Once the open enrollment ended, I was without work

21  for several days.  And after that, I went over to the office to

22  see if they had my money, and that's when Mr. Reinier proposed

23  that I should stay there working for him at the office.

24  Q.   And at that time, did a new payment arrangement -- was a

25  new payment arrangement discussed?

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 126 of 206

Direct Examination of Rafaela Valencia
July 11, 2023                                                          126
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   A.  I would still get paid the same amount, $10 for every

2   member that I would register.

3   Q.  And now, once you came back to Avant -- which month was

4   that, by the way?

5   A.  End of -- beginning of February.

6   Q.  So if you sold a policy in February, you received $10 for

7   that member, correct?

8   A.  Yes.  Every month.  So that was our initial agreement.  It

9   was going to be $10 per each member every month.

10  Q.  Got it.  Meaning -- so now if you sold a policy to member X

11  in February, then you would also receive $10 for that same

12  policy in March?

13  A.  Correct.

14  Q.  And then in April for that same number X, you would receive

15  another $10?

16  A.  Correct.  But then it changed in April.

17  Q.  Okay.  And that would have been April of 2021?

18  A.  Correct.

19  Q.  During your interview back in -- I'm sorry.

20      When did you start working at Avant?

21  A.  More or less, the 15th or 16th of October.

22  Q.  2020?

23  A.  Yes, correct.

24  Q.  And that's when you interviewed also, in 2020, with

25  Mr. Cortes?

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 127 of
206                                                                                          127
Direct Examination of Nataska Valdance
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1    A.   Yes.

 2    Q.   Did you discuss what your work schedule would be in that

 3    interview?

 4    A.   During that time, the office was open -- would work from

 5    11:00 to 8:00.

 6    Q.   11:00 in the morning to 8 p.m.?

 7    A.   Correct.

 8    Q.   Did you receive any training to work at Avant?

 9    A.   Yes.

10    Q.   Who trained you?

11    A.   Andrea Quintero did.

12    Q.   Okay.  And what kind of training were you given?

13    A.   She showed me what systems they used to work with and how

14    to record the sales in that Excel sheet that they had created.

15    There was a small training regarding the phone calls; whenever

16    a phone call from a client would come in, on how to offer the

17    different plans to them.

18    Q.   Did you ever work from home during the time you were

19    employed at Avant?

20    A.   No, never.

21    Q.   So you always worked in the office?

22    A.   Yes.

23    Q.   Did you ever request to work from home while you were

24    employed at Avant?

25    A.   I did.
```

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 128 of
206                                                                                              128

Direct Examination - Rafaela Valencia
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   Q.  How many times did you request to work from home?

2   A.  Once during COVID.  I was infected with COVID, sick with

3   COVID for three weeks, and I asked for permission for me to be

4   able to access the system from home during that time.

5   Q.  Who did you ask permission from?

6   A.  Mr. Reinier.  He was the one that was supposed to give me

7   access.

8   Q.  So you had COVID, you went to Mr. Cortes and you asked him

9   could you work from home.  What was his response?

10  A.  He said no.

11  Q.  Did Mr. Cortes explain why you could not work from home

12  while you had COVID?

13  A.  No.  At that moment what he told me was that if he would

14  authorize me to work from home, then every other agent would

15  also want to work from home in turn.

16  Q.  And about what time period was this when you contracted

17  COVID and asked to work from home?

18  A.  Well, I got COVID, like, in 2022, like in February or March

19  of 2022.

20          THE COURT:  Is this a good time to break?  Okay.

21          Ladies and gentlemen, we will take a ten-minute

22  afternoon recess.  Please don't discuss the case.

23          COURT SECURITY OFFICER:  All rise for the jury.

24      (The jury exited the courtroom at 3:31 p.m.)

25          THE COURT:  We're in recess.

1        (Witness temporarily excused.)

2        (A recess was taken from 3:31 p.m. to 3:44 p.m.)

3            COURT SECURITY OFFICER:  All rise for the jury.

4        (The jury entered the courtroom at 3:44 p.m.)

5            THE COURT:  Everyone, please be seated.

6            Please continue.

7                DIRECT EXAMINATION (Cont'd.)

8    BY MR. CUMMINGS:

9    Q.  Okay.  Ms. Valiente, when we left off, you mentioned that

10   Mr. Cortes did not allow you to work from home when you got

11   COVID, correct?

12   A.  Correct.

13   Q.  And so did you stay at home because you were not allowed to

14   work in the office?

15   A.  Correct.

16   Q.  Actually, let me ask this the other way around.  Did you go

17   into the office with COVID?

18   A.  No.  I was the one that decided to stay home.

19   Q.  Because you don't want to get other people sick with COVID

20   in the office, correct?

21   A.  Yes.

22            THE COURT:  The microphone is not on.

23   BY MR. CUMMINGS:

24   Q.  Was it your understanding that Mr. Cortes would have

25   allowed you to work in the office to continue selling insurance

Direct Examination - Naralexa Valience
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    even with COVID?

2    A.   Well, there were some people that during COVID had some

3    symptoms, had fever, and they were still going into the office.

4    Q.   Now -- so you stayed home?

5    A.   Yes.

6    Q.   How long did you stay home?

7    A.   For three weeks.

8    Q.   Did you sell any insurance for Avant at that time?

9    A.   No.

10   Q.   Did you have a computer at home to sell insurance?

11   A.   Yes.

12   Q.   Could you have put the CRM software on your computer at

13   home?

14   A.   Perfectly well.

15   Q.   Did you have a headset that you could use to receive calls?

16   A.   Yes.

17   Q.   So you had everything you needed at home to continue

18   selling insurance for Avant, correct?

19   A.   Correct.

20   Q.   Did you ask Reinier Cortes to allow you to work from home

21   using your equipment?

22   A.   Yes.

23   Q.   And what was his response?

24   A.   He said no.

25   Q.   At some point not related to the COVID situation we are

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 131 of
206                                                                              131
Direct Examination - Rafaela Valience
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    talking about now, but at some point did Mr. Cortes arrange for

2    you to -- arrange transportation from your house to the Avant

3    office?

4    A.   Yes.

5    Q.   Okay.  And what kind of transportation did he arrange for

6    you?

7    A.   Uber.

8    Q.   Why?  Why did Mr. Cortes have a Uber pick you up from your

9    house and brought to the Avant office?

10   A.   Because I had an accident, a car accident in my car coming

11   back home from work, and my car ended up being unusable.

12   Q.   Okay.  When was this?

13   A.   End of October, early November of '22.

14   Q.   '22?

15   A.   Yes.

16   Q.   Would you have still been working for Avant in 2000 --

17   November 2022?

18   A.   Oh, I apologize.  It was '21.

19   Q.   Okay.  Thank you.

20       Now, you got into a car accident and your car was unusable,

21   correct?

22   A.   Correct, sir.

23   Q.   Would you have preferred to stay at home and continue

24   selling insurance policies?

25   A.   Of course.

Direct Examination - Rafaela Valiente
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   Q.  Did you ask Mr. Cortes if you could stay at home because

2   your car was not working?

3   A.  No.

4   Q.  However, once he found out that you did not have a car to

5   use, he arranged for Uber to come pick you up and bring you to

6   the office?

7   A.  Correct.

8   Q.  And how long did that go on?

9   A.  That was for two days.

10  Q.  Okay.  Okay.  Ms. Valiente, I am presenting on the screen

11  which has already been in evidence as Exhibit 20.

12      (Plaintiffs' Exhibit No. 20 was identified.)

13  BY MR. POLLOCK:

14  Q.  Have you seen this?

15  A.  Yes.

16  Q.  And when you worked at -- what was your e-mail address that

17  you used for communications with -- when you worked at Avant

18  Assurance?

19  A.  My e-mail address?

20  Q.  E-mail address.

21  A.  It was my personal e-mail, RafaelaValiente@Gmail.com.

22  Q.  Okay.  So could you please read this e-mail that we see

23  here?

24  A.  "Ray, on Monday, September the 13th, I have an appointment

25  for my citizenship.  On Wednesday, the 15th of September, I

1    have surgery, seven days of rehab."

2    Q.  And Ray is who?

3    A.  Reinier Cortes.

4    Q.  What was the purpose of this e-mail?

5    A.  I was informing him that I wasn't going to be attending,

6    that I was going to be away from the office at that time.

7    Q.  And why did you need to tell Mr. Cortes that you would be

8    out of work during those times?

9    A.  Well, it's a matter of being responsible at work.

10   Q.  Could you have just not shown up to work at the Avant

11   office on September 13th?

12   A.  Well, I could have done it, but then, you know, I could

13   have also run the risk.

14   Q.  The risk of what?

15   A.  That I would no longer be able to work there, that they

16   would just, you know, close my contract.  I wouldn't be able to

17   work with them any longer.

18   Q.  Now, you previously, I believe, heard Mr. Cortes say that

19   several insurance agents at Avant brought their own equipment

20   to work, correct?

21   A.  I didn't understand it, because when he was testifying, it

22   was all in English.

23   Q.  Okay.  All right.  So let me ask you this:  Did you ever

24   bring any of your own equipment to the Avant office?

25   A.  Never.

1    Q.   Did you bring a headset?

2    A.   No.

3    Q.   Did you bring a mouse?

4    A.   No.

5    Q.   Did you bring a keyboard?

6    A.   No.

7    Q.   So all of the equipment that you used at Avant was provided

8    by Avant, right?

9    A.   Correct.

10   Q.   And you previously testified that your -- you began working

11   during -- at Avant during the 2020 to 2021 open enrollment

12   period?

13   A.   Correct.

14   Q.   When did that open enrollment period start?

15   A.   More or less on the 25th or 26th of October.

16   Q.   2020?

17   A.   Correct.

18   Q.   And when did that open enrollment period end?

19   A.   On January the 31st of 2021.

20   Q.   Now, during the open enrollment period, what hours were you

21   working at Avant's office?

22   A.   Once the open enrollment period actually started, I was

23   there from 9 a.m. to 9 p.m.

24   Q.   Now, those hours, 9 a.m. to 9 p.m., were those hours that

25   you set for yourself to work?

1    A.  Well, Reinier was the one that addressed us.  He stood in

2    the middle of the room in front of everybody of us that were

3    there and he said that during this open enrollment period, to

4    be able to take better advantage of daylight, we were going to

5    work during that schedule.

6    Q.  Now, when you say us, what other insurance agents were

7    working at Avant during that 2020 to '21 open enrollment

8    period?

9    A.  It was Delio, Andrea and -- well, and then it was us.

10   Because there was another agent that would come in to work in

11   the afternoons, that was Harris and also another agent, her

12   name was Mary Lou, she would also come in the afternoons.

13   Q.  Now, during the first two months of that open enrollment

14   period, November and December of 2020, how many policies did

15   you sell?

16   A.  Well, I registered more than 600 members.

17   Q.  And when you were finally paid for those first two months

18   of the open enrollment period, how much money were you paid for

19   selling those over 600 policies?

20   A.  $2800.

21   Q.  How much money did you expect to receive for selling over

22   600 policies?

23   A.  Over 6,000.

24   Q.  And that's because you received $10 for every member that

25   you sold?

Direct Examination of Rafaela Valience
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   A.   Correct.

2   Q.   So if you sold over 600, then you should have received over

3   $6,000?

4   A.   Correct.

5   Q.   Did Mr. Cortes explain why you were receiving so much less

6   money than the 6,000 you expected?

7   A.   He told me that the rest of the clients I had registered

8   had not verified or qualified their IDs.

9   Q.   So, in essence, he was saying over 320 people did not

10  qualify for the health insurance that you sold to them?

11  A.   Correct.

12  Q.   And did Mr. Cortes show you any proof that these 320 people

13  did not qualify for health insurance?

14  A.   No, only his word.

15  Q.   And did he tell you to call all 320 of those people that

16  apparently did not qualify for health insurance?

17  A.   No.

18  Q.   And the $2800 that you did receive, when did you actually

19  receive that money?

20  A.   He had given me an advance of $1500 in January, and then in

21  February when they started paying out, he started deducting

22  from that.

23  Q.   And so did you receive the majority of the money in

24  February?

25  A.   Yes.

Direct Examination - Rafaela Valencia
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1   Q.  Okay.  Or are you saying that you received $1500 in January
 2   and then you received $1300 in February?
 3   A.  Yes.
 4   Q.  And is that all the money that you received for that open
 5   enrollment period?
 6   A.  Yes.
 7   Q.  You heard -- this morning you heard Alix Ledesma explain
 8   that she would receive monthly commission statements of the
 9   money that Avant paid to her, correct?
10   A.  Correct.
11   Q.  And did Avant also e-mail you monthly commission
12   statements?
13   A.  What they were paying me, yes.
14   Q.  And just to be clear, the statements that you received from
15   Avant just showed how much money they were paying you for
16   selling insurance policies, correct?
17   A.  Correct.
18   Q.  Those commission statements did not reflect how much you
19   thought you should be paid based on the number of policies that
20   you actually sold?
21   A.  Correct.
22   Q.  Now, were you able to keep the commission statements that
23   you received from Avant and from the open enrollment period?
24   A.  Yes.
25   Q.  Because those e-mails -- I'm sorry, those commission
```

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 138 of
206                                                                                              138
Direct Examination - Rafaela Valience
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1    statements were e-mailed to you?

 2    A.   That's correct.

 3    Q.   Where did those e-mails come from?

 4    A.   First from -- at first, it was from Advance Assurance, from

 5    Reinier Cortes, and then it came over from the accounts

 6    account.

 7    Q.   Do you mean something like accounting, the accounting

 8    department?

 9    A.   Yes.

10    Q.   Was it an e-mail that said accounting@AvantAssurance.com?

11    A.   That's correct.

12    Q.   And the commission statements that you received -- can you

13    see my screen right now?

14    A.   You want me to open it?

15    Q.   No, no, no.  You can't open it.  I am just asking, do you

16    see the screen?

17    A.   I can.

18    Q.   And do you recognize the documents that you see there in

19    that folder?

20    A.   Yes.

21    Q.   Are these examples of the commission statements that you

22    received from the Avant -- from the

23    accounting@AvantAssurance.com e-mail?

24    A.   That's correct, yes.

25             MR. CUMMINGS:  Okay.  And all of these individual
```

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 139 of
206                                                                                                             139
                              Direct Examination - Natalea Valencia
                                     July 11, 2023
      Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   Excel sheets which represent commission statements are

2   previously marked.  I believe they are all part of Composite

3   Exhibit 13.  Actually, they are part of Composite Exhibit 13.

4       (Composite Exhibit No. 13 was identified.)

5   BY MR. CUMMINGS:

6   Q.  So what I would like to do is, let's look at the very first

7   document that I'm highlighting here.

8       What is Ambetter?

9   A.  That's a carrier.

10  Q.  An insurance company?

11  A.  Yes, correct.

12  Q.  Okay.  And so when we open up this document, what are we

13  actually looking at here?

14  A.  Those are the lists, the list that I would get by e-mail

15  each time that I would get paid.

16  Q.  And essentially, this is just a list of the members that

17  Avant said that actually fully registered policies that you

18  sold, correct?

19  A.  Correct, which would be -- add up to 49.

20  Q.  Which would be -- what do you mean when you say that?

21  A.  Yeah, because if you look at the number 490, and $10 per

22  person, what they are trying to tell me here is that in all of

23  November and December, I only registered 49 people.

24  Q.  Understood.  And so you are referring to this members

25  column?

1    A.  Correct.

2    Q.  Now, we can see that there is only 38 rows, right?

3    A.  Okay.

4    Q.  However, when we look in the numbers column, we can see

5    that some of these cells have more than one member where

6    policies were sold, right?

7    A.  Correct.

8    Q.  And essentially, if we add all of those numbers up, it

9    should be 49, 49 times 10 is $490?

10   A.  Correct.

11   Q.  And so in -- during the open enrollment period of 2020 to

12   2021, you were paid $490 for the members that -- for selling

13   Ambetter insurance?

14   A.  Under Ambetter, yes.

15   Q.  Okay.  Now -- now, Ms. Valiente, what I am going to do is

16   -- well, what we are going to do is, you are going to help me,

17   showing this sheet, so that we can keep track of how much money

18   you were paid altogether.

19   A.  Okay.

20   Q.  So now separately, you receive a commission statement for

21   selling Anthem Insurance; is that right?

22   A.  Well, but that is three month's worth.  That was January,

23   February, March.

24   Q.  Okay.  And when we look in Column H, Column H tells us the

25   period when the policy became effective, right?

1    A.   Correct.

2    Q.   Okay.  So if it says January 1st, 2021, does that mean you

3    sold that policy during the open enrollment period?

4    A.   Correct.

5    Q.   And if it says February 1st, 2021, is it also possible that

6    you sold that policy during the open enrollment period?

7    A.   In January, yes.

8    Q.   Okay.  I am talking about February.  Let me ask you this:

9    When you sell a policy during the open enrollment period, when

10   does it go into effect for the number?

11   A.   The ones that are sold up and including December the 31st,

12   they begin on January 1st.

13   Q.   And what happens if you sell a policy on the closing day,

14   let's say January 31st, of the open enrollment period?

15   A.   Well, the registration department would stay open all the

16   way until we closed so that they could begin to be active on

17   February the 1st.

18   Q.   Okay.  So if we see February 1st here, we can still say

19   that that policy was sold during an open enrollment period,

20   right?

21   A.   Yes, because the open enrollment went all the way up to

22   January 31st.

23   Q.   Okay.  And when -- you did not put a title on the

24   commission statements that you received from Avant, correct?

25   A.   I did not.  No, of course not.

1   Q.  So at the top where it says "Rafaela Valiente - Anthem -

2   January, February, March 2021," that's how you received this

3   document from Avant?

4   A.  Correct.

5   Q.  And what you were paid was $350 for selling Anthem

6   insurance during those open enrollment period, correct?

7   A.  Correct.

8   Q.  All right.  What does BCBSTX mean?

9           THE INTERPRETER:  I'm sorry, Counsel, what's that

10  again?

11          MR. CUMMINGS:  Sorry.  Just looking at the top in the

12  green part there where it says BCBSTX.

13          THE WITNESS:  That's an insurance company.  Stands for

14  Blue Cross Blue Shield of Texas.

15  BY MR. CUMMINGS:

16  Q.  This is a commission statement that you received from

17  Avant, again, for a Blue Cross Blue Shield that you sold during

18  the open enrollment period?

19  A.  Correct.

20  Q.  And how much money did you receive for selling insurance --

21  or for selling Blue Cross Blue Shield as far as during that

22  first open enrollment period?

23  A.  $180.  And they deducted -- because they deducted $120 from

24  the advance that they had given me.

25  Q.  But through your efforts, you actually sold what I believe

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 143 of 206                                                                    143
Direct Examination - Naraesa Valance
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1  would have been 30 policies, correct?

2  A.   Well, from what it says there, it would be 30 policies.

3  Q.   Right.  Because 30 times ten is $300.

4     And now, what's the name of the insurance company that

5  we're looking at in this commission statement?

6  A.   Bright Health.

7  Q.   And you sold Bright Health policies during that first open

8  enrollment period?

9  A.   Yes.

10  Q.   And how much did Avant pay you for selling Bright Health?

11  A.   $240.

12  Q.   What is Cigna?

13  A.   That's another insurance company.

14  Q.   And you sold Cigna health plans during the open enrollment

15  period?

16  A.   Yes.

17  Q.   Why do you have two separate commission statements for

18  Cigna?

19     Well, let me ask you this:  Do you know why you have two

20  separate commission statements from Cigna?

21  A.   I don't.  I don't remember.

22  Q.   However, when we look at the column here that says "policy

23  period," does it seem to you that you sold this policy -- these

24  policies during the open enrollment period?

25  A.   Yes.

1    Q.  And so one calculation we have here, you would have been

2    paid $190 based on this commission statement for selling Cigna?

3    A.  Correct.

4    Q.  And then when we look at the Cigna policy or Cigna

5    commission statements that says January 2021, how much were you

6    paid for selling those insurance policies?

7    A.  No.  If you look at the prior statement that we were

8    looking at, those $80 were already included there.  It was --

9    it was $80 from one and 110 from another.

10   Q.  Okay.  Thank you.

11       Okay.  So altogether, $190, correct?

12   A.  Correct.

13   Q.  All right.  Friday is also an insurance company?

14   A.  Yes.

15   Q.  So I see that there is three commission statements that you

16   received for Friday.  Now, it looks like you sold a lot of

17   Friday.

18       Is there a reason why there is so many more policies sold

19   for Friday than the other statements that we have been seeing?

20   A.  Well, the one that you have open on the screen right now,

21   that's the March statement.

22   Q.  Now, again, what we have to do is, we have to look at the

23   effective date, correct?

24   A.  Well, yes, but since there is only one for the month of

25   January, though.

1   Q.  When you say there is only one for the month of January,

2   what do you mean?

3   A.  There's one for January, one for February and one for

4   March.

5   Q.  Oh, you mean three -- three separate commission statements.

6       However, looking at this March 2021 commission statement

7   for Friday, we see that there are policies with an effective

8   date of January 21st, 2021?

9   A.  Yes.

10  Q.  Which means you would have sold them during the open

11  enrollment period, correct?

12  A.  Correct.

13  Q.  And could it be possible that even the ones at the bottom

14  that say March 21st, 2021, were sold during the open enrollment

15  period?

16  A.  No.

17  Q.  Why is that?

18  A.  Because those that have an effective date on March, must

19  have been sales from February.

20  Q.  Okay.  Which would have been outside of the open enrollment

21  period?

22  A.  Correct.

23  Q.  Now, since there are two other Friday commission

24  statements, as you already pointed out, do you think that the

25  March statement that we were just looking at also includes

1    those other two commission statements for Friday?

2    A.  It looks like that.  It looks like they have been added up.

3    Q.  Okay.  So now looking at your January Friday -- January

4    Friday -- January commission statement for the Friday insurance

5    company, how much money were you paid?

6    A.  580.

7    Q.  And now we are looking at your February Friday commission

8    statement, correct?

9    A.  Yes.

10   Q.  And all of these policies have an effective date of January

11   1st, 2021?

12   A.  Yes.

13   Q.  Which means you sold it during the open enrollment period?

14   A.  Correct.

15   Q.  Okay.  And so how much did Avant pay you for selling these

16   -- for selling Friday, according to this statement?

17   A.  As per this statement, it's 640.

18   Q.  Let's go to Molina.  How much did Avant pay you for selling

19   Molina insurance during the open enrollment period?

20   A.  450.

21   Q.  And again, we have two statements, so let's go to the one

22   that says February 2021.

23       And how much were you paid for selling these policies?

24   A.  710.

25   Q.  And last but not least, now we have the Oscar Insurance

Direct Examination - Nataska Valencia
July 11, 2023                                                    147
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    Company?

2    A.   Correct.

3    Q.   And what does your January Oscar commission statement sent

4    to you by Avant say that you were paid?

5    A.   670.

6    Q.   And how about your February Oscar commission statement from

7    Avant, how much did they pay you?

8    A.   This is 740.

9    Q.   And just to be clear, when we look all the way in the

10   left-hand column where it says "state," what does TX stand for?

11   A.   That's the name of the state, whether the client is from

12   Florida or Texas.

13   Q.   And are you licensed to sell insurance in Texas?

14   A.   At that time, at that point in time, I was not.

15   Q.   How were you able to sell policies in Texas if you were not

16   licensed?

17   A.   Because those policies sold would not be registered using

18   my license number.

19   Q.   Whose license number were they registered using?

20   A.   They would be registered under Reinier Cortes's license

21   number or Andrea Quintero's number.

22   Q.   And when you say license number, are you referring to the

23   NTN?

24   A.   Yes.

25   Q.   But you were the one who actually -- you were the person

1   who was actually on the call center floor taking the leads for

2   these policies, correct?

3   A.  Correct.

4   Q.  All right.  Now, you already said that the open enrollment

5   period went from, I believe you said, October 2020 to January

6   31st, 2021?

7   A.  Correct.

8   Q.  Did the open enrollment period officially start on November

9   1st?

10   A.  Yes.

11   Q.  And during open enrollment period, what was your work

12   schedule?  What hours were you required to be at the Avant

13   office?

14   A.  From 9 a.m. to 9 p.m.

15   Q.  Did you ever work on Saturdays during open enrollment

16   period?

17   A.  No.  No, I would not work on Saturdays.

18   Q.  Okay.  And so is it fair to say you were working 60 hours a

19   week during the open enrollment period?

20         MR. TROPP:  Objection, leading.

21         THE COURT:  I'm sorry?

22         MR. TROPP:  Leading.

23         THE COURT:  Sustained.

24   BY MR. CUMMINGS:

25   Q.  How many hours a week did you work during the open

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 149 of 206

149
Direct Examination - Naraesa Valiente
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    enrollment period?

2    A.   60 hours.

3    Q.   Now, we just went through several commission statements

4    that you received from Avant, correct?

5    A.   Yes.

6    Q.   Do you believe those commission statements are correct?

7    A.   I don't know.

8    Q.   Why don't you know?

9    A.   Because those are the statements of the amounts that I was

10   paid.  These are not the statements, these -- this is not where

11   I registered my sales.

12   Q.   Where did you register your sales?

13   A.   At the -- in the Excel spreadsheets.

14   Q.   This morning did you hear Alix Ledesma explain how she had

15   a Google sheet that she shared with Reinier Cortes?

16   A.   Yes.

17   Q.   Did you have a similar Google sheet that you used to record

18   the policies you sold at Avant?

19             MR. TROPP:  Objection, leading.

20             THE COURT:  Sustained.

21   BY MR. CUMMINGS:

22   Q.   How did you -- what document did you use to record the

23   policies that you sold for Avant?

24   A.   The Excel worksheets.  Well, it was actually Google Sheets

25   that Reinier would share.

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 150 of 206

150

Direct Examination of Rafaela Valiente
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    Q.   And, Ms. Valiente, I am now showing -- or getting ready to

2    show you what has previously been marked as part of Composite

3    Exhibit 4.

4         (The exhibit was published to the jury.)

5    BY MR. CUMMINGS:

6    Q.   Do you recognize this document?

7    A.   Correct.

8    Q.   What is this document?

9    A.   This was an e-mail I sent to Mr. Cortes because I had some

10   very large discrepancies between the commissions from one month

11   to the next, so that he could look into it to see what was

12   going on because I was not in agreement.

13   Q.   Could you please read the e-mail that you sent?

14   A.   What I wrote to him was:  "Ray, please, I did not

15   understand such abrupt changes from one month to the next.

16   Please look into this and let me know.  I would be grateful."

17   Q.   Now, um, the numbers that are in this e-mail, what do those

18   numbers represent?

19   A.   This is what, as per the commission statements, I was paid

20   for May.  It says for Molina, 100; for BH, 630; for Blue Cross

21   Blue Shield, 2,200; and for Anthem, 280.  But then you get to

22   the month of June where I was paid these amounts, and this

23   caught my attention because I would make almost the same amount

24   of sales every week.

25   Q.   Every week or every month?

1   A.   I mean -- but I worked from Monday through Friday, so more

2   or less every week I knew I was making a hundred clients a

3   week.

4   Q.   And the numbers here, do they represent numbers or do they

5   represent dollars?

6   A.   Dollars.

7   Q.   Okay.  So when we see 1100, that represents $1100?

8   A.   Correct.

9   Q.   And where did you get that number from, 1100 for Molina

10  Health Insurance?

11  A.   From my commission statement for May, from Molina.

12  Q.   So again, that number would have been the amount that Avant

13  paid you per a commission statement you received?

14  A.   Correct.

15  Q.   So why was it an issue for you that -- why was it an issue

16  for you when you see from May to June, the Molina Health

17  Insurance --

18          MR. TROPP:  Objection, leading.

19          THE COURT:  Overruled.

20  BY MR. CUMMINGS:

21  Q.   Why was it an issue for you where you see the Molina Health

22  Insurance payment went from 1,100 in May to $865 in June?

23  A.   It's not that it was an issue, it was concerning.  Because

24  if I'm working the same amount, the same amount of hours, it is

25  a big difference in the amount of money.

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 152 of
206

Batista Examination of Rafaela Valiente                                152
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    Q.   Now, if you received $1,100 in a commission statement in

2    May, when did you actually produce those sales?

3    A.   In April.

4    Q.   And in April of 2021, were you still under the payment plan

5    where you were receiving residual payments every month?

6    A.   No.

7    Q.   When did you say that stopped?

8    A.   That started with the May sales -- no, it was April and

9    May.  Started in April.

10   Q.   And the numbers that are in red in this e-mail, what

11   does -- what's the significance of the red?

12   A.   It means that in the other companies, we had a difference,

13   you know, maybe like $200 here or there.  But this one was

14   almost a thousand dollars worth of a difference.

15   Q.   Now, this is an e-mail that you sent to Reinier Cortes,

16   right?

17   A.   Yes.

18   Q.   What was Mr. Cortes's response to you?

19   A.   By e-mail, he didn't respond to anything.

20   Q.   Did you have any separate conversation that did not take

21   place in response to this e-mail?

22   A.   Yes.

23   Q.   And let me rephrase that question.

24        Did you have a separate conversation that did not take

25   place over e-mail about what you wrote here?

Direct Examination - Narsesa Valience
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
1    A.   That's correct.

2    Q.   And what kind of a conversation was that; how did it take

3    place?

4    A.   It was over at his office, and I asked him if he had been

5    able to review this request of mine that I had sent over to him

6    by e-mail.

7    Q.   About how long after you sent the e-mail were you having

8    this conversation in his office?

9    A.   It was a week, the following week.

10   Q.   What did Reinier tell you?

11   A.   He said that he -- he said that he was going to schedule a

12   Zoom meeting between me and the person that was in charge of

13   the payments, that was doing the payments, supposedly, from the

14   accounting department to look into what was going on.

15   Q.   And did you have that meeting?

16   A.   I never met -- I never even met that person.

17   Q.   Did -- did Reinier schedule the Zoom call?

18   A.   No, it never happened.

19   Q.   Did you ever get an explanation for the differences -- or

20   your concerns about the differences in your pay?

21   A.   Never.

22   Q.   And I am now showing you another document from Composite

23   Exhibit 4.

24        (The exhibit was published to the jury.)

25
```

Direct Examination of Rafaela Valdes
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1    BY MR. CUMMINGS:

 2    Q.  Do you recognize this document?

 3    A.  That's correct, I do.

 4    Q.  And did you send this e-mail to Reinier Cortes?

 5    A.  I did as well.

 6    Q.  Was this on the same day as the last e-mail?

 7    A.  Yes.

 8    Q.  And just a few minutes later?

 9    A.  Yes.

10    Q.  Could you please read this e-mail to us?

11    A.  I wrote him the name of the insurance company, in this case

12    it's Friday, and the payments that, as per the commission

13    statement, I had gotten paid and what I got paid in April and

14    what I got paid in May, and I wrote a note saying that, "Please

15    also review these payments as well."

16    Q.  And did you expect the discrepancy in this e-mail to also

17    be addressed during that Zoom call?

18    A.  Of course.

19    Q.  But as you said, there was no Zoom call, correct?

20    A.  Correct.

21    Q.  And yesterday in court -- scratch that.

22        (Pause in proceedings.)

23    BY MR. CUMMINGS:

24    Q.  After the January 31st -- or after January 31st in 2021,

25    you continued to sell insurance; is that correct?
```

1    A.   That's correct.

2    Q.   And you sold insurance for the whole year at Avant in 2021,

3    right?

4    A.   Correct.

5    Q.   How much money did you make in 2021 at Avant?

6    A.   84,215.

7    Q.   If you had to average that out per month, about how much

8    money is that a month?

9    A.   $7,000.

10   Q.   Do you think that the $84,215 that you made at Avant in

11   2021 was the correct amount of payment you should have

12   received?

13   A.   No.

14   Q.   And did you have access to the statements from the

15   insurance companies about how many policies you sold that were

16   actually fulfilled?

17   A.   No.

18   Q.   And if you had to guess, how much do you think you should

19   have earned per month in 2021?

20   A.   Well, it's not a matter of guessing, right?  In the Excel

21   sheet at the end of the month, I would add up, more or less,

22   and get an amount of the total amount of clients.  But yes, it

23   would have been $9,000 a month.

24   Q.   And in 2021, did a new open enrollment period start at the

25   end of the year?

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 156 of
206                                                                                    156
Direct Examination - Natasha Valencia
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    A.   It did.

2    Q.   And when did the open enrollment period begin again in

3    2021?

4    A.   From November the 1st until January of 2022.

5    Q.   And how many -- what months in 2021 were not part of the

6    open enrollment period?

7    A.   But that's the thing, there were some extensions of time

8    due to the pandemic, they extended the period, so I don't

9    recall exactly.

10   Q.   Well, let me ask.  Is it fair to say that February 2021,

11   was not part of an open enrollment period?

12   A.   Of 2021?

13   Q.   Correct.

14   A.   I don't remember.

15   Q.   I believe you previously stated that the open enrollment

16   period ended January 31st, 2021; is that right?

17   A.   Correct.

18   Q.   So is it fair to say that February 2021 was not an open

19   enrollment period?

20          MR. TROPP:  Objection, leading.

21          THE COURT:  Overruled.

22          THE WITNESS:  Correct.  And that means it was no

23   longer.

24   BY MR. CUMMINGS:

25   Q.   And similarly, would October 2021, not have been part of

Case 1:22-cv-22671-CMA  Document 123-2  Entered on FLSD Docket 09/21/2023  Page 157 of
206                                                                                    157
Direct Examination of Nathalia Valencia
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

 1   the open enrollment period?

 2   A.   It would not have.

 3   Q.   Okay.  So if it's February to October 2021, were those

 4   months that were not part of the open enrollment period?

 5   A.   No, they were not part of the enrollment period.  But yes,

 6   I would register clients throughout the entire year.

 7   Q.   Now, I am not going to go through all of these, but you

 8   also worked the next open enrollment period starting at the end

 9   of 2021 at Avant, correct?

10   A.   Correct.

11   Q.   And during that open enrollment period, you received -- or

12   let me put it like this:  After the enrollment period, you

13   received commission statements from Avant?

14   A.   Yes.

15   Q.   And looking at my screen right now, right about where that

16   yellow arrow is, do you recognize those Excel spreadsheets as

17   the commission statements you received from Avant?

18   A.   That is correct.

19   Q.   And each one of those Excel spreadsheets is going to have

20   the amount of money that Avant paid you during the open

21   enrollment period?

22   A.   Correct.

23   Q.   And from 2021 to 2022?

24   A.   Correct.

25   Q.   Now, in 2022, how much money did you make at Avant?

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 158 of
206                                                                                      158
Direct Examination of Nataska Valience
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    A.   57,920.

2    Q.   And so on average, how much did you make a month in 2022?

3    A.   If we count up until the date that I last worked there,

4    around $8,000 per month.

5    Q.   What date did you last work at Avant?

6    A.   June -- June the 23rd of 2022.

7    Q.   And again, the commission statements that you received from

8    Avant for the open enrollment period from 2021 to 2022, do you

9    believe they are correct?

10        MR. TROPP:  Your Honor, objection.  Just first of all,

11   on the earnings, 2022, 8,000, I don't know how the numbers work

12   like that, if that's a mistake or just got put in there, 8,000

13   on the overtime calculation sheet.

14        THE COURT:  Overruled.

15        I don't know what your evidentiary objection is.

16        MR. TROPP:  My objection is, I am objecting, first of

17   all, on the mathematics of 8,000 a month.

18        THE COURT:  What rule of evidence?

19        MR. TROPP:  I'm sorry?

20        THE COURT:  What rule of evidence are you citing to

21   me?

22        MR. TROPP:  Facts not in evidence is my objection and

23   conclusory --

24        THE COURT:  I'm sorry?

25        MR. TROPP:  I'm objecting on facts not in evidence and

1    the conclusory number there.

2              THE COURT:  Overruled.

3              THE WITNESS:  What was the question?

4    BY MR. CUMMINGS:

5    Q.   Yeah.  Do you think that the commission statements you

6    received for the 2021 to 2022 open enrollment period from Avant

7    are correct?

8    A.   No.

9    Q.   And what about commission statements you received after the

10   open enrollment period in 2022?  Do you think they are correct?

11   A.   No.

12   Q.   And why is that?

13   A.   Because by that time period, there was a whole lot of more

14   personnel working down in Colombia, and the amount of calls

15   coming in of perspective clients was a lot greater.  Meaning

16   that we would sign up many clients.

17   Q.   And at this time in 2022, you were still -- did you still

18   keep a Google sheet of the policies you were selling?

19   A.   That is correct.

20   Q.   And so how much do you think you should have earned monthly

21   in 2022?

22   A.   Around $10,000.

23   Q.   Ms. Valiente, I am now showing you what has already been

24   marked as Exhibit 8.

25        (The Exhibit was published to the jury.)

1   BY MR. CUMMINGS:

2   Q.   And have you seen this document before?

3   A.   Yes, that's correct.

4   Q.   And when did you first see this document?

5   A.   Mr. Reinier gave it to each one of us agents.

6   Q.   And which insurance plan were you most concerned about

7   selling during the 2021/2022 open enrollment period?

8   A.   Oscar.

9   Q.   Why were you most concerned about selling Oscar?

10  A.   Because you had greater possibilities of earning a bonus

11  through them.

12  Q.   And how many insurance policies did you need to sell for

13  Oscar to receive the largest bonus that they offered?

14  A.   Over 600 members.

15  Q.   Did you sell more than 600 members for Oscar during the

16  2021/'22 open enrollment period?

17  A.   More than 1,000.

18       (Pause in proceedings.)

19  BY MR. CUMMINGS:

20  Q.   Mr. Garfield -- I'm sorry, Ms. Valiente, I am now going to

21  show you what's been previously marked as Composite Exhibit 1.

22       (The exhibit was published to the jury.)

23  BY MR. CUMMINGS:

24  Q.   Do you recognize the image on the screen right here?

25  A.   Of course.

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 161 of 206

Direct Examination - Natacha Valentine
July 11, 2023
161
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   Q.   And what is this a picture of?

2   A.   This is a picture that I took of the summary of the chart

3   or Google Sheets spreadsheet where I would record my sales.

4   Q.   You took this picture?

5   A.   Yes.

6   Q.   Do you remember when you took this exact picture or what

7   time period this was?

8   A.   That picture was December's closing.

9   Q.   Meaning the end of December 2021?

10  A.   Correct.

11  Q.   During the open enrollment period?

12  A.   Correct.

13  Q.   And at that time, how many Oscar policies did you record?

14  A.   889.

15  Q.   And is this also a picture that you took?

16  A.   That's correct.

17  Q.   When did you take this picture?

18  A.   That was January's closing.

19  Q.   At the end of the complete open enrollment period at the

20  end of 2022?

21  A.   Correct.   Correct.

22  Q.   Now -- and how many Oscar policies had you sold by that

23  time?

24  A.   I had 1,082 members.

25  Q.   Now, is this a continuation, meaning that here you had --

 1   you had sold 889 and then you sold from 890 to 1092 the next

 2   month?

 3   A.  Yes, correct.

 4   Q.  And is this the Google sheet that was shared with

 5   Mr. Cortes?

 6   A.  Correct.

 7   Q.  Now, how did your employment at Avant end?

 8   A.  Mr. Reinier Cortes fired me.

 9   Q.  And why did he fire you?

10   A.  I don't know.

11   Q.  Did you ask him why you were being fired?

12   A.  Of course I did.

13   Q.  What did he say?

14   A.  He said that he didn't have to give me any information.

15   Q.  Did you ever receive your Oscar bonus?

16   A.  No.

17           MR. CUMMINGS:  No further questions.

18           THE COURT:  Cross-examination?

19       (Pause in proceedings.)

20           MR. CUMMINGS:  Your Honor, I actually have just about

21   five more minutes with Ms. Valiente.  Thank you.

22           THE COURT:  That was five minutes right there.

23                   DIRECT EXAMINATION (Cont'd.)

24   BY MR. CUMMINGS:

25   Q.  Okay.  Ms. Valiente, I just want to walk you through some

Case 1:22-cv-22671-CMA  Document 123-2  Entered on FLSD Docket 09/21/2023  Page 163 of
206                                                                                              163
Direct Examination - Nataska Valiente
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    numbers.

2         (Pause in proceedings.)

3    BY MR. CUMMINGS:

4    Q.  All right.  Ms. Valiente, what is the total amount of money

5    that you earned during the 2022/2021 open enrollment period,

6    according to Avant?

7    A.  Well, my 1099 showed 84,250.

8    Q.  Not all of the money that you earned in 2021, I am just

9    saying if we look at the numbers here on your screen, based on

10   the commission statements that we went through and we added all

11   these numbers up, what would that total be?

12   A.  I'm not good for math.

13        MR. CUMMINGS:  Your Honor, if I may approach the

14   witness?

15   BY MR. CUMMINGS:

16   Q.  Ms. Valiente, do me a favor and calculate those numbers for

17   me.

18   A.  I got 5,360.

19   Q.  Okay.  So you earned $5,360 according to Avant during the

20   open enrollment period.  And how many weeks are there from

21   November 1st, 2020 to January 31st, 2021?

22   A.  Around 13 weeks.

23   Q.  And you worked 60 hours a week, correct?

24   A.  And even more than that.

25   Q.  Why do you say you worked more than that?

```
1    A.   Because on some occasions, it was still 9 p.m. and we are

2    still getting phone calls transferred over to us.  And we had

3    to answer the clients and sell them policies.

4    Q.   Okay.  Is it fair to say, however, that, generally

5    speaking, during the open enrollment period, you worked 12

6    hours a week [sic]?

7              THE INTERPRETER:  I'm sorry?

8    BY MR. CUMMINGS:

9    Q.   Is it fair to say, however, that generally speaking during

10   the open enrollment period, you worked 12 hours a day?

11   A.   Correct.

12   Q.   Okay.

13             MR. CUMMINGS:  Just one second.

14       (Pause in proceedings.)

15   BY MR. CUMMINGS:

16   Q.   Okay.  All right.  So, Ms. Valiente, what is $5,316 divided

17   by 13 weeks?

18   A.   My phone is in my purse.  412 and 31 [sic].

19   Q.   $412.31?

20   A.   Yes.

21   Q.   So now -- now, what is $412.31 divided by 60 hours?

22   A.   6.87.

23   Q.   What is $6.87 divided by two?

24   A.   3.44.

25   Q.   I'm sorry, what did say again?
```

Direct Examination - Natacha Valdes
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

```
 1   A.  Oh, 3.44.

 2   Q.  What is 3.44 times 13 weeks?

 3   A.  44.72.

 4   Q.  I apologize.  I'm sorry.  What's 3.44 times 20 hours?

 5          MR. TROPP:  Objection, Judge, leading.

 6          THE COURT:  Overruled.

 7          THE WITNESS:  68.8.

 8   BY MR. CUMMINGS:

 9   Q.  All right.  And what is $68.80 times 13?

10   A.  $894.40.

11   Q.  Did the screen lock?  Did the screen lock on my phone?

12       Did you say no?

13   A.  No, no, I am making sure it doesn't lock.

14   Q.  Okay.  Thank you.

15       All right.  Now, how many months are there from February to

16   October?

17   A.  Eight.

18   Q.  And what is 9,000 times 8?

19   A.  Now I lost your calculator app.

20       (Pause in proceedings.)

21          THE WITNESS:  Okay.  Well, 9 times 8 is 81, isn't it?

22   BY MR. CUMMINGS:

23   Q.  9,000 times 8?

24   A.  72.  Oh, my, I've become dumb because of this.

25   Q.  Generally speaking, how many weeks are in the month?
```

1   A.  Well, some months are four, other months have five.

2   Q.  So generally speaking?

3       Would you say that there are four months -- I'm sorry, four

4   weeks in a month?

5   A.  Yes.  But some months have five.

6   Q.  Okay.  So -- but we are going to go with an average here,

7   so.

8   A.  So that would be 34 in the 8 months.

9   Q.  8 times 4 should give you what?

10  A.  32, plus two additional weeks out of two months with five

11  weeks each, that would be two more.

12  Q.  What is 72,000 divided by 30 -- I'm sorry, what did you

13  say, two more?  How many weeks did you say?

14  A.  Yes, 34.

15  Q.  Okay.  What's 72 divided -- 72,000 divided by 34?

16  A.  $2,117.65.  $2,117.65.

17  Q.  Now, during the months in 2021 when it was not open

18  enrollment, how many hours were you working?

19  A.  I worked the entire year.  2021, I worked the entire year,

20  Monday through Friday, from 9 a.m. to 9 p.m.

21  Q.  So how many hours did you work per week?

22  A.  60 hours per week, the whole year.

23  Q.  And what is 2,117.65 divided by 60?

24  A.  Now it locked again.  I have mine in the purse.

25      (Pause in proceedings.)

```
 1   BY MR. CUMMINGS:
 2   Q.  Okay.  So, Ms. Valiente, what is 2,17.65 divided by 17?
 3   A.  35.29.
 4   Q.  I'm sorry, say that again, 35.29?
 5   A.  35.29.
 6   Q.  So that would be your hourly rate.  What's 35.29 divided by
 7   two?
 8   A.  17.65.
 9   Q.  And what is 17.65 times 20?
10   A.  353.
11   Q.  353 flat?
12   A.  Yes.
13   Q.  And what is 353 times 34 weeks?
14   A.  12,002.
15   Q.  Now, did you also work from 9 a.m. to 9 p.m. in 2022
16   outside of the enrollment period?
17   A.  No.  In 2022, when was it -- February, March -- it was
18   either in April or May when they changed the schedule and they
19   started doing the schedules.  That's when I started working
20   from 3 p.m. to 9 p.m.
21   Q.  And did you work 9 a.m. to 9 p.m. anywhere from February
22   2022 to March 2022?
23   A.  In February, yes, I did work from 9:00 to 9:00.
24   Q.  And do you agree that there should, again, be nine months
25   of open enrollment -- of non-open enrollment months in 2022?
```

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 168 of
206
Direct Examination - Rafaela ValLence
July 11, 2023
168
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    A.   Correct.

2    Q.   But you only worked 9:00 to 9:00 in February, correct?

3    A.   No, up until February.

4    Q.   Because you worked 9:00 to 9:00 during the open enrollment

5    period?

6    A.   Correct.

7    Q.   Okay.  I am not worried about the open enrollment period

8    right now, so.

9    A.   Okay.

10   Q.   All right.  How many weeks are in a month?  Well, how many

11   weeks are in February?

12   A.   Four.

13   Q.   What is 10,000 divided by 4?

14   A.   2500.

15   Q.   And how many hours did you work per week in February 2022?

16   A.   60.

17   Q.   All right.  What is 2,500 divided by 60?

18   A.   41.67.

19   Q.   What's 41.67 divided by 2?

20   A.   20.84.

21   Q.   What is 20.84 times 20?

22   A.   $416.80.

23   Q.   Did you say 8, as in O, 8?

24   A.   8-0.

25   Q.   What is 416.80 times 4?

```
 1   A.   $1,667.20.

 2   Q.   Give me that number again, please?

 3   A.   $1,667.20.

 4   Q.   I got it.

 5   A.   1667.

 6   Q.   Okay.  Excellent, thank you.

 7        All right.

 8              MR. CUMMINGS:  Your Honor, just in the interest of

 9   time, there is another section I would have to go through with

10   Ms. Valiente, but it would take quite some time.  The

11   commission statements are already entered into evidence, so by

12   stipulation, if the -- if the Defense doesn't mind, what I can

13   do is I can input those numbers and then when they finish with

14   their cross, I can just quickly run back over them with

15   Ms. Valiente.

16              THE COURT:  Let's proceed in that fashion.

17              Cross-examination?

18              MR. TROPP:  Your Honor, do you mind if I ask how long

19   we are going today?

20              THE COURT:  Until we are done with her.

21              MR. TROPP:  Until I'm done?

22              THE COURT:  Until we are done with her as a witness.

23              MR. TROPP:  I will go as quickly as I can.  I know we

24   are all tired.

25
```

1                    CROSS-EXAMINATION

2   BY MR. TROPP:

3   Q.   How, Ms. Valiente, how are you?

4   A.   Good, thank you.

5   Q.   Did you spend some time on those numbers for the December

6   2020/'21 period, correct?

7   A.   Correct.

8   Q.   Isn't it true, isn't it correct that in December, you left

9   the office?  December of 2020 you went to work at a warehouse

10  from December 2020 until up all of January 2021, you were

11  working at a warehouse and not working for Avant?

12  A.   No, that was in January.  And I worked in Avant up until

13  the 31st, and that was our agreement.  In other words, I was

14  unemployed at the time.

15  Q.   So when -- what period did you not work in Avant in that

16  window?

17  A.   It was approximately for 15 days during January, 15 or 20

18  days.

19  Q.   So 15 to 20 days of January 2021?

20  A.   Correct, yes.

21  Q.   So from that chart we just did, we can subtract 12 hours a

22  day you said you were working for those 20 days?

23  A.   Correct.

24  Q.   Okay.  And in December, didn't you leave periods to work at

25  this other place, the warehouse, December 2020?

1    A.   When could I work at a warehouse if I was working at Avant

2    from 9 a.m. to 9 p.m.?

3              MR. CUMMINGS:   Objection.

4    BY MR. TROPP:

5    Q.   And that same period where you worked for 20 days not

6    working at Avant because you were working at the warehouse,

7    that's when you're saying you sold a thousand policies of

8    Oscar?

9    A.   Well, the 1,000 policies for Oscar were in the enrollment

10   period from 2021 to 2022, and if I'm not mistaken, you are

11   asking me for the 2022/2021 period.  Please correct me.

12   Q.   I am.  I am.

13   A.   What period are you talking about?

14   Q.   2020 to 2021 when you were -- that was January where you

15   were not -- you were working at a warehouse?

16   A.   Correct, yes.  But the 1,082 policies from Oscar were not

17   in the period ending in 2021, they were in the period from '21

18   to '22.

19   Q.   Okay.  We will talk about that.

20        Also, isn't it correct in December of 2020, you went to

21   Cuba and Jamaica?

22   A.   Yes.

23   Q.   For how long?

24   A.   Like three days, about three days.

25   Q.   Just three days?

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 172 of
206

Cross-Examination - Rafael A. Valiente
July 11, 2023                                             172
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

 1   A.   Yes.  And two of the days were Saturdays -- because the

 2   other days were Saturday and Sunday that I wasn't working

 3   anyway, so it didn't effect me.

 4   Q.   So you went to Cuba and Jamaica over the weekend for a

 5   three-day trip in December?

 6   A.   No, it was in November.

 7   Q.   Not in December?

 8   A.   No.

 9   Q.   Okay.  Now, when you first started, you were -- you were

10   doing insurance for a while before working for Avant?

11        MR. CUMMINGS:  Objection, relevance, Your Honor,

12   motion *in limine*.

13        THE COURT:  Overruled.

14        THE WITNESS:  Correct.

15   BY MR. TROPP:

16   Q.   You worked for some company called Combine or something

17   selling insurance?

18   A.   Combined, right.

19   Q.   And you were an independent contractor for them?

20   A.   Correct.

21        MR. CUMMINGS:  Objection, Your Honor, relevance and

22   motion *in limine*.

23        THE COURT:  Overruled.  She answered the question.

24   BY MR. TROPP:

25   Q.   And when you started working for Avant, there was never any

```
 1   discussion or there was never any agreement that you were going
 2   to get paid hourly, correct?
 3   A.   Correct.
 4   Q.   At your previous place, did you get paid hourly?
 5           MR. CUMMINGS:  Objection, relevance.
 6           THE COURT:  Overruled.
 7           THE WITNESS:  Yes.
 8   BY MR. TROPP:
 9   Q.   And commission?
10   A.   No.
11   Q.   Just hourly, there's no commissions?
12   A.   Correct.  But my prior job I wasn't selling -- see, between
13   Combined and Avant, I was working at a different place.
14   Q.   Was there a period where you worked for both?
15   A.   Both what?  No.
16   Q.   Okay.  But at Combined, you were selling insurance and the
17   agreement over there was to get paid hourly?
18           MR. CUMMINGS:  Objection, relevance.
19           THE COURT:  Overruled.
20           THE WITNESS:  No.
21   BY MR. TROPP:
22   Q.   So how were you paid at Combined when you were selling
23   insurance there?
24   A.   Based on commission.
25   Q.   Pure commission?
```

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 174 of 206
Cross-Examination - Rafael de ValFonte
July 11, 2023
174
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1   A.   Okay, yes, correct.

2   Q.   And then when you came over to Avant, there was no

3   discussion, no agreement about getting paid hourly, correct?

4   A.   Correct.

5   Q.   Is it fair to say that in the marketplace sales for health

6   insurance -- and you have been doing this for a long time --

7            MR. CUMMINGS:   Objection, Your Honor, industry custom

8   is not relevant.

9            THE COURT:   Overruled.

10            MR. CUMMINGS:   Your Honor, can we approach to make a

11   record on this?

12            THE COURT:   Let me hear the question.  I haven't heard

13   the question.

14   BY MR. TROPP:

15   Q.   In all the marketplace sales, and in your experience, they

16   are based on commission and not hourly?

17   A.   The insurance companies do pay based on commission.  Now,

18   insurance agencies do pay a base salary.

19   Q.   But that wasn't your case at Combined or that wasn't the

20   agreement with Avant, correct?

21   A.   In Combined, I was self-employed out on the streets on my

22   own.  I didn't have to go to any office there.

23   Q.   Okay.  Okay.  So -- so around November or October, you said

24   in 2020, you started working for Avant, and you eventually got

25   paid in -- in February?

1    A.  Yes.  He did give me an advance in January, a check; if I

2    remember correctly, it was 1,560.

3    Q.  And is it fair to say that in February, your total amount

4    of earnings was almost 3,000?

5            MR. CUMMINGS:  Objection, misstatement of evidence.

6            THE COURT:  Overruled.

7            THE WITNESS:  Well, partially.  You see, the companies

8    don't always pay everything at the same time.  They take a

9    while.  So I collected, but partially and by parts.

10   BY MR. TROPP:

11   Q.  Partially how much --

12   A.  By parts.  In parts.

13   Q.  And that's about what, 3,000?

14   A.  I don't remember.  I don't remember.

15   Q.  Okay.  And a month after that, you started -- you started

16   being -- average about of 7,000 a month?

17   A.  No.  It began to increase month by month.

18   Q.  You did not average 7,000 a month after March?

19   A.  That would be the average if I divide the total amount I

20   made throughout the whole year, divided by the number of months

21   I worked.

22   Q.  No.  I am actually asking -- I am actually asking you

23   whether or not you were actually paid $7,000 a month starting

24   in -- after that period?

25   A.  It would vary.  I wouldn't be making a fixed salary, and

1  the amounts would change based on the commissions that the

2  companies were paying.

3  Q.  Okay.  So, um, I'm going to come back to that because we

4  need to be -- I can try to remind you.

5     Okay.  For the -- for the time you worked at Avant, is it

6  fair to say that -- that the hours that you worked, because you

7  chose to work it in order to make more money, not because you

8  had to?

9  A.  Yes, correct.  But can I clarify?

10  Q.  Go head, I will let you.  Thank you.

11  A.  Yes, I did -- I did elect that, because if I am in a place

12  that I'm only making money based on commission, the more I

13  work, the more money I'll make.  First, that's number one.

14  Q.  That makes sense.

15  A.  And No. 2 would be that if there were no people to answer

16  the phones as they were coming in, if that were to happen,

17  Reinier would stand up in front of everybody and say, Look,

18  today we lost so many phone calls, so many sales because of

19  these -- not being anybody available.  So in certain ways, he

20  was implying that we needed to be there at the office all this

21  time to be able to answer any phone calls that would come in.

22  Q.  Okay.  Before I ask you the hours that you worked, it's --

23  is the hours that you chose to work not because you had to

24  because you wanted to.  You said yes.

25  A.  Yes.

1   Q.  Thank you.

2   A.  And I confirmed my answer.

3   Q.  Yes.  Thank you.

4       And if you wanted to work less hours, that would be okay;

5   you would be allowed to work less hours, right?

6   A.  Well, I think that that could have been the case if I

7   initially, when I first started, had my interview with Reinier,

8   I would have told him that I had a limited schedule, he would

9   have accepted that.  But since I started working there with an

10  open schedule, then I had to accept that.

11  Q.  My question is, the hours that you worked, they were

12  completely because of your choice, not because you had to do

13  it; yes?

14  A.  Correct.

15  Q.  And you could choose hours if you -- you could choose less

16  hours if you didn't care about making more money, and if you

17  decided to stay home and watch TV or not go to work at all,

18  that would be okay also?

19  A.  I don't think I would have been able to stay at home

20  whenever I wanted to watch TV; that, I don't think so.

21  Q.  What are you saying, you think you would have been fired if

22  you decided to stay home and watch TV?

23  A.  Of course.  But on top of that, I'm a person that am

24  responsible, reliable at work.  And if I -- and if I have a

25  commitment at work to follow a certain schedule and a certain

Cross-Examination - Rafael A. Valiente
July 11, 2023
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    amount of clients.

2    Q.  Let me ask you this way, I want to use these exact words.

3    If you chose not to go to work at all and stay home and watch

4    TV, or not go at all, that would be okay with Avant; yes or no?

5    Would you agree with that?

6    A.  I don't know.

7    Q.  Okay.  And are you -- okay.  Let me try to remind you.  Do

8    you remember I took your -- I asked you some questions at

9    deposition?

10   A.  Oh, my, four hours worth.

11   Q.  Right.  Yes, I asked questions.  And you told the truth

12   right when I asked you the questions, right?

13   A.  Correct.

14   Q.  Okay.  So -- so, um, let's try to clear this up.

15       (Pause in proceedings.)

16           MR. CUMMINGS:  Objection, Your Honor.  I am not sure

17   what exhibit it is.  It looks like a deposition that's not in

18   evidence.

19           THE COURT:  Not in evidence, please remove it.

20           MR. CUMMINGS:  Can you please have that taken down?

21       (Pause in proceedings.)

22           MR. TROPP:  Okay.  So, Your Honor, if I could read

23   from Page 65 and the line?

24           MR. CUMMINGS:  Your Honor, I am not sure if this is an

25   impeachment that's happening, but I am objecting to improper

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 179 of 206

Cross-Examination - Rafael Valiente
July 11, 2023                                                    179
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1    impeachment.

2            THE COURT:  I have no way of knowing.  I don't know

3    the question and answer he is going to read.

4            MR. TROPP:  I asked a question, the question was:  "If

5    you decided -- okay.  Um, if you decided to take a two and a

6    half hour lunch today, walk at the beach for half an hour,

7    three hours and then come back, you could do that if you wanted

8    to, right?"

9            And you answered, "Yes, also."

10           THE COURT:  I think our interpreter needs to translate

11   that, please.

12           THE INTERPRETER:  This is the interpreter.  Can you

13   repeat the question, the -- what you were reading?

14           MR. TROPP:  Yes.

15   BY MR. TROPP:

16   Q.  Okay.  I had asked the question on Page 66, Line 2, "If you

17   didn't care about making more money, if you want to take the

18   day off and watch TV, that's okay, too, right?"

19       And the answer was, "Correct?"

20   A.  Yes.  It's the same answer I gave you today.

21   Q.  Okay.  And you were allowed to do that because you were an

22   independent contractor?

23           MR. CUMMINGS:  Objection, calls for a legal

24   conclusion.

25           THE COURT:  Overruled.

Case 1:22-cv-22671-CMA   Document 123-2   Entered on FLSD Docket 09/21/2023   Page 180 of 206
Cross-Examination - Rafael Valiente
July 11, 2023
180
Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

1          THE WITNESS:  I don't know, because that never

2   happened.

3   BY MR. TROPP:

4   Q.  But if you wanted to, that would be okay because you were

5   an independent contractor?

6   A.  Okay.

7   Q.  Thank you.  I'm okay with that.

8          When I last spoke to you, didn't -- do you remember telling

9   me in the deposition that you were not suing or asking for

10  overtime in your lawsuit?

11          MR. CUMMINGS:  Objection, improper impeachment.

12          THE COURT:  Sustained.

13  BY MR. TROPP:

14  Q.  Is it fair to say that your claim, what you have been

15  asking for, has been for bonuses and commissions, not for

16  overtime?

17  A.  For everything.

18  Q.  Okay.  Well, I asked you that same question at our

19  deposition.  We talked about that.

20  A.  Yes, I remember.

21  Q.  And -- and when I asked you those questions, were you being

22  truthful at that time, like you are being now?

23  A.  And you also asked me if I had to choose between one where

24  there was overtime or bonuses or commissions, which one I would

25  drop, and I said that I would drop the overtime because it was

 1   less in quantity.

 2   Q.  Actually, the question that I asked was, um, "Why are you

 3   suing Reinier for overtime?"

 4       And you answered at the deposition, I'm not suing him --

 5           MR. CUMMINGS:  Objection, improper impeachment.

 6           THE COURT:  Sustained.

 7   BY MR. TROPP:

 8   Q.  At our -- the last time we spoke at the deposition, I asked

 9   you, What is it that's missing, what are you owed, and you said

10   just about a bonus --

11           MR. CUMMINGS:  Objection, improper impeachment.

12           THE COURT:  Sustained.  I think we will pause here.

13           Ladies and gentlemen, it's been a long day and I thank

14   you for your patience.  I am going to ask that you all return

15   tomorrow morning at 9:30, and we will go late in the day as we

16   have today as well.  So we'll give you a little morning break

17   and have you begin at 9:30.

18           Please don't discuss this case with anyone.  Please

19   avoid contact with the parties and the lawyers; they cannot

20   have any contact with you, even outside by the elevators or

21   outside the courthouse.  You can leave your notebooks in the

22   jury room.  Have a good evening.

23           COURT SECURITY OFFICER:  All rise for the jury.

24       (The jury exited the courtroom at 6:03 p.m.)

25           THE COURT:  So the way to impeach with prior

1    consistent testimony is to say, for example, You are not

2    claiming any overtime, correct?  Oh, no, yes, I am claiming

3    overtime.  Well, you remember me asking you that question at

4    deposition?  Page 50, Line 1, So and so, you are not claiming

5    any overtime, correct?  Your answer, correct.

6            That's how you impeach, but you can't sort of be

7    summarizing and paraphrasing from past questions.  It's become

8    a mish-mash, which is why I am sustaining these objections, all

9    right.  There has to be direct testimony that was contrary to

10   what was directly stated before.

11           So -- and I think part of the problem is you are going

12   through something on your computer and you haven't marked

13   clearly where things are.  You might want to print out your

14   depositions for tomorrow that you intend to use for impeachment

15   and use paper as opposed to having the jury and the Court and

16   everyone else waiting while you scroll through on a laptop to

17   try to find what it is you are looking, Mr. Tropp.  All right?

18           MR. TROPP:  Yes.

19           THE COURT:  Okay.  I have to begin a criminal trial on

20   Thursday because the Government is losing a witness.  I am just

21   letting you all know that.  If we are not done tomorrow, we are

22   going to take a break in this case and I will ask the jury to

23   come back next week.

24           Are there -- oh, and I need to see you all tomorrow

25   morning at 8:00 because I have returned to you the jury

1    instructions with questions and issues; they are not in final

2    form.  So you all need to look at those and we will work on

3    them again tomorrow morning at 8:00, without inconveniencing

4    the jury by having the jury wait while we do that.  The parties

5    must be here as well.

6            Any questions?

7            MR. TROPP:  No, Your Honor, thank you.

8            MR. CUMMINGS:  Your Honor, I am scheduled to leave on

9    Friday and be out the early part of next week.

10           THE COURT:  Right.  We told the jury when we picked

11   them that the case would be over Thursday, the latest, meaning

12   deliberating.  And you think you are going to be resting

13   tomorrow evening?  I am just looking at the pace that -- the

14   length of time it is taking each Plaintiff's testimony, is

15   about an average of three plus hours.

16           MR. CUMMINGS:  It is going to shrink, Your Honor.

17           THE COURT:  That's all I'm saying.  I mean, if we can

18   get you to do your closing arguments tomorrow, I can charge the

19   jury Thursday morning while I begin another trial.

20           MR. CUMMINGS:  That's what I'm hoping.  For closings,

21   if we can get through them tomorrow, how long would Your Honor

22   be giving us?

23           THE COURT:  I would give 25 minutes, maximum.

24           MR. CUMMINGS:  Okay.  And then do we get a sandwich

25   open and close, close?

1          THE COURT:  Correct.  I will say, doing -- having the

2  witnesses doing the math with a phone calculator is eating up a

3  lot of time.  Do the math yourself and just walk them through,

4  as opposed to --

5          MR. CUMMINGS:  That's what I was trying to do, and

6  then we didn't know -- we were getting leading objections.

7          THE COURT:  Well, I understand.  You do the math, put

8  it up there.

9          MR. CUMMINGS:  Okay.

10         THE COURT:  And then ask the witness your question.

11         MR. CUMMINGS:  We will do that to speed things up, and

12 we then don't need to rehash a lot of the stuff that we've

13 already done.  So we will clean up some of these examinations,

14 that way we can --

15         THE COURT:  I think we wasted a lot of time today with

16 some of this cross-examination where we were sitting here with

17 nothing being said and a lot of math going on and sometimes

18 questions that are somewhat unnecessary or answers that are

19 unnecessary.

20         But I think our goal still is to have me charge the

21 jury Thursday morning and have them deliberating Thursday so

22 that you can have a verdict by Thursday.

23         MR. CUMMINGS:  That's -- that's the goal.

24         THE COURT:  Okay.  Very good.

25         MR. CUMMINGS:  We need to be done tomorrow, I thought

```
 1    you meant like jury verdict and everything else.

 2              THE COURT:  No, no.  But I need those jury

 3    instructions in final form.  I can't charge the jury Thursday

 4    morning if they're not in that --

 5              MR. CUMMINGS:  No, I saw that and I -- just quickly,

 6    because I saw Your Honor's concern was that the instructions

 7    seem repetitive, and that was just the nature between 4.14 for

 8    the employee versus independent contractor and then joint

 9    employer under 4.24.  So I don't know how we -- I guess we can

10    talk about that tomorrow.

11              THE COURT:  Discuss it with opposing counsel to see

12    how you want to restructure them.  I will see you all at 8:00.

13              MR. CUMMINGS:  Okay, Your Honor.

14              THE COURT:  Thank you.

15         (Witness temporarily excused.)

16         (The proceedings adjourned at 6:09 p.m.)

17                     C E R T I F I C A T E

18

19         I hereby certify that the foregoing is an

20    accurate transcription of the proceedings in the

21    above-entitled matter.

22

23    _08/31/2023_
           DATE                    STEPHANIE A. McCARN, RPR
24                                 Official United States Court Reporter
                                   400 North Miami Avenue, Thirteenth Floor
25                                 Miami, Florida 33128
                                   (305) 523-5518
```

July 11, 2023                                                                 1

Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

## $

**$1,000** [1] - 67:13
**$1,100** [1] - 152:1
**$1,667.20** [2] - 168:25, 169:2
**$10** [16] - 62:11, 65:24, 66:6, 66:11, 124:9, 124:11, 125:2, 125:7, 125:12, 126:1, 126:6, 126:9, 126:11, 126:15, 135:24, 139:21
**$10,000** [2] - 101:7, 159:21
**$1100** [1] - 151:7
**$12,525** [1] - 95:22
**$120** [1] - 142:23
**$1300** [1] - 137:2
**$14** [1] - 84:19
**$15** [1] - 45:4
**$15,080** [3] - 95:12, 95:17, 95:19
**$1500** [2] - 136:20, 137:1
**$18,000** [1] - 113:3
**$180** [1] - 142:23
**$190** [2] - 144:2, 144:11
**$2,117.65** [2] - 166:15
**$20** [9] - 62:11, 65:23, 66:5, 66:7, 67:5, 102:2, 102:9, 102:13, 105:15
**$200** [1] - 152:13
**$23,465** [2] - 93:4, 93:6
**$240** [1] - 143:11
**$25,000** [4] - 97:23, 97:24, 98:1, 115:4
**$2800** [2] - 135:20, 136:18
**$300** [1] - 143:3
**$35** [3] - 77:19, 102:10, 102:11
**$350** [1] - 142:5
**$36,000** [1] - 117:21
**$3600** [1] - 117:22
**$4,153.58** [1] - 97:2
**$412.31** [2] - 164:18, 164:20
**$416.80** [1] - 168:21
**$47,796** [1] - 96:14
**$47,800** [1] - 96:10
**$490** [2] - 140:9, 140:12
**$5,000** [2] - 98:7, 98:13
**$5,316** [1] - 164:15
**$5,360** [1] - 163:18

**$5,970** [1] - 95:14
**$54,000** [4] - 96:18, 96:20, 97:19, 97:25
**$6,000** [2] - 98:4, 136:3
**$6,461.54** [2] - 98:25, 99:13
**$6.87** [1] - 164:22
**$60,000** [1] - 112:25
**$600** [6] - 60:1, 60:9, 60:10, 60:12, 93:7, 101:24
**$68.80** [1] - 165:8
**$7,000** [2] - 155:8, 175:23
**$8,000** [1] - 158:3
**$80** [2] - 144:8, 144:9
**$800** [2] - 85:16, 93:10
**$84,000** [1] - 98:21
**$84,215** [1] - 155:9
**$865** [1] - 151:22
**$894.40** [1] - 165:9
**$9,000** [1] - 155:22
**$9,110** [2] - 95:2, 95:8

**'21** [4] - 48:23, 131:18, 135:7, 171:17
**'21/'22** [2] - 66:18, 66:23
**'22** [4] - 48:23, 131:13, 131:14, 171:18

## 0

**08/31/2023** [1] - 185:22

## 1

**1** [5] - 1:8, 77:9, 90:1, 160:20, 182:4
**1,000** [2] - 160:16, 171:9
**1,082** [2] - 161:23, 171:16
**1,100** [1] - 151:22
**1,265** [1] - 93:19
**1,560** [1] - 175:2
**10** [3] - 45:4, 66:14, 140:9
**10,000** [1] - 168:12
**100** [1] - 150:20
**101** [1] - 3:8
**1092** [1] - 161:25
**1099** [13] - 8:17, 8:22, 92:12, 93:1, 93:2, 93:3, 93:15, 98:10, 113:5, 113:8,

113:10, 163:6
**1099s** [3] - 92:7, 92:15, 120:16
**10:00** [1] - 70:23
**10:43** [1] - 55:8
**10:44** [1] - 55:12
**10:58** [1] - 55:12
**10:59** [2] - 55:19, 55:22
**10th** [1] - 26:7
**11** [1] - 1:5
**110** [1] - 144:9
**1100** [2] - 151:7, 151:9
**11:00** [2] - 127:5, 127:6
**11th** [11] - 62:2, 62:3, 62:14, 62:25, 63:7, 89:7, 89:16, 89:25, 90:2, 90:8, 102:17
**12** [14] - 70:9, 72:18, 72:24, 80:18, 94:4, 103:3, 109:9, 110:2, 110:3, 111:11, 114:11, 164:4, 164:9, 170:21
**12,002** [1] - 167:13
**120** [1] - 3:8
**121** [1] - 3:9
**1250** [1] - 1:23
**12:00** [1] - 15:3
**12:26** [2] - 87:2, 87:5
**12:30** [2] - 86:10, 86:18
**13** [13] - 3:19, 96:25, 98:23, 110:3, 114:8, 139:3, 139:4, 163:21, 164:16, 165:1, 165:8
**13-3** [1] - 1:7
**132** [1] - 3:20
**135** [1] - 1:16
**139** [1] - 3:19
**13th** [4] - 25:19, 39:14, 132:24, 133:11
**15** [6] - 20:5, 100:9, 110:2, 170:17, 170:19
**15th** [6] - 20:13, 22:2, 24:1, 67:1, 126:21, 132:25
**16,000** [1] - 100:21
**1667** [1] - 169:4
**16th** [1] - 126:21
**17** [1] - 167:1
**17.65** [2] - 167:7, 167:8
**170** [1] - 3:10
**17th** [2] - 39:14, 74:9
**1800** [1] - 109:5, 111:13

**185** [2] - 1:8, 3:24
**18th** [1] - 98:5
**19** [1] - 3:18
**1:00** [1] - 86:19
**1:30** [2] - 15:5, 86:24
**1:37** [1] - 88:2
**1:38** [1] - 88:18
**1st** [14] - 66:19, 94:23, 94:25, 102:14, 102:22, 141:2, 141:5, 141:12, 141:17, 141:18, 146:11, 148:9, 156:3, 163:20

## 2

**2** [6] - 1:11, 68:22, 77:8, 168:18, 176:15, 179:16
**2,117.65** [1] - 166:22
**2,17.65** [1] - 167:1
**2,200** [1] - 150:21
**2,500** [1] - 168:16
**20** [14] - 3:20, 22:8, 82:8, 100:9, 110:17, 132:11, 132:12, 165:3, 167:8, 168:20, 170:17, 170:19, 170:22, 171:5
**20.84** [2] - 168:19, 168:20
**2000** [1] - 131:16
**2010** [2] - 122:6, 122:7
**2016** [1] - 56:23
**2019** [1] - 122:15
**2020** [23] - 9:7, 9:8, 9:9, 28:4, 43:15, 122:13, 122:14, 126:22, 126:24, 134:11, 134:16, 135:7, 135:14, 140:11, 148:5, 163:20, 170:9, 170:10, 170:25, 171:14, 171:20, 174:24
**2020/'21** [1] - 170:6
**2021** [67] - 28:5, 29:8, 29:11, 31:18, 61:4, 61:22, 62:14, 74:9, 81:14, 91:21, 92:9, 93:2, 98:11, 113:3, 113:4, 113:19, 113:20, 113:25, 114:12, 114:14, 114:17, 114:23, 126:17, 134:11, 134:19, 140:12,

141:2, 141:5, 142:2, 144:5, 145:6, 145:8, 145:14, 146:11, 146:22, 148:6, 152:4, 154:23, 155:1, 155:4, 155:10, 155:18, 155:23, 156:2, 156:4, 156:9, 156:11, 156:15, 156:17, 156:24, 157:2, 157:8, 157:22, 158:7, 159:5, 161:8, 163:7, 163:20, 166:16, 166:18, 170:10, 170:19, 171:10, 171:14, 171:17
**2021/'22** [1] - 160:15
**2021/2022** [2] - 66:15, 160:6
**2022** [63] - 5:20, 20:5, 20:13, 24:1, 25:18, 25:19, 26:2, 28:2, 42:4, 66:24, 78:22, 79:4, 81:14, 82:8, 83:8, 83:15, 83:18, 90:8, 90:18, 90:20, 90:21, 92:10, 92:11, 92:13, 92:14, 92:15, 94:19, 94:23, 94:25, 104:5, 104:23, 106:21, 106:23, 106:24, 112:25, 113:6, 113:9, 113:13, 113:15, 115:4, 128:18, 128:19, 131:17, 156:3, 157:22, 157:24, 158:1, 158:5, 158:7, 158:10, 159:5, 159:9, 159:16, 159:20, 161:19, 167:14, 167:16, 167:21, 167:24, 168:14, 171:10
**2022/2021** [2] - 163:4, 171:11
**2023** [2] - 1:5, 18:17
**21** [10] - 6:18, 6:21, 13:2, 13:5, 14:15, 15:17, 15:20, 15:22, 16:6, 18:2
**2100** [1] - 1:23
**21st** [2] - 145:8, 145:14
**22** [2] - 17:22, 116:13
**22-cv-22671-CMA** [1] - 1:2

July 11, 2023

Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

**220** [1] - 58:4
**23,000** [1] - 113:5
**23,465** [1] - 93:9
**230-4884** [1] - 1:17
**23rd** [3] - 26:1, 95:15, 158:5
**24** [1] - 3:19
**24th** [1] - 114:20
**25** [2] - 104:25, 183:23
**25,000** [4] - 113:14, 113:16, 113:17, 118:21
**2500** [1] - 168:13
**25th** [1] - 134:15
**26th** [3] - 66:20, 102:23, 134:15
**27th** [2] - 26:2, 61:4
**280** [1] - 150:21

### 3

**3** [4] - 3:17, 92:19, 92:21, 167:19
**3,000** [2] - 175:4, 175:13
**3.44** [4] - 164:23, 164:25, 165:1, 165:3
**30** [9] - 16:16, 22:8, 43:19, 86:9, 103:11, 143:1, 143:2, 143:3, 166:11
**30,000** [1] - 98:20
**30-something** [1] - 117:11
**305** [5] - 1:17, 1:21, 1:24, 2:6, 185:25
**30th** [2] - 26:4, 39:7
**31** [3] - 78:22, 79:3, 164:17
**31,000** [3] - 101:14, 117:9, 117:14
**31st** [12] - 67:2, 78:21, 134:19, 141:11, 141:14, 141:22, 148:6, 154:23, 156:15, 163:20, 170:13
**32** [1] - 166:9
**320** [3] - 136:9, 136:12, 136:15
**33** [1] - 3:5
**33128** [2] - 2:6, 185:24
**33134-5267** [1] - 1:24
**33140-2316** [1] - 1:20
**33146-1878** [1] - 1:16
**34** [4] - 166:7, 166:13, 166:14, 167:12
**35.29** [4] - 167:2, 167:3, 167:4, 167:5
**353** [3] - 167:9,

**167:10, 167:12**
**38** [1] - 140:2
**3:00** [1] - 70:22
**3:15** [1] - 121:17
**3:24** [1] - 90:8
**3:30** [1] - 121:12
**3:31** [2] - 128:24, 129:2
**3:44** [2] - 129:2, 129:4
**3rd** [1] - 26:5

### 4

**4** [16] - 3:18, 3:18, 3:24, 19:21, 19:24, 21:14, 60:21, 60:22, 68:23, 81:15, 89:9, 150:3, 153:23, 166:8, 168:12, 168:24
**4.14** [1] - 185:7
**4.24** [1] - 185:9
**40** [14] - 6:8, 6:13, 16:14, 16:20, 43:19, 59:1, 86:9, 109:14, 110:11, 110:13, 110:17, 110:20, 111:5
**400** [2] - 2:5, 185:24
**41.67** [2] - 168:17, 168:18
**412** [1] - 164:17
**416.80** [1] - 168:24
**42** [1] - 114:8
**44** [1] - 114:10
**44.72** [1] - 165:2
**440** [1] - 58:5
**450** [1] - 146:20
**47** [1] - 17:21
**47,700** [1] - 96:14
**47,796** [1] - 96:11
**49** [4] - 139:19, 139:23, 140:9
**490** [1] - 139:21
**4:00** [1] - 70:23
**4A** [1] - 1:20
**4th** [6] - 40:4, 40:9, 40:10, 40:11, 82:8, 83:8

### 5

**5** [5] - 3:5, 66:7, 66:10, 66:14, 67:6
**5,000** [1] - 119:3
**5,360** [1] - 163:17
**5/9** [1] - 38:20
**50** [2] - 3:6, 182:4
**523-5518** [2] - 2:6, 185:25

**54** [1] - 3:6
**54,000** [2] - 96:22, 98:19
**56** [1] - 3:7
**57,920** [1] - 157:25
**5700** [3] - 101:4, 118:12, 118:13
**5750** [1] - 1:20
**580** [1] - 146:6
**5:30** [1] - 105:18

### 6

**6** [1] - 73:23
**6,000** [2] - 135:23, 136:6
**6.87** [1] - 164:21
**60** [15] - 3:18, 70:10, 97:7, 99:12, 103:6, 109:9, 109:14, 148:18, 149:2, 163:22, 164:20, 166:21, 166:22, 168:15, 168:16
**60,000** [3] - 113:7, 113:11, 113:17
**600** [7] - 110:7, 135:16, 135:19, 135:22, 136:2, 160:13, 160:14
**62** [2] - 103:5
**630** [1] - 150:20
**640** [1] - 146:17
**65** [1] - 178:23
**66** [1] - 179:16
**670** [1] - 147:5
**68.8** [1] - 165:6
**688** [1] - 80:22
**6:03** [1] - 181:24
**6:09** [2] - 1:6, 185:16
**6th** [1] - 26:7

### 7

**7** [3] - 3:19, 24:5, 24:6
**7,000** [2] - 175:16, 175:18
**710** [1] - 146:24
**72** [2] - 165:23, 166:14
**72,000** [2] - 166:11, 166:14
**740** [1] - 147:8
**770** [1] - 1:16
**777-0377** [1] - 1:24
**7:19** [1] - 82:8
**7th** [1] - 90:21

### 8

**8** [15] - 15:15, 15:18,

16:10, 16:19, 68:1, 77:6, 127:6, 159:23, 165:17, 165:20, 165:22, 166:7, 166:8, 168:22
**8,000** [3] - 158:10, 158:11, 158:16
**8-0** [1] - 168:23
**80,000** [3] - 113:6, 113:9, 113:11
**800** [4] - 93:20, 93:21, 93:22, 110:17
**81** [1] - 165:20
**814-2035** [1] - 1:21
**84,215** [1] - 155:5
**84,250** [1] - 163:6
**889** [2] - 161:13, 161:25
**890** [1] - 161:25
**8:00** [4] - 127:5, 182:25, 183:3, 185:12
**8:24** [2] - 1:6, 4:1
**8:25** [1] - 4:15
**8:26** [1] - 4:19
**8th** [7] - 61:17, 61:18, 61:22, 90:18, 90:20, 90:23, 102:16

### 9

**9** [29] - 14:24, 15:15, 15:18, 15:21, 15:23, 16:7, 16:9, 16:19, 70:2, 70:5, 134:23, 134:24, 148:14, 163:25, 165:20, 166:19, 167:14, 167:19, 167:20, 171:2
**9,000** [2] - 165:17, 165:22
**92** [1] - 3:17
**955** [1] - 80:13
**9:00** [9] - 70:22, 103:2, 167:22, 168:1, 168:3
**9:04** [2] - 22:13, 22:17
**9:26** [2] - 22:17, 22:19
**9:30** [2] - 181:15, 181:17
**9th** [5] - 17:4, 18:17, 18:23, 19:1, 25:18

### A

**a.m** [29] - 1:6, 4:1, 4:15, 4:19, 15:15, 15:18, 15:21, 15:23, 16:7, 16:9, 16:19, 22:13, 22:17, 22:19,

55:8, 55:12, 55:19, 55:22, 70:2, 70:5, 134:23, 134:24, 148:14, 166:19, 167:14, 167:20, 171:2
**ability** [1] - 29:4
**able** [29] - 10:13, 13:11, 13:14, 14:21, 21:11, 42:24, 46:6, 49:10, 50:3, 53:12, 59:20, 61:20, 66:21, 67:13, 67:15, 75:9, 79:12, 102:9, 103:17, 120:23, 128:4, 133:15, 133:16, 135:4, 137:22, 147:15, 153:5, 176:21, 177:19
**above-entitled** [1] - 185:20
**abrupt** [1] - 150:15
**accept** [2] - 69:12, 177:10
**accepted** [3] - 9:16, 106:14, 177:9
**access** [21] - 13:14, 13:15, 13:17, 13:18, 14:3, 28:24, 46:8, 46:11, 49:9, 49:16, 78:22, 78:25, 79:14, 80:1, 80:8, 83:6, 83:9, 83:13, 128:4, 128:7, 155:13
**accident** [3] - 131:10, 131:20
**according** [6] - 69:5, 91:6, 97:3, 146:16, 163:5, 163:18
**account** [1] - 138:6
**accounting** [8] - 29:21, 29:22, 30:2, 30:12, 32:10, 138:7, 153:14
**accounting@
   AvantAssurance.
   com** [3] - 29:25, 138:10, 138:23
**accounts** [1] - 138:5
**accurate** [2] - 22:1, 185:19
**acquaintance** [1] - 122:10
**active** [1] - 141:16
**actively** [1] - 25:3
**actual** [1] - 30:1
**ad** [2] - 57:20, 58:18
**add** [6] - 90:19, 95:17, 99:14, 139:19,

140:8, 155:20
added [3] - 90:13,
146:2, 163:9
addition [1] - 97:19
additional [2] - 98:2,
166:9
address [10] - 19:11,
21:21, 29:25, 30:1,
83:9, 119:8, 132:16,
132:19, 132:20
addressed [3] - 21:8,
135:1, 154:16
adjourned [1] - 185:16
admission [1] - 47:20
ADMITTED [1] - 3:15
advance [7] - 67:9,
67:10, 67:20, 89:20,
136:20, 142:24,
175:1
Advance [1] - 138:4
advances [3] - 79:8,
93:25, 96:5
advantage [1] - 135:4
advise [1] - 23:8
afternoon [11] - 15:1,
15:3, 15:5, 21:18,
37:6, 90:8, 90:12,
101:22, 121:24,
121:25, 128:22
afternoons [2] -
135:11, 135:12
afterwards [3] - 72:2,
72:6, 82:24
agencies [6] - 51:3,
54:8, 54:13, 54:14,
106:11, 174:18
agency [7] - 51:4,
51:17, 51:24, 59:17,
73:20, 122:9
agent [51] - 8:15, 8:16,
8:18, 9:10, 9:24,
10:7, 12:2, 12:9,
12:15, 12:16, 13:12,
13:22, 16:16, 16:18,
27:3, 28:1, 32:5,
36:5, 36:9, 38:16,
41:14, 44:6, 44:16,
47:1, 48:23, 50:2,
50:3, 51:20, 52:2,
58:18, 59:20, 62:7,
62:10, 63:2, 64:4,
64:18, 66:3, 68:6,
68:11, 75:21, 90:17,
104:6, 111:25,
112:1, 112:8,
112:16, 112:18,
128:14, 135:10,
135:11
agents [84] - 5:12,
5:17, 6:6, 6:9, 6:13,

6:15, 6:18, 6:21, 7:1,
7:12, 7:16, 7:25,
10:2, 12:24, 13:2,
13:5, 13:8, 14:15,
14:21, 14:24, 15:1,
15:10, 15:17, 15:20,
15:22, 15:25, 16:6,
16:18, 17:17, 17:19,
17:23, 17:24, 18:3,
19:14, 19:18, 20:20,
20:25, 21:8, 23:3,
23:9, 23:17, 24:2,
25:3, 25:11, 25:13,
25:23, 26:1, 29:2,
29:5, 32:4, 38:25,
40:20, 41:5, 41:10,
43:16, 44:10, 45:12,
45:16, 49:19, 51:2,
54:13, 54:14, 57:22,
64:1, 64:11, 64:13,
64:22, 65:12, 69:22,
73:6, 77:1, 77:11,
77:22, 78:4, 78:14,
97:15, 102:1, 116:4,
124:7, 133:19,
135:6, 160:4
agents' [1] - 21:24
ago [4] - 17:4, 17:15,
19:4, 19:8
agree [13] - 20:12,
41:3, 41:8, 43:5,
43:11, 44:18, 95:25,
113:19, 115:6,
115:15, 116:1,
167:23, 178:5
agreed [1] - 66:5
agreement [12] -
59:23, 105:16,
123:2, 123:6,
125:16, 126:8,
150:12, 170:13,
173:1, 173:17,
174:3, 174:20
ahead [3] - 55:9,
71:22, 90:10
Alberto [1] - 91:4
Alcala [5] - 3:7, 55:15,
56:8, 104:14, 104:19
ALCALA [1] - 55:23
Alexa [1] - 33:16
Alice [1] - 5:6
Alix [14] - 3:4, 4:13,
19:11, 25:1, 38:20,
58:23, 63:8, 64:16,
73:9, 84:4, 89:22,
137:7, 149:14
ALIX [2] - 4:20, 19:11
Alix@
AvantAssurance.
com [2] - 20:3, 21:21

allow [4] - 6:23, 63:20,
129:10, 130:20
allowed [10] - 10:18,
14:3, 47:2, 81:6,
84:6, 103:20,
129:13, 129:25,
177:5, 179:21
almost [6] - 103:11,
115:22, 117:11,
150:23, 152:14,
175:4
altogether [2] -
140:18, 144:11
ALTONAGA [1] - 1:12
Amazon [1] - 84:19
Ambetter [7] - 54:10,
54:13, 77:13, 77:18,
139:8, 140:13,
140:14
amount [34] - 31:9,
31:10, 33:9, 33:10,
67:12, 93:19, 94:12,
95:4, 95:9, 95:25,
96:2, 96:7, 98:14,
100:25, 113:2,
114:5, 118:5, 118:9,
126:1, 150:23,
151:12, 151:24,
151:25, 155:10,
155:21, 157:19,
159:13, 163:3,
175:3, 175:19, 178:1
amounts [5] - 59:19,
94:16, 149:9,
150:22, 176:1
Ana [6] - 24:14, 64:15,
64:17, 73:8
Andrea [15] - 26:11,
26:19, 43:12, 46:11,
47:13, 61:6, 61:12,
63:6, 104:3, 115:7,
123:13, 123:19,
127:11, 135:9,
147:21
ANDREA [1] - 1:8
Anna [1] - 94:11
annual [1] - 11:7
annuity [2] - 58:9,
58:12
answer [25] - 44:25,
45:6, 71:13, 71:14,
71:24, 104:21,
105:19, 107:5,
109:13, 109:14,
110:20, 111:7,
111:8, 112:1, 112:2,
114:16, 116:16,
164:2, 176:15,
176:21, 177:2,
179:3, 179:19,

179:20, 182:5
ANSWER [2] - 18:1,
18:4
answered [6] - 50:6,
50:9, 118:10,
172:23, 179:9, 181:4
answering [1] -
110:18
answers [1] - 184:18
Anthem [4] - 140:21,
142:1, 142:5, 150:20
anxiety [1] - 90:13
anyway [1] - 172:3
apologies [1] - 4:17
apologize [2] -
131:18, 165:3
app [2] - 57:14, 165:18
appear [2] - 69:2,
78:16
APPEARANCES [2] -
1:13, 2:1
application [1] - 35:9
applications [4] -
85:7, 85:9, 85:15,
85:17
applied [4] - 57:24,
58:20, 59:1, 85:10
apply [1] - 84:23
applying [4] - 57:20,
58:24, 59:10, 85:12
appointment [1] -
132:24
appointments [1] -
65:13
approach [3] - 121:15,
163:12, 174:10
approached [1] -
102:8
approximate [1] -
59:19
April [10] - 106:25,
126:14, 126:16,
126:17, 152:3,
152:4, 152:8, 152:9,
154:12, 167:17
Apt [1] - 1:20
area [1] - 71:6
arguments [1] -
183:18
armed [1] - 91:8
arrange [3] - 131:1,
131:2, 131:5
arranged [1] - 132:5
arrangement [1] -
124:22, 125:19,
125:24, 125:25
arrangements [1] -
54:9
arrivals [1] - 21:20
arrive [2] - 41:2, 89:24

arrived [2] - 75:7, 91:8
arrow [1] - 157:15
aside [1] - 105:15
assistant [2] - 35:3
assumed [2] - 31:12,
33:7
assumes [2] - 54:16,
54:24
Assurance [12] -
57:11, 57:12, 57:13,
58:19, 60:9, 69:21,
93:3, 110:14,
116:14, 122:9,
132:18, 138:4
ASSURANCE [1] - 1:8
attach [3] - 74:25,
75:11, 75:23
attached [4] - 51:21,
75:5, 75:15, 85:21
attachment [1] - 76:6
attending [1] - 133:5
attention [2] - 82:4,
150:23
attorney [5] - 117:17,
117:20, 117:23,
118:4, 119:14
August [4] - 42:4,
90:21, 104:23,
106:23
authorize [2] - 83:17,
128:14
authorized [4] - 83:13,
83:14, 103:21
available [4] - 37:2,
66:22, 70:4, 176:19
Avant [175] - 5:7, 5:22,
6:19, 7:13, 7:21,
8:13, 8:18, 9:3, 9:5,
9:22, 9:25, 10:8,
10:10, 10:25, 11:9,
11:21, 11:24, 12:1,
12:7, 12:25, 15:14,
16:22, 17:17, 20:16,
21:9, 24:2, 25:10,
25:14, 26:13, 26:16,
27:13, 29:2, 29:22,
30:12, 33:7, 33:20,
34:20, 36:6, 37:10,
37:22, 38:1, 38:7,
41:14, 43:3, 45:10,
45:19, 45:21, 46:10,
46:16, 47:1, 47:13,
47:25, 48:9, 50:25,
51:2, 51:18, 51:20,
51:21, 52:2, 54:9,
57:11, 57:12, 57:13,
57:19, 58:19, 59:2,
60:8, 61:25, 62:17,
63:2, 63:14, 63:17,
65:9, 66:15, 67:23,

68:6, 68:8, 69:21, 74:5, 74:8, 74:22, 76:11, 84:3, 92:3, 92:6, 93:3, 93:25, 105:6, 105:17, 110:14, 111:25, 112:16, 114:13, 115:7, 115:25, 116:14, 117:8, 120:20, 121:3, 122:9, 122:12, 122:16, 123:4, 123:7, 123:10, 123:20, 123:24, 124:5, 124:10, 126:3, 126:20, 127:8, 127:19, 127:24, 130:8, 130:18, 131:2, 131:9, 131:16, 132:17, 133:10, 133:19, 133:24, 134:7, 134:8, 134:11, 135:7, 137:9, 137:11, 137:15, 137:23, 138:22, 139:17, 141:24, 142:3, 142:17, 143:10, 146:15, 146:18, 147:4, 147:7, 148:12, 149:4, 149:18, 149:23, 151:12, 155:1, 155:4, 155:9, 157:8, 157:12, 157:16, 157:19, 157:24, 158:4, 158:7, 159:5, 162:6, 163:5, 163:18, 170:11, 170:12, 170:15, 171:1, 171:6, 172:10, 172:25, 173:13, 174:2, 174:20, 174:24, 176:5, 178:4
**AVANT** [1] - 1:8
**Avant's** [9] - 5:12, 5:17, 8:9, 10:12, 32:10, 59:3, 104:7, 104:8, 134:21
**AvantAssurance.com** [1] - 19:12
**Ave** [2] - 1:16, 1:20
**Avenue** [2] - 2:5, 185:24
**average** [9] - 70:10, 73:10, 155:6, 158:1, 166:5, 175:16, 175:18, 175:19,
183:15
**avoid** [2] - 86:23, 181:19
**award** [1] - 101:10
**aware** [4] - 4:4, 47:25, 50:24, 54:12

## B

**balance** [3] - 101:7, 117:13, 117:24
**bank** [1] - 31:11
**base** [1] - 174:18
**baseball** [1] - 70:13
**based** [12] - 39:5, 54:2, 69:14, 120:15, 137:19, 144:2, 163:8, 173:24, 174:16, 174:17, 176:1, 176:12
**basis** [6] - 25:22, 31:16, 44:7, 83:12, 90:14, 99:3
**bathroom** [1] - 72:22
**BATISTA** [1] - 1:4
**Batista** [4] - 24:18, 47:14, 73:9, 123:13
**BCBSTX** [2] - 142:8, 142:12
**Beach** [1] - 1:20
**beach** [1] - 179:6
**bearing** [1] - 20:10
**became** [7] - 5:20, 8:23, 25:11, 62:7, 62:10, 64:18, 140:25
**become** [3] - 36:5, 165:23, 182:7
**becoming** [1] - 24:10
**BEFORE** [1] - 1:12
**began** [10] - 62:1, 66:1, 67:5, 67:8, 68:9, 78:15, 78:17, 102:12, 134:10, 175:17
**begin** [9] - 9:18, 66:19, 141:12, 141:16, 156:1, 181:17, 182:19, 183:19
**beginning** [10] - 17:6, 66:25, 74:16, 74:19, 97:10, 97:12, 105:9, 105:15, 125:8, 126:5
**behind** [2] - 64:15, 64:17
**beige** [1] - 7:8
**below** [2] - 82:5, 83:20
**benefits** [1] - 9:9
**better** [3] - 45:16, 72:24, 135:4

**between** [12] - 43:19, 50:21, 72:12, 79:19, 100:9, 109:14, 122:10, 150:10, 153:12, 173:12, 180:23, 185:7
**BH** [1] - 150:20
**big** [1] - 151:25
**bigger** [2] - 5:25, 94:8
**billing** [1] - 76:5
**birthday** [1] - 61:20
**bit** [5] - 26:23, 73:15, 86:2, 88:24, 94:8
**black** [1] - 7:7
**blaming** [3] - 106:10, 119:10, 119:12
**Blue** [18] - 75:22, 76:2, 76:5, 76:7, 76:13, 76:20, 85:1, 85:5, 85:6, 142:14, 142:17, 142:21, 150:20, 150:21
**Blvd** [1] - 1:23
**board** [1] - 59:19
**boat** [1] - 91:15
**Bob** [8] - 8:7, 12:19, 12:21, 63:11, 76:8, 76:16, 83:7, 83:9
**BOB** [1] - 8:7
**bonus** [19] - 68:25, 69:15, 78:3, 78:4, 78:6, 97:17, 97:20, 97:23, 97:24, 98:1, 98:6, 98:9, 98:13, 98:14, 115:4, 160:9, 160:12, 162:14, 181:10
**bonuses** [17] - 43:6, 43:12, 43:22, 44:8, 68:20, 68:22, 68:23, 69:1, 69:5, 77:16, 98:2, 98:3, 98:16, 98:20, 180:15, 180:24
**born** [1] - 122:3
**boss** [6] - 14:13, 14:14, 82:13, 82:14, 82:15, 82:17
**bothered** [1] - 80:23
**bottom** [1] - 145:13
**boy** [1] - 57:6
**boys** [2] - 57:6, 57:7
**break** [12] - 22:9, 22:15, 72:22, 85:24, 86:10, 86:15, 113:22, 121:10, 121:12, 128:20, 181:16, 182:22
**BRIAN** [1] - 1:14
**brian@**

**fairlawattorney.com** [1] - 1:17
**brief** [1] - 22:10
**Bright** [4] - 98:4, 143:6, 143:7, 143:10
**Brigitte** [2] - 81:24
**bring** [16] - 4:9, 4:14, 22:18, 45:17, 45:19, 45:22, 45:23, 46:3, 46:4, 84:9, 84:11, 132:5, 133:24, 134:1, 134:3, 134:5
**brought** [4] - 46:3, 57:10, 131:9, 133:19
**build** [3] - 52:16, 52:25, 53:14
**buildings** [1] - 52:20
**built** [1] - 91:23
**bunch** [2] - 45:6, 49:8
**business** [3] - 63:17, 91:25, 106:17
**busy** [1] - 47:5
**buy** [3] - 45:16, 84:14, 84:16
**BY** [124] - 2:4, 5:2, 5:16, 6:11, 9:20, 12:14, 18:16, 20:1, 20:9, 21:16, 22:24, 24:7, 25:17, 32:2, 33:15, 34:17, 35:15, 35:19, 36:4, 36:16, 36:20, 37:3, 38:19, 39:13, 40:3, 40:13, 42:2, 42:15, 43:20, 44:2, 44:24, 46:25, 47:23, 48:18, 50:1, 50:15, 54:6, 54:19, 56:3, 58:17, 60:23, 68:4, 72:4, 72:10, 73:25, 74:21, 77:10, 80:17, 80:21, 81:17, 83:24, 84:5, 84:21, 85:4, 88:23, 89:4, 89:12, 90:6, 92:23, 93:13, 94:7, 95:1, 97:13, 99:11, 100:16, 101:20, 102:7, 103:15, 105:5, 105:14, 107:16, 109:3, 109:22, 110:4, 111:10, 111:23, 112:14, 112:24, 114:3, 114:21, 115:23, 117:7, 118:1, 118:14, 120:6, 120:14, 121:23, 123:18, 129:8, 129:23, 132:13, 139:5,

142:15, 148:24, 149:21, 150:5, 151:20, 153:25, 154:22, 156:23, 159:3, 159:25, 160:18, 160:22, 162:23, 163:2, 163:14, 164:7, 164:14, 165:7, 165:21, 166:25, 170:2, 171:4, 172:15, 172:24, 173:8, 173:21, 174:14, 175:10, 179:15, 180:3, 180:13, 181:7

## C

**calculate** [2] - 99:3, 163:15
**calculation** [4] - 31:9, 97:3, 144:1, 158:12
**calculations** [1] - 97:4
**calculator** [2] - 165:18, 184:2
**cannot** [7] - 7:11, 13:8, 13:10, 13:14, 15:22, 104:4, 181:19
**car** [8] - 73:3, 131:10, 131:11, 131:20, 132:2, 132:4
**care** [4] - 41:4, 41:6, 177:16, 179:17
**Career** [1] - 35:2
**CARLOS** [1] - 1:4
**Carlos** [16] - 23:19, 24:20, 38:22, 39:3, 41:13, 47:14, 48:3, 48:10, 48:11, 48:21, 73:9, 91:7, 94:11, 104:14, 104:19
**carpenter** [3] - 52:15, 52:24, 53:8
**carpenters** [1] - 52:22
**carpentry** [1] - 53:4
**carrier** [1] - 139:9
**carriers** [3] - 76:23, 77:20, 80:24
**case** [17] - 14:23, 20:19, 22:11, 52:14, 53:11, 55:6, 86:23, 108:14, 116:1, 117:3, 128:22, 154:10, 174:19, 177:6, 181:18, 182:22, 183:11
**CASE** [1] - 1:2
**caught** [1] - 150:23
**CECILIA** [1] - 1:12

**cell** [3] - 75:18, 76:1, 82:21
**cells** [1] - 140:5
**cellular** [1] - 11:23
**center** [22] - 5:7, 5:9, 5:12, 5:17, 5:20, 6:5, 6:12, 8:12, 8:23, 13:13, 15:12, 20:15, 20:18, 20:21, 20:24, 21:1, 23:13, 24:11, 25:7, 27:12, 70:24, 148:1
**certain** [6] - 35:16, 35:23, 52:4, 176:19, 177:25
**Certificate..................** [1] - 3:24
**certification** [1] - 50:19
**certifications** [1] - 53:3
**certify** [1] - 185:18
**chance** [1] - 63:25
**change** [2] - 67:7, 176:1
**changed** [2] - 126:16, 167:17
**changes** [4] - 21:18, 41:16, 42:9, 150:15
**characterize** [1] - 43:8
**charge** [4] - 153:12, 183:18, 184:20, 185:3
**chart** [4] - 18:5, 79:15, 161:1, 170:21
**chat** [1] - 104:1
**check** [7] - 33:10, 33:11, 49:10, 50:3, 60:6, 79:15, 175:1
**checked** [6] - 30:20, 30:21, 31:3, 31:5, 31:8, 33:4
**CHIEF** [1] - 1:12
**children** [1] - 57:2
**choice** [1] - 177:12
**choose** [17] - 14:19, 14:21, 15:20, 15:23, 18:10, 37:13, 37:14, 37:23, 37:24, 39:1, 39:4, 39:5, 177:15, 180:23
**chose** [3] - 176:7, 176:23, 178:3
**Christopher** [2] - 64:14, 73:8
**Cigna** [7] - 143:12, 143:14, 143:18, 143:20, 144:2, 144:4
**citing** [1] - 158:19
**citizenship** [1] -

132:25
**claim** [1] - 180:14
**claiming** [5] - 99:25, 118:6, 182:2, 182:4
**clarified** [1] - 114:14
**clarify** [1] - 176:9
**clean** [1] - 184:13
**clear** [7] - 26:23, 43:1, 111:11, 119:15, 137:14, 147:9, 178:14
**clearly** [1] - 182:13
**click** [3] - 71:22, 71:24, 72:11
**clicking** [2] - 75:21
**client** [15] - 23:19, 24:16, 27:20, 53:14, 63:9, 74:13, 75:11, 75:19, 75:20, 76:9, 110:23, 111:4, 118:3, 127:16, 147:11
**Client** [1] - 74:1
**client's** [1] - 76:16
**clients** [22] - 8:3, 8:9, 21:8, 22:2, 23:25, 35:7, 49:12, 49:17, 50:24, 52:12, 65:2, 71:4, 73:16, 75:9, 136:7, 151:2, 155:21, 157:5, 159:14, 159:15, 164:2, 178:1
**clock** [4] - 120:20, 121:3, 121:4
**close** [3] - 133:16, 183:25
**closed** [3] - 40:11, 49:17, 141:16
**closing** [4] - 141:13, 161:7, 161:17, 183:18
**closings** [1] - 183:20
**clue** [1] - 106:4
**code** [2] - 46:8, 46:11
**colleague** [1] - 38:15
**collect** [2] - 67:15, 124:13
**collected** [1] - 175:9
**Collins** [1] - 1:20
**Colombia** [6] - 11:16, 13:6, 65:11, 65:17, 74:22, 159:13
**color** [1] - 7:8
**column** [4] - 139:25, 140:4, 143:22, 147:10
**Column** [2] - 140:24
**columns** [1] - 28:17
**Combine** [1] - 172:16

**combined** [1] - 172:18
**Combined** [5] - 173:13, 173:16, 173:22, 174:19, 174:21
**comfort** [3] - 84:14, 84:15, 121:10
**coming** [5] - 18:6, 107:17, 131:10, 159:14, 176:16
**commission** [59] - 29:14, 30:4, 30:11, 30:19, 31:5, 31:16, 32:9, 32:12, 32:23, 33:4, 102:3, 102:10, 102:13, 113:24, 137:8, 137:11, 137:18, 137:22, 137:25, 138:12, 138:21, 139:1, 140:20, 141:24, 142:16, 143:5, 143:17, 143:20, 144:2, 144:5, 144:15, 145:5, 145:6, 145:23, 146:1, 146:4, 146:7, 147:3, 147:6, 149:3, 149:6, 150:19, 151:11, 151:13, 152:1, 154:11, 157:12, 157:16, 158:6, 159:4, 159:8, 163:9, 169:10, 173:9, 173:24, 173:25, 174:16, 174:17, 176:12
**commissions** [42] - 28:2, 29:7, 29:11, 30:21, 31:3, 43:5, 43:12, 43:21, 44:8, 45:3, 49:9, 68:19, 77:16, 79:9, 80:3, 93:14, 93:17, 93:21, 93:24, 96:3, 97:16, 97:19, 101:8, 101:11, 101:12, 113:3, 113:19, 114:15, 114:16, 114:22, 117:14, 117:25, 118:7, 118:16, 118:19, 119:3, 119:21, 150:10, 173:11, 176:1, 180:15, 180:24
**commit** [1] - 27:15
**commitment** [1] - 177:25
**common** [2] - 122:10

**communicate** [1] - 27:15
**communication** [1] - 21:19
**communications** [1] - 132:17
**companies** [12] - 65:14, 68:19, 68:21, 69:2, 124:20, 125:8, 125:10, 152:12, 155:14, 174:17, 175:7, 176:2
**company** [51] - 11:16, 13:19, 13:20, 28:17, 32:23, 32:24, 33:1, 34:21, 35:1, 35:2, 55:2, 60:17, 63:5, 69:4, 69:11, 89:22, 91:18, 91:20, 91:21, 91:22, 104:16, 105:22, 106:3, 106:6, 106:10, 113:1, 113:17, 139:10, 142:13, 143:4, 143:13, 144:13, 146:5, 154:10, 172:16
**Company** [1] - 147:1
**company's** [1] - 77:5
**compare** [3] - 79:12, 79:16, 80:11
**compared** [1] - 96:23
**comparing** [1] - 80:2
**compensation** [5] - 68:8, 68:17, 69:5, 69:8, 69:15
**complain** [1] - 66:10
**complained** [5] - 23:19, 23:22, 43:21, 44:3, 66:9
**complaints** [1] - 50:24
**complete** [2] - 58:14, 161:18
**completely** [1] - 177:12
**Composite** [14] - 3:18, 3:19, 3:19, 19:21, 19:24, 21:13, 24:5, 24:6, 139:2, 139:3, 139:4, 150:2, 153:22, 160:20
**compound** [1] - 119:25
**computer** [16] - 10:8, 10:10, 10:13, 10:14, 10:15, 10:21, 12:4, 14:4, 45:22, 46:5, 63:19, 71:17, 84:12, 130:10, 130:12, 182:12

**computers** [3] - 45:17, 71:14, 75:23
**concern** [1] - 185:6
**concerned** [5] - 67:13, 79:10, 91:3, 160:5, 160:8
**concerning** [1] - 151:23
**concerns** [1] - 153:20
**conclusion** [2] - 44:21, 179:24
**conclusory** [2] - 158:22, 158:25
**conducted** [1] - 17:3
**confidential** [1] - 104:4
**confirmed** [2] - 20:2, 177:2
**confront** [1] - 48:10
**connect** [2] - 37:19, 82:22
**consent** [16] - 73:13, 73:14, 73:17, 73:18, 73:19, 74:7, 74:13, 74:23, 75:4, 75:11, 75:15, 75:22, 76:4, 76:16, 76:20, 76:22
**Consent** [1] - 74:1
**consents** [1] - 74:13
**consider** [8] - 36:17, 36:21, 45:8, 52:15, 52:20, 53:8, 63:19, 105:9
**considered** [4] - 36:10, 38:15, 80:25, 83:11
**consisted** [1] - 9:15
**consistent** [1] - 182:1
**constitute** [1] - 77:2
**construct** [1] - 52:20
**consult** [2] - 27:21, 27:23
**consultation** [1] - 27:21
**Cont'd** [4] - 22:23, 88:22, 129:7, 162:22
**contact** [6] - 75:9, 86:24, 88:8, 88:9, 181:19, 181:20
**contacted** [1] - 82:10
**continuation** [1] - 161:24
**continue** [8] - 61:25, 65:4, 75:20, 88:20, 129:6, 129:25, 130:17, 131:23
**CONTINUED** [1] - 2:1
**continued** [3] - 31:15, 69:3, 154:24
**continuing** [1] - 69:12

**contract** [4] - 9:21,
123:3, 123:6, 133:16
**contracted** [3] - 13:23,
82:21, 128:16
**contractor** [17] - 14:9,
33:21, 36:8, 36:21,
37:9, 45:24, 50:22,
60:3, 92:7, 105:7,
105:10, 116:1,
116:15, 172:19,
179:22, 180:5, 185:8
**contractors** [6] - 21:5,
34:1, 34:2, 36:17,
38:9, 116:19
**contrary** [1] - 182:9
**control** [3] - 35:25,
115:12, 115:13
**conversation** [7] -
48:11, 108:9,
125:19, 152:20,
152:24, 153:2, 153:8
**copied** [1] - 21:22
**copy** [3] - 117:15,
117:20
**Coral** [2] - 1:16, 1:24
**Correct** [1] - 179:19
**correct** [268] - 5:7,
5:11, 6:1, 6:2, 7:4,
7:13, 7:22, 8:13,
8:14, 8:19, 8:24,
9:10, 9:11, 10:11,
10:20, 10:22, 11:20,
11:22, 11:24, 12:23,
13:1, 13:9, 14:13,
14:25, 15:1, 15:2,
15:4, 15:6, 15:13,
15:16, 16:1, 16:10,
16:11, 16:20, 16:23,
17:1, 17:13, 18:18,
18:24, 19:6, 19:7,
19:17, 19:20, 20:3,
20:4, 20:6, 20:7,
20:17, 20:23, 21:10,
23:6, 23:15, 23:18,
23:24, 24:3, 24:8,
24:9, 25:2, 25:9,
25:20, 25:21, 25:24,
26:3, 26:6, 26:9,
26:11, 27:13, 27:25,
28:2, 28:3, 28:9,
28:15, 28:18, 28:21,
29:13, 30:14, 31:25,
32:8, 32:16, 33:3,
33:22, 36:6, 39:6,
40:18, 44:14, 45:7,
51:24, 53:17, 54:10,
59:8, 59:23, 61:23,
62:1, 62:8, 62:19,
63:12, 64:3, 68:14,
68:24, 69:7, 69:13,

69:16, 69:20, 70:14,
71:8, 71:18, 73:21,
74:6, 75:13, 75:16,
76:3, 76:10, 76:18,
81:8, 81:12, 82:3,
82:6, 90:3, 91:1,
93:5, 93:8, 93:11,
93:16, 94:2, 95:3,
95:7, 95:13, 95:21,
96:4, 97:22, 98:24,
100:5, 101:25,
102:4, 102:10,
105:23, 108:18,
109:6, 111:17,
114:1, 115:11,
116:10, 116:12,
118:20, 119:4,
120:18, 125:5,
125:17, 126:7,
126:13, 126:16,
126:18, 126:23,
127:7, 129:11,
129:12, 129:15,
129:20, 130:18,
130:19, 131:21,
131:22, 132:7,
133:20, 134:9,
134:13, 134:17,
136:1, 136:4,
136:11, 137:9,
137:10, 137:16,
137:17, 137:21,
138:2, 138:11,
138:24, 139:11,
139:18, 139:19,
140:1, 140:7,
140:10, 141:1,
141:4, 141:24,
142:4, 142:6, 142:7,
142:19, 143:1,
144:3, 144:11,
144:12, 144:23,
145:11, 145:12,
145:22, 146:8,
146:14, 147:2,
148:2, 148:3, 148:7,
149:4, 149:6, 150:7,
151:8, 151:14,
153:1, 154:2,
154:18, 154:19,
154:24, 154:25,
155:3, 155:10,
156:12, 156:16,
156:21, 157:8,
157:9, 157:17,
157:21, 157:23,
158:8, 159:6, 159:9,
159:18, 160:2,
161:9, 161:11,
161:15, 161:20,
162:2, 162:5,

163:22, 164:10,
167:25, 168:1,
168:5, 170:6, 170:7,
170:8, 170:20,
170:23, 171:11,
171:16, 171:20,
172:14, 172:20,
173:2, 173:3,
173:12, 174:1,
174:3, 174:4,
174:20, 176:9,
177:14, 178:13,
182:2, 182:5, 184:1
**correction** [2] - 64:23,
107:3
**corrections** [1] - 65:1
**correctly** [7] - 7:2,
31:13, 33:7, 49:20,
50:5, 79:9, 175:2
**CORTES** [1] - 1:8
**Cortes** [98] - 9:7, 9:9,
9:14, 9:24, 10:18,
13:20, 14:1, 14:8,
14:13, 28:10, 28:22,
31:12, 32:7, 57:11,
59:5, 59:6, 59:16,
59:21, 59:24, 60:2,
60:5, 60:8, 60:17,
61:11, 62:6, 62:9,
65:6, 65:23, 66:4,
66:8, 66:10, 68:16,
68:25, 69:3, 73:19,
76:13, 76:15, 76:25,
78:11, 78:18, 78:23,
79:18, 80:5, 80:19,
80:22, 81:3, 82:10,
82:11, 82:14, 83:1,
83:16, 85:7, 91:6,
94:5, 94:10, 95:8,
95:22, 96:18, 101:2,
102:8, 103:21,
106:1, 106:4,
106:10, 113:22,
114:19, 115:2,
117:13, 117:17,
117:24, 119:8,
119:13, 121:2,
122:25, 123:9,
123:16, 125:16,
126:25, 128:8,
128:11, 129:10,
129:24, 130:20,
131:1, 131:8, 132:1,
133:3, 133:7,
133:18, 136:5,
136:12, 138:5,
149:15, 150:9,
152:15, 154:3,
162:4, 162:7
**Cortes's** [4] - 104:11,

147:20, 152:18
**counsel** [6] - 34:11,
41:20, 99:6, 107:11,
108:8, 185:11
**Counsel** [11] - 5:14,
6:10, 12:11, 42:13,
58:11, 72:3, 85:3,
89:2, 97:11, 108:12,
142:9
**count** [1] - 158:2
**couple** [2] - 39:15,
69:19
**course** [7] - 31:2,
41:7, 46:9, 60:14,
60:16, 61:8, 64:20,
74:3, 77:13, 90:9,
121:6, 131:25,
141:25, 154:17,
160:24, 162:11,
177:23
**Court** [4] - 2:4, 3:24,
182:15, 185:23
**COURT** [158] - 1:1,
4:2, 4:3, 4:9, 4:10,
4:12, 4:14, 4:16,
4:23, 9:18, 18:9,
18:15, 22:6, 22:9,
22:12, 22:14, 22:18,
22:20, 22:22, 33:13,
35:18, 36:3, 36:15,
36:19, 36:23, 40:8,
43:18, 43:25, 44:22,
46:21, 46:24, 47:18,
47:21, 48:14, 48:17,
49:24, 50:7, 50:10,
50:12, 53:20, 53:22,
53:25, 54:3, 54:18,
55:1, 55:4, 55:7,
55:11, 55:13, 55:16,
55:18, 55:20, 56:1,
74:17, 84:2, 86:1,
86:4, 86:7, 86:10,
86:14, 86:17, 86:20,
86:22, 87:1, 87:3,
88:3, 88:8, 88:11,
88:14, 88:17, 88:19,
99:8, 99:10, 100:15,
101:18, 102:5,
103:9, 104:21,
105:2, 105:13,
107:4, 107:10,
107:13, 108:3,
108:7, 108:17,
108:20, 108:22,
109:18, 109:21,
109:24, 110:24,
111:6, 111:20,
112:10, 112:20,
112:23, 114:7,
115:21, 117:4,

118:11, 119:18,
120:1, 120:12,
121:9, 121:12,
121:15, 121:21,
128:20, 128:23,
128:25, 129:3,
129:5, 129:22,
148:21, 148:23,
149:20, 151:19,
156:20, 158:13,
158:17, 158:19,
158:23, 159:1,
162:17, 162:21,
165:5, 169:15,
169:19, 169:21,
172:13, 172:23,
173:6, 173:19,
174:9, 174:12,
175:6, 178:19,
179:2, 179:10,
179:25, 180:12,
181:6, 181:12,
181:23, 181:25,
182:19, 183:10,
183:17, 183:23,
184:1, 184:7,
184:10, 184:15,
184:24, 185:2,
185:11, 185:14
**court** [1] - 154:20
**courtesy** [3] - 23:7,
41:9
**courthouse** [1] -
181:21
**courtroom** [13] - 4:15,
17:1, 17:8, 22:13,
22:19, 55:8, 55:19,
56:11, 87:2, 88:18,
128:24, 129:4,
181:24
**Courtroom** [1] - 1:7
**cover** [2] - 67:13, 70:2
**coverage** [3] - 15:11,
23:14, 25:7
**covered** [1] - 21:24
**COVID** [20] - 13:23,
14:1, 81:11, 81:13,
82:21, 83:19,
103:21, 128:2,
128:3, 128:8,
128:12, 128:17,
128:18, 129:11,
129:17, 129:19,
130:1, 130:2, 130:25
**coworker** [2] - 90:16,
91:2
**coworkers** [1] - 78:16
**create** [6] - 14:18,
15:7, 15:9, 17:18,
18:2, 25:13

**created** [14] - 17:15, 17:16, 24:8, 24:10, 25:7, 25:10, 25:20, 26:4, 78:8, 78:10, 78:18, 78:23, 91:21, 127:14

**creating** [1] - 24:1

**credentials** [1] - 12:18

**credited** [2] - 79:24, 80:22

**criminal** [1] - 182:19

**CRM** [23] - 8:5, 8:9, 10:21, 10:24, 11:2, 11:7, 12:2, 12:5, 12:9, 12:16, 12:20, 13:2, 13:14, 14:4, 63:6, 63:11, 74:25, 75:5, 75:12, 75:24, 83:7, 83:12, 130:12

**Cross** [9] - 3:5, 3:8, 3:10, 85:1, 85:5, 142:14, 142:17, 142:21, 150:20

**cross** [8] - 33:13, 101:18, 108:14, 115:21, 162:17, 169:13, 169:16, 184:16

**CROSS** [3] - 33:14, 101:19, 170:1

**Cross-examination** [3] - 3:5, 3:8, 3:10

**cross-examination** [5] - 33:13, 101:18, 162:17, 169:16, 184:16

**CROSS-EXAMINATION** [3] - 33:14, 101:19, 170:1

**cross-examine** [1] - 108:14

**Cuba** [4] - 122:4, 122:5, 171:21, 172:4

**CUETO** [4] - 1:22, 4:7, 87:4, 123:16

**Cueto** [1] - 1:23

**CUMMINGS** [104] - 1:15, 5:2, 5:16, 6:11, 9:20, 12:13, 12:14, 18:7, 18:12, 18:16, 20:1, 20:9, 21:16, 22:8, 22:24, 24:7, 25:17, 32:2, 33:12, 34:11, 35:13, 35:17, 36:2, 36:14, 36:18, 36:22, 40:6, 40:9, 41:20, 43:17, 43:23, 44:20, 46:20, 46:22, 47:17, 48:13, 48:15, 49:22, 50:6, 50:9,

50:13, 50:15, 53:21, 54:16, 54:24, 121:14, 121:23, 123:18, 129:8, 129:23, 138:25, 139:5, 142:11, 142:15, 148:24, 149:21, 150:5, 151:20, 153:25, 154:22, 156:23, 159:3, 159:25, 160:18, 160:22, 162:16, 162:19, 162:23, 163:2, 163:12, 163:14, 164:7, 164:12, 164:14, 165:7, 165:21, 166:25, 169:7, 171:3, 172:11, 172:21, 173:5, 173:18, 174:7, 174:10, 175:5, 178:16, 178:20, 178:24, 179:23, 180:11, 181:5, 181:11, 183:8, 183:16, 183:20, 183:24, 184:5, 184:9, 184:11, 184:23, 184:25, 185:5, 185:13

**Cummings** [3] - 3:5, 3:6, 3:9

**current** [2] - 13:19, 91:16

**custom** [1] - 174:7

**customer** [3] - 11:19, 65:10, 75:18

**customer's** [1] - 76:1

**customers** [2] - 11:11, 41:6

**customize** [1] - 53:14

## D

**daily** [2] - 83:12, 90:14

**DANIEL** [1] - 1:19

**Daniel** [1] - 1:19

**dantropp@bellsouth .net** [1] - 1:21

**data** [1] - 106:12

**database** [1] - 8:10

**date** [11] - 61:16, 61:18, 94:20, 94:21, 94:22, 144:23, 145:8, 145:18, 146:10, 158:2, 158:4

**DATE** [1] - 185:23

**dated** [2] - 26:1,

114:20

**dates** [1] - 74:11

**DAY** [1] - 1:11

**daylight** [1] - 135:4

**days** [30] - 37:2, 37:13, 37:24, 39:1, 39:15, 39:24, 40:23, 47:7, 61:15, 70:5, 70:9, 70:11, 70:12, 84:6, 103:3, 109:9, 125:21, 132:9, 133:1, 170:17, 170:18, 170:19, 170:22, 171:5, 171:24, 171:25, 172:1, 172:2

**De** [1] - 1:23

**deal** [1] - 52:11

**December** [20] - 67:14, 67:24, 79:9, 81:14, 98:5, 98:9, 124:16, 135:14, 139:23, 141:11, 161:8, 170:5, 170:8, 170:9, 170:10, 170:24, 170:25, 171:20, 172:5, 172:7

**December's** [1] - 161:7

**decide** [1] - 37:16

**decided** [8] - 37:25, 90:16, 92:6, 129:18, 177:17, 177:22, 179:5

**deducted** [2] - 142:23

**deducting** [2] - 93:24, 136:21

**deductions** [1] - 60:10

**Defendants** [10] - 1:10, 80:22, 88:25, 89:6, 89:19, 96:8, 99:21, 100:24, 101:5, 101:11

**DEFENDANTS** [2] - 1:19, 3:12

**Defendants'** [1] - 3:16

**Defense** [1] - 169:11

**deliberating** [2] - 183:12, 184:21

**Delio** [9] - 24:18, 39:14, 47:14, 73:9, 91:8, 94:11, 123:13, 135:9

**DELIO** [1] - 1:4

**deliver** [1] - 94:21

**delivered** [1] - 94:22

**demonstrative** [2] - 117:6

**denied** [1] - 18:15

**department** [8] -

29:21, 29:22, 30:2, 30:12, 32:10, 138:8, 141:15, 153:14

**deposed** [1] - 108:24

**deposit** [5] - 60:6, 60:9, 93:19, 94:22, 95:14

**deposited** [2] - 98:5, 98:7

**deposition** [33] - 17:3, 17:6, 17:11, 17:13, 17:20, 17:22, 18:20, 18:23, 19:2, 107:12, 107:18, 107:21, 108:1, 108:3, 109:7, 109:11, 109:23, 110:5, 110:23, 110:25, 111:4, 112:21, 114:4, 114:5, 116:5, 116:9, 178:9, 178:17, 180:9, 180:19, 181:4, 181:8, 182:4

**depositions** [1] - 182:14

**deposits** [1] - 96:23

**describe** [1] - 71:1

**designations** [1] - 108:6

**desk** [3] - 68:11, 68:13, 71:12

**desks** [1] - 6:16

**determine** [2] - 100:17, 121:4

**determines** [2] - 17:23, 17:24

**developed** [2] - 62:23, 115:15

**difference** [7] - 33:23, 50:21, 80:23, 100:25, 151:25, 152:12, 152:14

**differences** [3] - 80:25, 153:19, 153:20

**different** [24] - 16:17, 20:11, 28:16, 51:4, 52:18, 52:19, 53:12, 58:7, 58:13, 60:16, 65:13, 68:18, 69:1, 80:24, 83:21, 85:13, 85:16, 85:17, 100:18, 111:7, 125:8, 127:17, 173:13

**difficulty** [1] - 5:15

**digital** [1] - 85:21

**direct** [4] - 60:6, 94:22, 111:7, 182:9

**DIRECT** [7] - 5:1,

22:23, 56:2, 88:22, 121:22, 129:7, 162:22

**Direct** [3] - 3:5, 3:7, 3:9

**directly** [2] - 122:7, 182:10

**disagree** [1] - 115:6

**discovery** [1] - 119:18

**discrepancies** [1] - 150:10

**discrepancy** [1] - 154:15

**discuss** [10] - 22:11, 22:14, 55:6, 86:23, 105:16, 124:1, 127:2, 128:22, 181:18, 185:11

**discussed** [1] - 125:25

**discussing** [1] - 22:25

**discussion** [5] - 62:13, 68:15, 105:19, 173:1, 174:3

**discussions** [2] - 59:16, 62:6

**disputed** [1] - 23:3

**distractions** [1] - 82:7

**DISTRICT** [3] - 1:1, 1:1, 1:12

**divide** [2] - 99:15, 175:19

**divided** [13] - 164:15, 164:20, 164:22, 166:11, 166:14, 166:22, 167:1, 167:5, 168:12, 168:16, 168:18, 175:20

**dividers** [1] - 6:23

**DIVISION** [1] - 1:2

**document** [21] - 68:6, 68:13, 74:2, 74:4, 77:4, 77:5, 78:20, 92:20, 95:10, 117:1, 123:8, 139:7, 139:12, 142:3, 149:22, 150:6, 150:8, 153:22, 154:1, 160:1, 160:3

**documents** [2] - 120:16, 138:18

**dollars** [3] - 151:5, 151:6, 152:14

**done** [13] - 22:5, 23:12, 53:20, 103:9, 115:21, 115:22, 133:12, 169:19, 169:20, 169:21, 182:21, 184:13,

184:25
**Doral** [11] - 5:23, 5:25, 6:8, 6:12, 6:16, 13:17, 13:18, 15:14, 20:22, 91:9
**down** [7] - 53:6, 94:21, 107:25, 113:22, 121:9, 159:13, 178:20
**download** [2] - 75:22, 76:8
**downloaded** [1] - 75:23
**drew** [1] - 59:18
**drive** [1] - 73:3
**drop** [2] - 180:25
**due** [4] - 82:21, 91:7, 101:1, 156:7
**dumb** [1] - 165:23
**during** [108] - 14:20, 17:20, 18:23, 22:14, 28:4, 28:7, 29:7, 30:8, 30:15, 47:8, 59:18, 59:20, 63:24, 64:6, 65:20, 67:7, 67:14, 67:17, 69:22, 70:1, 70:6, 70:7, 70:19, 70:25, 72:11, 72:14, 72:18, 73:6, 78:19, 79:2, 79:7, 84:7, 96:3, 96:8, 96:15, 96:21, 96:22, 97:2, 97:14, 97:15, 97:21, 98:14, 98:17, 100:7, 101:12, 107:20, 109:4, 109:8, 110:8, 110:21, 111:12, 120:24, 124:1, 124:6, 124:8, 124:13, 124:14, 124:18, 124:25, 125:6, 126:19, 127:4, 127:18, 128:2, 128:4, 130:2, 133:8, 134:11, 134:20, 135:3, 135:5, 135:7, 135:13, 140:11, 141:3, 141:6, 141:9, 141:19, 142:6, 142:17, 142:21, 143:7, 143:14, 143:24, 145:10, 145:14, 146:13, 146:19, 148:11, 148:15, 148:19, 148:25, 154:16, 157:10, 157:19, 160:6, 160:14,

161:10, 163:4, 163:18, 164:4, 164:8, 166:16, 168:3, 170:17
**duties** [1] - 123:22
**duty** [1] - 84:8

---
## E
---

**e-mail** [102] - 19:11, 20:2, 20:5, 20:11, 20:12, 21:7, 21:12, 21:17, 21:21, 21:23, 22:2, 22:3, 23:1, 23:8, 23:12, 23:20, 23:23, 23:25, 29:24, 30:1, 32:9, 41:12, 41:19, 41:21, 42:16, 42:23, 60:24, 61:1, 61:5, 61:7, 61:10, 61:15, 76:6, 80:24, 81:3, 81:18, 82:1, 82:2, 82:4, 82:10, 82:11, 82:12, 82:19, 83:1, 83:8, 89:10, 89:13, 89:15, 89:22, 90:7, 96:19, 101:2, 106:13, 106:14, 113:22, 114:19, 115:1, 117:13, 117:16, 117:19, 117:20, 117:24, 118:2, 118:5, 118:15, 118:18, 118:23, 118:24, 118:25, 119:1, 119:5, 119:7, 119:8, 119:11, 119:16, 119:17, 132:16, 132:19, 132:20, 132:21, 132:22, 133:4, 137:11, 138:10, 138:23, 139:14, 150:9, 150:13, 150:17, 152:10, 152:15, 152:19, 152:21, 152:25, 153:6, 153:7, 154:3, 154:5, 154:9, 154:15
**e-mailed** [1] - 138:1
**e-mails** [8] - 19:22, 42:1, 89:21, 89:25, 119:23, 137:25, 138:3
**earlier..** [1] - 111:18
**early** [5] - 66:21, 81:14, 83:15, 131:13, 183:9
**earn** [4] - 78:5, 78:6,

97:17, 98:3
**earned** [20] - 29:7, 30:25, 95:20, 97:20, 97:24, 97:25, 98:2, 98:6, 98:9, 98:14, 98:16, 98:17, 98:19, 101:10, 101:13, 155:18, 159:19, 163:4, 163:7, 163:18
**earning** [1] - 160:9
**earnings** [2] - 158:10, 175:4
**easy** [1] - 56:14
**eating** [1] - 184:2
**effect** [2] - 141:10, 172:3
**effective** [5] - 140:25, 144:23, 145:7, 145:18, 146:10
**efforts** [3] - 29:16, 31:1, 142:25
**eight** [8] - 6:5, 37:18, 47:8, 47:16, 48:1, 71:6, 71:9, 165:16
**either** [8] - 7:7, 11:3, 64:24, 67:1, 70:22, 77:21, 79:10, 167:17
**elect** [1] - 176:11
**elevators** [1] - 181:20
**ELMO** [1] - 117:1
**empathy** [1] - 53:14
**employed** [4] - 106:17, 127:19, 127:24, 174:21
**employee** [10] - 8:20, 8:22, 33:21, 34:23, 35:12, 50:22, 60:3, 60:11, 106:18, 185:8
**employees** [6] - 12:25, 16:22, 25:11, 25:14, 33:25, 34:3
**employer** [3] - 35:20, 104:17, 185:9
**employment** [5] - 89:5, 101:6, 101:10, 123:2, 162:6
**employments** [1] - 88:25
**encounter** [1] - 88:6
**end** [20] - 27:4, 66:23, 66:25, 81:14, 84:7, 88:24, 89:5, 105:8, 125:4, 125:18, 126:5, 131:13, 134:18, 155:20, 155:24, 157:7, 161:8, 161:18, 161:19, 162:6
**ended** [7] - 29:11, 67:1, 78:21, 125:1,

125:20, 131:11, 156:15
**ending** [1] - 171:17
**English** [3] - 21:12, 22:1, 133:22
**enrolled** [2] - 74:24, 109:5
**enrollment** [150] - 28:5, 28:7, 29:8, 29:10, 30:8, 30:15, 31:15, 33:1, 47:5, 47:8, 59:20, 65:25, 66:1, 66:3, 66:15, 66:17, 66:18, 66:23, 67:5, 67:7, 67:8, 67:17, 68:9, 68:21, 69:23, 70:1, 70:6, 70:7, 70:19, 70:25, 72:12, 72:14, 72:19, 73:7, 78:15, 78:16, 78:19, 79:3, 79:7, 84:7, 93:10, 93:15, 93:18, 93:25, 94:1, 95:20, 96:3, 96:8, 96:11, 96:15, 96:22, 96:24, 97:2, 97:14, 97:15, 97:17, 97:21, 97:25, 98:15, 98:18, 98:21, 99:2, 100:7, 101:1, 101:8, 101:12, 101:13, 102:11, 102:12, 102:14, 102:23, 113:21, 118:8, 118:17, 118:19, 120:25, 124:8, 124:15, 124:19, 124:25, 125:3, 125:6, 125:18, 125:20, 134:11, 134:14, 134:18, 134:20, 134:22, 135:3, 135:7, 135:13, 135:18, 137:5, 137:23, 140:11, 141:3, 141:6, 141:9, 141:14, 141:19, 141:21, 142:6, 142:18, 142:22, 143:8, 143:14, 143:24, 145:11, 145:14, 145:20, 146:13, 146:19, 148:4, 148:8, 148:11, 148:15, 148:19, 149:1, 155:23, 156:1, 156:5, 156:10, 156:14, 156:18, 156:25, 157:3,

125:20, 131:11
**entered** [6] - 4:15, 22:19, 55:19, 88:18, 129:4, 169:10
**entire** [6] - 70:19, 103:1, 124:13, 157:5, 166:18
**entitled** [4] - 44:3, 185:20
**environment** [1] - 90:13
**equipment** [4] - 130:21, 133:19, 133:24, 134:7
**ESQ** [4] - 1:14, 1:15, 1:19, 1:22
**Esquire** [1] - 1:19
**essence** [1] - 136:9
**essentially** [2] - 139:16, 140:8
**evening** [2] - 181:22, 183:13
**eventually** [2] - 125:9, 174:24
**EVIDENCE** [1] - 3:15
**evidence** [26] - 19:23, 40:7, 54:17, 54:25, 60:20, 61:8, 68:1, 73:22, 89:9, 92:19, 94:3, 107:12, 108:2, 117:1, 117:2, 117:4, 117:5, 132:11, 158:17, 158:19, 158:21, 158:24, 169:10, 175:5, 178:18, 178:19
**evidentiary** [1] - 158:14
**ex** [2] - 90:16, 91:2
**ex-coworker** [1] - 91:2
**exact** [3] - 120:24, 161:5, 178:2
**exactly** [6] - 58:3, 58:4, 113:18, 120:19, 121:4, 156:8
**exam** [2] - 61:21, 85:24
**EXAMINATION** [13] - 5:1, 22:23, 33:14, 50:14, 54:5, 56:2, 88:22, 101:19,

157:4, 157:7, 157:10, 157:11, 157:20, 158:7, 159:5, 159:9, 160:6, 160:15, 161:10, 161:18, 163:4, 163:19, 164:4, 164:9, 166:17, 167:15, 167:24, 168:3, 168:6, 171:9

120:13, 121:22, 129:7, 162:22, 170:1
**Examination** [6] - 3:5, 3:6, 3:7, 3:8, 3:9, 3:10
**examination** [8] - 3:5, 3:6, 3:8, 33:13, 101:18, 162:17, 169:16, 184:16
**examinations** [1] - 184:13
**examine** [1] - 108:14
**examining** [1] - 81:20
**example** [6] - 7:25, 27:19, 29:10, 52:11, 125:3, 182:1
**examples** [1] - 138:21
**Excel** [13] - 49:12, 78:9, 79:14, 80:1, 80:8, 119:23, 127:14, 139:1, 149:13, 149:24, 155:19, 157:15, 157:18
**excellent** [1] - 169:5
**except** [2] - 43:22, 72:21
**exceptions** [1] - 103:2
**excitement** [1] - 48:5
**excuse** [2] - 95:5, 123:16
**excused** [5] - 22:16, 53:22, 123:16, 129:1, 185:15
**exhausted** [1] - 73:1
**exhibit** [16] - 41:20, 41:23, 68:2, 68:3, 69:6, 73:24, 77:7, 80:20, 81:16, 89:11, 92:22, 94:6, 150:4, 153:24, 160:21, 178:17
**Exhibit** [34] - 3:16, 3:17, 3:18, 3:18, 3:19, 3:19, 3:20, 19:21, 19:24, 21:13, 24:5, 24:6, 60:21, 60:22, 68:1, 68:23, 73:22, 77:6, 80:18, 81:15, 89:9, 92:19, 92:21, 94:3, 132:11, 132:12, 139:3, 139:4, 150:3, 153:23, 159:23, 159:24, 160:20
**exhibits** [1] - 42:1
**EXHIBITS** [1] - 3:15
**exited** [5] - 22:13, 55:8, 87:2, 128:24, 181:24

**expect** [2] - 135:21, 154:15
**expected** [2] - 83:25, 136:6
**expecting** [1] - 124:18
**expenses** [4] - 51:7, 51:9, 51:12, 67:14
**experience** [3] - 33:20, 53:18, 174:15
**expertise** [1] - 27:23
**explain** [4] - 68:17, 69:3, 75:19, 76:15, 128:11, 136:5, 137:7, 149:14
**explained** [5] - 9:15, 63:6, 68:18, 68:20, 124:6
**explanation** [2] - 68:12, 153:19
**extended** [1] - 156:7
**extensions** [1] - 156:6
**external** [1] - 65:12

**F**

**fact** [5] - 5:9, 8:15, 25:22, 51:20, 82:21
**facts** [4] - 54:16, 54:24, 158:21, 158:24
**fair** [10] - 119:1, 148:18, 156:9, 156:17, 164:3, 164:8, 174:5, 175:3, 176:6, 180:14
**FairLaw** [1] - 1:15
**fall** [1] - 53:6
**far** [11] - 63:22, 64:12, 65:8, 67:12, 79:9, 81:2, 83:11, 96:11, 96:23, 120:19, 142:21
**fashion** [1] - 169:15
**fast** [1] - 104:24
**favor** [2] - 23:6, 163:15
**February** [46] - 29:12, 31:18, 67:25, 79:10, 92:16, 94:24, 94:25, 95:5, 95:12, 95:15, 96:6, 114:20, 124:21, 125:8, 125:11, 126:5, 126:6, 126:11, 128:18, 136:21, 136:24, 137:2, 140:23, 141:5, 141:8, 141:17, 141:18, 142:2, 145:3, 145:19,

146:7, 146:22, 147:6, 156:9, 156:17, 157:2, 165:14, 167:16, 167:20, 167:22, 168:1, 168:2, 168:10, 168:14, 174:25, 175:3
**federal** [1] - 10:5
**fee** [2] - 11:5, 11:7
**fellow** [1] - 78:16
**fever** [1] - 130:3
**few** [5] - 48:22, 61:15, 65:22, 103:2, 154:7
**figure** [2] - 99:18, 100:10
**file** [7] - 74:25, 75:5, 75:24, 76:16, 85:9, 106:16, 120:15
**filed** [2] - 85:7, 108:6
**fill** [4] - 35:8, 35:11, 85:18, 123:8
**filled** [1] - 106:13
**filling** [1] - 85:14
**final** [4] - 51:7, 51:9, 183:1, 185:3
**finalize** [1] - 75:20
**finally** [2] - 61:20, 135:17
**fine** [1] - 88:17
**finish** [4] - 18:9, 75:21, 86:19, 169:12
**fire** [1] - 162:8
**fired** [4] - 35:21, 162:7, 162:10, 177:21
**Firm** [1] - 1:15
**first** [31] - 9:7, 24:14, 28:7, 56:11, 56:12, 60:5, 65:20, 76:13, 78:15, 79:6, 83:6, 94:19, 95:9, 101:23, 102:17, 103:25, 124:10, 135:13, 135:17, 138:4, 139:6, 142:22, 143:7, 158:9, 158:15, 160:3, 172:9, 176:13, 177:7
**five** [13] - 39:24, 57:9, 70:9, 73:14, 86:10, 106:25, 109:9, 116:21, 162:20, 162:21, 165:25, 166:4, 166:9
**fixed** [1] - 175:25
**FL** [3] - 1:16, 1:20, 1:24
**flagged** [1] - 75:4
**flat** [1] - 167:10

**floor** [6] - 15:12, 23:13, 23:17, 25:7, 41:4, 148:1
**Floor** [2] - 2:5, 185:24
**FLORIDA** [1] - 1:1
**Florida** [6] - 1:4, 2:6, 58:6, 84:22, 147:12, 185:24
**fluid** [1] - 104:2
**folder** [2] - 117:19, 138:19
**follow** [1] - 177:25
**following** [2] - 4:1, 153:9
**follows** [3] - 4:21, 55:24, 121:19
**food** [1] - 35:8
**FOR** [4] - 1:14, 1:19, 3:3, 3:12
**forced** [4] - 40:20, 40:22, 40:23
**foregoing** [1] - 185:18
**form** [12] - 41:9, 73:18, 73:19, 74:2, 75:22, 76:4, 76:20, 76:22, 77:2, 116:17, 183:2, 185:3
**format** [1] - 20:12
**former** [1] - 90:16
**forms** [1] - 35:9
**forward** [2] - 55:16, 92:17
**forwarded** [1] - 106:14
**forwarding** [1] - 82:1
**foundation** [1] - 36:22
**four** [5] - 165:25, 166:2, 168:11, 178:10
**frames** [1] - 52:19
**Francisco** [4] - 56:21, 56:24, 57:2, 91:11
**freedom** [3] - 37:4, 37:9, 38:10
**Friday** [23] - 16:19, 39:20, 70:8, 77:13, 77:18, 90:18, 98:6, 144:13, 144:16, 144:17, 144:19, 145:7, 145:23, 146:1, 146:3, 146:4, 146:7, 146:16, 151:1, 154:11, 166:19, 183:9
**Fridays** [1] - 103:4
**front** [4] - 107:13, 110:25, 135:2, 176:17
**fulfilled** [1] - 155:15
**full** [7] - 36:25, 37:5, 37:18, 37:19, 60:12,

114:17, 122:1
**full-time** [4] - 36:25, 37:5, 37:18, 37:19
**fully** [1] - 139:17
**functions** [1] - 123:22
**funeral** [1] - 51:12

**G**

**Gables** [2] - 1:16, 1:24
**Garfield** [1] - 160:19
**Garza** [3] - 91:4, 91:5, 91:6
**gauge** [1] - 85:24
**general** [2] - 31:9, 33:8
**generally** [4] - 164:3, 164:8, 165:24, 166:1
**generates** [1] - 90:14
**gentlemen** [8] - 4:16, 22:10, 53:25, 55:5, 56:7, 86:22, 128:21, 181:13
**girl** [1] - 57:6
**girls** [1] - 57:6
**given** [9] - 14:20, 88:10, 88:11, 90:12, 98:25, 110:25, 127:12, 136:20, 142:24
**glass** [5] - 6:16, 6:23, 7:4, 7:9, 7:11
**goal** [2] - 184:20, 184:23
**Gomez** [1] - 64:15
**gonna** [1] - 125:9
**Gonzalez** [8] - 57:11, 61:6, 61:7, 61:11, 63:10, 64:18, 65:9, 65:19
**GONZALEZ** [1] - 1:9
**Google** [23] - 28:8, 28:10, 28:14, 28:16, 28:20, 28:22, 29:1, 29:5, 30:4, 30:7, 30:18, 30:22, 31:4, 31:6, 31:20, 32:25, 33:5, 149:15, 149:17, 149:24, 159:17, 161:2, 162:3
**Government** [1] - 182:20
**government's** [1] - 10:5
**graduated** [1] - 63:4
**graph** [1] - 15:9
**grateful** [1] - 150:16
**greater** [2] - 159:14, 160:9
**green** [1] - 142:12

Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

**Guerra** [2] - 24:24, 73:8
**guess** [2] - 155:17, 185:9
**guessing** [1] - 155:19

## H

**half** [7] - 99:24, 99:25, 100:3, 100:6, 100:11, 179:6
**hallway** [1] - 88:7
**hand** [7] - 4:18, 24:13, 30:7, 30:11, 55:21, 121:16, 147:10
**handle** [2] - 8:3, 26:15
**handled** [4] - 65:10, 65:11, 85:22, 106:7
**handles** [2] - 27:2, 27:8
**hang** [2] - 72:11, 72:16
**Harris** [1] - 135:11
**head** [2] - 88:12, 176:10
**headphones** [1] - 82:23
**headset** [4] - 71:19, 71:21, 130:15, 134:1
**headsets** [2] - 65:3, 84:11
**Health** [7] - 98:4, 143:6, 143:7, 143:10, 151:10, 151:16, 151:21
**health** [33] - 5:18, 9:3, 10:4, 10:8, 11:12, 51:22, 57:22, 57:23, 58:1, 58:3, 58:7, 58:8, 58:9, 58:12, 58:15, 58:18, 59:11, 59:19, 59:22, 60:13, 60:18, 61:14, 61:24, 71:4, 90:17, 112:17, 123:25, 124:11, 136:10, 136:13, 136:16, 143:14, 174:5
**hear** [13] - 33:18, 46:21, 47:13, 48:14, 50:7, 63:25, 64:7, 64:22, 65:4, 71:17, 73:5, 149:14, 174:12
**heard** [5] - 66:8, 133:18, 137:7, 174:12
**hearing** [2] - 5:15, 79:22
**hearsay** [3] - 47:17, 48:13, 48:16

**held** [1] - 4:1
**hello** [2] - 82:13, 88:13
**help** [10] - 27:19, 35:7, 35:8, 35:11, 104:3, 115:7, 115:10, 121:4, 124:7, 140:16
**helped** [1] - 106:1
**hereby** [1] - 185:18
**herself** [2] - 26:21, 112:7
**hi** [3] - 33:16, 56:8, 101:21
**higher** [1] - 102:10
**highest** [2] - 77:15, 78:3
**highlighted** [1] - 20:6
**highlighting** [1] - 139:7
**himself** [1] - 91:16
**hire** [1] - 7:12
**hired** [2] - 9:14, 122:22
**hold** [5] - 58:16, 110:17, 112:7, 112:15, 112:17
**home** [56] - 10:13, 10:14, 10:15, 10:16, 10:19, 12:4, 13:9, 13:11, 13:15, 13:23, 14:3, 14:4, 14:7, 14:8, 14:10, 46:11, 70:15, 73:4, 81:5, 81:6, 82:22, 82:25, 83:3, 83:4, 83:10, 83:14, 83:17, 91:12, 103:17, 103:24, 104:3, 127:18, 127:23, 128:1, 128:4, 128:9, 128:11, 128:14, 128:15, 128:17, 129:10, 129:13, 129:18, 130:4, 130:6, 130:10, 130:13, 130:17, 130:20, 131:11, 131:23, 132:1, 177:17, 177:19, 177:22, 178:3
**homes** [1] - 83:13
**honest** [1] - 43:9
**Honor** [48] - 4:6, 4:7, 4:18, 18:12, 34:10, 34:11, 36:2, 49:23, 50:13, 53:21, 54:17, 54:25, 55:14, 85:23, 86:15, 86:21, 87:4, 88:4, 88:5, 88:21, 101:16, 104:24, 105:11, 107:3,

107:11, 107:25, 108:12, 110:22, 112:3, 116:25, 121:10, 158:9, 162:19, 163:12, 169:7, 169:17, 172:11, 172:21, 174:7, 174:10, 178:16, 178:22, 178:24, 183:7, 183:8, 183:16, 183:21, 185:13
**Honor's** [1] - 185:6
**HONORABLE** [1] - 1:12
**hoping** [1] - 183:20
**hour** [16] - 39:17, 45:1, 62:11, 63:18, 63:20, 65:24, 66:5, 66:7, 67:6, 86:3, 99:14, 100:6, 102:2, 105:15, 179:6
**hourly** [15] - 44:4, 49:6, 97:9, 97:14, 99:2, 99:3, 99:17, 100:3, 167:5, 173:2, 173:4, 173:11, 173:17, 174:3, 174:16
**hours** [70] - 14:6, 16:14, 16:20, 37:17, 37:18, 38:2, 38:4, 39:17, 39:24, 40:24, 47:8, 47:16, 48:1, 52:6, 69:25, 70:9, 70:10, 70:21, 72:18, 72:19, 72:24, 97:7, 99:12, 100:7, 100:8, 100:11, 102:24, 103:3, 103:5, 109:9, 109:12, 110:7, 110:13, 110:20, 110:21, 111:5, 120:24, 121:4, 134:20, 134:24, 148:12, 148:18, 148:25, 149:2, 151:24, 163:22, 164:5, 164:9, 164:20, 165:3, 166:17, 166:20, 166:21, 168:14, 170:21, 176:6, 176:22, 176:23, 177:4, 177:5, 177:11, 177:15, 177:16, 178:10, 179:7, 183:15
**house** [5] - 52:16, 52:25, 53:6, 131:2,

131:9
**human** [2] - 50:16, 50:19
**hundred** [1] - 151:2
**husband** [4] - 91:11, 91:20, 91:22, 91:25
**husband's** [1] - 56:20

## I

**ID** [1] - 85:21
**idea** [2] - 33:8, 41:5
**IDENTIFIED** [1] - 3:15
**identified** [7] - 19:24, 24:6, 60:22, 69:5, 92:21, 132:12, 139:4
**identify** [1] - 41:20
**IDs** [1] - 136:8
**Illinois** [2] - 85:2, 85:6
**image** [1] - 160:23
**immediately** [1] - 67:4
**immigration** [1] - 27:20
**impeach** [4] - 108:23, 109:16, 181:25, 182:6
**impeaching** [1] - 112:4
**impeachment** [11] - 108:4, 108:15, 108:16, 108:17, 112:4, 178:25, 179:1, 180:11, 181:5, 181:11, 182:14
**implemented** [3] - 73:13, 73:15, 76:13
**implying** [1] - 176:20
**important** [1] - 17:10
**improper** [7] - 108:15, 112:4, 178:25, 180:11, 181:5, 181:11
**IN** [1] - 3:15
**inbound** [1] - 71:16
**inbox** [1] - 117:18
**inboxes** [1] - 120:10
**INC** [1] - 1:8
**include** [3] - 93:6, 93:9, 98:13
**included** [7] - 32:15, 93:14, 94:16, 98:10, 98:12, 118:18, 144:8
**includes** [1] - 145:25
**including** [1] - 141:11
**incoming** [1] - 23:17
**inconsistent** [1] - 108:23
**inconveniencing** [1] - 183:3

**incorrectly** [2] - 111:1, 111:3
**increase** [1] - 175:17
**indeed** [2] - 57:17, 57:18
**Indeed** [1] - 58:19
**independent** [27] - 14:9, 20:20, 20:25, 21:5, 33:21, 34:1, 36:8, 36:17, 36:21, 37:9, 38:9, 45:24, 50:22, 60:3, 92:7, 104:6, 105:7, 105:10, 112:1, 112:8, 112:15, 115:25, 116:15, 172:19, 179:22, 180:5, 185:8
**indicates** [2] - 93:3, 95:22
**individual** [4] - 80:6, 92:17, 113:16, 138:25
**individually** [1] - 78:17
**industry** [1] - 174:7
**infected** [1] - 128:2
**inform** [2] - 23:11, 89:22
**information** [5] - 83:2, 104:4, 106:7, 106:12, 162:13
**informed** [2] - 96:18, 107:21
**informing** [1] - 133:5
**initial** [2] - 125:16, 126:8
**Ink** [6] - 75:22, 76:2, 76:5, 76:7, 76:13, 76:21
**Innet** [1] - 57:16
**input** [1] - 169:12
**inside** [4] - 65:7, 65:12, 90:25, 116:20
**installations** [1] - 90:15
**instead** [1] - 61:11
**instructed** [1] - 17:6
**instruction** [2] - 76:18, 88:6
**instructions** [5] - 55:10, 89:21, 183:1, 185:3, 185:6
**insurance** [185] - 5:12, 5:17, 5:18, 6:6, 6:8, 6:13, 6:15, 6:18, 6:21, 7:1, 7:12, 7:15, 8:15, 8:16, 8:18, 9:3, 9:10, 9:24, 10:2, 10:4, 10:7, 10:8,

11:12, 11:23, 12:2,
12:9, 12:15, 12:16,
12:24, 13:2, 13:5,
13:8, 13:12, 13:22,
14:15, 14:21, 15:10,
15:17, 15:20, 15:22,
15:25, 16:6, 16:17,
16:18, 17:16, 17:23,
17:24, 18:3, 19:14,
19:18, 21:8, 23:9,
23:16, 24:2, 25:3,
25:10, 25:13, 25:23,
26:1, 26:15, 27:3,
27:16, 28:1, 28:17,
29:2, 29:4, 32:4,
32:23, 32:24, 33:1,
37:20, 43:15, 51:2,
51:3, 51:10, 51:11,
51:16, 51:17, 51:20,
51:21, 51:22, 51:23,
51:24, 51:25, 52:2,
54:21, 55:2, 57:22,
57:23, 57:24, 58:1,
58:4, 58:8, 58:9,
58:10, 58:12, 58:15,
58:18, 59:12, 59:14,
59:19, 59:22, 60:13,
60:18, 61:14, 61:24,
62:7, 62:10, 62:20,
62:24, 63:2, 63:22,
64:5, 64:18, 67:3,
68:6, 69:14, 70:25,
71:4, 76:22, 77:3,
77:11, 77:20, 78:7,
78:23, 79:2, 79:6,
83:22, 84:22, 84:23,
85:1, 85:5, 85:11,
85:13, 90:17, 104:6,
105:24, 105:25,
106:2, 111:25,
112:1, 112:8, 116:4,
122:14, 123:25,
124:12, 129:25,
130:8, 130:10,
130:18, 131:24,
133:19, 135:6,
136:10, 136:13,
136:16, 137:16,
139:10, 140:13,
142:6, 142:13,
142:20, 143:4,
143:13, 144:6,
144:13, 146:4,
146:19, 147:13,
154:10, 154:24,
155:1, 155:14,
160:5, 160:11,
172:10, 172:17,
173:16, 173:23,
174:6, 174:17,
174:18

**Insurance** [5] -
140:21, 146:25,
151:10, 151:17,
151:22
**intend** [1] - 182:14
**interest** [2] - 41:3,
169:7
**internal** [1] - 77:4
**Internet** [5] - 45:17,
45:23, 57:14, 82:23,
83:9
**interpreted** [1] - 107:7
**interpreter** [8] - 4:23,
31:25, 34:6, 50:8,
107:2, 107:8,
179:10, 179:12
**Interpreter** [1] - 2:2
**INTERPRETER** [24] -
5:14, 6:10, 12:11,
31:25, 34:6, 34:9,
34:13, 42:13, 58:10,
72:3, 72:7, 74:19,
85:3, 89:2, 90:1,
94:25, 97:11,
104:23, 107:2,
107:5, 117:22,
142:9, 164:6, 179:12
**interview** [14] - 57:25,
58:21, 59:2, 59:3,
59:4, 59:18, 122:16,
122:18, 122:24,
124:1, 124:6,
126:19, 127:3, 177:7
**interviewed** [5] - 9:9,
122:22, 123:9,
123:19, 126:24
**introduce** [3] - 56:6,
107:12, 108:13
**introduced** [1] - 89:9
**invite** [1] - 48:12
**inviting** [1] - 48:12
**involvement** [1] -
85:12
**involving** [1] - 54:20
**issue** [11] - 27:16,
27:20, 40:25, 58:7,
75:1, 105:12,
108:10, 151:15,
151:21, 151:23
**issued** [1] - 120:16
**issues** [3] - 75:7,
75:10, 183:1
**items** [2] - 84:9, 117:5
**itself** [2] - 35:4, 76:7

## J

**Jamaica** [2] - 171:21,
172:4
**January** [52] - 29:11,

66:24, 66:25, 67:1,
67:2, 78:21, 78:22,
79:3, 81:14, 82:8,
83:8, 83:15, 83:18,
92:16, 94:23, 94:24,
95:5, 125:4, 134:19,
136:20, 137:1,
140:22, 141:2,
141:7, 141:12,
141:14, 141:22,
142:2, 144:5,
144:25, 145:1,
145:3, 145:8, 146:3,
146:4, 146:10,
147:3, 148:5,
154:23, 156:3,
156:15, 163:20,
170:10, 170:12,
170:17, 170:19,
171:14, 175:1
**January's** [1] - 161:17
**Jennifer** [2] - 21:22,
89:23
**JManjarres@
AvantAssurance.
com** [1] - 21:23
**job** [27] - 7:1, 7:12,
7:15, 7:20, 9:15,
21:1, 26:15, 26:18,
27:4, 34:25, 35:7,
36:25, 37:1, 37:5,
37:18, 37:19, 47:3,
53:17, 57:13, 57:19,
57:24, 59:2, 91:16,
119:9, 122:16,
173:12
**jobs** [1] - 37:5
**joint** [1] - 185:8
**Jorge** [4] - 42:18,
42:19, 81:21
**Jorge@
fairlawattorney.
com** [1] - 42:20
**Jose** [1] - 2:2
**Judge** [8] - 4:8, 47:19,
99:6, 103:12,
109:25, 115:22,
120:11, 165:4
**judge** [2] - 55:9,
109:16
**JUDGE** [1] - 1:12
**July** [17] - 1:5, 40:9,
40:12, 89:7, 89:16,
89:25, 90:1, 90:2,
90:8, 90:18, 90:20,
90:23, 106:22,
106:23, 106:24,
106:25, 115:4
**jump** [1] - 95:10
**June** [22] - 17:4,

18:17, 18:23, 19:1,
20:5, 20:13, 22:2,
24:1, 26:5, 26:7,
39:14, 40:4, 40:10,
41:15, 106:25,
150:22, 151:16,
151:22, 158:5
**juror** [1] - 4:4
**jurors** [3] - 87:1, 88:6,
88:13
**jury** [50] - 4:9, 4:10,
4:15, 18:18, 19:8,
19:9, 22:13, 22:18,
22:19, 26:23, 55:8,
55:10, 55:18, 55:19,
56:7, 68:3, 73:24,
77:7, 80:20, 81:16,
87:2, 88:4, 88:18,
89:11, 92:22, 94:6,
101:9, 117:5,
128:23, 128:24,
129:3, 129:4, 150:4,
153:24, 159:24,
160:21, 181:22,
181:23, 181:24,
182:15, 182:22,
182:25, 183:4,
183:10, 183:19,
184:21, 185:1,
185:2, 185:3
**JURY** [1] - 1:11

## K

**Katrina** [4] - 24:24,
40:16, 73:8
**keep** [4] - 21:24,
137:22, 140:17,
159:17
**keeping** [1] - 4:17
**Kendall** [10] - 5:23,
6:1, 6:3, 6:5, 9:12,
10:21, 51:15, 81:10,
98:8, 122:21
**kept** [4] - 28:7, 31:20,
32:25, 66:4
**keyboard** [1] - 134:5
**keyboards** [1] - 84:11
**kind** [5] - 53:1, 91:5,
127:12, 131:5, 153:2
**knowing** [6] - 52:11,
52:12, 80:10, 83:11,
120:19, 179:2
**knowledge** [2] -
43:24, 62:20
**known** [2] - 8:7, 12:20
**knows** [3] - 18:5,
27:12, 52:16

## L

**ladies** [8] - 4:16,
22:10, 53:25, 55:5,
56:7, 86:22, 128:21,
181:13
**laptop** [1] - 182:16
**laptops** [1] - 46:4
**large** [2] - 71:5,
150:10
**largest** [1] - 160:12
**last** [16] - 18:14, 23:1,
34:7, 41:15, 58:10,
89:25, 90:2, 90:21,
90:22, 90:23,
146:25, 154:5,
158:2, 158:4, 180:8,
181:8
**late** [8] - 15:5, 19:19,
21:20, 23:5, 23:10,
41:2, 89:24, 181:15
**lately** [1] - 90:13
**latest** [1] - 183:11
**Law** [1] - 1:19
**lawsuit** [3] - 57:10,
99:22, 180:10
**lawyer** [1] - 119:6
**lawyers** [3] - 42:21,
88:6, 181:19
**lead** [1] - 73:10
**leading** [10] - 99:8,
100:14, 148:20,
148:22, 149:19,
151:18, 156:19,
165:4, 184:6
**leads** [10] - 11:9,
11:11, 11:14, 11:16,
13:6, 23:17, 65:2,
71:16, 72:20, 148:1
**learn** [7] - 7:19, 52:18,
52:23, 63:8, 63:20,
63:23, 64:5
**learned** [2] - 53:17,
85:11
**least** [1] - 146:25
**leave** [6] - 69:10,
70:12, 105:18,
170:24, 181:21,
183:8
**led** [1] - 68:15
**LEDESMA** [1] - 4:20
**Ledesma** [18] - 3:4,
4:13, 5:3, 5:6, 19:21,
20:10, 22:25, 23:25,
25:1, 50:16, 58:23,
63:8, 64:16, 69:18,
73:9, 81:20, 137:7,
149:14
**left** [14] - 22:25, 24:13,
34:1, 34:15, 34:18,

41:18, 48:3, 68:11, 68:13, 72:25, 106:22, 129:9, 147:10, 170:8
**left-hand** [2] - 24:13, 147:10
**legal** [3] - 44:20, 50:21, 179:23
**length** [1] - 183:14
**Leon** [2] - 1:23, 122:2
**less** [17] - 6:14, 22:7, 31:9, 37:17, 43:16, 98:5, 116:21, 119:3, 126:21, 134:15, 136:5, 151:2, 155:20, 177:4, 177:5, 177:15, 181:1
**lesser** [1] - 102:2
**letting** [1] - 182:21
**license** [39] - 37:1, 51:21, 51:22, 57:24, 58:1, 58:2, 58:3, 58:4, 58:7, 58:8, 59:7, 59:9, 59:12, 59:14, 59:22, 60:13, 60:18, 61:13, 61:14, 61:19, 61:24, 62:16, 62:17, 63:4, 63:7, 64:9, 84:22, 101:24, 102:16, 105:24, 105:25, 106:3, 106:9, 122:14, 147:18, 147:19, 147:20, 147:22
**licensed** [6] - 44:13, 58:9, 62:7, 62:10, 147:13, 147:16
**licenses** [4] - 58:14, 65:13, 84:23, 85:12
**licensing** [1] - 61:9
**life** [6] - 57:24, 58:1, 58:3, 58:9, 58:12, 59:13
**limine** [3] - 105:12, 172:12, 172:22
**limited** [1] - 177:8
**Lincoln** [1] - 51:7
**Line** [7] - 17:22, 110:2, 110:3, 114:8, 114:10, 179:16, 182:4
**line** [4] - 11:19, 109:24, 114:7, 178:23
**link** [1] - 83:6
**links** [2] - 82:24, 82:25
**list** [4] - 8:9, 32:12, 139:14, 139:16
**listen** [2] - 65:17, 73:3
**listening** [1] - 64:1

**lists** [1] - 139:14
**literally** [1] - 29:24
**live** [1] - 122:5
**LLC** [15] - 91:24, 92:1, 92:18, 105:22, 105:24, 105:25, 106:16, 106:18, 106:19, 106:20, 106:21, 107:6, 107:8, 113:10, 113:11
**location** [2] - 98:8, 110:14
**lock** [3] - 165:10, 165:12
**locked** [1] - 166:23
**log** [5] - 10:13, 12:16, 37:19, 82:22, 83:1
**log-in** [1] - 83:1
**logged** [1] - 12:9
**logging** [1] - 10:15
**Look** [1] - 176:17
**look** [19] - 24:13, 82:7, 95:8, 96:5, 100:10, 139:6, 139:21, 140:4, 140:24, 143:22, 144:4, 144:7, 144:22, 147:9, 150:11, 150:16, 153:14, 163:8, 183:2
**looked** [1] - 94:12
**looking** [17] - 18:20, 21:7, 57:22, 63:6, 68:22, 124:7, 139:13, 142:11, 143:5, 144:8, 145:6, 145:25, 146:3, 146:7, 157:14, 182:17, 183:13
**looks** [4] - 144:16, 146:2, 178:17
**LOPEZ** [3] - 1:4, 1:4, 55:23
**Lopez** [20] - 3:7, 23:19, 23:22, 24:16, 24:20, 42:11, 42:16, 47:15, 55:15, 56:8, 73:9, 90:19, 92:17, 99:12, 100:17, 101:21, 104:14, 104:19, 107:17, 120:15
**Lorenzo** [1] - 1:16
**lose** [1] - 82:20
**losing** [1] - 182:20
**lost** [3] - 79:14, 165:18, 176:18
**Lou** [1] - 135:12
**loud** [1] - 90:10

**louder** [1] - 50:8
**lunch** [5] - 86:23, 86:25, 87:3, 87:5, 179:6
**Lunes** [1] - 39:19

## M

**ma'am** [3] - 53:22, 55:4, 121:9
**madness** [2] - 71:2, 71:3
**mail** [102] - 19:11, 20:2, 20:5, 20:11, 20:12, 21:7, 21:12, 21:17, 21:21, 21:23, 22:2, 22:3, 23:1, 23:8, 23:12, 23:20, 23:23, 23:25, 29:24, 30:1, 32:9, 41:12, 41:19, 41:21, 42:16, 42:23, 60:24, 61:1, 61:5, 61:7, 61:10, 61:15, 76:6, 80:24, 81:3, 81:18, 82:1, 82:2, 82:4, 82:10, 82:11, 82:12, 82:19, 83:1, 83:8, 89:10, 89:13, 89:15, 89:22, 90:7, 96:19, 101:2, 106:13, 106:14, 113:22, 114:19, 115:1, 117:13, 117:16, 117:19, 117:20, 117:24, 118:2, 118:5, 118:15, 118:18, 118:23, 118:24, 118:25, 119:1, 119:5, 119:7, 119:8, 119:11, 119:16, 119:17, 132:16, 132:19, 132:20, 132:21, 132:22, 133:4, 137:11, 138:10, 138:23, 139:14, 150:9, 150:13, 150:17, 152:10, 152:15, 152:19, 152:21, 152:25, 153:6, 153:7, 154:3, 154:5, 154:9, 154:15
**mailed** [1] - 138:1
**mails** [8] - 19:22, 42:1, 89:21, 89:25, 119:23, 137:25, 138:3
**maintained** [1] - 8:10
**maintenance** [1] -

91:15
**majority** [1] - 136:23
**manage** [7] - 6:21, 13:5, 13:8, 15:17, 15:22, 21:2, 52:12
**managed** [2] - 14:16, 16:18
**manager** [14] - 5:7, 5:9, 5:20, 8:12, 8:23, 13:13, 20:15, 20:18, 20:22, 20:24, 21:1, 21:22, 24:11, 27:12
**manages** [2] - 26:20, 26:22, 27:9
**managing** [1] - 21:4
**mandatory** [3] - 74:16, 74:19, 76:19
**Manjarres** [2] - 21:22, 89:23
**March** [24] - 29:12, 79:11, 92:17, 95:22, 95:25, 96:6, 106:21, 106:22, 107:6, 107:8, 125:13, 126:12, 128:18, 140:23, 142:2, 144:21, 145:4, 145:6, 145:14, 145:18, 145:25, 167:16, 167:21, 175:18
**Mariana** [20] - 3:7, 23:22, 24:16, 39:9, 42:4, 42:11, 42:16, 42:23, 47:14, 55:15, 56:4, 56:8, 88:24, 90:19, 92:17, 101:17, 101:21, 113:16, 113:17
**MARIANA** [2] - 1:4, 55:23
**marked** [9] - 19:22, 21:14, 24:4, 89:8, 139:2, 150:2, 159:23, 160:20, 182:12
**marketplace** [5] - 10:5, 77:3, 83:22, 174:5, 174:15
**married** [2] - 56:18, 56:24
**Mary** [1] - 135:12
**mash** [1] - 182:8
**matched** [2] - 31:4, 31:6
**math** [6] - 110:16, 163:11, 184:2, 184:3, 184:7, 184:17
**mathematics** [1] - 158:16

**matter** [5] - 23:6, 53:11, 133:9, 155:19, 185:20
**matters** [2] - 34:5, 34:8
**maximum** [1] - 183:23
**McCARN** [2] - 2:4, 185:23
**mean** [21] - 7:18, 23:11, 26:24, 62:15, 62:23, 67:10, 84:6, 97:4, 104:7, 107:17, 114:4, 121:1, 124:14, 138:7, 139:20, 141:2, 142:8, 145:2, 145:5, 151:1, 183:17
**meaning** [5] - 126:10, 159:14, 161:8, 161:24, 183:11
**means** [4] - 145:10, 146:13, 152:12, 156:21
**meant** [1] - 185:1
**Medicaid** [1] - 35:8
**Medicare** [1] - 35:8
**meet** [2] - 122:20, 123:10
**meeting** [5] - 16:25, 68:12, 123:23, 153:12, 153:15
**member** [25] - 29:15, 30:4, 30:18, 31:8, 32:15, 62:12, 65:24, 66:6, 66:7, 66:11, 67:6, 74:23, 77:18, 77:19, 79:24, 124:9, 125:2, 126:2, 126:7, 126:9, 126:10, 135:24, 140:5
**member's** [1] - 32:17
**members** [15] - 30:6, 32:22, 73:19, 79:21, 80:6, 80:13, 111:13, 113:23, 135:16, 139:16, 139:24, 140:12, 160:13, 160:14, 161:23
**memorized** [1] - 116:7
**mentioned** [11] - 13:11, 25:6, 52:2, 53:16, 54:8, 65:23, 68:22, 70:5, 79:18, 123:23, 129:9
**met** [7] - 9:7, 122:25, 123:9, 123:11, 123:19, 153:16
**MIAMI** [1] - 1:2
**Miami** [7] - 1:4, 1:20, 2:5, 2:6, 122:7,

185:24, 185:24
**microphone** [4] -
4:24, 50:8, 102:5,
129:22
**middle** [1] - 135:2
**might** [1] - 182:13
**mind** [2] - 169:11,
169:17
**mine** [4] - 46:6, 78:17,
153:5, 166:23
**minus** [1] - 60:10
**minute** [1] - 128:21
**minutes** [11] - 22:8,
55:6, 59:1, 73:14,
86:9, 86:11, 116:22,
154:7, 162:20,
162:21, 183:23
**MISCELLANEOUS** [1]
- 3:22
**mischaracterization**
[2] - 40:6, 111:3
**mischaracterizing** [1]
- 110:23
**mish** [1] - 182:8
**mish-mash** [1] - 182:8
**miss** [3] - 82:20,
83:25, 89:23
**missing** [4] - 80:11,
80:25, 113:24, 181:9
**misstatement** [1] -
175:5
**mistake** [1] - 158:11
**mistaken** [4] - 114:20,
114:23, 118:12,
171:10
**mistranslated** [1] -
34:10
**Molina** [7] - 146:18,
146:19, 150:20,
151:9, 151:11,
151:16, 151:21
**moment** [6] - 17:15,
44:6, 69:17, 115:1,
123:22, 128:13
**Monday** [15] - 16:19,
39:3, 39:19, 40:5,
62:4, 62:5, 62:14,
62:18, 62:25, 63:7,
70:7, 103:4, 132:24,
151:1, 166:19
**money** [42] - 30:25,
37:17, 47:12, 67:17,
80:25, 93:23, 94:1,
94:22, 95:20, 96:5,
96:6, 96:14, 96:20,
98:9, 99:20, 100:23,
101:5, 125:22,
135:18, 135:21,
136:6, 136:19,
136:23, 137:4,

137:9, 137:15,
140:17, 142:20,
146:5, 151:25,
155:4, 155:7,
157:19, 157:24,
163:3, 163:7, 176:7,
176:12, 176:13,
177:16, 179:17
**moneys** [1] - 94:17
**Monge** [4] - 24:14,
64:15, 73:8
**MONGE** [1] - 24:14
**monitor** [2] - 49:19,
65:15
**monitors** [2] - 84:11,
108:1
**month** [34] - 17:3,
19:4, 19:8, 65:21,
67:25, 95:9, 126:3,
126:8, 126:9,
144:24, 145:1,
150:10, 150:15,
150:22, 150:25,
152:5, 155:6, 155:7,
155:18, 155:20,
155:22, 158:1,
158:3, 158:16,
162:1, 165:24,
166:3, 168:9,
175:15, 175:16,
175:17, 175:18,
175:23
**month's** [1] - 140:22
**monthly** [4] - 11:5,
137:8, 137:11,
159:19
**months** [19] - 92:16,
96:21, 106:25,
135:13, 135:17,
156:4, 157:3,
165:14, 165:25,
166:2, 166:4, 166:7,
166:9, 166:16,
167:23, 167:24,
175:20
**morning** [25] - 4:3,
4:16, 5:3, 5:4, 14:24,
15:15, 22:10, 55:5,
56:4, 56:5, 56:6,
56:8, 62:14, 62:18,
91:8, 127:6, 137:7,
149:14, 181:15,
181:16, 182:25,
183:3, 183:19,
184:21, 185:4
**most** [7] - 66:17,
70:11, 72:21, 77:12,
103:1, 160:5, 160:8
**motion** [3] - 105:11,
172:12, 172:22

**mouse** [7] - 71:15,
71:22, 72:11, 84:12,
84:14, 84:18, 134:3
**move** [8] - 77:8, 86:13,
91:10, 103:14,
104:24, 111:20,
112:23, 122:7
**moved** [1] - 5:22
**MR** [285] - 4:6, 4:7,
4:8, 4:13, 5:2, 5:16,
9:20, 12:13, 12:14,
18:7, 18:12, 18:16,
20:1, 21:16, 22:8,
22:24, 24:7, 32:2,
33:12, 33:15, 34:8,
34:11, 34:14, 34:17,
35:13, 35:15, 35:17,
35:19, 36:2, 36:4,
36:14, 36:16, 36:18,
36:20, 36:22, 37:3,
38:19, 39:13, 40:3,
40:6, 40:9, 40:13,
41:20, 41:21, 41:22,
41:25, 42:2, 42:15,
43:17, 43:20, 43:23,
44:2, 44:20, 44:24,
46:20, 46:22, 46:25,
47:17, 47:19, 47:22,
47:23, 48:13, 48:15,
48:18, 49:22, 50:1,
50:6, 50:9, 50:11,
50:13, 50:15, 53:21,
53:24, 54:1, 54:4,
54:6, 54:16, 54:19,
54:24, 55:3, 55:9,
55:14, 56:3, 58:12,
58:17, 60:23, 68:4,
72:4, 72:8, 72:10,
73:25, 74:21, 77:8,
77:10, 80:17, 80:21,
81:17, 83:24, 84:3,
84:5, 84:21, 85:4,
85:23, 86:2, 86:6,
86:9, 86:12, 86:15,
86:18, 86:21, 87:4,
88:4, 88:9, 88:12,
88:15, 88:21, 88:23,
89:4, 89:12, 90:2,
90:6, 92:23, 93:13,
94:7, 94:24, 95:1,
97:13, 99:6, 99:9,
99:11, 100:14,
100:16, 101:15,
101:20, 102:7,
103:7, 103:11,
103:14, 103:15,
104:24, 105:3,
105:5, 105:11,
105:14, 107:11,
107:16, 107:25,
108:5, 108:12,

108:19, 108:21,
109:2, 109:3,
109:16, 109:20,
109:22, 109:25,
110:2, 110:4,
110:22, 111:2,
111:9, 111:10,
111:23, 112:3,
112:6, 112:9,
112:14, 112:22,
112:24, 114:3,
114:8, 114:10,
114:21, 115:22,
115:23, 116:21,
116:24, 116:25,
117:3, 117:7, 118:1,
118:10, 118:13,
118:14, 119:15,
119:20, 119:25,
120:6, 120:11,
120:14, 121:8,
121:10, 121:14,
121:23, 123:16,
123:18, 129:8,
129:23, 132:13,
138:25, 139:5,
142:11, 142:15,
148:20, 148:22,
148:24, 149:19,
149:21, 150:5,
151:18, 151:20,
153:25, 154:22,
156:19, 156:23,
158:9, 158:15,
158:18, 158:21,
158:24, 159:3,
159:25, 160:18,
160:22, 162:16,
162:19, 162:23,
163:2, 163:12,
163:14, 164:7,
164:12, 164:14,
165:4, 165:7,
165:21, 166:25,
169:7, 169:17,
169:20, 169:22,
170:2, 171:3, 171:4,
172:11, 172:15,
172:21, 172:24,
173:5, 173:8,
173:18, 173:21,
174:7, 174:10,
174:14, 175:5,
175:10, 178:16,
178:20, 178:22,
178:24, 179:4,
179:14, 179:15,
179:23, 180:3,
180:11, 180:13,
181:5, 181:7,
181:11, 182:18,

183:7, 183:8,
183:16, 183:20,
183:24, 184:5,
184:9, 184:11,
184:23, 184:25,
185:5, 185:13
**must** [3] - 74:15,
145:18, 183:5
**mute** [1] - 65:4

**N**

**name** [14] - 5:5, 24:14,
32:15, 35:2, 35:4,
56:8, 56:20, 79:25,
91:22, 122:1,
135:12, 143:4,
147:11, 154:10
**names** [3] - 24:13,
73:7, 123:14
**narrative** [1] - 48:15
**national** [5] - 102:20,
102:25, 109:4,
110:21, 111:12
**nature** [1] - 185:7
**near** [1] - 71:7
**necessarily** [1] - 6:25
**necessary** [2] - 16:24,
120:9
**need** [18] - 7:19,
19:14, 27:19, 38:4,
52:10, 53:13, 91:10,
99:17, 103:11,
111:20, 133:7,
160:11, 176:4,
182:24, 183:2,
184:12, 184:25,
185:2
**needed** [8] - 23:13,
37:15, 41:4, 75:19,
83:2, 85:21, 130:17,
176:20
**needs** [4] - 4:24, 42:5,
53:15, 179:10
**nervous** [1] - 56:9
**never** [23] - 11:23,
30:20, 31:3, 31:5,
31:8, 33:4, 63:15,
82:18, 92:5, 106:19,
108:20, 108:22,
116:17, 119:16,
127:20, 133:25,
153:16, 153:18,
153:21, 172:25,
173:1, 180:1
**new** [4] - 89:21,
125:24, 125:25,
155:23
**next** [14] - 4:12, 55:13,
64:4, 64:12, 107:15,

109:21, 121:12,
121:14, 150:11,
150:15, 157:7,
161:25, 182:23,
183:9
**night** [1] - 15:15
**nine** [1] - 167:23
**NO** [1] - 1:2
**nobody** [2] - 66:8,
110:25
**non** [1] - 167:24
**non-open** [1] - 167:24
**none** [2] - 15:17, 63:1
**nonresponsive** [2] -
18:7, 18:13
**normally** [3] - 60:10,
70:6, 124:20
**North** [2] - 2:5, 185:24
**notation** [1] - 107:9
**note** [1] - 154:13
**notebooks** [1] -
181:21
**nothing** [6] - 53:21,
73:5, 90:19, 101:15,
121:8, 184:17
**notified** [1] - 90:4
**notifying** [1] - 89:17
**November** [18] -
66:19, 67:14, 67:24,
74:9, 79:8, 102:14,
102:21, 102:22,
124:16, 131:13,
131:17, 135:14,
139:23, 148:8,
156:3, 163:20,
172:6, 174:23
**nowhere** [1] - 118:23
**NTN** [1] - 147:23
**number** [25] - 32:17,
32:18, 32:19, 41:24,
58:2, 79:19, 79:20,
80:9, 85:19, 97:20,
126:14, 137:19,
139:21, 141:10,
147:18, 147:19,
147:21, 147:22,
151:9, 151:12,
158:25, 169:1,
175:20, 176:13
**numbered** [1] - 41:25
**numbers** [18] - 58:7,
80:10, 95:17,
113:23, 140:4,
140:8, 150:17,
150:18, 151:4,
152:10, 158:10,
162:25, 163:8,
163:10, 163:15,
169:12, 170:5

# O

**o'clock** [1] - 14:24
**oath** [4] - 18:23, 19:6,
107:20, 116:8
**object** [4] - 18:7,
18:12, 107:11,
116:25
**objecting** [3] - 158:15,
158:24, 178:25
**objection** [53] - 34:11,
35:13, 35:17, 36:2,
36:14, 36:18, 36:22,
40:6, 43:17, 43:23,
44:20, 46:20, 46:21,
46:22, 47:17, 48:13,
48:14, 49:22, 49:23,
50:6, 50:7, 50:9,
54:16, 54:24, 99:6,
99:8, 100:14,
105:11, 110:22,
112:3, 112:9,
119:25, 148:20,
149:19, 151:18,
156:19, 158:9,
158:14, 158:15,
158:21, 165:4,
171:3, 172:11,
172:21, 173:5,
173:18, 174:7,
175:5, 178:16,
179:23, 180:11,
181:5, 181:11
**objections** [3] - 52:12,
182:8, 184:6
**obtained** [4] - 61:9,
61:17, 63:7, 108:22
**occasions** [2] - 65:3,
163:25
**occurred** [1] - 91:7
**October** [24] - 9:8, 9:9,
31:18, 61:17, 61:18,
61:22, 62:1, 62:3,
62:14, 62:25, 66:20,
102:16, 102:17,
102:20, 102:23,
124:16, 126:21,
131:13, 134:15,
148:5, 156:24,
157:2, 165:15,
174:23
**OF** [1] - 1:1
**offer** [4] - 59:21,
59:24, 69:12, 127:16
**offered** [4] - 68:20,
69:15, 77:16, 160:12
**offering** [2] - 53:13,
69:10
**offhand** [1] - 100:20
**office** [88] - 5:25, 6:3,

6:8, 6:12, 9:12,
10:12, 10:21, 11:18,
13:17, 13:18, 14:12,
15:14, 20:22, 21:18,
21:20, 21:22, 40:11,
40:15, 42:9, 42:24,
48:10, 51:15, 59:13,
61:25, 62:5, 62:14,
64:7, 64:8, 64:9,
65:7, 65:13, 66:12,
70:2, 70:3, 70:15,
71:9, 71:12, 75:7,
77:11, 77:23, 78:14,
81:10, 81:22, 81:24,
82:2, 83:19, 84:12,
85:14, 90:5, 90:25,
91:7, 104:7, 104:8,
104:11, 104:12,
114:4, 115:9, 116:4,
116:20, 119:9,
122:21, 123:11,
123:15, 125:21,
125:23, 127:4,
127:21, 129:14,
129:17, 129:20,
129:25, 130:3,
131:3, 131:9, 132:6,
133:6, 133:11,
133:24, 134:21,
148:13, 153:4,
153:8, 170:9,
174:22, 176:20
**OFFICER** [10] - 4:2,
4:10, 22:12, 55:7,
55:18, 87:1, 88:3,
128:23, 129:3,
181:23
**officer** [2] - 90:15,
90:24
**offices** [3] - 1:19,
5:22, 59:3
**Official** [1] - 185:23
**official** [2] - 2:4, 21:11
**officially** [2] - 66:19,
148:8
**often** [2] - 65:19,
124:10
**old** [1] - 57:8
**once** [18] - 62:6,
62:10, 62:15, 62:17,
63:7, 64:18, 67:8,
67:20, 73:14, 75:20,
75:22, 79:14,
125:10, 125:20,
126:3, 128:2, 132:4,
134:22
**one** [68] - 4:4, 13:23,
16:13, 16:18, 18:5,
26:1, 26:7, 27:7,
28:16, 30:7, 32:24,

36:10, 37:25, 38:6,
38:25, 40:4, 41:21,
51:23, 54:1, 58:14,
58:15, 63:18, 64:22,
68:9, 68:19, 68:21,
72:14, 77:21, 77:22,
78:3, 78:15, 78:21,
80:10, 83:20, 88:12,
89:17, 92:9, 92:12,
93:20, 98:4, 103:7,
106:5, 115:17,
128:6, 129:18,
135:1, 140:5, 144:1,
144:9, 144:20,
144:24, 145:1,
145:3, 146:21,
147:25, 150:10,
150:15, 152:13,
157:18, 160:4,
164:12, 176:13,
180:23, 180:24
**ones** [10] - 18:10,
52:7, 77:13, 77:15,
77:16, 78:17, 92:11,
92:12, 141:11,
145:13
**online** [1] - 58:24
**open** [155] - 15:14,
28:5, 28:7, 29:7,
29:10, 30:8, 30:15,
31:15, 33:1, 40:15,
47:5, 47:8, 65:25,
66:3, 66:15, 66:17,
66:18, 66:23, 67:5,
67:7, 67:8, 67:17,
68:9, 68:21, 69:22,
70:1, 70:2, 70:6,
70:7, 70:19, 70:25,
71:23, 72:12, 72:14,
72:18, 73:7, 78:15,
78:16, 78:19, 79:2,
79:7, 82:24, 84:7,
93:10, 93:15, 93:17,
93:24, 94:1, 95:20,
96:3, 96:8, 96:11,
96:15, 96:22, 96:24,
97:2, 97:14, 97:15,
97:17, 97:21, 97:25,
99:2, 100:7, 101:1,
101:8, 101:12,
101:13, 102:11,
102:14, 102:23,
113:21, 118:7,
118:17, 118:19,
120:24, 124:8,
124:15, 124:25,
125:3, 125:6,
125:20, 127:4,
134:11, 134:14,
134:18, 134:20,

134:22, 135:3,
135:7, 135:13,
135:18, 137:4,
137:23, 138:14,
138:15, 139:12,
140:11, 141:3,
141:6, 141:9,
141:14, 141:15,
141:19, 141:21,
142:6, 142:18,
142:22, 143:7,
143:14, 143:24,
144:20, 145:10,
145:14, 145:20,
146:13, 146:19,
148:4, 148:8,
148:11, 148:15,
148:19, 148:25,
155:23, 156:1,
156:5, 156:10,
156:14, 156:17,
156:25, 157:3,
157:7, 157:10,
157:19, 158:7,
159:5, 159:9, 160:6,
160:15, 161:10,
161:18, 163:4,
163:19, 164:4,
164:9, 166:16,
167:24, 168:3,
168:6, 177:10,
183:25
**opened** [1] - 91:21
**opening** [2] - 66:1,
124:19
**opponent** [1] - 47:21
**opportunity** [3] -
37:16, 45:13, 102:1
**opposed** [2] - 182:15,
184:4
**opposing** [1] - 185:11
**order** [8] - 21:23,
60:13, 63:2, 75:20,
77:1, 78:6, 99:17,
176:7
**Oscar** [24] - 54:10,
54:13, 68:25, 77:13,
77:18, 78:1, 78:6,
80:12, 94:13,
146:25, 147:3,
147:6, 160:7, 160:8,
160:12, 160:14,
161:12, 161:21,
162:14, 171:8,
171:9, 171:16
**Oscar's** [1] - 79:10
**otherwise** [2] - 76:20,
76:21
**outbox** [1] - 117:18
**outside** [8] - 22:15,

64:10, 91:11, 101:8, 145:20, 167:15, 181:20, 181:21
**overall** [1] - 54:23
**overruled** [26] - 35:18, 36:3, 36:15, 36:23, 40:8, 43:18, 43:25, 44:22, 49:24, 50:10, 55:1, 112:10, 118:11, 120:1, 151:19, 156:20, 158:13, 159:1, 165:5, 172:13, 172:23, 173:6, 173:19, 174:9, 175:6, 179:25
**overtime** [24] - 16:22, 44:4, 49:6, 99:3, 99:18, 99:21, 99:24, 100:2, 100:7, 100:11, 100:19, 100:22, 101:11, 105:16, 105:19, 158:12, 180:10, 180:16, 180:24, 180:25, 181:3, 182:2, 182:3, 182:5
**owe** [2] - 101:6, 114:13
**owed** [17] - 43:11, 99:7, 100:1, 100:2, 100:6, 100:10, 100:11, 100:19, 100:22, 100:23, 117:8, 117:11, 117:13, 117:24, 118:6, 119:2, 181:9
**own** [21] - 12:4, 12:18, 32:5, 45:17, 45:22, 45:23, 57:24, 63:25, 79:15, 84:9, 84:14, 84:15, 91:20, 105:24, 106:17, 115:15, 133:19, 133:24, 174:22
**owned** [1] - 10:10

**P**

**P.A** [2] - 104:14, 104:19
**p.m** [31] - 1:6, 15:15, 15:18, 16:10, 16:19, 70:2, 70:5, 82:8, 87:2, 87:5, 88:2, 88:18, 105:18, 121:17, 127:6, 128:24, 129:2, 129:4, 134:23, 134:24, 148:14,

163:25, 166:19, 167:14, 167:19, 167:20, 171:2, 181:24, 185:16
**pace** [1] - 183:13
**Page** [17] - 3:3, 3:12, 3:23, 17:21, 68:22, 77:8, 77:9, 110:2, 110:3, 111:11, 114:8, 114:10, 116:13, 178:23, 179:16, 182:4
**page** [5] - 68:2, 95:9, 107:14, 109:24, 114:7
**Pages** [1] - 1:8
**paid** [125] - 8:17, 8:20, 21:4, 28:2, 29:8, 29:14, 29:18, 30:3, 30:6, 30:13, 30:18, 31:4, 43:6, 44:7, 49:6, 49:11, 49:14, 49:20, 50:5, 62:6, 62:9, 66:9, 67:4, 67:18, 67:23, 69:4, 75:1, 75:4, 75:10, 76:17, 77:15, 77:17, 79:3, 79:6, 79:12, 79:13, 79:16, 79:20, 79:21, 80:3, 80:7, 85:16, 92:16, 92:18, 93:3, 93:7, 93:10, 93:23, 94:12, 94:16, 94:17, 95:2, 95:4, 95:5, 95:9, 95:12, 95:22, 95:25, 96:5, 96:6, 96:8, 96:11, 97:9, 97:14, 97:16, 99:2, 99:5, 99:14, 99:20, 99:25, 100:3, 100:25, 101:1, 101:12, 101:23, 106:21, 107:6, 107:8, 110:6, 112:25, 113:3, 113:8, 113:20, 114:14, 114:16, 114:22, 119:22, 120:4, 120:5, 124:2, 124:4, 124:25, 125:9, 125:11, 125:12, 126:1, 135:17, 135:18, 137:9, 137:19, 139:15, 140:12, 140:18, 142:5, 144:2, 144:6, 146:5, 146:23, 147:4, 149:10, 150:19, 150:22, 151:13,

154:12, 154:13, 157:19, 173:2, 173:4, 173:17, 173:22, 174:3, 174:25, 175:23
**pandemic** [1] - 156:7
**paper** [2] - 69:2, 182:15
**paraphrasing** [1] - 182:7
**part** [38] - 7:12, 7:15, 8:16, 14:5, 14:6, 20:6, 21:13, 27:1, 27:5, 34:7, 34:9, 48:11, 60:20, 61:8, 65:10, 72:24, 74:25, 75:23, 77:2, 81:15, 89:8, 89:9, 95:19, 98:12, 99:22, 105:16, 117:14, 139:2, 139:3, 142:12, 150:2, 156:4, 156:10, 156:24, 157:3, 157:4, 182:11, 183:9
**part-time** [1] - 14:5
**partially** [3] - 175:7, 175:9, 175:11
**particular** [6] - 54:12, 54:21, 61:10, 62:24, 76:9, 123:22
**parties** [3] - 86:24, 181:19, 183:4
**parts** [3] - 175:9, 175:12
**party** [4] - 47:19, 47:21, 108:3
**pass** [1] - 61:20
**past** [1] - 182:7
**patience** [3] - 52:11, 52:13, 181:14
**patient** [2] - 44:19, 63:9
**Pause** [36] - 20:8, 21:15, 22:21, 25:16, 38:18, 39:12, 40:2, 53:19, 55:17, 80:16, 83:23, 84:20, 93:12, 102:6, 103:8, 103:13, 105:4, 108:11, 109:1, 110:1, 111:19, 111:22, 112:19, 114:2, 114:9, 115:20, 116:23, 154:21, 160:17, 162:18, 163:1, 164:13, 165:19, 166:24, 178:15, 178:21

**pause** [1] - 181:12
**pay** [33] - 10:24, 10:25, 11:2, 11:5, 11:7, 11:14, 43:12, 43:13, 59:17, 59:21, 59:24, 60:2, 60:5, 60:6, 60:17, 65:23, 77:1, 82:4, 93:21, 93:22, 93:24, 95:19, 102:9, 124:9, 125:10, 143:10, 146:15, 146:18, 147:7, 153:20, 174:17, 174:18, 175:8
**paying** [10] - 16:22, 31:12, 33:7, 68:19, 124:20, 125:8, 136:21, 137:13, 137:15, 176:2
**payment** [15] - 66:2, 66:6, 67:6, 67:9, 67:11, 85:15, 94:19, 124:11, 124:22, 125:12, 125:24, 125:25, 151:22, 152:4, 155:10
**payments** [9] - 81:2, 94:11, 113:24, 120:3, 152:5, 153:13, 154:11, 154:14
**pending** [3] - 18:8, 18:13, 118:7
**people** [27] - 27:7, 27:9, 35:6, 41:4, 43:9, 43:11, 43:13, 44:19, 46:23, 48:16, 51:12, 52:5, 65:17, 70:3, 109:6, 123:11, 123:14, 123:23, 123:25, 129:19, 130:2, 136:9, 136:12, 136:15, 139:23, 176:15
**per** [34] - 16:14, 30:1, 55:2, 60:1, 62:11, 66:5, 66:6, 66:7, 66:10, 66:11, 67:6, 67:13, 77:19, 89:21, 99:14, 100:19, 102:10, 124:6, 125:2, 126:9, 139:21, 146:17, 150:19, 151:13, 154:11, 155:6, 155:18, 158:3, 166:20, 166:21, 168:14
**perfectly** [1] - 130:14

**perform** [2] - 76:11, 92:3
**performance** [1] - 81:1
**period** [120] - 28:5, 28:7, 29:8, 29:10, 30:8, 30:15, 31:15, 33:1, 38:12, 59:20, 66:2, 66:17, 66:18, 68:21, 69:23, 70:1, 70:6, 70:19, 73:7, 73:16, 96:22, 98:18, 101:8, 102:25, 105:8, 109:5, 109:8, 110:8, 110:21, 111:12, 113:21, 118:8, 120:25, 124:8, 124:13, 124:14, 124:15, 124:19, 125:1, 125:3, 125:6, 125:15, 125:18, 128:16, 134:12, 134:14, 134:18, 134:20, 134:22, 135:3, 135:8, 135:14, 135:18, 137:5, 137:23, 140:11, 140:25, 141:3, 141:6, 141:9, 141:14, 141:19, 142:6, 142:18, 142:22, 143:8, 143:15, 143:23, 143:24, 145:11, 145:15, 145:21, 146:13, 146:19, 148:5, 148:8, 148:11, 148:16, 148:19, 149:1, 155:23, 156:1, 156:5, 156:7, 156:10, 156:15, 156:18, 156:25, 157:3, 157:4, 157:7, 157:10, 157:11, 157:20, 158:7, 159:5, 159:9, 159:12, 160:6, 160:15, 161:6, 161:10, 161:18, 163:4, 163:19, 164:4, 164:9, 167:15, 168:4, 168:6, 170:6, 170:15, 171:5, 171:10, 171:11, 171:13, 171:17, 173:14, 175:24
**periods** [2] - 49:1, 170:24

**permission** [2] - 128:3, 128:5
**person** [10] - 12:18, 31:8, 31:23, 40:23, 139:22, 147:25, 153:12, 153:16, 177:23
**personal** [2] - 119:7, 132:21
**personally** [5] - 45:18, 70:7, 73:13, 79:15, 93:4
**personnel** [1] - 159:13
**perspective** [1] - 159:14
**phone** [35] - 11:18, 11:21, 11:23, 32:17, 32:18, 32:19, 52:7, 52:8, 53:9, 58:20, 64:2, 64:23, 65:2, 65:15, 65:17, 71:5, 71:10, 71:17, 72:20, 72:24, 73:10, 73:11, 75:18, 76:1, 80:9, 82:22, 127:15, 127:16, 164:1, 164:17, 165:10, 176:18, 176:21, 184:2
**phones** [2] - 71:12, 176:16
**physical** [1] - 71:12
**pick** [4] - 70:12, 71:13, 131:8, 132:5
**picked** [1] - 183:10
**picture** [8] - 80:15, 160:25, 161:1, 161:3, 161:5, 161:7, 161:14, 161:16
**pictures** [2] - 120:8, 120:9
**place** [9] - 45:11, 120:20, 152:21, 152:25, 153:3, 170:25, 173:4, 173:13, 176:11
**places** [1] - 54:15
**Plaintiff** [4] - 4:21, 55:24, 103:9, 121:19
**plaintiff** [1] - 121:14
**Plaintiff's** [1] - 183:14
**Plaintiffs** [17] - 1:6, 20:19, 21:4, 34:1, 34:14, 36:11, 38:13, 42:21, 43:22, 44:4, 45:11, 46:4, 46:18, 46:23, 47:14, 48:1, 49:1
**plaintiffs** [1] - 55:14
**PLAINTIFFS** [2] -

1:14, 3:3
**Plaintiffs'** [8] - 3:17, 3:18, 3:20, 42:1, 60:22, 92:21, 108:8, 132:12
**plan** [7] - 9:5, 53:14, 68:8, 68:17, 69:8, 152:4, 160:5
**plans** [4] - 53:12, 66:22, 127:17, 143:14
**play** [2] - 71:19
**plus** [9] - 62:11, 65:24, 66:6, 67:6, 98:1, 98:20, 118:22, 166:9, 183:15
**point** [21] - 13:23, 26:19, 36:5, 43:12, 47:25, 57:23, 61:12, 62:21, 64:10, 71:8, 75:6, 76:19, 76:24, 77:2, 85:23, 85:25, 116:2, 116:13, 130:25, 131:1, 147:14
**pointed** [1] - 145:24
**police** [3] - 90:14, 90:24, 91:9
**policies** [65] - 13:19, 13:20, 26:16, 26:21, 27:6, 27:7, 29:18, 30:13, 31:6, 31:16, 32:12, 38:13, 45:13, 47:3, 51:17, 54:10, 54:22, 54:23, 64:5, 65:20, 66:21, 67:3, 67:15, 69:14, 78:13, 79:2, 79:6, 79:12, 79:13, 80:12, 83:21, 89:22, 124:25, 131:24, 135:14, 135:19, 135:22, 137:16, 137:19, 139:17, 140:6, 143:1, 143:2, 143:7, 143:24, 144:6, 144:18, 145:7, 146:10, 146:23, 147:15, 147:17, 148:2, 149:18, 149:23, 155:14, 159:17, 160:11, 161:12, 161:21, 164:2, 171:7, 171:9, 171:16
**policy** [33] - 8:1, 26:25, 27:3, 27:17, 27:19, 28:8, 28:13, 28:19, 30:8, 32:25, 51:11, 67:18, 78:7,

79:24, 102:10, 124:12, 125:6, 125:7, 125:11, 125:12, 126:6, 126:10, 126:12, 140:25, 141:3, 141:6, 141:9, 141:13, 141:19, 143:22, 143:23, 144:4
**Pollock** [2] - 3:7, 3:8
**POLLOCK** [69] - 1:14, 4:6, 4:13, 41:22, 55:9, 55:14, 56:3, 58:12, 58:17, 60:23, 68:4, 72:4, 72:8, 72:10, 74:21, 77:8, 77:10, 80:17, 80:21, 81:17, 83:24, 84:3, 84:5, 84:21, 85:4, 85:23, 86:2, 86:6, 86:9, 86:12, 86:15, 86:18, 86:21, 88:4, 88:9, 88:12, 88:15, 88:21, 88:23, 89:4, 89:12, 90:2, 90:6, 92:23, 93:13, 94:7, 94:24, 95:1, 97:13, 99:11, 100:16, 101:15, 105:11, 107:11, 107:25, 108:5, 108:12, 110:22, 111:2, 111:9, 112:3, 112:9, 116:25, 118:10, 119:25, 120:14, 121:8, 121:10, 132:13
**Ponce** [1] - 1:23
**popped** [1] - 88:12
**position** [4] - 35:4, 57:21, 58:20, 72:23
**possibilities** [1] - 160:9
**possible** [5] - 16:7, 16:8, 32:19, 141:5, 145:13
**possibly** [1] - 53:5
**posting** [1] - 57:19
**potential** [3] - 11:11, 11:18, 65:2
**practice** [1] - 26:9
**pre** [2] - 61:9, 61:13
**pre-license** [1] - 61:13
**pre-licensing** [1] - 61:9
**preferred** [1] - 131:23
**Present** [1] - 2:2
**presenting** [1] - 132:10

**president** [1] - 26:13
**pretty** [2] - 48:5, 71:5
**previous** [2] - 94:4, 173:4
**previously** [8] - 24:4, 25:6, 133:18, 134:10, 139:2, 150:2, 156:14, 160:20
**prices** [1] - 68:18
**print** [3] - 42:25, 61:12, 182:13
**problem** [4] - 12:13, 40:25, 97:6, 182:11
**procedure** [1] - 76:12
**proceed** [3] - 4:4, 22:22, 169:15
**proceedings** [39] - 4:1, 20:8, 21:15, 22:21, 25:16, 38:18, 39:12, 40:2, 53:19, 55:17, 80:16, 83:23, 84:20, 93:12, 102:6, 103:8, 103:13, 105:4, 108:11, 109:1, 110:1, 111:19, 111:22, 112:19, 114:2, 114:9, 115:20, 116:23, 154:21, 160:17, 162:18, 163:1, 164:13, 165:19, 166:24, 178:15, 178:21, 185:16, 185:19
**Proceedings............ ..................... [1] - 3:24
**process** [8] - 26:20, 27:4, 27:6, 27:7, 27:19, 63:8, 75:14, 75:17
**processed** [2] - 76:21, 106:1
**processing** [6] - 26:15, 26:20, 26:22, 27:10, 27:16, 27:24
**produce** [2] - 43:13, 152:2
**produced** [1] - 119:14
**produces** [1] - 119:13
**producing** [1] - 25:3
**products** [2] - 63:22, 115:18
**professionals** [2] - 44:11, 44:13
**program** [1] - 63:13
**promise** [2] - 66:4, 105:20
**promised** [2] - 65:23,

66:11
**proof** [1] - 136:12
**proper** [1] - 108:17
**properly** [1] - 107:7
**proposed** [1] - 125:22
**protect** [1] - 73:20
**protection** [2] - 77:4, 77:5
**provide** [3] - 69:21, 85:19, 90:16
**provided** [6] - 11:9, 11:21, 12:7, 28:10, 106:12, 134:7
**providing** [3] - 17:7, 17:8, 90:18
**published** [12] - 68:3, 73:24, 77:7, 80:20, 81:16, 89:11, 92:22, 94:6, 150:4, 153:24, 159:24, 160:21
**pure** [1] - 173:25
**purpose** [4] - 23:8, 40:21, 108:4, 133:4
**purse** [2] - 164:17, 166:23
**put** [13] - 16:4, 26:25, 39:4, 40:19, 65:3, 76:25, 105:25, 106:2, 130:12, 141:23, 157:11, 158:11, 184:7
**putting** [1] - 27:1

## Q

**qualified** [1] - 136:8
**qualify** [3] - 136:10, 136:13, 136:16
**quantity** [1] - 181:1
**QUESTION** [2] - 18:2, 110:13
**question's** [1] - 110:2
**questions** [18] - 33:12, 37:21, 45:1, 45:6, 48:22, 56:13, 73:17, 107:18, 119:19, 162:16, 178:8, 178:11, 178:12, 180:21, 182:7, 183:1, 183:6, 184:18
**quick** [8] - 41:12, 44:15, 54:1, 54:2, 54:4, 86:13, 88:5
**quickly** [3] - 169:13, 169:22, 185:5
**Quintero** [13] - 26:11, 27:12, 27:15, 57:11, 61:11, 63:10, 63:16, 65:8, 65:9, 65:19, 123:13, 123:19,

127:11
**QUINTERO** [1] - 1:9
**Quintero's** [2] - 27:4, 147:21
**quite** [1] - 169:9
**quote** [2] - 7:25, 83:21

# R

**Radius** [8] - 8:7, 12:19, 12:21, 63:11, 76:8, 76:16, 83:7, 83:9
**Rafaela** [11] - 3:9, 24:22, 39:3, 47:15, 51:4, 73:8, 94:11, 121:14, 122:2, 142:1
**RAFAELA** [2] - 1:4, 121:18
**RafaelaValiente@ Gmail.com** [1] - 132:21
**raise** [3] - 4:18, 55:21, 121:16
**raises** [1] - 58:6
**rate** [3] - 99:17, 100:3, 167:5
**rates** [1] - 97:16
**rather** [1] - 27:22
**ray** [1] - 132:24
**Ray** [2] - 133:2, 150:14
**re** [2] - 108:19, 112:12
**re-ask** [2] - 108:19, 112:12
**read** [17] - 21:12, 30:2, 90:7, 90:10, 108:5, 109:17, 111:1, 111:2, 111:6, 111:7, 111:8, 112:21, 132:22, 150:13, 154:9, 178:22, 179:3
**reading** [3] - 90:11, 111:14, 179:13
**ready** [5] - 4:4, 4:6, 4:7, 51:13, 150:1
**real** [4] - 41:12, 54:2, 54:4, 88:5
**realized** [1] - 104:1
**really** [8] - 34:5, 34:8, 42:25, 45:19, 67:1, 82:4, 97:25
**reason** [5] - 17:10, 33:10, 74:10, 119:5, 144:18
**receive** [45] - 29:11, 29:24, 30:11, 32:9, 33:9, 33:10, 52:22, 63:3, 67:5, 67:13, 67:17, 68:7, 68:8, 68:10, 76:4, 84:23,

92:7, 92:15, 93:17, 113:8, 113:13, 113:24, 114:13, 115:4, 115:5, 117:13, 120:2, 124:11, 124:16, 124:18, 125:7, 125:12, 126:11, 126:14, 127:8, 130:15, 135:21, 136:18, 136:19, 136:23, 137:8, 140:20, 142:20, 160:12, 162:14
**received** [55] - 23:19, 23:22, 30:19, 30:21, 31:10, 58:20, 60:8, 63:5, 66:2, 66:6, 67:24, 76:18, 78:15, 78:17, 81:1, 84:22, 92:11, 92:14, 93:2, 93:25, 96:10, 96:23, 97:2, 98:13, 98:20, 113:2, 113:5, 113:15, 113:22, 116:17, 118:7, 126:6, 135:24, 136:2, 137:1, 137:2, 137:4, 137:14, 137:23, 138:12, 138:22, 141:24, 142:2, 142:16, 144:16, 149:4, 151:13, 152:1, 155:11, 157:10, 157:12, 157:16, 158:6, 159:5, 159:8
**receiving** [6] - 43:21, 66:10, 79:8, 79:10, 136:5, 152:5
**recess** [10] - 22:11, 22:17, 55:5, 55:11, 55:12, 86:23, 87:5, 128:22, 128:25, 129:2
**recognize** [13] - 60:24, 60:25, 81:18, 81:21, 89:10, 89:13, 92:20, 92:24, 138:18, 150:6, 154:1, 157:15, 160:23
**recollection** [1] - 18:20
**record** [13] - 18:14, 28:13, 28:19, 41:23, 78:8, 78:9, 107:3, 127:14, 149:17, 149:22, 161:2, 161:12, 174:11
**recorded** [4] - 30:7,

30:22, 30:23, 31:6
**records** [2] - 120:23, 121:1
**RECROSS** [1] - 54:5
**Recross** [1] - 3:6
**red** [2] - 152:10, 152:11
**redacted** [1] - 92:20
**redirect** [4] - 50:12, 54:1, 111:9, 120:12
**Redirect** [2] - 3:6, 3:8
**REDIRECT** [2] - 50:14, 120:13
**refer** [3] - 8:4, 77:6, 82:11
**referrals** [1] - 45:13
**referred** [1] - 82:14
**referring** [5] - 8:4, 29:20, 121:2, 139:24, 147:22
**reflect** [1] - 137:18
**refresh** [1] - 18:20
**regarding** [7] - 21:20, 54:22, 65:10, 81:1, 89:21, 118:19, 127:15
**regardless** [1] - 67:12
**register** [3] - 126:2, 149:12, 157:5
**registered** [13] - 29:15, 49:13, 113:23, 124:9, 135:16, 136:7, 139:17, 139:23, 147:17, 147:19, 147:20, 149:11
**registration** [9] - 63:9, 102:21, 102:25, 106:14, 109:5, 111:12, 125:15, 141:15
**rehab** [1] - 133:1
**rehash** [1] - 184:12
**Reinier** [42] - 8:25, 13:20, 14:1, 28:10, 28:22, 31:12, 32:6, 43:8, 43:12, 45:10, 45:21, 46:11, 47:13, 49:15, 102:8, 105:17, 119:2, 119:8, 119:10, 119:22, 122:11, 122:19, 122:20, 124:6, 125:22, 128:6, 130:20, 133:3, 135:1, 138:5, 147:20, 149:15, 149:25, 152:15, 153:10, 153:17, 154:3, 160:4, 162:7,

176:17, 177:7, 181:3
**REINIER** [1] - 1:8
**related** [1] - 130:25
**relation** [1] - 64:16
**relative** [1] - 104:15
**release** [2] - 54:7, 54:20
**released** [1] - 51:23
**relevance** [7] - 35:13, 35:17, 36:2, 172:11, 172:21, 173:5, 173:18
**relevant** [1] - 174:8
**reliable** [1] - 177:24
**remained** [1] - 67:2
**remaining** [1] - 111:8
**remember** [43] - 16:25, 17:4, 17:8, 17:11, 18:22, 32:18, 32:21, 57:15, 57:16, 61:16, 61:18, 62:3, 74:7, 74:12, 79:9, 79:22, 88:25, 89:6, 94:14, 94:15, 107:17, 107:19, 107:20, 107:23, 109:13, 110:18, 110:19, 114:18, 116:6, 116:8, 123:12, 123:14, 143:21, 156:13, 161:5, 175:2, 175:14, 178:8, 180:8, 180:20, 182:3
**remembered** [3] - 74:10, 108:24, 115:1
**remind** [2] - 176:4, 178:7
**remove** [1] - 178:19
**repeat** [3] - 18:25, 33:8, 179:13
**repeated** [1] - 32:1
**repetitive** [1] - 185:7
**rephrase** [1] - 152:23
**report** [1] - 103:17
**REPORTED** [1] - 2:4
**REPORTER** [5] - 9:18, 74:17, 84:2, 102:5, 104:21
**Reporter** [2] - 2:4, 185:23
**Reporter's** [1] - 3:24
**reporting** [1] - 120:16
**represent** [6] - 93:25, 96:2, 139:1, 150:18, 151:4, 151:5
**represents** [2] - 94:10, 151:7
**request** [6] - 22:5, 23:6, 38:24, 127:23,

128:1, 153:5
**requested** [2] - 21:19, 38:24
**requesting** [1] - 23:3
**requests** [1] - 21:20
**require** [1] - 54:13
**required** [7] - 22:3, 22:4, 73:19, 76:22, 81:9, 89:19, 148:12
**requirement** [1] - 76:25
**requirements** [2] - 54:21, 77:3
**requires** [4] - 44:18, 52:3, 52:8
**residual** [1] - 152:5
**resigned** [3] - 104:9, 104:10, 119:9
**resolve** [1] - 75:9
**resources** [2] - 50:16, 50:19
**respond** [4] - 73:17, 81:3, 88:16, 152:19
**response** [9] - 18:14, 18:17, 108:22, 128:9, 130:23, 152:18, 152:21
**responsibility** [1] - 106:9
**responsible** [2] - 133:9, 177:24
**rest** [4] - 64:11, 93:23, 106:8, 136:7
**restart** [2] - 60:14, 60:15
**resting** [1] - 183:12
**restrictions** [2] - 54:20, 54:22
**restroom** [1] - 123:17
**restructure** [1] - 185:12
**resume** [1] - 86:18
**retirement** [1] - 9:5
**return** [1] - 181:14
**returned** [1] - 182:25
**review** [2] - 153:5, 154:14
**reviewed** [1] - 94:4
**ring** [3] - 11:18, 71:10, 71:17
**rise** [10] - 4:2, 4:10, 22:12, 55:7, 55:18, 87:1, 88:3, 128:23, 129:3, 181:23
**risk** [2] - 133:13, 133:14
**role** [2] - 65:8, 123:20
**room** [2] - 135:2, 181:22
**rows** [1] - 140:2

**RPR** [2] - 2:4, 185:23
**rude** [1] - 88:15
**rule** [2] - 158:17, 158:19
**rules** [2] - 47:24
**run** [4] - 86:12, 86:16, 133:13, 169:13
**résumés** [1] - 35:11

## S

**salary** [5] - 60:18, 124:17, 124:18, 174:18, 175:25
**sale** [8] - 65:5, 75:2, 76:17, 76:19, 76:21, 79:25, 80:9, 102:17
**sales** [53] - 5:13, 29:4, 29:15, 30:15, 30:23, 30:25, 31:20, 36:5, 36:8, 43:15, 44:10, 44:16, 47:1, 62:1, 63:25, 67:2, 67:12, 67:19, 67:22, 67:23, 70:4, 75:1, 75:3, 75:10, 78:19, 78:24, 79:16, 79:19, 79:20, 80:10, 80:15, 80:23, 81:1, 82:20, 82:21, 96:23, 97:20, 98:17, 112:15, 115:15, 115:16, 123:25, 127:14, 145:19, 149:11, 149:12, 150:24, 152:2, 152:8, 161:2, 174:5, 174:15, 176:18
**San** [1] - 1:16
**sandwich** [1] - 183:24
**SANTIAGO** [1] - 1:22
**Santiago** [1] - 1:23
**Saturday** [1] - 172:2
**Saturdays** [6] - 70:18, 70:20, 70:22, 148:15, 148:17, 172:1
**saw** [4] - 57:19, 58:18, 185:5, 185:6
**sc@cuetolawgroup. com** [1] - 1:25
**schedule** [29] - 14:18, 15:7, 16:4, 17:18, 18:2, 24:8, 24:10, 25:6, 25:10, 25:18, 25:19, 25:25, 26:4, 37:23, 38:20, 39:1, 39:4, 40:20, 40:22, 40:23, 127:2, 135:5, 148:12, 153:11, 153:17, 167:17,

177:8, 177:10, 177:25
**scheduled** [3] - 19:15, 89:16, 183:8
**schedules** [12] - 17:16, 24:2, 25:13, 25:22, 39:19, 39:24, 40:19, 40:21, 41:8, 69:19, 69:21, 167:18
**school** [4] - 52:18, 53:4, 57:23, 70:13
**scratch** [1] - 154:20
**screen** [11] - 21:7, 23:1, 132:10, 138:13, 138:16, 144:20, 157:14, 160:23, 163:8, 165:10
**scroll** [1] - 182:16
**se** [1] - 30:1
**seated** [11] - 4:3, 4:17, 4:23, 22:20, 55:20, 56:1, 64:10, 64:24, 88:19, 121:21, 129:5
**second** [3] - 71:11, 103:7, 164:12
**seconds** [2] - 103:11, 105:1
**section** [5] - 26:20, 26:22, 27:8, 65:11, 169:8
**security** [1] - 85:19
**SECURITY** [10] - 4:2, 4:10, 22:12, 55:7, 55:18, 87:1, 88:3, 128:23, 129:3, 181:23
**see** [57] - 6:23, 7:9, 7:11, 17:21, 23:1, 24:13, 25:25, 29:4, 31:3, 31:5, 38:20, 38:22, 42:3, 42:6, 51:16, 53:3, 65:8, 68:5, 75:6, 75:7, 86:24, 92:20, 94:8, 94:17, 94:18, 94:19, 95:5, 95:14, 95:15, 95:16, 95:23, 95:24, 104:1, 107:14, 108:9, 119:16, 121:7, 125:22, 132:22, 138:13, 138:16, 138:18, 140:2, 140:4, 141:18, 144:15, 145:7, 150:11, 151:7, 151:16, 151:21, 160:3, 173:12, 175:7, 182:24, 185:11,

185:12
**seeing** [3] - 94:14, 119:10, 144:19
**seek** [1] - 108:23
**seeking** [4] - 99:20, 108:13, 108:15
**seem** [2] - 143:23, 185:7
**selects** [1] - 16:13
**self** [2] - 106:17, 174:21
**self-employed** [2] - 106:17, 174:21
**sell** [29] - 5:17, 10:4, 10:8, 11:12, 11:23, 58:8, 58:9, 62:20, 69:14, 77:12, 77:23, 78:6, 78:7, 80:12, 84:23, 85:5, 85:11, 85:13, 130:8, 130:10, 135:15, 141:9, 141:13, 147:13, 147:15, 154:24, 160:11, 160:14, 164:2
**selling** [42] - 31:16, 47:2, 51:10, 51:16, 51:25, 62:24, 63:22, 65:20, 66:21, 67:3, 70:25, 102:18, 102:19, 102:22, 115:18, 124:11, 125:7, 129:25, 130:18, 131:24, 135:19, 135:21, 137:16, 140:12, 140:21, 142:5, 142:20, 142:21, 143:10, 144:2, 144:6, 146:15, 146:16, 146:18, 146:23, 159:17, 160:6, 160:8, 172:17, 173:12, 173:16, 173:22
**sells** [1] - 27:3
**send** [18] - 25:25, 29:17, 30:5, 61:3, 61:5, 61:7, 61:10, 75:18, 75:25, 82:2, 82:19, 89:15, 89:25, 92:10, 92:12, 119:23, 154:3
**sends** [1] - 83:1
**senior** [1] - 5:9
**sense** [3] - 45:16, 46:1, 176:14
**sent** [29] - 23:25, 25:22, 29:19, 42:4, 42:12, 42:17, 61:1,

61:2, 61:13, 80:24, 82:10, 82:11, 82:24, 90:8, 96:19, 101:1, 114:19, 115:2, 117:18, 117:24, 119:1, 119:7, 147:3, 150:9, 150:13, 152:15, 153:5, 153:7
**separate** [5] - 143:17, 143:20, 145:5, 152:20, 152:24
**separated** [2] - 6:16
**separately** [2] - 59:15, 140:20
**September** [7] - 61:4, 109:23, 110:5, 110:6, 132:24, 132:25, 133:11
**Service** [2] - 91:24, 92:18
**service** [2] - 45:17, 45:23
**services** [2] - 90:17, 92:3
**Services** [3] - 92:1, 92:4, 120:17
**set** [2] - 19:22, 134:25
**seven** [2] - 71:6, 133:17
**several** [3] - 125:21, 133:19, 149:3
**shadowed** [1] - 63:8
**share** [2] - 78:20, 149:25
**shared** [10] - 28:22, 29:1, 29:5, 32:4, 32:6, 78:10, 78:12, 78:18, 149:15, 162:3
**sheet** [30] - 28:8, 28:10, 28:14, 28:20, 28:22, 29:1, 30:4, 30:7, 30:18, 30:22, 31:4, 31:6, 31:21, 32:25, 33:5, 68:11, 69:2, 78:9, 79:14, 80:1, 80:8, 80:15, 127:14, 140:17, 149:15, 149:17, 155:20, 158:12, 159:17, 162:3
**sheets** [2] - 49:12, 139:1
**Sheets** [3] - 29:5, 149:24, 161:2
**Shield** [6] - 85:2, 85:6, 142:14, 142:17, 142:21, 150:21
**shift** [1] - 18:11
**shifts** [11] - 14:16, 14:17, 14:18, 14:19, 14:21, 15:10, 16:13,

21:24, 39:17, 70:3
**shoot** [1] - 55:9
**short** [2] - 52:7, 123:15
**shorter** [1] - 59:12
**show** [26] - 24:4, 32:22, 35:16, 35:23, 38:6, 39:24, 41:12, 42:24, 60:20, 68:1, 73:22, 78:8, 80:18, 81:15, 84:6, 84:8, 89:8, 92:19, 94:3, 103:16, 103:24, 117:5, 118:4, 136:12, 150:2, 160:20
**showed** [8] - 10:4, 25:18, 63:10, 76:11, 118:3, 127:13, 137:15, 163:6
**showing** [9] - 19:21, 20:11, 21:13, 30:12, 89:18, 140:17, 150:1, 153:22, 159:22
**shown** [2] - 69:19, 133:10
**shrink** [1] - 183:16
**shut** [1] - 117:1
**sic** [4] - 4:14, 5:6, 54:1, 164:5
**sic]** [3] - 33:16, 57:16, 164:17
**sick** [3] - 83:4, 128:2, 129:19
**side** [1] - 24:13
**sign** [5] - 9:21, 73:20, 123:2, 123:6, 159:15
**signatures** [2] - 85:20, 85:21
**signed** [9] - 65:24, 74:23, 75:15, 76:4, 76:15, 77:18, 79:21, 80:6, 111:13
**significance** [1] - 152:11
**signing** [1] - 38:12
**similar** [2] - 10:2, 149:17
**similarly** [1] - 156:24
**simply** [3] - 41:1, 116:4, 116:19
**sit** [2] - 64:4
**site** [1] - 83:21
**sitting** [3] - 64:12, 121:7, 184:16
**situation** [2] - 23:16, 130:25
**six** [2] - 39:17, 39:24
**six-hour** [1] - 39:17

**skill** [7] - 44:18, 45:8, 52:9, 52:13, 52:15, 52:20
**skills** [4] - 52:3, 52:10, 62:23, 63:20
**slower** [1] - 9:19
**small** [2] - 64:8, 127:15
**smiled** [1] - 88:16
**smoke** [1] - 72:22
**social** [1] - 85:19
**soft** [1] - 71:10
**software** [14] - 10:22, 10:25, 12:2, 12:5, 12:7, 12:10, 12:16, 12:19, 63:11, 63:17, 63:20, 76:5, 83:6, 130:12
**sold** [60] - 26:25, 28:8, 28:13, 28:17, 28:19, 30:8, 30:18, 31:6, 32:13, 32:22, 32:25, 45:13, 49:8, 51:12, 54:14, 64:5, 67:16, 67:18, 67:24, 78:8, 78:13, 79:2, 79:7, 79:13, 80:4, 85:1, 124:25, 125:6, 125:11, 126:6, 126:10, 135:25, 136:2, 136:10, 137:20, 139:18, 140:6, 141:3, 141:6, 141:11, 141:19, 142:17, 142:25, 143:7, 143:14, 143:23, 144:16, 144:18, 145:10, 145:14, 146:13, 147:17, 149:18, 149:23, 155:1, 155:14, 161:21, 161:25, 171:7
**soliciting** [1] - 48:15
**someone** [2] - 68:12, 76:11
**sometimes** [5] - 10:13, 44:25, 45:3, 70:17, 184:17
**somewhat** [1] - 184:18
**somewhere** [1] - 42:17
**son** [1] - 70:13
**soon** [4] - 67:17, 72:16, 75:6, 75:8
**sorry** [42] - 5:14, 6:4, 6:10, 9:18, 12:11, 17:16, 31:4, 34:6, 34:10, 42:13, 53:25,

58:11, 72:3, 74:17, 84:2, 85:3, 86:6, 89:2, 97:11, 102:17, 103:12, 104:21, 109:25, 110:2, 111:20, 114:10, 121:1, 123:3, 126:19, 137:25, 142:9, 142:11, 148:21, 158:18, 158:23, 160:19, 164:6, 164:24, 165:3, 166:2, 166:11, 167:3
**sort** [2] - 52:10, 182:6
**Source** [1] - 35:3
**SOUTHERN** [1] - 1:1
**space** [4] - 6:3, 6:5, 6:8, 6:12
**spaces** [1] - 6:15
**Spanish** [2] - 21:11, 74:5, 90:7, 90:11
**speakers** [1] - 71:20
**speaking** [5] - 45:18, 164:4, 164:8, 165:24, 166:1
**special** [10] - 44:18, 45:8, 52:3, 52:9, 52:10, 52:13, 52:15, 52:20, 52:23, 63:19
**specific** [4] - 7:21, 7:23, 54:23, 123:21
**specify** [1] - 118:5
**speculation** [6] - 43:17, 43:23, 46:20, 46:22, 49:22, 49:23
**speed** [1] - 184:11
**spend** [2] - 84:18, 170:5
**spent** [1] - 33:25
**spot** [2] - 9:14, 122:22
**spreadsheet** [12] - 28:16, 31:22, 32:3, 32:5, 32:6, 78:10, 78:12, 78:18, 78:23, 94:4, 94:10, 161:2
**spreadsheets** [3] - 149:13, 157:15, 157:18
**staff** [1] - 115:8
**staffing** [2] - 34:21, 35:1
**staggered** [1] - 15:11
**stamps** [1] - 35:8
**stand** [3] - 83:20, 147:10, 176:17
**stands** [3] - 24:14, 24:16, 142:13
**stared** [1] - 115:24
**start** [23] - 14:24, 15:1,

15:20, 15:23, 16:7, 17:25, 59:12, 60:15, 66:18, 66:21, 67:3, 77:9, 79:1, 102:15, 104:13, 104:18, 106:20, 124:20, 125:8, 126:20, 134:14, 148:8, 155:23
**started** [45] - 8:15, 8:16, 9:21, 12:1, 16:9, 36:9, 41:16, 44:7, 62:24, 63:13, 67:8, 74:7, 79:8, 79:10, 93:15, 101:23, 102:18, 102:19, 102:20, 102:22, 103:25, 105:6, 106:21, 107:6, 107:7, 110:6, 111:24, 112:16, 116:14, 123:3, 124:10, 134:22, 136:21, 152:8, 152:9, 167:18, 172:9, 172:25, 174:24, 175:15, 177:7, 177:9
**starting** [5] - 102:2, 102:14, 124:20, 157:7, 175:23
**State** [1] - 58:6
**state** [5] - 5:5, 85:11, 122:1, 147:10, 147:11
**statement** [35] - 29:17, 29:19, 30:6, 30:12, 30:19, 31:5, 32:12, 32:15, 32:23, 32:24, 75:4, 75:12, 80:2, 80:3, 117:3, 120:3, 120:4, 140:20, 142:16, 143:5, 144:2, 144:7, 144:21, 145:6, 145:25, 146:4, 146:8, 146:16, 146:17, 147:3, 147:6, 151:11, 151:13, 152:1, 154:12
**Statement** [1] - 74:1
**statements** [39] - 32:9, 33:4, 74:7, 74:13, 74:23, 119:24, 120:7, 137:8, 137:12, 137:14, 137:18, 137:22, 138:1, 138:12, 138:21, 139:1,

141:24, 143:17, 143:20, 144:5, 144:15, 144:19, 145:5, 145:24, 146:1, 146:21, 149:3, 149:6, 149:9, 149:10, 150:19, 155:13, 157:12, 157:16, 158:6, 159:4, 159:8, 163:9, 169:10
**STATES** [2] - 1:1, 1:12
**states** [3] - 85:13, 85:16, 85:17
**States** [1] - 185:23
**stay** [13] - 70:15, 70:17, 125:23, 129:13, 129:18, 130:6, 131:23, 132:1, 141:15, 177:17, 177:19, 177:22, 178:3
**stayed** [1] - 130:4
**Ste** [2] - 1:16, 1:23
**step** [2] - 22:15, 121:9
**STEPHANIE** [2] - 2:4, 185:23
**Stephanie_McCarn @flsd.uscourts. gov** [1] - 2:7
**still** [26] - 12:15, 13:5, 13:22, 14:9, 14:10, 28:1, 31:20, 31:22, 32:6, 45:6, 50:25, 63:24, 64:6, 64:9, 98:8, 108:9, 126:1, 130:3, 131:16, 141:18, 152:4, 159:16, 163:25, 164:1, 184:20
**stipulation** [1] - 169:11
**stood** [1] - 135:1
**stopped** [5] - 41:13, 41:14, 102:13, 106:22, 152:7
**streets** [1] - 174:21
**stricken** [1] - 18:14
**structure** [1] - 69:15
**study** [4] - 59:11, 59:14, 60:18, 101:24
**studying** [8] - 58:2, 59:7, 59:21, 59:25, 60:5, 63:24, 64:6, 93:7
**stuff** [1] - 184:12
**subscription** [1] - 11:2
**subtract** [2] - 99:14, 170:21

**suggested** [1] - 80:5
**suggestions** [1] - 65:4
**suing** [3] - 180:9, 181:3, 181:4
**summarized** [1] - 95:8
**summarizing** [1] - 182:7
**summary** [1] - 161:1
**Sunday** [1] - 172:2
**supervise** [3] - 64:19, 64:21, 115:13
**supervised** [1] - 20:18
**support** [1] - 65:10
**suppose** [2] - 53:2, 98:12
**supposed** [9] - 31:10, 33:9, 66:14, 69:25, 77:17, 90:15, 95:19, 114:12, 128:6
**supposedly** [3] - 91:6, 125:9, 153:13
**Suprani** [21] - 56:21, 91:11, 91:24, 91:25, 92:4, 92:18, 105:22, 105:24, 105:25, 106:3, 106:16, 106:18, 106:19, 106:20, 106:21, 107:6, 107:8, 113:1, 113:10, 113:11, 120:17
**surgery** [4] - 42:5, 89:16, 90:4, 133:1
**sustained** [14] - 36:19, 46:24, 47:18, 48:17, 54:18, 99:10, 100:15, 105:13, 108:18, 148:23, 149:20, 180:12, 181:6, 181:12
**sustaining** [1] - 182:8
**swear** [2] - 4:22, 55:25
**swearing** [1] - 108:24
**switch** [1] - 8:25
**switched** [2] - 8:22, 31:22
**sworn** [1] - 18:22
**symptoms** [1] - 130:3
**system** [17] - 7:17, 7:18, 7:19, 8:3, 8:4, 8:7, 27:1, 45:11, 45:18, 49:10, 50:4, 75:8, 75:22, 76:14, 76:20, 128:4
**systems** [3] - 7:21, 7:24, 127:13

**T**

**table** [1] - 15:9

**tagged** [1] - 75:1
**Tamayo** [1] - 42:18
**tax** [1] - 120:15
**taxes** [3] - 60:10, 106:18, 120:15
**teach** [1] - 8:3
**technique** [1] - 115:16
**teeth** [1] - 89:17
**temporarily** [3] - 22:16, 129:1, 185:15
**ten** [5] - 6:5, 55:6, 57:9, 128:21, 143:3
**ten-minute** [1] - 128:21
**terms** [1] - 11:7
**testified** [5] - 4:21, 34:12, 55:24, 121:19, 134:10
**testify** [1] - 66:8
**testifying** [3] - 48:16, 99:6, 133:21
**testimony** [12] - 16:3, 17:7, 17:17, 17:18, 22:14, 108:13, 108:23, 110:23, 111:4, 182:1, 182:9, 183:14
**Texas** [6] - 85:2, 85:6, 142:14, 147:12, 147:13, 147:15
**text** [1] - 21:17
**THE** [209] - 1:12, 1:14, 1:19, 3:3, 3:12, 4:3, 4:9, 4:12, 4:14, 4:16, 4:22, 4:23, 5:14, 6:10, 9:18, 12:11, 18:9, 18:10, 18:15, 22:6, 22:9, 22:14, 22:18, 22:20, 22:22, 31:25, 33:13, 34:6, 34:9, 34:13, 34:16, 35:14, 35:18, 36:3, 36:15, 36:19, 36:23, 36:24, 40:8, 40:11, 42:13, 43:18, 43:19, 43:25, 44:1, 44:22, 44:23, 46:21, 46:24, 47:18, 47:21, 48:14, 48:17, 49:24, 49:25, 50:7, 50:10, 50:12, 53:20, 53:22, 53:25, 54:3, 54:18, 55:1, 55:2, 55:4, 55:11, 55:13, 55:16, 55:20, 55:25, 56:1, 58:10, 58:13, 72:3, 72:7, 72:9, 74:17, 74:19, 84:2, 84:4, 85:3, 86:1, 86:4, 86:7, 86:10, 86:14, 86:17,

86:20, 86:22, 87:3, 88:8, 88:11, 88:14, 88:17, 88:19, 89:2, 90:1, 90:3, 94:25, 97:11, 97:12, 99:8, 99:10, 100:15, 101:18, 102:5, 103:9, 104:21, 104:23, 105:2, 105:13, 107:2, 107:4, 107:5, 107:10, 107:13, 108:3, 108:7, 108:17, 108:20, 108:22, 109:18, 109:21, 109:24, 110:24, 111:6, 111:20, 112:10, 112:12, 112:20, 112:23, 114:7, 114:18, 115:21, 117:4, 117:22, 117:23, 118:11, 118:12, 119:18, 120:1, 120:2, 120:12, 121:9, 121:12, 121:15, 121:20, 121:21, 128:20, 128:25, 129:5, 129:22, 142:9, 142:13, 148:21, 148:23, 149:20, 151:19, 156:20, 156:21, 158:13, 158:17, 158:19, 158:23, 159:1, 159:2, 162:17, 162:21, 164:6, 165:5, 165:6, 165:20, 169:15, 169:19, 169:21, 172:13, 172:14, 172:23, 173:6, 173:7, 173:19, 173:20, 174:9, 174:12, 175:6, 175:7, 178:19, 179:2, 179:10, 179:12, 179:25, 180:1, 180:12, 181:6, 181:12, 181:25, 182:19, 183:10, 183:17, 183:23, 184:1, 184:7, 184:10, 184:15, 184:24, 185:2, 185:11, 185:14
**theirs** [1] - 38:15
**themselves** [2] - 63:22, 76:23

**then..** [1] - 39:11
**therefore** [1] - 80:9
**Thirteenth** [2] - 2:5, 185:24
**thousand** [3] - 117:12, 152:14, 171:7
**threat** [2] - 48:20, 90:15
**threats** [2] - 91:3, 91:5
**three** [22] - 14:6, 38:1, 43:4, 77:20, 77:21, 77:22, 86:4, 86:7, 98:16, 128:3, 130:7, 140:22, 144:15, 145:5, 171:24, 171:25, 172:5, 179:7, 183:15
**three-day** [1] - 172:5
**throughout** [2] - 157:5, 175:20
**Thursday** [7] - 182:20, 183:11, 183:19, 184:21, 184:22, 185:3
**tinted** [1] - 7:6
**tired** [1] - 169:23
**title** [1] - 141:23
**today** [17] - 17:1, 17:18, 19:6, 86:4, 86:7, 109:8, 116:11, 117:8, 117:10, 118:2, 121:7, 169:18, 176:18, 179:6, 179:20, 181:16, 184:15
**together** [4] - 39:4, 40:19, 95:17, 104:16
**Tomayo** [2] - 81:21
**tomorrow** [10] - 181:15, 182:14, 182:21, 182:24, 183:3, 183:13, 183:18, 183:21, 184:25, 185:10
**took** [13] - 19:2, 19:6, 39:14, 40:5, 40:16, 80:15, 116:5, 116:9, 161:1, 161:3, 161:5, 161:14, 178:8
**top** [7] - 42:11, 42:16, 74:1, 82:1, 142:1, 142:11, 177:23
**tops** [1] - 103:6
**total** [12] - 32:22, 85:15, 85:16, 96:7, 98:20, 100:21, 114:5, 155:21, 163:3, 163:10, 175:3, 175:19
**totals** [1] - 80:19

**TOUSSAINT** [1] - 1:15
**toussaint@ fairlawattorney. com** [1] - 1:18
**towards** [1] - 94:1
**track** [3] - 28:7, 31:20, 140:17
**trade** [1] - 52:23
**train** [4] - 7:15, 7:25, 10:2, 63:16
**trained** [3] - 9:24, 50:16, 127:10
**training** [10] - 52:23, 53:1, 53:8, 63:3, 63:5, 102:18, 115:15, 127:8, 127:12, 127:15
**transaction** [1] - 27:5
**transcript** [1] - 108:1
**transcription** [1] - 185:19
**transferred** [1] - 164:1
**translate** [1] - 179:10
**translated** [1] - 107:5
**translation** [4] - 18:9, 21:11, 22:1, 32:1
**transparent** [2] - 7:4, 7:7
**transportation** [2] - 131:2, 131:5
**treated** [6] - 34:1, 34:3, 34:13, 34:15, 44:11, 44:13
**TRIAL** [1] - 1:11
**trial** [4] - 68:5, 119:18, 182:19, 183:19
**tried** [2] - 77:11, 77:23
**trip** [1] - 172:5
**Tripp** [1] - 1:19
**Tropp** [21] - 3:5, 3:6, 3:8, 3:10, 40:9, 52:5, 81:20, 101:22, 102:5, 103:10, 108:7, 109:19, 111:8, 111:21, 112:20, 115:21, 117:4, 117:23, 118:16, 119:19, 182:17
**TROPP** [115] - 1:19, 4:8, 33:15, 34:8, 34:14, 34:17, 35:15, 35:19, 36:4, 36:16, 36:20, 37:3, 38:19, 39:13, 40:3, 40:13, 41:21, 41:25, 42:2, 42:15, 43:20, 44:2, 44:24, 46:25, 47:19, 47:22, 47:23, 48:18, 50:1, 50:11, 53:24,

54:1, 54:4, 54:6, 54:19, 55:3, 73:25, 99:6, 99:9, 100:14, 101:20, 102:7, 103:7, 103:11, 103:14, 103:15, 104:24, 105:3, 105:5, 105:14, 107:16, 108:19, 108:21, 109:2, 109:3, 109:16, 109:20, 109:22, 109:25, 110:2, 110:4, 111:10, 111:23, 112:6, 112:14, 112:22, 112:24, 114:3, 114:8, 114:10, 114:21, 115:22, 115:23, 116:21, 116:24, 117:3, 117:7, 118:1, 118:13, 118:14, 119:15, 119:20, 120:6, 120:11, 148:20, 148:22, 149:19, 151:18, 156:19, 158:9, 158:15, 158:18, 158:21, 158:24, 165:4, 169:17, 169:20, 169:22, 170:2, 171:4, 172:15, 172:24, 173:8, 173:21, 174:14, 175:10, 178:22, 179:4, 179:14, 179:15, 180:3, 180:13, 181:7, 182:18, 183:7
**true** [2] - 77:1, 170:8
**trusted** [1] - 106:11
**truth** [11] - 17:11, 17:13, 18:23, 18:24, 19:1, 19:6, 56:14, 107:22, 108:25, 116:9, 178:11
**truthful** [2] - 114:23, 180:22
**try** [9] - 11:11, 75:9, 78:6, 86:12, 86:19, 176:4, 178:7, 178:14, 182:17
**trying** [5] - 78:5, 94:8, 107:11, 139:22, 184:5
**Tuesday** [2] - 40:17, 82:8
**turn** [4] - 71:23, 116:24, 125:10,

Delio Batista, et al., v. Avant Assurance, Inc. et al., 22-cv-22671-CMA

128:15
**TV** [5] - 177:17,
177:20, 177:22,
178:4, 179:18
**two** [32] - 14:5, 37:5,
45:1, 57:5, 57:6,
60:19, 67:20, 68:2,
70:19, 80:11, 92:14,
92:15, 95:17, 98:2,
123:14, 123:23,
132:9, 135:13,
135:17, 143:17,
143:19, 145:23,
146:1, 146:21,
164:22, 166:9,
166:10, 166:12,
167:6, 172:1, 179:5
**two-page** [1] - 68:2
**TX** [1] - 147:10
**type** [5] - 38:10, 47:3,
51:11, 51:25, 58:10
**types** [5] - 7:23, 52:18,
52:19, 58:13, 68:20

**U**

**U.S** [2] - 56:22, 56:25
**Uber** [4] - 91:19,
131:7, 131:8, 132:5
**ultimately** [1] - 61:14
**uncomfort** [1] - 90:12
**under** [12] - 18:22,
20:22, 42:1, 77:18,
92:18, 107:20,
116:8, 140:14,
147:20, 152:4, 185:9
**understood** [5] - 44:6,
77:4, 96:12, 115:25,
139:24
**unemployed** [1] -
170:14
**United** [1] - 185:23
**UNITED** [2] - 1:1, 1:12
**unless** [2] - 74:25,
117:5
**unnecessary** [2] -
184:18, 184:19
**untruthful** [2] -
114:24, 114:25
**unusable** [2] - 131:11,
131:20
**unusual** [1] - 124:22
**up** [57] - 4:14, 35:16,
35:23, 38:6, 38:13,
42:24, 48:22, 65:24,
67:2, 70:12, 71:10,
71:13, 72:11, 72:16,
77:18, 79:21, 80:6,
80:19, 84:6, 84:8,
89:18, 90:18, 95:17,

99:17, 102:10,
102:13, 103:16,
103:24, 111:9,
111:11, 111:13,
116:21, 119:15,
122:6, 131:8,
131:11, 132:5,
133:10, 139:12,
139:19, 140:8,
141:11, 141:21,
146:2, 155:20,
158:2, 159:15,
163:10, 168:2,
170:10, 170:12,
176:17, 178:14,
184:2, 184:8,
184:11, 184:13
**upload** [1] - 76:8
**users** [1] - 82:10
**uses** [2] - 45:19, 63:17
**usual** [1] - 88:5

**V**

**VALIENTE** [2] - 1:5,
121:18
**Valiente** [25] - 3:9,
24:22, 47:15, 51:16,
73:9, 121:14,
121:24, 122:1,
122:2, 129:9,
132:10, 140:15,
142:1, 150:1,
159:22, 160:19,
162:20, 162:24,
163:3, 163:15,
164:15, 167:1,
169:9, 169:14, 170:3
**vary** [1] - 175:25
**Vasquez** [2] - 64:14,
73:8
**Vega** [1] - 2:2
**Venezuela** [1] - 56:17
**verdict** [2] - 184:22,
185:1
**verified** [1] - 136:8
**verify** [1] - 50:3
**verifying** [1] - 65:13
**version** [1] - 74:4
**versus** [4] - 58:8,
79:13, 80:3, 185:8
**vice** [1] - 26:13
**view** [1] - 26:19
**violence** [1] - 48:19
**virus** [1] - 13:24
**volume** [1] - 71:5
**vs** [1] - 1:7

**W**

**W-2** [5] - 8:20, 8:22,
12:25, 16:22, 34:23
**W-9** [1] - 123:8
**wage** [1] - 44:4
**wages** [2] - 34:18,
101:10
**wait** [4] - 67:18, 73:16,
113:15, 183:4
**waiting** [4] - 4:17,
72:17, 112:21,
182:16
**walk** [3] - 162:24,
179:6, 184:3
**wants** [1] - 34:6
**warehouse** [6] -
170:9, 170:11,
170:25, 171:1,
171:6, 171:15
**wasted** [1] - 184:15
**watch** [5] - 177:17,
177:20, 177:22,
178:3, 179:18
**ways** [1] - 176:19
**website** [2] - 57:15,
83:20
**websites** [1] - 83:2
**Wednesday** [1] -
132:25
**week** [45] - 14:20,
16:15, 16:20, 39:25,
60:1, 60:5, 62:3,
62:15, 63:4, 67:13,
68:9, 70:5, 70:9,
70:10, 97:2, 97:7,
98:25, 99:12, 100:7,
100:10, 100:19,
102:24, 103:3,
103:5, 109:9,
109:12, 110:7,
110:17, 110:20,
148:19, 148:25,
150:24, 150:25,
151:2, 151:3, 153:9,
163:22, 164:5,
166:20, 166:21,
168:14, 182:23,
183:9
**weekend** [1] - 172:4
**weekends** [1] - 39:22
**weekly** [6] - 25:22,
26:9, 60:18, 93:21,
93:22, 93:24
**weeks** [25] - 60:17,
60:19, 63:24, 67:21,
93:6, 93:9, 96:24,
96:25, 98:23, 128:3,
130:7, 163:19,
163:21, 164:16,

165:1, 165:24,
166:3, 166:9,
166:10, 166:12,
167:12, 168:9,
168:10
**what'd** [1] - 73:3
**whatever's** [2] - 100:1,
100:2
**WhatsApp** [1] - 23:11
**wherein** [2] - 36:25,
40:25
**white** [1] - 59:18
**whole** [7] - 48:25,
66:16, 155:1,
159:12, 166:21,
175:20
**wife** [1] - 43:8
**window** [1] - 170:16
**wisdom** [1] - 89:17
**witness** [20] - 4:12,
4:18, 4:21, 22:6,
48:19, 48:20, 53:20,
55:13, 55:24, 90:11,
101:15, 104:25,
109:17, 119:19,
121:13, 121:19,
163:13, 169:21,
182:20, 184:10
**Witness** [3] - 22:16,
129:1, 185:15
**WITNESS** [33] - 4:22,
18:10, 34:16, 35:14,
36:24, 40:11, 43:19,
44:1, 44:23, 49:25,
55:2, 55:25, 58:13,
72:9, 84:4, 90:3,
97:12, 112:12,
114:18, 117:23,
118:12, 120:2,
121:20, 142:13,
156:21, 159:2,
165:6, 165:20,
172:14, 173:7,
173:20, 175:7, 180:1
**WITNESSES** [3] - 3:2,
3:3, 3:12
**witnesses** [3] - 86:4,
86:7, 184:2
**wood** [1] - 52:19
**word** [2] - 23:2,
136:14
**words** [2] - 170:13,
178:2
**worker** [3] - 8:17,
8:22, 14:5
**worksheets** [1] -
149:24
**workstations** [1] -
71:7
**worried** [1] - 168:6

**worth** [3] - 140:22,
152:14, 178:10
**wrap** [1] - 116:21
**written** [5] - 9:21,
69:21, 123:2, 123:3,
123:6
**wrote** [9] - 20:5,
20:12, 22:2, 22:4,
82:20, 150:14,
152:25, 154:10,
154:13

**Y**

**year** [14] - 41:15,
66:23, 89:25, 90:2,
92:11, 92:14,
122:12, 155:1,
155:24, 157:5,
166:18, 166:21,
175:20
**years** [1] - 43:4
**yellow** [1] - 157:15
**yesterday** [3] - 56:11,
80:19, 154:20
**yourself** [14] - 8:15,
25:1, 36:21, 38:15,
44:7, 56:6, 63:19,
73:2, 102:8, 104:5,
105:10, 111:25,
134:25, 184:3
**yourselves** [1] - 36:17

**Z**

**Zelle** [4] - 60:6, 60:7,
60:8, 60:9
**Zoom** [4] - 153:12,
153:17, 154:16,
154:18