```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                     CASE NO. 22-cv-22671-CMA
 3

 4    DELIO BATISTA, CARLOS LOPEZ,     Miami, Florida
      MARIANA LOPEZ and RAFAELA
 5    VALIENTE,                        July 12, 2023

 6            Plaintiffs,              8:21 a.m. to 5:16 p.m.

 7        vs.                          Courtroom 13-3

 8    AVANT ASSURANCE, INC.,           (Pages 1 to 176)
      REINIER CORTES and ANDREA
 9    GONZALEZ QUINTERO,

10            Defendants.
      _____

11                       JURY TRIAL - DAY 3
12          BEFORE THE HONORABLE CECILIA M. ALTONAGA,
                CHIEF UNITED STATES DISTRICT JUDGE
13

14    APPEARANCES:

      FOR THE PLAINTIFFS:    BRIAN H. POLLOCK, ESQ.
15                           TOUSSAINT M. CUMMINGS, ESQ.
                             FairLaw Firm
16                           135 San Lorenzo Ave, Ste 770
                             Coral Gables, FL 33146-1878
17                           (305) 230-4884
                             brian@fairlawattorney.com
18                           toussaint@fairlawattorney.com

19    FOR THE DEFENDANTS:    DANIEL E. TROPP, ESQ.
                             Law Offices of Daniel E. Tripp, Esquire
20                           5750 Collins Ave, Apt 4A
                             Miami Beach, FL 33140-2316
21                           (305) 814-2035
                             dantropp@bellsouth.net
22
                             SANTIAGO A. CUETO, ESQ.
23                           Santiago A. Cueto
                             2100 Ponce De Leon Blvd, Ste 1250
24                           Coral Gables, FL 33134-5267
                             (305) 777-0377
25                           sc@cuetolawgroup.com
```

1    APPEARANCES CONTINUED:

2      Also Present:          Carmen Barros, Interpreter

3

       REPORTED BY:           STEPHANIE A. McCARN, RPR
4                             Official Court Reporter
                              400 North Miami Avenue
5                             Thirteenth Floor
                              Miami, Florida 33128
6                             (305) 523-5518
                              Stephanie_McCarn@flsd.uscourts.gov
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           <u>I N D E X</u>

2                <u>WITNESSES</u>

3

<u>WITNESSES FOR THE PLAINTIFFS:</u>                    <u>Page</u>

4

**Rafaela Valiente**

5    Cross-Examination (Cont'd.) by Mr. Tropp          **9**
     Redirect Examination by Mr. Cummings             **20**

6    Recross Examination by Mr. Tropp                 **29**

**Delio Batista**

7    Direct Examination by Mr. Cummings               **32**
     Cross-Examination by Mr. Tropp                   **55**

8    Cross-Examination (Cont'd.) by Mr. Tropp         **71**
     Redirect Examination by Mr. Cummings            **101**

9  **Carlos Lopez Alcala**
     Direct Examination by Mr. Pollock               **106**

10   Cross-Examination by Mr. Tropp                  **127**
     Redirect Examination by Mr. Pollock             **143**

11

12

13   <u>WITNESSES FOR THE DEFENDANTS:</u>                 <u>Page</u>

14                                                     **--**

15

16   <u>EXHIBITS IN EVIDENCE</u>          <u>IDENTIFIED</u>    <u>ADMITTED</u>

17   **Plaintiffs' Exhibit No. 17**          116          **--**

18

19

20                <u>MISCELLANEOUS</u>

21                                                    <u>Page</u>

22   Proceedings.......................................   **4**
     Court Reporter's Certificate.....................   **157**

23

24

25

```
 1              (The following proceedings were held at 8:21 a.m.)

 2            COURT SECURITY OFFICER:  All rise.

 3            THE COURT:  Good morning.

 4            ALL PARTIES:  Good morning.

 5            THE COURT:  Are the jury instructions in final form?

 6            MR. POLLOCK:  They are not, Judge.

 7            THE COURT:  They are not.  All right.  I will let you

 8    keep working on that, unless you need my intervention.

 9            MR. POLLOCK:  I think -- I'd appreciate that.  I think

10    it will go a lot quicker.  I sent a proposed -- an e-mail last

11    night.  It didn't have -- let me slow down.

12            I sent an e-mail last night because I saw the -- some

13    of the highlights, but because of the gray in the columns, I

14    didn't pick up all of the revisions.

15            THE COURT:  Uh-huh.

16            MR. POLLOCK:  So I sent over some of the revisions,

17    what I propose we take out, how we change some language, and I

18    didn't hear back.  I am going over with Mr. Tropp now about

19    which version we are even talking about.  So I think if we kind

20    of look at the instructions, I have been working on them while

21    I have been waiting for Mr. Tropp to figure out which version

22    we are talking about to kind of skinny them and have them

23    tailored a little bit more, but I think if we all work

24    together, we can get this done a lot quicker.

25            THE COURT:  Tell me where your issues are.  You can be
```

 1   seated.

 2          MR. CUETO:  So my clients are in the conference room

 3   just behind us.

 4          THE COURT:  I'm sorry?

 5          MR. CUETO:  My clients are in the conference room.

 6          THE COURT:  Well, they should be here, should they

 7   not?  Let me just grab my phone so I can open this computer.

 8      (Pause in proceedings.)

 9          THE COURT:  There's a multifactor authentication.

10      (Pause in proceedings.)

11          THE COURT:  All right.  On Page 5, the first sentence

12   made no sense.

13          MR. POLLOCK:  I took a look at that, Your Honor, and

14   what I think it should say, If you find that Defendants failed

15   to keep adequate time and pay records for Plaintiffs and that

16   Plaintiffs performed work for which they should have been paid

17   in full.

18          THE COURT:  All right.

19          MR. POLLOCK:  "Which they."

20          THE COURT:  For which they should have been paid.

21          MR. POLLOCK:  Plaintiffs may recover a reasonable

22   loss.  And I think it was that Plaintiffs performed.

23          THE COURT:  Any objection from the Defendants?

24          MR. TROPP:  No.

25          THE COURT:  All right.  Next issue appears?

```
 1              MR. CUMMINGS:  Excuse me, Your Honor.  Ms. Valiente
 2   has to use the bathroom.  May she be excused?
 3              THE COURT:  Yes.
 4              The next issue appears on Page 8.
 5              MR. POLLOCK:  So that makes sense to get rid of.
 6              THE COURT:  What are we getting rid of?
 7              MR. POLLOCK:  "It is not always clear."
 8              THE COURT:  Through?  The next page, the paragraph
 9   that's highlighted in yellow?  "Consideration of all
10   circumstances."
11              MR. POLLOCK:  Yes.
12              THE COURT:  Any objection?
13              MR. TROPP:  No, Your Honor.
14              THE COURT:  All right.
15              MR. POLLOCK:  I think this is where it gets a little
16   funky.
17              THE COURT:  I think all of these thrown-in statements
18   of law have very little relevance.
19              MR. POLLOCK:  I'm sorry?
20              THE COURT:  All these statements of law are not
21   connected to anything.
22              MR. POLLOCK:  I don't think they should be there.  I
23   think they should be moved around --
24              THE COURT:  Right.  So I am relying on you folks to
25   move them around.
```

Proceedings
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
1              MR. POLLOCK:  That's what I was looking at.

2              THE COURT:  Right.

3              MR. POLLOCK:  I think we take a version of what's here

4    and cobble it into what -- 4.14 under overtime claim.

5              THE COURT:  Why don't you move it all around and then

6    show it to Defense counsel.  How's that?

7              MR. POLLOCK:  Okay.  That works.  Can we get a Word

8    version of --

9              THE COURT:  Of this?

10             MR. POLLOCK:  Of that.

11             THE COURT:  Sure.

12             And then recordkeeping at the bottom of Page 11.

13             MR. POLLOCK:  Agreed.  It's redundant and we can just

14   move the -- that last sentence that says if Plaintiffs weren't

15   employees, Defendants didn't have to keep the records, I think

16   that was what Your Honor said should be included.  "The

17   Defendants are not required to maintain records" --

18             THE COURT:  "For independent contractors."  That's the

19   only thing that should stay.  But that needs to be moved up to

20   the prior instructions involving recordkeeping.

21             MR. POLLOCK:  Yes.

22             THE COURT:  All right.  Let me take this out and you

23   can move that around as well.

24             And then the breach of contract claim.

25             MR. POLLOCK:  I think that has to be revised just
```

1    against Avant.  I caught that in the verdict form as well.

2    Under the breach of contract, it says Defendants, but it should

3    say Avant Assurance, Inc., in the verdict form.

4             THE COURT:  Right.

5             MR. POLLOCK:  And then -- so this should say instead

6    of "the parties" entered into a contract, it would be "they"

7    entered into a contract with Avant Assurance.

8             THE COURT:  So I will let you all rework the breach of

9    contract instructions, and I think they are repetitive.  But

10   you can take a look at that.  And then there are all these

11   things at the end sort of tacked on.

12            All right.  So let me have this e-mailed to you and

13   have you make the changes, Mr. Pollock, and just share that

14   with Defense counsel.  I will hear any objections Defense

15   counsel has.  I think that is the most efficient course because

16   you are taking way too long.

17            MR. POLLOCK:  Okay.  I'll try to do that and then I

18   can shoot them over.  That way if I can just sit and work, it

19   may be a little bit quicker.

20            THE COURT:  I will ask my courtroom deputy to e-mail

21   this to both sides.

22            MR. POLLOCK:  Thank you.

23            THE COURT:  And you can work on moving things, cutting

24   things and showing them to Defense counsel and giving me a

25   final set, as well as on the verdict.

Cross-Examination (Cont'd.) Rafaela Valiente
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

9

```
 1            MR. POLLOCK:  Okay.

 2            THE COURT:  Okay?  Any questions?

 3            MR. POLLOCK:  No, Judge.

 4            THE COURT:  And please don't leave the courtroom until

 5    they are set.  If you need me for anything, I am in my

 6    chambers.  Thank you.

 7            ALL PARTIES:  Thank you.

 8            COURT SECURITY OFFICER:  All rise.

 9       (A recess was taken from 8:29 a.m. to 9:50 a.m.)

10            COURT SECURITY OFFICER:  All rise.

11            THE COURT:  Let's bring the jury in, please.

12            COURT SECURITY OFFICER:  Please remain standing for

13    the jury.

14            THE COURT:  Let's bring the witness back to the

15    witness stand, please.

16       (The jury entered the courtroom at 9:51 a.m.)

17            THE COURT:  Good morning, ladies and gentlemen, and

18    welcome back.

19            Please proceed.

20                    RAFAELA VALIENTE,

21       a witness for the Plaintiff, previously sworn,

22    testified as follows:

23                 CROSS-EXAMINATION (Cont'd.)

24    BY MR. TROPP:

25    Q.  Hi, Ms. Valiente.
```

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 10 of
176
Cross-Examination (Cont'd.) - Rafaela Valiente                10
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1   A.   Good morning.

 2   Q.   A few more questions.

 3        So how long have you been licensed as -- for insurance?

 4   A.   Since 2019.

 5   Q.   And how many -- what are those licenses?

 6   A.   I have a license for medical insurance and also life

 7   policies -- life insurance.

 8   Q.   Do you need a special license to work with CMS for

 9   marketplace?

10   A.   No.

11   Q.   You don't have to be approved with CMS?

12   A.   Well, yes, because if I am not an insurance agent, then it

13   doesn't make any sense.

14   Q.   Okay.  And did you have a contract with the Lincoln

15   Heritage?

16   A.   Correct.

17             MR. CUMMINGS:  Objection, relevance.

18             THE COURT:  Overruled.

19   BY MR. TROPP:

20   Q.   What was -- what was that contract about?

21   A.   I used to sell life insurance for final expenses.

22   Q.   And did you sell those policies for Lincoln Heritage to

23   some of Avant's customers?

24             MR. CUMMINGS:  Objection, relevance.

25             THE COURT:  Overruled.
```

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 11 of 176

Cross-Examination (Cont'd.) - Rafaela Valiente
July 12, 2023                                                          11
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1            THE WITNESS:  I didn't understand the question.
 2  BY MR. TROPP:
 3  Q.  Did you also sell some of those life insurance policies
 4  from Lincoln Heritage to some of the Avant customers?
 5  A.  No, of course not.
 6  Q.  But you were selling those life insurance policies also
 7  while working with Avant?
 8  A.  Avant, yes.
 9  Q.  And who -- what other -- were you selling any other
10  policies from other insurance companies while working with
11  Avant besides Lincoln Heritage?
12  A.  Yes.
13  Q.  Which others -- what others?
14  A.  Life insurance for final expenses.
15  Q.  Sorry?
16  A.  Final expenses.
17  Q.  Final expenses?
18  A.  Yes, correct.
19  Q.  And any other companies?
20  A.  No.
21  Q.  Okay.  Now, when you worked at Combined, Combined only paid
22  you -- and that was the insurance company you worked at before
23  Avant?
24            MR. CUMMINGS:  Objection, relevance and this violates
25  -- the testimony elicits --
```

1          THE COURT:  Sustained.  Sustained.

2    BY MR. TROPP:

3    Q.  Now, while -- for the time -- for 2021 and 2022, did you

4    file your taxes?

5    A.  Of course I did.

6    Q.  And you filed as being self-employed as an independent

7    contractor?

8          MR. TROPP:  I am asking her if she filed her taxes as

9    an independent contractor with a 1099.

10         THE WITNESS:  Yes.

11   BY MR. TROPP:

12   Q.  And did you also claim your business, being self-employed

13   by your business -- what was the name of your company?

14   A.  Valiante Insurance.

15   Q.  And you're in -- you're the president of Valiante

16   Insurance?

17   A.  Yes.  Presently, I am the only person in the company.

18   Q.  And for -- for the time that you were working for Avant,

19   you are getting paid through your company?

20   A.  Yes.

21   Q.  And when you filled out your taxes for your company, and

22   you being self-employed, did you claim deductions for expenses

23   for your business?

24   A.  Yes.

25   Q.  One of them was for -- you had some computer upgrades?

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 13 of
176
Cross-Examination (Cont'd) - Rafaela Valiente          13
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1    A.   What do you mean?

 2    Q.   What were the deductions that you claimed that you needed

 3    for the use of your business?

 4    A.   I don't do that.  That is prepared by -- prepared by an

 5    accountant.

 6    Q.   Your accountants prepared that for you?

 7    A.   Yes.  The accountant that I use for the taxes, yes.

 8    Q.   Do you remember claiming mileage?

 9    A.   Of course.

10         MR. CUMMINGS:  Objection, assumes facts not in

11    evidence.

12         THE COURT:  Overruled.

13    BY MR. TROPP:

14    Q.   Software?

15    A.   No.

16    Q.   What other -- what do you need to do your business, what

17    are some of those things?

18    A.   For the business?

19    Q.   Yes.

20    A.   Well, for my business, I did tolls and also the maintenance

21    for the vehicle that I use to go back and forth to my office.

22    Q.   Okay.  And what else?

23    A.   Clothing expenses and administration ones.

24         THE INTERPRETER:  The interpreter's correction.  Food

25    expenses.
```

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 14 of 176

Cross-Examination (Cont'd.) - Rafaela Valiente
July 12, 2023                                                        14
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   BY MR. TROPP:

2   Q.   Okay.  How many, more or less, of the life insurance

3   policies were you able to sell around 2020?

4   A.   What is the question, sir?

5   Q.   Well, between 2020 to 2022, for those two years, more or

6   less, how many other insurance policies, like life insurance,

7   did you sell other than the ones for Avant?

8   A.   Well, not many, because I didn't work for a long time, only

9   for a few months.

10  Q.   Okay.  Now, yesterday we clarified through January of 20-

11  -- the beginning of 2021, you were at -- you were working at a

12  warehouse for 15 to 20 days.

13          THE INTERPRETER:  From 15 to?

14          MR. POLLOCK:  15 to 20 days she did not work for

15  Avant, she worked at a warehouse.  I'm sorry, in January of

16  2021, she said that she worked 15 to 20 -- 15 to 20 days for a

17  warehouse.

18          THE WITNESS:  Yes.

19  BY MR. TROPP:

20  Q.   Could it have been 26 days?

21  A.   No.

22  Q.   How do you -- how do you know?

23  A.   Because I was working about two weeks only.

24  Q.   And then for November, when you said that you went to Cuba

25  and Jamaica for three days, was that for two weeks, 14 days?

Cross-Examination (Cont'd.) - Rafaela Valiente
July 12, 2023                                              15
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1   A.  I worked at the warehouse in January of 2021, and my trip

 2   was at the end of that year.  I don't understand.  Are you

 3   trying to add up the days I did not work?

 4   Q.  I am saying in November, in November of 2020, when the

 5   marketplace national distribution started, you said that you

 6   were out of the country for three days in November?

 7   A.  2021 I was working at Apatch Insurance (phonetic).

 8   Q.  2020, November of 2020, you went -- you said that you went

 9   to Cuba and Jamaica?

10   A.  No, it was not in 2020.

11   Q.  When did you go?

12   A.  It was 2021.

13   Q.  And what -- when was that?  When was that period?  When did

14   you go to Jamaica and Cuba?

15           MR. CUMMINGS:  Objection, asked and answered.

16           THE COURT:  Overruled.  Could you use the microphone,

17   Mr. Tropp?

18           MR. TROPP:  Yes.

19       (Pause in proceedings.)

20           MR. TROPP:  Do you want me to repeat the question?  I

21   just want to know when she went to Cuba and Jamaica, what were

22   the dates, more or less.

23           THE WITNESS:  I don't remember exactly.

24   BY MR. TROPP:

25   Q.  Was it in January, maybe?
```

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 16 of 176

Cross-Examination (Cont'd.) - Rafaela Valiente
July 12, 2023                                    16
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   A.   No.

2   Q.   Not in November?

3   A.   I don't remember.

4   Q.   And I do want to ask you one more time, when you filed your

5   Schedule C itemized deductions for being an independent

6   contractor in 2021 and 2022, did you -- did you ask for a

7   deduction for a computer?

8   A.   Yes.

9   Q.   Okay.  Thank you.  I wanted to ask you that.

10      And then for both years?  For both years?

11  A.   No, just one time.  Because I just bought the computer one

12  time.  I did it one time.

13  Q.   Okay.  And that was for 2021 -- which year?

14  A.   For 2021.

15  Q.   Okay.  And I know it was a long time ago, so I'm not trying

16  to trick you, I'm trying to see if I can help you with your

17  memory.

18      Would it help you to remember that in November of 2020, you

19  went to Cuba to sell your mom's house?

20  A.   I went to?

21          MR. TROPP:  She went to Cuba to sell her mother's

22  house.

23          THE WITNESS:  Yes.

24  BY MR. TROPP:

25  Q.   And how long did that take?

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 17 of
176
Cross-Examination (Cont'd.)  Rafaela Valiente                    17
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  A.  Well, I just went to see because she was the one that was

2  going to do the whole operation.  So I just went there to see

3  it.

4  Q.  Okay.  That's good enough.

5      And then, would you agree that when you started working for

6  Avant and Reinier, for the time that you -- that November when

7  you started, would you agree Reinier tried to help you by

8  giving you an advance?

9        MR. CUMMINGS:  Objection, mischaracterizing the

10  evidence.

11        THE COURT:  Overruled.

12  BY MR. TROPP:

13  Q.  Would you agree that he was nice and tried to help you by

14  giving you an advance?

15  A.  Well, the advance that I got, that was in 2021, it was in

16  January, and he gave me an advance on the commissions that I

17  was going to receive once they were paid.  And at the end of

18  2021, he give me an advance of $15,000 for the commissions that

19  I was going to get in 2022, but that was his decision.

20      Well, he asked me whether that was okay to give me the

21  advance, and I said, No.  I imagine that he did so, so that he

22  would have a tax advantage.  But it is not because I asked for

23  it.

24  Q.  So you are saying that he paid you this advance not because

25  he was being nice to help you, but for his own tax advantage?

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 18 of
176
Cross-Examination (Cont'd.)   Rafaela Valiente
July 12, 2023                                                                                    18
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1   A.   For him, of course.

 2   Q.   Okay.  Are you working now still as -- selling insurance?

 3   A.   Yes.

 4   Q.   As an independent contractor also?

 5            MR. CUMMINGS:  Objection, relevance.

 6            THE COURT:  Overruled.

 7            THE WITNESS:  Yes.

 8   BY MR. TROPP:

 9   Q.   Okay.  And tell me, as an independent -- I'm sorry.

10        As a insurance agent, would you consider yourself to have

11   any -- like a skill, you have to be good at it?

12   A.   Of course I do.

13   Q.   You have to be very patient?  Patience?

14   A.   Well, not patience, but yes, you have to give good service

15   to the client.

16   Q.   And you know how -- you have to know how to answer the

17   questions?

18   A.   Well, the questions are always linked to the insurance

19   plans and you have to explain those to the client.

20   Q.   Okay.  And now -- who are you working for now, selling

21   insurance for?

22            MR. CUMMINGS:  Objection, relevance.

23            THE COURT:  Overruled.

24            THE WITNESS:  I'm working independently.

25
```

1  BY MR. TROPP:

2  Q.  And what do you mean by that?

3  A.  That I look for my clients and I sign them up.

4  Q.  And how do you find your clients?

5  A.  Well, I get referrals from the clients I already have; they

6  refer me to friends and family members.

7  Q.  Do you get any clients from -- from, um, Carlos Lopez's

8  company?

9  A.  No, not at all.

10  Q.  How about from Mariana?

11        THE INTERPRETER:  Repeat it.

12  BY MR. TROPP:

13  Q.  How about from Mariana?

14  A.  Neither.

15  Q.  Have you ever worked for their companies?

16  A.  No.

17  Q.  Okay.  So you're -- you're an independent contractor, an

18  independent agent now, which is what you have been since you

19  started, since you've become a licensed agent, correct?

20  A.  Yes.

21  Q.  Thank you.  Thank you.  Okay.  Thank you very much.

22        THE COURT:  Redirect examination?

23        MR. CUMMINGS:  Yes, Your Honor.

24

25

```
 1                      REDIRECT EXAMINATION

 2   BY MR. CUMMINGS:

 3   Q.  Ms. Valiente, your claim in this case is not that

 4   Mr. Cortes is a mean person, is it?  Your claim --

 5             THE INTERPRETER:  Could you please speak in the mic?

 6   Thank you.

 7        (Pause in proceedings.)

 8   BY MR. CUMMINGS:

 9   Q.  Ms. Valiente, you are not claiming that Mr. Cortes is a

10   mean person, that's not what this lawsuit is to you, is it?

11             MR. CUMMINGS:  You can't hear what I'm saying?

12             THE INTERPRETER:  No.

13             MR. CUMMINGS:  Can you hear me?

14             THE INTERPRETER:  No.

15             MR. CUMMINGS:  You cannot hear me?

16             THE INTERPRETER:  I can hear you now, yes.

17             MR. CUMMINGS:  Can you please ask my client --

18             THE COURT:  Please translate the question.

19             Ms. Valiente, your claim in this case is not that

20   Mr. Cortes is a mean person, is it?

21             THE WITNESS:  I'm not evaluating his personal traits.

22   BY MR. CUMMINGS:

23   Q.  Instead, you are claiming that Mr. Cortes and his company

24   did not pay you the money you're owed, correct?

25   A.  Well, in the sense of payments for work that had been
```

 1    performed.

 2    Q.   Now, Mr. Tropp asked you a lot of questions about taxes.

 3    Did Avant issue you a 1099 tax document for the money they paid

 4    you?

 5    A.   In 2021, yes.

 6    Q.   And what about in 2022?

 7    A.   He never sent that to me.

 8    Q.   Whose idea was it for you be paid by a 1099?

 9    A.   Mr. -- from Mr. Reinier Cortes.

10    Q.   Did you ever go to Mr. Cortes and say, Hey, pay me as a

11    1099 contractor?

12    A.   No.

13    Q.   And why did Mr. Cortes pay you as a 1099 contractor?

14    A.   Well, the only document I filled out when I started working

15    there was a W-9 which they use as a 1099 toward payment.

16    Q.   And then you were also asked about some deductions that you

17    take on your taxes.  Did you rely on your accountant to list

18    your deductions?

19    A.   Well, I lied to the accountant.

20    Q.   I didn't say anything about lying.  I just asked you, did

21    you rely, rely, rely on your accountant to list your

22    deductions?

23    A.   Well, because the accountant is the one who prepared the

24    taxes, I just told him the expenses I had.

25    Q.   Now, yesterday, do you remember Mr. Trump asking you about

Redirect Examination - Barbara Varrichio
July 12, 2023                                                                22
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   claiming -- I'm sorry, Mr. Tropp.  I apologize.

2       Do you remember Mr. Tropp asking you about claiming

3   overtime in this case?

4   A.   Correct.

5   Q.   And he asked you why you were suing Mr. Cortes for not

6   paying overtime; do you remember that?

7   A.   Yes, correct, I remember the question.

8   Q.   Okay.  And Mr. Tropp read a part of your deposition where

9   you said no, you are not claiming overtime; do you remember

10  that?

11  A.   I didn't say at the deposition that I was not claiming

12  extra hours.  He just asked me if I was going to renounce the

13  bonus and also to -- and the commissions, not to repay the

14  commissions and just the extra hours.

15  Q.   So yesterday do you remember having a conversation with

16  Mr. Tropp about whether or not you felt you were owed overtime?

17  Just yes or no.

18  A.   Yes, of course.

19  Q.   All right.  And when Mr. Tropp took your deposition back in

20  June, did he also ask you the following questions -- and I'm

21  reading from your deposition at Page 66, Line 25 here.

22      Actually, I apologize.  I need my glasses, which I have.

23          MR. TROPP:  I would just object on predicate, unless

24  we could stipulate to what the deposition --

25          MR. CUMMINGS:  I am not asking to put the deposition

```
 1    in evidence.

 2              THE COURT:  Overruled.

 3              MR. CUMMINGS:  Page 66, Line 55.

 4              "QUESTION:  But" --

 5              From Mr. Tropp.

 6              "But you are suing him for overtime?"

 7              And your answer:  "That was because toward the end, he

 8    would treat us as if we were W-2 employees.

 9              "QUESTION:  So" --

10              THE COURT:  One second, we have an interpreter, unless

11    she has it.

12              THE INTERPRETER:  Could you give me a copy of what

13    you're reading?

14              MR. POLLOCK:  Sure.

15              Your Honor, may I?

16              THE COURT:  Yes, please.

17              MR. POLLOCK:  You are going to need your reading

18    glasses, my version is very small.

19              THE INTERPRETER:  No, no, I don't need reading

20    glasses.

21              MR. CUMMINGS:  I also apologize, I forgot, you are not

22    the interpreter from yesterday, so I think you're kind of

23    catching up on what's going on in this case.

24         (Pause in proceedings.)

25              MR. CUMMINGS:  Madam interpreter, are you ready?
```

1              THE INTERPRETER:  Yes, I am.

2      BY MR. CUMMINGS:

3      Q.  All right.  So, Ms. Valiente, on -- I apologize, I said

4      June.  But do you remember taking a deposition in this case on

5      May 30th, 2023, correct?

6      A.  Of course.

7      Q.  And Mr. Tropp asked you certain questions on that day,

8      correct?

9      A.  Yes.

10     Q.  All right.  Now, as it relates to the overtime, as he was

11     discussing with you yesterday, started on Page 66 at Line 20,

12     Mr. Tropp's question:

13              "Okay.  Why are you suing Reinier for not paying

14     overtime?"

15              And then your answer, "I'm not suing him for not

16     paying overtime.  I am suing him for a bonus that I never

17     received that he should have paid me and he never paid me the

18     bonus."

19              And then Mr. Tropp's question at Line 25:  "But you

20     are suing him for overtime?"

21              Moving down to Page 67, Line 2, your answer was:

22     "That was because towards the end, he would treat us as if we

23     were W-2 employees."

24              THE INTERPRETER:  That was Line 2?

25              MR. CUMMINGS:  Page 67, Line 2.

 1              "ANSWER:  That was because at the end, he would treat

 2     us as if we were W-2 employees."

 3              THE COURT:  Why don't you approach and show her,

 4     please.

 5              MR. CUMMINGS:  Okay.

 6          (Pause in proceedings.)

 7              THE WITNESS:  Yes.

 8     BY MR. CUMMINGS:

 9     Q.  Line 4 on the same page, 67:

10              "QUESTION:  So you are aware that you are suing him

11     for overtime?"

12     A.  Yes.

13     Q.  And your answer was, "Correct."

14          Do you remember giving those answers to Mr. Tropp on May

15     30th?

16     A.  Yes.

17     Q.  And then, do you remember on that same day during that

18     deposition, after Mr. Tropp asked you some questions, do you

19     remember me asking you some questions also?

20     A.  That other questions were asked, yes.

21     Q.  And then on Page 107, at Line 12, I asked you -- I

22     apologize, on Line 13, Page 107:

23              "If you are entitled to overtime because you worked at

24     Avant, do you want the money that you are owed for overtime?"

25              And then your answer at Line 16:  "But of course."

Case 1:22-cv-22671-CMA   Document 123-3   Entered on ELSD Docket 09/21/2023   Page 26 of
176                                                                                              26
Redirect Examination of Barbara Valiente
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    A.   Yes.

2    Q.   Do you remember giving those answers?

3    A.   Yes.

4    Q.   All right.  Now, just so we can move along here, I want to

5    finish up with you from yesterday.  And we were in the process

6    of filling out your worksheet, which is now complete.

7         Ms. Valiente, did you have time --

8              MR. TROPP:  Your Honor -- I'm sorry, objection,

9    objection as to scope.

10             THE COURT:  We addressed this.  He indicated he would

11   go into this on redirect.

12             MR. TROPP:  Oh, okay.

13             THE COURT:  Was this document shared with you?  Was

14   this document shared with you, Mr. Tropp?

15             MR. CUETO:  We haven't seen it.

16             THE COURT:  Why don't you show Defense counsel?

17             MR. CUMMINGS:  No problem.  I sent it to them this

18   morning.

19             THE COURT:  It was sent to you this morning.

20        (Pause in proceedings.)

21   BY MR. CUMMINGS:

22   Q.   All right.  So, Ms. Valiente, did you have an opportunity

23   to finish completing the calculations that we were going over

24   yesterday?

25   A.   Correct.

1   Q.  All right.  And so for the 2020 to 2021 open enrollment

2   period, how much total overtime are you saying you were

3   entitled to?

4   A.  894.40.

5   Q.  And for the 2021 to 2022 open enrollment period, how much

6   total overtime are you saying you are entitled to?

7   A.  $12,404.49.

8   Q.  And those numbers are based on the commission statements

9   that you received from Avant Assurance?

10  A.  For overtime.

11  Q.  Correct.

12      Now, when -- after the open enrollment period in 2021, did

13  you still work overtime at Avant?

14  A.  Yes.

15  Q.  And what hours did you work at Avant when it was not the

16  open enrollment period?

17  A.  How many hours?  Twenty hours per week.

18  Q.  And you are saying that you worked 20 overtime hours per

19  week?

20  A.  Correct.

21  Q.  And is that because you were working from 9 a.m. to 9 p.m.

22  every day?

23  A.  Correct.

24  Q.  And by every day, I mean Monday through Friday?

25  A.  Correct.

Case 1:22-cv-22671-CMA   Document 123-3   Entered on ELSD Docket 09/21/2023   Page 28 of
176
Redirect Examination - Barbara Valdivieso
July 12, 2023                                                                28
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   Q.  And so for the 2021 year which was not open enrollment

2   period -- for the time that was not open enrollment, how much

3   money are you owed in overtime?

4   A.  During open enrollment or outside that time?

5   Q.  Outside that time.

6   A.  12,002.

7   Q.  And then yesterday we also discussed that in 2022, after

8   the open enrollment period, you worked overtime as well; is

9   that correct?

10  A.  Correct.

11  Q.  But you only worked overtime for one month, in February of

12  2022?

13  A.  Correct.

14  Q.  Could you please explain to the jury -- well, let me go

15  back for a second.

16      You didn't stop working at Avant until June of 2022, right?

17  A.  Correct.

18  Q.  Because that's when Mr. Cortes fired you?

19  A.  Correct.

20  Q.  However, you did not work overtime from March 2022 to June

21  2022, right?

22  A.  Correct.

23  Q.  So for the month of February 2022, how much overtime are

24  you claiming?

25  A.  $1,667.20.

Recross Examination - Rafaela Valience
July 12, 2023                                                    29
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   Q.   Now, your -- are you also making a claim for the

2   commissions that Avant owes you?

3   A.   Correct.

4   Q.   And we already talked yesterday and said that you estimated

5   that you're owed about $2,000 more per month than what you were

6   actually paid; is that right?

7   A.   Correct.

8        (Pause in proceedings.)

9        MR. CUMMINGS:  No further questions.

10       THE COURT:  Proceed, please.

11                   RECROSS EXAMINATION

12   BY MR. TROPP:

13   Q.   It's just a point we want to clarify and then we can move

14   on.  May 30th, that was about two months ago, more or less?

15   June -- a month and -- less than a month and a half ago.  I

16   asked -- we had your deposition, remember, for four hours where

17   I was trying to find out.

18   A.   Yes.

19   Q.   And -- and, um -- I -- I -- you are disagreeing that at

20   that time, you told me that you were not seeking hourly wages?

21       MR. CUMMINGS:  Objection, improper impeachment.

22       THE COURT:  Overruled.

23       THE WITNESS:  I didn't understand the question.

24   BY MR. TROPP:

25   Q.   Would you agree that you told me on that date, that you

1    were not seeking hourly wages, that you thought the only thing

2    that you were owed involved a bonus?

3    A.   Well, I was asked whether I wanted to give up something, if

4    I were to give up something, and then I asked whether that

5    could be the extra hours, and I said correct.

6    Q.   Would you agree that your testimony on that day that you

7    said that bonus and commission received, that was your only

8    loss?

9         MR. CUMMINGS:  Objection, improper impeachment.

10   BY MR. TROPP:

11   Q.   And that's what you said was your loss?

12   A.   Well, mainly it was bonus and commission, mainly.

13   Q.   That was -- okay.  And then would you agree that when I

14   asked you, "It's not really about the overtime, you are really

15   suing for the bonus and commissions" --

16        MR. CUMMINGS:  Objection, improper impeachment.

17        Your Honor, I am not even sure what page and line he

18   is reading from.

19        MR. TROPP:  Page 68, Line 25.  Again, it's all

20   repeated on Page 70, Line 2 and Page 71, Line 18 and then as

21   well as 66, Line 22, four times.

22   BY MR. TROPP:

23   Q.   And would you agree you never asked Reinier or Andrea for

24   hourly wages?

25   A.   Correct.

1   Q.  Or for overtime?

2   A.  Correct.

3   Q.  Okay.  And, Ms. Valiente, I -- I -- I think you are a very

4   studied woman.  You have your licenses.  You also took a course

5   on taxes, right?

6   A.  Well, I studied, but I never took a license.

7   Q.  And -- okay.  And you took a course that focused and was

8   mostly about the difference between a W-2 worker and a 1099

9   independent contractor?

10  A.  Well, you know, the course didn't concentrate just on that.

11  I mean, there were many, many other issue that were dealt with.

12  Q.  But do you remember telling Reinier that you took a course

13  -- tax course about the difference between 1099 and W-2

14  employees?

15          MR. CUMMINGS:  Objection, Your Honor, the testimony

16  that's being elicited is in violation of a motion *in limine*.

17          THE COURT:  It's beyond the scope.

18          Is there anything else regarding the area that

19  Plaintiffs' counsel went into that was beyond the scope of the

20  cross?  Anything else for this Plaintiff?

21          MR. TROPP:  No, Your Honor.

22          THE COURT:  All right.  Thank you.

23          Thank you, ma'am.  You may step down.

24          Next witness.

25      (Witness excused.)

1              MR. CUMMINGS:  Plaintiffs call Mr. Delio Batista.

2              THE COURT:  Please remain standing and raise your

3    right hand.

4                        (Time 10:47 a.m.)

5                          DELIO BATISTA,

6    a witness for Plaintiffs, testified as follows:

7              THE WITNESS:  I do.

8              THE COURT:  Please be seated.

9                      DIRECT EXAMINATION

10   BY MR. CUMMINGS:

11   Q.  Good morning, Mr. Batista.

12   A.  Good morning.

13   Q.  Would you please state your name?

14   A.  Delio Batista.

15   Q.  Mr. Batista, where were you born?

16   A.  In Havana, Cuba.

17   Q.  And how long did you live in Cuba?

18   A.  Until I was 39 years old.

19   Q.  And when did you move to the United States?

20   A.  In 1995.

21             THE COURT:  Okay.  Could we have the Plaintiff speak

22   into the microphone, please?

23             MR. CUETO:  Mr. Cortes would like to use the restroom.

24             THE COURT:  Yes, certainly.

25

Direct Examination - Delio Batista
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1    BY MR. CUMMINGS:

 2   Q.  How long have you known Mr. Cortes?

 3   A.  For 12 or 13 years.

 4   Q.  And how did you find out about the Avant Assurance agency?

 5   A.  He told me about the company.

 6   Q.  When did you start working at Avant?

 7   A.  Around September of 2020.

 8   Q.  Did you have an insurance license before you stared working

 9   at Avant?

10   A.  Yes.

11   Q.  And when did you first obtain your insurance license?

12   A.  During the summer of 2020.

13   Q.  Did you say the summer?

14   A.  Yes.

15   Q.  So that was right before you started working at Avant?

16   A.  Yes.

17   Q.  And when you started working at Avant, where was the office

18   located?

19   A.  In Kendall.

20   Q.  Did you ever sign any written contract or agreement when

21   you started working at Avant?

22   A.  No.

23   Q.  Did you ever sign any written contract or agreement while

24   you worked at Avant?

25   A.  No.
```

1   Q.  Did you make a verbal agreement with Mr. Cortes to be -- to

2   be paid $10 for each insurance policy you sold?

3   A.  Yes.

4   Q.  Now, when you first started working for Avant, how often

5   would you receive that $10 payment for selling a policy?

6   A.  During the first year, month to month.

7   Q.  And could you explain to the jury what you mean by that?

8   A.  Well, the reason was that during the open period, the

9   policy was for 12 months and it ended in December of that same

10  year.

11  Q.  And before you actually started selling insurance at Avant,

12  had you received training?

13  A.  I don't understand the question.

14  Q.  Before you started selling insurance at Avant, did you

15  receive training?

16  A.  Very limited one.

17  Q.  Did you have to bring any of your own equipment to do work

18  at Avant?

19  A.  No.

20  Q.  Did you have to bring your own headset to work?

21          THE INTERPRETER:  Headset?

22          MR. CUMMINGS:  Headset.

23          THE WITNESS:  Yes, I did.

24  BY MR. CUMMINGS:

25  Q.  And why did you need to bring your own headset to work?

Case 1:22-cv-22671-CMA  Document 123-3  Entered on FLSD Docket 09/21/2023  Page 35 of 176
Direct Examination - Delio Batista
July 12, 2023
35
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   A.  Because they were easier to use than the ones provided by

2   Avant.

3   Q.  Why were the headsets that you were using easier?

4   A.  Because the ones provided by Avant applied a lot of

5   pressure, and at the end of a 12-hour day, I had a lot of pain

6   on my ears.  So the ones that I used had less pressure and they

7   were better to use -- to be used.

8   Q.  And did you bring a mouse to work as well?

9           THE INTERPRETER:  A mouse?

10          MR. CUMMINGS:  A mouse.

11          THE WITNESS:  Well, yes, I brought my own mouse, but I

12  attempted to use the ones provided by Avant because sometimes

13  they worked better than the ones I brought.

14  BY MR. CUMMINGS:

15  Q.  Now, you've previously mentioned the open enrollment

16  period; when did it start in 2020?

17  A.  That started approximately one week before the first of

18  November.

19  Q.  And when did that open enrollment period end?

20  A.  At the end of the month of January.

21  Q.  In 2021?

22  A.  Yes.

23  Q.  During that open enrollment period, what hours did you work

24  at Avant's office?

25  A.  It was from 9 a.m. to 9 p.m., and if there was any

1    additional issue, like there was another last-minute call, I

2    would stay as long as it was needed.

3    Q.   And what's the latest you remember staying on any

4    particular day?

5    A.   I seem to recall that one time I had to stay until 10 p.m.,

6    or maybe 9:45, something like that.

7    Q.   And so is it fair to say that you were working more than 40

8    hours a week?

9    A.   20 hours.

10   Q.   How many hours a week were you working during the open

11   enrollment period?

12   A.   It was an average of 64 or 65 hours.

13   Q.   Now, if you were working 9 a.m. to 9 p.m., about, what days

14   of the week were you working during the open enrollment period?

15   A.   Well, I would work from 9 a.m. to 9 p.m., Monday through

16   Friday, and on Saturdays, I worked mid-morning to maybe about

17   4 p.m. or so.

18   Q.   Now, at -- did you receive commission statements that were

19   e-mailed to you from Avant showing how much you earned during

20   the open enrollment period?

21   A.   Yes, I used to receive e-mails.

22   Q.   And those e-mails contained your commission statements?

23   A.   That's correct.

24   Q.   And yesterday, did you see when I asked Ms. Valiente about

25   the commission statements she received?

1   A.   Yes.

2   Q.   And did you see the individual Excel sheet files that she

3   kept?

4   A.   Yes.

5   Q.   Did you receive Excel sheet statements like that as well?

6   A.   Well, yes, I used to receive the e-mails, but then I

7   stopped receiving them once I was fired from the company.   I

8   did not receive them any longer after that.   I did not have

9   access to my e-mails.   My e-mails were stopped.

10  Q.   Okay.   And do you have those commission statements to show

11  to the jury today?

12  A.   No, because those e-mails, I don't have any access to them

13  anymore.

14  Q.   Now, those commission statements that you did receive, did

15  you think that they were accurate?

16  A.   No, generally they were not accurate.

17  Q.   And why do you say that?

18  A.   Because there was also a discrepancy between what had

19  actually been done during the week and what the owners of the

20  company stated that were done.

21       (Pause in proceedings.)

22           MR. CUMMINGS:   Just one second, please.

23       (Pause in proceedings.)

24           MR. CUMMINGS:   Your Honor, may I just have a second to

25  show the Defense counsel the demonstrative I am getting ready

Direct Examination - Delio Batista
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1   to use?

 2            THE COURT:  Yes.

 3        (Pause in proceedings.)

 4            MR. TROPP:  Your Honor?

 5            THE COURT:  Yes.

 6            MR. TROPP:  I do have an objection.  It is one

 7   thing -- and I understand and I had received earlier the blank

 8   demonstrative of what they claim to be earned, which if it

 9   could be followed, if someone could follow it, that's fine, but

10   it's been --

11            THE COURT:  This one is filled out as opposed to

12   having the witness sit there with a telephone and a calculator

13   while the jury and all of us sit waiting.

14            MR. CUMMINGS:  That's correct.

15            THE COURT:  That's the reason for that.  But it should

16   have been given to Defense counsel earlier, quite frankly.

17   Right?  But you will examine it, and if you see anything that's

18   inaccurate, you will have the opportunity to cross-examine.

19            I'm sorry?  Microphone, please, Mr. Tropp.

20            MR. TROPP:  Wouldn't it be more proper for him --

21            THE COURT:  To do the math while we are sitting here?

22            MR. TROPP:  For him to say what is owed instead of it

23   being shown in front of him saying to -- basically like what to

24   say?

25            MR. CUMMINGS:  I will direct my client.
```

1          THE COURT:  Very well.  Thank you.

2     BY MR. CUMMINGS:

3     Q.  Now, Mr. Batista, you received the 1099 from Avant in 2021,

4     correct?

5     A.  Yes.

6          THE INTERPRETER:  And what was the year, I'm sorry,

7     2021?

8          MR. CUMMINGS:  2021.

9          THE WITNESS:  Yes.

10    BY MR. CUMMINGS:

11    Q.  Is this the 2021 1099 that you received from Avant?

12    A.  Yes.

13    Q.  Okay.  And how much money did Avant say you earned in 2021?

14    A.  58,115.

15    Q.  And based on that number, were you able to calculate how

16    much overtime you were owed for the open enrollment period in

17    2020 -- from 2020 to 2021?

18    A.  Well, how many hours?

19    Q.  No, I am just saying based on the amount of money you were

20    paid in 2021 for the whole year, which I believe you said was

21    $58,115, right?

22    A.  That's correct.

23    Q.  Were you able to use that number and come up with a total

24    amount that you were owed in overtime for the open enrollment

25    period?

1    A.   Yes.  The total amount is $3,375.

2    Q.   And did you base that on working 64 hours a week during the

3    open enrollment period?

4    A.   That's correct.

5    Q.   And did you average out how much you made per month in

6    2021?

7    A.   $4,842.92.

8    Q.   Okay.  The number you just said was the average that you

9    made per month?

10   A.   Yes.

11   Q.   Now, do you believe that Avant -- that $58,115 was the

12   correct amount of money that you should have been paid in 2021

13   by Avant?

14   A.   No.

15   Q.   What do you estimate you should have made per month at

16   Avant in 2021?

17   A.   Approximately $6,000.

18   Q.   Okay.  Why is that?

19   A.   Well, because of the discrepancy that I had with the sales

20   that I had made and the statements that I received.

21   Q.   Did you think that you were -- you should have been paid

22   more in your commissions than what you were being paid?

23   A.   Yes.

24   Q.   And why is that?

25   A.   Because there was always some discrepancy or something that

Case 1:22-cv-22671-CMA Document 123-3 Entered on FLSD Docket 09/21/2023 Page 41 of 176
Direct Examination - Delio Batista 41
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  was missed in terms of the sales that were there than what was

2  included in the papers.

3  Q.  And yesterday you heard Ms. Valiente and Ms. Ledesma say

4  they had a Google sheet they would keep with all of the

5  policies they sold?

6  A.  Yes, but I don't have any access to that type of documents.

7  Q.  Well, I am not asking if you have access to it now, but did

8  you have one of those while you were still working at Avant?

9  A.  Yes.  Absolutely, yes.

10 Q.  And did you record every policy that you sold onto that

11 Google sheet?

12 A.  Well, its policy was registered in that Google page.

13 Q.  And did you notice that when you received your commission

14 statements, they did not match the policies that you had

15 recorded in the Google sheet?

16 A.  That's correct.

17 Q.  And that's why you believed that you should have earned

18 $6,000 a month?

19 A.  That's correct.

20 Q.  Now, you previously mentioned that you would receive $10

21 for every policy that you sold, correct?

22 A.  Yes.  That was according to --

23        THE COURT REPORTER:  I'm sorry, the answer again,

24 please.

25        THE WITNESS:  The verbal agreement we did initially.

1  BY MR. CUMMINGS:

2  Q.  And when you say we, you are talking about the verbal

3  agreement that you had with who?

4  A.  Mr. Cortes.

5  Q.  And at some point did that payment arrangement change?

6  A.  Yes.

7  Q.  And how did it change?

8  A.  Yes, during the second period, during February or March, I

9  noticed that I did not receive a monthly allowance like I used

10  to receive the prior year.  So Mr. Cortes told me the payment

11  method had been changed, and he sent me an e-mail with the new

12  modality for payment.

13      So basically you got your commission during the first month

14  that you actually did the sale, so that guaranteed to him that

15  the salesman would be producing every month for his

16  convenience.

17  Q.  And about what time period are you talking about that this

18  change was explained to you?

19  A.  Well, the change had to take place during the open

20  moment --

21          THE COURT:  Enrollment.

22          THE INTERPRETER:  The open enrollment, thank you.

23          THE WITNESS:  But I did not receive that information.

24  Well, I think it must have been during February or March when

25  that happened.

1   BY MR. CUMMINGS:

2   Q.  In February or March of 2021?

3   A.  No, 2022.

4   Q.  So you did receive residual payments for the policies you

5   sold throughout 2021?

6   A.  Yes, every month I received a payment.

7   Q.  And throughout 2000 -- after the open enrollment period

8   ended in January 2021, did you continue selling insurance

9   policies for Avant?

10  A.  Yes.

11  Q.  Did you work overtime after the open enrollment period

12  while you were at Avant in 2021?

13  A.  No.

14  Q.  Now, at some point -- scratch that.

15      Did you work a second open enrollment period while you were

16  employed at Avant?

17  A.  Yes.

18  Q.  And that open enrollment period began in November of 2021?

19  A.  Yes, a few days or a week before the first of November.

20  Q.  And that open enrollment period ended in January -- at the

21  end of January 2022?

22  A.  Yes.

23  Q.  Now, before that second enrollment period, did you also

24  receive monthly commission statements from Avant?

25  A.  Yes.

```
 1   Q.  For policies that you were selling in March, April, May and
 2   on and on in 2021?
 3   A.  And also February.
 4   Q.  February, thank you.  And where were you selling these
 5   policies from?
 6           THE INTERPRETER:  Could you repeat for the
 7   interpreter?
 8   BY MR. CUMMINGS:
 9   Q.  Where were you when you sold these policies?
10   A.  First, in the Kendall office and then in the office at
11   Doral.
12   Q.  But let's just stick with 2021.  Where were you located at
13   that time?
14   A.  Well, 2021, in the Kendall office.
15   Q.  And the commissions that you made in 2021 at the Kendall
16   office, did you think that you were being paid correctly by
17   Avant?
18   A.  No.  There was always an amount that remained that was
19   missing.
20           THE REPORTER:  I'm sorry, there was always a what?
21           THE INTERPRETER:  That remained that was missing.
22           THE REPORTER:  No, there was --
23           THE INTERPRETER:  There was an amount that remained
24   that was missing.
25
```

1    BY MR. CUMMINGS:

2    Q.  And how much of an amount do you estimate was missing from

3    your commissions that you received monthly from Avant?

4    A.  It was around 20, 25 percent.

5    Q.  Meaning 20 to 25 percent of the policies that you sold, you

6    were not being actually paid for in your commission statements?

7    A.  That's correct.

8    Q.  And you were able to verify that by checking the Google

9    sheet against the statements you were receiving?

10   A.  Yes.

11   Q.  Now, you are aware that Mr. Cortes prepared a spreadsheet

12   that shows how much he paid each Plaintiff in this case,

13   correct?

14        (The exhibit was published to the jury.)

15            THE WITNESS:  Yes.

16        (Pause in proceedings.)

17   BY MR. CUMMINGS:

18   Q.  And that's what you are looking at right now, which is

19   Exhibit 12?

20   A.  Yes.

21   Q.  So Mr. Cortes said that he paid you $1,480 in January of

22   2022; is that correct?

23   A.  Yes, that's what's in the document I have here.

24   Q.  And would that payment have been for the 2021/2022 open

25   enrollment period?

1   A.   Yes, it seems to be that way on this page.

2   Q.   If you were paid money in January of 2022, would that money

3   have been earned by you during the open enrollment period?

4   A.   Yes.

5   Q.   And in February, that money that you received from Avant,

6   would that also have been earned by you during the open

7   enrollment period?

8   A.   Yes.

9   Q.   Now, we notice a big jump when we move over to March, and

10  was that money also earned by you during the open enrollment

11  period?

12  A.   Well, I believe so.  But it is possible that there is also

13  a bonus included that I earned.

14  Q.   Did you say that that amount includes a bonus that you

15  earned?

16  A.   It could be.

17  Q.   And what bonus are you referring to?

18  A.   I believe that it would be from a company called Ambetter,

19  or if I'm not mistaken, then it would be another company called

20  Friday.

21  Q.   And did you receive bonuses as a result of sales that you

22  made during the open enrollment period?

23  A.   Yes.  With the exception of the Oscar bonus, that was

24  supposed to be paid in May, but I was fired and then I had no

25  access to the information.

1   Q.   I am showing you what has already been marked as Exhibit 8.

2        (The exhibit was published to the jury.)

3   BY MR. CUMMINGS:

4   Q.   And we can see on this bonus compensation plan where you

5   were referring to Ambetter, and what was the other company that

6   you mentioned?

7   A.   The name is Friday, but I am not entirely sure where that

8   bonus is, for one only or for both of them.  No, no.  What I

9   mean is that I am not sure if that payment corresponds to

10  Ambetter or to both.

11  Q.   Okay.  And when you say Ambetter or Friday, are you

12  referring to the 250-plus policies that you would have had to

13  sell to reach $10,000?

14          THE INTERPRETER:  Can you please repeat the question?

15          THE COURT:  And when you say Ambetter or Friday, are

16  you referring to the 250-plus policies that you would have had

17  to sell to reach $10,000?

18          THE WITNESS:  That's correct.

19          THE INTERPRETER:  Thank you, Your Honor.

20  BY MR. CUMMINGS:

21  Q.   All right.  However, either way, you did receive that

22  $21,000 -- $21,845 as payment in March?

23  A.   Well, I am not entirely sure at this time, but if it's on

24  the statement, then it must be so.

25  Q.   All right.  And so when you look at how much money you are

1    owed -- well, let me ask you this:  What hours did you work

2    during the second open enrollment period?

3    A.   From 9 a.m. to 9 p.m.

4    Q.   And what days of the week did you work 9 a.m. to 9 p.m.?

5    A.   On Monday through Friday, and maybe there was another

6    Saturday when I did go to the office.

7    Q.   And so how many hours do you think you worked -- I'm sorry.

8         How many hours did you work per week during the second open

9    enrollment period you worked at Avant?

10   A.   I would say approximately 62 hours.

11   Q.   Now, the payments that you received in January, February

12   and March, are those payments an accurate representation of how

13   much -- how many policies you actually sold when you were

14   working at Avant?

15   A.   No, it should have been higher.

16   Q.   And do you think those payments -- or do you estimate that

17   those payments are also 20 to 25 percent off?

18   A.   That's correct, with the exception of the 10,000 bonus.

19   Q.   Okay.  And based on the money that you were paid, so, for

20   example, in January 2022, we know that Avant paid you $1,480,

21   how much do you estimate you should have earned in that month

22   of January 2022?

23   A.   No, it should have been approximately $2,000.

24   Q.   And then in February of 2022, how much do you think -- or

25   do you estimate that you should have made?

1    A.   Approximately $7,000.

2    Q.   And how about in March of 2022?

3    A.   24,000.

4    Q.   And did you sell more than 600 Oscar plans during the open

5    enrollment period?

6    A.   Could you please repeat the question?

7    Q.   Did you sell more than 600 Oscar policies during the

8    2021/2022 open enrollment period?

9    A.   I think you are asking me about the policies that have to

10   do with Oscar, and so that question is not posed correctly.

11   Q.   I am not asking you the right question?  You keep saying

12   that --

13   A.   No, I believe there was a problem with the translation.

14   Q.   All right.  I will make it very simple.

15        You mentioned previously that you did not get paid $25,000

16   for selling Oscar, correct?

17             THE COURT:  You did not get paid $25,000 for selling

18   Oscar, correct?

19             THE WITNESS:  That's correct.

20   BY MR. CUMMINGS:

21   Q.   And the way you would have received $25,000 bonus is by

22   selling over 600 or more Oscar policies?

23   A.   That's correct.

24   Q.   And did you sell more than 600 Oscar policies during the

25   open enrollment period?

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 50 of 176
Direct Examination - Delio Batista
July 12, 2023
50
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1          THE COURT:  600.

2          THE INTERPRETER:  Yes, Your Honor.

3          THE WITNESS:  Yes.

4     BY MR. CUMMINGS:

5     Q.   How many Oscar policies do you estimate you sold during the

6     open enrollment period?

7     A.   It was about 680 to 690 policies.

8     Q.   And how do you know that?

9     A.   Well, because I remember that some of the agents were very

10    enthusiastic when they reached that amount, 600, and I remember

11    that many of the agents were there before I got there.  But I

12    remember vividly the day when I arrived, and it was so, and

13    then they were still some days left there for the open

14    enrollment.  And then I knew that you have to be -- more had to

15    be sold so that you would not just remain at that period of

16    600.

17    Q.   So you remember the day that you actually hit 600 members

18    because you were able to verify it in your Google sheet?

19    A.   That's correct.

20    Q.   But it was your thought that you needed to sell over 600 so

21    that you could ensure you got that bonus?

22    A.   That's correct.

23    Q.   All right.  So based on the amount that you estimate you

24    should have made, and including the bonus, what is the total

25    amount of overtime you are claiming you are owed from Avant for

1   the second open enrollment period?

2   A.  10,290.28.

3   Q.  Now, you also mentioned that your commissions -- or you --

4   your commissions were not being paid correctly month after

5   month, whether it was open enrollment or not; is that right?

6          THE INTERPRETER:  I'm sorry, the interpreter --

7          THE COURT:  Were not being paid correctly month after

8   month, whether it was open enrollment or not; is that right?

9          THE WITNESS:  That's correct.

10  BY MR. CUMMINGS:

11  Q.  And so the first year that you worked at Avant from 2020 to

12  2021, how much do you estimate you should have been paid more

13  per month?

14         THE COURT:  No.  How much do you estimate you should

15  have been paid more?

16         THE WITNESS:  In the first year, $13,884.96.

17  BY MR. CUMMINGS:

18  Q.  Well, let's just say per month for right now.

19  A.  It would be an amount of 1,157 extra per month.

20  Q.  We also see in the spreadsheet prepared by Avant, that they

21  paid you a total of $72,845.

22  A.  Yes.

23  Q.  In 2022.

24  A.  Yes.

25  Q.  Is that the correct amount of money you should have been

```
 1   paid for all the policies that you sold at Avant?

 2   A.   I don't think so.

 3   Q.   How much money should you have made in 2022 for selling

 4   policies?

 5   A.   You mean the total amount or --

 6           THE COURT REPORTER:  I'm sorry, what was the answer?

 7           THE WITNESS:  What I consider is owed to me.

 8   BY MR. CUMMINGS:

 9   Q.   The yearly -- the amount for the year that you estimate

10   you're owed.

11   A.   What I estimate is 91,056.24.

12   Q.   Did you use your 20 to 25 percent difference to calculate

13   that number?

14   A.   Well, at a certain point, Carlos and I actually compared,

15   and his Google sheet and mine were almost the same except a

16   small discrepancy.

17   Q.   And when you say Carlos, who are you referring to?

18   A.   I'm referring to Carlos Lopez.

19   Q.   So you are saying that -- did you and him have some kind of

20   a friendly competition on how many policies you were selling at

21   Avant?

22   A.   Yes.  Actually, the agents, we had sort of a friendly

23   competition idea and we compared our policies.

24   Q.   Now, I previously asked you about bringing a headset and a

25   mouse to work.
```

1    A.   That's correct.

2    Q.   Did you already own that headset and that mouse, or did you

3    purchase them just so that you could bring them to work at

4    Avant?

5    A.   No, I did not purchase them.  And they belong to one of my

6    children.

7    Q.   How did your employment at Avant end?

8            THE COURT:  How did your employment at Avant end?

9            THE WITNESS:  I was fired.

10   BY MR. CUMMINGS:

11   Q.   Who fired you?

12   A.   Mr. Cortes.

13   Q.   Why did Mr. Cortes fire you?

14   A.   Well, the day he gave me an appointment to go to his house

15   to fire me, he gave me a very vague idea of why I was being

16   fired.  One of the reasons he gave me is that I didn't want to

17   respond to a telephone call he made and that I sent him a text

18   message saying that I did not want to talk at that time.

19       And another reason he give me was that I left early from

20   the conference meeting they had when they were having a meeting

21   with their CFOs.

22   Q.   And who was the CFO that he was referring to?

23   A.   His first name is Al, and I don't recall his last name.  I

24   believe it is Garza.

25   Q.   Did the explanations that Mr. Cortes gave you for firing

1   you make sense to you?

2   A.   Not at all.

3   Q.   And what day was that that you were fired?

4   A.   The 20th of June, the day after Father's Day.

5   Q.   Now, at some point before you were fired, did you learn

6   that Mr. Cortes had bought a new car?

7           MR. TROPP:  Objection, Judge, relevance.

8           THE COURT:  Sustained.

9           MR. CUMMINGS:  Your Honor, it goes to the Plaintiff's

10  theory of --

11          THE COURT:  We can have a discussion during the lunch

12  hour.  Let's move on.

13  BY MR. CUMMINGS:

14  Q.   And looking back at the commissions that you were paid by

15  Avant in 2022, did you still receive commissions from Avant

16  after you were fired?

17  A.   Yes.

18  Q.   Because you previously mentioned you were fired in June,

19  correct?

20  A.   Yes, I was fired during the month of June.

21  Q.   However, you received a payment in July; is that right?

22  A.   Yes, I seem to remember that I received a payment in July

23  and August.

24  Q.   And did that come to you through direct deposit?

25  A.   That's correct.

Cross-Examination of Delio Batista
July 12, 2023                                            55
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1    Q.   However, you did not receive your $25,000 for the Oscar

 2    bonus, correct?

 3    A.   No, I never received a bonus.

 4    Q.   You did not; is that what you said?

 5    A.   No, I did not.

 6            MR. CUMMINGS:  No further questions at this time.

 7            THE COURT:  Cross-examination?

 8                        CROSS-EXAMINATION

 9    BY MR. TROPP:

10    Q.   How are you, Mr. Batista?

11    A.   I'm fine.

12    Q.   So, Mr. Batista, before you worked at Avant, you worked at

13    a hotel?

14            MR. CUMMINGS:  Objection to relevance, outside the

15    scope and violates the motion *in limine*.

16            THE COURT:  Overruled.

17            THE WITNESS:  Yes.

18    BY MR. TROPP:

19    Q.   That was, like, for 24 years?

20            THE INTERPRETER:  24 years?

21            THE WITNESS:  Yes.

22    BY MR. TROPP:

23    Q.   And you were a concierge?

24    A.   Yes.

25    Q.   In Doral?

Cross-Examination of Delio Batista
July 12, 2023
56
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1   A.   Yes.
 2           MR. CUMMINGS:  Your Honor, may we please come sidebar?
 3           THE COURT:  We don't have sidebars anymore, but we'll
 4   take a lunch recess so we can have a nice discussion without
 5   holding up the jury.
 6           Ladies and gentlemen, we will take a lunch break.
 7   Please come back at -- it's ten to 12:00.  Please be back at
 8   ten minutes to 1:00.  Have a good lunch.  Please don't discuss
 9   the case.
10           COURT SECURITY OFFICER:  All rise.
11      (The jury exited the courtroom at 11:50 a.m.)
12           THE COURT:  You may retake your seat.  Thank you.
13      (Witness temporarily excused.)
14           THE COURT:  So the Plaintiffs want to bring out the
15   issue of the car.  I thought it already came out in testimony.
16   Is there any need to have it go --
17           MR. CUMMINGS:  Mr. Cortes, I believe, mentioned on the
18   first day he did buy a car; however --
19           THE COURT:  The relevance of the car is?  Besides it
20   being a luxury car, what's the relevance?
21           MR. CUMMINGS:  Well, Plaintiffs' theory is that the
22   money that our clients were supposed to be paid --
23           THE COURT:  Oh, went to the car?
24           MR. CUMMINGS:  Amongst other things, yeah.
25           THE COURT:  All right.  And you want to go into the
```

1   fact that Mr. Batista earned minimum wage and had a lowly job

2   before becoming an insurance agent; is that right?

3           MR. TROPP:  Not so much about that point.

4           THE COURT:  But as about what?

5           MR. TROPP:  About his -- it goes to the permanence.

6           THE COURT:  The what, I'm sorry?

7           MR. TROPP:  The permanence on the economic reality.

8   He worked at this job for 24 hours -- for 24 years.

9           THE COURT:  Right.

10          MR. TROPP:  As to the economic reality section of the

11  permanence, that was an important factor that he knows the

12  difference.  That was a permanent job and this was -- he was

13  only -- it was only a transient job.

14          THE COURT:  A transient job versus a permanent job as

15  a concierge at a hotel.

16          MR. TROPP:  Right.

17          THE COURT:  Right.

18          MR. TROPP:  But also about his knowledge.  He's a W-2

19  worker, he knows the difference.

20          THE COURT:  All right.

21          MR. POLLOCK:  I think we already touched on this and

22  we argued the motion *in limine* a couple weeks ago.  I don't

23  know how, you know --

24          THE COURT:  Well, he is not going to go into the

25  salary or the type of work.

1           MR. POLLOCK:  Well, he said he intends to say, you
2      know, you were a W-2 before, and that was the subject of the
3      motion *in limine*, what kind of -- how he was classified and
4      paid in a prior job has nothing to do with how Mr. Batista was
5      classified and paid versus should have been paid in this job
6      where he is performing different work for a different employer
7      under --
8           THE COURT:  Where are you going with this, Mr. Tropp?
9      We had this discussion.
10          MR. TROPP:  I mean, if -- and if there is some
11     confusion, maybe it is coming from me.  But someone who, for 24
12     years, works at a $12 an hour job, and goes to do an insurance
13     job, we are still trying to wrap our heads around how it turns
14     into, like, an hourly rec -- you know, hourly calculation.
15          THE COURT:  So where are you going with this?  I'm
16     sorry, I go back to my question.
17          MR. TROPP:  I mean, I know that there is a certain
18     restriction of -- there is a limit as to what the intent of the
19     employee is, what they think, but on the other hand, like how
20     do you -- how do you establish control or lack of control --
21          THE COURT:  So you are going to go to the factors that
22     I am going to be instructing the jury on in this line of
23     questioning; is that what you are saying?  Because I ruled on
24     this prior to trial.  So take a look at the ruling and take a
25     look at what it is you are allowed to go into in having the

1    jury consider the economic realities of the relationship,

2    right?

3              MR. TROPP:  Right.

4              THE COURT:  All right.  So I do have a concern, these

5    jury instructions are far from being in final form.  I tried to

6    do this before trial, that's why we had that long exercise.

7    And now the draft that I see deletes altogether all of these

8    factors and economic realities test, it is no longer even

9    there, let alone being in final form, right?  So --

10             MR. TROPP:  They are supposed to be.

11             THE COURT:  -- I don't know where we are going.  We

12   don't have sidebars because post COVID we don't have sidebars.

13   So it's not that I'm --

14             MR. CUMMINGS:  No --

15             THE COURT:  If you want to have discussions outside

16   the jury's presence, this is what we do.  All right.

17             Are there any other issues we need to address?

18             MR. CUMMINGS:  Well, we do -- obviously we have two

19   more -- one more client who is going to be testifying, so I

20   have a concern that Mr. Tropp is going to attempt to go into

21   that person's previous employment too and the mental status --

22             THE COURT:  Well, have a discussion, talk to each

23   other.  You know what you can -- you know what you can and

24   cannot go into.  I think he has some lack of clarity about it.

25   Have a discussion.  But we are not going to interrupt the trial

1    with sidebar conferences that I don't hold any longer.

2            MR. POLLOCK:  Your Honor, that was my mistake in

3    removing the economic realities, because I also -- I was trying

4    to remove the other section, but I think otherwise --

5            THE COURT:  I don't know.  I stopped looking when I

6    saw that there were gaps, and I just don't know where you all

7    are with that.

8            MR. POLLOCK:  What we did was beside improperly -- or,

9    you know, apparently removing that, we tried to rework the

10   instructions so that they made sense.

11           THE COURT:  Right.

12           MR. POLLOCK:  So we reordered them so that way you

13   have what -- how --

14           THE COURT:  So other than this, are they in final

15   form?

16           MR. POLLOCK:  Yes.

17           THE COURT:  Well, you can insert all of that and

18   show -- during the lunch hour and get it back to me, I can

19   start looking at it again, and the verdict form.

20           MR. POLLOCK:  We do have an issue in dispute.

21           THE COURT:  What is the issue?

22           MR. POLLOCK:  Um, looking at what we had sent over,

23   and I have it as Page 4, it's in the track changes.  So the

24   issue that remains are where the changes are still tracked.

25           THE COURT:  All right.

1    MR. POLLOCK:  I had moved up a section from proposed

2    instructions that I believe the Court approved previously.

3    They were highlighted because the Court had some concerns about

4    them being out of place and possibly cumulative, so I skinnied

5    it down and reinserted it after you talk about the Fair Labor

6    Standards Act, you talk about the fact that those rights can't

7    be waived or contracted away unless they're approved -- unless

8    that's approved by the DOL or the Court.

9         And then I retained the sections that the Defendant

10   had requested where it says, "The rights and requirements of

11   the FLSA do not apply to independent contractors to show the

12   integrity of that insertion."  The Defendants still object to

13   that inclusion.

14        THE COURT:  What's the objection?

15        MR. CUMMINGS:  I'm sorry, Your Honor, may my clients

16   have a seat?

17        THE COURT:  Yes.

18        What's the objection?

19        MR. TROPP:  If I understand correctly, the department

20   we are talking about --

21        THE COURT:  Use a microphone, please.

22        MR. TROPP:  The parts that I understand, if you can

23   read that sentence.

24        THE COURT:  I think the interpreter also, you can take

25   your lunch break, ma'am, as well.

1           THE INTERPRETER:  Thank you.

2           THE COURT:  Are we all prepared to discuss it, or do

3    you need time to reacquaint yourself with the objection?

4           MR. TROPP:  Judge, there have been 74 revisions.  It

5    took me, like, half an hour to figure out from just --

6           THE COURT:  Here is what we will do, because this is

7    your lunch hour and mine and my court reporter's, right?  So we

8    will meet in half an hour.  During this lunchtime, you will

9    reacquaint yourself with what your continued objections are to

10   the -- to the instruction so that you can talk to me about

11   them.  How's that?

12          MR. TROPP:  Correct.  It's not continued objections,

13   it's --

14          THE COURT:  All right.  So we will see each other at

15   12:30.  I told the jury to be back at 12:50, that gives us 20

16   minutes to go over them.  How's that?  Good?

17          MR. CUMMINGS:  Your Honor, what's the ruling on the

18   objection to the previous employment for Mr. Batista?

19          THE COURT:  He can go into it if it's going to go into

20   some of those factors and his knowledge about the economic

21   realities test.  It's not going to say, you only earned minimum

22   wage or you cleaned, you know, hotels rooms or did some menial

23   jobs and now you are an insurance agent, it is not for that

24   purpose, which is prejudicial.

25          MR. POLLOCK:  Your Honor, I don't know that any of the

1   factors relate to prior employment when you look at the six

2   factors as expanded in the 2022 or '-3 version of the jury

3   instructions.  They don't talk about what you did in your prior

4   employment.  They --

5           THE COURT:  He is trying to show the jury what these

6   economic realities mean.  How much risk or opportunity did the

7   Plaintiffs have?  Did the Plaintiffs provide tools, equipment

8   and supplies?  In your other job, you were an employee and you

9   didn't provide equipment and supplies, right?  Right.  That's

10  what he can use it for.

11          MR. POLLOCK:  Okay.

12          THE COURT:  All right?  Okay.  I will see everybody in

13  half an hour.  And please look at those instructions and let me

14  know what the remaining objections are so we can get them in

15  final form.  Is that good?

16          MR. TROPP:  Yes.

17          THE COURT:  Great.  Thank you.

18          (A lunch recess was taken at 11:59 a.m.)

19

20

21

22

23

24

25

Case 1:22-cv-22671-CMA   Document 123-3   Entered on ELSD Docket 09/21/2023   Page 64 of
176                                                                                          64
Cross-Examination of Delio Batista
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1                    A F T E R N O O N   S E S S I O N

 2              (12:36 p.m.)

 3              THE COURT:  Okay.  So I think the revised jury

 4      instructions were e-mailed.  You have seen them, Mr. Tropp?

 5              MR. TROPP:  Yes, Your Honor.

 6              THE COURT:  Let me see if I have them.

 7         (Pause in proceedings.)

 8              THE COURT:  Well, I don't have them yet.  Wait, I do.

 9         (Pause in proceedings.)

10              MR. POLLOCK:  You want us to send them again, Your

11      Honor?

12              THE COURT:  No, I have it.  It is just not opening.

13         (Pause in proceedings.)

14              THE COURT:  All right.  The Defendants have the

15      revised instructions.  I will hear any remaining objections.

16              You may remain seated, Mr. Tropp.

17              MR. TROPP:  Okay.

18              THE COURT:  It's easier for you, and just put the

19      microphone close to you.

20              MR. TROPP:  We basically agreed to everything for the

21      sake of efficiency and the Court's time.  The only thing is,

22      and this kind of ties into, we had argued in the past on the --

23      on the -- on the verdict form that we wanted included in there

24      whether or not the -- whether or not the Plaintiffs

25      individually were employees as defined under the CFR with the
```

1   definition of employees.  So we'd agreed as defined by -- and

2   had the actual, you know, CFR number.  And then counsel

3   understood that you removed that and that was removed.  So just

4   as defined by the FLSA.

5           That's one thing.  But what stuck in here, it says --

6           THE COURT:  I'm sorry, what are you reading from?

7           MR. TROPP:  I am reading from Page 4 where there's a

8   red highlight to the left and I think it's Paragraph 2 -- no,

9   I'm sorry, it's paragraph -- fourth paragraph, The rights and

10  requirements of the FLSA.

11          Now, you had allowed that last sentence on this

12  paragraph that says, "The rights and the requirements of the

13  FLSA do not apply to independent contractors."  We'd discussed

14  that, and that was the point of contention.  Now, on top of

15  that, counsel puts in this sentence, "The rights and

16  requirements of the FLSA are mandatory, cannot be weighed,

17  negotiated, bargained away between employee -- employers and

18  employees."  I get that.  Okay.

19          And then:  The rights and requirements cannot be

20  breached by contract otherwise waived by employee.  Can only be

21  comprised when supervised by fairness either by the United

22  States Department of Labor or a court."

23          And, you know, one of the issues is that -- that I

24  believe it was Rafaela had been getting $20 an hour and then

25  they agreed to waive that for higher commission.  I get it that

1   the jury would decide whether it's an employee or not under the

2   FLSA.  I get it that none of that would really matter if not.

3   It just seems like it causes confusion because it is so

4   overbroad.

5           All the rights and requirements of the FLSA say --

6   there's many requirements of the FLSA, cannot be breached by

7   contract or waived without approval.  I just think it's a

8   little overbroad, that sentence.  That's the only thing.

9   Everything else we've caved into.

10           THE COURT:  How would you reword it?

11           MR. TROPP:  How would I --

12           THE COURT:  Are you proposing an alternative?

13           MR. TROPP:  Can we just say "the rights and

14   requirements of the FLSA are mandatory, cannot be waived,

15   negotiated or bargained away between employers and employees"

16   and then remove the second sentence?  It's kind of redundant.

17           THE COURT:  Mr. Pollock?

18           MR. POLLOCK:  I get this feeling that we take one step

19   forward and five steps back.  And, you know, the last version

20   of the jury instructions were at Docket Entry 95.  The initial

21   version that we proposed with the pretrial stip was at 76-1,

22   and at that time, there was no objection to this language.  So

23   now we have a new objection.

24           I think the language with which counsel has a problem,

25   and I don't have it in front of me as either a quote or nearly

1   a quote from *Lynn's Food* from the 11th Circuit.  And so I think

2   it's an accurate recitation of the law, and I think it provides

3   the jury with a complete picture of the circumstances.  And the

4   only two circumstances under which the -- any rights or

5   responsibilities under the FLSA for employees can be waived.

6          So I believe that the sentence should be included so

7   that the jury understands that this is a strong protection and

8   there is only two ways to compromise or waive those protections

9   and we don't have them.

10          THE COURT:  And *Lynn's Food* is L-Y-N-N, apostrophe S.

11          So I don't see a problem with this paragraph.  In

12   fact, to take out the second sentence is to give an incomplete

13   and incorrect instruction.  Because, indeed, the rights can be

14   waived and can be negotiated, that's why you come to a court

15   for approval of a settlement agreement.  That's why most of

16   these cases, in fact, are resolved by settlement agreement.

17   This is the exception.

18          All right.  Next objection?

19          MR. POLLOCK:  Your Honor, I think that's it.  I mean,

20   the instructions at this point are pending the Court's review

21   and approval.  They are fairly different after the standard,

22   just when you get to computing, but I think they make more

23   sense now.  And counsel and I did work through these together.

24          THE COURT:  All right.  I will take a look at them as

25   we continue with the jury.

1           MR. POLLOCK:  I think counsel's other issue related to

2     the verdict form.

3           THE COURT:  Oh, that's right.  What's the issue with

4     the verdict form?

5           MR. POLLOCK:  I think what counsel is requesting is to

6     revert back to the language that was proposed in 76.2.  So the

7     way that the Defendants' proposed agreed is that "Delio Batista

8     was an employee covered under the FLSA as defined in 29 U.S.C.

9     203(e)(1), of."

10          My notes reflect, and I think the Court's ruling was,

11    that the -- that the question should read, "That Delio Batista

12    was an employee under the FLSA of," without the additional

13    "covered" or "as defined in" language.  And that's what my

14    notes reflect from the calendar call at the pretrial conference

15    we had on June 27th.

16          THE COURT:  I will hear from Defendants.

17          MR. TROPP:  I won't -- I mean, I recall that you

18    allowed the "as defined" language in, and I know counsel also,

19    like, for a week said that you had eliminated all the

20    affirmative defenses and that wasn't quite the case.  I do not

21    recall that you disagreed or said that we have to remove the

22    "as defined" by language.

23          THE COURT:  You want the verdict form to have a

24    reference to as defined by a regulation, right?

25          MR. TROPP:  At least as to what the definition of

Cross-Examination of Delio Batista
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1    employee --
 2             THE COURT:  Where is that definition given to the
 3    jury?  Where is the designation from the regulation given to
 4    the jury?  Because they're going to have that verdict form and
 5    they're going to -- question No. 1 from the jury is, What is
 6    this regulation that you referred to in the verdict form that
 7    you're asking us to make a finding about?
 8             MR. TROPP:  I --
 9             THE COURT:  I am just asking you; is it in the
10    evidence, is it in the instructions?  Is it anywhere?  Because
11    if it is not anywhere, it adds nothing to the verdict form but
12    confusion to the jury.
13             MR. TROPP:  Okay.  So -- so if it just says FLSA,
14    wouldn't the jury possibly ask what is that definition?
15             THE COURT:  That's what the jury instructions cover.
16    The jury instructions cover anything from that regulation you
17    are asking me to include in the verdict form.  Because if not,
18    maybe what you should be asking is to include that definition
19    in the jury instructions.
20             MR. TROPP:  All right.  So fine, we will just leave it
21    the way it is then, Judge.  Because I see that on Page 5, I
22    guess --
23             THE COURT:  You guess what, I'm sorry?
24             MR. TROPP:  I'm sorry.  It says FLSA requires about
25    the regular rate, but I actually don't.  I am trying to find
```

1    where in the -- the definition of employee is in the

2    instructions.

3              THE COURT:  At the risk of repeating myself, let me

4    say that perhaps what you should be considering, requesting is

5    that there be a definition from that regulation that you think

6    is so important it needs to be referenced in the verdict form.

7        (Pause in proceedings.)

8              MR. TROPP:  So, Judge, we will just -- just leave it

9    the way it is.  That's fine.

10             THE COURT:  All right.  Are there any other issues?

11             MR. POLLOCK:  Not now, I will just save it.  I know

12   Your Honor mentioned 25 minutes for closing.  I am just

13   concerned with the verdict form with four Plaintiffs.

14             THE COURT:  No, I think at this rate, I am calling off

15   the jury that I had scheduled to start for tomorrow.  You have

16   all day tomorrow, so if you want to take longer on your

17   closing, you can.  I can probably do it tomorrow.  I don't

18   think you will be ready today for closing with the amount of

19   evidence still left to cover and with the slow progress.

20             Okay?

21             MR. POLLOCK:  Okay.  Thanks, Judge.

22             THE COURT:  Anything else?

23             MR. POLLOCK:  No.  I think that's it from the

24   Plaintiff.  Thank you, Your Honor.

25             THE COURT:  Any issues from Defense?

```
 1              MR. TROPP:  No.  No, Judge.

 2              THE COURT:  All right.  I will get these instructions

 3    to you as I reformat them and go over them one more time.

 4    Please let me know if you see any errors or omission.

 5              MR. POLLOCK:  Thank you, Your Honor.

 6              THE COURT:  Okay.  All right.  So we'll see you in --

 7    we'll see you now.

 8              Are the jurors all back?

 9              Let's get Mr. Batista back to the witness stand and

10    the interpreter, please.

11              Are they all here?

12              COURT SECURITY OFFICER:  Let me check, Judge.

13         (Pause in proceedings.)

14              COURT SECURITY OFFICER:  They are there.

15              THE COURT:  Okay.  Let's bring them out, please.

16         (The jury entered the courtroom at 12:51 p.m.)

17              THE COURT:  Everyone, please be seated.

18              Please proceed.

19                      CROSS-EXAMINATION (Cont'd.)

20    BY MR. TROPP:

21    Q.  How you doing, Mr. Batista.  You had a good lunch?

22    A.  Yes.

23    Q.  Okay.  So the 24 years that you worked as a concierge, is

24    it fair to say you went from, like, making $12 to $18 in that

25    24 time -- 24 years' time an hour, right?
```

1   A.   Yes, commissions.

2   Q.   Did you consider that to be, like, a job that you were

3   going to have for the rest of your life?

4   A.   Yes.

5   Q.   And then because of COVID, that's why they had to -- they

6   let you go?

7   A.   Correct.

8   Q.   And is that where you met Reinier, he was working there

9   also?

10  A.   Yes.

11  Q.   What was he, like a bellhop?

12  A.   Yes.

13  Q.   And did you guys become friends there?

14  A.   Yes.

15  Q.   So at some point he tells you, Hey, why don't you work --

16  or get your license, he told you about working insurance?

17  A.   That's correct.

18  Q.   And was -- at first, the idea was that you were just going

19  to work an open enrollment period?

20  A.   At the beginning, probably, yes.  But as the days went by,

21  then it became more of a permanent thing because really it

22  campaigns throughout the year.

23  Q.   All right.  But when you first went there, the idea was, at

24  first, to do the open enrollment period?

25  A.   No, it was not like that.

```
 1   Q.   Now, you said when you started -- when you went to Avant,

 2   you had limited training?

 3   A.   Yes.  The second point Mr. Cortes came to me and said,

 4   Well, I know that you have not been trained yet, but you have

 5   potential.

 6   Q.   And the training was more about the, um -- the system to

 7   use?

 8   A.   It could be that way, yes, correct.

 9   Q.   But at that time, had you already gotten your license to --

10   to be an insurance agent?

11   A.   Yes.  It had already been two or three months I got it.

12   Q.   You had to study for that?

13   A.   Correct.

14   Q.   You took an exam?

15   A.   Yes.

16   Q.   So the training wasn't about like being an insurance agent,

17   you had already done that.  This was more about the company's

18   system?

19   A.   That's correct.

20   Q.   Okay.  And is it correct in January of 2021, there was not

21   an open enrollment?

22   A.   There was one in the state of California.

23   Q.   There was one.  But how about -- how about in Florida?

24   A.   I seem to remember that in Florida, it ended at the end of

25   December, something like that.
```

 1   Q.  Right.  It ended December 2020?

 2   A.  Well, I'm not really sure, because at a certain point --

 3   moment, the Government extended the period because of -- to the

 4   open enrollment because of COVID.

 5   Q.  Wasn't that the reason why there was no open enrollment for

 6   January, because of the COVID?  There was no open enrollment

 7   for January 2021?

 8   A.  I'm not sure about that.

 9   Q.  Well, you think it might be important?  Because you are

10   claiming you worked 12 hours a day when it was not even open.

11   A.  Well, as I was saying, I was working on a fair campaign in

12   the State of California, and we were establishing those but we

13   were not paying even one penny for that.

14   Q.  Were you doing that -- you were working something in

15   California for Avant?

16   A.  That was what was ordered at that time.

17   Q.  Okay.  So -- so you are still claiming that you worked

18   overtime for the January month of 2021, even though there was

19   no open enrollment during that period?

20        MR. CUMMINGS:  Objection, mischaracterization of the

21   evidence.

22        THE COURT:  Overruled.

23        THE WITNESS:  Well, I believe there was an open

24   enrollment, but it was in the state of California.

25

1   BY MR. TROPP:

2   Q.  And where -- where did you work those hours?  Did you do it

3   remotely, or did you do it from home?

4   A.  At the office in Kendall.

5   Q.  Did you keep any, like, of your own records or anything to

6   show the hours or time that you worked?

7   A.  I don't think so.

8   Q.  So are you still working?  Do you do any work with

9   insurance anymore?

10  A.  No.

11  Q.  Before you worked at Avant and while you were studying to

12  get your license, did you ever look into maybe working for any

13  other insurance companies?

14  A.  Not as far as I recall.

15  Q.  Have you ever heard of any insurance job where you go to

16  sell insurance and it's, um -- and you not only get paid on the

17  commissions or bonuses promised, but -- but at some point there

18  has -- like, we have to figure out -- there's -- the hourly,

19  you are entitled also to all the time that you are trying to

20  get insurance?

21  A.  I'm not so sure.  Could you repeat the question, please?

22  Q.  All right.  Let me ask you this:  When you spoke with

23  Reinier about working at Avant, at that time, you were friends,

24  correct?

25  A.  Yes.

1  Q.  And your case -- let's at least talk about your breach of

2  contract claim.  You are saying that they agreed -- the

3  agreement was to pay you bonuses and commissions?

4  A.  At that time, it seemed that the job was going to be that

5  way.

6  Q.  Which way is that?

7  A.  It seemed that there was going to be some flexibility as

8  independent contractors do have.

9  Q.  And -- and -- and like you testified earlier, it was based

10  on -- you're saying that there is an agreement that if you sold

11  a certain amount of insurance policies, you'd get paid X amount

12  for each one, etc., etc.?

13  A.  Yes, it was a verbal agreement.  But in practical terms, I

14  learned through my 24 years as a concierge, that I never felt

15  in any of the places where I worked as a concierge or any other

16  company, no control that I was -- when I was working with

17  Avant.

18  Q.  But you agree it was a free world.  You could have always

19  walked away or say, I don't want to work here anymore?

20  A.  Yes.

21  Q.  If you don't like a job, you can just leave, right?

22  A.  Probably, yes.

23  Q.  You're a grown man, aren't you?

24  A.  Yes.

25  Q.  There are millions of jobs or hundreds of jobs that you

1   could go to; if it doesn't fit you, you can walk away.  No one

2   is forcing you to go there or do anything with Avant or with --

3   with your hotel, right?

4   A.  What was the exact question?

5   Q.  As to the issue of control, no one is like -- was

6   controlling you; you could have left or not.  You don't -- when

7   you say that you were being controlled, you're saying you're a

8   grown man, you could always walk away from a job or not have to

9   -- no one is forcing you to sell insurance or work at -- or

10  have worked at your hotel job, correct?

11  A.  Well, but the issue of control that you have in almost any

12  steady job that you might have has nothing to do with leaving

13  or staying.

14  Q.  Well, let's go back to my original question.

15      Wouldn't you agree when most people agree to take on a job,

16  the first thing they want to know is what are the terms of the

17  employment?

18              MR. CUMMINGS:  Objection, speculation.

19              THE COURT:  Overruled.

20              THE WITNESS:  Not necessarily.

21  BY MR. TROPP:

22  Q.  So you think that people will agree to take on a job and

23  they don't know what is expected of them or what is expected of

24  the other side and they just start working?

25  A.  Well, I think most people take on a job because they need

1  to get a job.  But in my case, in my particular case, I took

2  that job because I am going with some person that I trusted.

3  Q.  Okay.  But -- so you disagree when -- when I say that

4  usually people when they agree to accept a job or not, they

5  want to know the terms, people want to know, what am I going to

6  get; you disagree with that.  And that's okay.  Because my

7  question is:  When you met with Reinier or discussed joining

8  Avant, did you have an idea of what was -- what was expected of

9  them and what was expected for you?  Like, what were you going

10  to get out of it?

11  A.  Well, the reason I did that was something and then, you

12  know, the first week it was one way and then after that, it

13  changed somewhat.  Correct.

14  Q.  Okay.  There was -- you've seen the 2022 -- like the

15  commission payment compensation plan you were referring to

16  earlier about the amount of people you have to qualify from

17  Oscar or whatever to get a bonus.  You have seen that

18  compensation plan?

19  A.  Yes, I saw it, and I realized that it didn't -- it wasn't

20  -- it wasn't done the proper way in many different ways.

21  Q.  But that was -- that was -- that was what you were

22  expecting to be paid to you from that plan?

23  A.  Well, for example, at the beginning, you know, during the

24  first term and the second term, there was a unilateral decision

25  that just one month was going to be paid for everything, and

1    that was not the original agreement.

2    Q.  I guess what I am trying to ask you is, you are saying that

3    they broke the agreement, and I'm saying what was the

4    agreement?  Where is the agreement?  What agreement are you

5    talking about that they broke?

6    A.  Well, you know, the thing was that, you know, I always

7    thought that they -- the commissions were going to be -- that

8    it was going to be paid in a very transparent and stream way

9    and that my bonuses were going to remain, including in my MPN.

10        So when I realized that none of my policies were under my

11   -- how do you call it? -- my MPN, and when I asked if I stood

12   with the company why I didn't have any of my policies and then

13   my MPN, the response was that it was not necessary.

14   Q.  Again, my question, where -- the basis of the agreement

15   that you are saying was not honored by them, which agreement

16   are we talking about?  What promises are you saying was not

17   fulfilled?  And -- and is it -- are you talking about the MPN,

18   or is it that you can't or won't tell us what it is exactly?

19   What was the agreement that was not honored from '21 to '22?

20   A.  Well, the commissions were missing and the payment for the

21   grand bonus for 2022.

22   Q.  Okay.  Now, for this grand bonus of 2022, where does that

23   come from?

24   A.  An insurance company called Oscar.

25   Q.  And what did you have to do to get that $25,000 bonus?

Cross-Examination of Delio Batista
July 12, 2023
80
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   A.   To sell a minimum of 600 policies.

2   Q.   And how many policies are you saying that you sold, and by

3   what time did you have to sell those policies?

4   A.   During the open enrollment period.

5   Q.   So you had to sell 600 policies from Oscar?

6   A.   Yes.

7   Q.   By the final date of, like, January -- what was it, the

8   31st or something?

9   A.   Correct.

10  Q.   And are you able to show a text message, maybe a e-mail,

11  anything at all that -- and you continued working for Avant

12  January, February, March, April, May, June; you stayed there

13  another five months.

14       Are you saying, which I heard today, that the only reason

15  why we haven't received anything from you saying that you were

16  entitled to this bonus is because there was some type of

17  internal e-mail that -- that you don't have access to?

18  A.   Well, it didn't have to do with a payment.  You know,

19  everybody, all the employees received a page with a register

20  with all the different types of transactions that took place

21  that month.

22  Q.   So do you have -- is there a text message that you could

23  show us or an e-mail and some type of -- anything that says,

24  wow, I hit my 600th Oscar policy sold, I'm entitled to $25,000,

25  anything that you have here today?

Cross-Examination of Delio Batista
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  A.  Well, it's unnecessary because everybody was singing

2  practically in the office when they reached 600.  I think the

3  first one was actually Rafaela.  And then going on, I continued

4  and then I reached also 600, and I believe that I even got to

5  680 or 690.  And as I say, it was unnecessary to have any

6  e-mail or anything like that because in the Google page, you

7  are notified about everything to Avant.

8  Q.  Rafaela is not saying she got -- she made that 600 bonus

9  commission, and Mariana asked for it and she got it.  Other

10  people when they -- they were entitled to it, they got it.

11      My question is, do you have anything to show that at some

12  point, Hey, where is my bonus or, Hey, I got 690 -- anything to

13  prove to show us that for those five months that you continued

14  to work for Avant, you asked for it one time or said --

15  anything that says you made those 600 people?  Because as you

16  have seen, you weren't even close to 600.

17  A.  Well, we could get that if we had access to Mr. Cortes's

18  e-mails, and I would have something if my e-mail account had

19  not been terminated and I could get access to it.  And as a

20  matter of fact, Rafaela sold for Oscar, I believe, up to 900.

21  So what was said before was incorrect.

22  Q.  Do you know what an evasive answer is?

23  A.  Could you ask the question again?

24  Q.  Is it possible if I ask you a question, I could just get an

25  answer, like yes or no?  My question is --

Cross-Examination of Delio Batista                                          82
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1          MR. CUMMINGS:  Objection, Your Honor, harassing.

2   BY MR. TROPP:

3   Q.  -- do you have anything to show, anything at all, without

4   blaming anybody or not -- take a little responsibility, please.

5   I'm asking, do you have anything ever to show in those months

6   that you continued to work for Avant where you said, Hey, I am

7   entitled to this $25,000 bonus, I met the 600 people

8   requirement?

9          MR. CUMMINGS:  Same objection, Your Honor.

10          THE COURT:  Overruled.

11          THE WITNESS:  Let me tell you my part, my answer.

12   BY MR. TROPP:

13   Q.  I just want to know if you have anything, because I want to

14   see it.  Please, show it to me.  Well, this one --

15   A.  In terms of answering with a yes or a no, not all questions

16   can be answered with a yes or a no.

17   Q.  Okay.  Now -- and you're -- we are talking about the 2022

18   open enrollment, right?

19   A.  I was not there during the open enrollment of 2022.

20   Q.  Okay.  So that starts, like, 2021 to '22?

21   A.  I was there in that period.

22   Q.  So you were there for the -- it starts '21/'22, but it is

23   called -- the 2022 open enrollment starts -- it's really like

24   the '22 to '23, right?

25   A.  Well, the 2020 open enrollment covers 2021, and the 2021

Cross-Examination of Delio Batista
July 12, 2023
83
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  covers 2022.  And the open enrollment for 2022 covers this

2  period we are in right now.

3  Q.  Okay.  So let me get back to the Oscar bonus that you are

4  claiming.  How many do you remember that you sold?  How many

5  Oscar policies did you sold -- sell in that 13-week open

6  enrollment period?

7  A.  I seem to remember it was 680 to 690, something like that.

8  Q.  And you're sure about that?

9  A.  Yes.

10  Q.  And you said you don't have it in front of you.  What --

11  what would you refer to that you would have in front of you to

12  help you know that?

13  A.  To my memory and what really happened at the office during

14  that period of time.

15  Q.  Oh, so your memory?

16  A.  Yes.

17  Q.  Okay.  So you said, I don't have it in front of me.  It's

18  between 685 and 690.  Were you basing it on your memory?

19  A.  Well, also because no one from Avant came to me and told

20  me, Hey, you didn't reach the 600 so you are not entitled to

21  the 25,000.  And everybody that is right here in this

22  courtroom, we were entitled to that.

23  Q.  So -- so again -- so you said, I don't have it in front of

24  me.  The numbers, it's around 680 to 690.  And my question to

25  you is, how do you know?  Because if you have something you

1   want to refer to, I would ask you to go get it so we can look

2   at it, but there is nothing to look at.  But without -- I want

3   to ask you the question without you blaming him for not having

4   an answer for it.

5       My question is, are you sure that's the number?  Are you

6   sure you made between 680 to 690 sales in that 13-week period;

7   yes or no?

8           MR. TROPP:  Your Honor, can we please instruct this

9   witness to answer one question?

10          THE COURT:  There can only be one speaker at a time.

11  We haven't heard the answer yet.

12          MR. TROPP:  Okay.

13          THE WITNESS:  Without blaming anybody, you know, if I

14  had not reached that number, somebody in the company would have

15  come and told me, Hey, you didn't.  Someone would have told me,

16  you know, Don't expect to get the $25,000 bonus because you

17  didn't reach the goal of the 600.

18  BY MR. TROPP:

19  Q.  My question is, are you sure you sold between 680 to 690

20  policies of Oscar in that 13-week open enrollment period?  Are

21  you sure that you sold that many?

22  A.  Yes.

23  Q.  Okay.  Do you remember coming -- do you remember where I

24  took your deposition, I want to say -- a month and about five

25  days ago, June 2nd -- I'm sorry, a month and about seven days?

Cross-Examination of Delio Batista
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

85

1    A.  Yes.

2    Q.  And just like today, when I asked you a question at that

3    deposition, you were under oath.  And did you answer all those

4    questions truthfully?

5         MR. POLLOCK:  Your Honor, can I just -- there was an

6    issue with the translation.  And I am not a native Spanish

7    speaker, but I believe Mr. Tropp said June, and I believe the

8    translation was January "enero."

9         THE INTERPRETER:  I said January.

10        MR. POLLOCK:  No, no, Your Honor --

11        THE INTERPRETER:  The response correction.

12        Okay.  Thank you.

13   BY MR. TROPP:

14   Q.  And when you -- you answered truthfully to all the

15   questions because you were under oath as -- during that

16   deposition?

17   A.  Yes.

18   Q.  Do you recall where I asked you in that deposition, when I

19   asked you, "You're claiming this $25,000.  You say that you

20   made enough sales for Oscar to get that bonus."

21        MR. CUMMINGS:  Objection, improper impeachment.  We

22   don't know where this is in the deposition.

23        MR. TROPP:  Page 95, Line 14.

24   BY MR. TROPP:

25   Q.  And your answer was, "Yes, yes."

Cross-Examination of Delio Batista
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1        And my question was, "How could you know that?  How could
2   you prove that?"
3        And then the answer was, "Because there was a list."
4        And then I asked, "How many did you sell for Oscar?"
5        And your answer was, "I don't have that number."
6        It's Line 23, "I don't have that number."
7        So my question is, are you being truthful today and were
8   you not truthful on June 2nd when you said you didn't have that
9   number?
10  A.   I am telling the truth both days.
11       (Pause in proceedings.)
12  BY MR. TROPP:
13  Q.   So you were being truthful when I said, "How do you know
14  how many -- how many people did you sell?"  You said, "I don't
15  have that number"; you were being truthful then?
16  A.   Well, as I recall, it was a month or two days ago, I said
17  600 or 700.  It wasn't very clear, but trying to remember and
18  also talking to my colleagues, I was able to confirm the
19  number.
20  Q.   So after you talked to your -- your other Plaintiffs, after
21  you talked to them, you were able to confirm your 680 to 690 we
22  just heard today?
23  A.   Well, what I confirmed with them was the amount to actually
24  reach the bonus.  So, you know, after the 600 amount was
25  confirmed, that's why I said 600 to 700.  And after trying to

1   remember, I again say that it's between 600 and 700.

2   Q.  The 600 to 700 is the list that was necessary to get the

3   $25,000 bonus, you weren't sure about that?

4   A.  Well, as far as I understand, 680 or 690 is enough to be

5   able to get that bonus.

6   Q.  And -- and this is the same period that you are saying last

7   month you couldn't give us a number, you didn't know how many

8   you sold, but this is the same enrollment period that, like,

9   was closed -- half of it was closed, right; we are talking

10  about that same period?

11  A.  Well, you are talking about the same enrollment period of

12  2021 to 2022.  It has to be the same enrollment period.

13  Q.  Okay.  Let me ask you this, because we are trying to make

14  sense of this, so everyone can make sense of this.  Before we

15  were talking about how much you are saying is owed to you, you

16  had your attorney helping you with that Excel sheet, the one

17  that at the top said, What Defendants are owed.

18      Did you put that -- did you write those numbers yourself,

19  or did you enter those numbers into the Excel sheet?

20  A.  Well, I told my lawyer and he input them --

21          MR. CUMMINGS:  Objection, attorney/client privilege,

22  Your Honor.

23          THE WITNESS:  -- and I was the one telling him the

24  numbers.

25

Case 1:22-cv-22671-CMA  Document 123-3  Entered on ELSD Docket 09/21/2023  Page 88 of
176                                                                              88
Cross-Examination of Delio Batista
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1   BY MR. TROPP:
 2   Q.  I don't want to know what you told -- communications
 3   between you and your lawyer.
 4       My question to you is, except for those -- that Excel sheet
 5   that your lawyer put together and the numbers that were put
 6   there in front of you just now by Mr. Cummings, what do you
 7   have?  What is there?  Show me.  Like, what is there in this
 8   world that you could show us that says, Oh, look, this is not
 9   what was paid to me, this is what is owed to me?  Other than
10   except for what your lawyer put together, do you have anything?
11   A.  Well, since I don't have access to my e-mails, there
12   were -- the calculations were made according to the numbers
13   proposed by Mr. Cortes.  And so to actually show exactly what
14   was in those statements, what we were asking for Mr. Cortes was
15   the statements for the insurance companies.
16   Q.  Let me ask you this, Mr. Batista.  You speak English
17   perfectly.  Do you really need an interpreter?  You even
18   corrected her before.
19   A.  I feel more at ease this way.
20   Q.  But you speak English pretty good?
21           THE INTERPRETER:  Excuse me?
22   BY MR. TROPP:
23   Q.  You speak English pretty good, Mr. Batista?
24   A.  In cases like this, but I prefer to rely on my native
25   tongue.
```

1  Q.  Okay.  You are not making it up that you can't speak
2  English, right?
3  A.  Well, I wouldn't like to have to ask three and four times
4  to please repeat the question because I did not understand it.
5  Q.  Okay.  What is it -- what is the total amount of
6  commissions you are saying is owed to you?  And I am not
7  talking about the bonus or the hourly -- the bonus.  I'm
8  talking about the commission.  How much is it owed to you in
9  commissions?
10  A.  It's about $40,000.
11  Q.  40-?
12  A.  Correct.
13  Q.  And are you sure about that?
14  A.  It's around that.
15  Q.  Could it be higher?
16  A.  I'm not sure of that.
17  Q.  It could be lower?
18  A.  I'm not sure of that either.
19  Q.  Again, do you remember at the deposition where I asked you
20  some questions and you swore to tell the truth, like you did
21  today, correct?  Remember, it was June 2nd of your deposition?
22  A.  Correct.
23  Q.  And do you remember where I asked you, um, "Okay, you're
24  entitled to another 18,000 commissions, right?"  Because you
25  were asked -- you said you were entitled to 18,000 in

1    commission and it's 90, Line 12.

2         MR. POLLOCK:  What page?

3         MR. TROPP:  90.

4    BY MR. TROPP:

5    Q.  And you said, "That is correct."  You were saying -- you

6    said it was only $18,000 in commissions you received.

7         Do you remember that answer?

8         THE INTERPRETER:  The interpreter is not finished

9    interpreting.  I'm sorry.

10        MR. TROPP:  I'm sorry, I apologize.

11        THE WITNESS:  At that time, we were working with

12   preliminary numbers, so basically the numbers were adjusted

13   according to the numbers that happened, that were there.

14   BY MR. TROPP:

15   Q.  So yes, you gave that answer; you agree that's what the

16   answer that you gave last month was --

17   A.  What answer, I'm sorry?

18   Q.  My question to you was, was that your -- was that the

19   answer when I asked you how much commissions you were entitled

20   to; you said $18,000?

21   A.  Well, at that time, there was a report that I think had to

22   do with a report that was for 2,029, 2029.

23   Q.  You are saying it was a mistake for a report from 2029 is

24   why you told me it was 18,000 in commissions?

25   A.  As I said before, those were preliminary numbers.

1   Q.  So you start working for all of 20 -- the beginning of 2021

2   to 2022, you were working at Avant, and you never asked him --

3   I am not talking about the last six months of 2022 where you

4   made 12,000 a month; right?  You made 12,000 a month for 2022,

5   the six months you were there; is it fair to say?

6           MR. CUMMINGS:  Objection, mischaracterizes the

7   evidence.

8           THE COURT:  Overruled.

9           THE WITNESS:  Yes.

10  BY MR. TROPP:

11  Q.  So from 20 -- the beginning of 2022 to -- let's say to -- I

12  mean, to the end -- to -- all of 2021, which seems like so long

13  ago, actually, and 2022, that -- those periods, you establish

14  you never asked him or sent him something about the 18,000 or

15  anything, although I understand you are saying that you sent to

16  an e-mail that you don't have access to.

17      But from January -- from last month to now, you've -- you

18  are saying -- I'm trying to understand how you jump from 18- to

19  42-, or are you just making these numbers up as you go along?

20          MR. CUMMINGS:  Objection, mischaracterizes the

21  evidence.

22          THE COURT:  Overruled.

23          THE WITNESS:  I am not making up any numbers, and I

24  don't know what e-mail you are referring to when you mentioned

25  January.

```
 1   BY MR. TROPP:
 2   Q.  Well, yeah, because there are no e-mails, so I understand
 3   your confusion.
 4       But, Mr. Batista, let me ask you, a big element in this
 5   case that your lawyer brought up is that Avant employees were
 6   not allowed to work for other companies, they only had to work
 7   for Avant; is that the case?
 8   A.  I believe that is right, because the license is to the
 9   insurance company, and the agents are not allowed to work for
10   other companies.
11   Q.  Well, what about you, you were not allowed to work for
12   other companies?
13   A.  No, I couldn't because, as I said, all of the license are
14   tied to Avant.
15   Q.  For instance, did you work for other companies?
16   A.  No.
17   Q.  Did you ever work for a company called Shore Bridge?
18   A.  Well, it was a dental insurance, and it was linked to
19   Avant.  So all the license and everything that had to do with
20   dental was actually under Avant.  And since I was let go from
21   Avant, I don't have access to any of that.
22   Q.  Didn't you get 1099's directly from Shore Bridge to you for
23   all the periods you are claiming that you are owed money?
24   A.  Yes, they paid through a 1099.
25   Q.  So you got a 1099 from Shore Bridge Insurance?
```

1   A.   Yes, that is what we received from Shore Bridge.

2   Q.   From another insurance company?

3   A.   Well, it is another insurance company, but we were

4   appointed from the base of Avant.

5   Q.   Okay.  So you are blaming them again.  You are blaming

6   Avant for you getting a 1099 from another insurance company you

7   worked for, okay.  I got that.

8        What about did you get a 1099 -- oh, I'm sorry,

9   Ms. Interpreter.  I apologize.  Go ahead and finish.

10            THE INTERPRETER:  The interpreter is finished, thank

11   you.

12            THE COURT REPORTER:  I'm sorry, I need for you to

13   repeat the question.

14   BY MR. TROPP:

15   Q.   You also worked for Southern Florida Concierge Association,

16   right?

17   A.   Well, I am glad you are mentioning that, because this is

18   actually a 1099 from a real company as an independent

19   contractor through which I worked any hours I want, I worked

20   wherever I want and the days that I want.

21   Q.   Okay.  But the same company you worked for and got money

22   for during the period while you were working for Avant?

23   A.   But that is not an insurance company.

24   Q.   You were allowed to work for other companies, right?  You

25   want to take back your statement that you were not allowed to

1    work for other companies, or you want to keep it?

2    A.   The Southern Florida Concierge Association has nothing to

3    do with an insurance company.  It's not an insurance company.

4    Q.   So I agree with you --

5             THE INTERPRETER:  I haven't finished.  I haven't

6    finished.

7             THE COURT:  One second, please, she hasn't finished

8    the answer.

9             THE WITNESS:  Basically I shouldn't even have to talk

10   about this because with the South Florida company, it is not a

11   insurance company.  And basically I am working weekends with

12   that company.  But if I ever wanted to, I could even go and

13   work after 10 p.m., whenever I left Avant.

14   BY MR. TROPP:

15   Q.   I agree with you.  That's right, you are allowed to work

16   for other companies.  They didn't care who you worked for,

17   right?

18   A.   The restrictions had to do with health insurance.  If I was

19   working for Avant, which is an insurance company, I could not

20   work for another insurance company because the license is tied

21   to that company, the insurance.

22       And as a matter of fact, with the dental company mentioned

23   before, Avant actually pushed us to work with them because they

24   received a commission when we worked for them.

25   Q.   Right.  So South Florida Association -- Concierge

Case 1:22-cv-22671-CMA  Document 123-3  Entered on ELSD Docket 09/21/2023  Page 95 of 176
Cross-Examination of Delio Batista
July 12, 2023
95
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    Association, I get your point, not an insurance company like

2    Shore Bridge.  Shore Bridge was an insurance company that you

3    got paid for separately, 1099.

4        But the point is -- the point -- you understood, you were

5    about to answer it.  You understood my question, right?

6    A.  It wasn't a question (in English).

7    Q.  That is perfect English.  I know you speak perfect English.

8    That's okay.  We'll -- we'll -- we'll do this -- we'll do it

9    your way.

10       And I understand and we agree that there's -- there's a --

11   there's third-party insurance companies like Oscar, for

12   instance.  Oscar does require -- make it a requirement that if

13   there is an agent with an MPN number, then they don't want that

14   agent working for another company selling Oscar.  And there are

15   restrictions with certain insurance companies.  But -- but

16   Rafaela sold life insurance, she was able to do it.  He knew

17   about it; she didn't get fired.

18       The point -- the point that was made, was you guys were not

19   allowed to work for anyone else, anyone else --

20           MR. CUMMINGS:  Objection, counsel is testifying, Your

21   Honor.

22           THE COURT:  Overruled.

23   BY MR. TROPP:

24   Q.  And you said, Yes, that's the case, I don't have to work

25   for anyone else because that's the big sign of control --

 1   that's a big aspect of this case.

 2           MR. CUMMINGS:  Objection, Your Honor.

 3           THE COURT:  This is sort of like a narrative stream of

 4   consciousness.  Ask your question of the witness, please.

 5           MR. POLLOCK:  And, Your Honor, I don't know that any

 6   of this has been translated.

 7           THE COURT:  It has not, but again, I think he

 8   understands.

 9           What's the question?

10   BY MR. TROPP:

11   Q.  My question is -- the question was simply, you were allowed

12   to work for anyone you wanted to when you worked for Avant; you

13   didn't care, right?

14   A.  No, no, I didn't, because it was impossible.

15       (Pause in proceedings.)

16   BY MR. TROPP:

17   Q.  You work for the State of Florida now?

18   A.  Correct.

19   Q.  In something with collections or something?  Or what do you

20   do for the State of Florida?

21   A.  Florida Department of Revenue.

22   Q.  In that job, you're a -- you're a W-2 employee, correct?

23           MR. CUMMINGS:  Objection to relevance.

24           THE COURT:  Overruled.

25           THE WITNESS:  I imagine they are going to give it to

1    me.

2    BY MR. TROPP:

3    Q.  You are -- what do you mean?  You're employed now as a W-2

4    employee, correct?

5    A.  Yes, but I didn't get it yet.

6    Q.  You are not -- you're -- are you an independent contractor

7    for the State of Florida?

8    A.  No.

9    Q.  And -- and you're not -- you're not really free to do what

10   you want to do as an employee of the State of Florida.  You

11   have to show up certain times and you have rules for your job,

12   right?

13   A.  Exactly the same as with Avant.

14   Q.  Well, you're -- so -- let me -- are you a W-2 employee?

15   A.  Yes.

16   Q.  And, um, is it -- is it fair to say in the entire time that

17   you have lived in the United States, which is 30 years, more or

18   less, 30 years, 20 -- like 28 of those years you have been

19   working as a W-2 employee and you have only worked, what is it,

20   a year and a half or 18 months with Avant as a 1099.

21       So my question is, do you know the difference between the

22   W-2 employee and a 1099 employee?

23   A.  Well, the only difference is the job that I had had as a

24   part-time employee with the South Florida Concierge Association

25   where I receive a 1099, which I believe is more real, no one

1   supervises my job; I work the hours I want to work; I know the

2   days I want to go, and if I don't want to go, I don't have to

3   report to anybody.  The 24 years, including the 18 months with

4   Avant, have been very similar if you compare one to another.

5   Q.  Okay.  Now, one of the issues in this case is you feel that

6   Mr. Reinier or Andrea knew that they owed you overtime or

7   hourly wages and deliberately, willfully, like knowing that

8   they owe you this -- these hourly wages, they didn't pay you

9   deliberately?

10              MR. CUMMINGS:  Objection, relevance.

11              THE COURT:  Your response?  What's the relevance?

12              One moment.  One moment, please.

13              THE INTERPRETER:  Sorry.

14              THE COURT:  Sustained.

15   BY MR. TROPP:

16   Q.  All right.  So these hourly wages that you are claiming

17   were owed to you -- well, first of all, we are trying to

18   establish what the agreement that you are saying was not

19   honored by Avant.  But did they ever agree to pay you hourly?

20   A.  No, there was never such an agreement.

21   Q.  All right.  Would you agree -- I mean, at some -- you said

22   at some point later on in the relationship with Avant, there

23   was more -- there was more control; is that fair?

24   A.  Even from the beginning, I remember that one of the first

25   weeks when I was working for Avant, ever since I have been

Cross-Examination of Delio Batista
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  working with people or the public, I always took notes about

2  agreements or things that I should remember about the clients.

3  And during the first week working there, Mr. Cortes told me

4  that I could not take any such notes anymore.  I was notified

5  the same way that you are taking notes on the witnesses.

6        THE INTERPRETER:  Referring to the interpreter.

7  BY MR. TROPP:

8  Q.  My question -- I am not sure what you were answering.  But

9  my question was, you said at the end of the relationship, there

10 was too much control.  But was it like -- in the beginning,

11 what -- for the first year were you guys okay?  You had

12 problems with Reinier in the beginning before you were making

13 12,000 a month?

14 A.  Well, you know, I -- I say that there was control.  There

15 was control from day one when I was working for the company,

16 even from the vice president who used to sit next to me.  She

17 constantly interrupted phone calls to interact with me with

18 corrections.  And that at one point, she had went to the office

19 of Mr. Cortes and he came to ask me whether I was actually on

20 the phone because -- or if I was answering the phone because

21 the phone was ringing and it seemed that I wasn't answering.

22 Q.  All right.  So when I asked you, is it okay in the

23 beginning, I guess I can't get an answer out of that.

24     But let me ask you this:  You -- you said that working for

25 Avant, same as working for State of Florida, like the same

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 100 of
176
Cross-Examination - Delio Batista
July 12, 2023
100
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  thing, and -- but let me ask you this:  Your job now with the

2  State of Florida, are you saying that you could choose your

3  hours and do whatever you want?

4  A.   Honestly, I don't understand the question well.

5  Q.   You said earlier that with your job now, you could pick

6  your hours.

7  A.   I didn't say that.

8  Q.   Okay.  But now, your job with the State of Florida, can you

9  pick your hours and be free to go in when you want to go in?

10           THE INTERPRETER:  The interpreter would like to note

11  that the answer, maybe she wasn't clear when she said it, but

12  the witness said, I didn't say so.

13  BY MR. TROPP:

14  Q.   Your job with the State of Florida now, are you able to go

15  as you wish or work when you want to work?

16  A.   It is very similar to Avant but shorter hours, at least

17  during the open enrollment.

18  Q.   You're never working more than 40 hours a week now, right?

19  A.   That's correct.

20  Q.   You get a straight salary?  Straight salary?

21  A.   Yes.

22  Q.   If you pay -- if you work over 40 hours, you get overtime?

23  A.   I don't think there is overtime, no.

24           THE COURT REPORTER:  I'm sorry, what was the answer?

25           THE WITNESS:  I don't think there is overtime, no.

```
 1    BY MR. TROPP:
 2    Q.  But you have rules in the job now, you have to show up at a
 3    certain time?
 4    A.  The same as in any other job where you are not an
 5    independent contractor.
 6    Q.  Thank you.
 7              MR. TROPP:  That's all I have.
 8              THE COURT:  Redirect?
 9                         REDIRECT EXAMINATION
10    BY MR. CUMMINGS:
11    Q.  Mr. Batista, it's true that you don't remember the exact
12    number of Oscar policies you sold during the open enrollment
13    period, correct?
14    A.  Well, I didn't recall at the time, but I believe that the
15    numbers I give a while ago are very close to being true.
16    Q.  But just as a yes or no answer.  You just -- you don't
17    remember the exact number you sold, correct?
18    A.  That's correct.
19    Q.  And just because you don't remember the exact number, does
20    that mean that you sold less than 600?
21    A.  That's correct.
22    Q.  And Mr. Tropp referred to Page 95 of your deposition to
23    make it seem that you didn't sell at least 600 policies, but,
24    in fact, on that same day and that same deposition, just a
25    moment later, on Page 97, at Line 6, do you remember giving
```

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 102 of
176                                                                               102
Redirect Examination of Delio Batista
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   this answer:

2          "QUESTION:  Well" -- question by Mr. Tropp.

3          "Well, look.  You're the one saying you're owed just

4   $25,000 for getting the super bonus, and you don't know?  You

5   don't remember what you had to do to get it?"

6          And do you remember giving this answer:  "This was

7   almost two years ago, and during the months of January,

8   February and March, we were anxiously awaiting this bonus

9   because we were certain that we had made enough sales.  And

10  whether the number was 600 or 700 or 800, we knew that we had

11  gotten to that number because of all the effort we had put in

12  during the months of November and December"?

13  A.  Correct.

14  Q.  Now, just a few minutes ago Mr. Tropp said that you made

15  $12,000 a month.  And let me just show you something.

16     (The exhibit was published to the jury.)

17  BY MR. CUMMINGS:

18  Q.  Is there -- going back to the first page of the document

19  that we were going through together, is there anything on this

20  first page that says that you made $12,000 a month?

21  A.  No, I don't see anything like that.

22  Q.  Okay.  And is there anything on this second page that says

23  that you made $12,000 a month or you think you made $12,000 a

24  month?

25  A.  No, I don't see anything like that.

1  Q.   So when Mr. Tropp said that you make -- you -- you are

2  saying you made $12,000 a month, those are his words and not

3  yours, correct?

4  A.   Correct.

5  Q.   But in total in commissions, overtime and bonus, how much

6  are you saying that Avant owes you for 2021 and 2022?

7  A.   $70,761.48.

8  Q.   Thank you.

9           MR. CUMMINGS:  I have no further questions.

10          THE COURT:  Thank you.  You may step down.

11          (Witness excused.)

12          THE COURT:  All right.  We will take a brief afternoon

13  recess, ladies and gentlemen.  We'll take ten minutes.  Please

14  don't discuss the case.

15          COURT SECURITY OFFICER:  All rise.

16     (The jury exited the courtroom at 2:30 p.m.)

17          THE COURT:  You may retake your seat.

18          I made some additional edits to the verdict form.  It

19  still had the individual defendants on a breach of contract

20  count, so I deleted them and just kept it singular to a

21  potential contract with Avant.

22          The other -- I made some additional edits to the jury

23  instructions, so read those carefully.  The edit spoke in the

24  singular of one contract, but there would not have been one

25  contract, there would have been four, so I made all of those

 1    references in the plural.

 2            And then I am left with a question to Defendants.

 3    There was discussion of the unclean hands defense.  In

 4    reviewing the pleadings, I believe the Defendants raised

 5    unclean hands as an affirmative defense to all of the claims

 6    without being specific about any of the three claims.

 7            Unclean hands would presumably be a viable defense to

 8    the unjust enrichment claim against Avant, so I leave it up to

 9    you gentlemen to propose a jury instruction and/or a finding on

10    the verdict form, if -- if it is even called for, on that

11    affirmative defense just specific to the unjust enrichment

12    claim directed to Avant.

13            You have never proposed such an instruction.  All you

14    did was propose a reading of the affirmative defense, which is

15    not an instruction on the law.  So if you want to propose that,

16    you need to do it today and share it with Plaintiffs and then

17    we can discuss about including it.

18            MR. POLLOCK:  Your Honor, the third affirmative

19    defense, which is the unclean hands defense, is not -- was not

20    pled as to breach of contract or unjust enrichment.

21            THE COURT:  It was not specific, it's just there.

22            MR. POLLOCK:  I don't see how it could ever apply to

23    breach of contract or --

24            THE COURT:  No, it would only be as to unjust

25    enrichment.  It's only a defense to the inequitable claims in

1    this action, which is the unjust enrichment claim.

2         MR. POLLOCK:  But the way it's pled is that because my

3    clients were claimed 1099 independent contractor status with

4    the United States Department of Treasury, Internal Revenue

5    Service and in internal documents and communications, the rest

6    of the sentence would read:  "They cannot recover under a claim

7    of unjust enrichment."  I don't know how one has anything

8    legally to do with the other because they can still recover

9    under unjust enrichment if they were independent employees.

10        THE COURT:  You're right.  That's why I put the issue

11   out there.  Let's have it be clear so it's not an issue post

12   verdict.

13        Thank you.  We'll take a brief recess.

14     (A recess was taken from 2:33 p.m. to 2:51 p.m.)

15        COURT SECURITY OFFICER:  All rise.  Please remain

16   standing for the jury.

17        THE COURT:  The next witness, please.

18        MR. POLLOCK:  Plaintiffs call Carlos Lopez Alcala.

19        THE COURT:  Does he need the interpreter as well?

20        MR. POLLOCK:  Yes, Your Honor.

21     (The jury entered the courtroom at 2:52 p.m.)

22        THE COURT:  Everyone, please be seated.

23        Please raise your right hand.

24              (Time 2:52 p.m.)

25              CARLOS LOPEZ ALCALA,

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 106 of 176

Direct Examination - Carlos Lopez Alcala
July 12, 2023                                                106
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1   a witness for Plaintiffs testified as follows:

 2            THE WITNESS:  I do.

 3            THE COURT:  Please be seated.

 4            MR. POLLOCK:  May I proceed, Your Honor?

 5            THE COURT:  Yes.

 6                     DIRECT EXAMINATION

 7   BY MR. POLLOCK:

 8   Q.  Good afternoon, Carlos.

 9   A.  Good afternoon.

10   Q.  Carlos, I'm going to try to be as brief as I can with you

11   today.

12   A.  Very good.

13   Q.  And I am going to try not to talk about things that I think

14   we have already established pretty well.

15       And I am going to also try to not ask the same thing six

16   different ways, if that's okay with you.

17   A.  Perfect.

18   Q.  Okay.  Just a little bit about you at first so the jury

19   understands kind of who you are and where you are from.

20       Tell us, where are you from?

21   A.  My name is Carlos Lopez, and I am from Venezuela.  I was

22   born in Caracas, Venezuela.

23   Q.  And --

24            THE COURT REPORTER:  I'm sorry, one more time.

25

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 107 of 176

Direct Examination - Carlos Lopez Alcala                    107
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  BY MR. POLLOCK:

2  Q.  Are you married?

3  A.  Yes.

4  Q.  What is your wife's name?

5  A.  Roxanna Tork, T-O-R-K.

6  Q.  Did you meet your wife here in the U.S.?

7  A.  Yes, I did.

8  Q.  And when did you arrive here to the United States?

9  A.  In 2014.

10  Q.  Do you and Roxanna have any kids?

11  A.  We are trying to have.

12  Q.  And I know that's been a struggle.

13  A.  Amen.

14  Q.  So let's just kind of jump into this.  Why did you want to

15  be an insurance agent?  What kind of sparked your interest?

16  A.  Well, my sister, Mariana Lopez, actually knew Reinier at

17  Avant, and she told me there was a possibility of a possible

18  business, and so that's what interested me.

19          THE COURT REPORTER:  I'm sorry.  Madam Interpreter,

20  can you turn on your microphone.  Thank you.

21          THE INTERPRETER:  Did you need the interpreter to

22  repeat?

23          THE COURT REPORTER:  No, I got it.

24  BY MR. POLLOCK:

25  Q.  When was the first time that you saw or met Mr. Cortes?

1  Where was that?

2  A.  The first time was at the end of October of 2021.  I went

3  to look for some keys at my house that my sister had, and she

4  was working for Mr. Cortes.  And I had met him at the corridor

5  of the office.

6  Q.  Did you talk at all about a job at Avant or working at

7  Avant or what you were doing?  Tell us about that.

8  A.  Well, at that time, I was introduced to him, and he was

9  told that I was standing to take up the license for health

10  insurer.  And he told me that when I got my license, he had a

11  desk waiting for me right there.

12  Q.  Did you end up getting your health insurance license?

13  A.  That's correct.

14  Q.  And about how long after you got your health insurance

15  license did you start working for Avant and Mr. Cortes and

16  Ms. Gonzalez Quintero?

17  A.  I approve my exam for the license, it was a Saturday, the

18  13th of November.  And Monday, the 15th of November, I started

19  working for Mr. Cortes.

20  Q.  When you got to the office at Avant, was there a computer

21  and monitors and everything you needed waiting for you?

22  A.  When I got to Avant, all the computers were being used, and

23  so Mr. Reinier bought me a computer and two screens for me to

24  be able to work because there were not enough to go around.

25  Q.  Did you talk with Mr. Cortes about how you would be paid

1  for your work at Avant?

2  A.  Well, when I started working for Avant, the open enrollment

3  had been -- was over, so everything had to do with the piece of

4  paper where everything was recorded.

5  Q.  And the piece of paper where everything was recorded that

6  you are talking about is Exhibit 8, the 2022 compensation plan,

7  which is that two-page document we have seen over and over in

8  this case; is that what you are talking about?

9  A.  Yes, correct.

10 Q.  Okay.  We don't need to look at it again right now, do we?

11 A.  I don't think it's necessary.

12 Q.  Did -- besides showing you that document, did Mr. Cortes

13 explain it to you at all?

14 A.  Well, the initial commitment was that in the contract, I

15 have no children.  I do have a child, a girl, but she is not

16 with me; she lives in Venezuela.  And so the initial idea was

17 that I would be working from 9 a.m. to 9 p.m., including

18 Saturdays when I would be working from 10:00 in the morning

19 till 4:00 in the afternoon.

20 Q.  And was that important for Mr. Cortes to have you work from

21 9:00 in the morning to 9:00 at night, Monday through Friday and

22 on Saturdays from 10:00 to 4:00 during open enrollment because

23 there were ladies who worked at Avant who couldn't stay late

24 because they had a family to go home to?

25          MR. TROPP:  Objection, leading.

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 110 of
176

Direct Examination - Carlos Lopez Alcala
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

110

1          THE COURT:  Sustained.

2          THE WITNESS:  That's correct.

3   BY MR. POLLOCK:

4   Q.  Since there was an objection that was sustained, did you

5   have a discussion with Mr. Cortes about why he wanted you to

6   work from 9:00 to 9:00, Monday to Friday and 10:00 to 4:00 on

7   Saturdays?

8          MR. TROPP:  Objection, leading.  Objection, leading.

9          THE COURT:  Overruled.

10          THE WITNESS:  Well, in the front office at Avant,

11   there are some people who work with what we call leads, that

12   means potential clients.  And the section was that at that

13   moment, there were 50 people -- I'm sorry, 40 people initially.

14   And they were in charge of passing on the phone calls to these

15   agents that are on this side to forward the phone calls from

16   the clients.

17          And so any time that is lost because of those phone

18   calls is time that is wasted and money lost for Mr. Cortes.

19   That is why you had to be all of those hours and to receive any

20   calls that would be coming in until 9 p.m.

21   BY MR. POLLOCK:

22   Q.  Was it your decision whether you would re- -- a call would

23   come to you or not?

24   A.  No.

25   Q.  We have talked about the lead process and the calls, but

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 111 of
176
Direct Examination of Carlos Lopez Alcazar
July 12, 2023                                                               111
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    we've talked about how this works in a little bit more detail.

2    How -- how was it that a particular -- you know, you would get

3    on a certain call?  Was there a special procedure that you had

4    to follow, or was there, you know, a dialer that would go agent

5    to agent to agent; how did that work?

6    A.  Well, all the calls came in through the system that was

7    used, that was CRM.  And then all the calls actually came in

8    directly to the office in Kendall, and we had to receive all

9    the phone calls that came from Colombia.  And the system showed

10   you an alert that there was an incoming call and you had to

11   click on it.

12   Q.  Did the system decide who gets the call, or how is it

13   determined which agent would get which call?

14   A.  The agent who actually activated the click is the one who

15   got the call.

16   Q.  Now, before you started working at Avant, did you ever work

17   with a system like Radius Bob that you used at Avant?

18   A.  Never.

19   Q.  When you started working at Avant, did you receive

20   training?

21   A.  Well, first, Ms. Andrea showed me a presentation that was

22   for about five minutes, and then they sat me next to Alix

23   Ledesma and that was for another 20 minutes.

24   Q.  And then after this 25 minutes of training that you had,

25   you were able to start selling insurance; is that what

1   happened?

2   A.  Yes.

3   Q.  And were you able to sell insurance after 25 minutes of

4   training because you came in with this expertise or special

5   skills of how to sell insurance policies?

6   A.  No, I believe I sold because I was really able and wanting

7   to sell.

8   Q.  You told us that Mr. Cortes -- let me back up for a second.

9       You mentioned Andrea.  That's Andrea Gonzalez Quintero, the

10  other named Defendant in this case; is that who you are talking

11  about?

12  A.  Yes.

13  Q.  Okay.  Now, you may have told us that Mr. Cortes went out

14  and bought you a computer and a monitor, and I'm presuming

15  everything else that goes with it, the mouse, the keyboard, the

16  headset; is that what happened?

17  A.  Correct.

18  Q.  And then were you given a workstation, you know, the desk

19  and a chair and all that where you would be assigned to work

20  while you were at Avant?

21  A.  Yes, correct.

22  Q.  And who was it -- was that workstation assigned to you, or

23  did you walk in and somebody say, Hey, Carlos, you know, this

24  is the computer that we just put up for you, and go to work?

25  A.  Well, no, that workstation was assigned to me with my

Direct Examination - Carlos Lopez Alcalde
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    computer, my password and I was the only one who could use it.

2    Q.  How did you know that workstation was yours; who walked you

3    over or brought you to it?  How'd you know?

4    A.  Mr. Reinier Cortes is the one who showed me the place.

5    Q.  Besides having your license in Florida, did you get

6    licenses in other states?

7    A.  I have license for seven other states that Mr. Reinier

8    Cortes got me so I could work in other states.

9    Q.  The licenses that Mr. Cortes got you in those seven other

10   states, was it the same process that your sister Mariana

11   described where Mr. Cortes filled everything out and she just

12   electronically signed?

13   A.  Yes.

14   Q.  You mentioned the processing center, the call center in

15   Colombia.  What hours did you say that they would normal --

16   that they would send leads or calls over to Avant in Kendall

17   and then -- I guess it was only Kendall while you were there?

18   A.  Yes, in Colombia, they work from 9:00 to 9:00 as well.

19   Q.  And then did you also continue to get leads from Colombia

20   after the open enrollment period 2021 to 2022?

21   A.  That's correct.

22   Q.  And did you continue to work with the Colombian call center

23   after the office was moved to Doral?

24   A.  Correct.

25   Q.  And referring back to this open enrollment period, what

1  hours do you recall working, as far as your best estimate?

2  A.  How many hours according to the time table, or how many

3  hours a day?

4  Q.  How many would you be at work a day at Avant?

5         THE COURT REPORTER:  What was the end of that

6  question?

7         MR. POLLOCK:  At Avant.

8         THE WITNESS:  12 hours daily, sometime a little bit

9  more.

10  BY MR. POLLOCK:

11  Q.  That's Monday through Friday, and then Saturday you said it

12  would be about 10:00 to 4:00?

13  A.  Correct.

14  Q.  So for you, you would work about 66 hours a week during

15  open enrollment; is that right?

16  A.  That's correct, yes.

17  Q.  And if the open enrollment period we talked about is 13

18  weeks, how many of those weeks in the open enrollment period

19  did you work?

20  A.  Well, I work for 8 -- 11 weeks, because the open enrollment

21  started the 15th of November and two weeks had gone by before I

22  started.

23  Q.  Now, Mr. Cortes told us that he kept a spreadsheet of all

24  the sales for all the agents.  Did you keep your own

25  spreadsheet of all your sales?

1    A.   Yes, had my own spreadsheet from Google, Google Sheets that

2    I shared with Mr. Cortes.

3    Q.   Now, there are certain documents that we have looked at so

4    far and that we are going to look at that were just created

5    just for this lawsuit.   The spreadsheets that we are going to

6    look at that you prepared, were they prepared for this lawsuit?

7    A.   Well, those were the daily sheets that prepared with

8    Mr. Cortes for all the companies that worked -- or that we

9    worked with at that time.   They were created by Mr. Cortes and

10   shared with the lawyers in this case.

11   Q.   And the spreadsheets that you created, did they exist

12   before the lawsuit was filed?

13   A.   They were created by Mr. Cortes.   And day No. 1 when I

14   started working, he shared them with me.   And then after that,

15   there was a second spreadsheet created by Mr. Cortes that was

16   used for the open enrollment.

17   Q.   And between your spreadsheet that you kept and the

18   spreadsheet that Mr. Cortes kept, did you start to see a

19   difference in how many policies you were selling and how much

20   money you should have made versus how much Mr. Cortes was

21   crediting you for?

22   A.   In each and every payment, there were -- there was a

23   difference.

24   Q.   I am going to show you what's part of Exhibit 17.   Let me

25   know if you recognize this.

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 116 of
176
Direct Examination of Carlos Lopez Alcazar
July 12, 2023                                                                116
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1          (Plaintiffs' Exhibit No. 17 was identified.)

2              THE WITNESS:  That was the spreadsheet that I was --

3     that I prepared personally where I registered all the payments

4     that -- received by Mr. Cortes and everything that was still

5     pending to be paid.

6     BY MR. POLLOCK:

7     Q.  Had you shared this spreadsheet with Mr. Cortes?

8     A.  Yes, I shared it with Mr. Cortes.

9     Q.  Did you share it with Mr. Cortes while you were still

10    working at Avant?

11    A.  Yes.

12    Q.  And so this spreadsheet was prepared before you received a

13    cease and desist letter, before you filed the lawsuit and

14    before Mr. Cortes or his company filed a lawsuit against you;

15    is that all -- is that all correct?

16    A.  No.  This register was prepared before because it was the

17    register that I had to be able to verify my payments.

18    Q.  Gotcha.  So according to the spreadsheet that you kept

19    while you were working at Avant, how many Oscar policies -- or

20    excuse me, how many Oscar members did you enroll during the

21    open enrollment period?

22    A.  836 members.

23    Q.  And so besides the bonus that you earned, were there also

24    additional commissions that you believe you had earned for

25    selling insurance policies that were not paid to you?

Direct Examination - Carlos Lopez Alcala
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    A.   That is correct.

2    Q.   And besides the Oscar bonus, did you qualify for any other

3    bonuses?

4    A.   Well, besides the Oscar, there was also an original one

5    from Mr. Cortes that was created.  Bright Health, that was for

6    8,000.  Yes, 8,000.

7    Q.   And for Oscar, Mr. Cortes was paying you and the other

8    agents at Avant $35 per member.  Do you know how much Oscar was

9    paying to Avant for each member that it signed up?

10   A.   Well, we got $75 commission but for the boss.  Mr. Cortes

11   was interested in Oscar because he would get a commission of

12   100 percent.  Well, for every member that we -- that we

13   actually made money for the $35 bonus, Mr. Reinier made $100

14   per each member on the 600 members.

15   Q.   And how much did you calculate that you were owed from the

16   -- from Avant for the open enrollment period between the

17   bonuses and commissions?

18   A.   $30,000.

19   Q.   And is it what appears on the spreadsheet --

20        THE INTERPRETER:  Sorry.

21   BY MR. POLLOCK:

22   Q.   And is it what appears on the spreadsheet to be exact,

23   $30,135?

24   A.   Yes, it is correct.  30,135, that's 3, 0, 1, 3, 5.

25   Q.   Okay.  And you got to that by calculating how much you

1  earned and you deducted how much you were paid; is that how you

2  got that number?

3  A.   That's correct.

4  Q.   And did you get advances from Avant during the open

5  enrollment period until you started getting payments for the

6  commissions?

7  A.   Well, from the 15th of November, we agreed with Mr. Cortes

8  that I would be getting a thousand dollars a week for the

9  commissions that I would be getting during open enrollment.

10  Well, the only other money was the $8,000 bonus that I got or

11  we got from Bright Health Rewards.

12  Q.   Okay.  And then after open enrollment, do you have another

13  spreadsheet that -- where you track how much you earned, how

14  much you were paid and how much you are owed for the

15  commissions that you earned while working at Avant?

16  A.   Well, yes, correct.  And it was the same spreadsheet as

17  open enrollment but from the 1st of February on.  We started

18  from zero at that time.

19  Q.   Okay.  Same spreadsheet, it's just another tab at the

20  bottom?

21  A.   Well, this amount is everything that happened after the

22  open enrollment period was finished, because Mr. Reinier took

23  away my access to the -- to Google Drive -- Google Sheets.

24  Q.   Okay.  And so according to your calculations, how much does

25  Avant owe you for the commissions that you earned after the

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 119 of
176
119
Direct Examination of Carlos Lopez Alcala
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    enrollment period but were not paid?

2    A.   Well, he didn't pay me $10,725.

3    Q.   Gotcha.  And your records -- I mean, to be fair, your last

4    day of work was June 17th of 2022?

5    A.   That's correct.

6    Q.   And did you continue to get some commission payments after

7    you stopped working at Avant?

8    A.   I received commission payments from the month of July.

9    Q.   Did you receive the bonus payment that you were owned for

10   selling, whether it was 840 or 836 Oscar policies?

11   A.   You mean the bonus for 836 Oscar?

12   Q.   Yes.

13   A.   I did not receive that.

14          THE COURT REPORTER:  I'm sorry, you said I did?

15          THE INTERPRETER:  I did not.

16          MR. POLLOCK:  Did not.

17   BY MR. POLLOCK:

18   Q.   Did you feel like you're getting your commissions on time,

19   or did you think that the commissions were being delayed from

20   when they were being paid to you from Avant?

21   A.   I believe that at times, the payment of the commissions

22   were delayed.

23   Q.   When you brought up to -- or let me ask you this way:  Did

24   you ever -- how did you send Mr. Cortes the spreadsheet that

25   showed how much you're owed from open enrollment?

Direct Examination of Carlos Lopez Alcazar
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   A.   Yes, I communicated that to him through WhatsAPP.  I did an

2   optic from my screen, and then I also sent him -- and I sent

3   him through WhatsAPP an Excel file.

4   Q.   Did Mr. Cortes ever respond to you in response to your

5   complaints about not being paid properly?

6   A.   Well, unfortunately, the answer was, We are talking about

7   this later, the same way as my other colleagues, we never had a

8   proper answer.

9   Q.   At the office, were there cameras that monitored and

10  surveilled the workstations where you were working and selling

11  insurance at Avant?

12  A.   In both offices.

13  Q.   Did Mr. Cortes and Ms. Gonzalez Quintero listen to phone

14  calls that you had been on, either live or through the

15  recordings that were made in Radius Bob?

16  A.   Yes, they listened to them.

17  Q.   How do you know?

18  A.   Because Ms. Andrea had the phone app of the service to the

19  customers from Colombia and she supervised the calls.

20  Mr. Reinier actually said that he fired Christopher Vazquez

21  because he listened him doing phone call where he actually --

22          THE COURT REPORTER:  Where he actually was, what was

23  that last part?

24          THE WITNESS:  Where he was actually doing his own

25  work.

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 121 of 176

Direct Examination of Carlos Lopez Alcala
July 12, 2023
121
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1           THE INTERPRETER:  Correction by the interpreter.

2   BY MR. POLLOCK:

3   Q.   Did Mr. Cortes or Ms. Gonzalez Quintero or anybody at Avant

4   complain to you that you were doing your own work from their

5   office?

6   A.   No.

7   Q.   And ultimately, you were fired from Avant on June 17th; is

8   that what happened?

9   A.   Yes, I was fired the 17th of June.  I had a problem with

10  the CFO that Mr. Cortes had hired.  He came to the office quite

11  in an aggressive way.  I was the only male that was at that

12  shift; it was around 7 p.m.  And Jennifer Manjarres,

13  Mr. Cortes's secretary at that time, was waiting for me at the

14  elevator and crying and telling me that Mr. Alberto Garza was

15  very aggressive.

16      I came into the office, I had a conversation with

17  Mr. Alberto Garza and I told him at that time that if he did

18  not behave in an appropriate way, then there would be other

19  ways to solve the problem.  And then he asked me, Which way was

20  that?  And I told him that it would be going down to the third

21  floor, which is where the parking spaces are, and deal with it

22  the same way we did in our country, in the Latin countries and

23  everything that goes with that.  So he took that as a threat,

24  even though we ended the conversation hugging each other and

25  saying that it was okay.

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 122 of
176

Direct Examination - Carlos Lopez Alcazar                    122
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

Q.  Now, just to put this in perspective.  On June 15th, the
day that that all went down -- actually, hold on.  This all
happened on June 16th, did it not?

A.  The 16th, yes.

Q.  Was there something that happened to you on June 15th
where -- you know, made it like there is no way you're getting
in a fight the next day?

A.  Well, on the 15th of June, I had an operation on both my
eyes.  And then on the 16th, I went to the office without
glasses, like Joe Feliciano.  And then I went to the office
because of all the commitments that we had, all the employees
at work.

Q.  There was talk about the bonus and when was the bonus paid
to Avant.  When do you believe the bonus was paid to Avant by
Oscar?

A.  I believe that Avant was paid for the bonus in May.

Q.  Why do you believe that?

A.  Because there were reports that other agencies had received
that payment, and Mr. Reinier Cortes never confirmed he had
received that payment.  And besides that, Mr. Reinier Cortes
bought a new house, bought a luxury car and then moved to a
very big office in the Doral.

Q.  All right.  You have heard Mr. Tropp talk to Delio and
Mariana and Rafaela about being an independent contractor and
employee because that's what the case is about, at least part

Direct Examination of Carlos Lopez Alcala
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1   of it.

 2        Tell me, are you an independent contractor now?

 3   A.   At this moment, yes.

 4   Q.   I mean, do you have your own business?

 5   A.   Yes.

 6   Q.   And that's with your sister?

 7   A.   Yes.

 8   Q.   Do you have to tell your sister that you are not going to

 9   go into work any day?

10   A.   No.

11   Q.   Do you have to make an excuse if you are going to miss work

12   or be late for work or leave early?

13   A.   No.

14   Q.   Do you have to ask anybody where to work?

15   A.   No.

16   Q.   Who decides which insurance policies you can sell as an

17   independent contractor?

18   A.   I am the one who decides what policies to sell and where I

19   can sell them.

20   Q.   With your insurance agency, can you hire other insurance

21   agents to do work for you?

22   A.   Yes.

23   Q.   Did you have to make any investment in order to have an

24   insurance agency?

25   A.   Through an agency or agent?

Direct Examination of Carlos Lopez Alcala
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   Q.  To operate your agency.

2   A.  For my agency, I pay for my office space, for my systems,

3   leads.

4   Q.  Did you have any of those expenses while you worked at

5   Avant?

6   A.  No.

7   Q.  So when you would text with or WhatsAPP with Mr. Cortes --

8   and I'll put up what's in evidence as part of Exhibit 4.

9       (The exhibit was published to the jury.)

10  BY MR. POLLOCK:

11  Q.  Would you also refer to Mr. Cortes as your boss?

12  A.  At all times and with the utmost respect.

13  Q.  How about now, do you have a boss?

14  A.  No.

15  Q.  I just want to look at this for a second.  Just to get

16  ready for what we are going to do next.

17          MR. CUETO:  May Mr. Cortes be excused to use the

18  restroom, Your Honor?

19          THE COURT:  Yes.

20  BY MR. POLLOCK:

21  Q.  Okay.  So we looked at this as Exhibit 12, it's the

22  spreadsheet that -- of the payments that Mr. Cortes and his

23  company made to you and Delio and Rafa and Mariana.  What I

24  want to do is -- so Mr. Cortes put together a spreadsheet for

25  this lawsuit where he was summarizing all of the information

1    that he contends is accurate, and he has in here Carlos Lopez

2    Alcala - Carlos Lopez Alcala Lopez P.A.  do you see that on the

3    summary, Page No. 1?

4    A.   Yes.

5    Q.   And then we go to the next tab, which is the detailed bank

6    deposits?

7    A.   Yes.

8    Q.   And the bank depot -- the bank deposits show here when

9    Avant paid from its operating account or paid to -- to you and

10    the dates and to whom it was paid.  Do you see that in the

11    first --

12    A.   Yes.

13    Q.   And for all the payments that Avant made to you while you

14    were their employee, did they make those payments directly to

15    you, or did they make it to Carlos Lopez Alcala P.A.?

16    A.   Avant never deposited those amounts directly in that

17    account.  They deposited the money in my personal account.

18    Q.   And did you have any control over which account Avant was

19    going pay you to, whether your personal or your business?

20    A.   No.

21    Q.   Did you have any control over which tax reporting form

22    Avant issued to you, whether it be a 1099 or a W-2?

23    A.   No.

24    Q.   And if Mr. Cortes or Ms. Gonzalez or anybody else at Avant

25    had put in front of you a W-4 form so that he could figure out

Direct Examination - Carlos Lopez Alcazar
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   what deductions you needed to take and how to -- and then pay

2   you as a W-2 -- as an employee and issue a W-2, would you have

3   signed the W-4 form to be paid as an employee and have taxes

4   taken out?

5   A.   Well, there is no question that you have to pay taxes.  It

6   doesn't matter what form is yours, whether it is a W-2 or W-4

7   with Avant.

8   Q.   Now, for the money that you're asking the jury to award in

9   this case because you weren't paid properly or entirely, we

10  have got a spreadsheet that we have created together, and

11  before I get to that spreadsheet, I just want to look again at

12  the total -- and to be clear, so we are all understanding, that

13  the total amount that you were paid -- let's see, for the open

14  enrollment period was $74,105 -- excuse me, that's the amount

15  that you were -- that you earned.  So let me ask you again

16  because that is going to look really bad if there is ever a

17  transcript.

18       The total amount you earned during open enrollment was

19  $74,105.  Is that what we should take from your spreadsheet?

20  A.   Yes.

21  Q.   Okay.  So then we go over to the spreadsheet which talks

22  about how much you are owed, and, again, we see the same 74,105

23  and then we came up with a total amount that you are owed for

24  your overtime.

25       How much do you believe you should have been paid for the

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 127 of 176

Cross-Examination - Carlos Lopez Alzate                127
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   hours that you spent at Avant during open enrollment while you

2   were not with your wife, while you were at the office, on the

3   phone, selling policies?

4   A.   $14,596.46.

5   Q.   Now, when we also include the commissions that you're owed

6   and bonuses for open enrollment and then the commissions that

7   you are owed after open enrollment, and we add those together

8   with the overtime that you're owed.  How much are you asking

9   the jury to award you in the wages that you earned while you

10  were employed by Avant?

11  A.   $55,456.44.

12  Q.   Are you asking the jury for less than that?

13  A.   No.

14  Q.   Are asking the jury for more than that?

15  A.   No.

16  Q.   Are you asking the jury to award you anything more than you

17  earned?

18  A.   No.

19          MR. POLLOCK:  Nothing further from this witness, Your

20  Honor.

21          THE COURT:  Cross-examination?

22      (Pause in proceedings.)

23                          CROSS-EXAMINATION

24  BY MR. TROPP:

25  Q.   How are you doing, Mr. Lopez?

Cross-Examination - Carlos Lopez Alcala
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   A.   Good.

2   Q.   I want to wish you good luck in having a baby.

3   A.   Thank you very much.

4   Q.   A boy.

5       Okay.  So basically the whole time -- you -- you worked for

6   Avant for, like, almost seven months?

7   A.   Correct.

8   Q.   And -- and you basically followed your sister.  Your sister

9   was working there first, and she told you she was making pretty

10  good money and you thought you should join as well, right?

11  A.   Well, my sister talked to me about the possibilities that

12  you had with the license -- insurance license.  And there was a

13  good opportunity that -- there was in Avant.

14  Q.   Okay.  And you met with Reinier, and he even told you that

15  he would pay you advances towards your commissions, about a

16  thousand dollars a week?

17  A.   Correct.

18  Q.   And would you agree that they did their best to teach you

19  everything on this insurance business; they welcomed you with

20  open arms?

21  A.   Yes.

22  Q.   They -- they -- they -- you had some training, although you

23  said it was limited, and they -- they were trying to get you to

24  be like your sister and produce sales of insurance policies?

25  A.   What limits are you referring to?

Cross-Examination of Carlos Lopez Alcala
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   Q.   I'm just saying that the idea was to get you to -- they

2   were trying to help you to sell insurance policies like your

3   sister.   That was the -- initially the old honeymoon phase.

4   A.   Well, Avant is not a charity entity, you know, it's a

5   business, and they were hiring me to sell insurance policies

6   for me to make money and for them to make money too.

7   Q.   We agree with that.   That's true.   And like your business

8   is now, that's what -- you are in business to do the same

9   thing?

10  A.   Correct.

11  Q.   Wouldn't you agree that, like, after -- now that there is

12  Obamacare during these open enrollment periods, people are

13  rushing to get insurance policies, there is a demand?

14  A.   Yes.

15  Q.   I mean, if you didn't -- if you didn't have to sleep, you

16  could, for 24 hours, be signing people up because there's

17  deadlines?

18  A.   I believe that the offer is a limited one.   It's not 24

19  hours.

20  Q.   But there is a lot of people, there's a demand during these

21  periods because there's deadlines, right?

22  A.   Yes.

23  Q.   Now, are you saying that during these deadlines where there

24  is a -- masses of people trying to sign up, you have an

25  opportunity to make money, that you worked those hours, you

1    worked 12 hours to sign these people up during these deadlines

2    because he made you do it or because you wanted to do it?

3    A.   Well, the time was from 9 a.m. to 9 p.m., but if you close

4    the more policies, then you would be making more money.

5    Q.   But the 9 a.m. to the 9 p.m. were the office hours, that's

6    when he had the office hours.  If he opened up at 6 a.m., you

7    think you probably might have shown up at 6 a.m. as well?

8    A.   Well, if there was a client who wanted to communicate at

9    6 a.m. and then there was a possibility of signing up the

10   client, I would consider that possibility.

11   Q.   Because that's -- that's the best time, that's the best

12   time for you to make money during these periods.  He didn't

13   force you to make -- what was it -- in those seven months, is

14   it -- didn't you make $65,000 in that seven-month period?

15   A.   What is the question?

16   Q.   In the time that you worked for Avant, and I am not talking

17   about you received some money after you left in August, but in

18   the time that you were there, those seven months, less than

19   seven months, you were paid $65,000, correct?

20   A.   I was paid all that money for working from 9 a.m. to 9 p.m.

21   when I'm not with my family and I'm not working there.

22   Q.   I know your lawyer said that he -- a question should be

23   asked one time without six different ways to ask it, and I

24   don't want to ask -- just let me ask you a question and just

25   answer my question.

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 131 of
176
Cross-Examination - Carlos Lopez Alfaro                    131
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1        Weren't you paid $65,000 from the time that you worked for

2   Avant, 65,000; yes or no?

3   A.   Yes.

4   Q.   All right.  And that chart you made where it said you only

5   got paid $55,000, you think that might have been a mistake?

6   A.   What spreadsheet are you talking about?  What chart are you

7   talking about?

8   Q.   All right.  I will take away that question, that's fine.

9        You made about $10,000 a month.  $10,000 a month is pretty

10  good in the little while that you worked at Avant.  And then 30

11  to 45 days, right after you started working, you did make a

12  bonus, so some type of $8,000 bonus that you got?

13  A.   Yes.

14  Q.   Which one was that?  Who was that for?

15  A.   Well, that was to quote each one of the clients that signed

16  for Bright Health and then opened a portal and create the first

17  medical appointment and everything.  And it represented quite a

18  lot of work.

19  Q.   And you got paid for that work, right?

20  A.   Yes.

21  Q.   I probably would agree, you -- you started this job, I

22  would say you had a talent for it.  You did pretty well; is

23  that fair?  Probably the best one out of everybody.

24  A.   Well, I'm very flattered by your question, but I was the

25  same as everybody else.

Cross-Examination of Carlos Lopez Alcala
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   Q.  But you seem like you have a knack for it.  Not everyone

2   knows -- not everyone can sell insurance, otherwise everybody

3   would do it.

4   A.  There is no formula to be able to sell insurance.

5   Q.  But it takes a little -- some skill, there is some skill

6   involved; would you agree?

7   A.  Yes.

8   Q.  And you -- you were earning $10,000 a month from the start.

9   Would you agree you worked harder and longer than like, let's

10  say, Delio?

11  A.  No, not really.

12  Q.  She [sic] worked as long -- as many hours as you?

13  A.  She [sic] worked as many hours.

14  Q.  You earned a lot more than he did, so I don't want to say

15  anything about Delio, but -- okay.

16      I say it in jest.

17  A.  No worries.

18  Q.  And how much are you saying -- wait.  In -- the total

19  amount of commissions owed, how much are you saying is owed

20  just for commissions?  Forgot about the bonus for a second.

21  A.  30,000.

22  Q.  Do you recall, as a reminder, I took your deposition about

23  a month ago, right?

24  A.  Yes.

25  Q.  And I asked you how much was owed in commissions, and do

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 133 of
176
Cross-Examination - Carlos Lopez Alcala
July 12, 2023
133
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    you remember what you told me then?

2    A.  I must have said the same amount.

3    Q.  All right.  So let me ask you again.  Today under oath you

4    are saying that you are owed -- just in commissions, not the

5    bonuses, 30,000; yes?

6    A.  Yes.

7    Q.  Okay.  So --

8            MR. TROPP:  I'm just going to refer to Page 57, Line

9    4.

10    BY MR. TROPP:

11    Q.  I want to read you a question I asked you at your

12    deposition.  Remember, you were under oath just like you are

13    now.

14       "Can we not include bonuses -- all right.  Can we not

15    include bonuses?  Let's not include bonuses.  How much do you

16    think you were just owed in commissions without including

17    bonuses?"

18       And your answer was 15,000.

19    A.  Well, yes, it was 15,000, but then when we actually looked

20    at the amounts today, there were 15,000 for commissions and

21    15,000 for the bonus.  You did not ask me if it included extra

22    hours or not.

23    Q.  That's right, I didn't.  I am not talking about bonuses and

24    hours.  The question was commissions, commissions only.  And

25    today you are saying it's over 30,000.  When I asked you a

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 134 of 176

Cross-Examination of Carlos Lopez Alcala                   134
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    month ago, you said 15,000.

2    A.   I might have misunderstood the question by the lawyer.

3    Q.   Not me.  Me you misunderstood, or you're -- okay.  All

4    right.

5         And would you agree that you did -- and we agree, you sent

6    an e-mail or communication to Reinier, I think it was like a

7    month before you left or something, asking him to check into

8    about 2- to $3,000 in commissions; do you remember that

9    communication?

10   A.   Well, that, yes, was something that -- the position.  And

11   that amount, actually, was said, and I didn't have anything to

12   consult at the time to be able to give the amount.

13   Q.   Okay.  So -- so before you hired a lawyer, you wrote -- you

14   wrote to your employer and asked him -- you didn't say you were

15   owed 2- or 3,000.  You said could you check into the

16   discrepancy of about 2- to $3,000, right?

17   A.   No.  I wrote to him to review the pending amounts because

18   they were not correct.

19   Q.   And -- and that's -- we understand that, and that was for,

20   like, 2- or 3,000.  And then later, a year and a half later, I

21   speak to you and it went to 15,000, and then from last month to

22   today it went to 30,000.

23        My question is, next month is it going to be 60,000?  Are

24   we just making these numbers up?

25   A.   When I wrote to Mr. Cortes, he owed me the money for the

1  enrollment period that he had not paid me for, 5,000.  And then

2  after that, in July, he didn't pay me 10,000 for the enrollment

3  period.  Then after that, we have the extra hours pending and

4  another 15,000.  And then after that, a bonus for 25,000.

5  Excuse me if I don't have exact number right now.

6  Q.  Well, would you agree that you do not have any proof that

7  shows what you were -- what you're owed?

8  A.  No, I don't agree with that.

9  Q.  Okay.  And then, again, I took your deposition, I asked you

10  questions, trying to -- I was trying to figure out what was

11  going on.  That's the purpose of a deposition.  And -- and I --

12  let me go to Page 69, 69, page, Line 14.  And I asked --

13  actually, before I said, "What proof do you have that shows

14  what you were paid and what you were owed?"  Right?

15       And your answer was, "I have no proof."

16       My question is, were you telling the truth then or are you

17  telling the truth now?

18            MR. POLLOCK:  Your Honor, can Mr. Lopez finish his

19  answer, he was cut off.

20            THE COURT:  There was no question yet.

21            MR. POLLOCK:  Right.  But Mr. Lopez was finishing his

22  last answer when he was cut off.

23            THE COURT:  You can go into that on your redirect.

24            MR. POLLOCK:  Okay, no problem.

25            THE COURT:  There was no question.

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 136 of 176

Cross-Examination of Carlos Lopez Alcala
July 12, 2023                                    136
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1          THE WITNESS:  Should I respond right now?

2          THE COURT:  The question is, were you telling the

3   truth then or now?

4          THE WITNESS:  On both occasions.

5   BY MR. TROPP:

6   Q.  Okay.  You work now -- you are selling insurance, you are

7   doing a lot of the same things as Avant does?

8   A.  The same as any other insurance agency.

9   Q.  Do you have any employees?

10  A.  No.

11  Q.  How about other agents that work for you?

12  A.  Only my sister and myself.

13  Q.  And is your sister a 1099 or is she a W-2 employee?

14  A.  She is my partner in the company, and then we have

15  dividends.  We don't have any other thing.

16  Q.  But she works for -- the name of your company is Carlos

17  Lopez --

18  A.  Carlos Eduardo Lopez Alcala P.A.

19  Q.  And you do business as Saguaros Obamacare?

20  A.  That's -- that is the name, yes.

21  Q.  You have a big website to try to also --

22          THE COURT:  That's the fictitious name, yes.

23  BY MR. TROPP:

24  Q.  And when you do -- do you -- you deal with a broker, or do

25  you get paid directly with the insurance companies?

Cross-Examination - Carlos Lopez Alcove
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    A.   Every broker with whom I have appointments, through the

2    broker, I have access to insurance companies.

3    Q.   So you have access with some insurance companies, but a lot

4    of them you don't, so you deal with another broker, another

5    broker called?

6    A.   Comfort Insurance.

7    Q.   Comfort?

8    A.   Yes (in English).

9    Q.   Comfort Insurance.  And why don't you sue them for wage and

10   hour?

11   A.   Because I don't work for Comfort Insurance.

12   Q.   Because you are an independent contractor?

13   A.   It's my company, it's not Avant.

14   Q.   Right.  Like -- and then the first month you started

15   working for Reinier, you were working for your company, Carlos

16   Lopez Alcove -- I'm sorry, I forget.

17   A.   No, I was not.

18   Q.   But you formed your company a year -- a month after you

19   started working for Reinier, right?

20   A.   Well, yes, I formed my company, but I never worked for

21   Avant through my company, Carlos Lopez.

22   Q.   But -- okay.  But you certainly asked Avant to have you

23   paid to your company, and you were paid to your company, right?

24   A.   Not really.  All the payments that Avant made were made to

25   my personal account, not to my company's account.

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 138 of
176
138
Cross-Examination of Carlos Lopez Alcala
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  Q.  So for that $65,000 that you made, did you -- did you file

2  taxes under your company's name as self-employed for your

3  company?

4  A.  It was a 1099 that I received for that.

5  Q.  And what kind of deductions did you ask for with -- from

6  the Government?  What kind of expenses did you -- did you put

7  some for mileage, driving around?

8  A.  All the ones that were recommended by my accountant.

9           THE COURT REPORTER:  I'm sorry, the answer again,

10  please.

11           THE INTERPRETER:  All the ones that were recommended

12  by my accountant.

13           THE COURT:  Excuse me, do any of the jurors need

14  parking validated?

15           THE JURY:  No.

16           THE COURT:  No, okay.  Thank you.

17  BY MR. TROPP:

18  Q.  Now, we're almost done.  Everyone's tired and wants to go

19  home, including, me.

20      At some point -- at the -- when -- when we were going

21  through and we were talking about what proof you had, you said

22  something to the effect that you had a list of clients to prove

23  the policies you sold and that you had their phone numbers.

24      How -- did you -- did you sign up a lot of -- after you

25  left Avant, do you agree that you signed up about 150 to 250 of

Cross-Examination of Carlos Lopez Alcaide
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    the clients that you had from Avant with your company?

2              MR. POLLOCK:  Relevance, Your Honor.

3              THE COURT:  Overruled.

4              THE WITNESS:  I believe there is a confusion with the

5    information that the lawyer has.  One thing is the sales

6    statements that I had during the open enrollment period, and

7    another thing is a list of phone numbers that were shared

8    between Mr. Cortes and ourselves.  I think that created a

9    confusion, so it would be good to clarify that right now.

10             When I claim the money that is owed to me, it is based

11   on the sales that I did.  And it was really sent in a shared

12   file with Mr. Reinier through Google Sheets.  And that's the

13   way I did it, as well as all the other agents in the agency.

14   And another list that is separate with phone numbers, there is

15   a list shared -- with phone numbers shared with Mr. --

16   Ms. Andrea Gonzalez where she shared with us a list of more

17   than 1500 clients.  That is what I wanted to clarify.

18   BY MR. TROPP:

19   Q.  Right.  So you have got the names of these clients, and you

20   called a lot of them.  You were calling the clients and -- and

21   let's put everything on the table.  You have a successful

22   business going on now, but you basically took the clients from

23   him, started your own company because you realized in the six

24   months, I can -- you were making $10,000 a month.  You called

25   all these clients, and then you got a cease and desist letter

Case 1:22-cv-22671-CMA    Document 123-3    Entered on FLSD Docket 09/21/2023    Page 140 of
176
140
Cross-Examination - Carlos Lopez Alcazar
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    to stop taking his business, right?  And then a month later you

2    responded with the lawsuit; is that correct?

3        MR. POLLOCK:  Object.  Objection to the relevance of

4    counsel's narrative.

5        THE COURT:  Overruled.

6        MR. POLLOCK:  That is compound as well.

7        THE COURT:  It is compound.

8        THE WITNESS:  Okay.  Well, I had a list of the

9    clients, and I did call the clients that were on my list that

10   were not Mr. Reinier's or Ms. Andrea.  These clients accepted,

11   through a consent, that the agent that represented those

12   clients were -- was Carlos Lopez.  I never did any changes in

13   any of those policies of the clients without authorization from

14   the clients.

15       On the contrary, Mr. Cortes, once I had clients, he

16   actually took over the clients and put them in his files.  I

17   was taking into consideration whether the client had some

18   medical condition that required him to have that health policy.

19   To avoid that that would happen and to avoid any damage for

20   those clients, we didn't call any more -- any client from that

21   list.

22       And the business that my sister and I have nowadays is

23   -- it is successful thanks to our efforts and sacrifice.

24       When I received a letter of cease and desist, and this

25   lawsuit had already been prepared because Mr. Reinier had not

1   paid us already.  Four out of seven people from the same

2   office, we are sitting right here in this courtroom because we

3   were not paid what we were owed.

4   BY MR. TROPP:

5   Q.  Well, your -- you -- half -- 50 percent of that is you and

6   your sister who started this company.  And if I understand

7   correctly, that list you are talking about, 1400 of their

8   people from their company, that form that you had them sign

9   with your name on it was about -- it was about 400 of those

10  people.  And I am sure you were trying to help them, but 400 of

11  those people, you had them sign the consent form with your

12  company instead of Avant's company, right?

13  A.  I don't understand, I'm sorry.

14  Q.  Just to close it up, let me finish up.  And -- again, this

15  case is -- and that's the jury's job to find out what the truth

16  is.

17      Simple question:  Are you saying that you had an agreement

18  and you feel that you are owed $120 an hour for the time you

19  worked during open enrollment?  You're asking for -- you're

20  saying you are owed $120 an hour?

21  A.  Well, what was -- I was owed, I mean, we can deal with that

22  with my lawyer.  I am not doing any calculation right now also

23  or not.

24  Q.  Right, your lawyer put those numbers together.

25      But let me ask you this:  Tell me, how -- how do you come

Case 1:22-cv-22671-CMA Document 123-3 Entered on FLSD Docket 09/21/2023 Page 142 of 176

Cross-Examination - Carlos Lopez Alcala
July 12, 2023                                          142
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   up with $120 an hour?  Where does that come from?

2        MR. POLLOCK:  Objection, assumes facts not in

3   evidence.  There is no testimony or anything about 120.

4        MR. TROPP:  Well, that's what it said on the list.

5        THE COURT:  Overruled.

6        MR. POLLOCK:  That's not what he said.

7        MR. TROPP:  It's from the little sheet thing.

8        MR. POLLOCK:  Can I see it?  Let's put it up for the

9   jury.

10        MR. CUETO:  Can Ms. Quintero be excused for the

11   restroom, Your Honor?

12        THE COURT:  Yes.

13     (Pause in proceedings.)

14        MR. POLLOCK:  I don't know which other one you are

15   talking about.  You have the spreadsheets in evidence.  If you

16   think there was one, you are more than welcome to show the

17   witness.

18   BY MR. TROPP:

19   Q.  Well, let me ask you then.  How much are you saying for the

20   time that you worked -- for the overtime that you worked at

21   Avant, how much are you saying you should be getting per hour?

22   A.  For overtime?

23   Q.  Yes.

24   A.  $15,000.

25   Q.  Did you -- do you know how you came up with the hourly on

 1   that?

 2   A.   No.

 3   Q.   That's what I am trying to figure out.  That's what we are

 4   trying to figure out, but thank you, Mr. Lopez.

 5             THE COURT:  Redirect?

 6             MR. POLLOCK:  Yes, Your Honor.  Just give me a moment.

 7   I am looking up the printed transcript so I can move this

 8   along.

 9        (Pause in proceedings.)

10                       REDIRECT EXAMINATION

11   BY MR. POLLOCK:

12   Q.   Carlos, Mr. Tropp is asking you about skills and special

13   skills because that's going to become important when the jury

14   decides our case.

15        And so I'm going to ask you, when you interviewed with

16   Mr. Cortes, how long did he interview with you?

17   A.   Ten minutes.

18   Q.   Did Mr. Cortes ask you about any specialized training,

19   education, experience, unique qualifications or specialized

20   knowledge that you possessed?

21   A.   No.

22   Q.   Did you tell him that you had any great skills that would

23   -- that were necessary to sell insurance?

24   A.   No.

25   Q.   I mean, all you needed was your insurance license and your

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 144 of
176
144
Redirect Examination - Carlos Lopez/Iheozor
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  voice, your computer skills and the ability to type; isn't that

2  right?

3  A.   Totally.

4  Q.   All right.  For the numbers, just to go through real quick,

5  Mr. Tropp was having a problem with you telling him that -- in

6  deposition that you were owed $15,000 in commissions, and so

7  I'm going to show you and we can do this real quick and -- no,

8  it's simple math.

9      You claim that during open enrollment, you were owed

10  $30,000, 25,000 of which was a bonus.  So we take 30 minus 25,

11  we get how much money?

12  A.   5,000.

13  Q.   Okay.  And then after open enrollment, your spreadsheet

14  also shows that you are owed how much in commissions?

15  A.   10,000.

16  Q.   So 10,000, 5,000, 15,000; is that correct for commissions

17  only?

18  A.   That's simple math.

19  Q.   I agree.

20      Mr. Tropp, also wants the jury to believe that even though

21  you had these Excel spreadsheets and you shared them with his

22  office and that Mr. Cortes had them, that you had no proof as

23  to how much you are owed.  So remember what he asked you about

24  your deposition testimony where he told you -- where he read

25  your [sic] question, and your answer was that you have no

1    proof; do you remember that?

2    A.   Yes.

3    Q.   And on Page 58 of your deposition, starting at Line 9,

4    Mr. Tropp asked you, "I am asking you about your proof.  What

5    do you have?  And you're saying Excel sheet."

6         And your answer was, "Okay.  Besides my Excel form, I have

7    no other where I have annotated all my sales.  I have none

8    other."

9              THE COURT REPORTER:  I'm sorry, I lost you right

10   there.

11   BY MR. POLLOCK:

12   Q.   Okay.  "Besides my Excel form, I have no other where I have

13   annotated all my sales.  I have none other."

14             MR. POLLOCK:  I'm sorry.

15             MR. TROPP:  Mr. Pollock, can you give me page and

16   line?

17             MR. POLLOCK:  No problem.  It starts on Page 58, it

18   starts on Line 9.

19             MR. TROPP:  Page 58?

20             MR. POLLOCK:  Yes.

21   BY MR. POLLOCK:

22   Q.   Was that the question and the answer that you gave in your

23   sworn deposition on June 1st?

24   A.   Correct.

25   Q.   And as we have seen, Mr. Tropp's not just going to ask you

Redirect Examination - Certified Copy - Andres
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   the question once, he is going to ask it again.  So was this

2   the question that you were asked and the answers that you gave

3   on Page 69, starting at Line 14 where Mr. Tropp started, but

4   now ending at Line 25?

5       And this is what Mr. Tropp asked you and this is what you

6   answered:  "Actually, but -- but before I said what proof do

7   you have that shows you what you were paid and what you are

8   owed, right?"  And then --

9   A.  Yes.

10  Q.  And then your answer was, "I have no proof," right?

11  A.  Yes.

12  Q.  And then Mr. Tropp asked you again, "You don't have any

13  proof that he owes you that money?"

14      And you answered, "Only my listing."

15      And then Mr. Tropp asked you, "By looking at what?"

16      And you answered, "Numbers."

17      And then Mr. Tropp asked you, "Wasn't that the numbers that

18  you prepared in your own Excel sheet?"

19      And your answer was, "Yes."

20  A.  Correct.

21  Q.  Now, were those the questions that Mr. Tropp asked you and

22  the answers that you gave on June 1st in your deposition?

23  A.  Yes.

24  Q.  And those are the same answers you gave today, aren't they?

25  A.  Totally.

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 147 of
176
147
Redirect Examination - Certified Copy - Arballo
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

Q.   Okay.   And then Mr. Tropp went into this issue about

clients.   Do you remember him asking about that a couple

moments ago?

A.   Yes.

Q.   Now, the clients that he is talking about you contacting,

that happened how long after you were -- you left Avant?

A.   Two or three months.

Q.   And while you were working at Avant, were you required to

have every client sign a consent statement?

A.   Yes.

Q.   And was that Avant's requirement or your requirement?

A.   Avant's.

Q.   And was the requirement that the client sign and that you

sign every client consent statement for every member that you

enrolled?

A.   Yes.

Q.   And I put up Exhibit 6, which is the client consent

statement that we have seen before.

     (The exhibit was published to the jury.)

BY MR. POLLOCK:

Q.   And did the client consent statement identify you as the

insurance agent for each member whom you signed up?

A.   Correct.

Q.   So according to the form that Avant required you to

complete with each member and according to the member or the

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 148 of
176                                                                                                148
Redirect Examination - Carlos Lopez Alcala
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   client, you were the agent for each member who signed one of

2   these client consent statements; is that right?

3   A.   That's correct.

4   Q.   And does this consent form give you, Carlos Eduardo Lopez

5   Alcala, the authorization to contact these insureds in writing?

6   A.   Yes, correct.

7   Q.   And again, are you asking for any money, any more money or

8   any less money because of this issue about contacting clients?

9   A.   Absolutely not.

10  Q.   I appreciate your time, Mr. Lopez.

11       MR. POLLOCK:  And, Your Honor, the Plaintiffs rest

12  their case at this point.  I appreciate the Court's time.

13       THE COURT:  Thank you.

14       All right.  Ladies and gentlemen, we will adjourn for

15  the day.  Please remember my instructions:  Not to discuss the

16  case with each other or anyone else; to avoid contact with

17  those whom you see have a relationship to the case, and please

18  return tomorrow morning at 9 o'clock.  See you tomorrow morning

19  at 9 o'clock.  Have a good evening.

20       COURT SECURITY OFFICER:  All rise.

21   (The jury exited the courtroom at 5:02 p.m.)

22       THE COURT:  You may retake your seat.  Thank you.

23   (Witness excused.)

24       THE COURT:  And I don't think we need the interpreter

25  for the rest of the day.  Thank you, so much, ma'am.  You have

July 12, 2023

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    a good day.

2              THE INTERPRETER:  Thank you.

3              THE COURT:  All right.  The Plaintiffs have rested.

4    Do I hear a motion?

5              MR. POLLOCK:  Your Honor, the Plaintiffs move for a

6    directed verdict on the issue of employment.  We believe that

7    no reasonable juror could find other than my clients were

8    employees of Avant Assurance, Reinier Cortes and Andrea

9    Gonzalez Quintero.

10             When we review the factors for determination, the

11   greater weight of the evidence is that the Defendants

12   controlled every meaningful aspect of my clients' work; they

13   told them when to work, where to work, gave them all the work,

14   gave them all the clients, all the forms, all the tools,

15   everything they needed except for maybe a mouse or a headset.

16             My clients were paid like employees on -- some of them

17   an hourly, but all of them a commission and nondiscretionary

18   bonus basis.  Also favoring employment status.

19             Also, that my clients had zero opportunity for loss.

20   As long as they made a phone call and had somebody sign up,

21   they would make money.  They had, again, no investment.

22             The Defense had raised the issue of driving to and

23   from work.  Home to work travel is not compensable under the

24   FLSA, and I don't even think you can deduct for it under the

25   IRS regulations.  They provided nothing for their work.  They

1   didn't offer their services or advertising.  In fact, they

2   didn't normally place outgoing phone calls.  They only received

3   leads provided, again, by the Defendants.

4        They didn't list their names in a phone book, have a

5   website.  I mean, they didn't market because everything was

6   done for them.

7        They were entirely and economically dependant on

8   Defendants for their work.  And the -- although not in the jury

9   instruction, I know the cases talk about that my clients as

10  insurance agents were an integral and indispensable part of the

11  insurance agency for which they worked.

12       We get to the issue of individual employers, and I

13  don't think there's any reasonable dispute that if there is

14  employment, that Mr. Cortes was the employer who hired, fired

15  and set the rates of pay and controlled the daily aspect, as

16  well as the operational control of the business and that

17  Ms. Gonzalez Quintero trained and actively supervised and

18  monitored and managed my clients in their work.

19       So I am tracking the jury instructions and the 11th

20  Circuit's Scantlin Knight (phonetic) opinion which talked about

21  the six factors and I guess the other couple that are

22  considered.  So we'd request that the Court spare the jury of

23  having to decide the issue of employment and employers.

24       Likewise, the finding of whether a contract or series

25  of contracts were made, we believe is abundantly clear.

Case 1:22-cv-22671-CMA    Document 123-3    Entered on FLSD Docket 09/21/2023    Page 151 of
176
151
Proceedings
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    Mr. Cortes admitted that he offered the commissions and he

2    offered the bonuses, and my clients' testimony was also that he

3    offered the commissions and offered the bonuses.  There is no

4    reasonable dispute.  No juror could find otherwise, and there

5    was a contract between the parties which would relieve the jury

6    from having to decide or just perform a perfunctory function of

7    checking off that a contract was formed and eluding the

8    necessity of going through the unjust enrichment exercise.

9         THE COURT:  Thank you very much.  I will hear from

10   Defense counsel.

11        MR. TROPP:  Judge, if you want to cut in and interrupt

12   me, just deny the motion for directed verdict.  I would -- I

13   would hope that these last three days that we have been here,

14   because this -- this is a question for the jury.  I think there

15   has been a lot posed for the jury here, obviously, otherwise we

16   wouldn't have been here these last three days.

17        But on the issue of control, I think definitely they

18   have not met their burden.  If anything, the witnesses have

19   been anything but credible.  You had Rafaela first say that she

20   worked 12 hours a day for -- for 13 weeks.  Then it turns out

21   she -- and then starts off saying that employer has all of

22   these controls over her; you have to be there from this hour to

23   that hour.  And she admits that -- she says, Oh, I didn't have

24   to go in at all.  I could have watched TV.  I went there

25   because I wanted to make money.

1      They had the opportunity for profit and loss by their

2   own talents.  They decided to go in there.  This is an

3   insurance business.  There's --- there's so little case law

4   because just about every insurance agent knows that they are

5   1099.  Otherwise everyone would be asking for hourly rates.

6      Certainly the issue of control is for the jury to

7   decide, um, how are they paid -- you know.  It even says the

8   employer pays -- an independent contractor's ordinarily paid an

9   agreed or set amount according to an agreed formula.  That's

10  the whole basis of your contract and equity claim.

11     It wasn't based on the amount of time, it was based on

12  the given task or job.  And again, as the instructions say,

13  independent contractors will have an opportunity to make a

14  profit or face the risk of taking a loss.  These are licensed

15  professionals who study and become licensed insurance agents.

16  They are all 1099 employees.  They are independent contractors.

17  They have their own companies they were working for.  They ask

18  for deductions including for their computer software, cars,

19  everything.  They had their own expenses because they are

20  professional agents.

21     There's argument just because they provided them with

22  computers is what absolves them from being an informed

23  contractor?

24     And they offered -- these are independent contractors,

25  like the instructions say.  How did the Plaintiffs offer

 1  services?  They offered their services to the public and others

 2  in a particular industry, and they haven't procured the

 3  necessary licenses for performing their services.

 4       What was the party's intent?  That's obviously a

 5  question for the jury.  The intent here was about the

 6  commissions and bonuses and sales and selling to the masses.

 7  That wasn't about an hourly.  So that's certainly a question

 8  about, is this an FLSA coverage case, would be posed for the

 9  jury.

10       THE COURT:  Thank you.

11       MR. POLLOCK:  Your Honor, I -- just for the record, on

12  the issue of special skill, which I forgot to mention, I think

13  Mr. Lopez, Mariana mentioned it, nobody had any special skills,

14  licenses -- excuse me, special skills, expertise, knowledge.

15  And as Mr. Cortes testified in deposition and again in trial,

16  you just needed a voice, computer skills and that's basically

17  it.  As far as -- and then I will respond to whatever is

18  necessary, but.

19       THE COURT:  Thank you.

20       As you all know, in order to be entitled to a directed

21  verdict, the Court does not weigh evidence and, moreover, must

22  draw all factual inferences in favor of the nonmoving parties.

23  Credibility determinations, weighing the evidence, drawing

24  inferences from the facts, those are all jury functions, not

25  the function of the Court, the Judge.

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 154 of
176
Proceedings                                                     154
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1          The evidence of the non-movants, in this case, the

2    Defendants, is to be believed and all justifiable inferences

3    are to be drawn in their favor, not the movants' favor.  And so

4    the motion is denied.

5          Any motions from Defendants?

6       (Pause in proceedings.)

7          MR. TROPP:  No, Judge.

8          THE COURT:  So we begin with the jury at 9 o'clock.

9    We will be hearing from your witnesses and your clients.  Is

10   the anticipation that you all will be resting and doing closing

11   arguments after the lunch hour?

12         MR. TROPP:  If I may ask the Court a quick question,

13   we had a little confusion.  He -- when he -- he presented his

14   case and he called our client, Reinier, spent a while with

15   that, and then -- I remember it was on Monday, I was told I was

16   going to cross him and I went to lunch expecting to do that,

17   but then there was an issue with an interpreter and witnesses.

18   It was -- we changed it from me cross-examining Mr. Cortes to

19   -- to us going with other witnesses.  I never got to do that

20   with Mr. Cortes, to redirect or re -- or cross on -- that was

21   his first witness to be called.

22         THE COURT:  Right.

23         MR. TROPP:  So my question is, like, we wanted -- we

24   wanted to address the line of questioning that he did.

25         THE COURT:  You can address anything with Mr. Cortes.

1    He is a named defendant, and he can testify in your case in

2    chief, we fully expect him to.

3           MR. TROPP:  All right.  So -- so I will be calling him

4    in regards to whatever we need to do.

5           THE COURT:  With regards to any relevant evidence to

6    defend these three claims.

7           MR. TROPP:  Okay.

8           THE COURT:  All right?

9           MR. TROPP:  All right.  All right.  We just had that

10   question.  And then we have my client and then there is two

11   more witnesses, which I don't anticipate to be very long.

12          THE COURT:  Right.

13          MR. TROPP:  I would hope.  I am not sure -- I can't

14   promise that I will get it done by lunch, but we will try.  But

15   I just want -- we don't want to rush without --

16          THE COURT:  I am just sort of asking for your planning

17   purposes.  Each side gets 25 minutes for closing arguments and

18   we'll be hearing them sometime tomorrow.  You all have those

19   jury instructions, verdict forms.  Please review them.  I don't

20   want to hear, you know, a late, Oh, Judge, I just saw this in

21   the jury instruction after we have made multiple copies and

22   gotten them ready.

23          Anything else?

24          MR. POLLOCK:  Can I split up the closing any way I

25   want?

Proceedings
July 12, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1            THE COURT:  Yes.

 2            MR. POLLOCK:  Thank you.  And then -- I guess that's

 3   it.

 4            THE COURT:  Only you can't do, like, a 2-minute first

 5   close and then a 23-minute second, not quite like that.

 6            MR. POLLOCK:  No.  If I did a 10 and 15 or something.

 7            And then tomorrow, you're going to have Mr. Cortes.

 8   And who else do you anticipate you're going to have,

 9   Ms. Gonzalez Quintero?

10            MR. TROPP:  I haven't determined that yet.  We may or

11   we may not call her.  I can tell you after I find out.

12            MR. POLLOCK:  Okay.

13            MR. TROPP:  All right.

14            MR. POLLOCK:  Ms. Guerra and Ms. Monez.

15            MR. TROPP:  Ms. Guerra, Ms. Monez, and Mr. Cortes.

16            MR. POLLOCK:  Okay.  Great.  We should be able to get

17   to them tomorrow.

18            THE COURT:  And you will have an interpreter here.

19            MR. POLLOCK:  I won't.

20            THE COURT:  No, Defendants will.

21            MR. TROPP:  Yes.

22            THE COURT:  All right.  Very good.  We will see you

23   tomorrow morning at 9:00.

24            MR. POLLOCK:  Thank you, Your Honor.

25            MR. TROPP:  Thank you, Judge.
```

1          COURT SECURITY OFFICER:  All rise.

2          MR. POLLOCK:  Can we get another copy of the jury

3   instructions?

4          THE COURT:  That's the final copy.

5          MR. POLLOCK:  Can I get one that's not double sided or

6   can I get it printed so I can have one that's not double sided

7   just when I put up --

8          THE COURT:  It will be double sided, but Patricia can

9   certainly print one on just one side of the page.

10          MR. POLLOCK:  That's okay.  I will do it at home.

11      (The proceedings adjourned at 5:16 p.m.)

12

13                    C E R T I F I C A T E

14

15      I hereby certify that the foregoing is an

16   accurate transcription of the proceedings in the

17   above-entitled matter.

18

19

20   _09/02/2023_
        DATE                STEPHANIE A. McCARN, RPR
21                           Official United States Court Reporter
                             400 North Miami Avenue, Thirteenth Floor
                             Miami, Florida 33128
22                           (305) 523-5518

23

24

25

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

**$**

**$1,480** [1] - 45:16, 48:15
**$1,667.20** [1] - 28:22
**$10** [3] - 33:23, 34:1, 41:16
**$10,000** [6] - 47:8, 47:12, 131:6, 132:5, 139:21
**$10,725** [1] - 118:24
**$100** [1] - 117:10
**$12** [2] - 58:7, 71:24
**$12,000** [5] - 102:13, 102:18, 102:21, 102:25
**$12,404.49** [1] - 27:4
**$120** [3] - 141:15, 141:17, 141:23
**$13,884.96** [1] - 51:11
**$14,596.46** [1] - 127:1
**$15,000** [3] - 17:18, 142:21, 144:3
**$18** [1] - 71:24
**$18,000** [2] - 90:4, 90:18
**$2,000** [2] - 29:2, 48:18
**$20** [1] - 65:24
**$21,000** [1] - 47:17
**$21,845** [1] - 47:17
**$25,000** [11] - 49:10, 49:12, 49:16, 54:21, 79:24, 80:23, 82:6, 84:15, 85:18, 87:2, 102:2
**$3,000** [2] - 134:5, 134:13
**$3,375** [1] - 39:22
**$30,000** [2] - 117:15, 144:7
**$30,135** [1] - 117:20
**$35** [2] - 117:5, 117:10
**$4,842.92** [1] - 40:3
**$40,000** [1] - 89:8
**$55,000** [1] - 131:2
**$55,456.44** [1] - 127:8
**$58,115** [2] - 39:17, 40:7
**$6,000** [2] - 40:13, 41:14
**$65,000** [4] - 130:11, 130:16, 130:23, 137:23
**$7,000** [1] - 48:21
**$70,761.48** [1] - 103:5
**$72,845** [1] - 51:16
**$74,105** [2] - 126:11, 126:16
**$75** [1] - 117:7

**$8,000** [2] - 118:7, 131:9

**'**

**'21** [1] - 79:18
**'21/'22** [1] - 82:21
**'22** [3] - 79:18, 82:19, 82:23
**'23** [1] - 82:23

**0**

**0** [1] - 117:21
**09/02/2023** [1] - 157:16

**1**

**1** [5] - 1:8, 69:5, 115:10, 117:21, 124:25
**1,157** [1] - 51:14
**10** [3] - 36:1, 94:11, 156:3
**10,000** [4] - 48:13, 134:24, 144:12, 144:13
**10,290.28** [1] - 50:22
**100** [1] - 117:9
**101** [1] - 3:8
**106** [1] - 3:9
**107** [2] - 25:18, 25:19
**1099** [25] - 12:9, 20:25, 21:5, 21:8, 21:10, 21:12, 31:5, 31:10, 38:24, 39:7, 92:22, 92:23, 93:4, 93:6, 93:16, 95:1, 97:18, 97:20, 97:23, 105:1, 125:19, 136:10, 138:1, 152:2, 152:13
**1099's** [1] - 92:20
**10:00** [4] - 109:15, 109:19, 110:3, 114:9
**10:47** [1] - 32:1
**11** [2] - 7:12, 114:17
**115** [1] - 3:17
**11:50** [1] - 56:6
**11:59** [1] - 63:13
**11th** [2] - 67:1, 150:16
**12** [11] - 1:5, 25:18, 32:24, 34:5, 45:14, 74:10, 89:24, 114:5, 124:18, 129:23, 151:17
**12,000** [3] - 91:2, 99:11
**12,002** [1] - 28:3
**12-hour** [1] - 35:1

**120** [1] - 141:25
**1250** [1] - 1:23
**127** [1] - 3:10
**12:00** [1] - 56:2
**12:30** [1] - 62:10
**12:36** [1] - 64:2
**12:50** [1] - 62:10
**12:51** [1] - 71:16
**13** [4] - 25:19, 32:24, 114:14, 151:17
**13-3** [1] - 1:7
**13-week** [2] - 83:4, 84:5, 84:19
**135** [1] - 1:16
**13th** [1] - 108:15
**14** [4] - 14:25, 85:22, 135:9, 145:25
**1400** [1] - 141:4
**143** [1] - 3:10
**15** [6] - 14:12, 14:13, 14:14, 14:16, 156:3
**15,000** [8] - 133:15, 133:16, 133:17, 133:18, 133:23, 134:18, 135:1, 144:13
**150** [1] - 138:22
**1500** [1] - 139:14
**157** [2] - 1:8, 3:22
**15th** [6] - 108:15, 114:18, 118:4, 121:23, 122:2, 122:5
**16** [1] - 25:22
**16th** [3] - 121:25, 122:1, 122:6
**17** [3] - 3:17, 115:21, 115:23
**17th** [3] - 119:1, 121:4, 121:6
**18** [4] - 30:17, 91:16, 97:18, 98:1
**18,000** [4] - 89:22, 89:23, 90:22, 91:12
**19** [1] - 3:5
**1995** [1] - 32:17
**1:00** [1] - 56:3
**1st** [3] - 118:14, 145:20, 146:19

**2**

**2** [9] - 24:18, 24:21, 24:22, 30:17, 65:8, 134:5, 134:12, 134:13, 134:17
**2,029** [1] - 90:20
**2-minute** [1] - 156:1
**20** [17] - 14:10, 14:12, 14:14, 14:16, 24:8, 27:15, 36:5, 44:24,

44:25, 48:12, 52:7, 62:10, 90:24, 91:9, 97:16, 111:20
**2000** [1] - 43:3
**2014** [1] - 107:6
**2019** [1] - 10:4
**2020** [16] - 14:3, 14:5, 15:4, 15:8, 15:10, 16:18, 26:23, 33:3, 33:8, 35:12, 39:13, 51:6, 74:1, 82:24
**2021** [12] - 12:3, 14:11, 14:16, 15:1, 15:7, 15:12, 16:6, 16:13, 16:14, 17:15, 17:18, 21:2, 26:23, 27:2, 27:9, 27:23, 35:17, 38:24, 39:3, 39:4, 39:7, 39:9, 39:13, 39:16, 40:2, 40:8, 40:12, 42:23, 43:1, 43:4, 43:8, 43:14, 43:23, 44:8, 44:10, 44:11, 51:7, 73:20, 74:7, 74:18, 82:19, 82:24, 87:11, 90:24, 91:10, 103:4, 107:24, 113:17
**2021/2022** [2] - 45:19, 49:3
**2022** [42] - 12:3, 14:5, 16:6, 17:19, 21:3, 27:2, 28:4, 28:9, 28:13, 28:17, 28:18, 28:20, 42:24, 43:17, 45:17, 45:22, 48:15, 48:17, 48:19, 48:22, 51:18, 51:23, 54:10, 62:22, 78:13, 79:20, 79:21, 82:16, 82:18, 82:22, 82:25, 87:11, 90:25, 91:1, 91:2, 91:9, 91:11, 103:4, 109:3, 113:17, 119:1
**2023** [2] - 1:5, 24:2
**2029** [2] - 90:20, 90:21
**203(e)(1** [1] - 68:9
**20th** [1] - 53:24
**2100** [1] - 1:23
**22** [1] - 30:18
**22-cv-22671-CMA** [1] - 1:2
**23** [1] - 86:5
**23-minute** [1] - 156:2
**230-4884** [1] - 1:17
**24** [12] - 55:14, 55:15, 57:3, 58:6, 71:23, 71:25, 76:13, 98:1, 129:13, 129:15
**24,000** [1] - 48:23

**25** [13] - 22:18, 24:16, 30:16, 44:24, 44:25, 48:12, 52:7, 70:12, 111:21, 111:25, 144:7, 146:1, 155:14
**25,000** [3] - 83:20, 135:1, 144:7
**250** [1] - 138:22
**250-plus** [2] - 47:7, 47:11
**26** [1] - 14:20
**27th** [1] - 68:15
**28** [1] - 97:16
**29** [2] - 3:6, 68:8
**2:30** [1] - 103:14
**2:33** [1] - 105:12
**2:51** [1] - 105:12
**2:52** [2] - 105:19, 105:22
**2nd** [3] - 84:24, 86:7, 89:19

**3**

**3** [4] - 1:11, 62:22, 117:21
**3,000** [2] - 134:12, 134:17
**30** [4] - 97:15, 97:16, 131:7, 144:7
**30,000** [4] - 132:18, 133:2, 133:22, 134:19
**30,135** [1] - 117:21
**305** [5] - 1:17, 1:21, 1:24, 2:6, 157:19
**30th** [3] - 24:2, 25:12, 29:11
**31st** [1] - 80:7
**32** [1] - 3:7
**33128** [2] - 2:5, 157:18
**33134-5267** [1] - 1:24
**33140-2316** [1] - 1:20
**33146-1878** [1] - 1:16
**39** [1] - 32:15

**4**

**4** [7] - 3:22, 25:6, 36:13, 60:18, 65:7, 124:5, 133:6
**4.14** [1] - 7:4
**40** [5] - 36:3, 89:9, 100:16, 100:20, 110:10
**400** [4] - 2:4, 141:6, 141:7, 157:18
**42** [1] - 91:17
**45** [1] - 131:8
**4:00** [4] - 109:16,

109:19, 110:3, 114:9
**4A** [1] - 1:20

## 5

**5** [3] - 5:11, 69:21, 117:21
**5,000** [3] - 134:23, 144:9, 144:13
**50** [2] - 110:10, 141:2
**523-5518** [2] - 2:6, 157:19
**55** [2] - 3:7, 22:25
**57** [1] - 133:5
**5750** [1] - 1:20
**58** [3] - 144:25, 145:14, 145:16
**58,115** [1] - 39:10
**5:02** [1] - 148:18
**5:16** [2] - 1:6, 157:8

## 6

**6** [5] - 101:23, 130:3, 130:4, 130:6, 147:14
**60,000** [1] - 134:20
**600** [28] - 48:24, 49:2, 49:17, 49:19, 49:21, 50:5, 50:11, 50:12, 50:15, 79:25, 80:4, 81:1, 81:3, 81:7, 81:14, 81:15, 82:6, 83:19, 84:16, 86:16, 86:23, 86:24, 86:25, 87:1, 101:18, 101:21, 102:8, 117:11
**600th** [1] - 80:23
**62** [1] - 48:5
**64** [2] - 36:8, 39:23
**65** [1] - 36:8
**65,000** [1] - 130:24
**66** [5] - 22:18, 22:25, 24:8, 30:18, 114:11
**67** [3] - 24:18, 24:22, 25:6
**68** [1] - 30:16
**680** [8] - 50:2, 81:4, 83:6, 83:23, 84:5, 84:18, 86:20, 87:3
**685** [1] - 83:17
**69** [3] - 135:9, 145:25
**690** [10] - 50:2, 81:4, 81:11, 83:6, 83:17, 83:23, 84:5, 84:18, 86:20, 87:3

## 7

**7** [1] - 121:9

## 70

**70** [1] - 30:17
**700** [5] - 86:16, 86:24, 86:25, 87:1, 102:8
**71** [2] - 3:8, 30:17
**74** [1] - 61:24
**74,105** [1] - 126:19
**76-1** [1] - 66:21
**76.2** [1] - 68:6
**770** [1] - 1:16
**777-0377** [1] - 1:24

## 8

**8** [4] - 6:4, 46:21, 109:3, 114:17
**8,000** [2] - 117:3
**800** [1] - 102:8
**814-2035** [1] - 1:21
**836** [3] - 116:19, 119:7, 119:8
**840** [1] - 119:7
**894.40** [1] - 27:1
**8:21** [2] - 1:6, 4:1
**8:29** [1] - 9:9

## 9

**9** [27] - 3:5, 27:18, 35:21, 36:9, 36:11, 47:23, 47:24, 109:14, 110:17, 129:25, 130:2, 130:17, 144:25, 145:15, 148:15, 148:16, 154:5
**90** [2] - 89:24, 90:1
**900** [1] - 81:19
**91,056.24** [1] - 52:6
**95** [3] - 66:20, 85:22, 101:20
**97** [1] - 101:23
**9:00** [7] - 109:18, 110:3, 113:15, 156:20
**9:45** [1] - 36:2
**9:50** [1] - 9:9
**9:51** [1] - 9:16

## A

**a.m** [21] - 1:6, 4:1, 9:9, 9:16, 27:18, 32:1, 35:21, 36:9, 36:11, 47:23, 47:24, 56:6, 63:13, 109:14, 129:25, 130:2, 130:3, 130:4, 130:6, 130:17
**ability** [1] - 143:23
**able** [19] - 14:3, 39:11,

39:19, 45:3, 50:13, 80:9, 86:17, 86:20, 87:4, 95:14, 100:12, 108:21, 111:22, 111:25, 112:3, 116:14, 132:1, 134:9, 156:13
**above-entitled** [1] - 157:14
**absolutely** [2] - 41:5, 148:6
**absolves** [1] - 152:19
**abundantly** [1] - 150:22
**accept** [1] - 78:3
**accepted** [1] - 140:7
**access** [14] - 37:5, 37:8, 41:2, 41:3, 46:20, 80:16, 81:16, 81:18, 88:9, 91:14, 92:19, 118:20, 136:24, 136:25
**according** [9] - 41:18, 88:10, 90:11, 113:24, 116:15, 118:21, 147:21, 147:22, 152:6
**account** [7] - 81:17, 125:6, 125:14, 125:15, 137:22
**accountant** [8] - 13:5, 13:7, 21:14, 21:16, 21:18, 21:20, 138:5, 138:9
**accountants** [1] - 13:6
**accurate** [6] - 37:11, 37:12, 48:7, 67:2, 124:23, 157:13
**Act** [1] - 61:1
**action** [1] - 104:24
**activated** [1] - 111:11
**actively** [1] - 150:14
**actual** [1] - 65:2
**add** [2] - 15:3, 127:4
**additional** [5] - 35:22, 68:12, 103:16, 103:20, 116:21
**address** [3] - 59:12, 154:21, 154:22
**addressed** [1] - 26:7
**adds** [1] - 69:11
**adequate** [1] - 5:15
**adjourn** [1] - 148:11
**adjourned** [1] - 157:8
**adjusted** [1] - 90:10
**administration** [1] - 13:23
**admits** [1] - 151:20
**ADMITTED** [1] - 3:15
**admitted** [1] - 150:23

**advance** [7] - 17:8, 17:14, 17:15, 17:16, 17:18, 17:21, 17:24
**advances** [2] - 118:1, 128:12
**advantage** [2] - 17:22, 17:25
**advertising** [1] - 149:23
**afternoon** [4] - 103:10, 106:6, 106:7, 109:16
**agencies** [1] - 122:15
**agency** [9] - 32:25, 123:17, 123:21, 123:22, 123:23, 123:24, 136:5, 139:10, 150:8
**agent** [21] - 10:12, 18:10, 19:17, 19:18, 56:22, 62:18, 73:10, 73:16, 95:11, 95:12, 107:12, 111:1, 111:2, 111:10, 111:11, 123:22, 140:8, 147:19, 147:23, 152:1
**agents** [13] - 50:4, 50:6, 52:17, 92:7, 110:12, 114:21, 117:5, 123:18, 136:8, 139:10, 150:7, 152:12, 152:17
**aggressive** [2] - 121:8, 121:12
**ago** [13] - 16:15, 29:11, 29:12, 57:17, 84:24, 86:15, 91:11, 101:13, 102:5, 102:12, 132:20, 133:23, 146:25
**agree** [30] - 17:5, 17:7, 17:13, 29:22, 30:3, 30:10, 30:20, 76:17, 77:14, 77:21, 78:3, 90:13, 94:2, 94:13, 95:8, 98:17, 98:19, 128:15, 129:4, 129:8, 131:18, 132:3, 132:6, 134:2, 135:3, 135:5, 138:22, 144:16
**agreed** [9] - 7:13, 64:20, 65:1, 65:25, 68:7, 76:1, 118:4, 152:6
**agreement** [21] - 33:16, 33:19, 33:22, 41:21, 41:24, 67:15,

67:16, 76:2, 76:9, 76:12, 78:25, 79:2, 79:3, 79:13, 79:14, 79:18, 98:16, 98:18, 141:14
**agreements** [1] - 98:25
**ahead** [1] - 93:7
**AI** [1] - 53:18
**Alberto** [2] - 121:11, 121:14
**Alcala** [7] - 3:9, 105:16, 124:24, 125:12, 136:15, 148:2
**ALCALA** [1] - 105:23
**Alcove** [1] - 137:13
**alert** [1] - 111:7
**Alix** [1] - 111:19
**ALL** [2] - 4:4, 9:7
**allowance** [1] - 42:5
**allowed** [11] - 58:20, 65:11, 68:18, 92:4, 92:7, 92:9, 93:22, 93:23, 94:13, 95:17, 96:9
**almost** [5] - 52:10, 77:10, 102:5, 128:3, 138:15
**alone** [1] - 59:4
**alternative** [1] - 66:12
**altogether** [1] - 59:2
**ALTONAGA** [1] - 1:12
**Ambetter** [5] - 46:13, 46:25, 47:5, 47:6, 47:10
**amen** [1] - 107:10
**amount** [33] - 39:15, 39:20, 39:22, 40:8, 44:14, 44:19, 44:22, 46:9, 50:5, 50:18, 50:20, 51:14, 51:20, 51:25, 52:4, 70:18, 76:10, 78:15, 86:22, 86:23, 89:3, 118:18, 126:10, 126:11, 126:15, 126:20, 132:16, 132:24, 134:8, 134:9, 152:6, 152:8
**amounts** [3] - 125:13, 133:17, 134:14
**Andrea** [6] - 30:20, 98:4, 111:18, 112:6, 120:15, 139:13, 140:7, 149:5
**ANDREA** [1] - 1:8
**annotated** [2] - 145:4, 145:10
**ANSWER** [1] - 24:23

July 12, 2023                                                              3

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

**answer** [44] - 18:16, 23:4, 24:12, 24:18, 25:10, 25:22, 41:19, 52:1, 81:21, 81:24, 82:10, 84:3, 84:8, 84:10, 85:2, 85:24, 86:2, 86:4, 90:5, 90:13, 90:14, 90:15, 90:17, 94:6, 95:3, 99:21, 100:9, 100:22, 101:14, 101:24, 102:4, 120:3, 120:5, 130:22, 133:15, 135:12, 135:16, 135:19, 138:6, 144:22, 145:3, 145:19, 146:7, 146:16
**answered** [6] - 15:15, 82:15, 85:13, 146:3, 146:11, 146:13
**answering** [4] - 82:14, 99:6, 99:18, 99:19
**answers** [5] - 25:11, 25:24, 145:24, 146:19, 146:21
**anticipate** [2] - 155:8, 156:5
**anticipation** [1] - 154:7
**anxiously** [1] - 102:6
**Apatch** [1] - 15:7
**apologize** [7] - 21:23, 22:19, 23:18, 23:25, 25:19, 90:8, 93:7
**apostrophe** [1] - 67:10
**app** [1] - 120:15
**APPEARANCES** [2] - 1:13, 2:1
**applied** [1] - 34:25
**apply** [3] - 61:6, 65:13, 104:20
**appointed** [1] - 93:2
**appointment** [2] - 53:9, 131:14
**appointments** [1] - 136:23
**appreciate** [3] - 4:9, 148:7, 148:9
**approach** [1] - 24:25
**appropriate** [1] - 121:15
**approval** [3] - 66:7, 67:15, 67:21
**approve** [1] - 108:14
**approved** [4] - 10:11, 60:22, 61:2, 61:3
**April** [2] - 43:22, 80:11

**Apt** [1] - 1:20
**area** [1] - 31:15
**argued** [2] - 57:17, 64:22
**argument** [1] - 152:18
**arguments** [2] - 154:8, 155:14
**arms** [1] - 128:17
**arrangement** [1] - 42:1
**arrive** [1] - 107:5
**arrived** [1] - 50:7
**aspect** [3] - 95:24, 149:9, 150:12
**assigned** [3] - 112:16, 112:19, 112:22
**Association** [5] - 93:13, 93:25, 94:23, 94:24, 97:22
**assumes** [2] - 13:10, 141:24
**ASSURANCE** [1] - 1:8
**Assurance** [5] - 8:3, 8:7, 27:6, 32:25, 149:5
**attempt** [1] - 59:15
**attempted** [1] - 35:8
**attorney** [1] - 87:15
**attorney/client** [1] - 87:20
**August** [2] - 54:18, 130:14
**authentication** [1] - 5:9
**authorization** [2] - 140:10, 148:2
**Avant** [161] - 8:1, 8:3, 8:7, 11:4, 11:7, 11:8, 11:11, 11:23, 12:18, 14:7, 14:15, 17:6, 20:25, 25:21, 27:6, 27:10, 27:12, 28:13, 28:24, 32:25, 33:2, 33:5, 33:11, 33:13, 33:17, 33:20, 33:25, 34:7, 34:10, 34:14, 34:23, 34:25, 35:8, 36:15, 38:24, 39:7, 39:9, 40:7, 40:9, 40:12, 41:4, 43:5, 43:8, 43:12, 43:20, 44:13, 44:23, 45:25, 48:4, 48:9, 48:15, 50:20, 51:6, 51:15, 51:21, 52:16, 52:24, 53:2, 53:3, 54:10, 55:7, 73:1, 74:15, 75:10, 75:22, 76:16, 77:1, 78:7, 80:10, 81:6, 81:13, 82:5,

83:18, 90:25, 92:3, 92:5, 92:12, 92:17, 92:18, 92:19, 93:2, 93:4, 93:20, 94:11, 94:17, 94:21, 96:10, 97:11, 97:18, 98:2, 98:17, 98:20, 98:23, 99:23, 100:14, 103:4, 103:19, 104:6, 104:10, 107:14, 108:3, 108:4, 108:12, 108:17, 108:19, 108:23, 108:24, 109:20, 110:7, 111:13, 111:14, 111:16, 112:17, 113:13, 114:1, 114:4, 116:7, 116:16, 117:5, 117:6, 117:13, 118:1, 118:12, 118:22, 119:4, 119:17, 120:8, 120:25, 121:4, 122:11, 122:13, 124:2, 125:6, 125:10, 125:13, 125:15, 125:19, 125:21, 126:4, 126:23, 127:7, 128:3, 128:10, 129:1, 130:13, 130:24, 131:7, 136:4, 137:10, 137:18, 137:19, 137:21, 138:22, 138:23, 142:18, 147:3, 147:5, 147:21, 149:5
**AVANT** [1] - 1:8
**Avant's** [5] - 10:23, 35:20, 141:9, 147:8, 147:9
**Ave** [2] - 1:16, 1:20
**Avenue** [2] - 2:4, 157:18
**average** [3] - 36:8, 40:1, 40:4
**avoid** [2] - 140:16, 148:13
**awaiting** [1] - 102:6
**award** [3] - 126:5, 127:6, 127:13
**aware** [2] - 25:7, 45:6

## B

**baby** [1] - 127:24
**bad** [1] - 126:13

**bank** [3] - 125:2, 125:5
**bargained** [2] - 65:17, 66:15
**Barros** [1] - 2:2
**base** [2] - 39:23, 93:2
**based** [9] - 27:5, 39:11, 39:15, 48:14, 50:18, 76:8, 139:7, 152:8
**basing** [1] - 83:17
**basis** [3] - 79:13, 149:15, 152:7
**bathroom** [1] - 6:2
**BATISTA** [2] - 1:4, 32:2
**Batista** [19] - 3:6, 31:23, 32:8, 32:11, 32:12, 38:24, 55:5, 55:7, 56:21, 57:24, 62:13, 68:7, 68:11, 71:9, 71:21, 88:14, 88:21, 92:2, 101:9
**Beach** [1] - 1:20
**became** [1] - 72:21
**become** [4] - 19:18, 72:13, 143:10, 152:12
**becoming** [1] - 56:22
**BEFORE** [1] - 1:12
**began** [1] - 43:14
**begin** [1] - 154:5
**beginning** [9] - 14:11, 72:20, 78:22, 90:24, 91:9, 98:22, 99:8, 99:10, 99:21
**behave** [1] - 121:15
**behind** [1] - 5:3
**bellhop** [1] - 72:11
**belong** [1] - 52:25
**beside** [1] - 60:3
**best** [5] - 113:23, 128:15, 130:8, 131:20
**better** [2] - 35:3, 35:9
**between** [16] - 14:5, 31:5, 31:10, 37:14, 65:17, 66:15, 83:17, 84:5, 84:18, 86:25, 88:1, 97:19, 115:14, 117:13, 139:5, 151:2
**beyond** [2] - 31:14, 31:16
**big** [6] - 46:4, 92:2, 95:23, 95:24, 122:19, 136:18
**bit** [5] - 4:23, 8:19, 106:16, 110:23, 114:5
**blaming** [1] - 82:3, 84:2, 84:12, 93:3

**blank** [1] - 38:3
**Blvd** [1] - 1:23
**Bob** [2] - 111:14, 120:12
**bonus** [55] - 22:10, 24:13, 24:15, 29:24, 30:4, 30:9, 30:12, 46:8, 46:9, 46:12, 46:18, 46:24, 47:3, 48:13, 49:16, 50:16, 50:19, 54:22, 54:23, 78:16, 79:20, 79:21, 79:24, 80:15, 81:7, 81:11, 82:6, 83:2, 84:15, 85:19, 86:23, 87:2, 87:4, 89:5, 102:2, 102:6, 103:3, 116:20, 116:24, 117:10, 118:7, 119:6, 119:8, 122:10, 122:11, 122:13, 131:9, 132:17, 133:18, 135:1, 144:7, 149:15
**bonuses** [16] - 46:16, 75:16, 76:2, 79:8, 116:25, 117:14, 127:3, 133:2, 133:11, 133:12, 133:14, 133:20, 150:24, 150:25, 153:3
**book** [1] - 150:1
**born** [2] - 32:12, 106:20
**boss** [3] - 117:7, 124:8, 124:10
**bottom** [2] - 7:12, 118:17
**bought** [6] - 16:11, 54:1, 108:20, 112:11, 122:18
**boy** [1] - 128:1
**breach** [7] - 7:24, 8:2, 8:8, 75:25, 103:17, 104:18, 104:21
**breached** [2] - 65:20, 66:6
**break** [2] - 56:1, 61:20
**BRIAN** [1] - 1:14
**brian@ fairlawattorney. com** [1] - 1:17
**Bridge** [6] - 92:15, 92:20, 92:23, 92:24, 94:25
**brief** [3] - 103:10, 105:11, 106:8
**Bright** [3] - 117:2, 118:8, 131:13

**bring** [9] - 9:11, 9:14, 34:13, 34:16, 34:21, 35:4, 52:23, 56:9, 71:15
**bringing** [1] - 52:19
**broke** [2] - 79:2, 79:4
**broker** [2] - 136:21, 136:23, 136:24, 137:1, 137:2
**brought** [5] - 35:7, 35:9, 92:3, 112:25, 119:20
**burden** [1] - 151:15
**business** [20] - 12:12, 12:13, 12:23, 13:3, 13:16, 13:18, 13:20, 107:15, 123:1, 125:16, 128:16, 129:2, 129:4, 129:5, 136:16, 139:19, 139:23, 140:19, 150:13, 151:25
**buy** [1] - 56:13
**BY** [99] - 2:3, 9:24, 10:19, 11:2, 12:2, 12:11, 13:13, 14:1, 14:19, 15:24, 16:24, 17:12, 18:8, 18:25, 19:11, 19:24, 20:5, 20:19, 23:24, 25:5, 26:18, 29:9, 29:21, 30:7, 30:19, 32:7, 32:22, 34:20, 35:10, 38:23, 39:6, 41:22, 42:22, 44:4, 44:21, 45:12, 46:23, 47:15, 49:15, 49:24, 51:5, 51:12, 52:3, 53:5, 54:8, 55:4, 55:13, 55:17, 71:20, 74:25, 77:20, 82:1, 82:11, 84:17, 85:12, 85:23, 86:11, 87:24, 88:20, 90:2, 90:12, 91:8, 91:24, 93:12, 94:12, 95:21, 96:8, 96:14, 96:25, 98:13, 99:5, 100:11, 100:24, 101:8, 102:15, 106:5, 106:23, 107:21, 109:25, 110:18, 114:7, 116:3, 117:18, 119:14, 120:24, 124:7, 124:17, 127:21, 133:7, 136:2, 136:20, 138:14, 139:15, 141:1, 142:15, 143:8, 145:8,

145:18, 147:17

---

## C

**calculate** [3] - 39:11, 52:7, 117:12
**calculating** [1] - 117:22
**calculation** [2] - 58:9, 141:19
**calculations** [3] - 26:20, 88:10, 118:21
**calculator** [1] - 38:8
**calendar** [1] - 68:14
**California** [4] - 73:22, 74:12, 74:15, 74:24
**cameras** [1] - 120:6
**campaign** [1] - 74:11
**campaigns** [1] - 72:22
**cannot** [7] - 20:12, 59:19, 65:16, 65:19, 66:6, 66:14, 105:4
**car** [5] - 54:1, 56:10, 56:13, 56:14, 56:15, 56:18, 122:18
**Caracas** [1] - 106:20
**care** [2] - 94:14, 96:11
**carefully** [1] - 103:21
**Carlos** [20] - 3:9, 19:6, 52:9, 52:12, 52:13, 105:16, 106:6, 106:8, 106:19, 112:20, 124:23, 124:24, 125:12, 136:13, 136:15, 137:12, 137:18, 140:9, 143:9, 148:1
**CARLOS** [2] - 1:4, 105:23
**Carmen** [1] - 2:2
**cars** [1] - 152:15
**CASE** [1] - 1:2
**case** [32] - 19:25, 20:16, 21:25, 23:20, 24:1, 45:7, 56:4, 68:20, 75:25, 77:25, 92:3, 92:5, 95:22, 95:24, 98:3, 103:12, 109:5, 112:7, 115:7, 122:22, 126:6, 141:12, 143:11, 148:9, 148:13, 148:14, 151:25, 153:5, 153:23, 154:11, 154:23
**cases** [3] - 67:16, 88:22, 150:6
**catching** [1] - 23:20
**caught** [1] - 8:1
**causes** [1] - 66:3

**caved** [1] - 66:9
**cease** [3] - 116:10, 139:22, 140:21
**CECILIA** [1] - 1:12
**center** [3] - 113:11, 113:19
**certain** [11] - 24:4, 52:9, 58:12, 74:2, 76:10, 95:13, 97:9, 101:1, 102:7, 110:25, 114:25
**certainly** [5] - 32:21, 137:19, 152:3, 153:4, 157:6
**Certificate.................
....** [1] - 3:22
**certify** [1] - 157:12
**CFO** [2] - 53:17, 121:7
**CFOs** [1] - 53:16
**CFR** [2] - 64:25, 65:2
**chair** [1] - 112:16
**chambers** [1] - 9:6
**change** [5] - 4:17, 42:1, 42:3, 42:14, 42:15
**changed** [3] - 42:7, 78:12, 154:15
**changes** [4] - 8:13, 60:18, 60:19, 140:9
**charge** [1] - 110:11
**charity** [1] - 129:1
**chart** [2] - 131:1, 131:3
**check** [3] - 71:12, 134:4, 134:12
**checking** [2] - 45:3, 151:4
**chief** [1] - 154:24
**CHIEF** [1] - 1:12
**child** [1] - 109:12
**children** [2] - 53:1, 109:12
**choose** [1] - 99:25
**Christopher** [1] - 120:17
**Circuit** [1] - 67:1
**Circuit's** [1] - 150:17
**circumstances** [3] - 6:10, 67:3, 67:4
**claim** [17] - 7:4, 7:24, 12:12, 12:22, 19:25, 20:1, 20:16, 28:23, 38:4, 76:1, 104:6, 104:10, 104:24, 105:4, 139:7, 144:6, 152:7
**claimed** [2] - 13:2, 105:1
**claiming** [15] - 13:8, 20:6, 20:20, 21:23,

21:24, 22:6, 22:8, 28:21, 50:20, 74:10, 74:17, 83:3, 85:18, 92:21, 98:14
**claims** [4] - 104:3, 104:4, 104:23, 155:3
**clarified** [1] - 14:10
**clarify** [3] - 29:10, 139:6, 139:14
**clarity** [1] - 59:19
**classified** [2] - 57:23, 57:25
**cleaned** [1] - 62:17
**clear** [6] - 6:7, 86:16, 100:9, 105:9, 126:9, 150:22
**click** [2] - 111:8, 111:11
**client** [18] - 18:15, 18:19, 20:14, 38:21, 59:14, 130:5, 130:7, 140:14, 140:17, 147:6, 147:10, 147:11, 147:14, 147:18, 147:23, 147:24, 154:11, 155:7
**clients** [39] - 5:2, 5:5, 19:2, 19:3, 19:4, 19:6, 56:17, 61:10, 98:25, 105:1, 110:9, 110:13, 131:12, 138:19, 138:23, 139:14, 139:16, 139:17, 139:19, 139:22, 140:6, 140:7, 140:9, 140:10, 140:11, 140:12, 140:13, 140:17, 146:24, 147:2, 148:5, 149:4, 149:11, 149:13, 149:16, 150:6, 150:15, 154:6
**clients'** [2] - 149:9, 150:24
**close** [6] - 64:19, 81:15, 101:13, 129:25, 141:11, 156:2
**closed** [2] - 87:8
**closing** [6] - 70:12, 70:17, 70:18, 154:7, 155:14, 155:21
**clothing** [1] - 13:23
**CMS** [2] - 10:8, 10:11
**cobble** [1] - 7:4
**colleagues** [2] - 86:17, 120:4
**collections** [1] - 96:17

**Collins** [1] - 1:20
**Colombia** [5] - 111:6, 113:12, 113:15, 113:16, 120:16
**Colombian** [1] - 113:19
**columns** [1] - 4:13
**Combined** [2] - 11:21
**comfort** [2] - 137:3, 137:4
**Comfort** [2] - 137:6, 137:8
**coming** [2] - 58:6, 84:22, 110:17
**commission** [23] - 27:5, 30:4, 30:9, 36:14, 36:18, 36:21, 37:6, 37:10, 41:9, 42:9, 43:20, 45:1, 65:25, 78:14, 81:8, 89:6, 89:24, 94:22, 117:7, 117:8, 119:3, 119:5, 149:14
**commissions** [52] - 17:16, 17:18, 22:10, 22:11, 28:24, 30:12, 40:18, 44:11, 44:23, 50:23, 50:24, 54:9, 54:10, 72:1, 75:16, 76:2, 79:6, 79:19, 89:4, 89:7, 89:22, 90:4, 90:17, 90:22, 103:3, 116:21, 117:14, 118:3, 118:6, 118:12, 118:22, 119:15, 119:16, 119:18, 127:2, 127:3, 128:12, 132:16, 132:17, 132:22, 133:1, 133:13, 133:17, 133:21, 134:5, 144:3, 144:11, 144:13, 150:23, 150:25, 153:3
**commitment** [1] - 109:11
**commitments** [1] - 122:8
**communicate** [1] - 130:5
**communicated** [1] - 119:23
**communication** [2] - 134:3, 134:6
**communications** [2] - 87:25, 105:3
**companies** [19] - 11:10, 11:19, 19:14,

75:12, 88:13, 92:4,
92:8, 92:10, 92:13,
93:22, 93:24, 94:14,
95:9, 95:13, 115:5,
136:22, 136:24,
136:25, 152:14
**company** [56] - 11:22,
12:13, 12:17, 12:19,
12:21, 19:7, 20:20,
33:1, 37:3, 37:16,
46:13, 46:14, 46:25,
76:15, 79:11, 79:23,
84:13, 92:7, 92:15,
92:25, 93:1, 93:4,
93:16, 93:19, 93:21,
94:1, 94:8, 94:9,
94:10, 94:17, 94:18,
94:19, 94:20, 94:24,
94:25, 95:12, 99:13,
116:11, 124:20,
136:11, 136:13,
137:10, 137:12,
137:15, 137:17,
137:18, 137:20,
137:25, 138:23,
139:20, 141:3,
141:5, 141:9
**company's** [3] -
73:17, 137:22,
137:24
**compare** [1] - 98:2
**compared** [2] - 52:9,
52:18
**compensable** [1] -
149:20
**compensation** [4] -
46:24, 78:14, 78:17,
109:3
**competition** [2] -
52:15, 52:18
**complain** [1] - 121:1
**complaints** [1] - 120:2
**complete** [3] - 26:3,
67:3, 147:22
**completing** [1] - 26:20
**compound** [2] - 140:3,
140:4
**comprised** [1] - 65:21
**compromise** [1] - 67:8
**computer** [12] - 5:7,
12:25, 16:7, 16:11,
108:17, 108:20,
112:11, 112:21,
112:23, 143:23,
152:15, 153:13
**computers** [2] -
108:19, 152:19
**computing** [1] - 67:22
**concentrate** [1] - 31:7
**concern** [2] - 58:24,

59:15
**concerned** [1] - 70:13
**concerns** [1] - 60:23
**concierge** [5] - 55:18,
57:10, 71:23, 76:13,
76:14
**Concierge** [4] - 93:13,
93:25, 94:23, 97:22
**condition** [1] - 140:15
**conference** [4] - 5:2,
5:5, 53:15, 68:14
**conferences** [1] -
59:21
**confirm** [2] - 86:17,
86:20
**confirmed** [3] - 86:22,
86:24, 122:16
**confusion** [7] - 58:6,
66:3, 69:12, 92:1,
139:1, 139:6, 154:10
**connected** [1] - 6:21
**consciousness** [1] -
96:2
**consent** [8] - 140:8,
141:8, 147:6,
147:11, 147:14,
147:18, 147:24,
148:1
**consider** [5] - 18:10,
52:2, 58:21, 72:2,
130:7
**consideration** [2] -
6:9, 140:14
**considered** [1] -
150:19
**considering** [1] - 70:4
**constantly** [1] - 99:15
**consult** [1] - 134:9
**Cont'd** [4] - 3:5, 3:8,
9:23, 71:19
**contact** [2] - 148:2,
148:13
**contacting** [1] - 147:2,
148:5
**contained** [1] - 36:18
**contends** [1] - 124:23
**contention** [1] - 65:14
**continue** [5] - 43:4,
67:25, 113:16,
113:19, 119:3
**CONTINUED** [1] - 2:1
**continued** [6] - 62:4,
62:7, 80:10, 81:2,
81:12, 82:5
**contract** [23] - 7:24,
8:2, 8:6, 8:7, 8:9,
10:14, 10:20, 33:16,
33:19, 65:20, 66:7,
76:1, 103:17,
103:19, 103:22,

103:23, 104:18,
104:21, 109:11,
150:21, 151:2,
151:4, 152:7
**contracted** [1] - 61:2
**contractor** [17] - 12:7,
12:9, 16:6, 18:4,
19:16, 21:8, 21:10,
31:6, 93:17, 97:4,
101:3, 105:1,
122:21, 122:24,
123:14, 137:9,
152:20
**contractor's** [1] -
152:5
**contractors** [7] - 7:18,
61:6, 65:13, 76:7,
152:10, 152:13,
152:21
**contracts** [1] - 150:22
**contrary** [1] - 140:12
**control** [15] - 58:15,
76:15, 77:4, 77:10,
95:23, 98:21, 99:8,
99:12, 99:13,
125:15, 125:18,
150:13, 151:14,
152:3
**controlled** [3] - 77:6,
149:9, 150:12
**controlling** [1] - 77:5
**controls** [1] - 151:19
**convenience** [1] -
42:12
**conversation** [3] -
22:12, 121:13,
121:21
**copies** [1] - 155:18
**copy** [3] - 23:9,
156:24, 157:1
**Coral** [2] - 1:16, 1:24
**correct** [103] - 10:16,
11:18, 19:18, 20:21,
22:1, 22:4, 24:2,
24:5, 26:22, 27:8,
27:17, 27:20, 27:22,
28:6, 28:7, 28:10,
28:14, 28:16, 28:19,
28:25, 29:4, 30:2,
30:22, 30:24, 36:19,
38:10, 38:25, 39:18,
39:25, 40:8, 41:12,
41:15, 41:17, 45:2,
45:8, 45:17, 47:13,
48:13, 49:11, 49:13,
49:14, 49:18, 50:14,
50:17, 51:4, 51:20,
52:21, 54:14, 54:20,
54:22, 62:7, 72:7,
72:17, 73:8, 73:13,

73:19, 73:20, 75:23,
77:9, 78:12, 80:8,
89:10, 89:19, 89:20,
90:3, 96:16, 96:20,
97:2, 100:17,
101:11, 101:15,
101:16, 101:19,
102:11, 103:1,
103:2, 108:10,
109:6, 109:24,
112:14, 112:18,
113:18, 113:21,
114:10, 114:13,
116:12, 116:23,
117:21, 117:25,
118:13, 119:2,
128:4, 128:14,
129:7, 130:16,
134:15, 139:24,
144:13, 145:21,
146:17, 147:20,
147:25, 148:3
**Correct** [1] - 25:10
**corrected** [1] - 88:16
**correction** [2] - 13:24,
85:10, 120:23
**corrections** [1] - 99:16
**correctly** [6] - 44:12,
49:5, 50:24, 51:2,
61:14, 141:4
**corresponds** [1] -
47:4
**corridor** [1] - 108:1
**CORTES** [1] - 1:8
**Cortes** [86] - 20:1,
20:6, 20:17, 20:20,
21:6, 21:7, 21:10,
22:2, 28:15, 32:20,
32:23, 33:22, 41:25,
42:6, 45:6, 45:16,
53:7, 53:8, 53:20,
54:1, 56:12, 73:3,
88:11, 88:12, 99:1,
99:17, 107:22,
108:1, 108:12,
108:16, 108:22,
109:9, 109:17,
110:2, 110:15,
112:5, 112:10,
113:1, 113:5, 113:6,
113:8, 114:20,
114:24, 115:5,
115:6, 115:10,
115:12, 115:15,
115:17, 116:1,
116:4, 116:5, 116:6,
116:11, 117:2,
117:4, 117:7, 118:4,
119:21, 120:1,
120:10, 120:25,

121:7, 122:16,
122:17, 124:4,
124:8, 124:14,
124:19, 124:21,
125:21, 134:22,
139:5, 140:12,
143:13, 143:15,
144:19, 149:5,
150:11, 150:23,
153:12, 154:15,
154:17, 154:22,
156:4, 156:12
**Cortes's** [2] - 81:16,
121:10
**counsel** [16] - 7:6,
8:14, 8:15, 8:24,
26:13, 31:16, 37:21,
38:12, 65:2, 65:15,
66:24, 67:23, 68:5,
68:18, 95:18, 151:7
**counsel's** [2] - 68:1,
140:1
**count** [1] - 103:18
**countries** [1] - 121:19
**country** [2] - 15:6,
121:19
**couple** [3] - 57:17,
146:24, 150:18
**course** [14] - 8:15,
11:5, 12:5, 13:9,
18:1, 18:12, 22:15,
24:3, 25:22, 31:1,
31:4, 31:7, 31:9,
31:10
**Court** [10] - 2:4, 3:22,
60:22, 60:23, 61:3,
150:19, 153:18,
153:22, 154:9,
157:17
**court** [3] - 62:2, 65:22,
67:14
**COURT** [231] - 1:1,
4:2, 4:3, 4:5, 4:7,
4:15, 4:25, 5:4, 5:6,
5:9, 5:11, 5:18, 5:20,
5:23, 5:25, 6:3, 6:6,
6:8, 6:12, 6:14, 6:17,
6:20, 6:24, 7:2, 7:5,
7:9, 7:11, 7:18, 7:22,
8:4, 8:8, 8:20, 8:23,
9:2, 9:4, 9:8, 9:10,
9:11, 9:12, 9:14,
9:17, 10:18, 10:25,
12:1, 13:12, 15:16,
17:11, 18:6, 18:23,
19:21, 20:15, 22:24,
23:7, 23:13, 24:25,
26:7, 26:10, 26:13,
26:16, 29:7, 29:19,
31:14, 31:19, 31:24,

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 163 of
176
July 12, 2023                                                              6
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

32:5, 32:18, 32:21,
37:23, 38:1, 38:7,
38:11, 38:17, 38:22,
41:19, 42:17, 47:10,
49:12, 49:21, 51:2,
51:9, 52:1, 53:3,
54:3, 54:6, 55:2,
55:11, 55:23, 56:5,
56:7, 56:9, 56:14,
56:18, 56:20, 56:24,
57:1, 57:4, 57:9,
57:12, 57:15, 57:19,
58:3, 58:10, 58:16,
58:24, 59:6, 59:10,
59:17, 59:25, 60:6,
60:9, 60:12, 60:16,
60:20, 61:9, 61:12,
61:16, 61:19, 61:22,
62:1, 62:9, 62:14,
62:25, 63:7, 63:12,
64:3, 64:6, 64:8,
64:12, 64:14, 64:18,
65:6, 66:10, 66:12,
66:17, 67:10, 67:24,
68:3, 68:16, 68:23,
69:2, 69:9, 69:15,
69:23, 70:3, 70:10,
70:14, 70:22, 70:25,
71:2, 71:6, 71:12,
71:14, 71:15, 71:17,
74:22, 77:18, 82:9,
84:9, 91:6, 91:20,
93:10, 94:5, 95:20,
96:1, 96:5, 96:22,
98:9, 98:12, 100:22,
101:6, 103:8,
103:10, 103:13,
103:15, 104:19,
104:22, 105:8,
105:13, 105:15,
105:17, 105:20,
106:1, 106:3,
106:22, 107:16,
107:20, 109:23,
110:6, 114:2,
119:11, 120:19,
124:16, 127:18,
135:17, 135:20,
135:22, 135:24,
136:19, 138:6,
138:10, 138:13,
138:25, 140:2,
140:4, 142:2, 142:9,
143:2, 145:6,
148:10, 148:17,
148:19, 148:21,
148:25, 151:6,
153:7, 153:16,
154:5, 154:19,
154:22, 155:2,
155:5, 155:9,

155:13, 155:23,
156:1, 156:15,
156:17, 156:19,
156:23, 157:1, 157:5
Court's [4] - 64:21,
67:20, 68:10, 148:9
courtroom [10] - 8:20,
9:4, 9:16, 56:6,
71:16, 83:21,
103:14, 105:19,
140:24, 148:18
Courtroom [1] - 1:7
cover [3] - 69:15,
69:16, 70:19
coverage [1] - 153:5
covered [2] - 68:8,
68:13
covers [3] - 82:24,
82:25
COVID [4] - 59:7, 72:5,
74:4, 74:6
create [1] - 131:13
created [8] - 115:1,
115:6, 115:8,
115:10, 115:12,
117:2, 126:7, 139:5
credibility [1] - 153:20
credible [1] - 151:16
crediting [1] - 115:18
CRM [1] - 111:4
cross [7] - 31:17,
38:14, 55:2, 127:18,
154:13, 154:15,
154:17
Cross [4] - 3:5, 3:7,
3:8, 3:10
CROSS [4] - 9:23,
55:3, 71:19, 127:20
cross-examination [2]
- 55:2, 127:18
Cross-Examination
[4] - 3:5, 3:7, 3:8,
3:10
CROSS-
EXAMINATION [3] -
9:23, 55:3, 127:20
cross-examine [1] -
38:14
cross-examining [1] -
154:15
crying [1] - 121:11
Cuba [8] - 14:24, 15:9,
15:14, 15:21, 16:19,
16:21, 32:13, 32:14
CUETO [7] - 1:22, 5:2,
5:5, 26:12, 32:20,
124:14, 142:7
Cueto [1] - 1:23
Cummings [4] - 3:5,
3:7, 3:8, 88:4

CUMMINGS [87] -
1:15, 6:1, 10:17,
10:24, 11:24, 13:10,
15:15, 17:9, 18:5,
18:22, 19:22, 19:24,
20:5, 20:8, 20:10,
20:12, 20:14, 20:19,
22:22, 22:25, 23:18,
23:22, 23:24, 24:22,
25:2, 25:5, 26:14,
26:18, 29:6, 29:18,
30:6, 30:13, 31:12,
31:23, 32:7, 32:22,
34:18, 34:20, 35:6,
35:10, 37:18, 37:20,
38:10, 38:21, 38:23,
39:4, 39:6, 41:22,
42:22, 44:4, 44:21,
45:12, 46:23, 47:15,
49:15, 49:24, 51:5,
51:12, 52:3, 53:5,
54:4, 54:8, 55:1,
55:9, 55:22, 56:12,
56:16, 56:19, 59:9,
59:13, 61:10, 62:12,
74:20, 77:17, 81:25,
82:8, 85:20, 87:20,
91:4, 91:18, 95:18,
95:25, 96:21, 98:8,
101:8, 102:15, 103:7
cumulative [1] - 60:24
customers [3] - 10:23,
11:4, 120:16
cut [1] - 135:16,
135:19, 151:8
cutting [1] - 8:23

## D

daily [3] - 114:5,
115:4, 150:12
damage [1] - 140:16
DANIEL [1] - 1:19
Daniel [1] - 1:19
dantropp@bellsouth
.net [1] - 1:21
date [2] - 29:22, 80:6
DATE [1] - 157:17
dates [2] - 15:22,
125:7
DAY [1] - 1:11
days [22] - 14:12,
14:14, 14:16, 14:20,
14:25, 15:3, 15:6,
36:9, 43:15, 47:24,
50:8, 72:20, 84:24,
86:9, 86:15, 93:18,
97:25, 131:8,
151:10, 151:13
De [1] - 1:23

deadlines [4] -
129:14, 129:18,
129:20, 129:23
deal [4] - 121:18,
136:21, 137:1,
141:18
dealt [1] - 31:8
December [4] - 34:5,
73:25, 74:1, 102:10
decide [5] - 66:1,
111:9, 150:20,
151:3, 152:4
decided [1] - 151:24
decides [2] - 123:13,
123:15, 143:11
decision [2] - 17:19,
78:23, 110:19
deduct [1] - 149:21
deducted [1] - 117:23
deduction [1] - 16:7
deductions [9] -
12:22, 13:2, 16:5,
21:13, 21:15, 21:19,
125:23, 138:2,
152:15
defend [1] - 155:3
Defendant [2] - 61:4,
112:7
defendant [1] - 154:23
defendants [1] -
103:17
DEFENDANTS [2] -
1:19, 3:13
Defendants [18] -
1:10, 5:14, 5:23,
7:15, 7:17, 8:2, 61:7,
64:14, 68:16, 87:16,
103:25, 104:2,
149:8, 149:25,
150:5, 153:24,
154:2, 156:17
Defendants' [1] - 68:7
Defense [10] - 7:6,
8:14, 8:24, 26:13,
37:21, 38:12, 70:25,
149:19, 151:7
defense [8] - 104:1,
104:3, 104:5, 104:9,
104:12, 104:17,
104:23
defenses [1] - 68:20
defined [8] - 64:25,
65:1, 65:4, 68:8,
68:13, 68:18, 68:22,
68:24
definitely [1] - 151:14
definition [7] - 65:1,
68:25, 69:2, 69:14,
69:18, 70:1, 70:5
delayed [2] - 119:16,

119:19
deleted [1] - 103:18
deletes [1] - 59:2
deliberately [2] - 98:5,
98:7
Delio [9] - 3:6, 31:23,
32:11, 68:7, 68:11,
122:20, 124:20,
132:7, 132:12
DELIO [2] - 1:4, 32:2
demand [2] - 129:10,
129:17
demonstrative [2] -
37:21, 38:4
denied [1] - 154:1
dental [3] - 92:16,
92:18, 94:20
deny [1] - 151:9
Department [3] -
65:22, 96:19, 105:2
department [1] - 61:14
dependant [1] - 150:4
deposit [1] - 54:19
deposited [2] -
125:13, 125:14
deposition [28] - 22:5,
22:8, 22:16, 22:18,
22:21, 22:22, 24:1,
25:15, 29:13, 84:23,
85:2, 85:15, 85:17,
85:21, 89:17, 89:19,
101:20, 101:22,
132:19, 133:9,
135:6, 135:8, 144:3,
144:21, 144:25,
145:20, 146:19,
153:12
deposits [2] - 125:3,
125:5
depot [1] - 125:5
deputy [1] - 8:20
described [1] - 113:8
designation [1] - 69:3
desist [3] - 116:10,
139:22, 140:21
desk [2] - 108:8,
112:15
detail [1] - 110:23
detailed [1] - 125:2
determination [1] -
149:7
determinations [1] -
153:20
determined [2] -
111:10, 156:7
dialer [1] - 111:1
difference [9] - 31:5,
31:10, 52:7, 57:7,
57:14, 97:19, 97:21,
115:16, 115:20

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 164 of 176
July 12, 2023
7
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

**different** [7] - 58:1, 67:21, 78:19, 80:19, 106:14, 130:20
**direct** [2] - 38:21, 54:19
**Direct** [2] - 3:7, 3:9
**DIRECT** [2] - 32:6, 106:4
**directed** [4] - 104:10, 149:3, 151:9, 153:17
**directly** [5] - 92:20, 111:5, 125:11, 125:13, 136:22
**disagree** [2] - 78:2, 78:5
**disagreed** [1] - 68:21
**disagreeing** [1] - 29:16
**discrepancy** [5] - 37:14, 40:15, 40:21, 52:11, 134:13
**discuss** [5] - 56:3, 61:22, 103:12, 104:15, 148:12
**discussed** [3] - 28:4, 65:13, 78:6
**discussing** [1] - 24:8
**discussion** [7] - 54:6, 55:24, 58:4, 59:17, 59:20, 104:1, 110:2
**discussions** [1] - 59:10
**dispute** [3] - 60:15, 150:10, 151:1
**distribution** [1] - 15:5
**DISTRICT** [3] - 1:1, 1:1, 1:12
**dividends** [1] - 136:12
**DIVISION** [1] - 1:2
**Docket** [1] - 66:20
**document** [8] - 20:25, 21:11, 26:10, 26:11, 45:18, 102:16, 109:4, 109:9
**documents** [3] - 41:2, 105:3, 114:25
**DOL** [1] - 61:3
**dollars** [2] - 118:5, 128:13
**done** [8] - 4:24, 37:15, 37:16, 73:17, 78:19, 138:15, 150:3, 155:11
**Doral** [4] - 44:7, 55:20, 113:20, 122:19
**double** [2] - 157:2, 157:3, 157:5
**down** [7] - 4:11, 24:18, 31:20, 60:25, 103:8, 121:17, 121:24

**draft** [1] - 59:2
**draw** [1] - 153:19
**drawing** [1] - 153:20
**drawn** [1] - 153:25
**Drive** [1] - 118:20
**driving** [2] - 138:4, 149:19
**during** [57] - 25:14, 28:1, 33:8, 34:2, 34:4, 35:19, 36:6, 36:10, 36:15, 37:15, 39:23, 42:4, 42:9, 42:15, 42:20, 45:23, 46:1, 46:5, 46:17, 47:22, 48:3, 48:24, 49:2, 49:19, 49:25, 54:6, 54:15, 60:13, 62:3, 74:19, 78:22, 80:3, 82:18, 83:12, 85:14, 93:20, 99:1, 100:15, 101:10, 102:5, 102:10, 109:19, 114:11, 116:17, 118:1, 118:6, 126:15, 126:23, 129:9, 129:17, 129:20, 129:23, 130:9, 139:3, 141:16, 144:6

**E**

**e-mail** [12] - 4:10, 4:12, 8:20, 42:7, 80:9, 80:16, 80:22, 81:5, 81:17, 91:14, 91:22, 134:3
**e-mailed** [3] - 8:12, 36:15, 64:4
**e-mails** [9] - 36:17, 36:18, 37:2, 37:5, 37:8, 81:17, 88:9, 91:25
**early** [2] - 53:14, 123:9
**earned** [23] - 36:15, 38:4, 39:9, 41:13, 45:23, 46:1, 46:5, 46:8, 46:10, 48:16, 56:21, 62:16, 116:20, 116:21, 117:23, 118:10, 118:12, 118:22, 126:12, 126:15, 127:6, 127:14, 132:11
**earning** [1] - 132:5
**ears** [1] - 35:2
**ease** [1] - 88:17
**easier** [3] - 34:22, 34:24, 64:18

**economic** [7] - 57:2, 57:5, 58:21, 59:3, 59:23, 62:15, 63:1
**economically** [1] - 150:4
**edit** [1] - 103:21
**edits** [2] - 103:16, 103:20
**Eduardo** [2] - 136:15, 148:1
**education** [1] - 143:16
**effect** [1] - 138:19
**efficiency** [1] - 64:21
**efficient** [1] - 8:15
**effort** [1] - 102:9
**efforts** [1] - 140:20
**either** [5] - 47:16, 65:21, 66:25, 89:16, 120:11
**electronically** [1] - 113:9
**element** [1] - 92:2
**elevator** [1] - 121:11
**elicited** [1] - 31:13
**elicits** [1] - 11:25
**eliminated** [1] - 68:19
**eluding** [1] - 151:4
**employed** [7] - 12:6, 12:12, 12:22, 43:12, 97:1, 127:7, 137:24
**employee** [22] - 58:14, 63:3, 65:17, 65:20, 66:1, 68:8, 68:12, 69:1, 70:1, 96:20, 97:2, 97:8, 97:12, 97:17, 97:20, 97:22, 122:22, 125:11, 125:24, 125:25, 136:10
**employees** [18] - 7:15, 23:5, 24:20, 24:24, 31:11, 64:25, 65:1, 65:18, 66:15, 67:5, 80:18, 92:3, 105:7, 122:8, 136:6, 149:5, 149:13, 152:13
**employer** [5] - 58:1, 134:11, 150:11, 151:18, 152:5
**employers** [4] - 65:17, 66:15, 150:9, 150:20
**employment** [11] - 53:2, 53:3, 59:16, 62:13, 62:21, 62:24, 77:16, 149:3, 149:15, 150:11, 150:20
**end** [18] - 8:11, 15:2, 17:17, 23:4, 24:19, 24:23, 35:1, 35:15,

35:16, 43:17, 53:2, 53:3, 73:24, 91:10, 99:7, 107:24, 108:9, 114:2
**ended** [6] - 34:5, 43:4, 43:16, 73:24, 74:1, 121:21
**ending** [1] - 146:1
**enero** [1] - 85:7
**English** [6] - 88:14, 88:18, 88:21, 88:25, 95:5
**English)** [2] - 95:4, 137:5
**enrichment** [8] - 104:6, 104:9, 104:18, 104:23, 104:24, 105:5, 105:7, 151:5
**enroll** [1] - 116:17
**enrolled** [1] - 147:12
**enrollment** [91] - 26:23, 27:2, 27:9, 27:13, 27:23, 27:24, 28:1, 28:5, 35:11, 35:15, 35:19, 36:7, 36:10, 36:16, 39:12, 39:20, 39:24, 42:17, 42:18, 43:3, 43:7, 43:11, 43:14, 43:16, 43:19, 45:20, 45:23, 46:2, 46:5, 46:17, 47:22, 48:4, 48:25, 49:3, 49:20, 50:1, 50:9, 50:21, 50:25, 51:3, 72:19, 72:24, 73:21, 74:4, 74:5, 74:6, 74:19, 74:24, 80:3, 82:17, 82:18, 82:22, 82:24, 82:25, 83:5, 84:19, 87:7, 87:10, 87:11, 100:15, 101:10, 108:24, 109:19, 113:17, 113:22, 114:12, 114:14, 114:15, 114:17, 115:13, 116:18, 117:13, 118:2, 118:6, 118:9, 118:14, 118:19, 118:23, 119:22, 126:11, 126:15, 126:23, 127:3, 127:4, 129:9, 134:23, 134:24, 139:3, 141:16, 144:6, 144:10
**ensure** [1] - 50:16
**enter** [1] - 87:18

**entered** [5] - 8:6, 8:7, 9:16, 71:16, 105:19
**enthusiastic** [1] - 50:5
**entire** [1] - 97:14
**entirely** [4] - 47:2, 47:18, 126:6, 150:4
**entitled** [15] - 25:20, 26:25, 27:3, 75:18, 80:15, 80:23, 81:9, 82:6, 83:19, 83:21, 89:22, 89:23, 90:17, 153:17, 157:14
**entity** [1] - 129:1
**Entry** [1] - 66:20
**equipment** [3] - 34:13, 63:2, 63:4
**equity** [1] - 152:7
**errors** [1] - 71:4
**ESQ** [4] - 1:14, 1:15, 1:19, 1:22
**Esquire** [1] - 1:19
**establish** [3] - 58:15, 91:11, 98:16
**established** [1] - 106:12
**establishing** [1] - 74:12
**estimate** [12] - 40:11, 44:22, 48:11, 48:16, 48:20, 49:25, 50:18, 51:7, 51:9, 52:4, 52:6, 113:23
**estimated** [1] - 29:1
**etc** [2] - 76:11
**evaluating** [1] - 20:18
**evasive** [1] - 81:21
**evening** [1] - 148:16
**evidence** [16] - 13:11, 17:10, 22:23, 69:10, 70:19, 74:21, 91:5, 91:19, 124:5, 141:25, 142:12, 149:8, 153:18, 153:20, 153:23, 155:2
**EVIDENCE** [1] - 3:15
**exact** [6] - 77:3, 101:9, 101:15, 101:17, 117:19, 135:2
**exactly** [4] - 15:23, 79:17, 88:11, 97:11
**exam** [2] - 73:14, 108:14
**EXAMINATION** [10] - 9:23, 19:23, 29:8, 32:6, 55:3, 71:19, 101:7, 106:4, 127:20, 143:7
**examination** [3] - 19:21, 55:2, 127:18

**Examination** [10] - 3:5, 3:5, 3:6, 3:7, 3:7, 3:8, 3:8, 3:9, 3:10, 3:10
**examine** [2] - 38:13, 38:14
**examining** [1] - 154:15
**example** [2] - 48:15, 78:22
**Excel** [11] - 36:23, 37:1, 87:15, 87:18, 88:2, 119:25, 144:18, 145:2, 145:3, 145:9, 146:15
**except** [4] - 52:10, 88:2, 88:8, 149:12
**exception** [3] - 46:18, 48:13, 67:17
**excuse** [8] - 6:1, 88:19, 116:17, 123:8, 126:11, 135:2, 138:10, 153:11
**excused** [7] - 6:2, 31:22, 56:8, 103:9, 124:14, 142:7, 148:20
**exercise** [2] - 59:1, 151:5
**exhibit** [5] - 45:9, 46:22, 102:14, 124:6, 147:16
**Exhibit** [9] - 3:17, 45:14, 46:21, 109:3, 115:21, 115:23, 124:5, 124:18, 147:14
**EXHIBITS** [1] - 3:15
**exist** [1] - 115:8
**exited** [3] - 56:6, 103:14, 148:18
**expanded** [1] - 62:22
**expect** [2] - 84:15, 154:24
**expected** [4] - 77:22, 78:7, 78:8
**expecting** [2] - 78:21, 154:13
**expenses** [11] - 10:21, 11:14, 11:16, 11:17, 12:22, 13:23, 13:25, 21:21, 124:1, 138:3, 152:16
**experience** [1] - 143:16
**expertise** [2] - 112:1, 153:11
**explain** [4] - 18:19, 28:11, 34:3, 109:10

**explained** [1] - 42:14
**explanations** [1] - 53:20
**extended** [1] - 74:3
**extra** [6] - 22:9, 22:11, 30:2, 51:14, 133:18, 134:25
**eyes** [1] - 122:6

**F**

**face** [1] - 152:11
**fact** [8] - 56:21, 61:1, 67:12, 67:16, 81:19, 94:20, 101:22, 149:23
**factor** [1] - 57:6
**factors** [7] - 58:16, 59:3, 62:15, 62:21, 62:22, 149:7, 150:18
**facts** [3] - 13:10, 141:24, 153:21
**factual** [1] - 153:19
**failed** [1] - 5:14
**Fair** [1] - 60:25
**fair** [8] - 36:3, 71:24, 74:11, 91:3, 97:14, 98:21, 118:25, 131:20
**FairLaw** [1] - 1:15
**fairly** [1] - 67:21
**fairness** [1] - 65:21
**family** [3] - 19:5, 109:21, 130:18
**far** [6] - 58:25, 75:13, 87:3, 113:23, 115:1, 153:14
**Father's** [1] - 53:24
**favor** [3] - 153:19, 153:25
**favoring** [1] - 149:15
**February** [13] - 28:8, 28:20, 42:4, 42:20, 42:23, 43:24, 43:25, 45:25, 48:6, 48:19, 80:11, 102:6, 118:14
**Feliciano** [1] - 122:7
**felt** [2] - 22:13, 76:13
**few** [4] - 10:2, 14:9, 43:15, 102:12
**fictitious** [1] - 136:19
**fight** [1] - 122:4
**figure** [7] - 4:21, 61:25, 75:17, 125:22, 135:7, 142:25, 143:1
**file** [4] - 12:4, 119:25, 137:23, 139:9
**filed** [6] - 12:6, 12:8, 16:4, 115:9, 116:10,

116:11
**files** [2] - 36:23, 140:13
**filled** [4] - 12:21, 21:11, 38:7, 113:8
**filling** [1] - 26:3
**final** [12] - 4:5, 8:25, 10:21, 11:14, 11:16, 11:17, 58:25, 59:4, 60:9, 63:10, 80:6, 157:1
**fine** [5] - 38:5, 55:6, 69:20, 70:9, 131:5
**finish** [5] - 26:2, 26:20, 93:7, 135:15, 141:11
**finished** [6] - 90:6, 93:8, 94:3, 94:4, 94:5, 118:19
**finishing** [1] - 135:18
**fire** [2] - 53:8, 53:10
**fired** [16] - 28:15, 37:3, 46:19, 53:4, 53:6, 53:11, 53:23, 53:25, 54:11, 54:13, 54:15, 95:15, 120:17, 121:4, 121:6, 150:11
**firing** [1] - 53:20
**Firm** [1] - 1:15
**first** [36] - 5:11, 33:7, 33:25, 34:2, 35:13, 42:9, 43:15, 44:6, 51:6, 51:11, 53:18, 56:13, 72:18, 72:23, 72:24, 77:15, 78:11, 78:23, 81:2, 98:15, 98:22, 99:1, 99:9, 102:16, 102:18, 106:16, 107:22, 107:24, 111:18, 125:8, 128:6, 131:13, 137:11, 151:16, 154:18, 156:1
**fit** [1] - 76:25
**five** [5] - 66:19, 80:12, 81:12, 84:23, 111:19
**FL** [3] - 1:16, 1:20, 1:24
**flattered** [1] - 131:21
**flexibility** [1] - 76:6
**floor** [1] - 121:18
**Floor** [2] - 2:5, 157:18
**FLORIDA** [1] - 1:1
**Florida** [20] - 1:4, 2:5, 73:23, 73:24, 93:13, 93:25, 94:8, 94:23, 96:15, 96:18, 96:19, 97:5, 97:8, 97:22, 99:23, 99:25, 100:6,

100:12, 113:2, 157:18
**FLSA** [16] - 61:6, 65:4, 65:10, 65:13, 65:16, 66:2, 66:5, 66:6, 66:14, 67:5, 68:8, 68:12, 69:13, 69:24, 149:21, 153:5
**focused** [1] - 31:4
**folks** [1] - 6:24
**follow** [2] - 38:5, 111:1
**followed** [2] - 38:5, 128:5
**following** [2] - 4:1, 22:17
**follows** [3] - 9:22, 32:3, 105:24
**Food** [2] - 67:1, 67:10
**food** [1] - 13:24
**FOR** [4] - 1:14, 1:19, 3:3, 3:13
**force** [1] - 130:10
**forcing** [2] - 77:1, 77:8
**foregoing** [1] - 157:12
**forget** [1] - 137:13
**forgot** [3] - 23:18, 132:17, 153:9
**form** [30] - 4:5, 8:1, 8:3, 58:25, 59:4, 60:10, 60:14, 63:10, 64:23, 68:2, 68:4, 68:23, 69:4, 69:6, 69:11, 69:17, 70:6, 70:13, 103:16, 104:8, 125:18, 125:22, 125:25, 126:3, 141:5, 141:8, 145:3, 145:9, 147:21, 148:1
**formed** [3] - 137:15, 137:17, 151:4
**forms** [2] - 149:11, 155:16
**formula** [2] - 132:1, 152:6
**forth** [1] - 13:21
**forward** [2] - 66:19, 110:12
**four** [6] - 29:13, 30:18, 70:13, 89:1, 103:23, 140:23
**fourth** [1] - 65:9
**frankly** [1] - 38:12
**free** [3] - 76:17, 97:7, 100:7
**Friday** [10] - 27:21, 36:12, 46:15, 47:2, 47:6, 47:10, 47:25, 109:18, 110:3, 114:8
**friendly** [2] - 52:15,

52:17
**friends** [3] - 19:5, 72:13, 75:22
**front** [9] - 38:19, 66:25, 83:9, 83:10, 83:16, 83:22, 88:4, 110:7, 125:22
**fulfilled** [1] - 79:16
**full** [1] - 5:17
**fully** [1] - 154:24
**function** [2] - 151:3, 153:22
**functions** [1] - 153:21
**funky** [1] - 6:16

**G**

**Gables** [2] - 1:16, 1:24
**gaps** [1] - 60:1
**Garza** [3] - 53:19, 121:11, 121:14
**generally** [1] - 37:12
**gentlemen** [5] - 9:17, 56:1, 103:11, 104:7, 148:11
**girl** [1] - 109:12
**given** [5] - 38:12, 69:2, 69:3, 112:15, 152:9
**glad** [1] - 93:15
**glasses** [4] - 22:19, 23:15, 23:17, 122:7
**goal** [1] - 84:16
**GONZALEZ** [1] - 1:9
**Gonzalez** [9] - 108:13, 112:6, 120:10, 120:25, 125:21, 139:13, 149:6, 150:14, 156:6
**Google** [13] - 40:25, 41:7, 41:8, 41:11, 45:3, 50:13, 52:10, 81:5, 114:23, 118:20, 139:9
**gotcha** [2] - 116:15, 118:25
**Government** [2] - 74:3, 138:3
**grab** [1] - 5:7
**grand** [2] - 79:20, 79:21
**gray** [1] - 4:13
**great** [3] - 63:12, 143:19, 156:13
**greater** [1] - 149:8
**grown** [2] - 76:22, 77:7
**guaranteed** [1] - 42:10
**guerra** [1] - 156:11
**Guerra** [1] - 156:12
**guess** [7] - 69:22,

69:23, 79:1, 99:21,
113:14, 150:18,
155:24
**guys** [3] - 72:13,
95:16, 99:9

# H

**half** [8] - 29:12, 61:25,
62:3, 63:8, 87:8,
97:18, 134:17, 141:2
**hand** [3] - 31:25,
58:14, 105:21
**hands** [4] - 104:1,
104:3, 104:5, 104:17
**harassing** [1] - 81:25
**harder** [1] - 132:6
**Havana** [1] - 32:13
**heads** [1] - 58:8
**headset** [8] - 34:16,
34:17, 34:18, 34:21,
52:19, 52:22,
112:13, 149:12
**headsets** [1] - 34:24
**health** [5] - 94:16,
108:6, 108:9,
108:11, 140:15
**Health** [3] - 117:2,
118:8, 131:13
**hear** [11] - 4:18, 8:14,
20:8, 20:10, 20:12,
20:13, 64:15, 68:16,
149:1, 151:6, 155:17
**heard** [6] - 40:24,
75:14, 80:13, 84:10,
86:21, 122:20
**hearing** [2] - 154:6,
155:15
**held** [1] - 4:1
**help** [8] - 16:16, 16:18,
17:7, 17:13, 17:25,
83:11, 128:24, 141:7
**helping** [1] - 87:15
**hereby** [1] - 157:12
**Heritage** [4] - 10:15,
10:22, 11:4, 11:11
**hi** [1] - 9:25
**higher** [3] - 48:10,
65:25, 89:13
**highlight** [1] - 65:8
**highlighted** [2] - 6:9,
60:23
**highlights** [1] - 4:13
**hire** [1] - 123:17
**hired** [3] - 121:7,
134:10, 150:11
**hiring** [1] - 129:2
**hit** [2] - 50:12, 80:23
**hold** [2] - 59:21,
121:24

**holding** [1] - 55:25
**home** [5] - 75:2,
109:21, 138:16,
149:20, 157:7
**honestly** [1] - 100:2
**honeymoon** [1] -
128:25
**Honor** [48] - 5:13, 6:1,
6:13, 7:16, 19:22,
23:12, 26:5, 30:14,
31:12, 31:18, 37:20,
37:25, 47:14, 49:22,
54:4, 55:22, 59:22,
61:10, 62:12, 62:20,
64:5, 64:11, 67:19,
70:12, 70:24, 71:5,
81:25, 82:8, 84:7,
85:4, 85:9, 87:21,
95:19, 95:25, 96:3,
104:16, 105:18,
106:2, 124:15,
127:17, 135:15,
138:24, 142:8,
143:3, 148:8, 149:2,
153:8, 156:21
**HONORABLE** [1] -
1:12
**honored** [3] - 79:14,
79:18, 98:17
**hope** [2] - 151:10,
155:10
**hotel** [4] - 55:8, 57:10,
77:2, 77:9
**hotels** [1] - 62:17
**hour** [17] - 54:7, 58:7,
60:13, 61:25, 62:2,
62:3, 63:8, 65:24,
71:25, 137:7,
141:15, 141:17,
141:23, 142:18,
151:19, 151:20,
154:8
**hourly** [15] - 29:17,
29:23, 30:21, 58:9,
75:17, 89:5, 98:5,
98:6, 98:14, 98:17,
142:22, 149:14,
152:2, 153:4
**hours** [51] - 22:9,
22:11, 27:12, 27:14,
27:15, 29:13, 30:2,
35:19, 36:4, 36:5,
36:6, 36:8, 39:14,
39:23, 47:21, 48:2,
48:3, 48:5, 57:3,
74:10, 75:1, 75:5,
93:17, 97:24, 100:1,
100:4, 100:7,
100:14, 100:16,
100:20, 110:16,

113:12, 113:23,
113:24, 113:25,
114:5, 114:11,
126:23, 129:13,
129:16, 129:22,
129:23, 130:2,
130:3, 132:9,
132:10, 133:19,
133:21, 134:25,
151:17
**house** [5] - 16:19,
16:22, 53:9, 107:25,
122:18
**how'd** [1] - 112:25
**hugging** [1] - 121:21
**hundreds** [1] - 76:24

# I

**idea** [8] - 21:5, 52:18,
53:10, 72:18, 72:23,
78:7, 109:13, 128:23
**IDENTIFIED** [1] - 3:15
**identified** [1] - 115:23
**identify** [1] - 147:18
**imagine** [2] - 17:21,
96:23
**impeachment** [4] -
29:18, 30:6, 30:13,
85:20
**important** [5] - 57:6,
70:6, 74:9, 109:17,
143:10
**impossible** [1] - 96:12
**improper** [4] - 29:18,
30:6, 30:13, 85:20
**improperly** [1] - 60:3
**IN** [1] - 3:15
**inaccurate** [1] - 38:14
**Inc** [1] - 8:3
**INC** [1] - 1:8
**include** [6] - 69:17,
69:18, 127:2,
133:11, 133:12
**included** [6] - 7:16,
40:23, 46:8, 64:23,
67:6, 133:18
**includes** [1] - 46:9
**including** [8] - 50:19,
79:8, 98:1, 104:15,
109:14, 133:13,
138:16, 152:15
**inclusion** [1] - 61:8
**incoming** [1] - 111:7
**incomplete** [1] - 67:12
**incorrect** [2] - 67:13,
81:20
**indeed** [1] - 67:13
**independent** [25] -
7:18, 12:6, 12:9,

16:5, 18:4, 18:9,
19:16, 19:17, 31:6,
61:6, 65:13, 76:7,
93:16, 97:4, 101:3,
105:1, 105:7,
122:21, 122:24,
123:14, 137:9,
152:5, 152:10,
152:13, 152:21
**independently** [1] -
18:24
**indicated** [1] - 26:7
**indispensable** [1] -
150:7
**individual** [3] - 36:23,
103:17, 150:9
**individually** [1] -
64:25
**industry** [1] - 152:24
**inequitable** [1] -
104:23
**inferences** [3] -
153:19, 153:21,
153:24
**information** [4] -
42:19, 46:20,
124:22, 139:2
**informed** [1] - 152:19
**initial** [3] - 66:20,
109:11, 109:13
**input** [1] - 87:19
**insert** [1] - 60:12
**insertion** [1] - 61:7
**instance** [2] - 92:13,
95:10
**instead** [4] - 8:5,
20:20, 38:18, 141:9
**instruct** [1] - 84:7
**instructing** [1] - 58:17
**instruction** [7] - 62:5,
67:13, 104:7,
104:11, 104:13,
150:6, 155:18
**instructions** [26] - 4:5,
4:20, 7:20, 8:9,
58:25, 60:5, 60:22,
62:23, 63:8, 64:4,
64:15, 66:20, 67:20,
69:10, 69:15, 69:16,
69:19, 70:2, 71:2,
103:21, 148:12,
150:16, 152:9,
152:22, 155:16,
156:25
**insurance** [89] - 10:3,
10:6, 10:7, 10:12,
10:21, 11:3, 11:6,
11:10, 11:14, 11:22,
14:2, 14:6, 18:2,
18:10, 18:18, 18:21,

33:4, 33:7, 33:23,
34:7, 34:10, 43:4,
56:22, 58:7, 62:18,
72:16, 73:10, 73:16,
75:8, 75:12, 75:14,
75:15, 75:19, 76:10,
77:8, 79:23, 88:13,
92:7, 92:16, 92:25,
93:1, 93:4, 93:21,
94:1, 94:9, 94:16,
94:17, 94:18, 94:19,
94:24, 94:25, 95:9,
95:13, 95:14,
107:12, 108:9,
108:11, 111:22,
111:25, 112:2,
116:22, 120:8,
123:13, 123:17,
123:21, 128:9,
128:16, 128:21,
128:24, 129:2,
129:10, 131:24,
132:1, 136:3, 136:5,
136:22, 136:24,
136:25, 143:20,
143:22, 147:19,
150:7, 150:8,
151:25, 152:1,
152:12
**Insurance** [7] - 12:14,
12:16, 15:7, 92:23,
137:3, 137:6, 137:8
**insureds** [1] - 148:2
**insurer** [1] - 108:7
**integral** [1] - 150:7
**integrity** [1] - 61:7
**intends** [1] - 57:21
**intent** [3] - 58:13,
153:1, 153:2
**interact** [1] - 99:15
**interest** [1] - 107:12
**interested** [2] -
107:15, 117:8
**internal** [2] - 80:16,
105:3
**Internal** [1] - 105:2
**Interpreter** [2] - 2:2,
107:16
**INTERPRETER** [39] -
13:24, 14:13, 19:10,
20:2, 20:9, 20:11,
20:13, 23:9, 23:16,
23:23, 24:21, 34:17,
35:5, 39:2, 42:18,
44:2, 44:17, 44:19,
47:9, 47:14, 49:22,
51:1, 55:15, 61:21,
85:8, 85:10, 88:19,
90:6, 93:8, 94:3,
98:11, 99:4, 100:8,

107:18, 117:17,
119:12, 120:23,
138:8, 148:24
**interpreter** [19] - 23:7,
23:19, 23:22, 44:3,
51:1, 61:19, 71:10,
88:15, 90:6, 93:7,
93:8, 99:4, 100:8,
105:17, 107:18,
120:23, 148:21,
154:14, 156:15
**interpreter's** [1] -
13:24
**interpreting** [1] - 90:7
**interrupt** [2] - 59:20,
151:8
**interrupted** [1] - 99:15
**intervention** [1] - 4:8
**interview** [1] - 143:13
**interviewed** [1] -
143:12
**introduced** [1] - 108:5
**investment** [2] -
123:20, 149:18
**involved** [2] - 29:24,
132:3
**involving** [1] - 7:20
**IRS** [1] - 149:22
**issue** [27] - 5:25, 6:4,
20:25, 31:8, 35:22,
56:10, 60:15, 60:16,
60:19, 68:1, 68:3,
77:4, 77:10, 85:5,
105:8, 105:9,
125:24, 146:23,
148:5, 149:3,
149:19, 150:9,
150:20, 151:14,
152:3, 153:9, 154:14
**issued** [1] - 125:19
**issues** [6] - 4:25,
59:12, 65:23, 70:10,
70:25, 98:3
**itemized** [1] - 16:5

## J

**Jamaica** [4] - 14:25,
15:9, 15:14, 15:21
**January** [25] - 14:10,
14:15, 15:1, 15:25,
17:16, 35:16, 43:4,
43:16, 43:17, 45:16,
45:22, 48:6, 48:15,
48:17, 73:20, 74:6,
74:7, 74:18, 80:6,
80:11, 85:7, 85:8,
91:15, 91:23, 102:5
**Jennifer** [1] - 121:9
**jest** [1] - 132:13

**job** [38] - 56:21, 57:3,
57:7, 57:8, 57:9,
57:24, 57:25, 58:7,
58:8, 63:3, 72:2,
75:14, 76:3, 76:20,
77:7, 77:9, 77:11,
77:14, 77:21, 77:24,
77:25, 78:1, 78:3,
96:20, 97:9, 97:21,
97:24, 99:24, 100:3,
100:6, 100:12,
100:25, 101:2,
108:3, 131:18,
141:12, 152:9
**jobs** [3] - 62:18, 76:24
**Joe** [1] - 122:7
**join** [1] - 128:7
**joining** [1] - 78:6
**Judge** [13] - 4:6, 9:3,
54:2, 61:24, 69:21,
70:8, 70:21, 71:1,
71:12, 153:22,
154:4, 155:17,
156:22
**judge** [1] - 151:8
**JUDGE** [1] - 1:12
**July** [5] - 1:5, 54:16,
54:17, 119:5, 134:24
**jump** [3] - 46:4, 91:16,
107:11
**June** [23] - 22:17,
24:1, 28:13, 28:17,
29:12, 53:24, 54:13,
54:15, 68:15, 80:11,
84:24, 85:6, 86:7,
89:19, 119:1, 121:4,
121:6, 121:23,
121:25, 122:2,
122:5, 145:20,
146:19
**juror** [2] - 149:4, 151:1
**jurors** [2] - 71:8,
138:10
**JURY** [2] - 1:11,
138:12
**jury** [66] - 4:5, 9:11,
9:13, 9:16, 28:11,
34:3, 37:7, 38:9,
45:9, 46:22, 55:25,
56:6, 58:17, 58:21,
58:25, 62:10, 62:22,
62:25, 64:3, 66:1,
66:20, 67:3, 67:7,
67:25, 69:3, 69:4,
69:5, 69:12, 69:14,
69:15, 69:16, 69:19,
70:15, 71:16,
102:14, 103:14,
103:20, 104:7,
105:14, 105:19,

106:16, 124:6,
126:5, 127:6, 127:9,
127:11, 127:13,
142:6, 143:10,
144:17, 147:16,
148:18, 150:5,
150:16, 150:19,
151:2, 151:11,
151:12, 152:3,
153:2, 153:6,
153:21, 154:5,
155:16, 155:18,
156:24
**jury's** [2] - 59:11,
141:12
**justifiable** [1] - 153:24

## K

**keep** [8] - 4:8, 5:15,
7:15, 40:25, 49:6,
75:4, 93:24, 114:21
**Kendall** [8] - 33:15,
44:6, 44:10, 44:11,
75:3, 111:5, 113:13,
113:14
**kept** [6] - 36:24,
103:18, 114:20,
115:14, 115:15,
116:15
**keyboard** [1] - 112:12
**keys** [1] - 107:25
**kids** [1] - 107:7
**kind** [12] - 4:19, 4:22,
23:19, 52:14, 57:23,
64:22, 66:16,
106:17, 107:11,
107:12, 138:2, 138:3
**knack** [1] - 131:23
**Knight** [1] - 150:17
**knowing** [1] - 98:5
**knowledge** [4] -
57:13, 62:15,
143:17, 153:11
**known** [1] - 32:23
**knows** [4] - 57:6,
57:14, 131:24, 152:1

## L

**Labor** [2] - 60:25,
65:22
**lack** [2] - 58:15, 59:19
**ladies** [5] - 9:17, 56:1,
103:11, 109:20,
148:11
**language** [7] - 4:17,
66:22, 66:24, 68:6,
68:13, 68:18, 68:22
**last** [17] - 4:10, 4:12,

7:14, 35:22, 53:18,
65:11, 66:19, 87:5,
90:14, 91:1, 91:15,
118:25, 120:20,
134:18, 135:19,
151:10, 151:13
**last-minute** [1] - 35:22
**late** [3] - 109:20,
123:9, 155:17
**latest** [1] - 35:24
**Latin** [1] - 121:19
**Law** [1] - 1:19
**law** [5] - 6:18, 6:20,
67:2, 104:13, 151:25
**lawsuit** [9] - 20:7,
115:2, 115:3, 115:9,
116:10, 116:11,
124:22, 139:24,
140:22
**lawyer** [11] - 87:19,
88:1, 88:3, 88:8,
92:3, 130:19,
133:24, 134:10,
139:2, 141:19,
141:21
**lawyers** [1] - 115:7
**lead** [1] - 110:22
**leading** [3] - 109:22,
110:5
**leads** [5] - 110:8,
113:13, 113:16,
123:25, 149:25
**learn** [1] - 53:25
**learned** [1] - 76:13
**least** [5] - 68:25,
75:25, 100:14,
101:21, 122:22
**leave** [6] - 9:4, 69:20,
70:8, 76:20, 104:6,
123:9
**leaving** [1] - 77:11
**Ledesma** [2] - 40:24,
111:20
**left** [11] - 50:8, 53:14,
65:8, 70:19, 77:5,
94:11, 103:25,
130:14, 134:4,
138:22, 147:3
**legally** [1] - 105:6
**Leon** [1] - 1:23
**less** [11] - 14:2, 14:6,
15:22, 29:11, 29:12,
35:2, 97:16, 101:18,
127:9, 130:15, 148:5
**letter** [3] - 116:10,
139:22, 140:21
**license** [22] - 10:6,
10:8, 31:3, 33:4,
33:7, 72:16, 73:9,
75:11, 92:6, 92:11,

92:17, 94:18, 108:6,
108:7, 108:9,
108:12, 108:14,
113:2, 113:4, 128:9,
143:22
**licensed** [4] - 10:3,
19:18, 152:11,
152:12
**licenses** [6] - 10:5,
31:1, 113:3, 113:6,
152:25, 153:11
**lied** [1] - 21:16
**life** [10] - 10:6, 10:7,
10:21, 11:3, 11:6,
11:14, 14:2, 14:6,
72:3, 95:14
**likewise** [1] - 150:21
**limine** [4] - 31:13,
55:10, 57:17, 57:23
**limit** [1] - 58:13
**limited** [4] - 34:12,
73:2, 128:20, 129:15
**limits** [1] - 128:22
**Lincoln** [4] - 10:14,
10:22, 11:4, 11:11
**line** [5] - 25:6, 30:14,
58:17, 145:13,
154:21
**Line** [24] - 22:18,
22:25, 24:8, 24:16,
24:18, 24:21, 24:22,
25:18, 25:19, 25:22,
30:16, 30:17, 30:18,
85:22, 86:5, 89:24,
101:23, 133:5,
135:9, 144:25,
145:15, 145:25,
146:1
**linked** [2] - 18:18,
92:16
**list** [15] - 21:14, 21:18,
86:2, 87:1, 138:19,
139:4, 139:11,
139:12, 139:13,
140:5, 140:6,
140:18, 141:4,
142:1, 150:1
**listen** [1] - 120:10
**listened** [2] - 120:13,
120:18
**listing** [1] - 146:11
**live** [2] - 32:14, 120:11
**lived** [1] - 97:15
**lives** [1] - 109:13
**located** [2] - 33:14,
44:8
**look** [22] - 4:20, 5:13,
8:10, 19:2, 47:20,
58:19, 58:20, 62:21,
63:8, 67:24, 75:11,

83:25, 84:1, 88:6, 102:1, 107:25, 109:7, 115:1, 115:3, 124:12, 126:8, 126:13
**looked** [3] - 114:25, 124:18, 133:16
**looking** [8] - 7:1, 45:13, 54:9, 59:25, 60:14, 60:17, 143:4, 146:12
**LOPEZ** [3] - 1:4, 1:4, 105:23
**Lopez** [21] - 3:9, 52:13, 105:16, 106:19, 107:13, 124:23, 124:24, 125:12, 127:22, 135:15, 135:18, 136:14, 136:15, 137:13, 137:18, 140:9, 143:1, 148:1, 148:7, 153:10
**Lopez's** [1] - 19:6
**Lorenzo** [1] - 1:16
**loss** [6] - 5:22, 30:5, 30:8, 149:16, 151:23, 152:11
**lost** [3] - 110:14, 110:15, 145:6
**lower** [1] - 89:15
**lowly** [1] - 56:21
**luck** [1] - 127:24
**lunch** [12] - 54:6, 55:24, 56:1, 56:3, 60:13, 61:20, 62:2, 63:13, 71:21, 154:8, 154:13, 155:11
**lunchtime** [1] - 62:3
**luxury** [2] - 56:15, 122:18
**lying** [1] - 21:17
**LYNN** [1] - 67:10
**Lynn's** [2] - 67:1, 67:10

## M

**ma'am** [3] - 31:20, 61:20, 148:22
**madam** [2] - 23:22, 107:16
**mail** [12] - 4:10, 4:12, 8:20, 42:7, 80:9, 80:16, 80:22, 81:5, 81:17, 91:14, 91:22, 134:3
**mailed** [3] - 8:12, 36:15, 64:4
**mails** [9] - 36:17,

36:18, 37:2, 37:5, 37:8, 81:17, 88:9, 91:25
**maintain** [1] - 7:17
**maintenance** [1] - 13:20
**male** [1] - 121:8
**man** [2] - 76:22, 77:7
**managed** [1] - 150:15
**mandatory** [2] - 65:16, 66:14
**Manjarres** [1] - 121:9
**March** [11] - 28:17, 42:4, 42:20, 42:23, 43:22, 46:4, 47:17, 48:7, 48:22, 80:11, 102:6
**MARIANA** [1] - 1:4
**Mariana** [8] - 19:9, 19:12, 81:8, 107:13, 113:7, 122:21, 124:20, 153:10
**marked** [1] - 46:21
**market** [1] - 150:2
**marketplace** [2] - 10:9, 15:5
**married** [1] - 106:24
**masses** [2] - 129:21, 153:3
**match** [1] - 41:10
**math** [3] - 38:17, 144:5, 144:15
**matter** [6] - 66:2, 81:19, 94:20, 126:3, 157:14
**McCARN** [2] - 2:3, 157:17
**mean** [26] - 13:1, 19:1, 20:1, 20:7, 20:17, 27:21, 31:8, 34:3, 47:4, 51:25, 58:5, 58:12, 63:1, 67:19, 68:17, 91:10, 97:1, 98:19, 101:18, 118:25, 119:8, 123:1, 129:12, 141:18, 143:22, 150:2
**meaning** [1] - 44:25
**meaningful** [1] - 149:9
**means** [1] - 110:9
**medical** [3] - 10:6, 131:14, 140:15
**meet** [2] - 62:3, 107:3
**meeting** [2] - 53:15
**member** [9] - 117:5, 117:6, 117:9, 117:11, 147:11, 147:19, 147:22, 147:23

**members** [5] - 19:5, 50:12, 116:17, 116:19, 117:11
**memory** [4] - 16:17, 83:12, 83:14, 83:17
**menial** [1] - 62:17
**mental** [1] - 59:16
**mention** [1] - 153:9
**mentioned** [13] - 35:11, 41:16, 47:1, 49:10, 50:23, 54:13, 56:12, 70:12, 91:22, 94:20, 112:6, 113:11, 153:10
**mentioning** [1] - 93:15
**message** [3] - 53:13, 80:9, 80:21
**met** [7] - 72:8, 78:6, 82:6, 107:22, 108:1, 128:11, 151:15
**method** [1] - 42:7
**MIAMI** [1] - 1:2
**Miami** [6] - 1:4, 1:20, 2:4, 2:5, 157:18, 157:18
**mic** [1] - 20:2
**microphone** [6] - 15:16, 32:19, 38:15, 61:16, 64:19, 107:17
**mid** [1] - 36:12
**mid-morning** [1] - 36:12
**might** [5] - 74:9, 77:11, 130:4, 131:2, 133:24
**mileage** [2] - 13:8, 138:4
**millions** [1] - 76:24
**mine** [2] - 52:10, 62:2
**minimum** [3] - 56:21, 62:16, 79:25
**minus** [1] - 144:7
**minute** [1] - 35:22
**minutes** [11] - 56:3, 62:11, 70:12, 102:12, 103:11, 111:19, 111:20, 111:21, 111:25, 143:14, 155:14
**MISCELLANEOUS** [1] - 3:20
**mischaracterization** [1] - 74:20
**mischaracterizes** [2] - 91:4, 91:18
**mischaracterizing** [1] - 17:9
**miss** [1] - 123:8
**missed** [1] - 40:22
**missing** [5] - 44:15,

44:17, 44:20, 44:22, 79:19
**mistake** [3] - 59:22, 90:21, 131:2
**mistaken** [1] - 46:14
**misunderstood** [2] - 133:24, 133:25
**modality** [2] - 42:8
**mom's** [1] - 16:19
**moment** [8] - 42:16, 74:3, 98:10, 101:23, 110:10, 122:25, 143:3
**moments** [1] - 146:25
**Monday** [8] - 27:21, 36:11, 47:25, 108:15, 109:18, 110:3, 114:8, 154:12
**money** [41] - 20:21, 20:25, 25:21, 27:25, 39:9, 39:15, 40:8, 45:22, 45:25, 46:5, 47:20, 48:14, 51:20, 51:23, 56:17, 92:21, 93:19, 110:15, 115:17, 117:10, 118:7, 125:14, 126:5, 128:7, 129:3, 129:22, 130:1, 130:9, 130:14, 130:17, 134:22, 139:7, 144:8, 146:10, 148:4, 148:5, 149:18, 151:22
**Monez** [2] - 156:11, 156:12
**monitor** [1] - 112:11
**monitored** [2] - 120:6, 150:15
**monitors** [1] - 108:18
**month** [55] - 28:8, 28:20, 29:2, 29:12, 34:2, 35:16, 40:1, 40:5, 40:11, 41:14, 42:9, 42:11, 43:2, 48:16, 50:24, 50:25, 51:2, 51:3, 51:8, 51:13, 51:14, 54:15, 74:18, 78:24, 80:20, 84:23, 84:24, 86:15, 87:6, 90:14, 91:2, 91:15, 99:11, 102:13, 102:18, 102:21, 102:22, 102:25, 119:5, 130:11, 131:6, 132:5, 132:20, 133:23, 134:4, 134:18, 134:20,

137:11, 137:15, 139:21, 139:23
**monthly** [3] - 42:5, 43:20, 44:23
**months** [19] - 14:9, 29:11, 34:5, 73:11, 80:12, 81:12, 82:4, 91:1, 91:3, 97:18, 98:1, 102:5, 102:10, 128:3, 130:10, 130:15, 130:16, 139:21, 147:4
**moreover** [1] - 153:18
**morning** [14] - 4:3, 4:4, 9:17, 10:1, 26:15, 26:16, 32:8, 32:9, 36:12, 109:15, 109:18, 148:15, 156:20
**most** [4] - 8:15, 67:15, 77:14, 77:24
**mostly** [1] - 31:5
**mother's** [1] - 16:21
**motion** [7] - 31:13, 55:10, 57:17, 57:23, 149:1, 151:9, 154:1
**motions** [1] - 154:2
**mouse** [8] - 35:4, 35:5, 35:6, 35:7, 52:20, 52:22, 112:12, 149:12
**movants** [1] - 153:23
**movants'** [1] - 153:25
**move** [11] - 6:25, 7:5, 7:14, 7:23, 26:1, 29:10, 32:16, 46:4, 54:7, 143:4, 149:2
**moved** [6] - 6:23, 7:19, 60:21, 113:20, 122:18
**moving** [2] - 8:23, 24:18
**MPN** [5] - 79:8, 79:10, 79:12, 79:16, 95:11
**MR** [321] - 4:6, 4:9, 4:16, 5:2, 5:5, 5:13, 5:19, 5:21, 5:24, 6:1, 6:5, 6:7, 6:11, 6:13, 6:15, 6:19, 6:22, 7:1, 7:3, 7:7, 7:10, 7:13, 7:21, 7:25, 8:5, 8:17, 8:22, 9:1, 9:3, 9:24, 10:17, 10:19, 10:24, 11:2, 11:24, 12:2, 12:8, 12:11, 13:10, 13:13, 14:1, 14:14, 14:19, 15:15, 15:18, 15:20, 15:24, 16:21, 16:24, 17:9, 17:12, 18:5, 18:8, 18:22,

18:25, 19:11, 19:22,
19:24, 20:5, 20:8,
20:10, 20:12, 20:14,
20:19, 22:20, 22:22,
22:25, 23:11, 23:14,
23:18, 23:22, 23:24,
24:22, 25:2, 25:5,
26:5, 26:9, 26:12,
26:14, 26:18, 29:6,
29:9, 29:18, 29:21,
30:6, 30:7, 30:13,
30:16, 30:19, 31:12,
31:18, 31:23, 32:7,
32:20, 32:22, 34:18,
34:20, 35:6, 35:10,
37:18, 37:20, 37:25,
38:2, 38:10, 38:16,
38:18, 38:21, 38:23,
39:4, 39:6, 41:22,
42:22, 44:4, 44:21,
45:12, 46:23, 47:15,
49:15, 49:24, 51:5,
51:12, 52:3, 53:5,
54:2, 54:4, 54:8,
55:1, 55:4, 55:9,
55:13, 55:17, 55:22,
56:12, 56:16, 56:19,
56:23, 56:25, 57:2,
57:5, 57:11, 57:13,
57:16, 57:21, 58:5,
58:12, 58:23, 59:5,
59:9, 59:13, 59:22,
60:3, 60:7, 60:11,
60:15, 60:17, 60:21,
61:10, 61:14, 61:17,
61:24, 62:7, 62:12,
62:20, 63:6, 63:11,
64:5, 64:10, 64:17,
64:20, 65:7, 66:11,
66:13, 66:18, 67:19,
68:1, 68:5, 68:17,
68:25, 69:8, 69:13,
69:20, 69:24, 70:8,
70:11, 70:21, 70:23,
71:1, 71:5, 71:20,
74:20, 74:25, 77:17,
77:20, 81:25, 82:1,
82:8, 82:11, 84:7,
84:11, 84:17, 85:4,
85:9, 85:12, 85:20,
85:22, 85:23, 86:11,
87:20, 87:24, 88:20,
89:25, 90:1, 90:2,
90:8, 90:12, 91:4,
91:8, 91:18, 91:24,
93:12, 94:12, 95:18,
95:21, 95:25, 96:3,
96:8, 96:14, 96:21,
96:25, 98:8, 98:13,
99:5, 100:11,
100:24, 101:5,
101:8, 102:15,
103:7, 104:16,
104:20, 104:25,
105:16, 105:18,
106:2, 106:5,
106:23, 107:21,
109:22, 109:25,
110:5, 110:18,
114:4, 114:7, 116:3,
117:18, 119:13,
119:14, 120:24,
124:7, 124:14,
124:17, 127:16,
127:21, 133:5,
133:7, 135:15,
135:18, 135:21,
136:2, 136:20,
138:14, 138:24,
139:15, 139:25,
140:3, 141:1,
141:24, 142:1,
142:3, 142:4, 142:5,
142:7, 142:11,
142:15, 143:3,
143:8, 145:8,
145:11, 145:12,
145:14, 145:16,
145:17, 145:18,
147:17, 148:8,
149:2, 151:8, 153:8,
154:4, 154:9,
154:20, 154:25,
155:4, 155:6,
155:10, 155:21,
155:24, 156:3,
156:7, 156:9,
156:10, 156:11,
156:12, 156:13,
156:16, 156:18,
156:21, 156:22,
156:24, 157:2, 157:7
**multifactor** [1] - 5:9
**multiple** [1] - 155:18
**must** [4] - 42:20,
47:19, 132:24,
153:18

**N**

**name** [12] - 12:13,
32:10, 47:2, 53:18,
106:19, 107:1,
136:13, 136:17,
136:19, 137:24,
141:6
**named** [2] - 112:7,
154:23
**names** [2] - 139:16,
150:1
**narrative** [2] - 96:1,
140:1

**national** [1] - 15:5
**native** [2] - 85:5, 88:22
**nearly** [1] - 66:25
**necessarily** [1] - 77:19
**necessary** [6] - 79:12,
87:1, 109:8, 143:20,
152:25, 153:15
**necessity** [1] - 151:5
**need** [21] - 4:8, 9:5,
10:8, 13:16, 22:19,
23:14, 23:16, 34:21,
56:11, 59:12, 61:23,
77:24, 88:15, 93:10,
104:14, 105:17,
107:18, 109:7,
138:10, 148:21,
155:1
**needed** [8] - 13:2,
35:23, 50:15,
108:18, 125:23,
143:22, 149:12,
153:13
**needs** [2] - 7:19, 70:6
**negotiated** [3] - 65:17,
66:15, 67:14
**never** [19] - 21:4,
24:13, 24:14, 30:20,
31:3, 54:23, 76:13,
90:25, 91:12, 98:18,
100:16, 104:11,
111:15, 120:4,
122:16, 125:13,
137:17, 140:9,
154:16
**new** [4] - 42:7, 54:1,
66:23, 122:18
**next** [12] - 5:25, 6:4,
6:8, 31:21, 67:18,
99:14, 105:15,
111:19, 122:4,
124:13, 125:2,
134:20
**nice** [3] - 17:13, 17:25,
55:24
**night** [3] - 4:11, 4:12,
109:18
**NO** [1] - 1:2
**nobody** [1] - 153:10
**non** [1] - 153:23
**non-movants** [1] -
153:23
**nondiscretionary** [1] -
149:14
**none** [4] - 66:2, 79:9,
145:4, 145:10
**nonmoving** [1] -
153:19
**normal** [1] - 113:12
**normally** [1] - 149:24
**North** [2] - 2:4, 157:18

**note** [1] - 100:8
**notes** [5] - 68:10,
68:14, 98:24, 99:2,
99:3
**nothing** [7] - 57:24,
69:11, 77:11, 84:1,
93:25, 127:16,
149:22
**notice** [2] - 41:9, 46:4
**noticed** [1] - 42:5
**notified** [2] - 81:6,
99:2
**November** [16] -
14:24, 15:4, 15:6,
15:8, 16:2, 16:18,
17:6, 35:14, 43:14,
43:15, 102:10,
108:15, 114:18,
118:4
**nowadays** [1] - 140:19
**number** [21] - 39:11,
39:19, 40:4, 52:8,
65:2, 84:4, 84:13,
86:4, 86:5, 86:8,
86:14, 86:18, 87:6,
95:11, 101:10,
101:15, 101:17,
102:8, 102:9,
117:24, 135:2
**Numbers** [1] - 146:13
**numbers** [22] - 27:5,
83:23, 87:17, 87:18,
87:23, 88:3, 88:10,
90:10, 90:11, 90:23,
91:17, 91:21,
101:13, 134:21,
138:20, 139:4,
139:11, 139:12,
141:21, 144:1,
146:14

**O**

**o'clock** [3] - 148:15,
148:16, 154:5
**oath** [4] - 85:2, 85:14,
132:25, 133:9
**Obamacare** [2] -
129:9, 136:16
**object** [3] - 22:20,
61:7, 139:25
**objection** [44] - 5:23,
6:12, 10:17, 10:24,
11:24, 13:10, 15:15,
17:9, 18:5, 18:22,
26:5, 26:6, 29:18,
30:6, 30:13, 31:12,
38:2, 54:2, 55:9,
61:9, 61:13, 61:23,
62:13, 66:22, 66:23,

67:18, 74:20, 77:17,
81:25, 82:8, 85:20,
87:20, 91:4, 91:18,
95:18, 95:25, 96:21,
98:8, 109:22, 110:1,
110:5, 139:25,
141:24
**objections** [5] - 8:14,
62:4, 62:7, 63:9,
64:15
**obtain** [1] - 33:7
**obviously** [3] - 59:13,
151:12, 153:1
**occasions** [1] - 136:1
**October** [1] - 107:24
**OF** [1] - 1:1
**offer** [3] - 129:15,
149:23, 152:22
**offered** [6] - 150:23,
150:24, 150:25,
152:21, 152:23
**office** [30] - 13:21,
33:13, 35:20, 44:6,
44:10, 44:12, 48:1,
75:3, 81:1, 83:12,
99:16, 108:2,
108:17, 110:7,
111:5, 113:20,
120:6, 121:2, 121:7,
121:13, 122:6,
122:7, 122:19,
123:24, 126:24,
130:2, 130:3,
140:24, 144:19
**OFFICER** [11] - 4:2,
9:8, 9:10, 9:12, 56:5,
71:12, 71:14,
103:13, 105:13,
148:17, 156:23
**Offices** [1] - 1:19
**offices** [1] - 120:9
**Official** [1] - 157:17
**official** [1] - 2:4
**often** [1] - 33:25
**old** [2] - 32:15, 120:25
**omission** [1] - 71:4
**once** [4] - 17:17, 37:3,
140:12, 145:23
**one** [73] - 12:25, 16:4,
16:11, 16:12, 17:1,
21:20, 23:7, 28:8,
34:12, 35:13, 36:1,
37:18, 38:2, 38:7,
41:4, 47:3, 52:25,
53:11, 59:14, 65:5,
65:23, 66:18, 71:3,
73:22, 73:23, 74:13,
76:11, 76:25, 77:4,
77:8, 78:11, 78:24,
81:2, 81:13, 82:13,

83:18, 84:8, 84:9,
87:15, 87:22, 94:5,
97:23, 98:2, 98:3,
98:10, 98:22, 99:13,
99:16, 102:1,
103:22, 105:5,
106:22, 111:11,
112:23, 113:1,
117:1, 123:15,
129:15, 130:20,
131:11, 131:12,
131:20, 139:2,
142:11, 142:13,
147:23, 157:2,
157:3, 157:6
**ones** [9] - 13:23, 14:7,
34:22, 34:25, 35:2,
35:8, 35:9, 138:5,
138:8
**open** [88] - 5:7, 26:23,
27:2, 27:9, 27:13,
27:23, 27:24, 28:1,
28:5, 34:4, 35:11,
35:15, 35:19, 36:6,
36:10, 36:16, 39:12,
39:20, 39:24, 42:15,
42:18, 43:3, 43:7,
43:11, 43:14, 43:16,
45:19, 45:23, 46:1,
46:5, 46:17, 47:22,
48:3, 48:24, 49:3,
49:20, 50:1, 50:8,
50:21, 50:25, 51:3,
72:19, 72:24, 73:21,
74:4, 74:5, 74:6,
74:10, 74:19, 74:23,
80:3, 82:17, 82:18,
82:22, 82:24, 82:25,
83:4, 84:19, 100:15,
101:10, 108:24,
109:19, 113:17,
113:22, 114:12,
114:14, 114:15,
114:17, 115:13,
116:18, 117:13,
118:1, 118:6, 118:9,
118:14, 118:19,
119:22, 126:10,
126:15, 126:23,
127:3, 127:4,
128:17, 129:9,
139:3, 141:16,
144:6, 144:10
**opened** [2] - 130:3,
131:13
**opening** [1] - 64:12
**operate** [1] - 123:23
**operating** [1] - 125:6
**operation** [2] - 17:2,
122:5

**operational** [1] -
150:13
**opinion** [1] - 150:17
**opportunity** [8] -
26:19, 38:14, 63:1,
128:10, 129:22,
149:16, 151:23,
152:10
**opposed** [1] - 38:7
**optic** [1] - 119:24
**order** [2] - 123:20,
153:17
**ordered** [1] - 74:16
**ordinarily** [1] - 152:5
**original** [3] - 77:13,
78:25, 117:1
**Oscar** [34] - 46:18,
48:24, 49:2, 49:5,
49:11, 49:13, 49:17,
49:19, 49:25, 54:21,
78:16, 79:23, 80:4,
80:23, 81:19, 83:2,
83:4, 84:19, 85:19,
86:3, 95:9, 95:10,
95:12, 101:10,
116:16, 116:17,
116:24, 117:1,
117:4, 117:5, 117:8,
119:7, 119:8, 122:12
**otherwise** [6] - 59:24,
65:20, 131:24,
151:1, 151:12, 152:2
**ourselves** [1] - 139:5
**outgoing** [1] - 149:24
**outside** [4] - 28:1,
28:2, 55:9, 59:10
**overbroad** [2] - 66:4,
66:8
**overruled** [1] - 10:18,
10:25, 13:12, 15:16,
17:11, 18:6, 18:23,
22:24, 29:19, 55:11,
74:22, 77:18, 82:9,
91:6, 91:20, 95:20,
96:22, 110:6,
138:25, 140:2, 142:2
**overtime** [39] - 7:4,
21:25, 22:3, 22:6,
22:13, 23:3, 24:7,
24:11, 24:13, 24:17,
25:8, 25:20, 25:21,
26:24, 27:3, 27:7,
27:10, 27:15, 27:25,
28:5, 28:8, 28:17,
28:20, 30:11, 30:23,
39:12, 39:20, 43:7,
50:20, 74:18, 98:4,
100:20, 100:21,
100:23, 103:3,
126:21, 127:5,

142:17, 142:19
**owe** [2] - 98:6, 118:22
**owed** [49] - 20:21,
22:13, 25:21, 27:25,
29:2, 29:24, 38:18,
39:12, 39:20, 47:21,
50:20, 52:2, 52:5,
87:14, 87:16, 88:7,
89:4, 89:6, 92:21,
98:4, 98:15, 102:1,
117:12, 118:11,
119:22, 126:19,
126:20, 127:2,
127:4, 127:5,
132:16, 132:22,
133:1, 133:13,
134:12, 134:22,
135:4, 135:11,
139:7, 140:25,
141:15, 141:17,
141:18, 144:3,
144:6, 144:11,
144:20, 146:5
**owes** [3] - 28:24,
103:4, 146:10
**own** [17] - 17:25,
34:13, 34:16, 34:21,
35:7, 52:22, 75:4,
114:21, 114:23,
120:21, 121:1,
123:1, 139:20,
146:15, 151:24,
152:14, 152:16
**owned** [1] - 119:6
**owners** [1] - 37:15

## P

**P.A** [3] - 124:24,
124:12, 136:15
**p.m** [25] - 1:6, 27:18,
35:21, 36:1, 36:9,
36:11, 36:13, 47:23,
47:24, 64:2, 71:16,
94:11, 103:14,
105:12, 105:19,
105:22, 109:14,
110:17, 121:9,
129:25, 130:2,
130:17, 148:18,
157:8
**Page** [28] - 3:3, 3:13,
3:21, 5:11, 6:4, 7:12,
22:18, 22:25, 24:8,
24:18, 24:22, 25:18,
25:19, 30:16, 30:17,
60:18, 65:7, 69:21,
85:22, 101:20,
101:23, 133:5,
135:9, 144:25,

145:14, 145:16,
145:25
**page** [16] - 6:8, 25:6,
30:14, 41:8, 45:21,
80:18, 81:5, 89:25,
102:16, 102:18,
102:20, 109:4,
124:25, 135:9,
145:12, 157:6
**Pages** [1] - 1:8
**paid** [79] - 5:16, 5:20,
11:21, 12:19, 17:17,
17:24, 20:25, 21:5,
24:14, 29:3, 33:23,
39:16, 40:8, 40:17,
40:18, 44:12, 45:1,
45:7, 45:16, 45:22,
46:19, 48:14, 48:15,
49:10, 49:12, 50:24,
51:2, 51:7, 51:10,
51:16, 51:21, 54:9,
56:17, 57:24, 57:25,
75:15, 76:10, 78:21,
78:24, 79:7, 88:7,
92:22, 95:1, 108:22,
116:2, 116:22,
117:23, 118:11,
118:23, 119:17,
120:2, 122:10,
122:11, 122:13,
125:6, 125:7,
125:25, 126:6,
126:10, 126:22,
130:16, 130:17,
130:23, 131:2,
131:16, 134:23,
135:11, 136:22,
137:20, 140:23,
140:25, 146:4,
149:13, 152:4, 152:5
**pain** [1] - 35:1
**paper** [2] - 109:1,
109:2
**papers** [1] - 40:23
**paragraph** [5] - 6:8,
65:9, 65:12, 67:11
**Paragraph** [1] - 65:8
**parking** [2] - 121:18,
138:11
**part** [8] - 22:5, 82:10,
97:22, 115:21,
120:20, 122:22,
124:5, 150:7
**part-time** [1] - 97:22
**particular** [4] - 35:25,
77:25, 110:24,
152:24
**PARTIES** [2] - 4:4, 9:7
**parties** [3] - 8:6,
151:2, 153:19

**partner** [1] - 136:11
**parts** [1] - 61:17
**party** [1] - 95:9
**party's** [1] - 153:1
**passing** [1] - 110:11
**password** [1] - 112:23
**past** [1] - 64:22
**patience** [2] - 18:13,
18:14
**patient** [1] - 18:13
**Patricia** [1] - 157:5
**Pause** [23] - 5:8, 5:10,
15:19, 20:4, 23:21,
25:3, 26:17, 29:5,
37:17, 37:19, 37:24,
45:11, 64:7, 64:9,
64:13, 70:7, 71:13,
86:10, 96:13,
127:19, 142:10,
143:6, 154:3
**pay** [16] - 5:15, 20:21,
21:7, 21:10, 76:2,
98:6, 98:17, 100:20,
118:24, 123:24,
125:16, 125:23,
126:2, 128:12,
134:24, 150:12
**paying** [6] - 22:3,
24:10, 24:13, 74:13,
117:4, 117:6
**payment** [19] - 21:12,
34:1, 42:1, 42:6,
42:8, 43:2, 45:19,
47:4, 47:17, 54:16,
54:17, 78:14, 79:19,
80:17, 115:19,
119:6, 119:18,
122:16, 122:17
**payments** [15] - 20:22,
42:25, 48:6, 48:7,
48:11, 48:12,
115:25, 116:14,
118:2, 119:3, 119:5,
124:19, 125:10,
125:11, 137:21
**pays** [1] - 152:5
**pending** [4] - 67:20,
116:2, 134:14,
134:25
**penny** [1] - 74:13
**people** [23] - 77:14,
77:21, 77:24, 78:3,
78:4, 78:15, 81:9,
81:14, 82:6, 86:13,
98:24, 110:8,
110:10, 129:9,
129:13, 129:17,
129:21, 129:23,
140:23, 141:5,
141:7, 141:8

**per** [13] - 27:14, 27:15, 29:2, 40:1, 40:5, 40:11, 48:3, 51:8, 51:13, 51:14, 117:5, 117:11, 142:18
**percent** [6] - 44:24, 44:25, 48:12, 52:7, 117:9, 141:2
**perfect** [3] - 95:5, 106:15
**perfectly** [1] - 88:15
**perform** [1] - 151:3
**performed** [3] - 5:16, 5:22, 20:23
**performing** [2] - 58:1, 152:25
**perfunctory** [1] - 151:3
**perhaps** [1] - 70:4
**period** [70] - 15:13, 26:24, 27:2, 27:9, 27:13, 27:24, 28:5, 34:4, 35:12, 35:15, 35:19, 36:7, 36:10, 36:16, 39:12, 39:21, 39:24, 42:4, 42:13, 43:3, 43:7, 43:11, 43:14, 43:16, 43:19, 45:20, 45:23, 46:2, 46:6, 46:17, 47:22, 48:4, 48:25, 49:3, 49:20, 50:1, 50:10, 50:21, 72:19, 72:24, 74:3, 74:19, 80:3, 82:20, 83:1, 83:5, 83:13, 84:5, 84:19, 87:5, 87:7, 87:9, 87:10, 87:11, 93:20, 101:11, 113:17, 113:22, 114:14, 114:15, 116:18, 117:13, 118:2, 118:19, 118:23, 126:11, 130:11, 134:23, 134:25, 139:3
**periods** [5] - 91:11, 92:21, 129:9, 129:18, 130:9
**permanence** [3] - 56:25, 57:2, 57:6
**permanent** [3] - 57:7, 57:9, 72:21
**person** [5] - 12:17, 20:1, 20:7, 20:17, 78:1
**person's** [1] - 59:16
**personal** [4] - 20:18, 125:14, 125:16, 137:22

**personally** [1] - 115:25
**perspective** [1] - 121:23
**phase** [1] - 128:25
**phone** [20] - 5:7, 99:15, 99:18, 99:19, 110:11, 110:12, 110:14, 111:6, 120:10, 120:15, 121:18, 126:25, 138:20, 139:4, 139:11, 139:12, 149:17, 149:24, 150:1
**phonetic** [1] - 150:17
**phonetic)** [1] - 15:7
**pick** [3] - 4:14, 100:3, 100:7
**picture** [1] - 67:3
**piece** [2] - 108:25, 109:2
**place** [5] - 42:15, 60:24, 80:19, 113:1, 149:24
**places** [1] - 76:14
**Plaintiff** [5] - 9:21, 31:17, 32:18, 45:7, 70:24
**Plaintiff's** [1] - 54:4
**Plaintiffs** [18] - 1:6, 5:15, 5:16, 5:22, 71:4, 32:3, 56:9, 63:2, 64:24, 70:13, 86:19, 104:14, 105:24, 148:8, 148:25, 149:2, 152:22
**plaintiffs** [3] - 5:21, 31:23, 105:16
**PLAINTIFFS** [2] - 1:14, 3:3
**Plaintiffs'** [4] - 3:17, 31:16, 56:16, 115:23
**plan** [5] - 46:24, 78:14, 78:17, 78:21, 109:3
**planning** [1] - 155:13
**plans** [2] - 18:19, 48:24
**pleadings** [1] - 104:2
**pled** [2] - 104:18, 104:25
**plural** [1] - 103:24
**point** [22] - 29:10, 42:1, 43:10, 52:9, 53:25, 56:23, 65:14, 67:20, 72:15, 73:3, 74:2, 75:16, 81:11, 94:24, 95:2, 95:16, 98:20, 99:16,

138:17, 148:9
**policies** [54] - 10:7, 10:22, 11:3, 11:6, 11:10, 14:3, 14:6, 41:1, 41:10, 42:25, 43:5, 43:22, 44:1, 44:5, 44:25, 47:7, 47:11, 48:8, 49:2, 49:4, 49:17, 49:19, 49:25, 50:2, 51:21, 51:24, 52:15, 52:18, 76:10, 79:9, 79:11, 79:25, 80:1, 80:2, 80:4, 83:4, 84:19, 101:10, 101:21, 112:2, 115:16, 116:16, 116:22, 119:7, 123:13, 123:15, 126:25, 128:21, 128:24, 129:2, 129:10, 130:1, 138:20, 140:10
**policy** [8] - 33:23, 34:1, 34:5, 41:6, 41:8, 41:17, 80:23, 140:15
**POLLOCK** [105] - 1:14, 4:6, 4:9, 4:16, 5:13, 5:19, 5:21, 6:5, 6:7, 6:11, 6:15, 6:19, 6:22, 7:1, 7:3, 7:7, 7:10, 7:13, 7:21, 7:25, 8:5, 8:17, 8:22, 9:1, 9:3, 14:14, 23:11, 23:14, 57:16, 57:21, 59:22, 60:3, 60:7, 60:11, 60:15, 60:17, 60:21, 62:20, 63:6, 64:10, 66:18, 67:19, 68:1, 68:5, 70:11, 70:21, 70:23, 71:5, 85:4, 85:9, 89:25, 96:3, 104:16, 104:20, 104:25, 105:16, 105:18, 106:2, 106:5, 106:23, 107:21, 109:25, 110:18, 114:4, 114:7, 116:3, 117:18, 119:13, 119:14, 120:24, 124:7, 124:17, 127:16, 135:15, 135:18, 135:21, 138:24, 139:25, 140:3, 141:24, 142:3, 142:5, 142:11, 143:3, 143:8, 145:8, 145:11, 145:14,

145:17, 145:18, 147:17, 148:8, 149:2, 153:8, 155:21, 155:24, 156:3, 156:9, 156:11, 156:13, 156:16, 156:21, 156:24, 157:2, 157:7
**Pollock** [5] - 3:9, 3:10, 8:13, 66:17, 145:12
**Ponce** [1] - 1:23
**portal** [1] - 131:13
**posed** [3] - 49:5, 151:12, 153:5
**position** [1] - 134:7
**possessed** [1] - 143:17
**possibilities** [1] - 128:8
**possibility** [3] - 107:14, 130:6, 130:7
**possible** [3] - 46:7, 81:23, 107:14
**possibly** [2] - 60:24, 69:14
**post** [2] - 59:7, 105:9
**potential** [3] - 73:5, 103:19, 110:9
**practical** [1] - 76:12
**practically** [1] - 81:1
**predicate** [1] - 22:20
**prefer** [1] - 88:22
**prejudicial** [1] - 62:19
**preliminary** [2] - 90:10, 90:23
**prepared** [15] - 13:4, 13:6, 21:20, 45:6, 51:15, 61:22, 115:3, 115:4, 115:25, 116:9, 116:13, 140:22, 146:15
**presence** [1] - 59:11
**Present** [1] - 2:2
**presentation** [1] - 111:18
**presented** [1] - 154:10
**presently** [1] - 12:17
**president** [2] - 12:15, 99:14
**pressure** [2] - 35:1, 35:2
**presumably** [1] - 104:5
**presuming** [1] - 112:11
**pretrial** [2] - 66:21, 68:14
**pretty** [6] - 88:18, 88:21, 106:12, 128:6, 131:6, 131:19

**previous** [2] - 59:16, 62:13
**previously** [7] - 9:21, 35:11, 41:16, 49:10, 52:19, 54:13, 60:22
**print** [1] - 157:6
**printed** [2] - 143:4, 157:3
**privilege** [1] - 87:20
**problem** [9] - 26:14, 49:8, 66:24, 67:11, 121:6, 121:16, 135:21, 144:2, 145:14
**problems** [1] - 99:10
**procedure** [1] - 110:25
**proceed** [4] - 9:19, 29:7, 71:18, 106:2
**proceedings** [26] - 4:1, 5:8, 5:10, 15:19, 20:4, 23:21, 25:3, 26:17, 29:5, 37:17, 37:19, 37:24, 45:11, 64:7, 64:9, 64:13, 70:7, 71:13, 86:10, 96:13, 127:19, 142:10, 143:6, 154:3, 157:8, 157:13
**Proceedings**............ .........................[1] - 3:22
**process** [3] - 26:2, 110:22, 113:7
**processing** [1] - 113:11
**procured** [1] - 152:24
**produce** [1] - 128:21
**producing** [1] - 42:11
**professional** [1] - 152:17
**professionals** [1] - 152:12
**profit** [2] - 151:23, 152:11
**progress** [1] - 70:19
**promise** [1] - 155:11
**promised** [1] - 75:16
**promises** [1] - 79:15
**proof** [10] - 135:3, 135:10, 135:12, 138:18, 144:19, 144:23, 145:1, 146:3, 146:7, 146:10
**proper** [3] - 38:16, 78:19, 120:5
**properly** [2] - 120:2, 126:6
**propose** [4] - 4:17, 104:7, 104:12, 104:13

**proposed** [7] - 4:10, 60:21, 66:21, 68:6, 68:7, 88:11, 104:11
**proposing** [1] - 66:12
**protection** [1] - 67:7
**protections** [1] - 67:8
**prove** [3] - 81:12, 86:1, 138:19
**provide** [2] - 63:2, 63:4
**provided** [6] - 34:22, 34:25, 35:8, 149:22, 149:25, 152:18
**provides** [1] - 67:2
**public** [2] - 98:24, 152:23
**published** [5] - 45:9, 46:22, 102:14, 124:6, 147:16
**purchase** [2] - 52:23, 52:25
**purpose** [2] - 62:19, 135:8
**purposes** [1] - 155:14
**pushed** [1] - 94:21
**put** [20] - 22:22, 64:18, 87:17, 88:3, 88:8, 102:9, 105:8, 112:21, 121:23, 124:5, 124:21, 125:22, 138:3, 139:18, 140:13, 141:21, 142:5, 147:14, 157:4
**puts** [1] - 65:15

## Q

**qualifications** [1] - 143:16
**qualify** [2] - 78:15, 116:24
**QUESTION** [4] - 23:1, 23:6, 25:7, 101:25
**questioning** [2] - 58:18, 154:21
**questions** [19] - 9:2, 10:2, 18:17, 18:18, 20:24, 22:17, 24:4, 25:15, 25:16, 25:17, 29:6, 55:1, 82:14, 85:3, 85:14, 89:18, 103:7, 135:7, 146:18
**quick** [3] - 144:1, 144:4, 154:9
**quicker** [3] - 4:10, 4:24, 8:19
**QUINTERO** [1] - 1:9
**Quintero** [8] - 108:13, 112:6, 120:10,

120:25, 142:7, 149:6, 150:14, 156:6
**quite** [5] - 38:12, 68:20, 121:7, 131:14, 156:2
**quote** [3] - 66:25, 67:1, 131:12

## R

**Radius** [2] - 111:14, 120:12
**Rafa** [1] - 124:20
**Rafaela** [8] - 3:4, 65:24, 81:2, 81:7, 81:19, 95:14, 122:21, 151:16
**RAFAELA** [2] - 1:4, 9:20
**raise** [2] - 31:24, 105:21
**raised** [2] - 104:2, 149:19
**rate** [2] - 69:25, 70:14
**rates** [2] - 150:12, 152:2
**re** [2] - 110:19, 154:17
**reach** [5] - 47:8, 47:12, 83:19, 84:16, 86:23
**reached** [4] - 50:5, 81:1, 81:3, 84:13
**reacquaint** [2] - 61:23, 62:4
**read** [7] - 22:5, 61:18, 68:11, 103:21, 105:4, 133:8, 144:21
**reading** [8] - 22:18, 23:10, 23:14, 23:16, 30:15, 65:6, 65:7, 104:12
**ready** [5] - 23:22, 37:21, 70:18, 124:13, 155:19
**real** [4] - 93:16, 97:23, 144:1, 144:4
**realities** [5] - 58:21, 59:3, 59:23, 62:16, 63:1
**reality** [2] - 57:2, 57:5
**realized** [2] - 78:18, 79:9, 139:20
**really** [14] - 30:11, 66:2, 72:21, 74:2, 82:22, 83:12, 88:15, 97:7, 112:3, 126:13, 132:8, 137:21, 139:8
**reason** [6] - 34:4, 38:11, 53:14, 74:5, 78:10, 80:13

**reasonable** [4] - 5:21, 149:4, 150:10, 151:1
**reasons** [1] - 53:11
**rec** [1] - 58:9
**receive** [25] - 17:17, 34:1, 34:11, 36:14, 36:17, 37:1, 37:2, 37:4, 37:10, 41:16, 42:5, 42:6, 42:19, 42:25, 43:20, 46:16, 47:16, 54:10, 54:21, 97:23, 110:16, 111:5, 111:16, 119:6, 119:10
**received** [32] - 24:14, 27:6, 30:4, 34:8, 36:21, 38:3, 38:24, 39:7, 40:16, 41:9, 43:2, 44:23, 45:25, 48:6, 49:16, 54:16, 54:17, 54:23, 80:14, 80:18, 90:4, 92:24, 94:22, 116:1, 116:9, 119:5, 122:15, 122:17, 130:14, 138:1, 140:21, 149:24
**receiving** [2] - 37:3, 45:4
**recess** [6] - 9:9, 55:24, 63:13, 103:11, 105:11, 105:12
**recitation** [1] - 67:2
**recognize** [1] - 115:22
**recommended** [2] - 138:5, 138:8
**record** [2] - 41:6, 153:8
**recorded** [3] - 41:11, 109:1, 109:2
**recordings** [1] - 120:12
**recordkeeping** [2] - 7:12, 7:20
**records** [5] - 5:15, 7:15, 7:17, 75:4, 118:25
**recover** [3] - 5:21, 105:4, 105:6
**Recross** [1] - 3:6
**RECROSS** [1] - 29:8
**red** [1] - 65:8
**redirect** [6] - 19:21, 26:8, 101:6, 135:20, 143:2, 154:17
**Redirect** [3] - 3:5, 3:8, 3:10
**REDIRECT** [3] - 19:23, 101:7, 143:7
**redundant** [2] - 7:13,

66:16
**refer** [5] - 19:5, 83:10, 83:25, 124:8, 133:5
**reference** [1] - 68:24
**referenced** [1] - 70:6
**references** [1] - 103:24
**referrals** [1] - 19:4
**referred** [2] - 69:6, 101:20
**referring** [12] - 46:12, 46:25, 47:7, 47:11, 52:12, 52:13, 53:17, 78:14, 91:22, 99:4, 113:22, 128:22
**reflect** [2] - 68:10, 68:14
**reformat** [1] - 71:3
**regarding** [1] - 31:15
**regards** [2] - 155:1, 155:2
**register** [3] - 80:18, 116:13, 116:14
**registered** [2] - 41:8, 115:25
**regular** [1] - 69:25
**regulation** [5] - 68:24, 69:3, 69:6, 69:16, 70:5
**regulations** [1] - 149:22
**Reinier** [28] - 17:6, 17:7, 21:6, 24:10, 30:20, 31:9, 72:8, 75:22, 78:6, 98:4, 99:10, 107:13, 108:20, 113:1, 113:4, 117:10, 118:19, 120:17, 122:16, 122:17, 128:11, 134:3, 137:12, 137:16, 139:9, 140:22, 149:5, 154:11
**REINIER** [1] - 1:8
**Reinier's** [1] - 140:7
**reinserted** [1] - 60:25
**relate** [1] - 62:21
**related** [1] - 68:1
**relates** [1] - 24:7
**relationship** [4] - 58:21, 98:20, 99:7, 148:14
**relevance** [15] - 6:18, 10:17, 10:24, 11:24, 18:5, 18:22, 54:2, 55:9, 56:14, 56:15, 96:21, 98:8, 98:9, 138:24, 139:25
**relevant** [1] - 155:2

**relieve** [1] - 151:2
**rely** [5] - 21:14, 21:18, 88:22
**relying** [1] - 6:24
**remain** [6] - 9:12, 31:24, 50:10, 64:16, 79:8, 105:13
**remained** [3] - 44:14, 44:17, 44:19
**remaining** [2] - 63:9, 64:15
**remains** [1] - 60:19
**remember** [50] - 13:8, 15:23, 16:3, 16:18, 21:22, 21:24, 22:3, 22:4, 22:6, 22:12, 24:1, 25:11, 25:14, 25:16, 25:24, 29:13, 31:9, 35:24, 50:4, 50:5, 50:7, 50:12, 54:17, 73:24, 83:3, 83:6, 84:22, 86:16, 86:25, 89:17, 89:19, 89:21, 90:5, 98:22, 98:25, 101:9, 101:15, 101:17, 101:23, 102:3, 102:4, 132:23, 133:9, 134:5, 144:20, 144:23, 146:24, 148:12, 154:12
**reminder** [1] - 132:19
**remotely** [1] - 75:2
**remove** [3] - 59:24, 66:16, 68:21
**removed** [2] - 65:3
**removing** [2] - 59:23, 60:4
**renounce** [1] - 22:9
**reordered** [1] - 60:7
**repay** [1] - 22:10
**repeat** [9] - 15:20, 19:10, 44:2, 47:9, 49:1, 75:20, 89:2, 93:11, 107:19
**repeated** [1] - 30:17
**repeating** [1] - 70:3
**repetitive** [1] - 8:9
**report** [4] - 90:19, 90:20, 90:21, 98:1
**REPORTED** [1] - 2:3
**REPORTER** [14] - 41:19, 44:16, 44:18, 52:1, 93:10, 100:22, 106:22, 107:16, 107:20, 114:2, 119:11, 120:19, 138:6, 145:6
**Reporter** [2] - 2:4,

157:17
**reporter's** [1] - 62:2
**Reporter's** [1] - 3:22
**reporting** [1] - 125:18
**reports** [1] - 122:15
**representation** [1] -
48:7
**represented** [2] -
131:14, 140:8
**request** [1] - 150:19
**requested** [1] - 61:5
**requesting** [2] - 68:5,
70:4
**require** [1] - 95:10
**required** [4] - 7:17,
140:15, 147:5,
147:21
**requirement** [5] -
82:7, 95:10, 147:8,
147:10
**requirements** [8] -
61:5, 65:10, 65:12,
65:16, 65:19, 66:5,
66:6, 66:14
**requires** [1] - 69:24
**residual** [1] - 42:25
**resolved** [1] - 67:16
**respect** [1] - 124:9
**respond** [4] - 53:12,
120:1, 135:23,
153:14
**responded** [1] -
139:24
**response** [4] - 79:12,
85:10, 98:9, 120:1
**responsibilities** [1] -
67:5
**responsibility** [1] -
82:3
**rest** [4] - 72:3, 105:3,
148:8, 148:22
**rested** [1] - 148:25
**resting** [1] - 154:7
**restriction** [1] - 58:13
**restrictions** [2] -
94:16, 95:13
**restroom** [3] - 32:20,
124:15, 142:8
**result** [1] - 46:16
**retained** [1] - 61:4
**retake** [3] - 56:7,
103:15, 148:19
**return** [1] - 148:15
**Revenue** [2] - 96:19,
105:2
**revert** [1] - 68:6
**review** [4] - 67:20,
134:14, 149:7,
155:16
**reviewing** [1] - 104:2

revised [3] - 7:25,
64:3, 64:15
**revisions** [3] - 4:14,
4:16, 61:24
**Rewards** [1] - 118:8
**reword** [1] - 66:10
**rework** [2] - 8:8, 60:4
**rid** [2] - 6:5, 6:6
**rights** [10] - 61:1, 61:5,
65:9, 65:12, 65:15,
65:19, 66:5, 66:13,
67:4, 67:13
**ringing** [1] - 99:19
**rise** [8] - 4:2, 9:8, 9:10,
56:5, 103:13,
105:13, 148:17,
156:23
**risk** [3] - 63:1, 70:3,
152:11
**room** [2] - 5:2, 5:5
**rooms** [1] - 62:17
**Roxanna** [2] - 107:2,
107:7
**RPR** [2] - 2:3, 157:17
**ruled** [1] - 58:18
**rules** [2] - 97:9,
100:25
**ruling** [3] - 58:19,
62:12, 68:10
**rush** [1] - 155:12
**rushing** [1] - 129:10

**S**

**sacrifice** [1] - 140:20
**Saguaros** [1] - 136:16
**sake** [1] - 64:21
**salary** [3] - 57:20,
100:18
**sale** [1] - 42:10
**sales** [14] - 40:15,
40:22, 46:16, 84:5,
85:19, 102:7,
114:21, 114:22,
128:21, 139:2,
139:8, 145:4,
145:10, 153:3
**salesman** [1] - 42:11
**San** [1] - 1:16
**SANTIAGO** [1] - 1:22
**Santiago** [1] - 1:23
**sat** [1] - 111:19
**Saturday** [3] - 48:1,
108:14, 114:8
**Saturdays** [4] - 36:12,
109:15, 109:19,
110:4
**save** [1] - 70:11
**saw** [5] - 4:12, 60:1,
78:18, 107:22,

155:17
**sc@cuetolawgroup.**
**com** [1] - 1:25
**Scantlin** [1] - 150:17
**schedule** [1] - 16:5
**scheduled** [1] - 70:15
**scope** [4] - 26:6,
31:14, 31:16, 55:10
**scratch** [1] - 43:10
**screen** [1] - 119:24
**screens** [1] - 108:20
**seat** [4] - 56:7, 61:11,
103:15, 148:19
**seated** [6] - 5:1, 32:5,
64:16, 71:17,
105:20, 106:1
**second** [21] - 23:7,
28:12, 37:18, 37:20,
42:4, 43:11, 43:19,
47:22, 48:3, 50:21,
66:16, 67:12, 73:3,
78:23, 94:5, 102:20,
112:5, 115:12,
124:12, 132:17,
156:2
**secretary** [1] - 121:10
**section** [4] - 57:5,
59:24, 60:21, 110:9
**sections** [1] - 61:4
**SECURITY** [11] - 4:2,
9:8, 9:10, 9:12, 56:5,
71:12, 71:14,
103:13, 105:13,
148:17, 156:23
**see** [30] - 16:16, 17:1,
17:2, 36:20, 36:23,
38:13, 46:24, 51:15,
59:2, 62:9, 63:7,
64:6, 67:11, 69:21,
71:4, 71:6, 71:7,
82:13, 102:19,
102:23, 104:20,
115:15, 124:24,
125:7, 126:10,
126:19, 142:5,
148:14, 148:15,
156:19
**seeking** [2] - 29:17,
29:23
**seem** [6] - 36:1, 54:17,
73:24, 83:6, 101:21,
131:23
**self** [4] - 12:6, 12:12,
12:22, 137:24
**self-employed** [4] -
12:6, 12:12, 12:22,
137:24
**sell** [33] - 10:21, 10:22,
11:3, 14:3, 14:7,
16:19, 16:21, 47:8,

47:12, 48:24, 49:2,
49:19, 50:15, 75:15,
77:8, 79:25, 80:2,
80:4, 83:4, 86:3,
86:13, 101:21,
111:25, 112:2,
112:4, 123:13,
123:15, 123:16,
128:24, 129:2,
131:24, 132:1,
143:20
**selling** [24] - 11:6,
11:9, 18:2, 18:20,
34:1, 34:7, 34:10,
43:4, 43:22, 43:25,
49:11, 49:12, 49:17,
51:23, 52:15, 95:12,
111:22, 115:16,
116:22, 119:7,
120:7, 126:25,
136:3, 153:3
**send** [3] - 64:10,
113:13, 119:21
**sense** [9] - 5:12, 6:5,
10:13, 20:22, 53:21,
60:5, 67:23, 87:13
**sent** [15] - 4:10, 4:12,
4:16, 21:4, 26:14,
26:16, 42:7, 53:12,
60:17, 91:12, 91:13,
119:24, 134:2, 139:8
**sentence** [10] - 5:11,
7:14, 61:18, 65:11,
65:15, 66:8, 66:16,
67:6, 67:12, 105:4
**separate** [1] - 139:11
**separately** [1] - 95:1
**September** [1] - 33:3
**series** [1] - 150:21
**Service** [1] - 105:3
**service** [2] - 18:14,
120:15
**services** [4] - 149:23,
152:23, 152:25
**set** [4] - 8:25, 9:5,
150:12, 152:6
**settlement** [2] - 67:15,
67:16
**seven** [9] - 84:24,
113:4, 113:6, 128:3,
130:10, 130:11,
130:15, 130:16,
140:23
**seven-month** [1] -
130:11
**share** [3] - 8:13,
104:14, 116:6
**shared** [13] - 26:10,
26:11, 114:24,
115:7, 115:11,

116:4, 116:5, 139:4,
139:8, 139:12,
139:13, 144:18
**sheet** [14] - 36:23,
37:1, 40:25, 41:7,
41:11, 45:4, 50:13,
52:10, 87:15, 87:18,
88:2, 142:4, 145:2,
146:15
**Sheets** [3] - 114:23,
118:20, 139:9
**sheets** [1] - 115:4
**shift** [1] - 121:9
**shoot** [1] - 8:18
**Shore** [6] - 92:15,
92:20, 92:23, 92:24,
94:25
**shorter** [1] - 100:14
**show** [26] - 7:6, 24:25,
26:13, 37:6, 37:21,
60:13, 61:6, 62:25,
75:5, 80:9, 80:22,
81:10, 81:12, 82:2,
82:4, 82:13, 88:5,
88:6, 88:11, 97:9,
100:25, 102:13,
115:21, 125:5,
142:13, 144:4
**showed** [4] - 111:6,
111:18, 113:1,
119:22
**showing** [4] - 8:24,
36:15, 46:21, 109:9
**shown** [2] - 38:19,
130:4
**shows** [5] - 45:7,
135:4, 135:10,
144:11, 146:4
**sic** [3] - 132:9, 132:10,
144:22
**side** [4] - 77:23,
110:12, 155:14,
157:6
**sidebar** [2] - 55:22,
59:21
**sidebars** [3] - 55:23,
59:7
**sided** [3] - 157:2,
157:3, 157:5
**sides** [1] - 8:21
**sign** [13] - 19:2, 33:16,
33:19, 95:23,
129:21, 129:23,
138:21, 141:5,
141:8, 147:6,
147:10, 147:11,
149:17
**signed** [7] - 113:9,
117:6, 125:25,
131:12, 138:22,

Case 1:22-cv-22671-CMA   Document 123-3   Entered on FLSD Docket 09/21/2023   Page 174 of
176
July 12, 2023                                                    17
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

147:19, 147:23
**signing** [2] - 129:13, 130:6
**similar** [2] - 98:2, 100:14
**simple** [4] - 49:9, 141:14, 144:5, 144:15
**simply** [1] - 96:9
**singing** [1] - 80:25
**singular** [2] - 103:18, 103:22
**sister** [14] - 107:13, 107:25, 113:7, 123:3, 123:5, 128:5, 128:8, 128:21, 128:25, 136:9, 136:10, 140:19, 141:3
**sit** [4] - 8:18, 38:8, 38:9, 99:14
**sitting** [2] - 38:17, 140:24
**six** [7] - 62:21, 91:1, 91:3, 106:13, 130:20, 139:20, 150:18
**skill** [4] - 18:11, 132:2, 153:9
**skills** [8] - 112:2, 143:9, 143:10, 143:19, 143:23, 153:10, 153:11, 153:13
**skinnied** [1] - 60:24
**skinny** [1] - 4:22
**sleep** [1] - 129:12
**slow** [2] - 4:11, 70:19
**small** [2] - 23:15, 52:11
**software** [2] - 13:14, 152:15
**sold** [26] - 33:23, 41:1, 41:6, 41:17, 43:1, 44:5, 44:25, 48:8, 49:25, 50:10, 51:21, 76:9, 80:1, 80:23, 81:19, 83:3, 83:4, 84:18, 84:20, 87:7, 95:14, 101:10, 101:15, 101:18, 112:3, 138:20
**solve** [1] - 121:16
**someone** [3] - 38:5, 58:6, 84:14
**sometime** [2] - 114:5, 155:15
**sometimes** [1] - 35:8
**somewhat** [1] - 78:12
**sorry** [39] - 5:4, 6:19,

11:15, 14:15, 18:9, 21:23, 26:5, 38:15, 39:2, 41:19, 44:16, 48:2, 51:1, 52:1, 57:1, 58:11, 61:10, 65:6, 65:9, 69:23, 69:24, 84:24, 90:7, 90:8, 90:15, 93:6, 93:10, 98:11, 100:22, 106:22, 107:16, 110:10, 117:17, 119:11, 137:13, 138:6, 141:10, 145:6, 145:11
**sort** [4] - 8:11, 52:17, 96:1, 155:13
**South** [3] - 94:8, 94:23, 97:22
**SOUTHERN** [1] - 1:1
**Southern** [2] - 93:13, 93:25
**space** [1] - 123:24
**spaces** [1] - 121:18
**Spanish** [1] - 85:5
**spare** [1] - 150:19
**sparked** [1] - 107:12
**speaker** [2] - 84:9, 85:6
**special** [7] - 10:8, 110:25, 112:1, 143:9, 153:9, 153:10, 153:11
**specialized** [2] - 143:15, 143:16
**specific** [3] - 104:4, 104:9, 104:19
**speculation** [1] - 77:17
**spent** [2] - 126:23, 154:11
**split** [1] - 155:21
**spreadsheet** [26] - 45:6, 51:15, 114:20, 114:22, 114:23, 115:12, 115:14, 115:15, 115:24, 116:4, 116:9, 116:15, 117:16, 117:19, 118:10, 118:13, 118:16, 119:21, 124:19, 124:21, 126:7, 126:8, 126:16, 126:18, 131:3, 144:10
**spreadsheets** [4] - 115:2, 115:8, 142:12, 144:18
**stand** [2] - 9:15, 71:9

**standard** - 67:21
**Standards** [1] - 61:1
**standing** [4] - 9:12, 31:24, 105:14, 108:6
**stared** [1] - 33:4
**start** [10] - 33:2, 35:12, 60:14, 70:15, 77:23, 90:24, 108:12, 111:22, 115:15, 132:5
**started** [30] - 15:5, 17:5, 17:7, 19:18, 21:11, 24:8, 33:11, 33:13, 33:17, 33:25, 34:7, 34:10, 35:13, 73:1, 108:15, 108:24, 111:13, 111:16, 114:18, 114:19, 115:11, 118:2, 118:14, 131:8, 131:18, 137:11, 137:16, 139:20, 141:3, 145:25
**starting** [2] - 144:25, 145:25
**starts** [6] - 82:19, 82:21, 82:22, 145:14, 145:15, 151:18
**State** [9] - 74:12, 96:15, 96:18, 97:5, 97:8, 99:23, 99:25, 100:6, 100:12
**state** [3] - 32:10, 73:22, 74:24
**statement** [6] - 47:19, 93:23, 147:6, 147:11, 147:15, 147:18
**statements** [18] - 6:17, 6:20, 27:5, 36:14, 36:18, 36:21, 37:1, 37:6, 37:10, 40:16, 41:10, 43:20, 45:1, 45:4, 88:12, 88:13, 139:3, 147:24
**STATES** [2] - 1:1, 1:12
**states** [4] - 113:3, 113:4, 113:5, 113:7
**States** [6] - 32:16, 65:22, 97:15, 105:2, 107:5, 157:17
**status** [2] - 59:16, 105:1, 149:15
**stay** [4] - 7:19, 35:23, 36:1, 109:20
**stayed** [1] - 80:11
**staying** [2] - 35:24, 77:12

**Ste** [2] - 1:16, 1:23
**steady** [1] - 77:11
**step** [3] - 31:20, 66:18, 103:8
**STEPHANIE** [2] - 2:3, 157:17
**Stephanie_McCarn
@flsd.uscourts.
gov** [1] - 2:6
**steps** [1] - 66:19
**stick** [1] - 44:8
**still** [15] - 18:2, 27:10, 41:4, 50:8, 54:10, 58:8, 60:19, 61:7, 70:19, 74:17, 75:7, 103:17, 105:6, 116:1, 116:6
**stip** [1] - 66:21
**stipulate** [1] - 22:21
**stood** [1] - 79:10
**stop** [2] - 28:13, 139:23
**stopped** [6] - 37:3, 37:5, 59:25, 119:4
**straight** [2] - 100:18
**stream** [2] - 79:7, 96:1
**strong** [1] - 67:7
**struggle** [1] - 107:9
**stuck** [1] - 65:5
**studied** [2] - 31:1, 31:3
**study** [2] - 73:12, 152:12
**studying** [1] - 75:10
**subject** [1] - 57:22
**successful** [2] - 139:18, 140:20
**sue** [1] - 137:6
**suing** [8] - 22:2, 23:3, 24:10, 24:12, 24:13, 24:17, 25:7, 30:12
**summarizing** [1] - 124:22
**summary** [1] - 124:25
**summer** [2] - 33:8, 33:9
**super** [1] - 102:2
**supervised** [3] - 65:21, 120:16, 150:14
**supervises** [1] - 97:24
**supplies** [2] - 63:3, 63:4
**supposed** [3] - 46:19, 56:17, 59:5
**surveilled** [1] - 120:7
**sustained** [6] - 12:1, 54:3, 98:12, 109:23, 110:1
**swore** [1] - 89:18

**sworn** [2] - 9:21, 145:20
**system** [6] - 73:6, 73:18, 111:3, 111:6, 111:9, 111:14
**systems** [1] - 123:24

**T**

**T-O-R-K** [1] - 107:2
**tab** [2] - 118:16, 125:2
**table** [2] - 113:24, 139:18
**tacked** [1] - 8:11
**tailored** [1] - 4:23
**talent** [1] - 131:19
**talents** [1] - 151:24
**talks** [1] - 114:21
**task** [1] - 152:9
**tax** [5] - 17:22, 17:25, 20:25, 31:10, 125:18
**taxes** [11] - 12:4, 12:8, 12:21, 13:7, 20:24, 21:14, 21:21, 31:2, 125:25, 126:2, 137:24
**teach** [1] - 128:15
**telephone** [2] - 38:8, 53:12
**temporarily** [1] - 56:8
**ten** [4] - 56:2, 56:3, 103:11, 143:14
**term** [2] - 78:23
**terminated** [1] - 81:18
**terms** [5] - 40:22, 76:12, 77:15, 78:4, 82:14
**test** [2] - 59:3, 62:16
**testified** [5] - 9:22, 32:3, 76:8, 105:24, 153:12
**testify** [1] - 154:23
**testifying** [2] - 59:14, 95:18
**testimony** [7] - 11:25, 30:3, 31:12, 56:10, 141:25, 144:21, 150:24
**text** [4] - 53:12, 80:9, 80:21, 124:4
**THE** [313] - 1:12, 1:14, 1:19, 3:3, 3:13, 4:3, 4:5, 4:7, 4:15, 4:25, 5:4, 5:6, 5:9, 5:11, 5:18, 5:20, 5:23, 5:25, 6:3, 6:6, 6:8, 6:12, 6:14, 6:17, 6:20, 6:24, 7:2, 7:5, 7:9, 7:11, 7:18, 7:22, 8:4, 8:8, 8:20, 8:23,

9:2, 9:4, 9:11, 9:14, 9:17, 10:18, 10:25, 11:1, 12:1, 12:10, 13:12, 13:24, 14:13, 14:18, 15:16, 15:23, 16:23, 17:11, 18:6, 18:7, 18:23, 18:24, 19:10, 19:21, 20:2, 20:9, 20:11, 20:13, 20:15, 20:18, 22:24, 23:7, 23:9, 23:13, 23:16, 23:23, 24:21, 24:25, 25:4, 26:7, 26:10, 26:13, 26:16, 29:7, 29:19, 29:20, 31:14, 31:19, 31:24, 32:4, 32:5, 32:18, 32:21, 34:17, 34:19, 35:5, 35:7, 37:23, 38:1, 38:7, 38:11, 38:17, 38:22, 39:2, 39:5, 41:19, 41:21, 42:17, 42:18, 42:19, 44:2, 44:16, 44:17, 44:18, 44:19, 45:10, 47:9, 47:10, 47:13, 47:14, 49:12, 49:14, 49:21, 49:22, 49:23, 51:1, 51:2, 51:4, 51:9, 51:11, 52:1, 52:2, 53:3, 53:4, 54:3, 54:6, 55:2, 55:11, 55:12, 55:15, 55:16, 55:23, 56:7, 56:9, 56:14, 56:18, 56:20, 56:24, 57:1, 57:4, 57:9, 57:12, 57:15, 57:19, 58:3, 58:10, 58:16, 58:24, 59:6, 59:10, 59:17, 59:25, 60:6, 60:9, 60:12, 60:16, 60:20, 61:9, 61:12, 61:16, 61:19, 61:21, 61:22, 62:1, 62:9, 62:14, 62:25, 63:7, 63:12, 64:3, 64:6, 64:8, 64:12, 64:14, 64:18, 65:6, 66:10, 66:12, 66:17, 67:10, 67:24, 68:3, 68:16, 68:23, 69:2, 69:9, 69:15, 69:23, 70:3, 70:10, 70:14, 70:22, 70:25, 71:2, 71:6, 71:15, 71:17, 74:22, 74:23, 77:18, 77:19, 82:9, 82:10, 84:9, 84:12, 85:8, 85:10, 87:22, 88:19, 90:6, 90:9, 91:6, 91:7, 91:20,

91:21, 93:8, 93:10, 94:3, 94:5, 94:7, 95:20, 96:1, 96:5, 96:22, 96:23, 98:9, 98:11, 98:12, 99:4, 100:8, 100:22, 100:23, 101:6, 103:8, 103:10, 103:15, 104:19, 104:22, 105:8, 105:15, 105:17, 105:20, 105:25, 106:1, 106:3, 106:22, 107:16, 107:18, 107:20, 109:23, 109:24, 110:6, 110:7, 114:2, 114:5, 115:24, 117:17, 119:11, 119:12, 120:19, 120:21, 120:23, 124:16, 127:18, 135:17, 135:20, 135:22, 135:23, 135:24, 136:1, 136:19, 138:6, 138:8, 138:10, 138:12, 138:13, 138:25, 139:1, 140:2, 140:4, 140:5, 142:2, 142:9, 143:2, 145:6, 148:10, 148:19, 148:21, 148:24, 148:25, 151:6, 153:7, 153:16, 154:5, 154:19, 154:22, 155:2, 155:5, 155:9, 155:13, 155:23, 156:1, 156:15, 156:17, 156:19, 157:1, 157:5
**theory** [2] - 54:5, 56:16
**third** [3] - 95:9, 104:16, 121:17
**third-party** [1] - 95:9
**Thirteenth** [2] - 2:5, 157:18
**thousand** [2] - 118:5, 128:13
**threat** [1] - 121:20
**three** [9] - 14:25, 15:6, 73:11, 89:1, 104:4, 147:4, 151:10, 151:13, 155:3
**throughout** [3] - 43:1, 43:3, 72:22
**thrown** [1] - 6:17
**thrown-in** [1] - 6:17

**tied** [2] - 92:12, 94:18
**ties** [1] - 64:22
**tired** [1] - 138:15
**today** [15] - 37:7, 70:18, 80:13, 80:24, 85:1, 86:6, 86:21, 89:19, 104:14, 106:9, 132:25, 133:17, 133:22, 134:19, 146:21
**together** [9] - 4:24, 67:23, 88:3, 88:8, 102:17, 124:21, 126:7, 127:4, 141:21
**tolls** [1] - 13:20
**tomorrow** [9] - 70:15, 70:16, 70:17, 148:15, 155:15, 156:4, 156:14, 156:20
**tongue** [1] - 88:23
**took** [18] - 5:13, 22:16, 31:1, 31:3, 31:4, 31:9, 61:25, 73:14, 77:25, 80:19, 84:23, 98:24, 118:19, 121:20, 132:19, 135:6, 139:19, 140:13
**tools** [2] - 63:2, 149:11
**top** [2] - 65:14, 87:16
**Tork** [1] - 107:2
**total** [14] - 26:24, 27:3, 39:19, 39:22, 50:19, 51:16, 51:25, 89:3, 103:3, 126:9, 126:10, 126:15, 126:20, 132:15
**totally** [2] - 143:25, 146:22
**touched** [1] - 57:16
**TOUSSAINT** [1] - 1:15
**toussaint@ fairlawattorney. com** [1] - 1:18
**toward** [2] - 21:12, 23:4
**towards** [2] - 24:19, 128:12
**track** [2] - 60:18, 118:10
**tracked** [1] - 60:19
**tracking** [1] - 150:16
**trained** [2] - 73:4, 150:14
**training** [10] - 34:8, 34:11, 73:2, 73:6, 73:16, 111:17, 111:21, 112:1,

128:19, 143:15
**traits** [1] - 20:18
**transactions** [1] - 80:19
**transcript** [2] - 126:14, 143:4
**transcription** [1] - 157:13
**transient** [2] - 57:8, 57:9
**translate** [1] - 20:15
**translated** [1] - 96:4
**translation** [3] - 49:8, 85:5, 85:7
**transparent** [1] - 79:7
**travel** [1] - 149:20
**Treasury** [1] - 105:2
**treat** [3] - 23:5, 24:19, 24:23
**trial** [4] - 58:19, 59:1, 59:20, 153:12
**TRIAL** [1] - 1:11
**trick** [1] - 16:16
**tried** [4] - 17:7, 17:13, 58:25, 60:4
**trip** [1] - 15:1
**Tripp** [1] - 1:19
**Tropp** [41] - 3:5, 3:6, 3:7, 3:8, 3:10, 4:18, 4:21, 15:17, 20:24, 21:23, 21:24, 22:5, 22:13, 22:16, 23:2, 24:4, 25:11, 25:15, 26:11, 38:15, 58:3, 59:15, 64:4, 64:16, 85:6, 101:20, 101:25, 102:12, 102:24, 122:20, 143:9, 144:2, 144:17, 145:1, 145:25, 146:2, 146:9, 146:12, 146:14, 146:18, 146:23
**TROPP** [126] - 1:19, 5:24, 6:13, 9:24, 10:19, 11:2, 12:2, 12:8, 12:11, 13:13, 14:1, 14:19, 15:18, 15:20, 15:24, 16:21, 16:24, 17:12, 18:8, 18:25, 19:11, 22:20, 26:5, 26:9, 29:9, 29:21, 30:7, 30:16, 30:19, 31:18, 37:25, 38:2, 38:16, 38:18, 54:2, 55:4, 55:13, 55:17, 56:23, 56:25, 57:2, 57:5, 57:11, 57:13, 58:5, 58:12,

58:23, 59:5, 61:14, 61:17, 61:24, 62:7, 63:11, 64:5, 64:17, 64:20, 65:7, 66:11, 66:13, 68:17, 68:25, 69:8, 69:13, 69:20, 69:24, 70:8, 71:1, 71:20, 74:25, 77:20, 82:1, 82:11, 84:7, 84:11, 84:17, 85:12, 85:22, 85:23, 86:11, 87:24, 88:20, 90:1, 90:2, 90:8, 90:12, 91:8, 91:24, 93:12, 94:12, 95:21, 96:8, 96:14, 96:25, 98:13, 99:5, 100:11, 100:24, 101:5, 109:22, 110:5, 127:21, 133:5, 133:7, 136:2, 136:20, 138:14, 139:15, 141:1, 142:1, 142:4, 142:15, 145:12, 145:16, 151:8, 154:4, 154:9, 154:20, 154:25, 155:4, 155:6, 155:10, 156:7, 156:10, 156:12, 156:18, 156:22
**Tropp's** [3] - 24:9, 24:16, 145:22
**true** [3] - 101:9, 101:13, 129:4
**trump** [1] - 21:22
**trusted** [1] - 78:1
**truth** [6] - 86:9, 89:18, 135:13, 135:14, 135:25, 141:12
**truthful** [4] - 86:6, 86:7, 86:12, 86:14
**truthfully** [2] - 85:3, 85:13
**try** [6] - 8:17, 106:8, 106:11, 106:13, 136:18, 155:11
**trying** [24] - 15:3, 16:15, 16:16, 29:14, 58:8, 59:23, 62:25, 69:25, 75:18, 79:1, 86:16, 86:24, 87:12, 91:16, 98:15, 107:8, 128:20, 128:24, 129:21, 135:7, 141:7, 142:25, 143:1
**turn** [1] - 107:17
**turns** [2] - 58:8, 151:17

**TV** [1] - 151:21
**twenty** [1] - 27:14
**two** [15] - 14:5, 14:23, 14:25, 29:11, 59:13, 67:4, 67:8, 73:11, 86:15, 102:5, 108:20, 109:4, 114:18, 147:4, 155:7
**two-page** [1] - 109:4
**type** [6] - 41:2, 57:20, 80:15, 80:22, 131:9, 143:23
**types** [1] - 80:19

## U

**U.S** [1] - 107:3
**U.S.C** [1] - 68:8
**ultimately** [1] - 121:4
**unclean** [4] - 104:1, 104:3, 104:5, 104:17
**under** [20] - 7:4, 8:2, 58:2, 64:25, 66:1, 67:4, 67:5, 68:8, 68:12, 79:9, 85:2, 85:14, 92:18, 105:4, 105:7, 132:25, 133:9, 137:24, 149:20, 149:21
**understood** [3] - 65:3, 95:2, 95:3
**unfortunately** [1] - 120:3
**unilateral** [1] - 78:23
**unique** [1] - 143:16
**UNITED** [2] - 1:1, 1:12
**United** [6] - 32:16, 65:21, 97:15, 105:2, 107:5, 157:17
**unjust** [8] - 104:6, 104:9, 104:18, 104:22, 104:24, 105:5, 105:7, 151:5
**unless** [5] - 4:8, 22:20, 23:7, 61:2
**unnecessary** [2] - 80:25, 81:4
**up** [47] - 4:14, 7:19, 15:3, 19:2, 23:20, 26:2, 29:25, 30:1, 39:19, 55:25, 60:21, 81:19, 88:24, 91:17, 91:21, 92:3, 97:9, 100:25, 104:6, 108:6, 108:9, 112:5, 112:21, 117:6, 119:20, 124:5, 126:20, 129:13, 129:21, 129:23, 130:3, 130:4, 130:6,

134:21, 138:21, 138:22, 141:11, 141:23, 142:5, 142:22, 143:4, 147:14, 147:19, 149:17, 155:21, 157:4
**upgrades** [1] - 12:25
**utmost** [1] - 124:9

## V

**vague** [1] - 53:10
**Valiante** [2] - 12:14, 12:15
**validated** [1] - 138:11
**VALIENTE** [2] - 1:5, 9:20
**Valiente** [12] - 3:4, 6:1, 9:25, 19:25, 20:6, 20:16, 23:25, 26:4, 26:19, 30:25, 36:20, 40:24
**Vazquez** [1] - 120:17
**vehicle** [1] - 13:21
**Venezuela** [3] - 106:19, 106:20, 109:13
**verbal** [4] - 33:22, 41:21, 41:23, 76:12
**verdict** [21] - 8:1, 8:3, 8:25, 60:14, 64:23, 68:2, 68:4, 68:23, 69:4, 69:6, 69:11, 69:17, 70:6, 70:13, 103:16, 104:8, 105:10, 149:3, 151:9, 153:18, 155:16
**verify** [3] - 45:3, 50:13, 116:14
**version** [8] - 4:19, 4:21, 7:3, 7:8, 23:15, 62:22, 66:19, 66:21
**versus** [3] - 57:9, 57:25, 115:17
**viable** [1] - 104:5
**vice** [1] - 99:14
**violates** [2] - 11:24, 55:10
**violation** [1] - 31:13
**vividly** [1] - 50:7
**voice** [2] - 143:23, 153:13
**vs** [1] - 1:7

## W

**W-2** [17] - 23:5, 24:20, 24:24, 31:5, 31:10,

57:13, 57:22, 96:20, 97:1, 97:12, 97:17, 97:20, 125:19, 125:24, 126:3, 136:10
**W-4** [3] - 125:22, 125:25, 126:3
**W-9** [1] - 21:12
**wage** [3] - 56:21, 62:17, 137:6
**wages** [7] - 29:17, 29:23, 30:21, 98:5, 98:6, 98:14, 127:6
**wait** [2] - 64:8, 132:15
**waiting** [5] - 4:21, 38:9, 108:8, 108:18, 121:10
**waive** [2] - 65:25, 67:8
**waived** [6] - 61:2, 65:20, 66:7, 66:14, 67:5, 67:14
**walk** [3] - 76:25, 77:7, 112:20
**walked** [2] - 76:18, 112:24
**wants** [2] - 138:15, 144:17
**warehouse** [4] - 14:12, 14:15, 14:17, 15:1
**wasted** [1] - 110:15
**watched** [1] - 151:21
**ways** [5] - 67:8, 78:19, 106:14, 121:16, 130:20
**website** [2] - 136:18, 150:2
**week** [18] - 27:14, 27:16, 35:13, 36:4, 36:6, 36:10, 37:15, 39:23, 43:15, 47:24, 48:3, 68:19, 78:11, 99:1, 100:16, 114:11, 118:5, 128:13
**weekends** [1] - 94:9
**weeks** [9] - 14:23, 14:25, 57:17, 98:23, 114:15, 114:17, 114:18, 151:17
**weigh** [1] - 153:18
**weighed** [1] - 65:16
**weighing** [1] - 153:20
**weight** [1] - 149:8
**welcome** [2] - 9:18, 142:13
**welcomed** [1] - 128:16
**WhatsAPP** [3] - 119:23, 119:25, 124:4

**whole** [4] - 17:2, 39:16, 128:2, 152:7
**wife** [2] - 107:3, 126:24
**wife's** [1] - 107:1
**willfully** [1] - 98:5
**wish** [2] - 100:13, 127:24
**Witness** [3] - 31:22, 56:8, 148:20
**witness** [16] - 9:14, 9:15, 9:21, 31:21, 32:3, 38:8, 71:9, 84:8, 96:2, 100:10, 103:9, 105:15, 105:24, 127:16, 142:14, 154:18
**WITNESS** [47] - 11:1, 12:10, 14:18, 15:23, 16:23, 18:7, 18:24, 20:18, 25:4, 29:20, 32:4, 34:19, 35:7, 39:5, 41:21, 42:19, 45:10, 47:13, 49:14, 49:23, 51:4, 51:11, 52:2, 53:4, 55:12, 55:16, 74:23, 77:19, 82:10, 84:12, 87:22, 90:9, 91:7, 91:21, 94:7, 96:23, 100:23, 105:25, 109:24, 110:7, 114:5, 115:24, 120:21, 135:23, 136:1, 139:1, 140:5
**witnesses** [6] - 99:3, 151:15, 154:6, 154:14, 154:16, 155:8
**WITNESSES** [3] - 3:2, 3:3, 3:13
**woman** [1] - 31:1
**Word** [1] - 7:7
**words** [1] - 102:25
**worker** [2] - 31:5, 57:14
**works** [4] - 7:7, 58:7, 110:23, 136:13
**worksheet** [1] - 26:3
**workstation** [4] - 112:15, 112:19, 112:22, 112:24
**workstations** [1] - 120:7
**world** [2] - 76:17, 88:6
**worries** [1] - 132:14
**wow** [1] - 80:23
**wrap** [1] - 58:8
**write** [1] - 87:17
**writing** [1] - 148:2

**written** [2] - 33:16, 33:19
**wrote** [4] - 134:10, 134:11, 134:14, 134:22

## Y

**year** [16] - 15:2, 16:13, 27:23, 34:2, 34:6, 39:2, 39:16, 42:6, 51:6, 51:11, 52:4, 72:22, 97:18, 99:9, 134:17, 137:15
**yearly** [1] - 52:4
**years** [16] - 14:5, 16:10, 32:15, 32:24, 55:14, 55:15, 57:3, 58:7, 71:23, 76:13, 97:15, 97:16, 98:1, 102:5
**years'** [1] - 71:25
**yellow** [1] - 6:9
**yesterday** [11] - 14:10, 21:22, 22:12, 23:19, 24:8, 26:2, 26:21, 28:4, 29:1, 36:20, 40:24
**yourself** [4] - 18:10, 61:23, 62:4, 87:17

## Z

**zero** [2] - 118:15, 149:16