```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
                     CASE NO. 22-cv-22671-CMA
3

4    DELIO BATISTA, CARLOS LOPEZ,    Miami, Florida
     MARIANA LOPEZ and RAFAELA
5    VALIENTE,                       July 13, 2023

6          Plaintiffs,              9:06 a.m. to 12:53 p.m.

7       vs.                         Courtroom 13-3

8    AVANT ASSURANCE, INC.,          (Pages 1 to 146)
     REINIER CORTES and ANDREA
9    GONZALEZ QUINTERO,

10         Defendants.

11   _____
                       JURY TRIAL - DAY 4
12         BEFORE THE HONORABLE CECILIA M. ALTONAGA,
              CHIEF UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15   FOR THE PLAINTIFFS:    BRIAN H. POLLOCK, ESQ.
                            TOUSSAINT M. CUMMINGS, ESQ.
16                          FairLaw Firm
                            135 San Lorenzo Ave, Ste 770
17                          Coral Gables, FL 33146-1878
                            (305) 230-4884
18                          brian@fairlawattorney.com
                            toussaint@fairlawattorney.com

19   FOR THE DEFENDANTS:    DANIEL E. TROPP, ESQ.
                            Law Offices of Daniel E. Tripp, Esquire
20                          5750 Collins Ave, Apt 4A
                            Miami Beach, FL 33140-2316
21                          (305) 814-2035
                            dantropp@bellsouth.net
22
                            SANTIAGO A. CUETO, ESQ.
23                          Santiago A. Cueto
                            2100 Ponce De Leon Blvd., Ste 1250
24                          Coral Gables, FL 33134-5267
                            (305) 777-0377
25                          sc@cuetolawgroup.com
```

```
 1    APPEARANCES CONTINUED:

 2     REPORTED BY:          STEPHANIE A. McCARN, RPR
                             Official Court Reporter
 3                           400 North Miami Avenue
                             Thirteenth Floor
 4                           Miami, Florida 33128
                             (305) 523-5518
 5                           Stephanie_McCarn@flsd.uscourts.gov

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

## I N D E X

### WITNESSES

3

**WITNESSES FOR THE PLAINTIFFS:**                                    **Page**

4                                                                        --

5

6

**WITNESSES FOR THE DEFENDANTS:**                                    **Page**

7    **Alix Lesesma**                                                     **4**

8    **Katrina Guerra**
        Direct Examination by Mr. Cueto                                 **6**
9        Direct Examination (Cont'd.) by Mr. Tropp                     **13**
        Cross-Examination by Mr. Pollock                              **42**
10       Redirect Examination by Mr. Tropp                             **52**
        Recross Examination by Mr. Pollock                            **57**

11

12

**EXHIBITS IN EVIDENCE**                      **IDENTIFIED**   **ADMITTED**

13

    **Plaintiffs' Exhibit No.**                      --              --

14

    **Defendants' Exhibit No.**                      --              --

15

16

17

18

### MISCELLANEOUS

19
                                                                    **Page**
20   **Proceeding.........................................    4**
    **Closing Argument on Behalf of the Plaintiffs......   67**
21   **Closing Argument on Behalf of the Defendants......   77**
    **Rebuttal Argument of Behalf of the Plaintiffs.....   94**
22   **Court's Closing Instructions......................  108**
    **Court Reporter's Certificate......................  128**

23

24

25

```
 1            (The following proceedings were held at 9:06 a.m.)

 2            THE COURTROOM DEPUTY:  All rise.

 3            THE COURT:  Good morning.  Are we ready to proceed?

 4            MR. CUETO:  Just waiting for counsel, Mr. Tropp; he

 5   stepped outside.

 6            THE COURT:  Let's bring the jury in, please.

 7        (The jury entered the courtroom at 9:06 a.m.)

 8            THE COURT:  Good morning, ladies and gentlemen, and

 9   welcome back.  Thank you for being so punctual.  Please be

10   seated.

11        (Pause in proceedings.)

12            MR. CUETO:  My apologies.  Counsel would be here in

13   about three minutes, he said.

14            THE COURT:  Who is the next witness?

15            MR. CUETO:  Mr. Cortes -- I'm sorry, Alix.

16            THE COURT:  Let -- let's bring the witness on to the

17   witness stand, please.

18        (Pause in proceedings.)

19            THE COURT:  Please raise your right hand, ma'am.

20                    (Time 9:09 a.m.)

21                    ALIX LESESMA,

22   a witness for Defendants, testified as follows:

23            THE WITNESS:  I do.

24            THE COURT:  Please be seated.

25            MR. POLLOCK:  Your Honor, I am going to object to the
```

Proceedings
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    recall of this witness.  She was already crossed by the

2    Defendants.

3            THE COURT:  I don't think that's a basis.

4            MR. POLLOCK:  Okay.

5            THE COURT:  Let's proceed.

6            MR. CUETO:  Your Honor, I apologize.  We need an

7    interpreter for Alix.  We need to call Katrina first.

8            THE COURT:  All right.  Just put your witness on.

9    We're ready here.  What witness do you want to call?

10           MR. CUETO:  I would like to call Katrina because we

11   need an interpreter for Alix.

12           THE COURT:  I understand.  So bring your witness in

13   that you can proceed with.

14           MR. CUETO:  I'll get her.

15           THE COURT:  All right.

16           Ma'am, you may step off.  Thank you.

17       (Pause in proceedings.)

18           THE COURT:  Please approach.  Please raise your right

19   hand.

20                    (Time 9:11 a.m.)

21                    KATRINA GUERRA,

22   a witness for Defendants, testified as follows:

23           THE WITNESS:  Yes.

24           THE COURT:  Please be seated.  Please state and your

25   spell your name.

```
 1                THE WITNESS:  My name is Katrina --

 2                THE COURT:  Speak into the microphone, please.

 3                THE WITNESS:  My name is Katrina, K-A-T-R-I-N-A.  Last

 4     name is Guerra, G-U-E-R-R-A.

 5                THE COURT:  Thank you.

 6                          DIRECT EXAMINATION

 7     BY MR. CUETO:

 8     Q.  Good morning, Ms. Guerra.

 9     A.  Good morning.

10     Q.  Are you currently employed?

11     A.  Yes.

12     Q.  Okay.  And who are you employed by?

13     A.  Avant Assurance.

14     Q.  And how long have you been with Avant Assurance?

15     A.  In October, it's gonna be two years.

16                THE COURT REPORTER:  I'm sorry, how many -- how many

17     years?

18                THE WITNESS:  In October will be two years.

19     BY MR. CUETO:

20     Q.  And what is your current position at Avant?

21     A.  I am a call center manager.

22     Q.  And what are your duties and responsibilities as a call

23     center manager?

24     A.  Basically to assist the senior call center manager, do

25     performance reviews, listen to calls, help train agents, things
```

1   of that -- of that nature.

2   Q.   When you first started with Avant, what was your position

3   at the time?  What did you -- what position did you interview

4   for?

5   A.   I interviewed for a sales agent, 1099.

6   Q.   And do you recall, what were your duties and

7   responsibilities as a -- as a sales agent?

8   A.   As a sales agent, it was basically to help provide

9   insurance, health insurance for clients.

10  Q.   And how did you come to learn about Avant Assurance?

11  A.   I had put my résumé out, and I was called in for -- for an

12  interview for the position.

13  Q.   Okay.  And did you meet with anybody at Avant for the

14  interview?

15  A.   Um, with the owner, Reinier Cortes.

16  Q.   Did you meet with anybody else?

17  A.   No.

18  Q.   Okay.  And did you -- did you sign a contract, any kind of

19  contract with --

20  A.   No.

21  Q.   -- at the time?

22  A.   No, I did not.  I don't believe so.

23  Q.   Okay.  And what was your understanding of the relationship

24  that you were assigned -- that you were -- the position that

25  you were entering into?

1   A.  Basically to have a flexible position where I can go ahead

2   -- there were resources available for me from 9:00 to 9:00

3   during the open enrollment period so that way we can go ahead

4   and, you know, help get people enrolled in the Obamacare

5   program.

6   Q.  Was it your understanding you were -- as -- you were an

7   employee or an independent contractor?

8   A.   Independent contractor.

9   Q.   Okay.  And why do you say that?

10  A.   Well, basically there was, you know, the flexibility.  It

11  wasn't, you know, a specific time that I had to be there.

12  There were no benefits.  We got paid strictly commissions.  You

13  know, having previously had that -- you know, being in the 1099

14  position, it was very similar to my, you know, previous

15  position as a 1099.

16  Q.   And what -- what was promised -- what was your

17  understanding of what was promised to you in terms of how you

18  are going to get paid at Avant Assurance as -- as a sales

19  agent?

20  A.   Basically we were told, you know, each carrier, what they

21  were paying per member, and that's what we would get as far as

22  commission.

23  Q.   Was it your -- your understanding that your only -- that

24  your compensation was only based on commission, or was there

25  another component to that?

1  A.  Commission and bonuses depending on the amount of members

2  that were enrolled and that, you know, stood on the books for

3  us.

4  Q.  And how was that conveyed to you?  How do you understand

5  that to be?

6  A.  I'm sorry, I don't understand the question exactly.

7  Q.  How does that compensation plan come to your knowledge?

8  Who told you about this compensation plan?

9  A.  The owner.

10  Q.  Okay.  And the owner is Mr. Cortes?

11  A.  Correct.

12  Q.  Can you talk a little bit about the -- the hours that you

13  worked.

14  A.  The hours that I worked?  Well, for open enrollment, you

15  know, you were able to work from 9:00 to 9:00.  I have four

16  children, so I really went ahead and maximized my time there.

17  But, you know, on the other hand, if I ever needed a day off

18  or, you know, if I needed personal time, there was never any

19  issues, which to me was huge.  Being able to maximize, you

20  know, the opportunity that I had when available, but if I

21  needed to step back for something personal, being able to do

22  so.

23  Q.  You said you were -- you were able to -- to work.  What do

24  you mean by that, able to work?  Were you required to work, or

25  you had access to the workplace?

Direct Examination of Katrina Guerra

July 13, 2023                                      10

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1    A.  I had access to the workplace.
 2    Q.  So, in other words, if you wanted to work an hour from 9:00
 3    9:00 -- 9:00 to 10:00, let's say, if one of your children had
 4    activities for the rest of the day, you could have?
 5    A.  Correct.
 6    Q.  Were there any repercussions?  Did you have to tell
 7    anybody?
 8    A.  No.  I mean, out of courtesy, you know, I would, you know,
 9    say, I have to do such and such, but it was never mandatory.
10    Q.  Okay.  Now, if you wanted to work 9:00 to 9:00, you could
11    do that if you chose to, couldn't you?
12    A.  Correct.
13    Q.  And you would do that because you would produce more?
14    A.  Yes, correct.
15              MR. POLLOCK:  Objection, leading.
16              THE COURT:  Sustained.
17    BY MR. CUETO:
18    Q.  Okay.  Why is it that you would work -- want to choose to
19    work 9:00 to 9:00?
20    A.  Because I know that that's when the -- you know, you get
21    the most enrollment so you have the most opportunity for
22    commission and ultimately for, you know, potential to reach
23    bonuses.
24    Q.  And was there a certain period where this would happen
25    throughout the year, where sales agents would want to be at
```

Case 1:22-cv-22671-CMA   Document 123-4   Entered on ELSD Docket 09/21/2023   Page 11 of
146
Direct Examination - Katrina Guerra
July 13, 2023                                                        11
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   work as much as they -- they could?

2   A.   Yes.  I mean, that's part of, I would say, you know, the

3   sales agent position; if you want to maximize potential, it was

4   -- it was open.  If you wanted to be there 9:00 to 9:00, you

5   could.  If it was less, that was fine as well.

6   Q.   What were these intense periods called, the value of sales

7   would pick up?

8   A.   Open enrollment period.

9   Q.   Open enrollment.  If you could describe a little bit to the

10  jury what open enrollment is.

11  A.   So, open enrollment is basically when everyone is eligible

12  to go ahead and -- go ahead and get -- get a new insurance plan

13  for the year.  So, when, you know, everyone's eligible.  So

14  basically if, you know, you have existing clients or new

15  clients for whatever reason, they are able to, which is

16  different from special enrollment period where during the

17  special enrollment period, they would need to have, like, a

18  life change or -- you know, there would need to be a reason to

19  go ahead and -- and get the insurance.  So that's, you know,

20  like for accountants, it's tax season.  For us, it's open

21  enrollment.

22  Q.   Okay.  And would you -- would you say that position as an

23  independent contractor as a sales agent at Avant, would it

24  require a particular -- any particular skills to do your job?

25  A.   Yeah, definitely.  I mean, as far as being able to, I mean,

1   sell, you know, like any good sales agent.  Being able to go

2   ahead and, you know, have patience, be kind to clients, listen

3   to their needs, to be able to overcome objections, you know, to

4   close.

5      At the end of the day, if you don't close, the commission

6   isn't going to come in and it was basically a waste of time,

7   you know, and a call, you know, with the client.

8   Q.  And were there any special bonuses that were set up for

9   performance?

10  A.  Yes.  Depending on the amount of members that were enrolled

11  with a particular carrier, we would, you know, get bonuses or

12  we had the potential to earn the bonus.

13  Q.  And how are these bonuses paid out?

14  A.  Once the final count was in as far as how many members we

15  enrolled, the bonuses were given to us; once the owner had

16  received the bonuses, it'd go ahead and be paid out to us.

17          MR. CUETO:  Lead counsel will take over the

18  questioning now.

19          MR. TROPP:  I apologize, Judge.  Is that okay for me

20  to take over?

21          MR. POLLOCK:  Are we tag teaming, Judge, or are --

22          THE COURT:  I'm sorry?

23          MR. POLLOCK:  I said, are we allowed to switch during,

24  or are we doing one for one?

25          THE COURT:  I don't hear any objection, so you may

```
 1    proceed.

 2             MR. POLLOCK:  We object to switching counsel in the

 3    middle of examination.  I don't think we have done that the

 4    entire time.  I don't think that's the purpose -- and the way

 5    the trial is conducted.

 6             THE COURT:  I think Mr. Cueto can continue.  Thank

 7    you.

 8             MR. POLLOCK:  Your Honor, that's fine.  I'll withdraw

 9    the objection.  I'll let Mr. Tropp go.

10             THE COURT:  All right.  Objection is withdrawn.

11             You may proceed, Mr. Tropp.

12             MR. POLLOCK:  Move it along.

13             MR. TROPP:  Thank you.

14             MR. POLLOCK:  Sure.

15                   DIRECT EXAMINATION (Cont'd.)

16    BY MR. TROPP:

17    Q.  Hello.

18    A.  Hi, how are you?

19    Q.  Katrina.  So you worked with the Plaintiffs, correct?

20    A.  Yes.

21    Q.  And when did you start again?

22    A.  October, it will be two years in October, so October 2021.

23    Q.  So you did the 2021 open enrollment and the '22?

24    A.  '20 to '23, yeah.

25    Q.  Right, okay.
```

 1   A.   Um-hmm.

 2   Q.   So for the '21, you worked -- what was it, like a small

 3   room with the Plaintiffs?  How big of an area?

 4   A.   Measurement-wise, I am not sure, but it was, you know,

 5   small room.  We were all -- you know, we had our desks there

 6   and there were desks and things, you know, for us to go ahead

 7   and -- go ahead and do our work.

 8   Q.   So is it fair to say you got to know the Plaintiffs pretty

 9   good?

10   A.   Fairly.  Fairly well.

11   Q.   And when you started, you started as -- you were an

12   independent contractor?

13   A.   Correct.

14   Q.   And you were a licensed agent?

15   A.   Yes.

16   Q.   And did you start with the same compensation agreement as

17   the Plaintiffs had?

18   A.   I don't know.  That was on an individual, you know, basis

19   or whatever agreement we came to with the owner.

20   Q.   What was your agreement that you had?  Like, when you

21   started -- you initially met with Reinier to get the job when

22   you first interviewed?

23   A.   Yes.

24   Q.   And when you went in to this interview, were you explained

25   what you would get out of the job, what your expectations were?

1  A.  Yes, correct.

2  Q.  And what were those expectations?  From the company and

3  from what you were going to get and what they were going to get

4  in return.

5  A.  Could you rephrase the question?  I'm sorry.

6  Q.  Well, would you agree when you interview for a job, you

7  want to know what is the agreement for the job; would you

8  agree?

9  A.  Of course, yes.

10  Q.  You want to know what the terms are?

11  A.  Yeah, basically, um, we were gonna get paid X amount per

12  member that we were able to enroll.

13  Q.  Um-hmm.

14  A.  If we reach a certain amount of members, there would be a

15  bonus.  And there was a space available between 9:00 and 9:00

16  during the enrollment for us to go ahead and try to produce.

17  Q.  Okay.  And then -- have you ever seen this document before?

18  Trying to get it in focus here.

19  A.  Yes.

20      (The exhibit was published to the jury.)

21  BY MR. TROPP:

22  Q.  Here we go.  What is this?  Do you know what this is?

23  A.  Yes, that was basically the outline of, you know, the

24  numbers we needed to hit in order to go ahead and obtain a

25  bonus for each mem- -- for each carrier.

Direct Examination - Katrina Cuello

July 13, 2023                                                    16

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   Q.  So when you first meet with Reinier, this was explained to

2   you?

3   A.  That was a little bit -- once we were closer to open

4   enrollment.  When I started, we were still doing 2021 members.

5   Q.  Um-hmm.

6   A.  But once this came out, I believe most of us, if not all of

7   us, were already there and it was brought to us together as a

8   team.

9   Q.  Is this similar or like the agreement for the 2021 year?

10  A.  Well, for the 2021 year, it was very -- I can't -- I don't

11  remember exactly what it was.  I know that there wasn't a huge

12  difference as far as the per member payment that we would get.

13  Q.  Um-hmm.

14  A.  Or the commission that we were eligible for.  The different

15  factor with open enrollment were the bonuses.  So the per

16  member was -- it's not the same, similar, the bonus was the

17  bigger factor --

18  Q.  And -- okay.  So --

19  A.  -- of open enrollment.

20  Q.  So did it involve -- like, I'm -- did the 2021 plan, like,

21  can you point out how it was different from this one?

22  A.  There were bonuses.

23  Q.  Bonuses?

24  A.  Yes.  Bonuses that was -- is the different -- the factor

25  when it comes to open enrollment.

Case 1:22-cv-22671-CMA   Document 123-4   Entered on ELSD Docket 09/21/2023   Page 17 of
146
Direct Examination of Katrina Guerra          17
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   Q.  And then what about with the amount of policies, or, like,

2   did you get -- like, the tier system; how did that work?

3   A.  Basically based on usually the members for the most part as

4   far as per carrier, and then there was a different bonus if you

5   had reached X amount of policies.

6   Q.  I see.  So -- so how does that work, the other bonuses with

7   the policies?

8   A.  I don't remember the exact numbers.  It should be on there,

9   I believe -- right -- I believe.

10  Q.  Was it something like this?

11  A.  It would go -- there was -- on one of the charts, it says

12  per policy.  You see here, it's saying per -- per Ambetter, per

13  Etna, per Bright Healthcare.  There's another one where it says

14  for policies, how much bonus we would be eligible to receive.

15  Q.  Okay.

16  A.  I believe it's on the other sheet.

17  Q.  On this sheet?

18  A.  If you -- if you go down.  Okay.  Right there it says

19  policy either between 1,250 to 1,499, there was a $10,000

20  bonus; 1500-1999, 15,000; 2000 plus policies, 20,000.  And

21  there's a difference between policies and members.  You can

22  have a policy with one member.  You can have a policy with five

23  members.  So that's where that difference comes in.

24  Q.  All right.  So -- so on here, you would have to sell 1250

25  policies -- between 1250 to 1499 to get the $10,000 bonus?

1    A.   Correct.

2    Q.   But also for each one of those policies sold, depending on

3    what it is, you're getting, like, either between 5, 15 or $35

4    for each one?

5    A.   For the members.

6    Q.   For the members?

7    A.   Within the policy, correct.

8    Q.   And for the multiple -- for each policy, it can be more

9    than one member?

10   A.   Yes.  Depends on -- on the particular -- the policy, the

11   individual policy.

12   Q.   How does that work, more or less?  You have one policy with

13   many members?

14   A.   So you have someone who is a single person and doesn't have

15   any dependants and they are just by themselves.  You know, as

16   far as taxes go, they -- there's one person in that policy.

17   But then if you have a married couple with three dependants,

18   it's five people in that one policy.  So it depends on the

19   household size.

20   Q.   Okay.  So you take on this job with basically this overview

21   where every policy you sell, you get a little -- either tier 1,

22   tier 2, tier 3; 5, 10, 15, $35?

23   A.   Um-hmm.

24   Q.   And if you sell a lot, you get a bonus?

25   A.   Correct.

 1   Q.  All right.  And open enrollment, that's like the period

 2   when people are just calling, that's the busy period?

 3   A.  Yes.

 4   Q.  Because there's deadlines?

 5   A.  Um-hmm.

 6   Q.  And sometimes they have the deadline extensions, correct?

 7   A.  Yes, correct.

 8   Q.  And then how many, like -- how many policies can you sign

 9   up in a day, for instance?

10   A.  Policies in a day?  If -- you could do 40 to 50 depending

11   on how quick the day is, but you can definitely do many

12   policies in a day.

13   Q.  In a place like -- would -- would you characterize it kind

14   of like a call center?  Are you guys on the phone all the time,

15   or are you seeing people personally?

16   A.  We're on the phones.

17   Q.  On the phone and answering questions?

18   A.  Correct.

19   Q.  And then as -- when you sign up somebody, you have to have

20   them fill out the consent form?

21   A.  Yes, we did a consent form for the clients.

22   Q.  And is that a rule from the CMS; is that a required --

23   A.  Yes.

24   Q.  Why is that?  Talk about that.  Why do they require that?

25   A.  Well, I mean, the way we are -- basically explain it to the

1   client is that, you know, it's not a contract of any sort, it's

2   basically them giving us permission to share their information

3   with the marketplace in order to go ahead and enroll them in

4   the -- in the plan.  You know, the protection for the client

5   and for the carriers.

6   Q.  And that protects the client and it protects Avant, right?

7   A.  I mean, I would say it protects everybody involved.  You

8   know, it's them saying yes, I give permission for -- for me to

9   be enrolled in X plan.

10  Q.  And then how does it work when you get somebody to sign up

11  for a policy and they have to -- you have to get a signature, a

12  consent form for them to approve the policy?  How does it work

13  if you need somebody's signature?

14  A.  We would send out a simple text message.  They get a link,

15  they'd open it up, you know, they'd press their buttons on

16  their end and it would come back signed.  It was electronic.

17  Q.  Okay.  And you have to follow up with them sometimes to

18  make sure you get the papers, or how did --

19  A.  It was fairly quick sales.  You know, it -- and most of the

20  clients had no problem with, you know, with completing the

21  consent because they understood what it was about if the agent

22  explains it correctly.

23      So there really -- I wouldn't say there's much follow up,

24  so to speak.  A lot of it was just, you know, on the spot

25  throughout the conversation with the client.  Of course if the

Direct Examination - Katrina Guerra
July 13, 2023                                                    21
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   client needed anything at any time, they had the number where

2   they can go ahead and call and get in contact with us.

3   Q.  And just to get idea -- just to have an idea, like a client

4   will call, you will ask a few questions and then you kind of

5   like will kind of guide them in the direction of what policy is

6   best for them?

7       How -- how did -- how did the different tiers gets selected

8   by either you or the clients?  How do you fit a client with the

9   right policy?

10  A.  I mean, at the end of the day, you do what's best for the

11  -- for the client.  And, you know, there's different aspects.

12  Does the client have a medical condition?  You know, what is

13  their income?  You know, can they pay a premium, can they not?

14  So really it's just doing what's best for the clients and kind

15  of seeing where -- where it falls.

16      You know, for one client, you know, they needed zero

17  dollars even if it has a deductible, you know, so on and so

18  forth, because they can't make the monthly payments.  Then you

19  have other clients who are willing to go ahead and go with

20  another carrier because they're able to afford, you know, the

21  better benefits of that plan.

22      So, you know, it's just -- just dependent on how many you

23  -- how many -- I guess how many policies you sell for a

24  particular carrier and how many members you have.  But there's

25  no strategy, I would say.  At least on my end, it wasn't a

Direct Examination of Katrina Guerra
July 13, 2023
22
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    strategy, it was doing what was best for the client.

2    Q.   All right.  And after a while, do you kind of develop,

3    like, a technique on how to answer questions?

4    A.   That comes with time and experience as -- as an agent.

5    Q.   Before you worked at Avant, were you also selling

6    insurance?

7    A.   I've had my 215 license since 2010, and I mostly worked on

8    -- that's the health and life licence, but I mostly did the

9    life side of things until I started with Avant.

10   Q.   The 215 license, that's insurance agent license?

11   A.   Correct, to sell life and health insurance.

12   Q.   And -- does that also -- like, when you guys take an exam

13   and the course, is that a big theme, about doing right for the

14   client?

15   A.   Of course, yes.

16   Q.   What's in the interest of the client.

17        What do you guys, like, have to know about those aspects?

18   About, like, making sure you are working in the best interest

19   of the clients and, you know, like fiduciary responsibilities?

20        Like, your responsibilities for the client, what do you

21   learn as an agent --

22   A.   I mean, that's where -- where the set of questions come in.

23   You know, you have to ask -- you know, ask, are there any

24   medical conditions?  What are they able -- you know, find out

25   what their budget is.  Things of that nature, you know, because

1   based on their need is how we are gonna put a plan together for

2   them.

3   Q.  And then what about -- you guys have to study and know

4   about, like, the HIPAA requirements and, like, keeping, you

5   know, confidentiality --

6   A.  Information.

7   Q.  -- information?

8   A.  Yes.  Information should be, of course, discussed in

9   confidential.

10  Q.  Okay.  And I'm sorry, so before you worked at Avant, where

11  did you work?

12  A.  I was at a -- an account executive for Bankers Healthcare

13  Group for about four years, and I also did with -- Family First

14  Life, I did independent contracting work for life insurance.

15  Q.  How long did you that for?

16  A.  I did that for about a year and a half, two years, perhaps.

17  Q.  Okay.  So before working for Avant, you were doing

18  something in a contracting work, but you were also an employee

19  somewhere?

20  A.  Not at the same time.  So with Avant, before Avant, it was

21  the Family First.  Prior to that, I was an account executive

22  and --

23  Q.  As an account executive, were you a W-2 employee?

24  A.  Yes.

25  Q.  It was more rigid?

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 24 of
146
Direct Examination of Katrina Guerra
July 13, 2023                                                    24
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1   A.   Yes.

 2   Q.   You weren't allowed to set your own hours?

 3   A.   Not at all.  It was a great company that I worked for, and

 4   I chose to not work with them anymore because having four kids,

 5   you know, you need flexibility, at least in my case, I did.

 6   And it just -- it became too much, the -- the workload and what

 7   was expected from me professionally.  And it is compromised too

 8   much, my personal, and so that's why I left that position and

 9   decided to become a 1099 agent.

10   Q.   And before working for Avant, you were doing a little bit

11   of independent contracting work, correct?

12   A.   Correct, I was selling life insurance.

13   Q.   And where did you --

14          THE COURT:  Can you use a microphone, Mr. Tropp,

15   please?

16          MR. TROPP:  Yes, Judge.  Okay.

17      (Pause in proceedings.)

18   BY MR. TROPP:

19   Q.   Did you go -- did you work at a certain place?  Or how did

20   that work?  Did you --

21   A.   At times, I would go ahead and I would meet with clients in

22   their home.  Sometimes we would meet in the Starbucks,

23   sometimes we did via Zoom.  It was just, you know, dependent on

24   what I was able to provide as far as services that week and

25   what worked for -- for the client.

Direct Examination - Katrina Guerra
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1    Q.   Okay.  And when you started Avant, did you find it easier

 2    to be able to do what you do as an agent --

 3    A.   Yes.

 4    Q.   -- much easier than before?

 5    A.   Yes, which is, you know, part of why -- even when I started

 6    working at Avant, I was still selling, you know, insurance on

 7    the side because I was able to do so as a 1099.  But it was

 8    just a lot easier to go into a place, have, you know, the tools

 9    there available if I needed it and to just get to work.  That

10    was definitely, you know, helpful and eased my job.

11    Q.   So when you were an independent contractor in your prior

12    place, both places you are doing the same essential work, you

13    are signing people up with policies, right?

14    A.   Yes.

15    Q.   You are helping people get insurance?

16    A.   Correct.

17    Q.   And that's your specialty, that's what you are licensed to

18    do?

19    A.   Yes.

20    Q.   But at Avant, it's the same type of thing, but you have

21    better --

22    A.   It's simplified.

23    Q.   It is simplified.  And you can do more -- you can help more

24    people?

25    A.   Correct.

Case 1:22-cv-22671-CMA   Document 123-4   Entered on ELSD Docket 09/21/2023   Page 26 of
146
Direct Examination of Katerina Guerra
July 13, 2023                                                                    26
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    Q.   Have more --

2    A.   Work smarter not harder.   I kind of fell under -- under

3    that.

4    Q.   Okay.   And you said also because you have the four kids,

5    that's a big -- is that a big decision for you why you wanted

6    to be an independent contractor, a licensed agent?

7    A.   Correct.

8    Q.   For the flexibility?

9    A.   Definitely.

10   Q.   Did you -- when you met with Reinier, did you tell him, did

11   you talk about that you had a need for flexibility and about

12   your kids?

13   A.   Yeah --

14          MR. POLLOCK:   Objection, leading.

15          THE COURT:   Sustained.

16   BY MR. TROPP:

17   Q.   Did you discuss matters concerning flexibility with Reinier

18   when you interviewed?

19          MR. POLLOCK:   Same objection.

20          THE COURT:   Sustained.

21   BY MR. TROPP:

22   Q.   What did you discuss with Reinier about your -- your

23   schedule when you first --

24   A.   Flexibility.   It's always been huge for me.   You know, when

25   I -- like I said, when I left the W-2 position, that's what I

Direct Examination - Katrina Guerra
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   was looking for, flexibility.  I didn't wanna compromise any

2   time or anything that my children needed, and I definitely

3   brought that up when I initially met Reinier.

4   Q.  And how -- how did Reinier respond to that?

5   A.  He was very open to it.  I mean, it's basically what they

6   were offering, so it worked well for -- for both of us.

7   Q.  And did you at any point continue working for the other

8   company while you were working for Reinier?

9   A.  Yes.  I did sell a few policies in the beginning while I

10  was working with -- you know, when I was writing my services

11  for Avant, but eventually, you know, things were good with the

12  income that I was making, and so now I just kind of do

13  residuals or, you know, get referrals if I have someone reach

14  out to me for the life side of insurance.

15  Q.  And was Reinier aware that you are working with another --

16  what would that be, like another broker or another agency?

17  A.  It is like another broker.  He knew that I was actively

18  working.  Whether or not we had the conversation that I was

19  selling with the other company, I don't recall.  But at the end

20  of the day, I have the right to do so as a 1099.  I was

21  independent.  It's a free agent.

22  Q.  Were there any discussions that you had with anyone from

23  Avant saying you can't do that, you have no -- you can't work

24  for anybody else?

25  A.  Not that I recall.

1    Q.  What about regarding the schedule, especially for open

2    enrollment?  Were there requirements to come in?

3    A.  No.  As I stated initially, it was -- there was a 9:00 to

4    9:00 availability for us to go ahead and, you know, perform our

5    -- you know, provide our services, basically.

6    Q.  Okay.  And then let me show you a -- this is a -- one of

7    the schedules.

8    A.  Um-hmm.

9        (The exhibit was published to the jury.)

10   BY MR. TROPP:

11   Q.  This is May 9th, and you are on that schedule, correct?

12   A.  Yes.

13   Q.  That's you?

14   A.  Correct.

15   Q.  With everybody else on there?

16   A.  Yes.

17   Q.  Okay.  And then what was -- what was the idea behind these

18   schedules, like --

19            MR. POLLOCK:  Objection, predicate and foundation.

20            THE COURT:  Overruled.

21            THE WITNESS:  So the idea behind that was basically

22   for us to go ahead and, you know, maximize our personal

23   production while we were there.  It was just kind of a

24   courtesy, you know, like just to make sure that there was

25   always someone available to go ahead and get these inbound

1    calls that were coming in.  You know, we just came up with a

2    system so that way there was always coverage, you know, for --

3    for potential clients.

4    BY MR. TROPP:

5    Q.  All right.  So.

6        (Pause in proceedings.)

7            THE WITNESS:  And what is the date on this, if I may

8    ask?

9    BY MR. TROPP:

10   Q.  This is May.

11   A.  So that's basically also after -- that's during the special

12   enrollment period where things really slow down.  So you

13   don't -- you know, things slow down as far as what we're able

14   to enroll as far as clients go.

15   Q.  So let's say here, for instance, you're supposed to show up

16   from 12:00 to 7:00 or 9:00 to 3:00, right?

17   A.  Um-hmm.

18   Q.  What if you showed up at 2 o'clock or 1 o'clock?  What

19   would happen --

20   A.  I mean, really nothing.  Nothing would happen, so to speak.

21   But once again, just as far as courtesy, I would be kind of

22   taking some potential calls away from another agent who, you

23   know, had been there from the morning and they weren't

24   scheduled to leave until that other hour.  So once again, this

25   was more of a courtesy amongst us, you know, and so go ahead

Case 1:22-cv-22671-CMA    Document 123-4   Entered on ELSD Docket 09/21/2023    Page 30 of
146
Direct Examination of Katrina Guerra
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA
30

 1    and maximize our sales while we were there.

 2    Q.  So let's say, like, this would be -- let's say here,

 3    Mariana is supposed to be there at 9:00 to 3 p.m., right?

 4    A.  Um-hmm.

 5    Q.  And you're -- either your set to be off that day or you're

 6    supposed to come in at another time.  You show up at 9 o'clock

 7    on her schedule.  That would be kinda award, right, now you are

 8    potentially now taking her calls?

 9    A.  Right.

10            MR. POLLOCK:  Objection, leading.

11            THE WITNESS:  Yes, if I were --

12            THE COURT:  Sustained.

13            THE WITNESS:  If I were --

14            THE COURT:  One second, please.

15    BY MR. TROPP:

16    Q.  Wait.

17        So -- so can you -- if you came at a time that was not

18    allotted for you and it was some other agent's time, would that

19    be confusing?

20    A.  There would be no consequence, but it would be a lack of

21    courtesy.

22    Q.  Would it be kind of like overstepping?

23            MR. POLLOCK:  Leading.

24            THE COURT:  Sustained.

25

 1   BY MR. TROPP:

 2   Q.  Well, why would it -- why would it be a lack of courtesy?

 3   A.  Because there -- there's potentially -- there's less calls,

 4   like I had stated before, during the special enrollment period,

 5   and so you're, you know, kind of taking away opportunity from

 6   -- from another agent.

 7   Q.  When these schedules were made, did -- did the -- did the

 8   agents themselves have input on how they were made?

 9          MR. POLLOCK:  Leading.

10          THE COURT:  Sustained.

11   BY MR. TROPP:

12   Q.  How are these schedules made?

13   A.  Basically just that, you know, these are -- you know, as

14   far as the 9:00 to 9:00 where the office was open, if we split

15   it in half, right.

16   Q.  Um-hmm.

17   A.  These would be the two shift.  It would be the 9:00 to 3:00

18   and 3:00 to 9:00.  What works best for who.  And, you know --

19   and this wasn't every week that it was the same, you know, it

20   was alternating.  We -- if I couldn't open, you know, or be

21   there from the 9:00 to 3:00, I would, you know, take the later

22   shift.  If, you know, I needed to -- to do vice versa, it was

23   fine.

24       I mean, as you see there, there's one day where I think I

25   am 12:00 to 7:00 because that's what worked for me on that day.

Direct Examination - Katrina Guerra
July 13, 2023                                                        32
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    And so that's what we went ahead and -- and agreed upon --

2    agreed upon.

3    Q.  What would happen -- and again, if you couldn't make it, or

4    if you decided you didn't want to show up some day, how would

5    that work?

6    A.  I don't understand how --

7    Q.  Let's say you are set -- here you were supposed to come at

8    3:00 to 9:00.  And let's say one of your kids had a play at

9    school and you wanted not to go to work; how would that work?

10   What would you do?

11   A.  Well, what I would do personally is I would let my

12   colleagues know, Ray at times, you know, Hey, listen, I'm not

13   gonna be able to go in for the shift that I had signed up for

14   and that was it.  But that was courtesy.  There were times when

15   an agent didn't show up and there were no consequences, even if

16   they didn't reach out to anyone.

17   Q.  And if you couldn't show up, you said as a matter of

18   courtesy, would you have to clear it with Reinier or Andrea, or

19   who would you have to clear that with?

20   A.  No, it never had to be cleared.  As I stated, it was just

21   courtesy if I chose to reach out to let my colleagues know that

22   I wasn't gonna, you know, be in.

23   Q.  Would you say that it was a professional atmosphere working

24   with the other agents?

25           MR. POLLOCK:  Leading.

Direct Examination of Katherina Guerra
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1              THE COURT:  Sustained.

2    BY MR. TROPP:

3    Q.  What was the atmosphere working with the other agents?

4    A.  It was a calm atmosphere.  It was a good atmosphere.  I

5    mean, we went in.  I feel like we were all friendly.  It was a

6    good group, but we all went there to work and produce.

7    Q.  Was -- what -- what was the idea behind the hours; was it

8    -- was it based on requirement to work, or did you guys work

9    because --

10   A.  It was based on potential to produce, basically.  That's

11   what it was.  You know, how can we maximize our production as

12   1099 agents with the space that's available, and this is

13   basically what we had agreed upon.

14   Q.  All right.  And, um.

15         So -- so wait.  October, November, December -- about

16   nine months, for about nine months you worked in, like, an

17   office space with about four of the Plaintiffs?

18   A.  Yes.

19   Q.  Okay.  And did -- at any point did you ever hear any of the

20   Plaintiffs say, Oh, I'm not getting paid correctly, something

21   to that effect?

22   A.  Not that I recall.

23   Q.  Did you ever to hear any, like, complaints about the

24   company from the Plaintiffs?

25   A.  Not that I recall.  Not in particular.

Direct Examination of Katerina Guerra
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  Q.  Did anyone ever, like, mention, Oh, I earned a bonus and I

2  didn't get it?

3  A.  I mean, not that they didn't get it.  I know that once the

4  numbers came out, you know, do you know where -- you knew where

5  you fell.  It was kind of -- especially if you made one of the

6  bigger bonuses, it was exciting.  But the details of everyone

7  else's bonus and commission, I -- I don't recall any of that

8  information.

9  Q.  When you guys would earn a bonus, like, did -- like, did

10  you ever hit one of the big bonuses, like the -- like this?

11  A.  Yes, I did.

12  Q.  What was it, the Oscar bonus?

13  A.  Yes.

14  Q.  That's the one where you have to get, like, 600 people in a

15  certain amount of time?

16  A.  Correct.

17  Q.  And you get, like, $25,000?

18  A.  Yes.

19  Q.  Was that like an exciting moment --

20  A.  For any of us, it was definitely an exciting moment.

21  Q.  And when you signed up the 600th person, what did you do?

22  You --

23  A.  So it was definitely a celebration if you had reached that

24  number, but ultimately, we knew you had to hit a lot higher

25  than that because things happen.  Client don't pay premiums,

Direct Examination - Katrina Guerra

July 13, 2023                                                           35

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1   clients go with another carrier.  You know, things happen where

 2   some things fall off the books and ultimately it would have to

 3   be what's it on, what -- what did we sell -- that stuff.  So

 4   although this was kind of exiting, you know, we had to do a lot

 5   more in order to go ahead and actually have the 600.

 6   Q.  There's no, like, a bell that you ring when you -- when you

 7   hit the 600 --

 8   A.  No, not a bell.  No.

 9   Q.  But did you go to Reinier and say, Hey, I got the 600th

10   person?

11   A.  I can't recall if I at that moment, you know, how I

12   reacted.  But, you know, everyone's different.  Everyone has

13   their personalities.  Some people are, you know, more open and

14   out there than others, some are more private.  So it would

15   depend on the individual, how they chose to, quote/unquote, I

16   guess, celebrate reaching a bonus or getting to a certain --

17   certain number of members.

18   Q.  Would you say that to a certain extent, there is a little

19   competition with the agents?

20   A.  I think anything that has to do with sales, there is always

21   underlining competition.  It's just the nature of the business.

22   Q.  And you guys would sometimes, like, tell each other, Oh, I

23   got more, or I got less?

24   A.  Once again, it all depends on the individual.  Some, you

25   know, spoke more than others and were more open than others.

Direct Examination - Katrina Guerra
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1   Q.  Did you ever hear Delio say, Hey, I got this bonus, the
 2   tier 600 Oscar selling bonus?
 3   A.  Delio was actually one of the more quiet ones.  So I can't
 4   recall if I -- hearing him say he had reached or did not reach.
 5   He was definitely one of the more introverted agents in the
 6   office.
 7   Q.  Did you ever hear him say, Oh -- in all the time you're
 8   working there, you never heard him complain or have any, like,
 9   comments regarding not being paid anything?
10          MR. POLLOCK:  Leading.
11          THE COURT:  Sustained.
12   BY MR. TROPP:
13   Q.  Did you ever hear Delio Batista -- what -- what did you
14   ever hear Batista say about commissions or bonuses owed, if
15   anything?
16   A.  I have never heard him really speak about that.  As I said
17   before, he was just very private.  He was more introverted.
18   Very kind person, very professional, but definitely more to
19   himself.
20   Q.  What about Rafaela, have you ever heard her mention
21   anything to that effect?
22   A.  To what effect exactly?
23   Q.  About -- did -- did you ever hear Rafaela say anything
24   about unpaid commissions or bonuses?
25   A.  Not that I recall.
```

Direct Examination of Katrina Guerra
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1   Q.  What about Mariana -- when you say, Not that I recall, do

 2   you --

 3   A.  I can't remember --

 4   Q.  -- can't remember?

 5   A.  Yeah, I can't remember hearing anyone.  I mean, when it

 6   comes down to what we are making, you know, it's not the most

 7   common conversation because, you know, everyone is just trying

 8   is to do their own thing.  So that wasn't a conversation that

 9   was, I would say, frequently had as far as, you know, that

10   goes.

11   Q.  Was there any discussion or expectation whatsoever of being

12   paid hourly?

13   A.  No.

14   Q.  What about overtime?

15   A.  No.

16   Q.  Did you ever think that that was part of the agreement?

17   A.  No.

18   Q.  Did you ever hear any of the other agents talk about hourly

19   or overtime?

20   A.  No.

21   Q.  And now you work on the office side of things?

22   A.  Now, currently?

23   Q.  Yes.

24   A.  Yes.

25   Q.  And you're a W-2 employee?

1   A.   Yes.

2   Q.   When did that switch; do you know?

3   A.   August 1st.  It is going to be a year August 1st.

4   Q.   And it's a salary, straight salary?

5   A.   Yes.

6   Q.   Is that better for you?

7   A.   When I chose to go ahead and do that transition, it was

8   just based on the respect that I -- that I have, you know, for

9   Avant and the fact that they are still very understanding and

10  flexible; for me, that was very important.  So yeah, there's

11  probably higher expectations as far as me having to --

12  quote/unquote, having to be there, but if need be, you know,

13  I've never been told no, you cannot attend such and such or

14  have this day off, so on and so forth.

15  Q.   And you -- but you work on the office side of things now?

16  A.   Yes.

17  Q.   Do you ever work with employment tax for the employees?

18  A.   No.

19  Q.   You don't work that aspect?

20  A.   No.

21  Q.   Okay.  Do you know anything about that?

22  A.   Not really.  As far as the taxes we report, I just know

23  it's taken from the W-2 income.

24  Q.   Now -- now, in all the -- in the time that you worked for

25  Reinier and Avant and Andrea, did you ever, like, have a

1   discrepancy or something like, Oh, I might not have been paid

2   on something, and discussed it with them?

3   A.   So there was one time -- so when we were transitioning --

4   like, the last month -- November -- November/December, you

5   still made the enrolling -- well, for November, you still may

6   be enrolling people for the 2021 --

7   Q.   Um-hmm.

8   A.   Well, in that time, it was for the 2021, even though it was

9   just for one month, I did do my enrollments in addition to the

10  2022.  So I had gotten a deposit, and the numbers that I had

11  for the 2021, I didn't get that deposit.  I had sent an e-mail

12  over to Reinier and then I went into his office.  I think he

13  had called me in based on the e-mail and immediately I got the

14  deposit.

15  Q.   Have you ever heard a situation from either -- any of the

16  Plaintiffs or any other agent where they might have had a

17  discrepancy and they discussed it with Reinier?

18           MR. POLLOCK:  Leading.

19           THE COURT:  Sustained.

20  BY MR. TROPP:

21  Q.   Have you ever heard of any other agents having

22  discrepancies about payments?

23           MR. POLLOCK:  Objection, elicits hearsay.

24           THE COURT:  Overruled.

25           THE WITNESS:  Not that I recall.

Direct Examination - Katrina Guerra
July 13, 2023                                            40
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1   BY MR. TROPP:
 2   Q.  What about have -- did you ever hear one of the Plaintiffs
 3   have a discrepancy and they either work it out or not with
 4   Reinier?
 5            MR. POLLOCK:  Leading.
 6            THE COURT:  Overruled.
 7            THE WITNESS:  Not that I recall.
 8   BY MR. TROPP:
 9   Q.  Okay.  So you had an issue, you sent him an e-mail and he
10   took care of it?
11   A.  Correct.
12       (Pause in proceedings.)
13            THE COURT REPORTER:  You have to zoom it out on the
14   top.
15            MR. TROPP:  Zoom it out.  Thanks.
16            THE COURT REPORTER:  You're welcome.
17   BY MR. TROPP:
18   Q.  What's this line on the bottom?  Can you read that part?
19   A.  "Bonuses will be paid in April of 2022 or once we receive
20   compensation for the -- from the insurance companies.  Agent
21   will need to be actively producing for the agency at the time
22   of payment."
23   Q.  What is that last sentence; what is that about?
24   A.  Basically once the insurance carriers paid, and you were
25   active with the company, you were going to go ahead and get
```

1  your bonus, if you earned one.

2  Q.  Why did you have to be active -- actively producing for the

3  agency at the time of payment to get the bonus?

4  A.  I wouldn't know how to answer that.  I don't run Avant.

5  Q.  Well, is it important, once -- once you sign up a policy or

6  -- or sign up people, is it important to remain as an agent

7  after that?

8          MR. POLLOCK:  Leading.

9          THE COURT:  Sustained.

10  BY MR. TROPP:

11  Q.  After a policy is signed, do you have any responsibilities

12  towards the people you signed up?

13  A.  I would say an agent who's a good agent, you always want to

14  have the line of communication open with your client.  It is

15  important to -- for retention, I would say, for any business.

16  Q.  And why is that?

17  A.  To be able to have the client trust you and count on you

18  and be there, that's what needs to stand out as an agent.

19  Q.  And do you get that?  Do you get calls from people you

20  signed up, or is it after you sign them up, that's it, you

21  don't hear from them?

22  A.  And as I stated, for the most part, it's just, you know,

23  one transaction.  But then you do have those clients who, you

24  know, keep calling.  Even now as a manager, I have clients who

25  I signed up in 2021, and they want to just speak to me.  So I

1   will get on the phone and I will speak to them and I will help

2   them out.  It's just part of the job.

3   Q.  And do you know, do the participating insurance companies,

4   like Oscar or Ambetter, do they have -- do they require that?

5   Do they have requirements on making sure that -- um, that the

6   agents are actively producing after --

7   A.  I don't know what their requirements are.

8   Q.  Okay.  Almost done here.  Okay.  That's it.  Thank you.

9   A.  No problem.  Thank you.

10                       CROSS-EXAMINATION

11  BY MR. POLLOCK:

12  Q.  Good morning, Ms. Guerra.  My name is Brian Pollock.  We

13  have not met before, have we?

14  A.  No, we have not.  Good morning.

15  Q.  Good morning.  It's nice to meet you.

16  A.  Same here.

17  Q.  I think -- were you here yesterday and we just didn't get

18  to you?

19  A.  Yes.

20  Q.  We're sorry about that.  Things were running a little

21  longer than expected, but I know we're doing what we can to

22  move things along.  I will try to be as quick as I can with you

23  today.  I'm just going to run through some questions.  If you

24  don't understand anything I am asking you, please let me know,

25  okay?

Cross-Examination - Katrina Guerra
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1      How long -- let me back up.

2      You have been working at Avant and you said almost two

3  years?

4  A.   Correct.

5  Q.   How long is your commute in the morning to get to Avant?

6  A.   Now, at the moment, my commute is about 25 minutes.

7  Q.   And you say now, at the moment, does that mean that you

8  used to work -- you used to live further away from work?

9  A.   I used to live -- well, in the office that we had before

10  where we were all together, we were -- I was closer.  Once they

11  moved, it became a little bit more of a commute.

12  Q.   Okay.  And Mr. Tropp showed you that comp -- 2022

13  compensation agreement, it was that two-page document that had

14  the 5 -- 5 to 35 per member and the different bonuses, right?

15  A.   Yes.

16  Q.   Did you consider that the contract under which you would be

17  paid while you were working at Avant?

18  A.   Yes.

19  Q.   Okay.  And when you needed to take a personal day or you

20  needed to go on vacation, you would e-mail either Mr. Cortes or

21  Ms. Gonzalez Quintero that you would be out of the office for

22  the time period that you were paid as an independent

23  contractor; is that what happened?

24  A.   If I needed time off, it would depend.  There was maybe an

25  occasion or two where I sent an e-mail.  There were times where

1  I made a phone call.  And, once again, it was out of common

2  courtesy.

3  Q.  But it was a courtesy that you would let them know that you

4  would not be in, whether it's tomorrow or the next day or in a

5  week or two, right?  You would always let them know in advance

6  as a courtesy?

7  A.  Typically.

8  Q.  And that's because you were working for somebody else that

9  it would be courteous to just not show up out of the blue,

10  right?

11  A.  I'm sorry, I don't understand.

12  Q.  Sure.  I mean, you were being courteous to the people you

13  work for to let them know that they needed to have your space

14  covered that day because you wouldn't be in, right?

15  A.  Well, to me, there is a difference between working for and

16  working with.

17  Q.  Okay.

18  A.  As a team, if -- you know, I know that there is a certain

19  amount of, let's say, leads that may come in.  If I'm not going

20  to be there to produce, you know, maybe they can say, Hey --

21  you know, maybe there's someone else who can go ahead and get

22  that -- get that business.

23  Q.  Right.  I mean, they could -- they could fill the seat for

24  somebody else, right?

25  A.  I'm sorry?

Cross-Examination - Katrina Guerra

July 13, 2023                                          45

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1   Q.  They could fill your seat with somebody else if you weren't
 2   going to be in; is that what you are saying?
 3   A.  What I am saying is, there is a certain amount of calls
 4   that are gonna come in.  If I'm not gonna be there, right, yes,
 5   essentially someone else could be there, someone else could
 6   not.  It's just -- as I stated, it's just common courtesy.
 7   Q.  But you didn't needed -- you did not need to fill that
 8   seat, that was what Avant did.  They filled the seat for you if
 9   you weren't going to be in, right?
10   A.  I don't --
11   Q.  Okay.  Maybe we are not understanding each other.
12   A.  Yeah, I don't think so.
13   Q.  Okay.  If you weren't going to be in, would Avant have
14   placed somebody else on your -- on the schedule in your place?
15   A.  Avant didn't have to.
16   Q.  I am not asking you if they have to.
17   A.  There were times, even amongst us as, you know, colleagues,
18   you know, we would talk, and sometimes someone would just not
19   be there.  If you can't, you can't.
20   Q.  Okay.  And if you can't, you can't.  And then what happens,
21   then the other agents just get the calls?
22   A.  I am not sure exactly what -- how they would deal with that
23   as far as the other agents at Avant.
24   Q.  But you thought you were an independent contractor because
25   you were flexible in your schedule, right?
```

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 46 of
146
Cross-Examination - Katiria Guerra                    46
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  A.  Yes.

2  Q.  And then August of 2022, comes around, and you become an

3  employee, right; that's what you told us?

4  A.  Yes.

5  Q.  And what you said was that they were still understanding

6  and flexible when you became an employee, and that was with

7  regard to your schedule; is that correct?

8  A.  Not, I would say, my schedule, per se, but my personal

9  needs.  Like, you know, if there is a day that I can't come in,

10  if I may need to leave early, there wasn't an issue.

11  Q.  Okay.  Just like when you were an independent contractor,

12  if you needed to leave early or you didn't come in, there

13  wasn't an issue, right?

14  A.  No, there wasn't an issue then either.

15  Q.  So there wasn't an issue then, and there is not an issue

16  now; can we agree on that?

17  A.  I would say for the most part.

18  Q.  You said that you needed certain skills because you are in

19  sales, right?  You needed -- let me take a look at what I wrote

20  down.

21      You needed to be a good sales agent, you needed to be --

22  you need to have patience, you needed to be kind to clients and

23  you needed to be able to overcome objections.  I think those

24  were your words, right?

25  A.  Yes.

```
 1   Q.  And just so we get a perspective what -- the items or the
 2   insurance policies that you're selling, on average, how much
 3   did it cost the members during this open enrollment period,
 4   let's say from 2021 to '22?  How much would each member
 5   normally have to pay for a policy out of pocket?
 6   A.  It would depend on the client.
 7   Q.  Okay.  And let me break it down, because I know there is a
 8   bunch of different insurance policies.
 9       Did you -- Oscar, you sold the most of Oscar policies out
10   of any of the different policies offered; would you agree?
11   A.  Yes.
12   Q.  Okay.  And Oscar typically would charge a client how much
13   money per member per month?
14   A.  That would depend on whatever subsidy the client qualified
15   for.  It could be from zero a month and you have clients who
16   pay $300 a month.
17   Q.  Okay.  And this arrangement for insurance that you were
18   selling, that would last, at the most, for a year?  Each policy
19   could be in place for as long as a year?
20   A.  Yes.
21   Q.  So the most we are talking about, an item that could cost
22   zero dollars or maybe at most $2400 a month -- $2400 a year if
23   we are talking about at $200, right?
24   A.  Okay.
25   Q.  Yes?  And you have gone to a car dealership, have you not?
```

1   A.   Me?

2   Q.   Yeah.

3   A.   My husband does all of that.

4   Q.   You don't know about buying cars?

5   A.   I don't.  I really don't deal with that much.

6   Q.   Okay.  And then during open enrollment, did you work 9:00

7   to 9:00?

8   A.   I would say for the most part, I did work 9:00 to 9:00.

9   Q.   So I mean, you know, what we are talking about here -- and

10  part of this case is about overtime.  You are not going to sit

11  here and tell the -- all of us in the courtroom that my clients

12  didn't work more than 40 hours a week during open enrollment,

13  are you?

14  A.   I'm sorry?

15  Q.   You are not going to tell us in the courtroom that Delio

16  and Mariana and Rafa and Carlos were working less than 40 hours

17  during open enrollment?

18  A.   Most of us were there from 9:00 to 9:00.

19  Q.   Is that something that Mr. Cortes and Ms. Gonzalez Quintero

20  knew as well, that, you know, the agents were working the 9:00

21  to 9:00 schedule during open enrollment?

22  A.   They knew that we were working 9:00 to 9:00 typically?

23  Q.   Yes.

24  A.   That was available for us, and if you wanted to maximize

25  production and bonus, the more you were there, the more you

Case 1:22-cv-22671-CMA  Document 123-4  Entered on FLSD Docket 09/21/2023  Page 49 of 146
Cross-Examination - Katriona Guerra     49
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   produced.

2   Q.   And my question was, is that something that they knew?

3   A.   They -- for the most part.  I mean, you know, they also

4   worked, so they were there a lot of times.

5   Q.   Okay.  And during the whole time that you were at Avant,

6   was that your main source of income?

7   A.   My main source of income, yes.

8   Q.   I mean, you would say that -- as far as you personally, you

9   were economically dependent on Avant to make a living?

10  A.   I did have, as I said, the opportunity and I did sell life

11  insurance on the side because I have -- I had my license with,

12  you know, the other carriers for life, but I felt the most

13  comfortable with the Avant structure.  It just made the most

14  sense for me.  It worked.

15  Q.   And you made the most money from Avant.  I mean, you didn't

16  get your -- you know, if you put your -- the money that you

17  made in the year on a balance, you had Avant on one side and

18  you had, you know, the side gig on the other selling life

19  insurance, I mean, the scale is going to tip heavily in favor

20  of Avant, won't it?

21  A.   Yes.

22  Q.   Okay.  As far as the -- the work that you performed at

23  Avant, I mean, all you had to do was walk in the office, right?

24  You didn't have to bring anything.  You didn't have to bring

25  clients.  You didn't have to bring computers.  You'd just walk

1   right in and just do your work, right?

2   A.   I mean, they had, like, computers and stuff available for

3   us, but if you wanted to -- like, I brought my iPad, I had

4   brought a mouse.  There was a moment where we felt like maybe

5   if your mouse was quicker, you'd answer the phone quicker.  So

6   we would bring in -- I know a couple of other agents also

7   brought their own mouse.  Cell phones, you know.  So yes, the

8   equipment was there, but we were never -- you know, if we

9   wanted to bring something in, it was fine.

10  Q.   Yeah, I mean --

11  A.   Never an issue.

12  Q.   Sure.  If you wanted to bring a mouse and -- I mean, just

13  so everybody in the courtroom understands.  When a call comes

14  in through Radius Bob, it's kind of like Jeopardy, right, where

15  the first one who clicks gets to answer?

16  A.   Typically that's how -- how it can be.

17  Q.   So it's just -- you know, that's -- you -- that's how you

18  determine who gets the call, you just have to be able to click

19  and get the call, right?

20  A.   For the most part.

21  Q.   Okay.  And then, you know, have you driven on I-95, like

22  any long distance?

23  A.   Yes.

24  Q.   Okay.  And then, you know, sometimes you're just driving

25  and you get caught up in traffic and you're just kind of going

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 51 of 146
Cross-Examination - Katrina Guerra                        51
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    with the flow of traffic, right?

2    A.   Um-hmm.

3    Q.   That's right?  Yes?

4    A.   For the most part.

5    Q.   Okay.  And then when you're going with the flow of traffic,

6    does that mean that you are not speeding?  Could you be

7    speeding if you are going with the flow of traffic?

8    A.   That's why I said for the most part.

9    Q.   Okay.  But I'm saying, if you are going with the flow of

10   traffic, you understand --

11   A.   If that's what you are choosing to do, then yes.

12   Q.   Okay.  And just so we all understand as far as your

13   background, because we didn't go into that in any kind of great

14   detail.  You have no legal training; is that correct?

15   A.   I'm sorry?

16   Q.   You have no legal training?

17   A.   No.

18   Q.   Okay.  You have any training in human resource management?

19   A.   No.

20   Q.   You are not an accountant?

21   A.   No.

22   Q.   You don't hold yourself out as somebody who has any

23   particular specialty or expertise in deciding who's a employee

24   and who's an independent contractor; is that fair to say?

25   A.   That's fair to say.

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 52 of
146
Redirect Examination - Katherine Guerra                52
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  Q.  Okay.  And then as far as working at Avant, you indicated

2  that you're paid a salary; is that right?

3  A.  Currently, yes.

4  Q.  Okay.  And so for the time that you are spending here with

5  us, is being paid for by Avant as part of your salary; is that

6  what we should understand?

7  A.  Yes.

8         MR. POLLOCK:  Thank you.  No further questions.

9         MR. TROPP:  Can I get a quick follow up?

10        THE COURT:  Yes.

11                    REDIRECT EXAMINATION

12  BY MR. TROPP:

13  Q.  Real quick, let's say you are signing up all of these

14  people.  How do you keep track, how do you keep accountability

15  of what's owed to you?

16  A.  You mean initially when we started working or --

17  Q.  Yeah.

18  A.  Well, for example, I had in the -- I would say the first

19  probably month or two, I would, at the end of the day, put the

20  total number of members on another spreadsheet, and then I

21  would put my total so I knew what was owed to me.  I did that,

22  I would say, for a couple of months and then I kind of lost

23  my -- you know, I felt like I was getting my deposits if things

24  matched up, you know.  But that would be dependent on the agent

25  in particular, how they chose to keep track of that.

```
 1    Q.  And while you were there, you could go through the system
 2    and see what's going on with the policies you listed?
 3              MR. POLLOCK:  Outside the scope.
 4              THE COURT:  Overruled.
 5              THE WITNESS:  Yes.
 6    BY MR. TROPP:
 7    Q.  And did you ever discuss with any of the other agents about
 8    how -- like, how -- other ways to possibly keep track of what's
 9    owed to you?
10              MR. POLLOCK:  Outside the scope.
11              THE COURT:  Overruled.  I will allow recross.
12              THE WITNESS:  Not in particular.  I mean, I -- I -- I
13    know -- I'm pretty certain that, you know, other agents were
14    keeping track, but as far as the exact format and everything,
15    everyone kind of had their own way of doing things.
16    BY MR. TROPP:
17    Q.  Did you ever have restrictions, like you weren't allowed to
18    bring a cell phone?
19    A.  No.
20    Q.  Did --
21    A.  When things slowed down, we had actually -- Netflix,
22    whatever we could to entertain ourselves if we chose to hang
23    around.
24    Q.  And so there were slow days, you guys would watch -- watch
25    Netflix?
```

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 54 of
146
Redirect Examination - Katherine Guerra          54
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    A.   I would say it -- it's happened, yes.

2    Q.   But tell -- explain to me, like, how do you -- how else

3    could you keep track of what's owed to you or what you closed?

4    A.   As I stated, that's how I did it.   Exactly how everyone

5    else did it, I -- I can't speak for them.   I just -- I would

6    put the members, what that would equal and I had an idea of,

7    you know, what was -- what was going to be owed to me.

8        I also -- I don't know if it's -- I want to go back to the

9    -- like, to the flexibility about before and after, because

10   it's just sticking with me.   I mean, at the end of the day, if

11   I gave notice as a 1099, it was out of courtesy, but there were

12   no consequences.   However, now, if, you know, I weren't to give

13   notice or even if I were to have -- you know, there -- there

14   would be consequences, I'm sorry.

15       So there is -- so there is definitely a huge difference in

16   those two.   I'm sorry, it just stuck with me.

17   Q.   A huge difference because you are a W-2?

18   A.   Correct.   Exactly.   There can be consequences for that.

19   Whereas before, there weren't.

20       I'm sorry.   Proceed.   I'm sorry.

21   Q.   Let's say, like, after court's over, I am sitting in the

22   same place you're sitting, and I say to you, I want to sign up

23   for a policy, sign me up.   You would be able to talk to me

24   about it?   Would you be able -- what would we need?

25   A.   As far as being able --

1    Q.   For you to --

2    A.   -- currently?

3    Q.   -- to service me.  Sign me up on a policy.

4    A.   I would need to go ahead and run a quote and get your

5    application into the system, your information into the

6    marketplace.

7    Q.   Would you need a phone?

8    A.   No.  Now I would not be able to do it with my phone.

9    Q.   Would you need a computer?

10   A.   Currently, I would need a computer.

11   Q.   Would you be able to use your laptop?

12   A.   Yes, be able to use a laptop.

13   Q.   Would you -- would you need to ask Reinier for access to

14   the system?  Would you be able to -- for him to give you access

15   to the system, you could ask Reinier?

16   A.   That would be dependent upon him at this point.

17   Q.   And once you have the laptop, what, you would ask me

18   questions?

19   A.   I would ask you questions, fill in the information and then

20   it would be processed and put into the system.  Well, even for,

21   like, COVID.  There was a time when COVID went through the

22   office; we got it, like, in two ways.  We worked from home.  We

23   were able to go ahead and work from home during that time.

24   Q.   So the big tool, the tool that you would need to sign me

25   up, you would need access to a computer?

1  A.  Correct.

2  Q.  Any computer?

3  A.  I actually bought two monitors for that time so that way I

4  could --

5  Q.  And you'd have to answer my questions?

6  A.  Right.  Yes.

7  Q.  So you would need your mouth?

8  A.  Yes.

9  Q.  To answer my questions.  And you would need yourself?

10  A.  Correct.

11  Q.  Yourself would be a tool to help me service them, right?

12          MR. POLLOCK:  Leading.

13          THE COURT:  Sustained.

14  BY MR. TROPP:

15  Q.  Any other tools that you would need to service a client?

16  A.  No.  Thankfully with technology, nowadays when it comes to

17  insurance sales, it tends to be pretty -- a pretty easy sale.

18  There is not a lot of overhead, so to speak.  As long as you

19  have access to the software and the right portals, you are able

20  to do it.

21  Q.  What about a pen; would you need a pen maybe?

22  A.  Perhaps.

23  Q.  As a tool?

24  A.  If the system goes down and you need to go paper route, a

25  pen would help.

1   Q.  It's more about person to person, would you say?

2           MR. POLLOCK:  Leading.

3           THE WITNESS:  I would say --

4           THE COURT:  Sustained.

5           MR. TROPP:  I will withdraw that.  Thank you.

6                       RECROSS EXAMINATION

7   BY MR. POLLOCK:

8   Q.  I'm going to be super brief.  You said that during COVID,

9   you were able to work from home.  Is that because Mr. Cortes

10  and Ms. Gonzalez Quintero allowed you to work from home?

11  A.  They allowed me to?

12  Q.  Yes.

13  A.  I wanted to keep producing and I did so from home.

14  Q.  Okay.  And then afterwards, if it takes you -- you know,

15  why continue to go to an office if you can just work from home?

16  A.  For me, I have -- I have a seven-year-old son and he is all

17  over the place.  It just -- for me, it's just more convenient

18  to go to -- where there is a space.

19      For example, when I did insurance, I never invited anyone

20  into my home.  I would either meet up with them or, you know,

21  do it in another place that was more convenient for me to go

22  ahead and complete -- complete the subscription for the client.

23  Q.  Yeah, but you said the whole -- the whole subscription

24  process was over the phone and the Internet, right?

25  A.  Yeah.  But when you have a child running ramped in the

 1    back, it's not as simple.

 2    Q.  Does your child go to school?

 3    A.  I'm sorry?

 4    Q.  Does your child, seven year old, go to school?

 5    A.  He does.  He goes to school, but we are also talking two

 6    years ago, so.

 7    Q.  Your child wasn't in school two years ago?

 8    A.  When I started, he had just gone into kindergarten or was

 9    going to go into kindergarten.

10    Q.  Okay.  So he's in kindergarten from, what, 7:30, 8 o'clock

11    in the morning until, what is it, 3 o'clock, something like

12    that?

13    A.  Till 1:50.

14    Q.  You didn't work from home from -- in the morning because it

15    was just easier?

16    A.  I'm sorry?

17    Q.  I said, you didn't work at home even though there's no

18    commute involved.  You went into the office at Avant?

19    A.  I never preferred to work from home.  I like to be out.  I

20    -- just everyone has their way of working.  To me, when you are

21    home, it is kind of easy to get distracted; there's the TV,

22    there's laundry, there's the dishes, so on and so forth.  I

23    like to maximize my production when I'm, you know producing,

24    and that's being out of the home space for.

25    Q.  I mean, that's pretty much, in your mind, the only reason

1  why you thought you were an independent contractor is because

2  you had flexibility as to when you could work?

3  A.  That's the only reason why I thought I was an independent

4  contractor?

5  Q.  Sure.

6  A.  I don't understand.

7  Q.  Okay.  Well, you told us that you had flexibility and there

8  were no consequences, right?  That's -- and then you came back

9  and you thought about my question because it was a good

10  question and then you said, Well, you know, actually, there was

11  -- you know, there were consequences for an employee --

12  A.  There were no consequences if you couldn't show up.  I

13  mean, you don't get that in a W-2.  I'm sorry, I am in a W-2

14  position currently.  If I don't show up for a shift, there are

15  going to be consequences when I get to work.

16  Q.  And you could work otherwise, let's say during the open

17  enrollment period of '21/'22, whenever you wanted; is that what

18  you're telling us?

19  A.  Yes.

20  Q.  Okay.  So --

21  A.  There is actually an agent, she's still with us.  She was

22  with us during that time.  And she never worked past 5:00.  She

23  has a child, and she wanted to produce and maximize her time

24  until 5:00.  She never stayed still 9:00.  She very rarely

25  worked weekends.  It -- it's what worked for her.  We were not

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 60 of
146
Recross-Examination - Natacha Queiroz
July 13, 2023
60
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    obligated to work 9:00 to 9:00, but the space was available

2    from 9:00 to 9:00.

3    Q.  Could you work, let's say, and get it inbound leads at

4    10 o'clock at night?

5    A.  Well, there's also -- I know that there is a law that after

6    a certain time, we are not able to contact clients.  So it just

7    wouldn't be -- I mean, you can't -- you are not going to call

8    the client at 10 o'clock at night for insurance.

9    Q.  No.  But most of your calls were inbound, weren't they?

10   A.  I'm sorry?

11   Q.  Most of your calls were inbound?

12   A.  Most were.

13   Q.  Okay.  And when it is 9 o'clock in Florida, it is what,

14   like 7 or 8 o'clock in Texas?

15   A.  7:00 or 8:00, yes.

16   Q.  And 7 or 8 o'clock in Illinois, right, they are behind us?

17   A.  Exactly, I guess.  More or less that time.

18   Q.  And you were licensed to sell insurance in Texas and

19   Illinois for Blue Cross Blue Shield?

20   A.  Yes, we were.

21   Q.  So you couldn't work and get inbound leads at 10 or

22   11 o'clock at night during open enrollment, could you?

23   A.  I never asked to.  9 o'clock worked for me.  I mean,

24   perhaps if we would have asked, the space may have been open

25   longer.  But I don't know.  We never came across that

```
 1   situation.
 2   Q.  It could have been there longer except for the fact that
 3   Mr. Cortes's business in Colombia, Avant Assurance SAS, wasn't
 4   sending leads after 9 p.m. Eastern Standard Time, were they?
 5   A.  I don't know the details of the Colombia team.
 6   Q.  But you --
 7   A.  I don't know if they could have gone longer or not.
 8   Q.  But you knew that you didn't get calls at the office,
 9   inbound calls, after 9 p.m., right?
10   A.  Based on what we all agreed upon, no one was there after
11   9:00.
12            MR. POLLOCK:  Nothing further.
13            THE WITNESS:  Thank you.
14            THE COURT:  All right.  Thank you, ma'am.  You are
15   excused.  You have a good day.
16            THE WITNESS:  Thank you, you too.
17       (Witness excused.)
18            THE COURT:  Next witness, please.
19       (Pause in proceedings.)
20            MR. TROPP:  Defense rests, Judge.
21            THE COURT:  I'm sorry?
22            MR. TROPP:  We rest our case.
23            THE COURT:  All right.  Ladies and gentlemen, we will
24   take a brief morning recess.  Please don't discuss the case.
25            COURT SECURITY OFFICER:  All rise for the jury.
```

Proceedings
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1          (The jury exited the courtroom at 10:25 a.m.)

 2              THE COURT:  Please be seated.

 3              I'll hear any motions, or is there rebuttal?  I don't

 4   know.

 5              MR. POLLOCK:  We are not going to do rebuttal, Your

 6   Honor.  The Plaintiffs will renew all previous motions and

 7   objections, including for a directed verdict.

 8              THE COURT:  Thank you.

 9              Motions from Defense?

10              MR. TROPP:  No, Judge.

11              THE COURT:  All right.  Motions are denied.

12              Ready to do your closing?  We will take a ten-minute

13   recess.

14              MR. POLLOCK:  There was a proposed instruction that

15   the Defense had sent over concerning the unclean hands.  We

16   have our objections to that.  I don't know if you're -- I just

17   need to reiterate those, but I am happy to do it.  I think it's

18   their burden because they are asking for the instruction, so

19   I'll handle it in course, unless Your Honor wants me to make

20   the argument now.

21              MR. TROPP:  There was a copy that I sent from the

22   earliest revised that had some red lines on it and then I tried

23   to clean that up and sent that one, Mr. Pollock.

24          (Pause in proceedings.)

25              MR. POLLOCK:  I think we are just talking about that

```
 1    paragraph.  We still have the objection to the --

 2           THE COURT:  I'm sorry, can I see what the proposed

 3    instruction is?  You want to put it up on the ELMO or not?

 4    Display it somehow?

 5           MR. CUMMINGS:  Your Honor, can Ms. Valiente be excused

 6    to use the bathroom?

 7           THE COURT:  Yes, of course.

 8           MR. CUETO:  Ms. Gonzalez would like to use the

 9    restroom, Your Honor.

10           THE COURT:  Yes, sure.

11       (The exhibit was published to the Court.)

12           THE COURT:  I'm sorry, did you understand me when I

13    spoke yesterday about the unclean hands defense and which of

14    the three claims it would go to?

15           MR. TROPP:  Yes, on the equity.

16           THE COURT:  The only equitable claim.

17           MR. TROPP:  Unjust enrichment.

18           THE COURT:  Unjust enrichment.

19           MR. TROPP:  I might have to write.

20           THE COURT:  But what you are showing me is a proposed

21    defense that goes to the FLSA claim.

22           MR. TROPP:  I know.

23           THE COURT:  All right.

24       (Pause in proceedings.)

25           THE COURT:  All right.  We will take our ten-minute
```

Proceedings
July 13, 2023                                                64
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   recess, we will hear the closing arguments and then if you want

2   to propose something, I can look at it at some point.  But this

3   is not -- what you're showing me now is not acceptable.

4            MR. TROPP:  There has been so many revisions.

5            THE COURT:  I'm sorry?

6            MR. TROPP:  There have been so many revisions, I might

7   have sent the wrong one.  I can fix that up.  Can I ask, Your

8   Honor, just considering we had planned to take the whole

9   afternoon with Reinier and Andrea, and we're resting early, you

10  think we can have a little bit more time before the closing

11  other than ten minutes?

12           THE COURT:  We have jurors sitting in the back

13  waiting.  How much time are you asking for?

14           MR. TROPP:  Maybe an early lunch?

15           THE COURT:  It's 10:30.

16           MR. TROPP:  10:30, yes.  Half an hour, 20 minutes?

17           THE COURT:  While you keep jurors waiting in the jury

18  room?  I'll give you 15 minutes.  I mean, they've already been

19  out for five minutes.  We will take another 15.

20           MR. TROPP:  Okay.

21           THE COURT:  All right?

22           MR. POLLOCK:  Your Honor, I would like to be able to

23  utilize instructions in my closing.

24           THE COURT:  You can certainly reference instructions,

25  except for this one which is not -- I am not giving this that's

Proceedings
July 13, 2023                                                          65
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1   being proposed.  So there is nothing else on the table.  If you

 2   want copies, Patricia can get you something.

 3          MR. POLLOCK:  I had the ones from yesterday, so I'm

 4   going to work off of that.

 5          THE COURT:  Work off of that, certainly.

 6          MR. POLLOCK:  It's not an issue.  And then go from

 7   there.

 8          THE COURT:  Okay.

 9          MR. POLLOCK:  So I guess we have 15?

10          THE COURT:  15 minutes.

11          MR. POLLOCK:  Perfect.  Thanks, Judge.

12          COURT SECURITY OFFICER:  All rise.

13      (A recess was taken from 10:33 a.m. to 10:51 a.m.)

14          COURT SECURITY OFFICER:  All rise.

15          THE COURT:  I believe Defense e-mailed a proposed

16   revised unclean hands defense instruction, which is not an

17   instruction on the law.  There is no law stated there of what

18   unclean hands consists of.  The theory that's written in the

19   instruction is not what was pled in the affirmative defense,

20   and it's replete with typographical and grammatical mistakes.

21   So I won't give that.

22          If you want to work on something else before I do

23   charge the jury, I will consider another submission.

24          Are we ready for the jury?

25          MR. POLLOCK:  Yes, Your Honor.

Proceedings
July 13, 2023                                        66
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1          THE COURT:  Let's bring them in.

 2      (The jury entered the courtroom at 10:52 a.m.)

 3          THE COURT:  Everyone, please be seated.

 4          Ladies and gentlemen, as you have heard, the

 5  Plaintiffs and the Defendants have rested.  All that remains is

 6  for the attorneys to present to you now their closing

 7  arguments, for me to instruct you on the law and for you to

 8  deliberate together and render a verdict.

 9          I am going to ask you to close your notebooks and put

10  them aside, and put those pencils aside and not take any notes

11  during closing arguments.

12          As you recall, I did not have you take notes during

13  opening statements either, and that is because what the lawyers

14  say is not evidence in the case, only what the witnesses say.

15          And your notes should be limited to notes about the

16  evidence.  However, having said that, please do listen

17  carefully to the attorney's arguments as they are intended to

18  go over each side's perspective on that which you saw and

19  heard, and also address some of the legal requirements on each

20  of the claims the Plaintiffs are asserting and any defenses

21  that the Defendants may have.

22          We will be hearing first from Plaintiff's counsel,

23  then from Defense counsel and Plaintiff's counsel has the

24  opportunity to return and give a brief rebuttal close.

25          Mr. Pollock.

Closing Argument on Behalf of the Plaintiffs                    67
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

### CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFFS

1

2          MR. POLLOCK:  The civil jury trial, it's kind of a

3    dying animal.  We don't get them that often as lawyers.  The

4    courts don't get them that often.  And so when we, as the

5    lawyers, have an opportunity to have a trial, we appreciate

6    that.  It's -- it's a phenomenal opportunity that comes from

7    hard work in preparation, and it comes with sacrifice.  And I

8    said this in my opening, and I make it in my closing as well,

9    that we appreciate you taking time out of your lives to be the

10   most important part of our civil jury trial process, because

11   there was a lot of hard work put in by everybody in the

12   courtroom and the sacrifices that we all made.

13          Her honor has been working late and here early so that

14   we could come in and handle issues that we didn't have to

15   bother you with, and this has gone on since August of last year

16   when we filed this lawsuit.  And so I -- I give you this

17   context so you can understand our true appreciation for your

18   service.

19          And this is the opportunity, and I will have another

20   opportunity at the end, so I am not going to do -- say the same

21   thing twice and I am not going to prolong anything more than I

22   have to, but there is two ways to do this, and that's how you

23   saw in my examinations, how when we direct a client, right,

24   when we put them on the stand, the person who goes first, goes

25   first; the person responds and then you get the last word, and

Case 1:22-cv-22671-CMA    Document 123-4    Entered on FLSD Docket 09/21/2023    Page 68 of
146                                                                                              68
                         Closing Argument on Behalf of the Plaintiffs
                                          July 13, 2023
         Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1    so I am going to get the last word.  So I'm going to save some

 2    of my comments for then.

 3             But what I want to do now is talk about what the

 4    evidence showed, right, and what you heard.  Because this is a

 5    civil trial, and you are going to hear about the burden in a

 6    civil trial and what we have to prove and what -- in order to

 7    win our case.

 8             And the major distinction that you are going to have

 9    in your minds is the difference between a civil trial and a

10    jury trial and the burden of proof.  The other distinction is

11    that it's what the evidence is in our trial.  And so the

12    evidence is what you heard and what you saw, and you are going

13    to hear instructions on that, and maybe even take them back to

14    the jury room with you.

15             So that's our burden.  And then there's the evidence.

16    And so you take the evidence, you weigh it against the burden

17    and you come to your decision.  And the evidence in the case,

18    except for Ms. Guerra and her testimony today, was all from us.

19    This isn't a criminal case where you get to just deny and we

20    have to prove everything and we have got to prove it in a

21    wrestling match where we have to pin you.  That's not the case.

22    We don't have to pin them down.  We don't have to prove our

23    case beyond a reasonable doubt.

24             And you are going to hear about our burden, which is

25    just slightly tipping the scales, but more importantly, it's

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 69 of
146                                                                                        69
Closing Argument on Behalf of the Plaintiffs
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  about the evidence and that's how you decide cases.

2          What's the evidence?  Who is telling the truth?  Who

3  is not telling the truth?  What's the motivation behind this?

4  What's an important fact, and what's something that's really a

5  distraction, it's irrelevant?

6          And so we had my clients who all came before you, and

7  Toussaint and I met with them beforehand so that we could make

8  this as quick as we possibly could.  And I understand that it

9  took a little bit longer with Mariana and with Rafaela because

10 there's certain facts that we need to get into evidence through

11 their testimony.  And then since we have them in evidence, we

12 didn't need to do it again with Carlos and with Delio.  So

13 those were much shorter.  But we got those facts into evidence

14 through their testimony.

15         What you didn't hear was Mr. Cortes come forward or

16 Ms. Gonzalez Quintero come forward, after having prepared with

17 their lawyers, and tell you their truth.  And I don't think

18 that's because they're afraid of me.  I'm not going to beat

19 them up.  You know, I'm a lawyer.  I'm not the best lawyer in

20 town, but.  So they are not afraid of me, so why didn't they

21 come up?  What are they afraid of?

22         What they are afraid of isn't me, it's not my clients.

23 You know, we are here in trial.  Why they didn't go on the

24 stand is because they're afraid of the truth.  They're afraid

25 of the truth coming out, and if they had got on the stand, that

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 70 of
146
Closing Argument on Behalf of the Plaintiffs       70
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1    truth was coming out.

 2           And I think already the truth has already come out in

 3    this case.  And, you know, sometimes I refer back to what I

 4    said in opening, but I think today it's -- at least for now,

 5    it's important to talk about what Mr. Tropp said in opening

 6    about the truth, and I wrote them down and I put quotes on

 7    them.

 8           He said, The truth doesn't change and the truth is

 9    simple.  There's a lot of things we disagree with, but I'm

10    telling you now, I totally agree, the truth don't change and

11    the truth is simple.

12           He said that Mr. Cortes and his wife, quote, taught

13    them how to make money.  Totally agree.  Then I think we get

14    into some things that it's not a matter of what I agree with or

15    what my clients agree with or not, but what the evidence

16    showed.  And one of the things that Mr. Tropp said in his

17    opening, that Mr. Cortes said on the stand, was that my clients

18    never complained about overtime or bonuses or commissions.

19           And I won't get into the different complaints and

20    whether you need to believe my clients or not, or whether you

21    just want to believe the documents.  Because by now, you know,

22    there should be no doubt in your mind, even if that's not the

23    standard, the overwhelming evidence in this case is that my

24    clients, although they were classified by the Defendants as

25    independent contractors, although they were issued 1099s by the

Closing Argument on Behalf of the Plaintiffs
July 13, 2023                                                71
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   Defendants, doesn't mean that they were independent

2   contractors.

3          And so the terms 1099 and W-2, you know what they have

4   to do with whether somebody is an employee or an independent

5   contractor under the Fair Labor Standards Act to be entitled to

6   overtime?  You know what has to do with that?  Nothing.

7   Because if it did, when you see the jury instructions, you will

8   have seen that's one of the factors that it's -- this is how

9   they are paid.  And one of the factors also involves who issues

10  those documents, right.  What control do my clients have over

11  how those documents were issued?

12         And as my clients testified, if they were given --

13  Carlos testified if he was given a W-9 -- excuse me.  If he was

14  given a W-4, he'd sign it.  If he was given a W-9, he'd sign

15  it.  Whatever your employer gives you for tax purposes so you

16  can report your income, you're going to sign it, and they did.

17         What really matters is what you heard and what are the

18  realities of all this.  I mean, you heard Ms. -- Ms. Guerra

19  testify that she was -- she put the scale -- you know, on the

20  scale, and she was almost all dependent on my -- on the

21  Defendants.

22         So what you heard was that Mr. Cortes opened his

23  company in 2020 before open enrollment, he paid everybody as an

24  independent contractor and he did this so he could save on

25  operational expenses.  I mean, I don't know how you run an

Closing Argument on behalf of the Plaintiffs
July 13, 2023                                          72
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1   entire company with all independent contractors who do the most

 2   important part of your business, which is selling insurance,

 3   but, hey, that's what he did.

 4          So what we have is the evidence in the case where

 5   Mariana got up and told you:  This is where I go to work.  This

 6   is when they told me to work.  This is what I did.  This is

 7   where I did it.  They trained me on how I did it because before

 8   I got there, I had no experience.  I had an insurance license,

 9   that's it.  And by the way, she studied for two weeks to get

10   the license and she got it, and she started working and she

11   made a sale the first day.

12          Carlos, who was in the process of getting his health

13   insurance license because his sister inspired him, he got

14   there, he made a sale on the first day, listened to other

15   agents, Oh, that's how you make a sale.

16          You heard Ms. Guerra, you know, there's a lot of

17   clients who don't pay anything because of their income, and

18   they qualify for subsidized health insurance.  How hard is it

19   to make a sale when somebody's on the phone with you because

20   they called in to a call center, call center transfers to you,

21   you're basically another call center, and says, Hey, I would

22   like insurance and I don't want to pay for it.  No problem, you

23   qualify.  Okay, great.  Pick from these.  Which one do you

24   want?

25          Sales took how long?  You heard from my clients, you

Closing Argument on Behalf of the Plaintiffs
July 13, 2023                                                        73
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    know, a couple minutes.  Mr. Tropp was asking questions, you

2    know, it could take hours, it could take hours.  Is there

3    anybody who'd ever came in the courtroom and said, Yeah, it

4    took me hours to make a sale?  You heard the evidence.  There

5    wasn't a single person who came in and said, Yeah, it took me

6    hours to make a sale.

7           Mr. Cortes, you know, he testified.  You know, one of

8    the things you can remember and you can think about is, you

9    know, how many times did Mr. Cortes -- asked me a question --

10   to ask it a different way, or accused me of putting words in

11   his mouth?  How many times did his testimony change in front of

12   you where he said one thing in the deposition, and then we

13   brought it out, went through that whole process, it's the same

14   truth.  So if you are sitting in the courtroom, he said this

15   back then.

16          It's like Mr. Cortes came to you and said,

17   Mr. Pollock, because he addressed me like that when he didn't

18   like the question or he didn't like the answer, he didn't like

19   where it was going.  Mr. Pollock, that's not what I said.  You

20   misquoted me.  Mr. Pollock, I have a reason for that.  There is

21   a reason I changed my answer so that it's better for me now in

22   front of the jury in a federal courtroom.  There's a reason for

23   all this.

24          The reason is because the truth is simple.  The truth

25   doesn't change, and the truth of the matter is that my clients,

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 74 of
146

Closing Argument on Behalf of the Plaintiffs
July 13, 2023
74
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    and as you heard, the Defendants, had no training about what's

2    an independent contractor or what's an employee because if they

3    all agreed, guess what?  We wouldn't be here.  They had no

4    idea.

5           Independent contractor, it's cheaper.  Okay, cool.

6    New business, great.  Save money, independent contractor.  We

7    don't have to pay a bunch of stuff.  Don't have to pay Work

8    Comp.  We don't have to pay social security taxes.  We don't

9    have to take off withholding.  We don't have to deal with any

10   of this back office stuff.  We don't have to have these

11   expenses.  We are spending enough money on computers and

12   software and office space and buying leads.

13          And, you know, Mr. Cortes has his business in Colombia

14   with all these call center agents.  Why?  Because my clients

15   were walking into basically a call center and they sat down at

16   a workstation and they worked on a computer and they put on a

17   headset.  To get a call, they clicked a mouse, answer the phone

18   from the client that was provided to them, sell the insurance

19   in three to five minutes and it is like Jeopardy, you hit the

20   mouse instead of clicking the buzzer, answer.  That's how you

21   the decide who is going to pick it up.

22          There's no skills -- there's definitely skills

23   involved, and I am not minimizing that.  There are skills

24   involved in selling.  There's skills involved in understanding

25   and knowing people.  I am not denying that those are skills.

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 75 of 146

Closing Argument on behalf of the Plaintiffs                        75
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    The question is, are they specialized skills.

2            It takes skills to stand up in front of you and try to

3    convince you; that's my job.  But I went to law school, I

4    trained for this.  That's why lawyers are professionals.

5            And the insurance agent license, it was online.

6    Mariana sat in the office, took the course online for two

7    weeks, she passed the exam and that was it.  She started

8    selling.

9            My clients didn't work anywhere else.  They couldn't

10   work anywhere else.  Yeah, they can have side jobs.  I mean, it

11   is not like Rafaela who was testifying, Yeah, you know, I had

12   some supplemental insurance I was selling.  You didn't hear

13   the -- like, she took off three weeks and she was taking off

14   days at a time.  You heard Rafaela say, It was on the weekend,

15   it was after hours.  I mean, why not go and bar tend after 9

16   p.m.?  It means that they are hard workers.  It doesn't mean

17   they are independent contractors.

18           I mean, the test in this case isn't how hard you work.

19   The test in this case isn't how much money did you make because

20   you are going to get -- you heard from Mariana; she said, I

21   worked really hard.  I have a family.  I had sacrifices I had

22   to make to work from 9:00 in the morning to 9:00 in the evening

23   in November through January.  Leading up to Thanksgiving,

24   leading up to Christmas, into Christmas and New Year's.

25           All this time.  We'd love that time with our families,

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 76 of
146
Closing Argument on behalf of the Plaintiffs                76
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    but if you have a chance to make money, you are going to make a

2    sacrifice.  Why?  Because that sacrifice is going to pay off.

3    Does that mean that because we sacrifice and work really hard,

4    that changes us from an employee to an independent contractor?

5    No.  It means that we work hard and we're given an opportunity

6    to make a profit.  You didn't hear anybody say, Hey, I lost

7    money today.  You didn't hear Mr. Tropp say, I could drive to

8    work and they would lose all this money from driving to work.

9           You all know that the time and money spent getting to

10   work is not what you put on your taxes, it is not a loss.  I

11   mean, does it make sense that every agent would decide, Yeah, I

12   think it is more convenient for me to just work out of the

13   office today and tomorrow and the next day and every day?  Does

14   that make any sense?  I mean, if this was a hybrid job or this

15   was a remote job, my clients could have worked at home.

16          And by the way, even if they had a computer and a

17   headset and monitors, would that have made them independent

18   contractors?  I mean, you can still be an employee and be a

19   remote employee.

20          I am going to pause for now, and I will come back in a

21   couple of minutes.  Thank you.

22          THE COURT:  Defense counsel.

23          MR. TROPP:  Hello, ladies and gentlemen.

24          THE COURT:  I'm sorry, you need a microphone,

25   Mr. Tropp.

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 77 of
146                                                                              77
Closing Argument on Behalf of the Defendant
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1          MR. TROPP:  Yes.

2              CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

3          MR. TROPP:  Okay.  Start again.  Hello, everyone.  And

4    you have probably figured out by now, sometimes I can be a

5    little quirky.  The other day if you ever -- I hadn't had my

6    best day with the technology; I hope you don't use that against

7    me.  I have my moments, good and bad.  I hope -- does everyone

8    understand me?

9          THE JURY:  Yes.

10          MR. TROPP:  If you don't understand, raise your hand,

11   or want me to repeat something, speak slower.  I want to make

12   sure everyone understands.

13          Okay.  So first of all, big point about this is they

14   brought a lawsuit.  And you are going to hear the Judge's

15   instructions, and they have the burden of proof.  We don't have

16   to prove their case.  We didn't bring the suit here.  And if

17   there was a decision for Reinier or his wife not to testify,

18   that would be a strategic decision.  That wouldn't be on them.

19   It doesn't mean anything.

20          Reinier came up and -- I mean, this has been painful

21   these last three days.  I mean, I would say for every ten

22   minutes that we presented evidence, they probably presented an

23   hour of that -- of theirs.  And the first day, first witness

24   they called, we spent about two, three hours on Reinier.  And I

25   mean, Reinier answered every question.  He never, like, tried

Closing Argument on behalf of the Defendant
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   to avert the question, or he was never evasive.  He answered

2   the questions.  He answered them truthfully.

3          What else were -- were we going to bring him up again

4   today to go -- to rehash the same thing that Plaintiff was

5   unable to show for three hours the other day?  What would be

6   the purpose of that?  We don't have that burden.  We don't --

7   what more could we -- we -- bring them up to rehash everything,

8   would that help to keep you guys another three hours listening

9   to this, for me to question Reinier over the same stuff that

10  we'd all heard on -- on -- on Monday?  Or him saying that he

11  paid all the commissions, he paid all the bonuses, there was

12  never an agreement about the overtime.  And then to have

13  Mr. Pollock question him again over the same things and then

14  look at you while he's asking him the questions, what would be

15  the purpose of that?

16         We don't have to do that.  That's not our burden.  And

17  -- and for -- there shouldn't be any inference or -- or you

18  shouldn't take that into any consideration him not coming

19  forward.  We had no obligation.

20         He's proven beyond every standard what he had to prove

21  and show.  He went through the whole cross-examination and --

22  and -- and that's a big point, that just because we didn't call

23  him today, we thought, we got enough.  We have enough to put it

24  in your hands.  We trust that you -- that you, the jury, are

25  going to come to the right conclusion to find the truth.

Closing Argument on behalf of the Defendants                    79
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1          Now, I said at the beginning, that's true, that the

2   truth stays the same.  They said that they weren't allowed --

3   that the agents were not allowed to work for other companies.

4   And even Delio said, Yeah, we were not allowed to work for

5   other companies.  But then, you know, a little bit during the

6   questioning, he admitted, oh, he's selling other insurances.

7   He was working for other companies.  He had 1099s with this

8   concierge company.  Everyone did.

9          Rafaela was selling life insurance.  You don't have to

10  do it.  You heard Katrina today say that she was working for

11  other companies; they don't care.  These are professionals.

12  They have -- they are licensed professionals.  I mean, you, the

13  jury, know Miami, like I talked about earlier, you know the job

14  market out here.  Go try to find -- if you find an insurance

15  job, insurance agents work on commissions.  It is not an hourly

16  job.  You work -- if you want to work two hours, you're gonna

17  make a little money.  It's your choice.  That's what makes you

18  an independent contractor.

19          And that was the whole point.  What, we are going to

20  bring Reinier up to say the same thing we've been saying from

21  day one?  These people were independent contractors.  They are

22  licensed professionals.  They sold insurance policies based on

23  sales like every insurance agent.  It is not a wage and hour

24  case.  It's not an FLSA case.  Those numbers, I mean -- I -- I

25  can't -- I can't say that I assume that I know what you are all

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 80 of 146

Closing Arguments on Behalf of the Defendants        80
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    thinking.  I certainly have no idea how they came up with those

2    numbers.  They are making them up.  They're making them up as

3    they go along.

4            On top of that, when I said the truth doesn't change,

5    these -- these Plaintiffs continue working for months, never

6    send an e-mail or say, I'm owed commissions, I'm owed overtime,

7    I'm owed wages.

8            And then even up until the month before I took their

9    -- you heard me ask questions about what -- I was trying to

10   figure out, what is owed to you?  What was owed?  What was not

11   paid to you?  At one point, Delio said -- I think he said

12   15,000 and then he says 35,000.  They are coming up with these

13   numbers that are just invented, and they can't just do that.

14   They have to -- they have the burden of proof.  They have to

15   show what was not paid, what they didn't get.

16           And -- and -- like, it's just human behavior.  If

17   people are owed -- if someone's owed $25,000 because -- back a

18   year and a half ago, they are owed $25,000 and they're owed a

19   bonus, what's the behavior?  You want it.  You write letters,

20   you write an e-mail, you ask for it.  You don't continue

21   working for a place for months, never bring it up and then all

22   of a sudden file a lawsuit and ask for all this stuff and then

23   come up -- like literally yesterday come up with numbers never

24   seen before, never requested or asked for.

25           But the part that I find most offensive is this is --

1    this is a free country, and we all -- like this idea of

2    control, that these people are being controlled.  You could

3    always walk away.  No one is being controlled here.  You don't

4    have to take the job.

5            But most importantly, the first thing that when people

6    get a job, you want to -- you sit down and you say, What do I

7    get?  What do you get?  What do I get?  Oh, I get this salary

8    and I get that much.  It was based on -- the agreement is, you

9    sell these policies, you get paid for this policy, you get $35,

10   $15, $5; if you sell a 1,500 of them, you get these bonuses.

11   You say, Oh, okay.  And the harder you work, the more money you

12   get.  That's the agreement.

13           This idea that you could come later on after you have

14   this agreement and you come in a court of law and say, Okay,

15   let me come up with these numbers and let's get a -- let's

16   figure out what my hourly is based on -- my hourly is going to

17   be higher because you paid me more money and then we'll divide

18   it with this -- these calculations that they are making up as

19   they go along.

20           Yeah, they have a right to do it.  They could ask for

21   anything.  They could ask for a million dollars or what have

22   you.  They can come up with these formulas, but it's you who

23   decides.  You know how things work.  You can't make an

24   agreement with somebody.  If I ask you, Hey, work for me, do

25   this thing for me and then later on come back and say, Oh, for

Closing Arguments on Behalf of the Defendant
July 13, 2023
82
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1  all the hours I worked, I want 120 or $110 an hour; that was

2  part of the agreement?  It was never part of the agreement.

3          So the most important part of this, before you go and

4  deliberate -- we are almost there, we are almost at the finish

5  line, thank God -- is you are going to hear instructions from

6  the Judge, and again, I am not here to distract you, I am

7  trying to make this simple for you.

8          There's going to be, like, long instructions about the

9  FLSA and the wages and how to calculate, but in every section,

10  it is going to say -- like, the part about recordkeeping, the

11  whole section on that, they'll say that if you find that they

12  are independent contractors, the employer has no obligation to

13  record keep and keep all the records or records of time for an

14  independent contractor.

15          And all the sections regarding wages and overtime and

16  everything, it's always the employer.  You will see employee,

17  employer, employee and all these determinations.  But the first

18  question you are going to be asked is you're -- you're going to

19  determine were they employees or independent contractors?

20          And if you find that they're -- which they are

21  independent contractors and not employees, none of that

22  applies.  None of that applies, and that will take out, like,

23  half of the whole process.  Make it really simple.  Then you

24  get to the contract claim, you are saying -- which is what this

25  is really about.  They're saying, Oh, there's a contract here;

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 83 of
146
83
Closing Arguments on Behalf of the Defendants
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    I wasn't paid X for that.

2          But the decision to not call Reinier today, why would

3    we?  They have to show, they have to prove I wasn't paid for

4    this bonus, I wasn't paid for this commission.

5          I can't -- there was -- you can't point to one

6    commission.  They can't say, Okay, this commission I was not

7    paid for, or this $35 Ambetter thing I sold in 2020, not one.

8    They just come up with these numbers that the attorney was

9    putting together as they're testifying.

10          And then when I asked Delio without those numbers, I

11   said, How do you come up with a formula?  He had no idea.  He

12   had no idea.  He says 35, last month he said 15.  And then I

13   asked him, How -- you are claiming this $25,000 bonus for

14   making 600 -- 600 people that you signed up for the Oscar

15   program.  He says, Yes, I made those 600 people.  Never

16   mentions it to anybody, never brags about it.  Never says,

17   like, Oh, I got the $25,000 bonus.

18          Last month in deposition you heard he said, I have no

19   proof of the 600 people, and he didn't have any proof yesterday

20   either.  They are making this up.  They are making this up as

21   they go along.  They're independent contractors.

22          And they try to like -- and I get it, that -- that we

23   are not supposed to, like, label and you have to determine

24   through the economic reality test, like the degree of control

25   that -- and -- and I wish, we should, I -- if it was up -- you

Closing Arguments on Behalf of the Defendant
July 13, 2023
84
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    know, I think that the best way to determine whether somebody

2    is an independent contractor or not is based on their taxes.

3    Are you a W-2 employee where the employer could tell you what

4    to do, when to come in, have all this control, which they did

5    switch to because of this after this.  Or are you an

6    independent contractor?  And they -- and we can't just go by

7    that, and I get that.  We wish we could.  It should be easy.

8         Because they're filing taxes saying they are

9    independent contractors and they are coming in and blaming him

10   for that.  Rafaela was taking deductions for her computer and

11   car and everything, saying she is an independent contractor.

12   She never sent something to the government saying, Oh, no, I am

13   not a independent contractor.  No.  In fact, they set up their

14   own corporations that -- that technically they're working for,

15   that they're saying that they're self-employed by.  They have

16   their own companies.  They pay their own taxes.  It is a

17   benefit for them not having your employer take your taxes.

18   They have deductions.  They are not showing their tax records

19   here today or this week, but they're -- they're claiming to be

20   independent contractors with the government and then come in

21   here and say, Oh, no, I am not a independent contractor, you

22   misclassified me.

23        They knew from day one they were going to be

24   independent contractors.  They were told that they had these

25   work schedules that they were ordered to do.  No, the agents

Case 1:22-cv-22671-CMA    Document 123-4    Entered on FLSD Docket 09/21/2023    Page 85 of 146

Closing Arguments on Behalf of the Defendants
July 13, 2023                                        85
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    came up with those work schedules themselves and the days that

2    they were allotted.  It would be like an infringement.  You

3    can't -- if an agent showed up on somebody else's day, taking

4    up his leads, that would be, like, improper.  It would be --

5    like, the other agent would be like, What are you doing?  This

6    is my day.

7            And you heard that there was another agent that left

8    at 5:00 to take care of her kids.  You saw those work schedules

9    where a couple of days Carlos was off and Delio was off.  They

10   would -- they would figure that out between themselves.

11           The whole idea of the whole hiring and this whole

12   program is Reinier and his wife set up a system where you have

13   an opportunity for profit or loss based on how much work you

14   do.  You want to make more money.  You are not stuck in some

15   job getting minimum wage where you got no opportunity for

16   growth, no opportunity to move anywhere.  No.  They had -- they

17   had that opportunity.  That was the whole beauty of being an

18   independent contractor.

19           So I'm not saying for you to, like, completely base

20   your decision on the fact that they all had their own companies

21   that they were working for, they filed the LLCs, they put

22   themselves out to the government and they signed their IRS

23   forms saying that this is all true and correct, that this is

24   their companies.

25           MR. POLLOCK:  Objection, that's not in evidence, Your

Closing Arguments on Behalf of the Defendant          86
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   Honor.

2          THE COURT:  The jury will rely on its recollection of

3   the testimony and evidence presented.  Overruled.

4          MR. TROPP:  That -- that they held themselves out as

5   independent contractors, took their deductions.  They got to

6   keep -- they got to not have the employer pay their taxes; yet

7   they took on that responsibility themselves.  You know, at one

8   point Delio said, Well -- they go, Oh, I set up my company --

9   because they blame him for that -- and I became an independent

10  contractor because of Reinier.  I mean, take a little

11  responsibility, please.

12         You got the money.  I assume that they paid their

13  taxes like we all do.  They held themselves out as independent

14  contractors; they were hired as independent contractors.  This

15  is an independent contractor job.

16         Part of the factors -- the key factors that you will

17  go through is -- like, five key factors which is a -- that you

18  are going to be asked to decide were they employees or

19  independent contractors?  And to determine that, you are going

20  to look at the economic realities of the entire relationship of

21  the parties.  The idea is that you are supposed to take

22  everything, the totality of the circumstances, take everything

23  into consideration.  And only a jury can really make that

24  decision.

25         Employee, under control, or independent contractors,

Closing Argument on Behalf of the Defendant
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    and who controlled the Plaintiffs' work?  And it says that an

2    employee has a right to control the employee's work to set the

3    means and manner, hours and work to be done, set the hours.

4    Wherein in contrast, an independent contractor must accomplish

5    certain work assignments within the desired time the details,

6    means and manner by which the contract completes them are

7    determined by them, using special skills to perform that type

8    of work.

9            So they're told, Go out, sign up people.  People are

10   going to be coming in in droves.  It's a great opportunity for

11   them.  Instead of going out like Rafaela would do and try to

12   find people on the street or what have you.  You get a bunch of

13   people needing health insurance, that's what they provided to

14   people.

15           And these people got the leads similar to -- an

16   analogy is like -- it is like Uber.  Uber sends the people who

17   need a ride.  And yeah, Mr. Pollock made this thing, Well,

18   where's the car?  They're -- they're the car.  People need a

19   transportation.  You have got Uber drivers who drive their car.

20   But this is -- what service is being offered?  Insurance.  So

21   they're -- these Plaintiffs, these contractors themselves are

22   like the car, like a Uber.

23           Yeah, Avant gave them the customers and they had to

24   close it using their -- themselves mostly.  Yeah, you needed a

25   -- you needed a computer; you could use your own laptop.  If

1    they ask for access to the system, they were giving it to them.

2    You heard that any time they asked for access, if Carlos needed

3    to go to Colombia, sure, no problem.  Because the whole idea is

4    the more money they make, the more money he makes.  That's the

5    idea behind the commission job.  That's sales.  It is a sales

6    job, it's not a hourly job.

7         At one point -- okay.  And then the other -- how --

8    how they were paid, that's another factor.  Were they -- were

9    they paid piecework, commission basis?  An employer's usually

10   provides vacation or sick time, insurance, retirement, other

11   fringe benefits.  That wasn't the case here.  And an

12   independent contractor is ordinarily paid an agreed or set

13   amount or according to an agreed formula.

14        If you read and if you see the instructions that the

15   Judge is going to give you on all these economic reality tests,

16   and every sentence is going to say, what is the difference

17   between an employee and an independent contractor?  You are

18   going to see conclusively, they're independent contractors.

19   And the risk involved, the profit or faces the risk of loss.

20        So an employee has a predetermined rate, has no risk

21   of loss, has social security taxes paid by the employer.  That

22   was not the case here.  The big aspect about the profit and

23   loss is, yeah, some people have jobs that are dead-end jobs and

24   they have no opportunity to move or go up or down; they get the

25   same amount, no matter what they do.

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 89 of 146
Closing Arguments on behalf of the Defendant
July 13, 2023
89
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    Here, they have every opportunity to make more money

2    or lose money based on themselves and their time and the hours

3    that they worked.  They -- it's not that they were suffered or

4    forced to work, they chose to do it.

5    The big thing that the -- that Mr. Pollock's going to

6    talk about and, yeah, if you look at it like a carpenter,

7    carpenter needs his own tools, a plumber needs his own tools.

8    But not -- you know, like lawyers, they are independent

9    contractors.  What do you need?  We need to talk.  We need

10   ourselves.  A doctor is an independent contractor.  Yeah, maybe

11   he needs the hospital or -- but, you know, or -- these are

12   professionals, they need themselves to tell you or help you get

13   a policy.

14   It's not a tool based industry.  It's not about the

15   tools.  And the tools, they could use their own tools.  It

16   wasn't -- the computer, a DS L, I mean, this concept that like

17   if Reinier or Avant said, Okay, you come, get our leads, but

18   you have got to bring your own computer, otherwise you --

19   otherwise you might -- you know, someone's gonna make a wage

20   and hour claim and you have to bring your own towers.  No.

21   They provided that to help.  Somebody could have brought their

22   own, like, monitor or they brought their own mouses or the

23   headphones, those are big things.  They can use the telephone,

24   they could use their head phones talking to people.  It's not a

25   big tool factor.

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 90 of
146                                                                          90
Closing Arguments on Behalf of the Defendants
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1          Independent contractors offer their services to the

2     public or others in particular industries and have procured

3     necessary licenses for performing their services.  That's what

4     this is about.  That's -- these definitions.  It's not about

5     whether we bring Reinier up today and have you listen to this

6     whole gambit for another four hours, looking at these Excel

7     sheets that will make you dizzy and looking at these, like,

8     calculations that are, like, just made up and make no sense.

9          That's the ultimate question that they have to prove.

10    When you hear the instructions, it will say independent

11    contractors have procured necessary license for performing

12    their services.

13         Employees ordinarily work for only one or just a few

14    employers and do not have business names or listings.  And

15    ultimately, what's the party's intent, is the sixth factor.

16    The intent is always important, but the description, the

17    parties themselves is not controlling, the substance over form.

18         So that's why I reiterate, yeah, I'm -- I wish it

19    would just -- like they classified themselves as independent

20    contractors, they agreed.  They take this job saying, I'm an

21    independent contractor, I get the flexibility, that was the

22    intent.  That's the most important.

23         What was the intention?  And I -- I -- I say to you

24    that when they come up here -- when they came in front of you

25    and looked at you and said, Oh, yeah, I was an employee, I'm

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 91 of 146
91
Closing Arguments on Behalf of the Defendant
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   not an independent contractor, that goes to truth.  That's not

2   true.

3          They knew they were independent contractors.  They are

4   holding themselves out as independent contractors.  For them to

5   say, Oh, no, I'm an employee now, let's change it.  Let's come

6   up with these, frankly, like -- gobbledygook for rec- -- for,

7   like, coming up with calculations as to why they are owed these

8   numbers, it doesn't -- it's beyond the pale.  I hope you see it

9   that way.

10          A big aspect I remember, Mariana made a few points

11  that -- that she said that $36,000 was owed to her in

12  commissions.  And I was like, Where did that come from?  We

13  never heard that before, didn't mention that earlier.  She

14  said, Oh, I wrote a letter.  I sent it by U.S. mail to him.

15  U.S. mail.  And I sent a copy to my attorney.

16          $36,000.  I said, Well, where is it?  I would love to

17  see that.  She sent a letter saying that she's owed $36,000

18  that she sent by U.S. mail.  We never got that.  Oh, well, she

19  got it.  I sent it to my attorneys.  Where is that?  It was

20  never sent to her attorney; that was a lie.

21          And then she did say, Well, it was for 5500.  I mean,

22  is that -- that's a lot of money.  I don't know about you, but

23  that's a lot of money for me.  That's a big difference.  Well,

24  where's that letter for the 5500?  You think that's, like,

25  behavior conducive with the truth?  People are owed money and

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 92 of
146
92
Closing Arguments on behalf of the Defendant
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   they write letters?  They came in front of you.  She said she

2   sent this letter out.  There was never any letter for 36,000,

3   and for the 5500.  It was untrue.

4       Rafaela said, Oh, yeah, I worked 12 hours a day, 12

5   hours a day for this open enrollment period.  She was out --

6   she was out working at a warehouse for 20 days.  Oh, yeah.  She

7   says, Okay, you got me.  I mean, God bless her, but I couldn't

8   even be mad, you know.  I was like, Okay, that's okay with me

9   if that's okay with you.

10      She said she worked 12 hours a day for this whole

11  period, and we went through this whole calculation, which is

12  mind numbing with a whole filling out of the -- like they came

13  up with every insurance policy, how much to come up with per

14  hour or what have you.  Oh, yeah, 20 days, which it was

15  actually more than 20 days, but 20 days.  She wasn't there for

16  almost all of January, that whole month.  And then she says,

17  Oh, yeah, in November I did go out to -- out of the country to

18  sell my mom's house and to Cuba and then to Jamaica for three

19  days.  That was untrue.  I mean, she didn't work.  She said she

20  worked 12 hours a day for those 13 weeks, half of it not even

21  here.

22      And then -- and then Delio says, Oh, yeah, we weren't

23  allowed to work for other people.  And he goes, Oh, yeah, yeah,

24  I worked for this -- I was selling insurance for this other

25  company that I got a 1099 for.  Oh, yeah.  But -- but it was

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 93 of 146

Closing Arguments on Behalf of the Defendant
July 13, 2023                                              93
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    just -- then he says -- makes the point, But -- I said, Well,

2    what about for the association of the concierge that you were

3    getting paid for and got a 1099 for?  Oh, yeah, but that

4    wasn't -- that wasn't for ins- -- like -- like, that's.

5           The point was, they were saying they couldn't work for

6    somebody else, which is a huge part of this.  When an employer

7    tells you, You can't work for somebody, you can't work for

8    somebody else.  They were all working for other people.

9           Another thing is Delio Batista.  Talk about being

10   evasive.  I am sure you saw it, how somebody answers a

11   question.  Did they answer the question directly and avoid the

12   answer?  I mean, the guy didn't answer a single question.

13   Every question went like this and like that, but he didn't --

14   the answers that ultimately came out, working for other people,

15   working for other companies.

16          He said that he worked this whole open enrollment 12

17   hours a day when there wasn't even an enrollment period because

18   of COVID.  He got caught in that one; that was a big one.

19          Go through all of them.  There is not -- we didn't

20   bring Reinier up today because he answered all his questions.

21   What else is there to bring?  He said, Here is the payments,

22   this is what was paid.  He sent out the text 1099s, the tax

23   information.  Carlos, he worked seven months; he got a total

24   of, like, 72,000.  That's why I figured out if you did the

25   math, divide it by the time he worked there, came out to over

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 94 of
146                                                                                94
Rebuttal Argument on Behalf of the Plaintiffs
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1   10,000 a month.  All of them were making bank over there,

 2   making a lot of money.

 3        There was never any gaps where they were getting paid

 4   below minimum wage or not getting money.  And out of the

 5   goodness of his heart, he didn't have to, but he would give

 6   advances to people, make sure that they didn't go without money

 7   because he was trying to develop these relationships.

 8        Another thing is, Delio even testified to it, that he

 9   was asked to come in to do this open enrollment period for the

10   three-month period.  There was nothing about permanency.  No

11   permanency aspects of this job.

12        I don't want to lose you.  I feel like I might be

13   losing you, so I'll -- I'll -- I'll stop now and I think,

14   Mr. Pollock is going to address you.

15        We are almost there.  We are almost at the finish.

16   Thank you.

17        MR. POLLOCK:  Your Honor, can I get commiserate time

18   as well?

19        THE COURT:  I'm sorry?

20        MR. POLLOCK:  Can I get commiserate time as well?

21        THE COURT:  Yes.  Rebuttal.

22        MR. POLLOCK:  Thank you, Your Honor.

23        REBUTTAL ARGUMENT ON BEHALF OF THE PLAINTIFFS

24        MR. POLLOCK:  So it's -- it's pretty cool when, you

25   know, the other side comes up and says, You guys are right.

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 95 of
146
Rebuttal Argument on Behalf of the Plaintiffs                    95
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1    And -- I mean, I was blown away when Mr. Tropp got up here and

 2    said, Yeah, our agents are paid as employees now because of

 3    your lawsuit.  It's like the old saying, if it ain't broke,

 4    don't fix it.

 5          But if it is, you don't want a problem with your other

 6    agents coming in and suing you for overtime.  No explanation as

 7    to why, but that's what he said.  Not my words.  I mean, I'm

 8    glad he said it, but those are his words.

 9          I don't know how you come back off that one, but it's

10    a good effort.

11          Can I get the Elmo, please -- I mean the HDMI?

12          THE COURT REPORTER:  It's on.

13          MR. POLLOCK:  Okay, thank you.

14          Let's just, you know, drive on and try to make it kind

15    of interesting, because we are all used to looking at

16    everything on our phones and visual, and so I am kind of a

17    visual guy.

18          So the evidence proved that my clients are owed wages,

19    they are owed overtime and they are owed the commissions and

20    bonuses.  And the Defendants didn't pay taxes, social security,

21    Work Comp. premiums, and they didn't do it to save money, just

22    like they didn't pay overtime to save money.  And they didn't

23    pay all the commissions and they didn't pay all the bonuses to

24    their employees so that they could save money and keep it for

25    themselves.

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 96 of
146
Rebuttal Argument on Behalf of the Plaintiffs
July 13, 2023                                                                96
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1           But, you know, this evidence -- and I'll go through

2      what the -- the jury instructions.  But my clients were

3      employees.  They got everything that they needed, including the

4      back office support.  They were told what insurance to sell and

5      how to sell it and where to sell it and everything.  And the

6      Defendants, all of them, Mr. Cortes, his wife, they controlled

7      everything.  They had -- they had cameras.  They had call

8      center managers.  I mean, you don't manage independent

9      contractors.  You let them do whatever the heck they want to do

10     when they want to do it.  Could earn business for themselves,

11     and they are not dependent on any one person.

12          But they supervised everything, and they controlled

13     all of the work, when to work, where to work, the permission,

14     what to sell, how to sell it, who to sell it, how much you are

15     going to get paid on commissions.  It's not like my clients

16     could negotiate a different price.  They couldn't negotiate how

17     much they were going to get per sale.

18          This is a preprinted commission statement, here it is,

19     take it or leave it.  Okay, we'll take it.  That's the

20     agreement we are going to work under, claiming that's a

21     contract.  You don't hear anybody on the other side saying, No,

22     that's not a contract.  Mr. Cortes says it's a contract.  You

23     heard Ms. Guerra say, Yeah, that's how I worked.  That's the

24     basis of the commissions and bonuses.  And so they had complete

25     control over everything my clients did.

Rebuttal Argument on Behalf of the Plaintiffs
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1      And what Mr. Cortes said that my clients needed to

2  bring, and I asked him about it, I cross-examined him, he

3  testified that they needed their voice, their computer skills

4  and be able to type.  That's it.  There is no special skills

5  needed to do this job.

6      And now they pay their other agents as employees.  The

7  only difference is we called them out on it in court and then

8  they changed.

9      So the evidence showed that Avant Assurance employed

10  my clients.  Reinier Cortes employed them and so did

11  Ms. Gonzalez Quintero.  I mean, Mr. Cortes is the boss.

12      You never got any -- anybody complained, but you have

13  Carlos sending his statements over, you've got the e-mails from

14  Rafa, but yet nobody complained?  They all complained.  In

15  fact, Carlos sent over his spreadsheets and there's a -- you

16  know, and the reason why nobody made that much of a big deal

17  about it is because what do you do when your employer's got

18  $5,000 of your money and you complain and nothing happens?  And

19  then it builds to 10,000, and then it's 15-, and you're like,

20  Well, he keeps saying, you know, we will talk about it.  He

21  keeps saying he's going to pay me.  If I piss him off and he

22  fires me, then what do I do?

23      And so in 2020, in May, you heard Carlos, Mr. Cortes

24  gets a house, he gets a car, he moved into a new office.  What

25  do you think happened to the money?  And I said, you know, this

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 98 of 146

Rebuttal Argument on Behalf of the Plaintiffs                    98
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   is like the Wizard of Oz.  Then you got Mr. Cortes and he's,

2   you know, in his office and he is the one who has the

3   spreadsheets and he's the one who's determining how much every

4   agent is going to get paid, because his name is on every

5   policy.  You know, he's -- you know, he's the wizard behind the

6   curtain with the computer.

7           So, you know, that's what the evidence showed.  And so

8   I am going show you how to -- where to get and how to get

9   there.

10          So -- can I get the ELMO, please?

11          So her honor is going to provide you with special

12  interrogatories and possibly the instructions themselves, and I

13  will go over them, but I think it's easy to just show you how

14  to fill out this form because the case and the evidence is so

15  overwhelming we've met our burden; and our burden in this case,

16  like I said, it's not a wrestling match.  We don't need to pin

17  them to the ground.  This is -- this is for even.

18          So if we are even at the beginning of the case and I

19  put a sheet of paper on one side, that's all we need to win.

20  It's a feather on a scale, that's all you need.  I mean, it's a

21  drop of water.  It's just a hair more.

22          This isn't the situation where you've got a sailboat

23  in the distance and you don't know which way the wind is

24  blowing because you can't tell because it is not a big wind.

25  This isn't a case where you say, Ah, you know what, the wind is

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 99 of
146
99
Rebuttal Argument on Behalf of the Plaintiffs
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    blowing from the left because I see the sailboat leaning way

2    over.  This is the situation and all you need to find is you

3    need to get up close and examine, if the sailboat is leaning

4    just a little bit, we win.  We have met our burden.

5            So here, we've met our burden by a tremendous margin

6    on each of these issues.  And for everybody, you're going to be

7    asked, for Delio, for Mariana, for Rafa, and for Carlos, were

8    they employees of Avant Assurance?  The answer is yes.  Reinier

9    Cortes, the answer is yes.  Ms. Gonzalez Capote, the answer is

10   yes.

11           As far as, are they owed overtime, the answer is also

12   yes.  We have proven that they are employees, and as they're

13   employees, you have heard even Ms. Guerra say that everybody

14   worked overtime.  You heard Rafa say that when she worked, she

15   was working overtime throughout the year because they just

16   didn't have any agents for 2020 to 2021 until Mariana started,

17   until Carlos started, and then they had more agents.  And

18   because they had more agents after open enrollment, they worked

19   less.

20           And so for Delio, we provided you, and I know you took

21   notes of the numbers, and I can show them to you again, but the

22   overtime that Delio was owed is 13,665.28.  And, you know,

23   Mr. Tropp was saying, They are not exact, they are not exact.

24   But I'll show you in a second as to why we don't have to be

25   exact as far as inadequate records.

Rebuttal Argument on Behalf of the Plaintiffs
July 13, 2023                                                    100
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1          And so the next question is, did Avant fail to pay

2     Delio the bonuses and commissions?  And again, the answer's

3     yes.  And how much is he owed?  Exactly what Delio estimated,

4     $57,096.20.

5          And you get to skip the next question because we have

6     two theories under which we are going under.  One is, there's

7     contracts.  Each of my clients had a contract, an agreement.  I

8     am going to get paid $10 a policy for Rafa and Delio until open

9     enrollment, and then I am going to get paid according to the

10    commission sheet.  And then for the next series of contracts

11    it's, I am getting paid according to the commission sheet for

12    2021 to 2022 and on.  And so that's what we calculated.

13         So the same questions are going to be for Carlos.  And

14    for Carlos, he's owed 14,596.44 in overtime.  The difference is

15    for Carlos, you saw in his spreadsheets, and Carlos has his

16    spreadsheets, and between the $25,000 in commissions -- excuse

17    me, the $25,000 bonus and the $15,000 in commission, it's the

18    same $40,000 that he talked about in his deposition because

19    remember I went through the exercise, $10,000, $5,000 is

20    $15,000.  And you said in your deposition you're owed $15,000

21    in commissions.  It's the numbers.

22         And then the same for Mariana.  She's another employee

23    of the three Defendants.  She's got overtime wages of $16,000

24    and they failed to pay her bonuses and commissions of $15,700.

25         And you get to skip the unjust enrichment because I

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 101 of
146

Rebuttal Argument on Behalf of the Plaintiffs                101
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   think really this case is about contracts.  I think they

2   weren't just the numbers, but we don't get to recover twice.

3   And again, we are not asking for any more than what we are

4   entitled to.

5            Rafa was an employee of everybody, and she is owed

6   $26,916.59, because remember, she worked much longer.  And she

7   was great at her sales, and she is owed $73,000 for the bonuses

8   and commissions.  And then you sign and you date your verdict

9   form.  And so that's this case.

10           Mr. Tropp went through with you on the jury

11  instructions, and I actually want to go through some of them

12  with you because I don't want to just talk and make stuff up.

13  I mean, you heard the evidence.  You heard what was made up and

14  what was real, what you heard.

15           And so the law deals with inadequate records, and it

16  requires -- this is not according to me, this is according to

17  the law, but it requires employers to keep records of the hours

18  their employees, like my clients, worked.

19           And if they failed to do it, and it's made it

20  difficult for us to give you an exact amount, Plaintiffs may

21  recover a reasonable estimation of their damages.  And if we're

22  so wrong and we have been sitting here for four days -- and

23  this trial didn't get sprung on us, you know, Friday

24  afternoon -- what is the alternative explanation?  Hey, they're

25  wrong.  I know they worked overtime.  And if you are going to

Rebuttal Argument on behalf of the Plaintiffs
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    find something, awarded them X.  It's a light switch.

2            We're employees, we're owed money.  We're owed the

3    money that we claim because there is no explanation otherwise.

4            We have claims against Ms. Gonzalez and, you know,

5    Mr. Cortes.  I don't think there is any dispute, any reasonable

6    dispute that they were controlling and supervising my clients

7    and their work.  And so then we get to this issue of

8    independent contractor versus employee and we talk about the

9    right to control; when and how and the means and the manner.

10           So if you're in business for yourself, you heard

11   Carlos say it, I just show up when I want to show up, man.  He

12   didn't have to go and -- you heard Ms. Guerra say, Yeah, well,

13   you know, it's a matter of courtesy.  It is not a courtesy to

14   piss off your boss; they're going to fire you.  Is it a matter

15   of courtesy?  Was she really working for herself?  No.  Just

16   like my clients.  And because she wasn't working for herself,

17   she became an employee or she was paid as an employee because

18   of this lawsuit.

19           How were they paid?  Well, an employer usually pays an

20   employee on time worked, fees worked or commission basis.  In

21   other words, they set the amount, and you have the ability to

22   go do it.  Like car salesmen and other salesmen and saleswomen

23   and salespeople, you can go and sell and be an employee.

24   Because you are making on commission, that makes you an

25   independent contractor?  No.  They didn't go door to door.

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 103 of
146
103
Rebuttal Argument on Behalf of the Plaintiffs
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    They went to an office, they clicked the mouse, they said what

2    they had to say for a couple of minutes and that was it.

3         Was there a risk of taking a loss?  Were they

4    compensated at a predetermined rate, like 5 to $35 a member, or

5    10 for the year before?

6         And then we get to the good stuff.  Who provided the

7    tools, equipment and supplies?  An employee doesn't.

8         How do they offer their services?  Did they advertise?

9    Is there any evidence in this case that my clients advertised

10   or offered their services?  And the description isn't

11   controlling.  Substance governs over form, in other words,

12   resonates with me.

13        THE COURT:  One minute.

14        MR. POLLOCK:  And the most important question is

15   whether the Plaintiffs were economically dependent on the

16   Defendants, or whether they were independent contractors

17   themselves.  It is not governed by the label.  You look to the

18   reality of the relationship and what that relation- -- and

19   whether that relationship demonstrates dependence.  Meaning did

20   my clients need, and I think they did, the computer, all the

21   agreements with the insurance companies and the leads and the

22   computer and the monitor to go in and work?  Yeah.  They're

23   employees, they're owed overtime.

24        This case is about overtime and the wages that they're

25   owed, nothing more and nothing less.  And that's all we are

Rebuttal Argument on behalf of the Plaintiffs
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    asking you to award them, because an award for my client is not

2    a reward.  They worked hard for this money, they sacrificed

3    time with their families and they earned it.

4            THE COURT:  Time.

5            MR. POLLOCK:  Thank you, Your Honor.

6            Thank you, ladies and gentlemen.  It's been a pleasure

7    and an honor.

8            THE COURT:  Ladies and gentlemen, we're going to give

9    you a brief break.  My courtroom deputy is going to meet you in

10   the jury room now to take your lunch orders.  We will be

11   ordering lunch in for you, so if you can fill out those forms.

12   We'll bring you back out to the courtroom and I will instruct

13   you on the law at that time.

14      (The jury exited the courtroom at 12:01 p.m.)

15           THE COURT:  So Defendants have submitted yet another

16   version of the unclean hands defense instruction that they want

17   me to read to the jury.

18           Have you had a chance to look at it, Mr. Pollock?

19           MR. POLLOCK:  I looked at it briefly.

20           THE COURT:  I can't make much sense of it.  It does

21   say, The equitable doctrine of unclean hands applies when a

22   party seeking equitable relief has committed an unconscionable

23   act immediately related to the equity the party seeks in

24   respect to the litigation.  To assert an unclean hands defense,

25   the Defendant must demonstrate the Plaintiff's wrongdoing is

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 105 of
146
Rebuttal Argument on Behalf of the Plaintiffs
July 13, 2023                                                  105
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    directly related to the claim against which it is asserted, and

2    even if directly related, the Defendant must also show that it

3    was personally injured by the Plaintiff's wrongful conduct.

4          And here, Avant contends that the Plaintiffs' claims

5    for unjust enrichment are barred because Plaintiffs' own

6    inequitable conduct and wrongdoings are directly related to

7    this claim.

8          Such Plaintiffs own wrongdoing and unclean hands are

9    to be considered, and as a result, their claim for unjust

10   enrichment should be barred in full.

11         I don't understand it.

12         MR. CUETO:  I took up drafting that.

13         THE COURT:  I'm sorry?

14         MR. CUETO:  I took over drafting while Mr. -- I wanted

15   to just --

16         MR. TROPP:  I had -- I had initially put in the

17   affirmative defense of unclean hands, and I listed all the

18   authorities for it, but I -- at the end, just those two

19   sentences, that it should be considered.

20         THE COURT:  What is it -- what is it, though?  In

21   other words, the alleged wrongdoing, the wrongdoing that you

22   assert should bar the claim for unjust enrichment is what

23   exactly?  You don't -- we don't frame it for the jury in this

24   muddled instruction.

25         What is the unclean hands that you maintain?  In your

Rebuttal Argument on behalf of the Plaintiffs
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

 1    -- in your answer it was what?

 2            MR. CUETO:  The cease and desist letter.

 3            THE COURT:  In your answer where you pled the

 4    affirmative defense, what was -- what was the conduct that

 5    constituted the unclean hands?  Do you know?

 6            MR. TROPP:  Well, yeah, the interference and the --

 7    that basically -- I had initially put that in there, that they

 8    basically had a scheme to defraud.  And in response to their

 9    interference with the business of Avant, they came up with

10    this --

11            THE COURT:  Third affirmative defense barred by the

12    doctrine of unclean hands because the Plaintiffs at all

13    material times claimed 1099 independent contractor status with

14    the IRS.

15            How does that relate to unjust enrichment?

16            MR. CUETO:  I --

17            THE COURT:  First of all, this proposed instruction

18    doesn't even tell the jury what you claim is the conduct

19    constituting the unclean hands that should bar recovery under

20    an equitable doctrine of unjust enrichment.

21            MR. CUETO:  It was also the interference with the

22    clients.

23            THE COURT:  Where do you say that?  In your pleading,

24    in your affirmative defense.

25            MR. CUETO:  I don't believe it's asserted.

Rebuttal Argument on Behalf of the Plaintiffs
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
 1              THE COURT:  I'm sorry?

 2              MR. CUETO:  I don't think it's described in there.

 3              THE COURT:  It's not.  So the only unclean hands

 4    defense you presented was this one that I'm reading from, from

 5    Docket Entry 14.  The unclean hands consists of the Plaintiffs'

 6    claiming 1099 independent contractor status with the IRS.

 7              MR. CUETO:  So the defense is, it is inequitable for

 8    them to come to this court asserting that they are employees

 9    when they self-reported to be independent contractors.  We

10    believe that's -- that's inequitable.

11              THE COURT:  But that's -- but that's not what this

12    proposed instruction even says, right?  Where is that in here?

13              MR. CUETO:  I believe it was -- I believe it was

14    initially --

15              THE COURT:  I don't know what I am working with.  You

16    folks want me to add something at the eleventh hour to these

17    instructions and you're giving me --

18              MR. CUETO:  I took over from --

19              THE COURT:  I understand that.  I don't have anything

20    to work with now.  The jury is coming back in about ten

21    minutes.  If you can clean this up, I will add it; if you

22    can't, I won't.

23              MR. POLLOCK:  Your Honor?

24              MR. TROPP:  I understand, Your Honor.

25              THE COURT:  I'm sorry?
```

Court's Closing Instructions

July 13, 2023

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

```
1           MR. POLLOCK:  I said, Your Honor, may we reopen just

2   to put into evidence the summaries of the worksheets of -- of

3   the wages that Mr. Cummings and I went through with the

4   witnesses?

5           THE COURT:  I'm sorry, what summaries?

6           MR. POLLOCK:  There were the demonstrative worksheets

7   that we had.  Can we admit -- can we move those into evidence?

8           THE COURT:  Those are demonstratives.

9           MR. POLLOCK:  Okay.  Thank you.

10           THE COURT:  I will be back in about ten minutes.  If

11   you are able to clean it up, I will add it; if not, I'm just

12   going to print out the jury instructions I do have and give

13   those.  Thank you.

14       (A recess was taken from 12:07 p.m. to 12:16 p.m.)

15           THE COURT DEPUTY:  All rise.

16           THE COURT:  Are they ready Patricia, the jurors?

17           THE COURTROOM DEPUTY:  Checking.

18           THE COURT:  Okay.

19       (Pause in proceedings.)

20       (The jury entered the courtroom at 12:20 p.m.)

21           THE COURT:  Everyone, please be seated.  I would ask

22   the court security officer to pass out those instructions to

23   each of the jurors.

24                   COURT'S CLOSING INSTRUCTIONS

25           THE COURT:  Ladies and gentlemen, these are the
```

1   instructions on the law that you must use in deciding this

2   case.  You each have, as you can see, have your own set of

3   these instructions, and you will have these to take back with

4   you and use during your deliberations.

5           When I have finished, you will go to the jury room and

6   begin your discussions, sometimes called deliberations.  You

7   are free to read along with me, if you would like.

8           Your decision must be based only on the evidence

9   presented here.  You must not be influenced in any way, by

10  either sympathy for or prejudice against anyone.

11          You must follow the law as I explain it, even if you

12  do not agree with the law - and you must follow all of my

13  instructions as a whole.  You must not single out or disregard

14  any of the instructions on the law.

15          The fact that a corporation is involved as a party

16  must not affect your decision in any way.  A corporation and

17  all other persons stand equal before the law and must be dealt

18  with as equals in a court of justice.  When a corporation is

19  involved, of course it may act only through people as its

20  employees; and in general, a corporation is responsible under

21  the law for the acts and statements of its employees that are

22  made within the scope of their duties as employees of the

23  company.

24          As I said before, you must consider only the evidence

25  that I have admitted in the case.  Evidence includes the

1   testimony of witnesses and the exhibits admitted.  Anything the

2   lawyers say is not evidence and is not binding on you.

3           You should not assume from anything I have said that I

4   have any opinion about any factual issue in this case.  Except

5   for my instructions to you on the law, you should disregard

6   anything I may have said during the trial in arriving at your

7   own decision about the facts.

8           Your own recollection and interpretation of the

9   evidence is what matters.

10          In considering the evidence, you may use reasoning and

11  common sense to make deductions and reach conclusions.  You

12  should not be concerned about whether the evidence is direct or

13  circumstantial.

14          "Direct evidence" is the testimony of a person who

15  asserts that he or she has actual knowledge of a fact, such as

16  an eyewitness.

17          "Circumstantial evidence" is proof of a chain of facts

18  and circumstances that tend to prove or disprove a fact.  There

19  is no legal difference in the weight that you may give to

20  either direct or circumstantial evidence.

21          When I say that you must consider all the evidence, I

22  do not mean that you must accept all the evidence as true or

23  accurate.  You should decide whether you believe what each

24  witness had to say, and how important that testimony was.  In

25  making that decision, you may believe or disbelieve any witness

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 111 of
146

Court's Closing Instructions
July 13, 2023

111
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    in whole or in part.  The number of witnesses testifying

2    concerning a particular point does not necessarily matter.

3           To decide whether you believe any witness, I suggest

4    that you ask yourself a few questions:

5           Did the witness impress you as one who was telling the

6    truth?

7           Did the witness have any particular reason not to tell

8    the truth?

9           Did the witness have a personal interest in the

10   outcome of the case?

11          Did the witness seem to have a good memory?

12          Did the witness have the opportunity and ability to

13   accurately observe the things he or she testified about?

14          Did the witness appear to understand the questions

15   clearly and answer them directly?

16          Did the witness's testimony differ from other

17   testimony or other evidence?

18          You should also ask yourself whether there was

19   evidence that a witness testified falsely about an important

20   fact.  And ask whether there was evidence that at some other

21   time, a witness said or did something or did not say or do

22   something that was different from the testimony the witness

23   gave during this trial.

24          But keep in mind that a simple mistake does not mean a

25   witness was not telling the truth as he or she remembers it.

1   People naturally tend to forgot some things or remember them

2   inaccurately.  So if a witness misstated something, you must

3   decide whether it was because of an innocent lapse in memory or

4   an intentional deception.  The significance of your decision

5   may depend on whether the misstatement is about an important

6   fact or about an unimportant detail.

7        In this case, it is the responsibility of Plaintiffs

8   to prove every essential part of their claim[s] by a

9   "preponderance of the evidence."  This is sometimes called the

10  "burden of proof" or the "burden of persuasion."  A

11  "preponderance of the evidence" simply means an amount of

12  evidence that is enough to persuade you that the Plaintiffs'

13  claims are more likely true than not true.

14       If the proof fails to establish any essential part of

15  a claim or contention by a preponderance of the evidence, you

16  should find against the Plaintiffs.

17       When more than one claim is involved, you should

18  consider each claim separately.

19       In deciding whether any fact has been proved by a

20  preponderance of the evidence, you may consider the testimony

21  of all of the witnesses, regardless of who may have called

22  them, and all of the exhibits received in evidence, regardless

23  of who may have produced them.

24       If the proof fails to establish any essential part of

25  the Plaintiffs' claims by preponderance of the evidence, you

Court's Closing Instructions

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    should find for the Defendants as to that claim.

2        Plaintiffs, Delio Batista, Carlos Lopez, Mariana Lopez

3    and Rafaela Valiente, claim that Defendants, Avant Assurance,

4    Reinier Cortes and Andrea Gonzalez Quintero, did not pay

5    Plaintiffs the overtime pay required by the Fair Labor

6    Standards Act, also known as the FLSA.

7        The rights and requirements of the FLSA are mandatory

8    and cannot be waived, negotiated or bargained away between

9    employers and employees.  These rights and requirements cannot

10   be abridged by contract or otherwise waived by an employee and

11   can only be compromised when supervised for fairness by either

12   the U.S. Department of Labor or a Court.  The rights and

13   requirements of the FLSA, however, do not apply to independent

14   contractors.

15       To succeed under FLSA claim against Defendants,

16   Plaintiffs must prove each of the following facts by a

17   preponderance of the evidence:

18       First, that Plaintiffs were employees of the

19   Defendants, and;

20       Second, that the Defendants failed to pay Plaintiffs

21   the overtime pay required by law.

22       As to the overtime claim:  Permitting an employee to

23   engage in an activity is considered work under the FLSA.  If

24   Defendants knew or had reason to believe a Plaintiff was

25   working, including work performed away from the office, then

Case 1:22-cv-22671-CMA   Document 123-4   Entered on FLSD Docket 09/21/2023   Page 114 of
146
114
Court's Closing Instructions
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    the time is work time and is compensable.  It is not relevant

2    that the employer did not ask the employee to do the work.  The

3    reason that the employee performed the work is also not

4    relevant.  If the employer knows or has reason to believe the

5    employee works overtime, the additional hours must be counted

6    as hours worked.

7            Now, the FLSA requires employers to pay an employee at

8    least one-and-one-half times the employee's regular rate for

9    time worked over 40 hours in a workweek.  Put another way, if

10   an employee earned works more than 40 hours in one workweek,

11   the employer must pay the employee the overtime rate of 1.5

12   times the regular rate for all time worked after the first 40

13   hours.  This is commonly known as time-and-a-half pay for

14   overtime work.  Plaintiffs claim as unpaid overtime wages the

15   difference between the amount they earned and the

16   time-and-a-half pay they claimed they also earned.

17           If Plaintiffs are owed overtime, it should be based on

18   one-half the "regular rate."

19           First, you must find the "regular rate."  Commissions

20   and non-discretionary bonuses must be included in calculating

21   the "regular rate."  This is true regardless of whether the

22   commission or bonus is the sole source of the employee's

23   compensation or is paid in addition to a guaranteed salary or

24   hourly rate and regardless of the method, frequency or

25   regularity of computing, allocating and paying the commission

1    or bonus.  It does not matter whether the commission or bonus

2    earnings are computed daily, weekly, biweekly, semimonthly

3    monthly or at some other interval.

4         If it is not possible or practicable to allocate the

5    commission or bonus to a particular workweek, you shall presume

6    that the employee earned an equal amount of commission and/or

7    bonus in each week of commission and bonus computation period

8    and compute any overtime compensation based on this amount.

9         An employee's regular rate for one week is the basis

10   for calculating any overtime pay due.  The regular rate for a

11   week is determined by dividing the total commissions and/or

12   bonuses earned during the period in question by the number of

13   weeks the commissions and/or bonuses were intended to cover.

14   This will give you an amount each Plaintiff earned each week.

15        To determine the regular rate, divide the amount each

16   employee earned each week by the total hours worked each week.

17   Employees are entitled to recover as overtime wage damages

18   one-half the "regular rate" for each overtime hour worked.

19        You must then determine how many overtime hours each

20   employee worked each week by subtracting 40 from the total

21   hours each employee worked each week.

22        Once you determine the "regular rate" and any

23   "overtime hours per week," you should then multiply the

24   overtime hours per week by one-half the "regular rate" for each

25   overtime hour worked.

1      The amount of damages is the difference between the

2    amount Plaintiffs should have been paid and the amount they

3    were actually paid.  Plaintiffs are entitled to recover damages

4    earned from the date of your verdict back to no more than two

5    years before they filed this lawsuit on August 23rd, 2022.

6           Inadequate Records:  The law requires employers to

7    keep records of how many hours their employees work and the

8    amount they are paid.  Employers are not required to maintain

9    records for independent contractors.

10          Plaintiffs claim that Defendants failed to keep and

11   maintain adequate records of their hours and pay.  Plaintiffs

12   also claim that Defendants' failure to keep and maintain

13   adequate records has made it difficult for Plaintiffs to prove

14   the exact amount of their claims.

15          If you find that Defendants failed to keep adequate

16   time and pay records for Plaintiffs and that Plaintiffs

17   performed work for which they should have been paid, Plaintiffs

18   may recover a reasonable estimation of the amount of their

19   damages.  But to recover this amount, Plaintiffs must prove by

20   a preponderance of the evidence a reasonable estimation of the

21   amount and extent of the work for which they seek pay.

22          Individual Liability:  An individual can also be

23   liable for a Plaintiff's damages under the FLSA if the

24   individual plays a substantial role in causing the FLSA

25   violation.  To determine whether the individual is liable, you

Court's Closing Instructions
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1    must consider all the relevant circumstances rather than any

2    one technical factor.  Plaintiffs must prove that Defendants,

3    Reinier Cortes and Andrea Gonzalez Quintero, had operational

4    control over Avant.  In other words, Cortes and Gonzalez

5    Quintero must have controlled significant aspects of Avant

6    Assurance Inc.'s day-to-day functions, including employee

7    compensation or have had direct responsibility for the

8    supervision of Plaintiffs.

9          It is not always clear whether the law considers

10   someone an "employee," and it is not always clear who the law

11   considers someone's "employer."  Some people, for example,

12   perform services for others while remaining self-employed as

13   independent contractors.

14         You must decide:  Were Plaintiffs employees of Avant

15   Assurance, Inc., Reinier Cortes and Andrea Gonzalez Quintero,

16   or for were Plaintiffs independent contractors?  You should

17   answer this question in light of the economic realities of the

18   entire relationship between the parties.  There are a number of

19   factors you must consider based on all the evidence in the

20   case:

21         Who controlled Plaintiffs' work?  In an

22   employer/employee relationship, the employer has the right to

23   control the employee's work, to set the means and manner in

24   which the work is done and set the hours of work.  In contrast,

25   an independent contractor generally must accomplish a certain

Case 1:22-cv-22671-CMA  Document 123-4  Entered on FLSD Docket 09/21/2023  Page 118 of
146
Court's closing instructions    July 13, 2023                                    118
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1   work assignment within a desired time, but the details, means

2   and manner by which the contractor completes that assignment

3   are determined by the independent contractor, normally using

4   special skills necessary to perform that kind of work.

5          How were Plaintiffs paid?  An employer usually pays

6   and employee on a time worked, piecework or commission basis,

7   and an employer usually provides vacation, or sick time,

8   insurance, retirement and other fringe benefits to the

9   employee.  An independent contractor is ordinarily paid an

10  agreed or set amount, or according to an agreed formula, for a

11  given task or job, and no benefits are provided.

12         How much risk or opportunity did Plaintiffs have?  An

13  independent contractor is generally one who has the opportunity

14  to make a profit or faces a risk of taking a loss.  But an

15  employee is generally compensated at a predetermined rate, has

16  no risk of loss and has social security taxes paid by the

17  employer.

18         Who provided Plaintiffs their tools, equipment and

19  supplies?  An independent contractor usually provides the

20  tools, equipment and supplies necessary to do the job - but an

21  employee usually does not.

22         How did Plaintiffs offer services?  Independent

23  contractors generally offer their services to the public or

24  others in a particular industry, have procured the necessary

25  licenses for performing their services and they have a business

1    name or listing in the phonebook.  Employees ordinarily work

2    for only one or just a few employers, and do not have business

3    names or listings.

4            What was the parties' intent?  The parties' intent is

5    always important.  But the description the parties themselves

6    give to their relationship is not controlling - substance

7    governs over form.

8            You should consider all the circumstances surrounding

9    the work relationship.  No single factor determines the

10   outcome.  Nevertheless, the extent of the right to control the

11   means and manner of the worker's performance is the most

12   important factor.  The factors listed above are guides for your

13   determination of employee status under the FLSA, but the most

14   important question is whether Plaintiffs were economically

15   dependent upon Defendants or were they independent contractors

16   in business for themselves.  The question of employee or

17   independent contractor status is not governed by the label put

18   on the relationship by the parties, nor is it relevant whether

19   the parties intended to create an employment relationship.

20   Whether an individual is an independent contractor or employee

21   requires that one look past the label put on the relationship

22   and look to the economic reality of the relationship.

23           Plaintiffs also claim that they and Avant Assurance

24   entered into a series of contracts to pay bonuses and

25   commissions based on the insurance policies they sold, that

1  Avant Assurance breached these contracts by failing to pay them

2  all the commissions and bonuses they earned and that the breach

3  resulted in damages to each of them.  Contracts may be written

4  or oral, and may be partly written or partly oral.  Oral

5  contracts are just as valid as written contracts.

6          To prove that contracts were created, Plaintiffs must

7  prove all of the following:

8          One, the essential contract terms were clear enough

9  that the parties could understand what each was required to do;

10         Two, the parties agreed to do something or not to do

11 something, may have value;

12         Three, the parties agree to the essential terms of the

13 contracts.  When you examine whether the parties agreed to the

14 essential terms of the contract -- contracts, ask yourself if,

15 under the circumstances, a reasonable person would conclude,

16 from the words and conduct of each party, that there were

17 agreements.  The making of a contract depends only on what the

18 parties said or did.  You may not consider the parties'

19 thoughts or unspoken intentions.

20         If Plaintiffs did not prove all of the above, then

21 contracts were not created.

22         To recover damages from Avant Assurance Inc. for

23 breach of contract, the Plaintiffs must prove all of the

24 following:

25         One, Plaintiffs and Avant Assurance Inc. entered into

1    contracts;

2         Two, Plaintiffs did all or substantially all of the

3    essential things which the contracts required them to do or

4    that they were excused from doing those things;

5         Three, All conditions -- conditions required by the

6    contracts for Avant Assurance Inc.'s performance had occurred;

7         Four, Avant Assurance Inc. breached the contracts by

8    not paying the commissions and/or bonuses the contracts

9    required it to pay;

10        And five, Plaintiffs were damaged by that failure.

11        If a contract does not state a specific time within

12   which a party is to perform a requirement of the contract, then

13   the party must perform the requirement within a reasonable

14   time.  What is a reasonable time depends on the facts of each

15   case, including the subject matter and purpose of the contract

16   and the express intent of the parties at the time they entered

17   into the contract.

18        Contracts can be created by the conduct of the parties

19   without spoken or written words.  Contracts created by conduct

20   are just as valid as contracts formed with words.

21        Conduct will create a contract if the conduct of both

22   parties is intentional and each knows, or under the

23   circumstances should know, that the other party will understand

24   the conduct as creating a contract.

25        In deciding whether a contract was created by conduct,

1    you should consider the conduct and relationship of the parties

2    as well as all of the circumstances.

3          Plaintiffs' last claim is asserted in the alternative,

4    and the -- and in the event that you do not find Plaintiffs

5    entered contracts with Avant Assurance Inc.  In this last

6    claim, Plaintiffs state that Avant Assurance Inc. owes them

7    commissions and bonuses for selling policies of insurance for

8    it because without payment for the additional amounts they

9    claim are owed, Avant Assurance would be unjustly enriched.  To

10   establish this claim, Plaintiffs must prove all of the

11   following:

12         One, Plaintiffs gave a benefit to Avant Assurance,

13   Inc.;

14         Two, Avant Assurance Inc. knew of the benefit;

15         Three, Avant Assurance Inc. accepted or retained the

16   benefit; and

17         Four, The circumstances are such that Avant Assurance

18   Inc. should, in all fairness, be required to pay for the

19   benefit.

20         Of course the fact that I have given you instructions

21   concerning the issue of Plaintiffs' damages should not be

22   interpreted in any way as an indication that I believe the

23   Plaintiffs should or should not prevail in this case.

24         Your verdict must be unanimous - in other words, you

25   must all agree.  Your deliberations are secret, and you will

1   never have to explain your verdict to anyone.

2          Each of you must decide the case for yourself, but

3   only after fully considering the evidence with the other

4   jurors.  You must discuss the case with one another and try to

5   reach an agreement.  While you are discussing the case, do not

6   hesitate to re-examine your own opinion and change your mind if

7   you become convinced that you were wrong.  But do not give up

8   your honest beliefs just because others think differently or

9   because you simply want to get the case over with.

10         Remember, in a very real way, you are judges, judges

11  of the facts.  Your only real interest is to seek the truth

12  from the evidence in the case.

13         When you go to the jury room, please choose one of

14  your members to act as foreperson.  The foreperson will direct

15  your deliberations and speak for you here in court.

16         A verdict form has been prepared for your convenience.

17  You will take the verdict form with you to the jury room, and

18  when you have all agreed on the verdict, your foreperson must

19  fill in the form, sign it and date it.  Then you will return

20  with it to the courtroom.

21         If you wish to communicate with me at any time, please

22  write down your message or question and give it to the court

23  security officer.  The court security officer will bring it to

24  me, and I will respond as promptly as possible, either in

25  writing or by talking to you here in the courtroom.

1      Please understand that I may have to talk to the

2   lawyers and the parties before I respond to your question or

3   message, so you should be patient as you await my response.

4   But I caution you not to tell me how many jurors have voted one

5   way or the other at that time.  That type of information should

6   remain in the jury room and not be shared with anyone,

7   including me in your note or question.

8         Ladies and gentlemen, some of you took notes to help

9   you remember what the witnesses said.  If you did take notes,

10  don't share them until you go to the jury room to decide the

11  case.  Whether or not you took notes, you should rely on your

12  own memory of the testimony.  Your notes are there only to help

13  your memory; they are not entitled to any greater weight than

14  your memory or impression about the testimony.

15        Ladies and gentlemen, the verdict form consists of

16  several pages.  You have seen the lawyers show it to you during

17  closing arguments, it consists of five pages in total.  At the

18  end of each question, you will you see an instruction on what

19  to do depending on how you answered that question.  So please

20  look at the instruction, it will tell you whether to skip over

21  the next question and go on to another one or move on,

22  depending on what the answer was.

23        We are going to give you two sets of these jury

24  instructions; one of those you can use sort of as a -- to write

25  on or scribble on and make changes to.  And then the other one,

1    to please make it your final.  Sometimes jurors with jury

2    instructions like these and verdict forms like these need,

3    like, a separate one in case they make mistakes in how they

4    filled it out or how they followed those instructions.  So

5    there's one -- I will write on it "draft" and the other one I

6    will leave clean so you know that that's the one the foreperson

7    is to fill in consistent with the instructions I have given.

8            Are all of these exhibits ready to go back to the

9    jury, gentlemen?

10           MR. POLLOCK:  We put them on a --

11           THE COURT:  All right.  My courtroom deputy will be

12   bringing lunch in as soon as it arrives for you.  If we have

13   not heard back from you by 5 p.m., she will knock on the door

14   and release you for the evening, with instructions to return

15   tomorrow morning at 9:00.  So the time you went today is

16   5 p.m., the latest.  Thank you very much.

17           COURT SECURITY OFFICER:  All rise.

18       (Jury exited the courtroom for deliberations at 12:47 p.m.)

19           THE COURT:  How is the jury to look at the exhibits,

20   gentlemen?

21           MR. POLLOCK:  Through a drive.

22           THE COURT:  And how are they going to look at it?

23           MR. CUMMINGS:  They don't have a computer.

24           MR. POLLOCK:  I thought there was going to be a laptop

25   or something where they'd be able to look at it.

Proceedings
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1           THE COURT:  The U.S. Attorney's Office provides

2    laptops in criminal cases; parties provide their own.  You

3    provide a clean laptop with nothing on it.

4           MR. POLLOCK:  We don't have a clean laptop.  The last

5    time -- we don't have a laptop, so we need one.

6           THE COURT:  I don't know.

7           MR. POLLOCK:  The last trial I had, the Court was able

8    to procure one to share.

9       (Pause in proceedings.)

10          THE COURT:  Patricia, do we have any blank laptops?

11          MR. POLLOCK:  Judge, if I could possibly just create a

12   new user on the Mac, which only gives them access to whatever's

13   on there, but it would still have Internet, which I don't know

14   if you want.

15          THE COURT:  Normally we just give them just blank

16   laptops with no Internet access.

17          THE COURTROOM DEPUTY:  With the thumb drive.

18          MR. POLLOCK:  And I've got the thumb drive, I just

19   don't have the blank laptop.

20          THE COURT:  If we can check with IT; I don't know if

21   they have one.

22          And you corrected the verdict forms, Patricia, as they

23   requested, or no?

24          Were you able to correct the verdict forms to correct

25   the --

Proceedings
127
July 13, 2023
Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

1          THE COURTROOM DEPUTY:  I gave -- I wasn't sure exactly

2     what I was going to send them.

3          THE COURT:  So are we all in agreement to change the

4     Defendant's name?  It is incorrect on the verdict form.

5          MR. POLLOCK:  Where do you see that?  I saw that there

6     is a reference to Gonzalez Capote instead of Gonzalez Quintero.

7     So I sent an e-mail asking that that be corrected.

8          MR. TROPP:  That's fine.

9          THE COURT:  So I will have Patricia make that change,

10    and we'll see if we can locate a blank laptop; if not, they're

11    without exhibits.

12         MR. POLLOCK:  You want me to just drop off the USB in

13    case there's one that's found?

14         THE COURT:  Umm --

15         MR. POLLOCK:  If there's a laptop, there's a laptop;

16    if there's not, there's not.  And if there is one, then I have

17    the USB to plug in.

18         THE COURT:  All right.  Okay.

19         MR. POLLOCK:  Okay.

20         THE COURT:  And have you all looked at the USB?

21         MR. TROPP:  It's the one you sent me?

22     (Pause in proceedings.)

23         THE COURT:  Joint exhibits.  We need your cell phone

24    numbers so in case there is a jury question, we can all contact

25    you.

1        (Pause in proceedings.)

2            MR. POLLOCK:  We are in recess, Your Honor?

3            THE COURT:  We are.  Thank you.

4        (Recess taken from 12:53 p.m. to 5 p.m. for deliberations.)

5        (Jurors released from jury room.)

6        (The proceedings adjourned at 12:53 p.m.)

7

8                    **C E R T I F I C A T E**

9

10       I hereby certify that the foregoing is an

11  accurate transcription of the proceedings in the

12  above-entitled matter.

13

14

15   _09/07/2023_           _____
         DATE               STEPHANIE A. McCARN, RPR
16                           Official United States Court Reporter
                             400 North Miami Avenue, Thirteenth Floor
17                           Miami, Florida 33128
                             (305) 523-5518

18

19

20

21

22

23

24

25

## $

**$10** [1] - 100:8
**$10,000** [3] - 17:19, 17:25, 100:19
**$110** [1] - 82:1
**$15** [1] - 81:10
**$15,000** [3] - 100:17, 100:20
**$15,700** [1] - 100:24
**$16,000** [1] - 100:23
**$200** [1] - 47:22
**$2400** [2] - 47:21
**$25,000** [7] - 34:16, 80:17, 80:18, 83:13, 83:17, 100:16, 100:17
**$26,916.59** [1] - 101:6
**$300** [1] - 47:15
**$35** [5] - 18:3, 18:22, 81:9, 83:7, 103:4
**$36,000** [3] - 91:11, 91:16, 91:17
**$40,000** [1] - 100:18
**$5,000** [2] - 97:18, 100:19
**$57,096.20** [1] - 100:4
**$73,000** [1] - 101:7

## '

**'20** [1] - 13:24
**'21** [1] - 14:2
**'21/'22** [1] - 59:16
**'22** [2] - 13:23, 47:3
**'23** [1] - 13:24

## 0

**09/07/2023** [1] - 128:14

## 1

**1** [3] - 1:8, 18:21, 29:18
**1,250** [1] - 17:19
**1,499** [1] - 17:19
**1,500** [1] - 81:10
**1.5** [1] - 114:11
**10** [5] - 18:22, 60:3, 60:7, 60:20, 103:5
**10,000** [2] - 94:1, 97:19
**108** [1] - 3:22
**1099** [13] - 7:5, 8:13, 8:15, 24:9, 25:7, 27:20, 33:11, 54:10, 71:3, 92:25, 93:3, 106:13, 107:6

**1099s** [3] - 70:25, 79:7, 93:22
**10:00** [1] - 10:3
**10:25** [1] - 61:25
**10:30** [2] - 64:14, 64:15
**10:33** [1] - 65:12
**10:51** [1] - 65:12
**10:52** [1] - 66:1
**11** [1] - 60:21
**12** [5] - 92:4, 92:10, 92:20, 93:16
**120** [1] - 82:1
**1250** [3] - 1:23, 17:24, 17:25
**128** [2] - 1:8, 3:22
**12:00** [2] - 29:16, 31:24
**12:01** [1] - 104:14
**12:07** [1] - 108:14
**12:16** [1] - 108:14
**12:20** [1] - 108:20
**12:47** [1] - 125:18
**12:53** [3] - 1:6, 128:4, 128:6
**13** [1] - 1:5, 3:9, 92:20
**13,665.28** [1] - 99:22
**13-3** [1] - 1:7
**135** [1] - 1:16
**14** [1] - 107:5
**14,596.44** [1] - 100:14
**1499** [1] - 17:25
**15** [8] - 18:3, 18:22, 64:17, 64:18, 65:8, 65:9, 83:12, 97:19
**15,000** [2] - 17:20, 80:12
**1500-1999** [1] - 17:20
**1:50** [1] - 58:12
**1st** [2] - 38:2

## 2

**2** [2] - 18:22, 29:18
**20** [5] - 64:15, 92:6, 92:14, 92:15
**20,000** [1] - 17:20
**2000** [1] - 17:20
**2010** [1] - 22:7
**2020** [4] - 71:23, 83:7, 97:23, 99:16
**2021** [13] - 13:22, 13:23, 16:4, 16:9, 16:10, 16:20, 39:5, 39:7, 39:10, 41:24, 47:3, 99:16, 100:12
**2022** [6] - 39:9, 40:18, 43:11, 46:1, 100:12, 116:5
**2023** [1] - 1:5

**2100** [1] - 1:23
**215** [2] - 22:7, 22:10
**22-cv-22671-CMA** [1] - 1:2
**230-4884** [1] - 1:17
**23rd** [1] - 116:5
**25** [1] - 43:5

## 3

**3** [3] - 18:22, 30:3, 58:10
**305** [5] - 1:17, 1:21, 1:24, 2:4, 128:17
**33128** [2] - 2:4, 128:16
**33134-5267** [1] - 1:24
**33140-2316** [1] - 1:20
**33146-1878** [1] - 1:16
**35** [2] - 43:13, 83:12
**35,000** [1] - 80:12
**36,000** [1] - 92:2
**3:00** [5] - 29:16, 31:16, 31:17, 31:20, 32:7

## 4

**4** [3] - 1:11, 3:7, 3:20
**40** [7] - 49:10, 48:11, 48:15, 114:9, 114:10, 114:12, 115:20
**400** [2] - 2:3, 128:16
**42** [1] - 3:9
**4A** [1] - 1:20

## 5

**5** [9] - 18:3, 18:22, 43:13, 81:10, 103:4, 125:13, 125:16, 128:4
**50** [1] - 19:10
**52** [1] - 3:10
**523-5518** [2] - 2:4, 128:17
**5500** [3] - 91:21, 91:24, 92:3
**57** [1] - 3:10
**5750** [1] - 1:20
**5:00** [3] - 59:21, 59:23, 85:8

## 6

**6** [1] - 3:8
**600** [8] - 34:13, 35:4, 35:6, 36:1, 83:14, 83:15, 83:19
**600th** [2] - 34:20, 35:8
**67** [1] - 3:20

## 7

**7** [2] - 60:13, 60:15
**72,000** [1] - 93:24
**77** [1] - 3:21
**770** [1] - 1:16
**777-0377** [1] - 1:24
**7:00** [3] - 29:16, 31:24, 60:14
**7:30** [1] - 58:9

## 8

**8** [3] - 58:9, 60:13, 60:15
**814-2035** [1] - 1:21
**8:00** [1] - 60:14

## 9

**9** [6] - 30:6, 60:12, 60:22, 61:3, 61:8, 75:15
**94** [1] - 3:21
**9:00** [44] - 8:2, 9:15, 10:2, 10:3, 10:10, 10:19, 11:4, 15:15, 28:3, 28:4, 29:16, 30:3, 31:13, 31:16, 31:17, 31:20, 32:7, 48:5, 48:6, 48:7, 48:17, 48:19, 48:20, 48:21, 59:23, 59:25, 60:1, 61:10, 75:22, 125:15
**9:06** [1] - 1:6, 4:1, 4:7
**9:09** [1] - 4:20
**9:11** [1] - 5:20
**9th** [1] - 28:11

## A

**a.m** [9] - 1:6, 4:1, 4:7, 4:20, 5:20, 61:25, 65:12, 66:1
**ability** [2] - 102:21, 111:12
**able** [3] - 9:15, 9:19, 9:21, 9:23, 9:24, 11:15, 11:25, 12:1, 12:3, 15:12, 21:20, 22:24, 24:24, 25:2, 25:7, 29:13, 32:12, 41:16, 46:22, 50:17, 54:22, 54:23, 54:24, 55:7, 55:10, 55:11, 55:13, 55:22, 56:18, 57:8, 60:5, 64:21, 97:4, 108:11, 125:25, 126:7,

126:24
**above-entitled** [1] - 128:12
**abridged** [1] - 113:10
**accept** [1] - 110:22
**acceptable** [1] - 64:2
**accepted** [1] - 122:15
**access** [10] - 9:25, 10:1, 55:12, 55:13, 55:24, 56:18, 88:1, 88:2, 126:12, 126:16
**accomplish** [2] - 87:4, 117:25
**according** [6] - 88:13, 100:9, 100:11, 101:16, 118:10
**account** [3] - 23:12, 23:21, 23:23
**accountability** [1] - 52:13
**accountant** [1] - 51:19
**accountants** [1] - 11:20
**accurate** [2] - 110:23, 128:11
**accurately** [1] - 111:13
**accused** [1] - 73:10
**act** [3] - 104:23, 109:19, 123:14
**Act** [2] - 71:5, 113:6
**active** [2] - 40:24, 41:1
**actively** [4] - 27:17, 40:20, 41:1, 42:5
**activities** [1] - 10:4
**activity** [1] - 113:23
**acts** [1] - 109:21
**actual** [1] - 110:15
**add** [3] - 107:16, 107:21, 108:11
**addition** [2] - 39:8, 114:23
**additional** [2] - 114:5, 122:8
**address** [2] - 66:18, 94:14
**addressed** [1] - 73:17
**adequate** [3] - 116:11, 116:13, 116:15
**adjourned** [1] - 128:6
**admit** [1] - 108:7
**ADMITTED** [1] - 3:12
**admitted** [3] - 79:6, 109:25, 110:1
**advance** [1] - 44:4
**advances** [1] - 94:6
**advertise** [1] - 103:8
**advertised** [1] - 103:9
**affect** [1] - 109:16
**afford** [1] - 21:20

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

**afraid** [6] - 69:18, 69:20, 69:21, 69:22, 69:24
**afternoon** [2] - 64:8, 101:24
**afterwards** [1] - 57:13
**agency** [3] - 27:16, 40:20, 41:2
**agent** [35] - 7:5, 7:7, 7:8, 8:19, 11:3, 11:23, 12:1, 14:14, 20:21, 22:4, 22:10, 22:21, 24:9, 25:2, 26:6, 27:21, 29:22, 31:5, 32:14, 39:15, 40:19, 41:5, 41:12, 41:17, 46:20, 52:23, 59:20, 75:5, 76:11, 79:23, 85:3, 85:5, 85:7, 98:4
**agent's** [1] - 30:18
**agents** [28] - 6:25, 10:25, 31:7, 32:23, 33:2, 33:11, 35:18, 36:4, 37:17, 39:20, 42:5, 45:20, 45:22, 48:19, 50:5, 53:6, 53:12, 72:15, 74:14, 79:3, 79:15, 84:25, 95:2, 95:6, 97:6, 99:16, 99:17, 99:18
**ago** [3] - 58:5, 58:6, 80:18
**agree** [11] - 15:6, 15:8, 46:15, 47:9, 70:10, 70:13, 70:14, 70:15, 109:12, 120:12, 122:25
**agreed** [13] - 31:25, 32:1, 33:12, 61:9, 74:3, 88:12, 88:13, 90:20, 118:10, 120:10, 120:13, 123:18
**agreement** [18] - 14:16, 14:19, 14:20, 15:7, 16:9, 37:15, 43:12, 78:12, 81:8, 81:12, 81:14, 81:24, 82:2, 96:20, 100:7, 123:5, 127:3
**agreements** [2] - 103:21, 120:17
**ahead** [28] - 8:1, 8:3, 9:16, 11:12, 11:19, 12:2, 12:16, 14:6, 14:7, 15:16, 15:24, 20:3, 21:2, 21:19, 24:21, 28:4, 28:22, 28:25, 29:25, 31:25,

35:4, 38:6, 40:24, 44:20, 55:3, 55:22, 57:21
**ain't** [1] - 95:3
**ALIX** [1] - 4:21
**Alix** [4] - 3:7, 4:15, 5:7, 5:11
**alleged** [1] - 105:21
**allocate** [1] - 115:4
**allocating** [1] - 114:25
**allotted** [2] - 30:18, 85:2
**allow** [1] - 53:10
**allowed** [9] - 12:23, 24:2, 53:16, 57:9, 57:10, 79:2, 79:3, 79:4, 92:23
**almost** [8] - 42:7, 43:1, 71:20, 82:4, 92:16, 94:15
**alternating** [1] - 31:19
**alternative** [2] - 101:24, 122:3
**ALTONAGA** [1] - 1:12
**Ambetter** [3] - 17:12, 42:3, 83:7
**amount** [28] - 9:1, 12:10, 15:11, 15:14, 17:1, 17:5, 34:14, 44:18, 45:2, 88:13, 88:25, 101:20, 102:21, 112:11, 114:15, 115:6, 115:8, 115:14, 115:15, 116:1, 116:2, 116:8, 116:14, 116:18, 116:19, 116:21, 118:10
**amounts** [1] - 122:8
**analogy** [1] - 87:16
**Andrea** [6] - 32:17, 38:24, 64:8, 113:4, 117:3, 117:15
**ANDREA** [1] - 1:8
**animal** [1] - 67:3
**answer** [22] - 22:3, 41:3, 50:4, 50:14, 56:4, 56:8, 73:18, 73:21, 74:17, 74:20, 93:11, 93:12, 99:8, 99:9, 99:11, 106:1, 106:3, 111:15, 117:17, 124:22
**answer's** [1] - 100:2
**answered** [5] - 77:25, 78:1, 78:2, 93:20, 124:19
**answering** [1] - 19:17
**answers** [2] - 93:10,

93:14
**apologies** [1] - 4:12
**apologize** [2] - 5:6, 12:19
**appear** [1] - 111:14
**APPEARANCES** [2] - 1:13, 2:1
**application** [1] - 55:4
**applies** [3] - 82:22, 104:21
**apply** [1] - 113:13
**appreciate** [2] - 67:5, 67:9
**appreciation** [1] - 67:17
**approach** [1] - 5:18
**approve** [1] - 20:12
**April** [1] - 40:18
**Apt** [1] - 1:20
**area** [1] - 14:3
**ARGUMENT** [3] - 67:1, 77:2, 94:23
**argument** [1] - 62:19
**Argument** [3] - 3:20, 3:21, 3:21
**arguments** [5] - 63:25, 66:6, 66:10, 66:16, 124:17
**arrangement** [1] - 47:16
**arrives** [1] - 125:12
**arriving** [1] - 110:6
**aside** [2] - 66:9
**aspect** [3] - 38:18, 88:22, 91:10
**aspects** [4] - 21:11, 22:17, 94:11, 117:5
**assert** [2] - 104:24, 105:22
**asserted** [3] - 105:1, 106:25, 122:3
**asserting** [2] - 66:19, 107:8
**asserts** [1] - 110:15
**assigned** [1] - 7:24
**assignment** [2] - 118:1, 118:2
**assignments** [1] - 87:5
**assist** [1] - 6:24
**association** [1] - 93:2
**assume** [3] - 79:25, 86:12, 110:3
**ASSURANCE** [1] - 1:8
**Assurance** [23] - 6:13, 6:14, 7:10, 8:18, 61:2, 97:9, 99:8, 113:3, 117:6, 117:15, 119:23, 120:1, 120:22,

120:25, 121:6, 121:7, 122:5, 122:6, 122:9, 122:12, 122:14, 122:15, 122:17
**atmosphere** [4] - 32:22, 33:2, 33:3
**attend** [1] - 38:12
**attorney** [2] - 83:8, 91:15, 91:20
**Attorney's** [1] - 126:1
**attorney's** [1] - 66:16
**attorneys** [2] - 66:5, 91:19
**August** [5] - 38:2, 46:1, 67:15, 116:5
**authorities** [1] - 105:18
**availability** [1] - 28:4
**available** [9] - 8:2, 9:20, 15:15, 25:9, 28:25, 33:11, 48:23, 50:1, 59:25
**Avant** [66] - 6:13, 6:14, 6:20, 7:2, 7:10, 7:13, 8:18, 11:23, 20:6, 22:5, 22:9, 23:10, 23:17, 23:20, 24:10, 25:1, 25:6, 25:20, 27:11, 27:23, 38:8, 38:24, 41:3, 43:1, 43:4, 43:16, 45:7, 45:12, 45:14, 45:22, 49:4, 49:8, 49:12, 49:14, 49:16, 49:19, 49:22, 51:25, 52:4, 58:17, 61:2, 87:23, 89:17, 97:9, 99:8, 100:1, 105:4, 106:9, 113:3, 117:4, 117:5, 117:14, 119:23, 120:1, 120:22, 120:25, 121:6, 121:7, 122:5, 122:6, 122:9, 122:12, 122:14, 122:15, 122:17
**AVANT** [1] - 1:8
**Ave** [2] - 1:16, 1:20
**Avenue** [2] - 2:3, 128:16
**average** [1] - 47:1
**avert** [1] - 78:1
**avoid** [1] - 93:11
**await** [1] - 124:3
**award** [3] - 30:7, 104:1
**awarded** [1] - 102:1
**aware** [1] - 27:15

**B**

**background** [1] - 51:12
**bad** [1] - 77:7
**balance** [1] - 49:16
**bank** [1] - 94:1
**Bankers** [1] - 23:12
**bar** [3] - 75:15, 105:22, 106:19
**bargained** [1] - 113:8
**barred** [3] - 105:5, 105:10, 106:11
**base** [1] - 85:19
**based** [20] - 8:24, 17:3, 23:1, 33:7, 33:9, 38:7, 39:12, 61:9, 79:22, 81:8, 81:16, 84:2, 85:13, 89:2, 89:14, 109:8, 114:17, 115:8, 117:19, 119:25
**basis** [7] - 5:3, 14:18, 88:9, 96:24, 102:20, 115:9, 118:6
**bathroom** [1] - 63:5
**Batista** [4] - 36:12, 36:13, 93:9, 113:2
**BATISTA** [1] - 1:4
**Beach** [1] - 1:20
**beat** [1] - 69:18
**beauty** [1] - 85:17
**became** [5] - 24:6, 43:10, 46:5, 86:9, 102:17
**become** [3] - 24:9, 46:1, 123:7
**BEFORE** [1] - 1:12
**beforehand** [1] - 69:7
**begin** [1] - 109:6
**beginning** [3] - 27:9, 79:1, 98:18
**Behalf** [3] - 3:20, 3:21, 3:21
**BEHALF** [3] - 67:1, 77:2, 94:23
**behavior** [3] - 80:16, 80:19, 91:25
**behind** [7] - 28:17, 28:21, 33:6, 60:15, 69:3, 88:5, 98:5
**beliefs** [1] - 123:8
**bell** [2] - 35:5, 35:7
**below** [1] - 94:4
**benefit** [5] - 84:17, 122:12, 122:14, 122:16, 122:19
**benefits** [5] - 8:12, 21:21, 88:11, 118:8, 118:11

**best** [9] - 21:6, 21:10, 21:14, 22:1, 22:18, 31:17, 69:19, 77:6, 84:1
**better** [4] - 21:21, 25:21, 38:5, 73:21
**between** [14] - 15:15, 17:19, 17:21, 17:25, 18:3, 44:14, 68:9, 85:10, 88:17, 100:16, 113:8, 114:15, 116:1, 117:18
**beyond** [3] - 68:23, 78:20, 91:8
**big** [17] - 14:3, 22:13, 26:5, 34:9, 55:23, 77:13, 78:22, 88:22, 89:5, 89:23, 89:25, 91:10, 91:23, 93:18, 97:16, 98:24
**bigger** [2] - 16:17, 34:5
**binding** [1] - 110:2
**bit** [9] - 9:12, 11:9, 16:3, 24:10, 43:10, 64:9, 69:9, 79:5, 99:4
**biweekly** [1] - 115:2
**blame** [1] - 86:9
**blaming** [1] - 84:9
**blank** [4] - 126:10, 126:15, 126:19, 127:10
**bless** [1] - 92:7
**blowing** [2] - 98:24, 99:1
**blown** [1] - 95:1
**Blue** [2] - 60:18
**blue** [1] - 44:8
**Blvd** [1] - 1:23
**Bob** [1] - 50:13
**bonus** [30] - 12:12, 15:15, 15:25, 16:16, 17:4, 17:14, 17:20, 17:25, 18:24, 33:25, 34:6, 34:8, 34:11, 35:15, 35:25, 36:1, 40:25, 41:2, 48:24, 80:19, 83:4, 83:13, 83:17, 100:17, 114:22, 115:1, 115:5, 115:7
**bonuses** [34] - 9:1, 10:23, 12:8, 12:11, 12:13, 12:15, 12:16, 16:15, 16:22, 16:23, 16:24, 17:6, 34:5, 34:9, 36:13, 36:23, 40:18, 43:13, 70:18,

78:11, 81:10, 95:20, 95:23, 96:24, 100:2, 100:24, 101:7, 114:20, 115:12, 115:13, 119:24, 120:2, 121:8, 122:7
**books** [2] - 9:2, 35:1
**boss** [2] - 97:11, 102:14
**bother** [1] - 67:15
**bottom** [1] - 40:17
**bought** [1] - 56:2
**brags** [1] - 83:16
**breach** [2] - 120:2, 120:23
**breached** [2] - 120:1, 121:7
**break** [2] - 47:6, 104:9
**Brian** [1] - 42:11
**BRIAN** [1] - 1:14
**brian@ fairlawattorney. com** [1] - 1:17
**brief** [4] - 57:7, 61:23, 66:23, 104:9
**briefly** [1] - 104:19
**Bright** [1] - 17:13
**bring** [24] - 4:6, 4:16, 5:12, 49:23, 49:24, 50:5, 50:8, 50:11, 53:17, 65:25, 77:16, 78:3, 78:7, 79:20, 80:21, 89:18, 89:20, 90:5, 93:20, 93:21, 97:2, 104:12, 123:23
**bringing** [1] - 125:12
**broke** [1] - 95:3
**broker** [2] - 27:16, 27:17
**brought** [9] - 16:7, 27:3, 50:2, 50:3, 50:6, 73:13, 77:14, 89:21, 89:22
**budget** [1] - 22:25
**builds** [1] - 97:19
**bunch** [3] - 47:7, 74:7, 87:12
**burden** [16] - 62:17, 68:5, 68:10, 68:15, 68:16, 68:24, 77:15, 78:6, 78:16, 80:14, 98:15, 99:4, 99:5, 112:10
**business** [14] - 35:20, 41:14, 44:21, 61:2, 72:2, 74:6, 74:13, 90:14, 96:10, 102:10, 106:9, 118:25, 119:2, 119:16

**busy** [1] - 19:2
**buttons** [1] - 20:15
**buying** [2] - 48:3, 74:12
**buzzer** [1] - 74:20
**BY** [28] - 2:2, 6:7, 6:19, 10:17, 13:16, 15:21, 24:18, 26:16, 26:21, 28:10, 29:4, 29:9, 30:15, 30:25, 31:10, 33:1, 36:11, 39:19, 39:25, 40:7, 40:16, 41:9, 42:10, 52:11, 53:5, 53:15, 56:13, 57:6

---

## C

**calculate** [1] - 82:9
**calculated** [1] - 100:12
**calculating** [2] - 114:20, 115:10
**calculation** [1] - 92:11
**calculations** [3] - 81:18, 90:8, 91:7
**calm** [1] - 33:3
**cameras** [1] - 96:7
**cannot** [3] - 38:12, 113:8, 113:9
**Capote** [2] - 99:9, 127:6
**car** [8] - 47:24, 84:11, 87:18, 87:19, 87:22, 97:24, 102:22
**care** [3] - 40:9, 79:11, 85:8
**carefully** [1] - 66:16
**CARLOS** [1] - 1:4
**Carlos** [18] - 48:15, 69:12, 71:13, 72:12, 85:9, 88:2, 93:23, 97:13, 97:15, 97:23, 99:7, 99:17, 100:13, 100:14, 100:15, 102:11, 113:2
**carpenter** [2] - 89:6, 89:7
**carrier** [7] - 8:20, 12:11, 15:25, 17:4, 21:20, 21:24, 34:25
**carriers** [3] - 20:5, 40:23, 49:11
**cars** [1] - 48:3
**case** [45] - 24:5, 48:9, 61:21, 61:23, 66:13, 68:7, 68:17, 68:19, 68:21, 68:23, 70:3, 70:23, 72:4, 75:18, 75:19, 77:16, 79:24,

88:11, 88:22, 98:14, 98:15, 98:18, 98:25, 101:1, 101:9, 103:9, 103:24, 109:2, 109:25, 110:4, 111:10, 112:7, 117:20, 121:15, 122:23, 123:2, 123:4, 123:5, 123:9, 123:12, 124:11, 125:3, 127:13, 127:24
**CASE** [1] - 1:2
**cases** [2] - 69:1, 126:2
**caught** [2] - 50:24, 93:18
**causing** [1] - 116:24
**caution** [1] - 124:4
**cease** [1] - 106:2
**CECILIA** [1] - 1:12
**celebrate** [1] - 35:15
**celebration** [1] - 34:22
**cell** [3] - 50:6, 53:17, 127:23
**center** [10] - 6:21, 6:23, 6:24, 19:14, 72:20, 72:21, 74:14, 74:15, 96:8
**certain** [15] - 10:24, 15:14, 24:19, 34:14, 35:15, 35:16, 35:17, 44:17, 45:2, 46:17, 53:12, 60:5, 69:10, 87:5, 117:25
**certainly** [2] - 64:23, 65:4, 80:1
**Certificate................ ....** [1] - 3:22
**certify** [1] - 128:10
**chain** [1] - 110:17
**chance** [2] - 76:1, 104:18
**change** [10] - 11:18, 70:8, 70:10, 73:11, 73:25, 80:4, 91:5, 123:6, 127:3, 127:9
**changed** [2] - 73:21, 97:8
**changes** [2] - 76:4, 124:25
**characterize** [1] - 19:13
**charge** [2] - 47:11, 65:22
**charts** [1] - 17:11
**cheaper** [1] - 74:5
**check** [1] - 126:20
**checking** [1] - 108:17
**CHIEF** [1] - 1:12
**child** [5] - 57:24, 58:1,

58:3, 58:6, 59:22
**children** [3] - 9:16, 10:3, 27:2
**choice** [1] - 79:17
**choose** [2] - 10:18, 123:13
**choosing** [1] - 51:10
**chose** [8] - 10:11, 24:4, 32:20, 35:14, 38:6, 52:24, 53:21, 89:4
**Christmas** [2] - 75:24
**circumstances** [8] - 86:22, 110:18, 117:1, 119:8, 120:15, 121:23, 122:2, 122:17
**circumstantial** [3] - 110:13, 110:17, 110:20
**civil** [5] - 67:2, 67:10, 68:5, 68:6, 68:9
**claim** [25] - 63:15, 63:20, 82:24, 89:20, 102:3, 105:1, 105:7, 105:9, 105:22, 106:18, 112:15, 112:17, 112:18, 113:1, 113:3, 113:15, 113:22, 114:14, 116:10, 116:12, 119:23, 122:3, 122:6, 122:9, 122:10
**claim[s** [1] - 112:8
**claimed** [2] - 106:13, 114:16
**claiming** [4] - 83:13, 84:19, 96:20, 107:6
**claims** [7] - 63:13, 66:19, 102:4, 105:4, 112:13, 112:25, 116:14
**classified** [2] - 70:24, 90:19
**clean** [6] - 62:22, 107:21, 108:11, 125:6, 126:3, 126:4
**clear** [5] - 32:17, 32:18, 117:9, 117:10, 120:8
**cleared** [1] - 32:19
**clearly** [1] - 111:15
**click** [1] - 50:17
**clicked** [2] - 74:17, 103:1
**clicking** [1] - 74:20
**clicks** [1] - 50:14
**client** [28] - 12:7, 20:1, 20:4, 20:6, 20:25,

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

21:1, 21:3, 21:8, 21:11, 21:12, 21:16, 22:1, 22:14, 22:16, 22:20, 24:25, 34:24, 41:13, 41:16, 47:5, 47:11, 47:13, 56:14, 57:21, 60:7, 67:23, 74:18, 104:1

**clients** [48] - 7:9, 11:14, 11:15, 12:2, 19:21, 20:20, 21:8, 21:14, 21:19, 22:19, 24:21, 29:3, 29:14, 34:25, 41:22, 41:23, 46:21, 47:14, 48:10, 49:24, 60:5, 69:6, 69:22, 70:15, 70:17, 70:20, 70:24, 71:10, 71:12, 72:17, 72:25, 73:25, 74:14, 75:9, 76:15, 95:18, 96:2, 96:15, 96:25, 97:1, 97:10, 100:7, 101:18, 102:6, 102:16, 103:9, 103:20, 106:22

**close** [6] - 12:4, 12:5, 66:8, 66:23, 87:24, 99:3

**closed** [1] - 54:2

**closer** [2] - 16:3, 43:9

**Closing** [3] - 3:20, 3:21, 3:22

**closing** [8] - 62:11, 63:25, 64:9, 64:22, 66:5, 66:10, 67:8, 124:17

**CLOSING** [3] - 67:1, 77:2, 108:24

**CMS** [1] - 19:22

**colleagues** [3] - 32:11, 32:20, 45:16

**Collins** [1] - 1:20

**Colombia** [4] - 61:2, 61:4, 74:13, 88:3

**comfortable** [1] - 49:12

**coming** [10] - 29:1, 69:25, 70:1, 78:18, 80:12, 84:9, 87:10, 91:7, 95:6, 107:20

**comments** [2] - 36:8, 68:2

**commiserate** [2] - 94:17, 94:20

**commission** [25] - 8:22, 8:24, 9:1, 10:22, 12:5, 16:14, 34:6, 83:4, 83:6, 88:5, 88:9, 96:18,

100:10, 100:11, 100:17, 102:20, 102:24, 114:22, 114:25, 115:1, 115:5, 115:6, 115:7, 118:6

**commissions** [24] - 8:12, 36:13, 36:23, 70:18, 78:11, 79:15, 80:6, 91:12, 95:19, 95:23, 96:15, 96:24, 100:2, 100:16, 100:21, 100:24, 101:8, 114:19, 115:11, 115:13, 119:25, 120:2, 121:8, 122:7

**committed** [1] - 104:22

**common** [4] - 37:6, 43:25, 45:5, 110:11

**commonly** [1] - 114:13

**communicate** [1] - 123:21

**communication** [1] - 41:13

**commute** [4] - 43:4, 43:5, 43:10, 58:17

**Comp** [2] - 74:8, 95:21

**comp** [1] - 43:11

**companies** [11] - 40:19, 42:2, 79:3, 79:5, 79:7, 79:11, 84:16, 85:20, 85:24, 93:15, 103:21

**company** [12] - 15:2, 24:3, 27:8, 27:19, 33:23, 40:24, 71:23, 72:1, 79:8, 86:8, 92:25, 109:23

**compensable** [1] - 114:1

**compensated** [2] - 103:4, 118:15

**compensation** [9] - 8:24, 9:7, 9:8, 14:16, 40:19, 43:12, 114:23, 115:8, 117:7

**competition** [2] - 35:18, 35:20

**complain** [2] - 36:7, 97:18

**complained** [4] - 70:18, 97:12, 97:14

**complaints** [2] - 33:22, 70:19

**complete** [3] - 57:21, 96:24

**completely** [1] - 85:19

**completes** [2] - 87:6, 118:2

**completing** [1] - 20:20

**component** [1] - 8:25

**compromise** [1] - 27:1

**compromised** [2] - 24:7, 113:11

**computation** [1] - 115:7

**compute** [1] - 115:8

**computed** [1] - 115:2

**computer** [15] - 55:8, 55:9, 55:24, 56:1, 74:16, 76:16, 84:10, 87:25, 89:16, 89:18, 97:3, 98:6, 103:20, 103:22, 125:23

**computers** [3] - 49:24, 50:1, 74:11

**computing** [1] - 114:25

**concept** [1] - 89:16

**concerned** [1] - 110:12

**concerning** [4] - 26:17, 62:14, 111:2, 122:21

**concierge** [2] - 79:8, 93:2

**conclude** [1] - 120:15

**conclusion** [1] - 78:25

**conclusions** [1] - 110:11

**conclusively** [1] - 88:18

**condition** [1] - 21:12

**conditions** [3] - 22:24, 121:5

**conducive** [1] - 91:25

**conduct** [12] - 105:3, 105:6, 106:4, 106:18, 120:16, 121:18, 121:19, 121:21, 121:24, 121:25, 122:1

**conducted** [1] - 13:5

**confidential** [1] - 23:9

**confidentiality** [1] - 23:5

**confusing** [1] - 30:19

**consent** [4] - 19:20, 19:21, 20:12, 20:21

**consequence** [1] - 30:20

**consequences** [8] - 32:14, 54:11, 54:13, 54:17, 59:7, 59:10, 59:11, 59:14

**consider** [11] - 43:15, 65:22, 109:24,

110:21, 112:18, 112:20, 117:1, 117:19, 119:8, 120:18, 122:1

**consideration** [2] - 78:18, 86:23

**considered** [3] - 105:9, 105:19, 113:23

**considering** [3] - 64:7, 110:10, 123:3

**considers** [2] - 117:9, 117:11

**consistent** [1] - 125:7

**consists** [4] - 65:17, 107:5, 124:15, 124:17

**constituted** [1] - 106:5

**constituting** [1] - 106:19

**Cont'd** [2] - 3:9, 13:15

**contact** [3] - 21:2, 60:5, 127:24

**contends** [1] - 105:4

**contention** [1] - 112:15

**context** [1] - 67:17

**continue** [5] - 13:6, 27:7, 57:14, 80:5, 80:20

**CONTINUED** [1] - 2:1

**contract** [23] - 7:18, 7:19, 20:1, 43:15, 82:24, 82:25, 87:6, 96:21, 96:22, 100:7, 113:10, 120:8, 120:14, 120:17, 120:23, 121:11, 121:12, 121:15, 121:17, 121:21, 121:24, 121:25

**contracting** [3] - 23:14, 23:18, 24:11

**contractor** [46] - 8:7, 8:8, 11:23, 14:12, 25:11, 26:6, 43:22, 45:23, 46:10, 51:23, 58:25, 59:3, 71:5, 71:24, 74:2, 74:5, 74:6, 76:4, 79:18, 82:14, 84:2, 84:6, 84:11, 84:13, 84:21, 85:18, 86:10, 86:15, 87:4, 88:12, 88:17, 89:10, 90:21, 91:1, 102:8, 102:25, 106:13, 107:6, 117:25, 118:2, 118:3, 118:9, 118:13, 118:19,

119:17, 119:20

**contractors** [35] - 70:25, 71:2, 72:1, 75:17, 76:18, 79:21, 82:12, 82:19, 82:21, 83:21, 84:9, 84:20, 84:24, 86:5, 86:14, 86:19, 86:25, 87:21, 88:18, 89:9, 90:1, 90:11, 90:20, 91:3, 91:4, 96:9, 103:16, 107:9, 113:14, 116:9, 117:13, 117:16, 118:23, 119:15

**Contracts** [1] - 120:3

**contracts** [20] - 100:7, 100:10, 101:1, 119:24, 120:1, 120:5, 120:6, 120:13, 120:14, 120:21, 121:1, 121:3, 121:6, 121:7, 121:8, 121:18, 121:19, 121:20, 122:5

**contrast** [2] - 87:4, 117:24

**control** [11] - 71:10, 81:2, 83:24, 84:4, 86:25, 87:2, 96:25, 102:9, 117:4, 117:23, 119:10

**controlled** [7] - 81:2, 81:3, 87:1, 96:6, 96:12, 117:5, 117:21

**controlling** [4] - 90:17, 102:6, 103:11, 119:6

**convenience** [1] - 123:16

**convenient** [3] - 57:16, 57:20, 76:12

**conversation** [4] - 20:25, 27:18, 37:6, 37:7

**conveyed** [1] - 9:4

**convince** [1] - 75:3

**convinced** [1] - 123:7

**cool** [2] - 74:5, 94:24

**copies** [1] - 65:1

**copy** [2] - 62:20, 91:15

**Coral** [2] - 1:16, 1:24

**corporation** [4] - 109:15, 109:16, 109:18, 109:20

**corporations** [1] - 84:14

**correct** [32] - 9:11, 10:5, 10:12, 10:14,

13:19, 14:13, 15:1, 18:1, 18:7, 18:25, 19:6, 19:7, 19:18, 22:11, 24:11, 24:12, 25:16, 25:25, 26:7, 28:11, 28:14, 34:15, 40:10, 43:3, 46:6, 51:13, 54:17, 55:25, 56:9, 85:23, 126:24
**corrected** [2] - 126:22, 127:7
**correctly** [2] - 20:22, 33:19
**CORTES** [1] - 1:8
**Cortes** [27] - 4:15, 7:15, 9:10, 43:19, 48:18, 57:8, 69:15, 70:12, 70:17, 71:22, 73:7, 73:9, 73:16, 74:13, 96:6, 96:22, 97:1, 97:10, 97:11, 97:23, 98:1, 99:9, 102:5, 113:4, 117:3, 117:4, 117:15
**Cortes's** [1] - 61:2
**cost** [2] - 47:2, 47:20
**counsel** [8] - 4:4, 4:12, 12:17, 13:2, 66:21, 66:22, 76:22
**count** [2] - 12:14, 41:16
**counted** [1] - 114:5
**country** [2] - 81:1, 92:17
**couple** [7] - 18:17, 50:5, 52:21, 73:1, 76:21, 85:9, 103:2
**course** [10] - 15:9, 20:25, 22:13, 22:15, 23:8, 62:18, 63:6, 75:6, 109:19, 122:20
**court** [8] - 81:14, 97:7, 107:8, 108:22, 109:18, 123:15, 123:22, 123:23
**COURT** [122] - 1:1, 4:3, 4:6, 4:8, 4:14, 4:16, 4:19, 4:24, 5:3, 5:5, 5:8, 5:12, 5:15, 5:18, 5:24, 6:2, 6:5, 6:16, 10:16, 12:22, 12:25, 13:6, 13:10, 24:14, 26:15, 26:20, 28:20, 30:12, 30:14, 30:24, 31:9, 32:25, 36:10, 39:18, 39:23, 40:5, 40:12, 40:15, 41:8, 52:9, 53:3, 53:10, 56:12, 57:3, 61:13, 61:17, 61:20,

61:22, 61:24, 62:1, 62:7, 62:10, 63:1, 63:6, 63:9, 63:11, 63:15, 63:17, 63:19, 63:22, 63:24, 64:4, 64:11, 64:14, 64:16, 64:20, 64:23, 65:4, 65:7, 65:9, 65:11, 65:13, 65:14, 65:25, 66:2, 76:22, 76:24, 86:2, 94:19, 94:21, 95:12, 103:13, 104:4, 104:8, 104:15, 104:20, 105:13, 105:20, 106:3, 106:11, 106:17, 106:23, 107:1, 107:3, 107:11, 107:15, 107:19, 107:25, 108:5, 108:8, 108:10, 108:15, 108:16, 108:18, 108:21, 108:25, 125:11, 125:17, 125:19, 125:22, 126:1, 126:6, 126:10, 126:15, 126:20, 127:3, 127:9, 127:14, 127:18, 127:20, 127:23, 128:3
**Court** [6] - 2:2, 3:22, 63:10, 113:12, 126:7, 128:15
**COURT'S** [1] - 108:24
**court's** [1] - 54:20
**Court's** [1] - 3:22
**courteous** [2] - 44:8, 44:11
**courtesy** [17] - 10:8, 28:24, 29:21, 29:25, 30:21, 31:1, 32:13, 32:17, 32:20, 44:1, 44:2, 44:5, 45:5, 54:10, 102:13, 102:15
**Courtroom** [1] - 1:7
**COURTROOM** [4] - 4:2, 108:17, 126:17, 127:1
**courtroom** [18] - 4:7, 48:10, 48:14, 50:12, 61:25, 66:1, 67:12, 73:3, 73:14, 73:22, 104:9, 104:12, 104:14, 108:20, 123:20, 123:25, 125:11, 125:18
**courts** [1] - 67:4

**cover** [1] - 115:13
**coverage** [1] - 29:2
**covered** [1] - 44:13
**COVID** [4] - 55:20, 57:7, 93:18
**create** [3] - 119:19, 121:21, 126:11
**created** [5] - 120:6, 120:21, 121:18, 121:19, 121:25
**creating** [1] - 121:24
**criminal** [2] - 68:19, 126:2
**cross** [2] - 78:21, 97:2
**Cross** [2] - 3:9, 60:18
**CROSS** [1] - 42:9
**cross-examination** [1] - 78:21
**Cross-Examination** [1] - 3:9
**CROSS-EXAMINATION** [1] - 42:9
**cross-examined** [1] - 97:2
**crossed** [1] - 5:1
**Cuba** [1] - 92:18
**CUETO** [22] - 1:22, 4:4, 4:12, 4:15, 5:6, 5:10, 5:14, 6:7, 6:19, 10:17, 12:17, 63:7, 105:12, 105:14, 106:2, 106:16, 106:21, 106:25, 107:2, 107:7, 107:13, 107:18
**Cueto** [3] - 1:23, 3:8, 13:6
**Cummings** [1] - 108:3
**CUMMINGS** [3] - 1:15, 63:4, 125:23
**current** [1] - 6:20
**curtain** [1] - 98:6
**customers** [1] - 87:23

## D

**daily** [1] - 115:2
**damaged** [1] - 121:10
**damages** [9] - 101:21, 115:17, 116:1, 116:3, 116:19, 116:23, 120:3, 120:22, 122:21
**DANIEL** [1] - 1:19
**Daniel** [1] - 1:19
**dantropp@bellsouth .net** [1] - 1:21
**date** [4] - 29:7, 101:8, 116:4, 123:19

**DATE** [1] - 128:15
**DAY** [1] - 1:11
**day-to-day** [1] - 117:6
**days** [11] - 53:23, 75:14, 77:21, 85:1, 85:9, 92:6, 92:14, 92:15, 92:19, 101:22
**De** [1] - 1:23
**dead** [1] - 88:23
**dead-end** [1] - 88:23
**deadline** [1] - 19:6
**deadlines** [1] - 19:4
**deal** [4] - 45:21, 48:4, 74:9, 97:16
**dealership** [1] - 47:24
**deals** [1] - 101:15
**dealt** [1] - 109:17
**December** [1] - 33:14
**deception** [1] - 112:4
**decide** [10] - 69:1, 74:21, 76:11, 86:18, 110:23, 111:3, 112:3, 117:14, 123:2, 124:10
**decided** [2] - 24:9, 32:3
**decides** [1] - 81:23
**deciding** [4] - 51:22, 109:1, 112:19, 121:25
**decision** [12] - 26:5, 68:17, 77:17, 77:18, 83:2, 85:20, 86:24, 109:8, 109:16, 110:7, 110:25, 112:4
**deductible** [1] - 21:17
**deductions** [4] - 84:10, 84:18, 86:5, 110:11
**Defendant** [2] - 104:25, 105:2
**Defendant's** [1] - 127:4
**Defendants** [25] - 1:10, 4:22, 5:2, 5:22, 66:4, 66:20, 70:24, 71:1, 71:21, 74:1, 95:20, 96:6, 100:23, 103:16, 104:15, 113:1, 113:3, 113:15, 113:19, 113:20, 113:24, 116:10, 116:15, 117:2, 119:15
**DEFENDANTS** [3] - 1:19, 3:6, 77:2
**Defendants'** [2] - 3:14, 116:12
**Defendants.....** [1] - 3:21

**defense** [14] - 61:19, 63:12, 63:20, 65:15, 65:18, 76:22, 104:16, 104:24, 105:17, 106:4, 106:11, 106:24, 107:4, 107:7
**Defense** [4] - 62:8, 62:14, 65:14, 66:22
**defenses** [1] - 66:19
**definitely** [11] - 11:25, 19:11, 25:10, 26:9, 27:2, 34:19, 34:22, 36:4, 36:17, 54:14, 74:22
**definitions** [1] - 90:4
**defraud** [1] - 106:8
**degree** [1] - 83:24
**deliberate** [2] - 66:7, 82:4
**deliberations** [6] - 109:4, 109:6, 122:25, 123:15, 125:18, 128:4
**Delio** [20] - 35:25, 36:2, 36:12, 48:14, 69:12, 79:4, 80:11, 83:10, 85:9, 86:8, 92:22, 93:9, 94:8, 99:7, 99:20, 99:22, 100:2, 100:3, 100:8, 113:2
**DELIO** [1] - 1:4
**demonstrate** [1] - 104:25
**demonstrates** [1] - 103:19
**demonstrative** [1] - 108:6
**demonstratives** [1] - 108:8
**denied** [1] - 62:10
**deny** [1] - 68:19
**denying** [1] - 74:25
**Department** [1] - 113:12
**dependants** [2] - 18:15, 18:17
**dependence** [1] - 103:19
**dependent** [9] - 21:22, 24:23, 49:8, 52:23, 55:15, 71:20, 96:11, 103:15, 119:15
**deposit** [3] - 39:9, 39:10, 39:13
**deposition** [4] - 73:12, 83:18, 100:18, 100:20
**deposits** [1] - 52:22

**deputy** [2] - 104:9, 125:11
**DEPUTY** [5] - 4:2, 108:15, 108:17, 126:17, 127:1
**describe** [1] - 11:9
**described** [1] - 107:2
**description** [3] - 90:16, 103:10, 119:5
**desired** [2] - 87:5, 118:1
**desist** [1] - 106:2
**desks** [2] - 14:5, 14:6
**detail** [2] - 51:13, 112:6
**details** [4] - 34:5, 61:4, 87:5, 118:1
**determination** [1] - 119:13
**determinations** [1] - 82:17
**determine** [9] - 50:17, 82:19, 83:23, 84:1, 86:19, 115:15, 115:19, 115:22, 116:25
**determined** [3] - 87:7, 115:11, 118:3
**determines** [1] - 119:9
**determining** [1] - 98:3
**develop** [2] - 22:2, 94:7
**differ** [1] - 111:16
**difference** [14] - 16:12, 17:21, 17:23, 44:14, 54:14, 54:16, 68:9, 88:16, 91:23, 97:7, 100:14, 110:19, 114:15, 116:1
**different** [15] - 11:16, 16:14, 16:21, 16:24, 17:4, 21:7, 21:11, 35:11, 43:13, 47:7, 47:9, 70:19, 73:10, 96:16, 111:22
**differently** [1] - 123:8
**difficult** [2] - 101:20, 116:13
**Direct** [2] - 3:8, 3:9
**direct** [6] - 67:23, 110:12, 110:14, 110:20, 117:7, 123:14
**DIRECT** [2] - 6:6, 13:15
**directed** [1] - 62:6
**direction** [1] - 21:5
**directly** [5] - 93:11, 105:1, 105:2, 105:6,

111:15
**disagree** [1] - 70:9
**disbelieve** [1] - 110:25
**discrepancies** [1] - 39:21
**discrepancy** [3] - 38:25, 39:16, 40:2
**discretionary** [1] - 114:20
**discuss** [5] - 26:17, 26:22, 53:6, 61:23, 123:4
**discussed** [3] - 23:8, 39:1, 39:16
**discussing** [1] - 123:5
**discussion** [1] - 37:10
**discussions** [2] - 27:22, 109:6
**dishes** [1] - 58:21
**display** [1] - 63:3
**disprove** [1] - 110:18
**dispute** [2] - 102:5, 102:6
**disregard** [2] - 109:13, 110:5
**distance** [2] - 50:21, 98:23
**distinction** [2] - 68:8, 68:10
**distract** [1] - 82:6
**distracted** [1] - 58:20
**distraction** [1] - 69:5
**DISTRICT** [3] - 1:1, 1:1, 1:12
**divide** [3] - 81:17, 93:25, 115:15
**dividing** [1] - 115:11
**DIVISION** [1] - 1:2
**dizzy** [1] - 90:7
**Docket** [1] - 107:5
**doctor** [1] - 89:10
**doctrine** [3] - 104:21, 106:12, 106:20
**document** [2] - 15:17, 43:12
**documents** [3] - 70:21, 71:10, 71:11
**dollars** [3] - 21:17, 47:21, 81:21
**done** [4] - 13:3, 42:7, 87:3, 117:24
**door** [3] - 102:25, 125:13
**doubt** [2] - 68:23, 70:22
**down** [14] - 17:18, 29:12, 29:13, 37:5, 46:19, 47:6, 53:20, 56:23, 68:22, 70:6, 74:15, 81:6, 88:24,

123:22
**draft** [1] - 125:5
**drafting** [2] - 105:12, 105:14
**drive** [6] - 76:7, 87:19, 95:14, 125:21, 126:17, 126:18
**driven** [1] - 50:20
**drivers** [1] - 87:19
**driving** [2] - 50:23, 76:8
**drop** [2] - 98:21, 127:12
**droves** [1] - 87:10
**DS** [1] - 89:16
**due** [1] - 115:2
**during** [25] - 8:3, 11:16, 12:23, 15:16, 29:11, 31:3, 47:2, 48:5, 48:11, 48:16, 48:20, 49:4, 55:22, 57:7, 59:15, 59:21, 60:21, 66:10, 66:11, 79:5, 109:4, 110:6, 111:23, 115:12, 124:16
**duties** [3] - 6:22, 7:6, 109:22
**dying** [1] - 67:3

# E

**e-mail** [8] - 39:10, 39:12, 40:8, 43:19, 43:24, 80:6, 80:20, 127:7
**e-mailed** [1] - 65:14
**e-mails** [1] - 97:13
**earliest** [1] - 62:21
**early** [5] - 46:9, 46:11, 64:8, 64:13, 67:13
**earn** [3] - 12:12, 34:8, 96:10
**earned** [12] - 33:25, 40:25, 104:3, 114:10, 114:15, 114:16, 115:6, 115:12, 115:14, 115:16, 116:4, 120:2
**earnings** [1] - 115:2
**eased** [1] - 25:10
**easier** [4] - 25:1, 25:4, 25:8, 58:14
**Eastern** [1] - 61:3
**easy** [4] - 56:16, 58:20, 84:7, 98:13
**economic** [5] - 83:24, 86:20, 88:15, 117:17, 119:22
**economically** [3] -

49:8, 103:15, 119:14
**effect** [3] - 33:20, 36:20, 36:21
**effort** [1] - 95:10
**either** [16] - 17:19, 18:3, 18:21, 21:8, 30:5, 39:14, 40:2, 43:19, 46:13, 57:19, 66:12, 83:20, 109:10, 110:20, 113:11, 123:24
**electronic** [1] - 20:16
**eleventh** [1] - 107:16
**elicits** [1] - 39:22
**eligible** [4] - 11:11, 11:13, 16:14, 17:14
**ELMO** [2] - 63:2, 98:10
**Elmo** [1] - 95:11
**employed** [6] - 6:10, 6:12, 84:15, 97:9, 97:10, 117:12
**employee** [51] - 8:7, 23:18, 23:23, 37:24, 46:2, 46:5, 51:22, 59:10, 71:4, 74:2, 76:4, 76:18, 76:19, 82:16, 82:17, 84:3, 86:25, 87:2, 88:17, 88:20, 90:25, 91:5, 100:22, 101:5, 102:8, 102:17, 102:20, 102:23, 103:7, 113:10, 113:22, 114:2, 114:3, 114:5, 114:7, 114:10, 114:11, 115:6, 115:16, 115:20, 115:21, 117:6, 117:10, 118:6, 118:9, 118:15, 118:21, 119:13, 119:16, 119:20
**employee's** [5] - 87:2, 114:8, 114:22, 115:9, 117:23
**employees** [25] - 38:16, 82:19, 82:21, 86:18, 90:13, 95:2, 95:24, 96:3, 97:6, 99:8, 99:12, 99:13, 101:18, 102:2, 103:23, 107:8, 109:20, 109:21, 109:22, 113:9, 113:18, 115:17, 116:7, 117:14, 119:1
**employer** [11] - 71:15, 82:12, 82:16, 82:17, 84:3, 84:17, 86:6,

88:21, 93:6, 102:19, 114:2, 114:4, 114:11, 117:11, 117:22, 118:5, 118:7, 118:17
**employer's** [2] - 88:9, 97:17
**employer/employee** [1] - 117:22
**employers** [7] - 90:14, 101:17, 113:9, 114:7, 116:6, 116:8, 119:2
**employment** [2] - 38:16, 119:19
**end** [11] - 12:5, 20:16, 21:10, 21:25, 27:19, 52:18, 54:9, 67:20, 88:23, 105:18, 124:18
**engage** [1] - 113:23
**enriched** [1] - 122:9
**enrichment** [8] - 63:16, 63:17, 100:25, 105:5, 105:10, 105:22, 106:15, 106:20
**enroll** [3] - 15:12, 20:3, 29:14
**enrolled** [5] - 8:4, 9:2, 12:10, 12:15, 20:9
**enrolling** [2] - 39:4, 39:5
**enrollment** [34] - 8:3, 9:14, 10:21, 11:8, 11:9, 11:10, 11:11, 11:16, 11:17, 11:21, 13:23, 15:16, 16:4, 16:15, 16:19, 16:25, 19:1, 28:2, 29:12, 31:3, 47:2, 48:5, 48:11, 48:16, 48:20, 59:16, 60:21, 71:23, 92:5, 93:16, 93:17, 94:9, 99:18, 100:9
**enrollments** [1] - 39:8
**entered** [7] - 4:7, 66:1, 108:20, 119:24, 120:25, 121:16, 122:5
**entering** [1] - 7:25
**entertain** [1] - 53:21
**entire** [4] - 13:4, 72:1, 86:20, 117:18
**entitled** [6] - 71:5, 101:4, 115:17, 116:3, 124:13, 128:12
**Entry** [1] - 107:5
**equal** [3] - 54:5,

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

109:17, 115:6
**equals** [1] - 109:18
**equipment** [4] - 50:7, 103:7, 118:18, 118:20
**equitable** [4] - 63:15, 104:21, 104:22, 106:20
**equity** [2] - 63:14, 104:23
**especially** [2] - 28:1, 34:4
**ESQ** [4] - 1:14, 1:15, 1:19, 1:22
**Esquire** [1] - 1:19
**essential** [8] - 25:12, 112:8, 112:14, 112:24, 120:8, 120:12, 120:14, 121:3
**essentially** [1] - 45:4
**establish** [3] - 112:14, 112:24, 122:10
**estimated** [1] - 100:3
**estimation** [3] - 101:21, 116:18, 116:20
**Etna** [1] - 17:13
**evasive** [2] - 78:1, 93:10
**evening** [2] - 75:22, 125:14
**event** [1] - 122:4
**eventually** [1] - 27:11
**evidence** [56] - 66:13, 66:15, 68:4, 68:11, 68:12, 68:15, 68:16, 68:17, 69:1, 69:2, 69:10, 69:11, 69:13, 70:15, 70:23, 72:4, 73:4, 77:22, 85:25, 86:3, 95:18, 96:1, 97:9, 98:7, 98:14, 101:13, 103:9, 108:2, 108:7, 109:8, 109:24, 109:25, 110:2, 110:9, 110:10, 110:12, 110:14, 110:17, 110:20, 110:21, 110:22, 111:17, 111:19, 111:20, 112:9, 112:11, 112:12, 112:15, 112:20, 112:22, 112:25, 113:17, 116:20, 117:19, 123:3, 123:12
**EVIDENCE** [1] - 3:12
**exact** [7] - 17:8, 53:13,

99:23, 99:25, 101:20, 116:14
**exactly** [10] - 9:6, 16:11, 36:21, 45:21, 54:3, 54:17, 60:16, 100:3, 105:23, 127:1
**exam** [2] - 22:12, 75:7
**EXAMINATION** [5] - 6:6, 13:15, 42:9, 52:10, 57:5
**examination** [2] - 13:3, 78:21
**Examination** [5] - 3:8, 3:9, 3:9, 3:10, 3:10
**examinations** [1] - 67:23
**examine** [3] - 99:3, 120:13, 123:6
**examined** [1] - 97:2
**example** [3] - 52:17, 57:18, 117:11
**Excel** [1] - 90:6
**except** [4] - 61:1, 64:24, 68:18, 110:4
**exciting** [3] - 34:5, 34:18, 34:19
**excuse** [2] - 71:13, 100:16
**excused** [4] - 61:14, 61:16, 63:4, 121:4
**executive** [4] - 23:12, 23:21, 23:23
**exercise** [1] - 100:19
**Exhibit** [2] - 3:13, 3:14
**exhibit** [3] - 15:20, 28:9, 63:10
**exhibits** [6] - 110:1, 112:22, 125:8, 125:19, 127:11, 127:23
**EXHIBITS** [1] - 3:12
**existing** [1] - 11:14
**exited** [3] - 61:25, 104:14, 125:18
**exiting** [1] - 35:3
**expectation** [1] - 37:10
**expectations** [3] - 14:25, 15:2, 38:10
**expected** [2] - 24:7, 42:20
**expenses** [2] - 71:25, 74:11
**experience** [2] - 22:4, 72:8
**expertise** [1] - 51:22
**explain** [4] - 19:25, 54:1, 109:11, 123:1
**explained** [2] - 14:24, 16:1

**explains** [1] - 20:22
**explanation** [3] - 95:6, 101:24, 102:3
**express** [1] - 121:16
**extensions** [1] - 19:6
**extent** [3] - 35:17, 116:21, 119:10
**eyewitness** [1] - 110:16

## F

**faces** [2] - 88:19, 118:14
**fact** [13] - 38:8, 61:1, 69:4, 84:13, 85:20, 97:15, 109:15, 110:15, 110:18, 111:20, 112:6, 112:19, 122:20
**factor** [9] - 16:15, 16:17, 16:24, 88:8, 89:25, 90:15, 117:2, 119:9, 119:12
**factors** [7] - 71:8, 71:9, 86:16, 86:17, 117:19, 119:12
**facts** [7] - 69:10, 69:13, 110:7, 110:17, 113:16, 121:14, 123:11
**factual** [1] - 110:4
**fail** [1] - 100:1
**failed** [5] - 100:24, 101:19, 113:20, 116:10, 116:15
**failing** [1] - 120:1
**fails** [2] - 112:14, 112:24
**failure** [2] - 116:12, 121:10
**Fair** [2] - 71:5, 113:5
**fair** [3] - 14:8, 51:23, 51:24
**FairLaw** [1] - 1:15
**fairly** [3] - 14:10, 20:19
**fairness** [2] - 113:11, 122:18
**fall** [1] - 35:1
**falls** [1] - 21:15
**falsely** [1] - 111:19
**families** [2] - 75:25, 104:3
**Family** [2] - 23:13, 23:21
**family** [1] - 75:21
**far** [23] - 8:21, 11:25, 12:14, 16:12, 17:4, 18:16, 24:24, 29:13, 29:14, 29:21, 31:13,

37:8, 38:10, 38:21, 45:22, 49:7, 49:21, 51:11, 51:25, 53:13, 54:24, 99:11, 99:25
**favor** [1] - 49:18
**feather** [1] - 98:20
**federal** [1] - 73:22
**fees** [1] - 102:20
**fell** [2] - 26:2, 34:4
**felt** [3] - 49:11, 50:3, 52:22
**few** [6] - 21:4, 27:9, 90:13, 91:10, 111:4, 119:2
**fiduciary** [1] - 22:19
**figure** [3] - 80:10, 81:16, 85:10
**figured** [2] - 77:4, 93:24
**file** [1] - 80:22
**filed** [3] - 67:16, 85:21, 116:5
**filing** [1] - 84:8
**fill** [9] - 19:20, 44:22, 44:25, 45:6, 55:18, 98:14, 104:11, 123:19, 125:7
**filled** [2] - 45:7, 125:4
**filling** [1] - 92:12
**final** [2] - 12:14, 125:1
**fine** [5] - 11:5, 13:8, 31:22, 50:8, 127:8
**finish** [2] - 82:4, 94:15
**finished** [1] - 109:5
**fire** [1] - 102:14
**fires** [1] - 97:22
**Firm** [1] - 1:15
**First** [2] - 23:13, 23:21
**first** [21] - 5:7, 7:2, 14:22, 16:1, 26:23, 50:14, 52:17, 66:21, 67:24, 67:25, 72:11, 72:14, 77:13, 77:23, 81:5, 82:17, 106:17, 113:18, 114:12, 114:19
**fit** [1] - 21:8
**five** [7] - 17:22, 18:18, 64:18, 74:19, 86:17, 121:10, 124:17
**fix** [2] - 64:6, 95:4
**FL** [3] - 1:16, 1:20, 1:24
**flexibility** [1] - 8:10, 24:5, 26:8, 26:11, 26:17, 26:24, 27:1, 54:8, 59:1, 59:6, 90:21
**flexible** [4] - 8:1, 38:9, 45:24, 46:5

**Floor** [2] - 2:3, 128:16
**FLORIDA** [1] - 1:1
**Florida** [4] - 1:4, 2:4, 60:12, 128:16
**flow** [4] - 50:25, 51:4, 51:6, 51:8
**FLSA** [12] - 63:20, 79:24, 82:9, 113:6, 113:7, 113:13, 113:15, 113:23, 114:7, 116:23, 116:24, 119:13
**focus** [1] - 15:18
**folks** [1] - 107:16
**follow** [5] - 20:17, 20:23, 52:8, 109:11, 109:12
**followed** [1] - 125:4
**following** [5] - 4:1, 113:16, 120:7, 120:24, 122:11
**follows** [2] - 4:22, 5:22
**FOR** [4] - 1:14, 1:19, 3:3, 3:6
**forced** [1] - 89:4
**foregoing** [1] - 128:10
**foreperson** [4] - 123:14, 123:18, 125:6
**forgot** [1] - 112:1
**form** [13] - 19:20, 19:21, 20:12, 90:17, 98:14, 101:9, 103:11, 119:7, 123:16, 123:17, 123:19, 124:15, 127:4
**format** [1] - 53:13
**formed** [1] - 121:20
**forms** [5] - 85:23, 104:11, 125:2, 126:22, 126:24
**formula** [3] - 83:11, 88:13, 118:10
**formulas** [1] - 81:22
**forth** [3] - 21:18, 38:13, 58:21
**forward** [3] - 69:15, 69:16, 78:19
**foundation** [1] - 28:19
**four** [7] - 9:15, 23:13, 24:4, 26:4, 33:16, 90:6, 101:22
**Four** [2] - 121:7, 122:17
**frame** [1] - 105:23
**frankly** [1] - 91:6
**free** [3] - 27:21, 81:1, 109:7
**frequency** [1] - 114:24

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

**frequently** [1] - 37:8
**Friday** [1] - 101:23
**friendly** [1] - 33:4
**fringe** [2] - 88:11, 118:8
**front** [5] - 73:11, 73:22, 75:2, 90:24, 92:1
**full** [1] - 105:10
**fully** [1] - 123:3
**functions** [1] - 117:6

## G

**G-U-E-R-R-A** [1] - 6:4
**Gables** [2] - 1:16, 1:24
**gambit** [1] - 90:6
**gaps** [1] - 94:3
**general** [1] - 109:20
**generally** [4] - 117:25, 118:13, 118:15, 118:23
**gentlemen** [11] - 4:8, 61:22, 66:3, 76:23, 104:6, 104:8, 108:25, 124:8, 124:15, 125:9, 125:20
**gig** [1] - 49:17
**given** [9] - 12:15, 71:12, 71:13, 71:14, 76:5, 118:11, 122:20, 125:7
**glad** [1] - 95:8
**gobbledygook** [1] - 91:6
**God** [2] - 82:5, 92:7
**gonna** [6] - 6:15, 15:11, 23:1, 32:12, 32:21, 45:3, 79:16, 89:19
**Gonzalez** [14] - 43:20, 48:18, 57:9, 63:7, 69:16, 97:11, 99:9, 102:4, 113:4, 117:3, 117:4, 117:15, 127:6
**GONZALEZ** [1] - 1:9
**goodness** [1] - 94:5
**governed** [2] - 103:17, 119:17
**government** [3] - 84:12, 84:20, 85:22
**governs** [2] - 103:11, 119:7
**grammatical** [1] - 65:19
**great** [6] - 24:3, 51:12, 72:23, 74:6, 87:10, 101:7
**greater** [1] - 124:13

**ground** [1] - 98:17
**group** [1] - 33:5
**Group** [1] - 23:13
**growth** [1] - 85:16
**guaranteed** [1] - 114:23
**Guerra** [10] - 3:8, 6:4, 6:8, 42:11, 68:18, 71:18, 72:16, 96:23, 99:13, 102:12
**GUERRA** [1] - 5:21
**guess** [5] - 21:23, 35:15, 60:16, 65:8, 74:3
**guide** [1] - 21:5
**guides** [1] - 119:12
**guy** [2] - 93:12, 95:17
**guys** [19] - 19:14, 22:12, 22:17, 23:3, 33:7, 34:8, 35:21, 53:23, 78:8, 94:25

## H

**hair** [1] - 98:21
**half** [12] - 23:16, 31:14, 64:15, 80:18, 82:23, 92:20, 114:8, 114:13, 114:16, 114:18, 115:18, 115:24
**hand** [4] - 4:19, 5:19, 9:17, 77:10
**handle** [2] - 62:18, 67:14
**hands** [16] - 62:14, 63:12, 65:15, 65:17, 78:24, 104:16, 104:21, 104:24, 105:8, 105:17, 105:25, 106:5, 106:12, 106:19, 107:3, 107:5
**hang** [1] - 53:21
**happy** [1] - 62:16
**hard** [6] - 67:7, 67:11, 72:18, 75:16, 75:18, 75:21, 76:3, 76:5, 104:2
**harder** [2] - 26:2, 81:11
**HDMI** [1] - 95:11
**head** [1] - 89:24
**headphones** [1] - 89:23
**headset** [2] - 74:17, 76:17
**health** [6] - 7:9, 22:8, 22:11, 72:12, 72:18, 87:13

**Healthcare** [2] - 17:13, 23:12
**hear** [24] - 12:25, 33:18, 33:22, 35:25, 36:6, 36:12, 36:13, 36:22, 37:17, 40:1, 41:20, 62:2, 63:25, 68:5, 68:13, 68:24, 69:15, 75:12, 76:6, 76:7, 77:14, 82:5, 90:10, 96:21
**heard** [35] - 36:7, 36:15, 36:19, 39:14, 39:20, 66:3, 66:18, 68:4, 68:12, 71:17, 71:18, 71:22, 72:16, 72:25, 73:4, 74:1, 75:14, 75:20, 78:10, 79:10, 80:9, 83:18, 85:7, 88:2, 91:13, 96:23, 97:23, 99:13, 99:14, 101:13, 101:14, 102:10, 102:12, 125:13
**hearing** [3] - 36:3, 37:4, 66:21
**hearsay** [1] - 39:22
**heart** [1] - 94:5
**heavily** [1] - 49:18
**heck** [1] - 96:9
**held** [3] - 4:1, 86:4, 86:13
**hello** [3] - 13:17, 76:23, 77:3
**help** [12] - 6:25, 7:8, 8:4, 25:23, 41:25, 56:10, 56:24, 78:8, 89:12, 89:21, 124:8, 124:12
**helpful** [1] - 25:10
**helping** [1] - 25:15
**hereby** [1] - 128:10
**herself** [2] - 102:15, 102:16
**hesitate** [1] - 123:6
**hi** [1] - 13:18
**higher** [3] - 34:23, 38:10, 81:17
**himself** [1] - 36:18
**HIPAA** [1] - 23:4
**hired** [1] - 86:14
**hiring** [1] - 85:11
**hit** [5] - 15:24, 34:9, 34:23, 35:6, 74:19
**hmm** [12] - 14:1, 15:13, 16:5, 16:13, 18:23, 19:5, 28:8, 29:17, 30:4, 31:15, 39:6, 51:1
**hold** [1] - 51:21

**holding** [1] - 91:4
**home** [14] - 24:22, 55:21, 55:22, 57:8, 57:9, 57:12, 57:14, 57:19, 58:13, 58:16, 58:18, 58:20, 58:23, 76:15
**honest** [1] - 123:8
**Honor** [18] - 4:25, 5:6, 13:8, 62:5, 62:18, 63:4, 63:8, 64:7, 64:21, 65:24, 86:1, 94:17, 94:22, 104:5, 107:23, 107:24, 108:1, 128:2
**honor** [2] - 67:13, 98:11, 104:7
**HONORABLE** [1] - 1:12
**hope** [3] - 77:6, 77:7, 91:8
**hospital** [1] - 89:11
**hour** [10] - 2:9, 29:24, 64:15, 77:23, 79:23, 82:1, 89:20, 92:14, 107:16, 115:18, 115:25
**hourly** [7] - 37:11, 37:17, 79:15, 81:16, 88:6, 114:24
**hours** [39] - 9:12, 9:14, 24:2, 33:6, 48:11, 48:15, 73:2, 73:4, 73:6, 75:15, 77:24, 78:5, 78:8, 79:16, 82:1, 87:3, 89:2, 90:6, 92:4, 92:5, 92:10, 92:20, 93:17, 101:17, 114:5, 114:6, 114:9, 114:10, 114:13, 115:16, 115:19, 115:21, 115:23, 115:24, 116:7, 116:11, 116:24, 117:24
**house** [2] - 92:18, 97:24
**household** [1] - 18:19
**huge** [6] - 9:19, 16:11, 26:24, 54:14, 54:16, 93:6
**human** [2] - 51:17, 80:16
**husband** [1] - 48:2
**hybrid** [1] - 76:14

## I

**I-95** [1] - 50:20
**idea** [16] - 21:3, 28:17,

28:21, 33:6, 54:5, 74:4, 80:1, 81:1, 81:13, 83:11, 83:12, 85:11, 86:21, 88:3, 88:5
**IDENTIFIED** [1] - 3:12
**Illinois** [2] - 60:15, 60:18
**immediately** [2] - 39:12, 104:23
**important** [18] - 38:9, 41:4, 41:5, 41:14, 67:10, 69:4, 70:5, 72:2, 82:3, 90:16, 90:22, 103:14, 110:24, 111:19, 112:5, 119:5, 119:12, 119:14
**importantly** [2] - 68:25, 81:5
**impress** [1] - 111:5
**impression** [1] - 124:14
**improper** [1] - 85:4
**IN** [1] - 3:12
**inaccurately** [1] - 112:2
**inadequate** [3] - 99:25, 101:15, 116:6
**inbound** [6] - 28:25, 60:2, 60:8, 60:10, 60:20, 61:8
**Inc** [10] - 117:15, 120:22, 120:25, 121:7, 122:5, 122:6, 122:13, 122:14, 122:15, 122:18
**INC** [1] - 1:8
**Inc.'s** [2] - 117:6, 121:6
**included** [1] - 114:20
**includes** [1] - 109:25
**including** [6] - 62:6, 96:3, 113:25, 117:6, 121:15, 124:7
**income** [7] - 21:13, 27:12, 38:22, 49:5, 49:6, 71:16, 72:17
**incorrect** [1] - 127:4
**independent** [82] - 8:7, 8:8, 11:23, 14:12, 23:14, 24:11, 25:11, 26:6, 27:21, 43:21, 45:23, 46:10, 51:23, 58:25, 59:2, 70:25, 71:1, 71:4, 71:24, 72:1, 74:2, 74:5, 74:6, 75:17, 76:4, 76:17, 79:18, 79:21, 82:12, 82:14,

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

82:19, 82:21, 83:21, 84:2, 84:6, 84:9, 84:11, 84:13, 84:20, 84:21, 84:24, 85:18, 86:5, 86:9, 86:13, 86:14, 86:15, 86:19, 86:25, 87:4, 88:12, 88:17, 88:18, 89:8, 89:10, 90:1, 90:10, 90:19, 90:21, 91:1, 91:3, 91:4, 96:8, 102:8, 102:25, 103:16, 106:13, 107:6, 107:9, 113:13, 116:9, 117:13, 117:16, 117:25, 118:3, 118:9, 118:13, 118:19, 118:22, 119:15, 119:17, 119:20

**indicated** [1] - 51:25
**indication** [1] - 122:22
**individual** [9] - 14:18, 18:11, 35:14, 35:23, 116:22, 116:24, 116:25, 119:20
**industries** [1] - 90:2
**industry** [2] - 89:14, 118:24
**inequitable** [3] - 105:6, 107:7, 107:10
**inference** [1] - 78:17
**influenced** [1] - 109:9
**information** [9] - 20:2, 23:6, 23:7, 23:8, 34:7, 55:4, 55:18, 93:23, 124:5
**infringement** [1] - 85:2
**injured** [1] - 105:3
**innocent** [1] - 112:3
**input** [1] - 31:7
**inspired** [1] - 72:13
**instance** [2] - 19:9, 29:15
**instead** [3] - 74:20, 87:11, 127:6
**instruct** [1] - 66:6, 104:12
**instruction** [12] - 62:13, 62:17, 63:2, 65:15, 65:16, 65:18, 104:16, 105:24, 106:17, 107:12, 124:18, 124:20
**instructions** [26] - 64:22, 64:23, 68:13, 71:7, 77:15, 82:5, 82:8, 88:14, 90:10,

96:2, 98:12, 101:11, 107:17, 108:12, 108:22, 109:1, 109:3, 109:13, 109:14, 110:5, 122:20, 124:24, 125:2, 125:4, 125:7, 125:14
**INSTRUCTIONS** [1] - 108:24
**Instructions..............** ....... [1] - 3:22
**insurance** [47] - 7:9, 11:12, 11:19, 22:6, 22:10, 22:11, 23:14, 24:12, 25:6, 25:15, 27:14, 40:19, 40:23, 42:2, 47:1, 47:7, 47:16, 49:10, 49:18, 56:16, 57:18, 60:7, 60:17, 72:2, 72:8, 72:13, 72:18, 72:22, 74:18, 75:5, 75:12, 79:9, 79:14, 79:15, 79:22, 79:23, 87:13, 87:20, 88:10, 92:13, 92:24, 96:4, 103:21, 118:8, 119:25, 122:7
**insurances** [1] - 79:6
**intended** [3] - 66:16, 115:13, 119:19
**intense** [1] - 11:6
**intent** [6] - 90:15, 90:16, 90:22, 119:4, 121:16
**intention** [1] - 90:23
**intentional** [2] - 112:4, 121:22
**intentions** [1] - 120:19
**interest** [4] - 22:16, 22:18, 111:9, 123:11
**interesting** [1] - 95:15
**interference** [3] - 106:6, 106:9, 106:21
**Internet** [3] - 57:23, 126:13, 126:16
**interpretation** [1] - 110:8
**interpreted** [1] - 122:22
**interpreter** [2] - 5:7, 5:11
**interrogatories** [1] - 98:12
**interval** [1] - 115:3
**interview** [5] - 7:3, 7:12, 7:14, 14:24, 15:6
**interviewed** [3] - 7:5, 14:22, 26:18

**introverted** [2] - 36:4, 36:16
**invented** [1] - 80:13
**invited** [1] - 57:18
**involve** [1] - 16:20
**involved** [9] - 20:7, 58:17, 74:23, 74:24, 88:19, 109:15, 109:19, 112:17
**involves** [1] - 71:9
**iPad** [1] - 50:2
**irrelevant** [1] - 69:5
**IRS** [3] - 85:22, 106:14, 107:6
**issue** [11] - 40:8, 46:9, 46:12, 46:13, 46:14, 50:10, 65:5, 102:7, 110:4, 122:21
**issued** [2] - 70:25, 71:11
**issues** [4] - 9:19, 67:14, 71:9, 99:6
**IT** [1] - 126:20
**it'd** [1] - 12:16
**item** [1] - 47:20
**items** [1] - 46:25

**J**

**Jamaica** [1] - 92:18
**January** [1] - 75:23, 92:16
**Jeopardy** [2] - 50:13, 74:19
**job** [26] - 11:24, 14:21, 14:25, 15:6, 15:7, 18:20, 25:10, 42:1, 75:3, 76:14, 76:15, 79:13, 79:15, 79:16, 81:4, 81:6, 85:15, 86:15, 88:5, 88:6, 90:20, 94:11, 97:5, 118:11, 118:20
**jobs** [3] - 75:10, 88:23
**joint** [1] - 127:23
**JUDGE** [1] - 1:12
**Judge** [8] - 12:19, 12:21, 24:16, 61:19, 62:9, 65:10, 82:6, 88:15
**judge** [1] - 126:11
**Judge's** [1] - 77:14
**judges** [2] - 123:10
**July** [1] - 1:5
**jurors** [7] - 64:11, 64:16, 108:16, 108:23, 123:4, 124:4, 125:1
**Jurors** [1] - 128:5
**JURY** [2] - 1:11, 77:9

**jury** [43] - 4:6, 4:7, 11:10, 15:20, 28:9, 61:24, 61:25, 64:16, 65:22, 65:23, 66:1, 67:2, 67:10, 68:10, 68:14, 71:7, 73:22, 78:24, 79:13, 86:2, 86:23, 96:2, 101:10, 104:10, 104:14, 104:17, 105:23, 106:18, 107:20, 108:12, 108:20, 109:5, 123:13, 123:17, 124:6, 124:10, 124:23, 125:1, 125:9, 125:18, 125:19, 127:24, 128:5
**justice** [1] - 109:18

**K**

**K-A-T-R-I-N-A** [1] - 6:3
**katrina** [1] - 3:8
**Katrina** [6] - 5:7, 5:10, 6:1, 6:3, 13:19, 79:10
**KATRINA** [1] - 5:21
**keep** [19] - 41:23, 52:13, 52:24, 53:7, 54:2, 57:12, 64:16, 78:8, 82:13, 86:6, 95:24, 101:17, 111:24, 116:7, 116:10, 116:12, 116:15
**keeping** [2] - 23:4, 53:13
**keeps** [2] - 97:20, 97:21
**key** [2] - 86:16, 86:17
**kids** [5] - 24:4, 26:4, 26:12, 32:7, 85:8
**kind** [27] - 7:18, 12:2, 19:13, 21:4, 21:5, 21:14, 22:2, 26:2, 27:12, 28:23, 29:21, 30:22, 31:4, 34:4, 35:3, 36:17, 46:21, 50:13, 50:24, 51:12, 52:21, 53:14, 58:20, 67:2, 95:14, 95:16, 118:4
**kinda** [1] - 30:7
**kindergarten** [3] - 58:7, 58:8, 58:9
**knock** [1] - 125:13
**knowing** [1] - 74:25
**knowledge** [2] - 9:7, 110:15

**known** [1] - 113:6, 114:13
**knows** [2] - 114:4, 121:22

**L**

**label** [4] - 83:23, 103:17, 119:17, 119:21
**Labor** [1] - 71:5, 113:5, 113:12
**lack** [2] - 30:20, 31:1
**ladies** [9] - 4:8, 61:22, 66:3, 76:23, 104:6, 104:8, 108:25, 124:8, 124:15
**lapse** [1] - 112:3
**laptop** [12] - 55:10, 55:11, 55:16, 87:25, 125:24, 126:3, 126:4, 126:5, 126:19, 127:10, 127:15
**laptops** [3] - 126:2, 126:10, 126:16
**Last** [1] - 6:3
**last** [13] - 39:3, 40:22, 47:17, 67:15, 67:25, 68:1, 77:21, 83:12, 83:18, 122:3, 122:5, 126:4, 126:7
**late** [1] - 67:13
**latest** [1] - 125:16
**laundry** [1] - 58:21
**Law** [1] - 1:19
**law** [20] - 60:4, 65:16, 66:6, 75:3, 81:14, 101:15, 101:17, 104:13, 109:1, 109:11, 109:12, 109:14, 109:17, 109:21, 110:5, 113:21, 116:6, 117:9, 117:10
**lawsuit** [6] - 67:16, 77:14, 80:22, 95:3, 102:18, 116:5
**lawyer** [2] - 69:19
**lawyers** [9] - 66:12, 67:3, 67:5, 69:17, 75:4, 89:8, 110:2, 124:2, 124:16
**lead** [1] - 12:17
**leading** [14] - 10:15, 26:14, 30:10, 30:23, 31:8, 32:24, 36:9, 39:17, 40:4, 41:7, 56:11, 57:1, 75:23, 75:24

**leads** [9] - 44:18, 60:2, 60:20, 61:3, 74:12, 85:4, 87:15, 89:17, 103:21
**leaning** [2] - 99:1, 99:3
**learn** [2] - 7:10, 22:21
**least** [4] - 21:25, 24:5, 70:4, 114:8
**leave** [5] - 29:24, 46:9, 46:11, 96:19, 125:6
**left** [4] - 24:8, 26:25, 85:7, 99:1
**legal** [4] - 51:13, 51:15, 66:18, 110:19
**Leon** [1] - 1:23
**LESESMA** [1] - 4:21
**Lesesma** [1] - 3:7
**less** [8] - 11:5, 18:12, 31:2, 35:22, 48:15, 60:16, 99:19, 103:25
**letter** [6] - 91:14, 91:17, 91:24, 92:2, 106:2
**letters** [2] - 80:19, 92:1
**Liability** [1] - 116:22
**liable** [2] - 116:23, 116:25
**licence** [1] - 22:8
**license** [9] - 22:7, 22:10, 49:10, 72:8, 72:10, 72:13, 75:5, 90:11
**licensed** [6] - 14:14, 25:17, 26:6, 60:17, 79:12, 79:22
**licenses** [2] - 90:3, 118:25
**lie** [1] - 91:20
**life** [11] - 11:18, 22:8, 22:9, 22:11, 23:14, 24:12, 27:14, 49:9, 49:11, 49:17, 79:9
**Life** [1] - 23:14
**light** [2] - 102:1, 117:17
**likely** [1] - 112:13
**limited** [1] - 66:14
**line** [3] - 40:17, 41:13, 82:5
**lines** [1] - 62:21
**link** [1] - 20:14
**listed** [3] - 53:1, 105:17, 119:12
**listen** [5] - 6:25, 12:2, 32:11, 66:15, 90:5
**listened** [1] - 72:14
**listening** [1] - 78:8
**listing** [1] - 119:1

**listings** [2] - 90:14, 119:3
**literally** [1] - 80:23
**litigation** [1] - 104:24
**live** [2] - 43:7, 43:8
**lives** [1] - 67:9
**living** [1] - 49:8
**LLCs** [1] - 85:21
**locate** [1] - 127:10
**look** [13] - 46:18, 64:1, 78:14, 86:20, 89:6, 103:17, 104:18, 119:21, 119:22, 124:20, 125:19, 125:22, 125:25
**looked** [3] - 90:25, 104:19, 127:20
**looking** [4] - 27:1, 90:6, 90:7, 95:15
**Lopez** [2] - 113:2
**LOPEZ** [2] - 1:4, 1:4
**Lorenzo** [1] - 1:16
**lose** [3] - 76:8, 89:2, 94:12
**losing** [1] - 94:13
**loss** [8] - 76:10, 85:13, 88:19, 88:21, 88:23, 103:3, 118:14, 118:16
**lost** [2] - 52:21, 76:6
**love** [2] - 75:25, 91:16
**lunch** [3] - 64:13, 104:10, 104:11, 125:12

# M

**ma'am** [3] - 4:19, 5:16, 61:13
**Mac** [1] - 126:12
**mad** [1] - 92:8
**mail** [11] - 39:10, 39:12, 40:8, 43:19, 43:24, 80:6, 80:20, 91:14, 91:15, 91:18, 127:7
**mailed** [1] - 65:14
**mails** [1] - 97:13
**main** [2] - 49:5, 49:6
**maintain** [4] - 105:25, 116:8, 116:11, 116:12
**major** [1] - 68:8
**man** [1] - 102:11
**manage** [1] - 96:8
**management** [1] - 51:17
**manager** [4] - 6:21, 6:23, 6:24, 41:23
**managers** [1] - 96:8

**mandatory** [2] - 10:9, 113:7
**manner** [6] - 87:3, 87:6, 102:9, 117:23, 118:2, 119:11
**margin** [1] - 99:5
**Mariana** [12] - 30:3, 36:25, 48:15, 69:9, 72:5, 75:6, 75:20, 91:10, 99:7, 99:16, 100:22, 113:2
**MARIANA** [1] - 1:4
**market** [1] - 79:14
**marketplace** [2] - 20:3, 55:5
**married** [1] - 18:17
**match** [2] - 68:21, 98:16
**matched** [1] - 52:23
**material** [1] - 106:13
**math** [1] - 93:25
**matter** [10] - 32:16, 70:14, 73:25, 88:25, 102:13, 102:14, 111:2, 115:1, 121:15, 128:12
**matters** [3] - 26:17, 71:17, 110:9
**maximize** [8] - 9:19, 11:3, 28:22, 30:1, 33:10, 48:23, 58:22, 59:22
**maximized** [1] - 9:16
**McCARN** [2] - 2:2, 128:15
**mean** [68] - 9:24, 10:8, 11:2, 11:25, 19:25, 20:7, 21:10, 22:22, 27:5, 29:20, 31:23, 33:4, 34:2, 37:4, 43:6, 44:11, 44:22, 48:8, 49:2, 49:7, 49:14, 49:18, 49:22, 50:1, 50:9, 50:11, 51:5, 52:15, 53:11, 54:9, 58:24, 59:12, 60:6, 60:22, 64:17, 71:1, 71:18, 71:25, 75:10, 75:15, 75:16, 75:18, 76:3, 76:11, 76:14, 76:18, 77:19, 77:20, 77:21, 77:25, 79:12, 79:24, 86:10, 89:16, 91:21, 92:7, 92:19, 93:12, 93:13, 95:7, 95:11, 96:8, 97:11, 98:20, 101:13, 110:22, 111:24
**meaning** [1] - 103:19

**means** [9] - 75:16, 76:5, 87:3, 87:6, 102:9, 112:11, 117:23, 118:1, 119:11
**measurement** [1] - 14:4
**measurement-wise** [1] - 14:4
**medical** [2] - 21:12, 22:24
**meet** [8] - 7:13, 7:16, 16:1, 24:21, 34:22, 42:14, 57:19, 104:9
**mem** [1] - 15:25
**member** [10] - 8:21, 15:12, 16:12, 16:16, 17:22, 18:9, 43:13, 47:3, 47:12, 103:4
**members** [17] - 9:1, 12:10, 12:14, 15:14, 16:4, 17:3, 17:21, 17:23, 18:5, 18:6, 18:13, 21:24, 35:16, 47:2, 52:19, 54:5, 123:14
**memory** [5] - 111:11, 112:3, 124:12, 124:13, 124:14
**mention** [3] - 33:25, 36:19, 91:13
**mentions** [1] - 83:16
**message** [3] - 20:14, 123:22, 124:3
**met** [8] - 14:21, 26:10, 27:3, 42:12, 69:7, 98:15, 99:4, 99:5
**method** [1] - 114:24
**MIAMI** [1] - 1:2
**Miami** [7] - 1:4, 1:20, 2:3, 2:4, 79:13, 128:16, 128:16
**microphone** [3] - 6:2, 24:14, 76:24
**middle** [1] - 13:3
**might** [6] - 38:25, 39:15, 63:18, 64:5, 89:19, 94:12
**million** [1] - 81:21
**mind** [5] - 58:24, 70:22, 92:12, 111:24, 123:6
**minds** [1] - 68:9
**minimizing** [1] - 74:23
**minimum** [2] - 85:15, 94:4
**minute** [3] - 62:11, 63:24, 103:13
**minutes** [14] - 4:13, 43:5, 64:10, 64:15,

64:17, 64:18, 65:9, 73:1, 74:19, 76:21, 77:22, 103:2, 107:21, 108:10
**MISCELLANEOUS** [1] - 3:18
**misclassified** [1] - 84:22
**misquoted** [1] - 73:20
**misstated** [1] - 112:2
**misstatement** [1] - 112:5
**mistake** [1] - 111:24
**mistakes** [2] - 65:19, 125:3
**mom's** [1] - 92:18
**moment** [6] - 34:18, 34:19, 35:10, 43:5, 43:6, 50:3
**moments** [1] - 77:7
**Monday** [1] - 78:10
**money** [34] - 47:12, 49:14, 49:15, 70:13, 74:6, 74:11, 75:19, 76:1, 76:7, 76:8, 76:9, 79:17, 81:11, 81:17, 85:14, 86:12, 88:4, 89:1, 89:2, 91:22, 91:23, 91:25, 94:2, 94:4, 94:6, 95:21, 95:22, 95:24, 97:18, 97:25, 102:2, 102:3, 104:2
**monitor** [1] - 89:22, 103:22
**monitors** [2] - 56:2, 76:17
**month** [13] - 39:3, 39:8, 47:12, 47:14, 47:15, 47:21, 52:18, 80:8, 83:12, 83:18, 92:16, 94:1, 94:10
**monthly** [2] - 21:18, 115:3
**months** [6] - 33:15, 52:21, 80:5, 80:21, 93:23
**morning** [14] - 4:3, 4:8, 6:8, 6:9, 29:23, 42:11, 42:13, 42:14, 43:4, 58:10, 58:13, 61:23, 75:22, 125:15
**most** [33] - 10:21, 16:6, 17:3, 20:19, 37:5, 41:21, 46:16, 47:8, 47:17, 47:20, 47:21, 48:7, 48:17, 49:2, 49:11, 49:12, 49:14, 50:19, 51:3, 51:7, 60:8, 60:10,

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

60:11, 67:10, 72:1,
80:25, 81:5, 82:3,
90:22, 103:14,
119:11, 119:13
**mostly** [3] - 22:7, 22:8,
87:24
**motions** [4] - 62:2,
62:5; 62:8, 62:10
**motivation** [1] - 69:3
**mouse** [7] - 50:3,
50:4, 50:6, 50:11,
74:17, 74:20, 103:1
**mouses** [1] - 89:22
**mouth** [2] - 56:6,
73:11
**move** [6] - 13:12,
42:21, 85:16, 88:24,
108:7, 124:21
**moved** [2] - 43:10,
97:24
**MR** [138] - 4:4, 4:12,
4:15, 4:25, 5:4, 5:6,
5:10, 5:14, 6:7, 6:19,
10:15, 10:17, 12:17,
12:19, 12:21, 12:23,
13:2, 13:8, 13:12,
13:13, 13:14, 13:16,
15:21, 24:16, 24:18,
26:14, 26:16, 26:19,
26:21, 28:10, 28:19,
29:4, 29:9, 30:10,
30:15, 30:23, 30:25,
31:8, 31:10, 32:24,
33:1, 36:9, 36:11,
39:17, 39:19, 39:22,
39:25, 40:4, 40:7,
40:14, 40:16, 41:7,
41:9, 42:10, 52:7,
52:8, 52:11, 53:2,
53:5, 53:9, 53:15,
56:11, 56:13, 57:1,
57:4, 57:6, 61:11,
61:19, 61:21, 62:4,
62:9, 62:13, 62:20,
62:24, 63:4, 63:7,
63:14, 63:16, 63:18,
63:21, 64:3, 64:5,
64:13, 64:15, 64:19,
64:21, 65:2, 65:5,
65:8, 65:10, 65:24,
67:2, 76:23, 77:1,
77:3, 77:10, 85:25,
86:4, 94:17, 94:20,
94:22, 94:24, 95:13,
103:14, 104:5,
104:19, 105:12,
105:14, 105:16,
106:2, 106:6,
106:16, 106:21,
106:25, 107:2,

107:7, 107:13,
107:18, 107:23,
107:24, 108:1,
108:6, 108:9,
125:10, 125:21,
125:23, 125:24,
126:4, 126:7,
126:11, 126:18,
127:5, 127:8,
127:12, 127:15,
127:19, 127:21,
128:2
**muddled** [1] - 105:24
**multiple** [1] - 18:8
**multiply** [1] - 115:23
**must** [37] - 87:4,
104:25, 105:2,
109:1, 109:8, 109:9,
109:11, 109:12,
109:13, 109:16,
109:17, 109:24,
110:21, 110:22,
112:2, 113:16,
114:5, 114:11,
114:19, 114:20,
115:19, 116:19,
117:1, 117:2, 117:5,
117:14, 117:19,
117:25, 120:6,
120:23, 121:13,
122:10, 122:24,
122:25, 123:2,
123:4, 123:18

## N

**name** [8] - 5:25, 6:1,
6:3, 6:4, 42:11, 98:4,
119:1, 127:4
**names** [2] - 90:14,
119:3
**naturally** [1] - 112:1
**nature** [3] - 7:1, 22:25,
35:20
**necessarily** [1] - 111:2
**necessary** [5] - 90:3,
90:11, 118:4,
118:20, 118:24
**need** [47] - 5:6, 5:7,
5:11, 11:17, 11:18,
20:13, 23:1, 24:5,
26:11, 38:11, 40:20,
45:6, 46:9, 46:21,
54:23, 55:3, 55:6,
55:8, 55:9, 55:12,
55:23, 55:24, 56:6,
56:8, 56:14, 56:20,
56:23, 62:16, 69:10,
69:12, 70:20, 76:24,
87:17, 87:18, 89:9,

89:12, 98:16, 98:19,
98:20, 99:2, 99:3,
103:20, 125:2,
126:5, 127:23
**needed** [28] - 9:17,
9:18, 9:21, 15:24,
21:1, 21:16, 25:9,
27:2, 31:21, 43:18,
43:19, 43:23, 44:12,
45:6, 46:11, 46:17,
46:18, 46:20, 46:21,
46:22, 87:24, 87:25,
88:2, 96:3, 97:1,
97:3, 97:5
**needing** [1] - 87:13
**needs** [6] - 12:3,
41:17, 46:8, 89:7,
89:11
**negotiate** [2] - 96:16
**negotiated** [1] - 113:8
**Netflix** [2] - 53:20,
53:24
**never** [34] - 9:18, 10:9,
32:19, 36:7, 36:15,
38:12, 50:7, 50:10,
57:18, 58:18, 59:21,
59:23, 60:22, 60:24,
70:18, 77:25, 78:1,
78:12, 80:5, 80:21,
80:23, 80:24, 82:2,
83:15, 83:16, 84:12,
91:13, 91:18, 91:20,
92:2, 94:3, 97:12,
123:1
**nevertheless** [1] -
119:10
**New** [1] - 75:24
**new** [5] - 11:12, 11:14,
74:6, 97:24, 126:12
**next** [8] - 4:14, 44:3,
61:17, 76:13, 100:1,
100:5, 100:10,
124:21
**nice** [1] - 42:14
**night** [3] - 60:3, 60:7,
60:21
**nine** [2] - 33:15
**NO** [1] - 1:2
**nobody** [2] - 97:14,
97:16
**non** [1] - 114:20
**non-discretionary** [1]
- 114:20
**none** [2] - 82:21,
82:22
**normally** [3] - 47:4,
118:3, 126:15
**North** [2] - 2:3, 128:16
**note** [1] - 124:7
**notebooks** [1] - 66:8

**notes** [9] - 66:9,
66:11, 66:14, 99:21,
124:8, 124:9,
124:11, 124:12
**nothing** [10] - 29:20,
61:11, 64:25, 71:6,
94:10, 97:18,
103:25, 126:3
**notice** [2] - 54:10,
54:12
**November** [5] - 33:14,
39:3, 39:4, 75:23,
92:17
**November/
December** [1] - 39:3
**nowadays** [1] - 56:15
**number** [7] - 21:1,
34:23, 35:16, 52:19,
111:1, 115:12,
117:18
**numbers** [16] - 15:24,
17:8, 34:3, 39:9,
79:24, 80:2, 80:13,
80:23, 81:15, 83:8,
83:10, 91:8, 99:21,
100:21, 101:2,
127:24
**numbing** [1] - 92:12

## O

**o'clock** [12] - 29:18,
30:6, 58:9, 58:10,
60:3, 60:7, 60:12,
60:13, 60:15, 60:21,
60:22
**Obamacare** [1] - 8:4
**object** [2] - 4:25, 13:2
**objection** [11] - 10:15,
12:25, 13:9, 13:10,
26:14, 26:19, 28:19,
30:10, 39:22, 62:25,
85:25
**objections** [4] - 12:3,
46:22, 62:6, 62:15
**obligated** [1] - 59:25
**obligation** [2] - 78:19,
82:12
**observe** [1] - 111:13
**obtain** [1] - 15:24
**occasion** [1] - 43:24
**occurred** [1] - 121:6
**October** [6] - 6:15,
6:18, 13:22, 33:14
**OF** [4] - 1:1, 67:1,
77:2, 94:23
**offensive** [1] - 80:25
**offer** [4] - 90:1, 103:8,
118:22, 118:23
**offered** [3] - 47:9,

87:20, 103:10
**offering** [1] - 27:6
**Office** [1] - 126:1
**office** [22] - 31:13,
33:16, 36:5, 37:20,
38:14, 39:11, 43:8,
43:20, 49:22, 55:21,
57:14, 58:17, 61:7,
74:10, 74:12, 75:6,
76:13, 96:4, 97:24,
98:2, 103:1, 113:25
**officer** [3] - 108:22,
123:23
**OFFICER** [4] - 61:24,
65:11, 65:13, 125:17
**Offices** [1] - 1:19
**Official** [1] - 128:15
**official** [1] - 2:2
**often** [2] - 67:3, 67:4
**old** [3] - 57:15, 58:3,
95:3
**ON** [3] - 67:1, 77:2,
94:23
**once** [16] - 12:14,
12:15, 16:3, 16:6,
29:21, 29:24, 34:2,
35:23, 40:18, 40:23,
41:4, 43:9, 43:25,
55:16, 115:22
**one** [91] - 10:3, 12:24,
16:21, 17:11, 17:13,
17:22, 18:2, 18:4,
18:9, 18:12, 18:16,
18:18, 21:16, 28:6,
30:14, 31:23, 32:7,
34:4, 34:9, 34:13,
36:2, 36:4, 39:2,
39:8, 40:1, 40:25,
41:22, 49:16, 50:14,
61:9, 62:22, 64:6,
64:24, 70:16, 71:8,
71:9, 72:23, 73:7,
73:12, 79:21, 80:11,
81:3, 83:5, 83:7,
84:23, 86:7, 88:7,
90:13, 93:18, 95:9,
96:11, 98:2, 98:3,
98:19, 100:6,
103:13, 107:4,
111:5, 112:17,
114:8, 114:10,
114:18, 115:9,
115:18, 115:24,
117:2, 118:13,
119:2, 119:21,
120:8, 120:25,
122:12, 123:4,
123:13, 124:4,
124:21, 124:24,
124:25, 125:3,

125:5, 125:6, 126:5, 126:8, 126:21, 127:13, 127:16, 127:21
**one-and-one-half** [1] - 114:8
**one-half** [3] - 114:18, 115:18, 115:24
**ones** [2] - 36:2, 65:2
**online** [2] - 75:5, 75:6
**open** [36] - 8:3, 9:14, 11:4, 11:8, 11:9, 11:10, 11:11, 11:20, 13:23, 16:3, 16:15, 16:19, 16:25, 19:1, 20:15, 27:5, 28:1, 31:13, 31:19, 35:12, 35:24, 41:13, 47:2, 48:5, 48:11, 48:16, 48:20, 59:15, 60:21, 60:23, 71:23, 92:5, 93:16, 94:9, 99:18, 100:8
**opened** [1] - 71:22
**opening** [5] - 66:12, 67:8, 70:4, 70:5, 70:17
**operational** [2] - 71:25, 117:3
**opinion** [2] - 110:4, 123:6
**opportunity** [20] - 9:20, 10:21, 31:4, 49:9, 66:23, 67:5, 67:6, 67:19, 67:20, 76:5, 85:13, 85:15, 85:16, 85:17, 87:10, 88:24, 89:1, 111:12, 118:12, 118:13
**oral** [3] - 120:4
**order** [4] - 15:24, 20:3, 35:4, 68:6
**ordered** [1] - 84:25
**ordering** [1] - 104:11
**orders** [1] - 104:10
**ordinarily** [4] - 88:12, 90:13, 118:9, 119:1
**Oscar** [7] - 34:11, 36:1, 42:3, 47:8, 47:11, 83:14
**otherwise** [5] - 59:15, 89:18, 89:19, 102:3, 113:10
**ourselves** [2] - 53:21, 89:10
**outcome** [2] - 111:10, 119:10
**outline** [1] - 15:23
**outside** [3] - 4:5, 53:2, 53:9

**overcome** [2] - 12:3, 46:22
**overhead** [1] - 56:17
**overruled** [6] - 28:20, 39:23, 40:5, 53:3, 53:10, 86:3
**overstepping** [1] - 30:22
**overtime** [36] - 37:13, 37:18, 48:9, 70:18, 71:6, 78:12, 80:6, 82:15, 95:6, 95:19, 95:22, 99:11, 99:14, 99:15, 99:22, 100:14, 100:23, 101:25, 103:23, 103:24, 113:5, 113:21, 113:22, 114:5, 114:11, 114:14, 114:17, 115:8, 115:10, 115:17, 115:18, 115:19, 115:23, 115:24, 115:25
**overview** [1] - 18:20
**overwhelming** [2] - 70:23, 98:15
**owed** [35] - 36:13, 52:14, 52:20, 53:8, 54:2, 54:6, 80:6, 80:7, 80:10, 80:17, 80:18, 91:7, 91:11, 91:17, 91:25, 95:18, 95:19, 99:11, 99:22, 100:3, 100:14, 100:20, 101:5, 101:7, 102:2, 103:23, 103:25, 114:17, 122:9
**owes** [1] - 122:6
**own** [24] - 24:2, 37:7, 50:6, 53:14, 84:14, 84:16, 85:20, 87:25, 89:7, 89:15, 89:18, 89:20, 89:22, 105:5, 105:8, 109:2, 110:7, 110:8, 123:6, 124:12, 126:2
**owner** [5] - 7:15, 9:9, 9:10, 12:15, 14:19
**Oz** [1] - 98:1

**P**

**p.m** [15] - 1:6, 30:3, 61:3, 61:8, 75:16, 104:14, 108:14, 108:20, 125:13, 125:16, 125:18, 128:4, 128:6

**page** [1] - 43:12
**Page** [3] - 3:3, 3:6, 3:19
**Pages** [1] - 1:8
**pages** [2] - 124:16, 124:17
**paid** [51] - 8:12, 8:18, 12:13, 12:16, 15:11, 33:19, 36:8, 37:11, 38:25, 40:18, 40:23, 43:16, 43:21, 52:1, 52:4, 71:9, 71:23, 78:11, 80:11, 80:15, 81:9, 81:17, 83:1, 83:3, 83:4, 83:7, 86:12, 88:8, 88:9, 88:12, 88:21, 93:3, 93:22, 94:3, 95:2, 96:15, 98:4, 100:8, 100:9, 100:11, 102:17, 102:19, 114:23, 116:2, 116:3, 116:8, 116:17, 118:5, 118:9, 118:16
**painful** [1] - 77:20
**pale** [1] - 91:8
**paper** [2] - 56:23, 98:19
**papers** [1] - 20:18
**paragraph** [1] - 62:25
**part** [28] - 11:2, 17:3, 25:5, 37:15, 40:17, 41:21, 42:1, 46:16, 48:7, 48:9, 49:2, 50:19, 51:3, 51:7, 52:4, 67:10, 72:2, 80:25, 82:2, 82:3, 82:10, 86:16, 93:6, 111:1, 112:8, 112:14, 112:24
**participating** [1] - 42:2
**particular** [14] - 11:24, 12:11, 18:10, 21:24, 33:24, 51:22, 52:24, 53:11, 90:2, 111:2, 111:7, 115:5, 118:24
**parties** [17] - 86:21, 90:17, 117:18, 119:5, 119:18, 119:19, 120:9, 120:10, 120:12, 120:13, 120:18, 121:16, 121:18, 121:22, 122:1, 124:2, 126:2
**parties'** [3] - 119:4, 120:18
**partly** [2] - 120:4

**party** [7] - 104:22, 104:23, 109:15, 120:16, 121:12, 121:13, 121:23
**party's** [1] - 90:15
**pass** [1] - 108:22
**passed** [1] - 75:7
**past** [2] - 59:21, 119:21
**patience** [2] - 12:2, 46:21
**patient** [1] - 124:3
**Patricia** [5] - 65:1, 108:16, 126:10, 126:22, 127:9
**pause** [1] - 76:20
**Pause** [13] - 4:11, 4:18, 5:17, 24:17, 29:6, 40:11, 61:18, 62:23, 63:23, 108:19, 126:9, 127:22, 128:1
**pay** [36] - 21:13, 34:24, 47:4, 47:15, 72:17, 72:22, 74:7, 74:8, 76:2, 84:16, 86:6, 95:20, 95:22, 95:23, 97:6, 97:21, 100:1, 100:24, 113:4, 113:5, 113:20, 113:21, 114:7, 114:11, 114:13, 114:16, 115:10, 116:11, 116:16, 116:21, 119:24, 120:1, 121:9, 122:18
**paying** [4] - 8:21, 114:25, 121:8
**payment** [4] - 16:12, 40:21, 41:2, 122:8
**payments** [3] - 21:18, 39:21, 93:21
**pays** [2] - 102:19, 118:5
**pen** [3] - 56:20, 56:24
**pencils** [1] - 66:9
**people** [41] - 8:4, 18:18, 19:2, 19:15, 25:13, 25:15, 25:24, 34:13, 35:12, 39:5, 41:5, 41:11, 41:18, 44:11, 52:13, 74:25, 79:21, 80:17, 81:2, 81:5, 83:14, 83:15, 83:19, 87:9, 87:12, 87:13, 87:14, 87:15, 87:16, 87:18, 88:23, 89:24, 91:25, 92:23, 93:8, 93:14, 94:6,

109:19, 112:1, 117:11
**per** [18] - 8:21, 15:11, 16:12, 16:15, 17:4, 17:12, 17:13, 43:13, 46:7, 47:12, 92:13, 96:17, 115:23, 115:24
**perfect** [1] - 65:10
**perform** [6] - 28:4, 87:7, 117:12, 118:4, 121:12, 121:13
**performance** [4] - 6:25, 12:9, 119:11, 121:6
**performed** [4] - 49:21, 113:25, 114:3, 116:17
**performing** [3] - 90:3, 90:11, 118:25
**perhaps** [3] - 23:16, 56:21, 60:23
**period** [19] - 8:3, 10:24, 11:8, 11:16, 11:17, 19:1, 19:2, 29:12, 31:3, 43:21, 47:2, 59:16, 92:5, 92:11, 93:17, 94:9, 94:10, 115:7, 115:12
**periods** [1] - 11:6
**permanency** [2] - 94:10, 94:11
**permission** [3] - 20:2, 20:8, 96:13
**permitting** [1] - 113:22
**person** [13] - 18:14, 18:16, 34:20, 35:9, 36:17, 56:25, 67:24, 67:25, 73:5, 96:11, 110:14, 120:15
**personal** [7] - 9:18, 9:21, 24:8, 28:22, 43:18, 46:7, 111:9
**personalities** [1] - 35:12
**personally** [4] - 19:15, 32:10, 49:7, 105:3
**persons** [1] - 109:17
**perspective** [2] - 46:25, 66:17
**persuade** [1] - 112:12
**persuasion** [1] - 112:10
**phenomenal** [1] - 67:6
**phone** [12] - 19:14, 19:17, 41:25, 43:25, 50:4, 53:17, 55:6, 55:7, 57:23, 72:19, 74:17, 127:23

phonebook [1] - 119:1
phones [4] - 19:16,
50:6, 89:24, 95:16
pick [2] - 11:7, 74:21
Pick [1] - 72:23
piecework [2] - 88:9,
118:6
pin [3] - 68:21, 68:22,
98:16
piss [2] - 97:21,
102:14
place [10] - 19:13,
24:19, 25:8, 25:12,
45:13, 47:18, 54:21,
57:16, 57:20, 80:21
placed [1] - 45:13
places [1] - 25:12
PLAINTIFF [1] - 94:23
Plaintiff [3] - 78:4,
113:24, 115:14
Plaintiff's [5] - 66:21,
66:22, 104:25,
105:3, 116:23
Plaintiffs [51] - 1:6,
13:19, 14:3, 14:8,
14:17, 33:16, 33:19,
33:23, 39:15, 40:1,
62:5, 66:4, 66:19,
80:5, 87:21, 101:20,
103:15, 105:8,
106:12, 112:7,
112:16, 113:5,
113:16, 113:18,
113:20, 114:17,
116:2, 116:13,
116:16, 116:17,
116:19, 117:8,
117:14, 117:16,
118:5, 118:12,
118:18, 118:22,
119:14, 120:6,
120:20, 120:23,
120:25, 121:2,
121:10, 122:4,
122:6, 122:10,
122:12, 122:23
plaintiffs [7] - 113:2,
114:14, 116:3,
116:10, 116:11,
117:2, 119:23
PLAINTIFFS [3] -
1:14, 3:3, 67:1
plaintiffs' [1] - 122:3
Plaintiffs' [9] - 3:13,
87:1, 105:4, 105:5,
107:5, 112:12,
112:25, 117:21,
122:21
Plaintiffs.... [1] - 3:21
Plaintiffs..... [1] - 3:20

plan [8] - 9:7, 9:8,
11:12, 16:20, 20:4,
20:9, 21:21, 23:1
planned [1] - 64:7
play [1] - 32:7
plays [1] - 116:24
pleading [1] - 106:23
pleasure [1] - 104:6
pled [2] - 65:18, 106:3
plug [1] - 127:17
plumber [1] - 89:7
plus [1] - 17:20
pocket [1] - 47:4
point [15] - 16:21,
27:7, 33:18, 55:15,
64:1, 77:13, 78:22,
79:19, 80:11, 83:5,
86:8, 88:7, 93:1,
93:5, 111:2
points [1] - 91:10
policies [23] - 17:1,
17:5, 17:7, 17:14,
17:20, 17:21, 17:25,
18:2, 19:8, 19:10,
19:12, 21:23, 25:13,
27:9, 47:1, 47:7,
47:8, 47:9, 53:1,
79:22, 81:9, 119:25,
122:7
policy [27] - 17:12,
17:19, 17:22, 18:7,
18:8, 18:10, 18:11,
18:12, 18:16, 18:18,
18:21, 20:11, 20:12,
21:5, 21:9, 41:4,
41:10, 47:4, 47:17,
54:22, 55:2, 81:9,
89:13, 92:13, 98:5,
100:8
Pollock [12] - 3:9,
3:10, 42:11, 62:22,
66:24, 73:17, 73:19,
73:20, 78:13, 87:17,
94:14, 104:18
POLLOCK [65] - 1:14,
4:25, 5:4, 10:15,
12:21, 12:23, 13:2,
13:8, 13:12, 13:14,
26:14, 26:19, 28:19,
30:10, 30:23, 31:8,
32:24, 36:9, 39:17,
39:22, 40:4, 41:7,
42:10, 52:7, 53:2,
53:9, 56:11, 57:1,
57:6, 61:11, 62:4,
62:13, 62:24, 64:21,
65:2, 65:5, 65:8,
65:10, 65:24, 67:2,
85:25, 94:17, 94:20,
94:22, 94:24, 95:13,

103:14, 104:5,
104:19, 107:23,
108:1, 108:6, 108:9,
125:10, 125:21,
125:24, 126:4,
126:7, 126:11,
126:18, 127:5,
127:12, 127:15,
127:19, 128:2
Pollock's [1] - 89:5
Ponce [1] - 1:23
portals [1] - 56:18
position [13] - 6:20,
7:2, 7:3, 7:12, 7:24,
8:1, 8:14, 8:15, 11:3,
11:22, 24:8, 26:25,
59:13
possible [2] - 115:4,
123:24
possibly [4] - 53:7,
69:8, 98:12, 126:11
potential [6] - 10:22,
11:3, 12:12, 29:3,
29:22, 33:9
potentially [2] - 30:8,
31:2
practicable [1] - 115:4
predetermined [3] -
88:20, 103:4, 118:15
predicate [1] - 28:19
preferred [1] - 58:18
prejudice [1] - 109:10
premium [1] - 21:13
premiums [2] - 34:24,
95:21
preparation [1] - 67:7
prepared [2] - 69:16,
123:16
preponderance [7] -
112:9, 112:11,
112:15, 112:20,
112:25, 113:17,
116:20
preprinted [1] - 96:18
present [1] - 66:5
presented [5] - 77:22,
86:3, 107:4, 109:9
press [1] - 20:15
presume [1] - 115:5
pretty [6] - 14:8,
53:12, 56:16, 58:24,
94:24
prevail [2] - 122:23
previous [2] - 8:14,
62:5
previously [1] - 8:13
price [1] - 96:16
print [1] - 108:12
private [2] - 35:13,
36:16

problem [5] - 20:20,
42:8, 72:22, 88:3,
95:5
proceed [6] - 4:3, 5:5,
5:13, 13:1, 13:11,
54:19
Proceeding...............
........................ [1] -
3:20
proceedings [16] -
4:1, 4:11, 4:18, 5:17,
24:17, 29:6, 40:11,
61:18, 62:23, 63:23,
108:19, 126:9,
127:22, 128:1,
128:6, 128:11
process [5] - 57:23,
67:10, 72:12, 73:13,
82:23
processed [1] - 55:19
procure [1] - 126:2
procured [3] - 90:2,
90:11, 118:24
produce [6] - 10:13,
15:16, 33:5, 33:9,
44:19, 59:22
produced [2] - 48:25,
112:23
producing [5] - 40:20,
41:1, 42:5, 57:12,
58:22
production [4] -
28:23, 33:10, 48:24,
58:22
professional [2] -
32:22, 36:17
professionally [1] -
24:7
professionals [5] -
75:4, 79:11, 79:12,
79:22, 89:12
profit [5] - 76:6, 85:13,
88:19, 88:22, 118:14
program [3] - 8:5,
83:15, 85:12
prolong [1] - 67:21
promised [2] - 8:16,
8:17
promptly [1] - 123:24
proof [9] - 68:10,
77:15, 80:14, 83:19,
110:17, 112:10,
112:14, 112:24
propose [1] - 64:1
proposed [7] - 62:13,
63:1, 63:19, 64:25,
65:14, 106:17,
107:12
protection [1] - 20:4
protects [3] - 20:6,

20:7
prove [19] - 68:6,
68:20, 68:22, 77:16,
78:20, 83:3, 90:9,
110:18, 112:8,
113:16, 116:13,
116:19, 117:2,
120:6, 120:7,
120:20, 120:23,
122:10
proved [2] - 95:18,
112:19
proven [2] - 78:20,
99:12
provide [6] - 7:8,
24:24, 28:5, 98:11,
126:2, 126:3
provided [7] - 74:18,
87:13, 89:21, 99:20,
103:6, 118:11,
118:18
provides [4] - 88:10,
118:7, 118:19, 126:1
public [2] - 90:2,
118:23
published [3] - 15:20,
28:9, 63:10
punctual [1] - 4:9
purpose [4] - 13:4,
78:6, 78:15, 121:15
purposes [1] - 71:15
put [27] - 5:8, 7:11,
23:1, 49:15, 52:18,
52:20, 54:5, 55:19,
63:2, 66:8, 66:9,
67:11, 67:24, 70:6,
71:19, 74:16, 76:10,
78:23, 85:21, 98:19,
105:16, 106:7,
108:2, 114:9,
119:17, 119:21,
125:10
putting [2] - 73:10,
83:9

Q

qualified [1] - 47:13
qualify [2] - 72:18,
72:23
questioning [2] -
12:18, 79:6
questions [18] - 19:17,
21:4, 22:3, 22:22,
42:22, 52:7, 55:17,
55:18, 56:4, 56:8,
73:1, 78:2, 78:14,
80:9, 93:20, 100:13,
111:4, 111:14
quick [6] - 19:11,

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

20:19, 42:21, 52:8, 52:12, 69:8
**quicker** [2] - 50:4
**quiet** [1] - 36:2
**Quintero** [10] - 43:20, 48:18, 57:9, 69:16, 97:11, 113:4, 117:3, 117:5, 117:15, 127:6
**QUINTERO** [1] - 1:9
**quirky** [1] - 77:5
**quote** [2] - 55:3, 70:12
**quote/unquote** [2] - 35:14, 38:11
**quotes** [1] - 70:6

## R

**Radius** [1] - 50:13
**Rafa** [6] - 48:15, 97:14, 99:7, 99:14, 100:8, 101:5
**Rafaela** [10] - 36:19, 36:22, 69:9, 75:11, 75:14, 79:9, 84:10, 87:11, 92:4, 113:3
**RAFAELA** [1] - 1:4
**raise** [3] - 4:19, 5:18, 77:10
**ramped** [1] - 57:24
**rarely** [1] - 59:23
**rate** [16] - 88:20, 103:4, 114:8, 114:11, 114:12, 114:18, 114:19, 114:21, 114:24, 115:9, 115:10, 115:15, 115:18, 115:22, 115:24, 118:15
**rather** [1] - 117:1
**Ray** [1] - 32:11
**re** [1] - 123:6
**re-examine** [1] - 123:6
**reach** [8] - 10:22, 15:14, 27:13, 32:15, 32:20, 36:3, 110:11, 123:5
**reached** [3] - 17:5, 34:22, 36:3
**reaching** [1] - 35:15
**reacted** [1] - 35:11
**read** [4] - 40:17, 88:14, 104:17, 109:7
**reading** [1] - 107:4
**ready** [6] - 4:3, 5:9, 62:11, 65:23, 108:16, 125:8
**real** [4] - 52:12, 101:14, 123:10, 123:11

realities [3] - 71:18, 86:20, 117:17
**reality** [4] - 83:24, 88:15, 103:18, 119:22
**really** [17] - 9:16, 20:23, 21:14, 29:12, 29:20, 36:15, 38:21, 48:4, 69:4, 71:17, 75:21, 76:3, 82:23, 82:25, 86:23, 101:1, 102:15
**reason** [13] - 11:15, 11:18, 58:24, 59:2, 73:20, 73:21, 73:22, 73:24, 97:16, 111:7, 113:24, 114:3, 114:4
**reasonable** [8] - 68:23, 101:21, 102:5, 116:18, 116:20, 120:15, 121:13, 121:14
**reasoning** [1] - 110:10
**rebuttal** [4] - 62:2, 62:4, 66:23, 94:21
**REBUTTAL** [1] - 94:23
**Rebuttal** [1] - 3:21
**rec** [1] - 91:6
**receive** [2] - 17:14, 40:18
**received** [2] - 12:16, 112:22
**recess** [7] - 61:23, 62:12, 63:25, 65:12, 108:14, 128:2, 128:4
**recollection** [2] - 86:2, 110:8
**record** [1] - 82:13
**recordkeeping** [1] - 82:10
**Records** [1] - 116:6
**records** [11] - 82:13, 84:18, 99:25, 101:15, 101:17, 116:7, 116:9, 116:11, 116:13, 116:16
**recover** [7] - 101:2, 101:21, 115:17, 116:3, 116:18, 116:19, 120:22
**recovery** [1] - 106:19
**recross** [1] - 53:10
**Recross** [1] - 3:10
**RECROSS** [1] - 57:5
**red** [1] - 62:21
**REDIRECT** [1] - 52:10
**Redirect** [1] - 3:10
**refer** [1] - 70:3
**reference** [2] - 64:23,

127:6
**referrals** [1] - 27:13
**regard** [1] - 46:6
**regarding** [3] - 28:1, 36:8, 82:15
**regardless** [4] - 112:21, 112:22, 114:21, 114:24
**regular** [11] - 114:8, 114:12, 114:18, 114:19, 114:21, 115:9, 115:10, 115:15, 115:18, 115:22, 115:24
**regularity** [1] - 114:25
**rehash** [2] - 78:4, 78:7
**REINIER** [1] - 1:8
**Reinier** [36] - 7:15, 14:21, 16:1, 26:10, 26:17, 26:22, 27:3, 27:4, 27:8, 27:15, 32:17, 35:8, 38:24, 39:11, 39:16, 40:3, 55:12, 55:14, 64:8, 77:17, 77:20, 77:24, 77:25, 78:9, 79:20, 83:2, 85:12, 86:10, 89:17, 90:5, 93:20, 97:10, 99:8, 113:4, 117:3, 117:15
**reiterate** [2] - 62:16, 90:18
**relate** [1] - 106:15
**related** [4] - 104:23, 105:1, 105:2, 105:6
**relation** [1] - 103:18
**relationship** [13] - 7:23, 86:20, 103:18, 103:19, 117:18, 117:22, 119:6, 119:9, 119:18, 119:19, 119:21, 119:22, 122:1
**relationships** [1] - 94:7
**release** [1] - 125:14
**released** [1] - 128:5
**relevant** [4] - 114:1, 114:4, 117:1, 119:18
**relief** [1] - 104:22
**rely** [2] - 86:2, 124:11
**remain** [2] - 41:5, 124:6
**remaining** [1] - 117:12
**remains** [1] - 66:4
**remember** [12] - 16:11, 17:8, 37:2, 37:3, 37:4, 73:8, 91:10, 100:19, 101:6, 112:1,

123:10, 124:9
**remembers** [1] - 111:25
**remote** [2] - 76:15, 76:19
**render** [1] - 66:7
**renew** [1] - 62:5
**reopen** [1] - 108:1
**repeat** [1] - 77:11
**repercussions** [1] - 10:6
**rephrase** [1] - 15:5
**replete** [1] - 65:19
**report** [2] - 38:21, 71:16
**REPORTED** [1] - 2:2
**reported** [1] - 107:9
**REPORTER** [4] - 6:16, 40:12, 40:15, 95:12
**Reporter** [2] - 2:2, 128:15
**Reporter's** [1] - 3:22
**requested** [2] - 80:24, 126:23
**require** [3] - 11:24, 19:24, 42:3
**required** [10] - 9:24, 19:22, 113:5, 113:21, 116:8, 120:9, 121:3, 121:5, 121:9, 122:18
**requirement** [3] - 33:7, 121:12, 121:13
**requirements** [8] - 23:4, 28:2, 42:4, 42:6, 66:18, 113:7, 113:9, 113:13
**requires** [5] - 101:16, 101:17, 114:7, 116:6, 119:21
**residuals** [1] - 27:13
**resonates** [1] - 103:12
**resource** [1] - 51:17
**resources** [1] - 8:2
**respect** [2] - 38:7, 104:24
**respond** [3] - 27:4, 123:24, 124:2
**responds** [1] - 67:25
**response** [2] - 106:8, 124:3
**responsibilities** [5] - 6:22, 7:7, 22:19, 22:20, 41:10
**responsibility** [4] - 86:7, 86:11, 112:7, 117:7
**responsible** [1] - 109:20
**rest** [2] - 10:4, 61:21

**rested** [1] - 66:4
**resting** [1] - 64:8
**restrictions** [1] - 53:16
**restroom** [1] - 63:8
**rests** [1] - 61:19
**result** [1] - 105:9
**resulted** [1] - 120:3
**retained** [1] - 122:15
**retention** [1] - 41:14
**retirement** [2] - 88:10, 118:8
**return** [4] - 15:4, 66:23, 123:19, 125:14
**reviews** [1] - 6:25
**revised** [2] - 62:21, 65:15
**revisions** [2] - 64:3, 64:5
**reward** [1] - 104:2
**ride** [1] - 87:17
**rights** [3] - 113:7, 113:9, 113:12
**rigid** [1] - 23:25
**ring** [1] - 35:5
**rise** [6] - 4:2, 61:24, 65:11, 65:13, 108:15, 125:17
**risk** [7] - 88:19, 88:20, 103:3, 118:12, 118:14, 118:16
**role** [1] - 116:24
**room** [11] - 14:3, 14:5, 64:17, 68:14, 104:10, 109:5, 123:13, 123:17, 124:6, 124:10, 128:5
**route** [1] - 56:23
**RPR** [2] - 2:2, 128:15
**rule** [1] - 19:22
**run** [4] - 41:3, 42:22, 55:3, 71:25
**running** [2] - 42:19, 57:24
**résumé** [1] - 7:11

## S

**sacrifice** [4] - 67:7, 76:2, 76:3
**sacrificed** [1] - 104:2
**sacrifices** [2] - 67:12, 75:21
**sailboat** [3] - 98:22, 99:1, 99:3
**salary** [6] - 38:3, 52:1, 52:4, 81:7, 114:23
**sale** [6] - 56:16, 72:11, 72:14, 72:15, 72:19, 73:4, 73:6, 96:17

**sales** [20] - 7:5, 7:7, 7:8, 8:18, 10:25, 11:3, 11:6, 11:23, 12:1, 20:19, 30:1, 35:19, 46:18, 46:20, 56:16, 72:25, 79:23, 88:5, 101:7
**salesmen** [2] - 102:22
**salespeople** [1] - 102:23
**saleswomen** [1] - 102:22
**San** [1] - 1:16
**SANTIAGO** [1] - 1:22
**Santiago** [1] - 1:23
**SAS** [1] - 61:2
**sat** [2] - 74:15, 75:6
**save** [6] - 68:1, 71:24, 74:6, 95:21, 95:22, 95:24
**saw** [7] - 66:17, 67:23, 68:12, 85:8, 93:10, 100:15, 127:5
**sc@cuetolawgroup. com** [1] - 1:25
**scale** [4] - 49:18, 71:19, 71:20, 98:20
**scales** [1] - 68:25
**schedule** [9] - 26:23, 28:1, 28:11, 30:7, 45:13, 45:24, 46:6, 46:7, 48:20
**scheduled** [1] - 29:24
**schedules** [7] - 28:7, 28:18, 31:6, 31:11, 84:25, 85:1, 85:8
**scheme** [1] - 106:8
**school** [6] - 32:8, 58:1, 58:3, 58:4, 58:6, 75:3
**scope** [3] - 53:2, 53:9, 109:22
**scribble** [1] - 124:25
**se** [1] - 46:7
**season** [1] - 11:20
**seat** [4] - 44:22, 44:25, 45:7
**seated** [6] - 4:10, 4:24, 5:24, 62:1, 66:2, 108:21
**second** [3] - 30:14, 99:24, 113:20
**secret** [1] - 122:25
**section** [2] - 82:9, 82:11
**sections** [1] - 82:15
**SECURITY** [4] - 61:24, 65:11, 65:13, 125:17
**security** [7] - 74:8, 88:21, 95:20,

108:22, 118:16, 123:23
**see** [16] - 17:6, 17:12, 31:23, 53:1, 63:1, 71:7, 82:16, 88:14, 88:18, 91:8, 91:17, 99:1, 109:2, 124:18, 127:5, 127:10
**seeing** [2] - 19:15, 21:15
**seek** [2] - 116:21, 123:11
**seeking** [1] - 104:22
**seeks** [1] - 104:23
**seem** [1] - 111:11
**selected** [1] - 21:7
**self** [3] - 84:15, 107:9, 117:12
**self-employed** [2] - 84:15, 117:12
**self-reported** [1] - 107:9
**sell** [21] - 12:1, 17:24, 18:21, 18:24, 21:23, 22:11, 27:9, 35:2, 49:9, 60:17, 74:18, 81:9, 81:10, 92:18, 96:4, 96:5, 96:14, 102:23
**selling** [16] - 22:5, 24:12, 25:6, 27:19, 36:1, 47:1, 47:17, 49:17, 72:2, 74:24, 75:8, 75:12, 79:6, 79:9, 92:24, 122:7
**semimonthly** [1] - 115:2
**send** [3] - 20:14, 80:6, 127:2
**sending** [2] - 61:3, 97:13
**sends** [1] - 87:16
**senior** [1] - 6:24
**sense** [6] - 49:13, 76:11, 76:14, 90:8, 104:20, 110:11
**sent** [19] - 39:10, 40:8, 43:24, 62:14, 62:20, 62:22, 64:6, 84:12, 91:14, 91:15, 91:17, 91:18, 91:19, 91:20, 92:2, 93:22, 97:15, 127:7, 127:21
**sentence** [2] - 40:22, 88:16
**sentences** [1] - 105:19
**separate** [1] - 125:3
**separately** [1] - 112:18
**series** [2] - 100:10,

119:24
**service** [5] - 55:2, 56:10, 56:14, 67:18, 87:20
**services** [12] - 24:24, 27:10, 28:5, 90:1, 90:3, 90:12, 103:8, 103:10, 117:12, 118:22, 118:23, 118:25
**set** [16] - 12:8, 22:22, 24:2, 30:5, 32:6, 84:13, 85:12, 86:8, 87:2, 87:3, 88:12, 102:21, 109:2, 117:23, 117:24, 118:10
**sets** [1] - 124:23
**seven** [3] - 57:15, 58:3, 93:23
**seven-year-old** [1] - 57:15
**several** [1] - 124:16
**shall** [1] - 115:5
**share** [3] - 20:2, 124:10, 126:8
**shared** [1] - 124:6
**sheet** [5] - 17:16, 17:17, 98:19, 100:10, 100:11
**sheets** [1] - 90:7
**Shield** [1] - 60:18
**shift** [4] - 31:16, 31:21, 32:12, 59:13
**shorter** [1] - 69:13
**show** [21] - 28:6, 29:15, 30:6, 32:3, 32:14, 32:16, 44:8, 59:11, 59:13, 78:5, 78:21, 80:15, 83:3, 98:8, 98:13, 99:21, 99:24, 102:11, 105:2, 124:16
**showed** [7] - 29:18, 43:11, 68:4, 70:16, 85:3, 97:9, 98:7
**showing** [3] - 63:19, 64:2, 84:18
**sick** [2] - 88:10, 118:7
**side** [12] - 22:9, 25:7, 27:14, 37:20, 38:14, 49:10, 49:16, 49:17, 75:10, 94:25, 96:21, 98:19
**side's** [1] - 66:17
**sign** [17] - 7:18, 19:8, 19:19, 20:10, 41:4, 41:5, 41:19, 54:21, 54:22, 55:2, 55:23, 71:14, 71:16, 87:9,

101:8, 123:19
**signature** [2] - 20:11, 20:13
**signed** [9] - 20:16, 32:12, 34:20, 41:10, 41:11, 41:19, 41:24, 83:14, 85:22
**significance** [1] - 112:4
**significant** [1] - 117:5
**signing** [2] - 25:13, 52:12
**similar** [4] - 8:14, 16:9, 16:16, 87:15
**simple** [8] - 20:14, 57:25, 70:9, 70:11, 73:24, 82:7, 82:23, 111:24
**simplified** [2] - 25:22, 25:23
**simply** [2] - 112:11, 123:9
**single** [5] - 18:14, 73:5, 93:12, 109:13, 119:9
**sister** [1] - 72:13
**sit** [2] - 48:9, 81:6
**sitting** [5] - 54:20, 54:21, 64:11, 73:14, 101:22
**situation** [4] - 39:14, 60:25, 98:22, 99:2
**sixth** [1] - 90:15
**size** [1] - 18:19
**skills** [13] - 11:24, 46:17, 74:22, 74:23, 74:24, 74:25, 75:1, 75:2, 87:7, 97:3, 97:4, 118:4
**skip** [3] - 100:5, 100:25, 124:20
**slightly** [1] - 68:25
**slow** [3] - 29:12, 29:13, 53:23
**slowed** [1] - 53:20
**slower** [1] - 77:11
**small** [2] - 14:2, 14:5
**smarter** [1] - 26:2
**social** [4] - 74:8, 88:21, 95:20, 118:16
**software** [2] - 56:18, 74:12
**sold** [5] - 18:2, 47:8, 79:22, 83:7, 119:25
**sole** [1] - 114:22
**someone** [8] - 18:14, 27:13, 28:25, 44:20, 45:4, 45:17, 117:10
**sometimes** [12] - 19:6, 20:17, 24:22, 24:23,

35:21, 45:17, 50:23, 70:3, 77:4, 109:6, 112:9, 125:1
**somewhere** [1] - 23:19
**son** [1] - 57:15
**soon** [1] - 125:12
**sorry** [29] - 4:15, 6:16, 9:6, 12:22, 15:5, 23:10, 42:19, 44:10, 44:24, 48:13, 51:14, 54:13, 54:15, 54:19, 58:2, 58:15, 59:12, 60:9, 61:20, 63:1, 63:11, 64:4, 76:24, 94:19, 105:13, 107:1, 107:25, 108:5
**sort** [2] - 20:1, 124:24
**source** [3] - 49:5, 49:6, 114:22
**SOUTHERN** [1] - 1:1
**space** [9] - 15:15, 33:11, 33:16, 44:12, 57:17, 58:23, 59:25, 60:23, 74:12
**special** [9] - 11:16, 11:17, 12:8, 29:11, 31:3, 87:7, 97:4, 98:11, 118:4
**specialized** [1] - 75:1
**specialty** [2] - 25:17, 51:22
**specific** [2] - 8:11, 121:11
**speeding** [2] - 51:5, 51:6
**spell** [1] - 5:25
**spending** [2] - 52:3, 74:11
**spent** [2] - 76:9, 77:24
**split** [1] - 31:13
**spoken** [1] - 121:19
**spot** [1] - 20:24
**spreadsheet** [1] - 52:19
**spreadsheets** [4] - 97:15, 98:3, 100:15, 100:16
**sprung** [1] - 101:23
**stand** [8] - 4:17, 41:17, 67:24, 69:24, 69:25, 70:17, 75:2, 109:17
**Standard** [1] - 61:3
**standard** [2] - 70:23, 78:20
**Standards** [2] - 71:5, 113:6
**Starbucks** [1] - 24:22
**start** [3] - 13:21,

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

14:16, 77:3
**started** [14] - 7:2,
14:11, 14:21, 16:4,
22:9, 25:1, 25:5,
52:15, 58:7, 72:10,
75:7, 99:16, 99:17
**state** [3] - 5:24,
121:11, 122:6
**statement** [1] - 96:18
**statements** [3] -
66:12, 97:13, 109:21
**States** [1] - 128:15
**STATES** [2] - 1:1, 1:12
**status** [4] - 106:13,
107:6, 119:13,
119:17
**stayed** [1] - 59:23
**stays** [1] - 79:2
**Ste** [2] - 1:16, 1:23
**step** [2] - 5:16, 9:21
**STEPHANIE** [2] - 2:2,
128:15
**Stephanie_McCarn**
**@flsd.uscourts.**
**gov** [1] - 2:5
**stepped** [1] - 4:5
**sticking** [1] - 54:9
**still** [11] - 16:4, 25:6,
38:8, 39:4, 46:4,
59:20, 59:23, 62:25,
76:18, 126:13
**stood** [1] - 9:2
**stop** [1] - 94:13
**straight** [1] - 38:3
**strategic** [1] - 77:18
**strategy** [2] - 21:25,
22:1
**street** [1] - 87:12
**strictly** [1] - 8:12
**structure** [1] - 49:12
**stuck** [2] - 54:15,
85:14
**studied** [1] - 72:9
**study** [1] - 23:3
**stuff** [8] - 35:2, 50:1,
74:7, 74:10, 78:9,
80:22, 101:12, 103:6
**subject** [1] - 121:15
**submission** [1] -
65:22
**submitted** [1] - 104:15
**subscription** [2] -
57:21, 57:22
**subsidized** [1] - 72:18
**subsidy** [1] - 47:13
**substance** [3] - 90:17,
103:11, 119:6
**substantial** [1] -
116:24
**substantially** [1] -

121:2
**subtracting** [1] -
115:20
**succeed** [1] - 113:15
**sudden** [1] - 80:22
**suffered** [1] - 89:3
**suggest** [1] - 111:3
**suing** [1] - 95:6
**suit** [1] - 77:16
**summaries** [2] -
108:2, 108:5
**super** [1] - 57:7
**supervised** [2] -
96:12, 113:11
**supervising** [1] -
102:6
**supervision** [1] -
117:8
**supplemental** [1] -
75:12
**supplies** [3] - 103:7,
118:19, 118:20
**support** [1] - 96:4
**supposed** [6] - 29:15,
30:3, 30:6, 32:6,
83:23, 86:21
**surrounding** [1] -
119:8
**sustained** [12] - 10:16,
26:15, 26:20, 30:12,
30:24, 31:9, 32:25,
36:10, 39:18, 41:8,
56:12, 57:3
**switch** [4] - 12:23,
38:1, 84:5, 102:1
**switching** [1] - 13:2
**sympathy** [1] - 109:10
**system** [10] - 17:2,
29:2, 52:25, 55:4,
55:13, 55:14, 55:19,
56:23, 85:12, 88:1

**T**

**table** [1] - 64:25
**tag** [1] - 12:21
**task** [1] - 118:11
**taught** [1] - 70:12
**tax** [5] - 11:20, 38:16,
71:15, 84:18, 93:22
**taxes** [13] - 18:16,
38:21, 74:8, 76:10,
84:2, 84:8, 84:16,
84:17, 86:6, 86:13,
88:21, 95:20, 118:16
**team** [3] - 16:8, 44:17,
61:4
**teaming** [1] - 12:21
**technical** [1] - 117:2
**technically** [1] - 84:14

**technique** [1] - 22:3
**technology** [2] -
56:15, 77:6
**telephone** [1] - 89:23
**ten** [6] - 62:11, 63:24,
64:10, 77:21,
107:20, 108:10
**ten-minute** [2] - 62:11,
63:24
**tend** [3] - 75:15,
110:18, 112:1
**tends** [1] - 56:16
**terms** [6] - 8:17,
15:10, 71:3, 120:8,
120:12, 120:14
**test** [3] - 75:18, 75:19,
83:24
**testified** [9] - 4:22,
5:22, 71:12, 71:13,
73:7, 94:8, 97:3,
111:13, 111:19
**testify** [2] - 71:19,
77:17
**testifying** [3] - 75:11,
83:9, 111:1
**testimony** [14] - 68:18,
69:11, 69:14, 73:11,
86:3, 110:1, 110:14,
110:24, 111:16,
111:17, 111:22,
112:20, 124:12,
124:14
**tests** [1] - 88:15
**Texas** [2] - 60:13,
60:17
**text** [2] - 20:14, 93:22
**thankfully** [1] - 56:15
**Thanksgiving** [1] -
75:23
**THE** [146] - 1:12, 1:14,
1:19, 3:3, 3:6, 4:2,
4:3, 4:6, 4:8, 4:14,
4:16, 4:19, 4:23,
4:24, 5:3, 5:5, 5:8,
5:12, 5:15, 5:18,
5:23, 5:24, 6:1, 6:2,
6:3, 6:5, 6:16, 6:18,
10:16, 12:22, 12:25,
13:6, 13:10, 24:14,
26:15, 26:20, 28:20,
28:21, 29:7, 30:11,
30:12, 30:13, 30:14,
30:24, 31:9, 32:25,
36:10, 39:18, 39:23,
39:24, 40:5, 40:6,
40:12, 40:15, 41:8,
52:9, 53:3, 53:4,
53:10, 53:11, 56:12,
57:2, 57:3, 61:12,
61:13, 61:15, 61:17,

61:20, 61:22, 62:1,
62:7, 62:10, 63:1,
63:6, 63:9, 63:11,
63:15, 63:17, 63:19,
63:22, 63:24, 64:4,
64:11, 64:14, 64:16,
64:20, 64:23, 65:4,
65:7, 65:9, 65:14,
65:25, 66:2, 67:1,
76:22, 76:24, 77:2,
77:9, 86:2, 94:19,
94:21, 94:23, 95:12,
103:13, 104:4,
104:8, 104:15,
104:20, 105:13,
105:20, 106:3,
106:11, 106:17,
106:23, 107:1,
107:3, 107:11,
107:15, 107:19,
107:25, 108:5,
108:8, 108:10,
108:15, 108:16,
108:17, 108:18,
108:21, 108:25,
125:11, 125:19,
125:22, 126:1,
126:6, 126:10,
126:15, 126:17,
126:20, 127:1,
127:3, 127:9,
127:14, 127:18,
127:20, 127:23,
128:3
**theirs** [1] - 77:23
**theme** [1] - 22:13
**themselves** [21] -
18:15, 31:7, 85:1,
85:10, 85:22, 86:4,
86:7, 86:13, 87:21,
87:24, 89:2, 89:12,
90:17, 90:19, 91:4,
95:25, 96:10, 98:12,
103:17, 119:5,
119:16
**theories** [1] - 100:6
**theory** [1] - 65:17
**they've** [1] - 64:17
**thinking** [1] - 80:1
**third** [1] - 106:11
**Thirteenth** [2] - 2:3,
128:16
**thoughts** [1] - 120:19
**three** [15] - 4:13,
18:17, 63:13, 74:19,
75:13, 77:21, 77:24,
78:5, 78:8, 92:18,
94:10, 100:23,
120:12, 121:5,
122:15

**three-month** [1] -
94:10
**throughout** [3] -
10:25, 20:25, 99:15
**thumb** [2] - 126:17,
126:18
**tier** [5] - 17:2, 18:21,
18:22, 36:1
**tiers** [1] - 21:7
**time-and-a-half** [2] -
114:13, 114:16
**tip** [1] - 49:18
**tipping** [1] - 68:25
**today** [13] - 42:22,
68:18, 70:4, 76:7,
76:13, 78:4, 78:23,
79:10, 83:2, 84:19,
90:5, 93:20, 125:15
**together** [5] - 16:7,
23:1, 43:9, 66:7,
83:9
**tomorrow** [3] - 44:3,
76:13, 125:15
**took** [16] - 40:9, 69:9,
72:25, 73:4, 73:5,
75:6, 75:13, 80:8,
86:5, 86:7, 99:20,
105:12, 105:14,
107:18, 124:8,
124:11
**tool** [6] - 55:23, 56:10,
56:22, 89:14, 89:25
**tools** [10] - 25:8,
56:14, 89:7, 89:15,
103:7, 118:18,
118:20
**top** [2] - 40:13, 80:4
**total** [7] - 52:19,
52:20, 93:23,
115:11, 115:16,
115:20, 124:17
**totality** [1] - 86:22
**totally** [2] - 70:10,
70:13
**Toussaint** [1] - 69:7
**TOUSSAINT** [1] - 1:15
**toussaint@**
**fairlawattorney.**
**com** [1] - 1:18
**towards** [1] - 41:11
**towers** [1] - 89:20
**town** [1] - 69:20
**track** [5] - 52:13,
52:24, 53:7, 53:13,
54:2
**traffic** [5] - 50:24,
50:25, 51:4, 51:6,
51:9
**train** [1] - 6:25
**trained** [2] - 72:7, 75:4

July 19, 2023

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

**training** [4] - 51:13, 51:15, 51:17, 74:1
**transaction** [1] - 41:22
**transcription** [1] - 128:11
**transfers** [1] - 72:20
**transition** [1] - 38:6
**transitioning** [1] - 39:2
**transportation** [1] - 87:19
**tremendous** [1] - 99:5
**TRIAL** [1] - 1:11
**trial** [14] - 13:5, 67:2, 67:5, 67:10, 68:5, 68:6, 68:9, 68:10, 68:11, 69:23, 101:23, 110:6, 111:23, 126:7
**tried** [2] - 62:21, 77:25
**Tripp** [1] - 1:19
**Tropp** [15] - 3:9, 3:10, 4:4, 13:9, 13:11, 24:14, 43:11, 70:5, 70:16, 73:1, 76:7, 76:25, 95:1, 99:23, 101:10
**TROPP** [52] - 1:19, 12:19, 13:13, 13:16, 15:21, 24:16, 24:18, 26:16, 26:21, 28:10, 29:4, 29:9, 30:15, 30:25, 31:10, 33:1, 36:11, 39:19, 39:25, 40:7, 40:14, 40:16, 41:9, 52:8, 52:11, 53:5, 53:15, 56:13, 57:4, 61:19, 61:21, 62:9, 62:20, 63:14, 63:16, 63:18, 63:21, 64:3, 64:5, 64:13, 64:15, 64:19, 76:23, 77:1, 77:3, 77:10, 86:4, 105:16, 106:6, 107:24, 127:8, 127:21
**true** [8] - 67:17, 79:1, 85:23, 91:2, 110:22, 112:13, 114:21
**trust** [2] - 41:16, 78:24
**truth** [25] - 69:2, 69:3, 69:17, 69:24, 69:25, 70:1, 70:2, 70:6, 70:8, 70:10, 70:11, 73:14, 73:24, 73:25, 78:25, 79:2, 80:4, 91:1, 91:25, 111:6, 111:8, 111:25, 123:11
**truthfully** [1] - 78:2

**try** [8] - 15:16, 42:21, 75:2, 79:14, 83:22, 87:11, 95:14, 123:4
**trying** [5] - 15:18, 37:6, 80:9, 82:7, 94:7
**TV** [1] - 58:20
**twice** [2] - 67:21, 101:2
**Two** [1] - 120:10
**two** [26] - 6:15, 6:18, 13:22, 23:16, 31:16, 43:1, 43:12, 43:24, 44:4, 52:18, 54:15, 55:21, 56:2, 58:4, 58:6, 67:22, 72:9, 75:6, 77:24, 79:16, 100:6, 105:18, 116:4, 121:2, 122:14, 124:23
**two-page** [1] - 43:12
**type** [4] - 25:20, 87:7, 97:4, 124:5
**typically** [4] - 44:6, 47:11, 48:21, 50:15
**typographical** [1] - 65:19

**U**

**U.S** [5] - 91:14, 91:15, 91:18, 113:12, 126:1
**Uber** [4] - 87:16, 87:19, 87:22
**ultimate** [1] - 90:9
**ultimately** [5] - 10:22, 34:23, 35:1, 90:15, 93:14
**um-hmm** [12] - 14:1, 15:13, 16:5, 16:13, 18:23, 19:5, 28:8, 29:17, 30:4, 31:15, 39:6, 51:1
**umm** [1] - 127:14
**unable** [1] - 78:5
**unanimous** [1] - 122:24
**unclean** [15] - 62:14, 63:12, 65:15, 65:17, 104:16, 104:21, 104:24, 105:8, 105:17, 105:25, 106:5, 106:12, 106:19, 107:3, 107:5
**unconscionable** [1] - 104:22
**under** [16] - 26:2, 43:15, 71:5, 86:25, 96:20, 100:6, 106:19, 109:20,

113:15, 113:23, 116:23, 119:13, 120:15, 121:22
**underlining** [1] - 35:20
**understood** [1] - 20:21
**unimportant** [1] - 112:6
**United** [1] - 128:15
**UNITED** [2] - 1:1, 1:12
**unjust** [8] - 63:16, 63:17, 100:25, 105:5, 105:9, 105:22, 106:15, 106:20
**unjustly** [1] - 122:9
**unless** [1] - 62:18
**unpaid** [2] - 36:23, 114:14
**unspoken** [1] - 120:19
**untrue** [2] - 92:3, 92:19
**up** [97] - 11:7, 12:8, 19:9, 19:19, 20:10, 20:15, 20:17, 20:23, 25:13, 27:3, 29:1, 29:15, 29:18, 30:6, 32:3, 32:12, 32:14, 32:16, 34:20, 41:4, 41:5, 41:11, 41:19, 41:24, 42:25, 44:8, 50:24, 52:8, 52:12, 52:23, 54:21, 54:22, 55:2, 55:24, 57:19, 59:11, 59:13, 62:22, 63:2, 64:6, 69:19, 69:21, 72:5, 74:21, 75:2, 75:23, 75:24, 77:20, 78:3, 78:7, 79:20, 80:1, 80:2, 80:8, 80:12, 80:21, 80:23, 81:15, 81:18, 81:22, 83:8, 83:11, 83:14, 83:20, 83:25, 84:13, 85:1, 85:3, 85:4, 85:12, 86:8, 87:9, 88:24, 90:5, 90:8, 90:24, 91:6, 91:7, 92:13, 93:20, 94:25, 95:1, 99:3, 101:12, 101:13, 102:11, 105:12, 106:9, 107:21, 108:11, 123:7
**USB** [3] - 127:12, 127:17, 127:20
**user** [1] - 126:12
**utilize** [1] - 64:22

**V**

**vacation** [3] - 43:19, 88:10, 118:7
**valid** [2] - 120:5, 121:20
**VALIENTE** [1] - 1:5
**Valiente** [2] - 63:4, 113:3
**value** [2] - 11:6, 120:11
**verdict** [14] - 62:6, 66:7, 101:8, 116:4, 122:24, 123:1, 123:16, 123:17, 123:18, 124:15, 125:2, 126:22, 126:24, 127:4
**versa** [1] - 31:21
**version** [1] - 104:16
**versus** [1] - 102:8
**via** [1] - 24:23
**vice** [1] - 31:21
**violation** [1] - 116:25
**visual** [2] - 95:16, 95:17
**voice** [1] - 97:3
**voted** [1] - 124:4
**vs** [1] - 1:7

**W**

**W-2** [9] - 23:23, 26:25, 37:24, 38:22, 54:16, 59:12, 71:3, 84:3
**W-4** [1] - 71:14
**W-9** [2] - 71:13, 71:14
**wage** [5] - 79:23, 85:15, 89:19, 94:4, 115:17
**wages** [8] - 80:7, 82:9, 82:15, 95:18, 100:23, 103:24, 108:3, 114:14
**wait** [2] - 30:16, 33:14
**waiting** [3] - 4:4, 64:12, 64:16
**waived** [2] - 113:8, 113:10
**walk** [3] - 49:22, 49:24, 81:3
**walking** [1] - 74:15
**wanna** [1] - 27:1
**wants** [1] - 62:18
**warehouse** [1] - 92:6
**waste** [1] - 12:6
**watch** [2] - 53:23
**water** [1] - 98:21
**ways** [3] - 53:7, 55:21, 67:22

**week** [15] - 24:24, 31:18, 44:4, 48:11, 84:19, 115:7, 115:9, 115:11, 115:14, 115:16, 115:20, 115:21, 115:23, 115:24
**weekend** [1] - 75:14
**weekends** [1] - 59:24
**weekly** [1] - 115:2
**weeks** [5] - 72:9, 75:7, 75:13, 92:20, 115:13
**weigh** [1] - 68:16
**weight** [2] - 110:19, 124:13
**welcome** [2] - 4:9, 40:15
**whatever's** [1] - 126:12
**whatsoever** [1] - 37:10
**whereas** [1] - 54:18
**wherein** [1] - 87:4
**who'd** [1] - 73:3
**whole** [22] - 49:4, 57:22, 64:7, 73:13, 78:21, 79:19, 82:11, 82:23, 85:11, 85:17, 88:3, 90:6, 92:10, 92:11, 92:12, 92:16, 93:16, 109:13, 111:1
**wife** [4] - 70:12, 77:17, 85:12, 96:6
**willing** [1] - 21:19
**win** [3] - 68:7, 98:19, 99:4
**wind** [3] - 98:23, 98:24, 98:25
**wise** [1] - 14:4
**wish** [4] - 83:25, 84:7, 90:18, 123:21
**withdraw** [2] - 13:8, 57:4
**withdrawn** [1] - 13:10
**withholding** [1] - 74:9
**witness** [25] - 4:14, 4:16, 4:17, 4:22, 5:1, 5:8, 5:9, 5:12, 5:22, 61:17, 77:23, 110:24, 110:25, 111:3, 111:5, 111:7, 111:9, 111:11, 111:12, 111:14, 111:19, 111:21, 111:22, 111:25, 112:2
**Witness** [1] - 61:16
**WITNESS** [16] - 4:23, 5:23, 6:1, 6:3, 6:18, 28:21, 29:7, 30:11,

July 19, 2023

Delio Batista, et al., v. Avant Assurance, Inc., 22-cv-22671-CMA

30:13, 39:24, 40:6,
53:4, 53:11, 57:2,
61:12, 61:15
**witness's** [1] - 111:16
**WITNESSES** [3] - 3:2,
3:3, 3:6
**witnesses** [6] - 66:13,
108:4, 110:1, 111:1,
112:21, 124:9
**Wizard** [1] - 98:1
**wizard** [1] - 98:5
**word** [2] - 67:25, 68:1
**words** [13] - 10:2,
46:23, 73:10, 95:7,
95:8, 102:21,
103:11, 105:21,
117:4, 120:16,
121:19, 121:20,
122:24
**worker's** [1] - 119:11
**workers** [1] - 75:16
**workload** [1] - 24:6
**workplace** [2] - 9:25,
10:1
**works** [3] - 31:17,
114:5, 114:10
**worksheets** [2] -
108:2, 108:6
**workstation** [1] -
74:16
**workweek** [3] - 114:9,
114:10, 115:5
**wrestling** [2] - 68:21,
98:16
**write** [7] - 63:18,
80:19, 80:20, 92:1,
123:22, 124:24,
125:5
**writing** [2] - 27:10,
123:25
**written** [5] - 65:17,
120:3, 120:4, 120:5,
121:19
**wrongdoing** [4] -
104:25, 105:8,
105:21
**wrongdoings** [1] -
105:6
**wrongful** [1] - 105:3
**wrote** [3] - 46:18,
70:6, 91:14

---

### Y

**year** [16] - 10:25,
11:13, 16:9, 16:10,
23:16, 38:2, 47:17,
47:18, 47:21, 49:16,
57:15, 58:3, 67:15,
80:18, 99:15, 103:5

**Year's** [1] - 75:24
**years** [10] - 6:15, 6:17,
6:18, 13:22, 23:13,
23:16, 43:2, 58:5,
58:6, 116:5
**yesterday** [5] - 42:16,
63:12, 65:2, 80:23,
83:19
**yourself** [8] - 51:21,
56:8, 56:10, 102:10,
111:4, 111:18,
120:14, 123:2

---

### Z

**zero** [3] - 21:16, 47:14,
47:21
**zoom** [2] - 40:12,
40:14
**Zoom** [1] - 24:23