UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 22-22671-CIV-ALTONAGA/Torres

DELIO BATISTA, et al,,

    Plaintiffs,

v.

AVANT ASSURANCE INC. et al,

    Defendants.

## DEFENDANT'S RENEWED RULE 59 MOTION FOR REMITTITUR, OR ALTERNATIVELY, NEW TRIAL

Defendant, Avant Assurance, Inc. ("Defendant"), by and through its undersigned counsel and pursuant to Rule 59 of the Federal Rules of Civil Procedure and this Court's order of August 15, 2023, hereby files its Renewed Rule 59 Motion For Remittitur, or Alternatively, New Trial, requesting that the Court grant a remittitur or new trial, and in support states as follows:

INTRODUCTION

What Plaintiffs called "sales" were not actually sales. Instead, what Plaintiffs called "sales" were instances in which Plaintiffs—salespersons—successfully filtered prospective customers into the next phase of enrolling in an insurance plan. These "sales" did not entitle Plaintiffs to any sort of incentive-based pay—not until the prospective clients completed the much-longer process of finalizing a plan-selection, enrolling-in the plan, and paying their premiums. And yet, the jury awarded

1

Plaintiffs damages for these incentive-based payments without any evidence that the enrollments were completed or the policies activated. That verdict had to be reached through speculation. Plaintiffs—in violation of governing Florida law on contract-damages—failed to present any concrete, non-guesswork evidence establishing their damages with definiteness. For these reasons, as detailed below, Defendant respectfully requests a remittitur to $0.00 (which fairly reflects the amount of contractual-damages evidence presented at trial), or alternatively, a new trial.

## PROCEDURAL POSTURE

1. A jury trial in this matter was completed on July 14, 2023, and the jury returned a verdict in favor of Plaintiffs Delio Batista, Carlos Lopez, Mariana Lopez, and Rafaela Valiente totaling $177,164. *See* Doc. 104.

2. On July 15, 2023, the court entered its Final Judgment in favor of Plaintiffs for $177,164. Doc. 106.

3. On August 3, 2023, Plaintiffs filed their Motion to Alter or Amend Judgment to Add Prejudgment Interest. Doc. 111.

4. On August 14, 2023, Defendants filed their Rule 59 Motion for New Trial and Unopposed Motion for to Leave to Amend, requesting a new trial, remittitur, and leave to amend the motion when the transcripts were completed. Doc. 113.

5. On August 15, 2023, this Court denied both post-judgment motions without prejudice and with leave to file renewed motions within 14 days of receipt of the trial transcripts. Doc. 114.

6. The trial transcripts were received by Defendants on September 11, 2022.

7. In light of the trial court's denial of the post-trial motions, Defendants and Plaintiffs both filed their notices of appeal within 30 days of the denial of the motions. Doc. 121; Doc. 122; *see* Rule 4.

8. Under this Court's order of August 15, 2023, Defendants hereby renew their motion remittitur or new trial, with the benefit of the transcript and filed exhibits, and in support of their request state as follows:

## MEMORANDUM OF LAW

A. Standard for Rule 59 Relief

Rule 59 governs motions for new trial, providing that a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). Federal case law clarifies that a motion for new trial may be granted on the grounds that "the verdict is against the weight of the evidence, that damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

The decision to grant a new trial rests within the sound discretion of the trial court. *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). In exercising its discretion, a trial court may grant a motion for new trial if it determines that a jury's verdict is against the great (but not merely greater) weight of the evidence. *Williams*

3

*v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982). And unlike on a motion for judgment as a matter of law, on a motion for new trial a judge is permitted to independently re-weigh the evidence. *Id.* The judge should consider not just the evidence in favor of the verdict, but also the evidence in favor of the moving party's position. *Id.*

> B. <u>The Evidence of Damages Was Speculative, Conclusory, and Against the Great Weight of the Evidence</u>

In breach of contract action, the damages awarded must not be the result of "speculation or guesswork." *Constr. Aggregate Transp., Inc. v. Florida Rock Indus., Inc.*, 710 F.2d 752, 786 (11th Cir. 1983). Instead, "all damages recovered for a breach of contract must be proven with certainty, and not left to speculation or conjecture." *Hodges v. Fries*, 15 So. 682, 684 (Fla. 1894). Although uncertainty or difficulty in proving a precise amount of damages will not prevent recovery, the damages awarded must still have some reasonable basis in the evidence adduced at trial. *Storfer v. Guarantee Tr. Life Ins. Co.*, 666 F. 3d 1277, 1280 (11th Cir. 2012) (citing *Centex-Rooney Const. Co., Inc. v. Martin Cnty.*, 706 So. 2d 20, 28 (Fla. 4th DCA 1997)).

Under Florida law, the proof adduced in support of damages must be definite enough "for a reviewing court to perform its review obligation." *Saewitz v. Saewitz*, 79 So. 3d 831, 833–34 (Fla. 3d DCA 2012). Thus, the party requesting damages must "present evidence to justify an award of damages in a definite amount." *Smith v. Austin Dev. Co.*, 538 So. 2d 128, 129 (Fla. 2d DCA 1989). Additionally, the party requesting damages must "'adduce evidence . . . from which [the trier of facts] could

properly determine' the extent of the plaintiff's alleged economic damages." *Regions Bank v. Maroone Chevrolet, L.L.C.*, 118 So. 3d 251, 257 (Fla. 3d DCA 2013).

Importantly, when damages must be calculated, conclusory testimony as to a total amount of damages does not provide a reasonable basis in the evidence from which a jury can calculate damages. *Instant One Media, Inc. v. EzFauxDecor, LLC*, 22-11374, 2023 WL 2422196, at *2 (11th Cir. Mar. 9, 2023). Instead, there must be some basis in the evidence from which a total amount of damages can be independently calculated by the jury. *Id.*; *see e.g.*, *Shumate & Co., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 509 F.2d 147, 153 (5th Cir. 1975) (reversing when "[t]he only evidence [the plaintiff] presented regarding his damages at trial was his own testimony, unsupported by any relevant data").

The evidence of alleged commissions and bonuses owed by Defendants in this case was speculative and conclusory, and it did not provide reasonable basis in the evidence from which the jury could arrive at its damages amounts.

**First**, all four plaintiffs used the same flawed methodology to calculate their commissions damages. When asked how they calculated damages for commissions, they each explained that they reviewed their own record of phone sales and compared it to the payments they received. *See* Trial Tr. vol. 1, 96, Doc. 123-1 (Mariana Lopez Alcala explaining that she calculated her commission damages by comparing her "sales compared to what [she] received as far as deposits"); Trial Tr. vol. 2, 135-36, 155-57, Doc. 123-2 (Rafaela Valiente explaining that she calculated her commission damages by totaling the number of her sales she kept track of and comparing that

5

number with the amount she was paid); Trial Tr. vol. 3, 32-45, Doc. 123-3 (Delio Batista explaining that he found a 20-25% discrepancy between his phone sales and the and commission payments he received); Trial Tr. vol. 3, 115, 139, Doc. 123-3 (Carlos Lopez Alcala explaining that he calculated his damages by comparing "the sales that [he] did" with the amount he received in payments).

But the compensation plan did not provide for payment for every successful "sale" made by a Plaintiff. Instead, the compensation plan specified that the insurance company would pay commissions only for policies that were actually "Active"—meaning the client had actually enrolled and paid premiums—and therefore were actually "paid by [the] Insurance Carrier." Compensation Plan, Trial Ex. 8, Doc. 116-2.

But as both sides testified, there were multiple steps between Plaintiffs ending their calls successfully—with a "sale" as Plaintiffs called it at trial—and a customer actually enrolling in an insurance policy, then paying premiums on it, such that Plaintiffs would be entitled to a commission. There was no dispute over the process: a Plaintiff would pick up the phone and be on the line with a customer who had requested to speak to an insurance agent; the Plaintiff would explain the various policies and options, including totals costs; the customer would select which policy they wanted; then the Plaintiff would indicate the policy choice in the sales management software Radiusbob. Trial Tr. vol. 1, 13-4, 31, Doc. 123-1 (Reinier Cortes testifying and Plaintiffs' counsel explaining process to jury). That was the end of the Plaintiffs "sale."

But after that, the customer service center would complete the actual enrollment paperwork with the customer and then send the information to the insurance company. Trial Tr. vol. 1, 13-4, 31, Doc. 123-1. In short, a Plaintiff's entering a so-called "sale" into the software then sending the client or information to the customer service department did not mean that the customer would end up actually enrolling and paying a premium. Sometimes, customers simply did not stay on the line to complete enrollment. Trial Tr. vol. 1, 96, Doc. 123-1. Or sometimes two agents—from the same or different agencies—would sell the same policy to the same person, but only the agent listed on the final policy would be paid by the carrier. Trial Tr. vol 1., 96, Doc. 123-1. Or as Plaintiffs' counsel asked in his direct examination of Mr. Cortes, "Isn't it true that some people didn't want to pay?" Trial Tr. vol. 1, 98, Doc. 123-1. It *was* true that some people did not pay to activate their policy; in that case, the insurance carrier would not pay. Or, as Ms. Alcala testified that Mr. Cortes explained, the discrepancies between her "sales" and commission arose because some customers "had not verified or qualified their IDs" during the follow-up, meaning they did not actually qualify for enrollment. Trial Tr. vol. 3, 136.

Moreover, during the 2021-22 enrollment period the company instituted a mandatory consent form that clients had to sign. If it didn't get signed, the sale would be flagged, and the Plaintiff would not get paid. So the Plaintiffs had to go back to tagged clients and follow up to get them to sign the mandatory disclosure form. Trial Tr. vol. 2, 73-77, Doc. 123-2 (Ms. Alcala explaining consent form follow-up process).

Despite the undisputed facts that (1) the compensation plan did not pay for every successful call or "sale" made by Plaintiffs, (2) a successful call or "sale" made by a Plaintiff was only the beginning of a process that might possibly result in a commission payment, and (3) numerous hurdles to actual enrollment existed between a successful call and a commission—despite these undisputed facts, the Plaintiffs testified that they calculated their damages simply by finding the difference between their "sales" and the commissions they received.

For example, Ms. Valiente explained to the jury that in November 2020 she recorded 600 policies sold at $10 per policy, but Avant paid her only $2,800. Trial Tr. vol. 2, 135-36, Doc. 123-2. According to her calculations, she was owed $6,000, meaning she believed she was entitled to every call "sold." But that does not comport with the compensation plan's commission framework, which only pays commissions for active and enrolled customers—customers who completed the process and made payments. Compensation Plan, Trial Ex. 8, Doc. 116-2. Each Plaintiffs' testimony was similar in this exact regard—they calculated their damage based on their total sales record, subtracted from what they were paid. *See, e.g.*, Trial Tr. vol. 2, 155, Doc. 123-2 (Ms. Valiente explaining that her total commission claim arose from adding up "more or less" her sales record to "get an amount of the total amount of clients"); Trial Tr. vol 3, 40, Doc. 123-3 (Mr. Batista explaining that there was a discrepancy of 20 to 25% between "the sales that [he] had made and the [commission] statements that [he] received" and used the difference to calculate an amount owed); Trial Tr. vol. 3,

8

139, Doc. 123-3 (Mr. Alcala explaining that he calculated his damages "based on the sales that [he] did").

But, again, it was undisputed that not all successful calls would result in commission payments. Therefore, to produce an accurate measure of damages, the Plaintiffs would have had to produce some evidence showing they were not paid for customers that actually ended up enrolling in policies. No Plaintiff produced any such evidence.

Mr. Cortes suggested that if the Plaintiffs believed they were not being paid for sales they should have been paid for, they could have followed up on their calls to inquire whether enrollment was completed. Trial Tr. vol. 1, 99, Doc. 123-1. When asked about this by Plaintiffs' counsel, Ms. Alcala testified that she did not keep track of her customer's phone numbers on her own, so she was not able to compare her sales list with the commission statements she received to check which were not paid. Therefore, she was unable to discover "which one of the numbers or the sales was missing." Trial Tr. vol. 2, 80. Apparently none of the Plaintiff kept track of this information or followed up in this manner, because none of the Plaintiffs testified that they made any effort to verify which of their "sales" actually entitled them to a commission payment.

Therefore, the damages amounts for commissions are speculative and inflated, because each Plaintiff simply testified—incorrectly—that all of their "sales" should have resulted in commissions, instead of producing evidence as to which commissions they did not receive. *See, e.g.*, *Alvarez v. All Star Boxing, Inc.*, 258 So. 3d 508, 513

9

(Fla. 3d DCA 2018) (reversing damages verdict as speculative when it was based on expert opinion that made unsupported assumptions about profit splitting, reasoning that "no weight may be accorded an . . . opinion which is totally conclusory in nature and is unsupported by any discernible, factually based chain of underlying reasoning").

**Second**, the evidence at trial was conclusory and did not form a reasonable basis from which the jury could arrive at its own calculation of damages. None of the Plaintiffs provided any documentary evidence in the form of a list of sales that were improperly denied commissions. At best, like Ms. Valiente and Mr. Alcala, they simply provided a spreadsheet, or a portion of a spreadsheet, showing how many successful calls they had recorded or how much they believed they were owed—*in total*. Ms. Valiente's Photograph of Spreadsheet, Trial Ex. 1, Doc. 116-1; Mr. Alcala's Spreadsheet of Totals Due, Ex. 17, 1-2, Doc. 117-7, Doc. 117-8. At worst, like Ms. Alcala and Mr. Batista, they did not even provide such a spreadsheet, but instead simply testified as to a total amount of sales, with no explanation of how it was calculated—what number of Oscar policies, what number of Friday policies, and so on; which sales were paid, which were not. Instead, the Plaintiffs simply testified as to a number, without providing any underlying support.

This case is like *Instant One Media*, cited above.[1] In that case, the plaintiff attempted to prove lost profits, for breach of contract under Georgia law, and

---

[1] *Instant One Media, Inc. v. EzFauxDecor, LLC*, 22-11374, 2023 WL 2422196, at *2 (11th Cir. Mar. 9, 2023).

trademark infringement under federal law. In support of the damages amount, the plaintiff provided (i) business records for sales of certain months; (ii) testimony that sales of the trademarked products totaled $2.3 million of the period in question; (iii) testimony that expenses were $300,000 over the same period; and finally (iv) testimony that the plaintiffs had "calculated $562,368 in estimated losses" after subtracting certain expenses. *Id.* The plaintiff's key witness explained the plaintiff's methods of calculation, but the plaintiff did not provide documentary evidence of the calculations or the underlying data. *Id.* The trial court denied a motion for judgment as a matter of law. *Id.*

The Eleventh Circuit Court of Appeals reversed for reconsideration, ruling that the evidence adduced did not support lost-profit damages under either a breach of contract or trademark infringement theory. In reversing, the court reasoned that (1) the plaintiff needed to provide "information or data sufficient to enable [the trier of fact] to estimate the amount of the loss with reasonable certainty"; and that (2) "[c]onclusory testimony about the estimated amount of profits and generic comments on her calculation process do not provide a sufficient 'basis of computation' for a jury to determine actual damages under the Lanham Act." *Id.*; *see also Saewitz*, 79 So. 3d at 833-34 (like Georgia, Florida follows "reasonable certainty" standard for proving contractual damages).

Here, just like in *Instant One Media*, the Plaintiffs provided generic comments on their calculation methods and conclusory testimony as to total amounts of damages without providing the jury any evidence or data from which the jury could

11

come to its own independent conclusion about the proper amount of damages. As in *Instant One Media*, the Plaintiffs' lack of underlying data left the jury with an insufficient basis of computation for the jury to determine damages amounts.

This case is also like *CE N. Am., LLC v. Certain Underwriters at Lloyds', London Subscribing to Policy No. B0799MC036620J*, 20-20446-CIV, 2023 WL 2714024, at *7 (S.D. Fla. Mar. 30, 2023), where, in attempting to overcome a motion for summary judgment on their claim for breach of an insurance policy, the Plaintiffs produced a spreadsheet of their claimed losses from by an affiant witness. *Id*. The trial court rejected the evidence as conclusory because the affiant:

> fails to state how the quantity and price figures displayed in the hundreds of entries were calculated; he fails to explain how he carried out the inventory counts; he omits any discussion regarding the original locations of the alleged inventory losses; and, more importantly, he completely fails to address the existence or whereabouts of the underlying documentation used to compile the spreadsheets.

*Id.*

Here, just like in *CE*, Plaintiffs have testified or produced conclusory evidence that fails to explain how the total damages were calculated. There is no spreadsheet or other documentary evidence of successful calls (Plaintiffs' "sales") showing, for each call: (1) an identifiable individual (for example a name, phone number, or last four digits of social); (2) the insurance provider selected, (3) the commission amount that would be due, and (4) confirmation that the individual actually enrolled in a policy and then went on to activate it (i.e. pay the first premium).

Without this information, there is no way to tell what amount was properly due to each Plaintiff, so that amount could be compared with the amount that was paid. The Plaintiffs' conclusory testimony was as a matter of law insufficient to support a damages award for commissions owed. *See, e.g.*, *Shumate & Co., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 509 F.2d 147, 153 (5th Cir. 1975) ("The only evidence Shumate presented regarding his damages at trial was his own testimony, unsupported by any relevant data."); *cf. Perez v. Gulf Coast Mgmt. Co., LLC*, CIV.A. 14-00426-N, 2015 WL 895098, at *6–7 (S.D. Ala. Mar. 3, 2015) ("Rather than merely telling the Court in summary fashion what its damages are, a plaintiff seeking default judgment must show the Court what those damages are, how they are calculated, and where they come from . . . ."); *Go Mobile Flooring, LLC v. Blue Banyan Sols., Inc.*, 8:20-CV-3098-CEH-JSS, 2023 WL 2610156, at *4 (M.D. Fla. Mar. 23, 2023) (pre-trial damages disclosure Rule 26 "by its very terms . . . requires a computation, supported by documents").

**Third**, at least two Plaintiffs simply conceded that their damages calculations were approximations. For example, Ms. Valiente testified that she added up "more or less" her total sales to get "an amount of the total amount of clients," then estimated that she should have been paid $9,000 per month instead of $7,000 for 2021. Trial Tr. vol. 2, 155. For 2022, she testified that she was paid "around $8,000 per month," but it should have been "[a]round $10,000" per month. Trial Tr. vol. 2, 158-59. She provided no explanation how she came to these figures, other than by totaling her own record of successful calls. Next, Mr. Batista testified that he should have made

13

"[a]pproximately $6,000" per month instead of what he was actually paid, "because of the discrepancy" between his sales and commissions. Trial Tr. vol. 3, 40. He believed that there was "around 20, 25 percent" of his commissions missing. Trial Tr. vol. 3, 45. When asked whether the commission statements from Avant were accurate, he replied, "I don't think so." Trial Tr. vol. 3, 45. When asked how much he "estimate[d]" he was owed, he replied, "What I estimate is $91,056.24." Trial Tr. vol. 3, 52.

This testimony does not satisfy Florida's "reasonable certainty" standard for proof of damages for breach of contract, which requires that a plaintiff seeking damages "present evidence to *justify* an award of damages in a definite amount." *Smith v. Austin Dev. Co.*, 538 So. 2d 128, 129 (Fla. 2d DCA 1989) (emphasis added). This also does not comport with Florida's bar on speculative or estimated damages. *See, e.g.*, *Saewitz*, 79 So. 3d at 833 ("The amount of damages claimed . . . must not be based upon speculation or guesswork.").

**Fourth**, the same problems that are inherent in the flawed calculations of commissions also prevented the jury from being able to accurately gauge whether bonuses were owed. The evidence showed between a 20% and 53% difference between "sales" and commissions. Trial Tr. vol. 2, 135-36 (Ms. Valiente testifying that in the 2020 enrollment period she "sold" 600 policies but received commissions for only 280 policies); Trial Tr. vol. 3, 45 (Mr. Batista testifying that he discovered a 20-25% difference between his "sales" and his commissions). As Katrina Guerra testified, while the agents celebrated when they hit 600 sales of Oscar, agents still "knew you

had to hit a lot higher than that because things happen." Trial Tr. vol. 4, 35. She explained, "[T]hings falls off the books . . . . So although [hitting 600] was kind of exciting, we had to do a lot more in order to go ahead and actually have the 600." Trial Tr. vol. 4, 35.

That means for each Plaintiff, it would not be enough to simply testify that they began the process of enrolling 600 or 700 or even 1,000 Oscar policies to entitle them to the $25,000 bonus. They had to show that 600 policies ended up being active and paid. But the Plaintiffs conceded that they made no attempt to discover whether any individual policy ended up being enrolled and active. Thus, for example, Ms. Valiente claims she sold around 1,000 Oscar policies. But she was admittedly unable to prove what percentage of those "sales" ended up actually enrolling and then activating. Determining that more than 60% of the clients enrolled and then activated would require the jury to speculate. The problem is even more difficult in the cases of Mr. Batista and Mr. Alcala. Mr. Batista claims he sold 680 or 690 Oscar policies, which means that if even 13% of his "sales" did not result in actual enrollments, he was not entitled to the $25,000 bonus. Trial Tr. vol. 3, 50. Mr. Batista provided no evidence or testimony that more than 87% of his "sales" should have resulted in actual commissions. For his part, Mr. Alcala testified that he sold around 840 Oscar policies. Trial Tr. vol. 3, 119. That means that if 29% of Mr. Alcala's Oscar clients did not finalize, then Mr. Alcala was not entitled to the $25,000 bonus either.

The only way the jury could have determined that Ms. Valiente, Mr. Batista, and Mr. Alcala were owed the $25,000 Oscar bonus would by determining that the

parties' Oscar sales were more than 40%, 13%, and 29% successful in producing clients who actually completed the enrollment process and proceeded to activate their policies. But no evidence was presented to the jury that would have allowed them to make this determination. The evidence of bonus entitlement, and therefore the awards for bonuses, was impermissibly speculative.

C. <u>The Jury's Verdict Is Excessive</u>

Defendant also seeks a remittitur on the ground that the damages are excessive. State law governs whether the breach of contract verdict is excessive, while federal law governs whether a new trial or remittitur should be granted. *Roboserve, Ltd. v. Tom's Foods, Inc.*, 940 F.2d 1441, 1446 (11th Cir. 1991). Under Florida Statutes section 768.74, upon a motion this Court is tasked with determining whether the verdict "is excessive or inadequate in light of the facts and circumstances which were presented to the trier of fact." In determining whether the verdict is excessive, this Court should consider:

> (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
>
> (b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
>
> (c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;
>
> (d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and

>    (e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

§ 768.74(5), Fla. Stat. (2023). When deciding whether to grant a new trial based on an excessive verdict, the verdict must be so grossly high as to shock the conscience of the Court. *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1447 (11th Cir. 1985).

Here, the verdict is grossly disproportionate to the amount proved at trial. For the reasons explained above, Plaintiffs' evidence was both speculative under section 768.74(5)(c) and bore no reasonable relation to the amount proved under subsection (5)(d). Specifically, the damages were speculative, because they were based on flawed methodologies, conclusory testimony, and unfounded assumptions described above. The evidence bears no reasonable relation to the amount proved for the same reasons—the Plaintiffs failed to prove they were owed any commissions, because they provided no evidence of specific "sales" that should have resulted in commissions but did not. And the Plaintiffs failed to prove they were owed any bonuses, because they provided no evidence that they achieved not just 600 "sales," but 600 Oscar enrollments and activations. Therefore, the jury's verdict should be reduced. Because Plaintiffs provided only speculative, conclusory, or methodologically flawed evidence—for both bonuses and commissions—the verdict should be reduced to zero.

## CONCLUSION

Defendant, Avant Assurance, Inc., respectfully requests that this Court reduce the jury's verdict to $0.00—which reflects the amount of non-speculative and non-

conclusory contractual-damages evidence presented at trial—or in the alternative, that this Court order a new trial.

### LOCAL RULE 7.1(a)(3) CERTIFICATE OF CONFERENCE

Counsel for Defendant certifies that, in accordance with S.D. Fla. L.R. 7.1(a)(3), he conferred with counsel for Plaintiffs on August 10, 2023, via electronic correspondence, in a good faith effort to resolve the issues raised in the instant Motion. Plaintiffs stated that they oppose the motion for new trial or remittitur.

Respectfully submitted,

/s/ Samuel Alexander
Samuel Alexander
Fla Bar No. 1007757
Alexander Appellate Law P.A.
120 S Woodland Blvd Suite 200
DeLand, Florida 32720
(689) 259-5010
samuel@alexanderappeals.com
*Counsel for Defendant*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 21, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Samuel Alexander
Samuel Alexander